**EXHIBIT D**





**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GERALD MANOWITZ, as trustee of the Annette Clair Manowitz revocable trust, on behalf of itself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **TRIAL BY JURY DEMANDED** |
| OPTIONABLE INC., KEVIN CASSIDY, EDWARD J. O' CONNER, and MARK NORDLICHT, | |
| Defendants | |

07 CIV. 3884

Plaintiff alleges the following for his Complaint in the above-captioned matter. Plaintiff so alleges individually and on behalf of all persons and entities (the "Class") who purchased the common stock of Optionable Inc. ("Optionable" or the "Company"), between May 6, 2005 through May 11, 2007, inclusive (the "Class Period"). The allegations contained herein are made upon information and belief, except as to the allegations about Plaintiff and his counsel, which are made upon personal knowledge. Plaintiff's information and belief is based, among other things, on investigations made by and through his attorneys. Such investigation included, but has not been limited to, the review and analysis of (a) filings made by Optionable with the United States Securities and Exchange Commission (the "SEC"); (b) press releases issued by the Company; (c) newspaper, magazine, and other periodical articles relating to Optionable and the allegations contained therein; and (d) other matters of public record.

## I.    NATURE OF THE ACTION

1.    This is a class action on behalf of all purchasers of the common stock of Optionable during the Class Period, seeking to pursue remedies under the federal securities laws.

2.  Optionable purports to be a provider of natural gas and other energy derivatives trading and brokerage services.

3.  Throughout the Class Period, Optionable issued false statements and made material omissions regarding its business fundamentals and financial results. While touting its continued success, Defendants failed to disclose the enormous dependence it had on its largest client, the Bank of Montreal ("BMO"), and that Optionable improperly concealed material losses incurred by BMO in connection with trades BMO transacted through Optionable.

4.  On April 27, 2007, BMO disclosed that it had lost between $300 to $400 million in trades executed through Optionable. On that day, the price of Optionable stock declined from a previous day closing price of $8.29 per share, to a closing price of $5.56 per share, a single day decline of $2.73 per share or 33% on heavier than usual volume.

5.  On May 2, 2007, Defendant Mark Nordlicht ("Nordlicht"), who served as Chairman and Director during the Class Period, resigned from both positions. On May 2, 2007, Optionable shares declined from a price of $5.34 per share at the close of trading on May 1, 2007, to close at $4.82 per share at the close of trading on May 2, 2007, a decline of $0.52 per share or approximately 10%.

6.  On May 8, 2007, after the close of trading, BMO announced that it was "suspending all of its business relationships" with Optionable and "all derivatives trading through that firm, pending the results of a full external review which is ongoing." BOM also announced that two of its commodity trading professionals were on leave pending the results of the external review.

7.  On May 9, 2007, Optionable shares declined from a close on May 8, 2007 of $4.64 per share to close at $2.61 per share on May 9, 2007, a decline of $1.83 per share or approximately 39% on heavier than usual volume.

2

8.      On May 10, 2007, it was disclosed that Deloitte & Touche LLP ("Deloitte") had conducted an audit of, and prepared a report in connection with, the trades BMO had conducted with Optionable. According to *Bloomberg,* the Deloitte report stated that there had been "serious mismarkings" of natural gas options and that the "auditors had never seen such a wide discrepancy between the pricing in the bank's portfolio and their market value." On May 10, 2007, Optionable shares declined from a close on May 9, 2007 of $2.81 per share, to close at $0.84 per share, a decline of $1.96 per share or approximately 70%.

9.      On May 14, 2007, Optionable disclosed the "resignation" of its Vice Chairman, CEO and Director, Defendant Kevin Cassidy ("Cassidy"). It was also disclosed that the New York Mercantile Exchange, which acquired a 19% stake in the Company on April 19, 2007, was concerned about recent developments at Optionable and was quitting its seat on the board of the Company.

10.     On May 14, 2007, Optionable shares declined from a close of $1.01 per share on May 11, 2007, to close at $0.42 per share on May 14, 2007, a decline of 58% on heavier than usual volume.

11.     During the Class Period, Defendants sold artificially inflated stock for proceeds of over $28 million.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to: (a) Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and (b) 28 U.S.C. §§ 1331 and 1337.

13.     This action arises under and pursuant to: (a) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); (b) Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (c) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

14.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa.

### III.    PARTIES

15.    Plaintiff purchased Optionable common stock during the Class Period, as set forth

in the attached Certification, and was damaged thereby.

16.    Defendant Optionable is a corporation organized under the laws of the state of

Delaware. It maintains its principal place of business at 465 Columbus Avenue, Valhalla, NY

10595.

17.    Defendant Cassidy served as Optionable's Chief Executive Officer, Vice Chairman

and Director during the Class Period. Cassidy sold 1,905,000 artificially inflated Optionable

shares for proceeds of approximately $5.1 million.

18.    Defendant Edward J. O'Connor ("O'Connor") served as the Company's President

and Director during the Class Period. Defendant O' Conner sold 1,853,886 artificially inflated

Optionable shares for proceeds of approximately $5 million.

19.    Defendant Nordlicht served as Chairman and Director during the Class Period.

Defendant Nordlicht sold 7 million artificially inflated Optionable shares for proceeds of

approximately $18.8 million.

20.    Defendants referred to in paragraphs 17-19 are referred to herein as the "Individual

Defendants."

### IV.    CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a) and 23(b)(3) on behalf of a class of all persons who purchased the common

stock of Optionable during the period from May 6, 2005 through May 11, 2007, inclusive (the

"Class").

4

22.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at the present time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members of the Class located throughout the United States. Throughout the Class Period, Optionable had over 52 million shares of common stock issued and outstanding, which were actively traded in an efficient market.

23.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein. Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by plaintiff. Plaintiff has no interests which are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

24.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

25.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

    (b)    whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

    (c)    whether defendants participated directly or indirectly in the course of conduct complained of herein; and

5

(d)    whether the members of the Class have sustained damages and the proper measure of such damages.

## V.    FALSE STATEMENTS AND MATERIAL OMISSIONS

26.    In a Registration Statement and Prospectus (collectively, the "Registration Statement") issued in connection with its May 6, 2005 initial public offering of 31,431,026 shares at $0.20 per share, which was signed by Defendants O'Conner and Nordlicht, Optionable made the following representation concerning the Bank of Montreal: "One of our customers, Bank of Montreal, accounted for approximately 10% of our revenues during 2004. Two of our customers, Bank of Montreal and Coral Energy Holding, L.P., accounted for approximately 17% and 10%, respectively, of our revenues during 2003."

27.    On March 15, 2006, Optionable filed annual report for the year ended December 31, 2005 with the SEC on Form 10-K. The annual report, which was signed by Defendants Nordlicht, Cassidy and O'Conner, represented that the Bank of Montreal accounted for 18% of its revenues during 2005.

28.    On July 25, 2006, the Company issued a press release stating in part:

Optionable Reports Record Results and Strong Growth for Second Quarter 2006

BRIARCLIFF MANOR, N.Y., July 25 /PRNewswire-FirstCall/ -- Optionable, Inc. (OTC Bulletin Board: OPBL), a rapidly growing provider of natural gas and other energy derivatives brokerage services, today announced record results from operations for the quarter ended June 30, 2006 . . .

"We are pleased to be able to report continued strong year over year growth in the volume of options traded along with the growing demand for our brokerage services," said Kevin Cassidy, chief executive officer of Optionable. "We continued to see strong demand for natural gas contracts even as we moved out of the traditional peak demand during the winter heating months in the northeast. Our continued growth reflects our ability to execute trades in a demanding market and provide our customers with broad access to counterparties."

29.    On October 26, 2006, the Company issued a press release which stated in part:

Optionable Inc. Reports Record Results for the 2006 Third Quarter, First Nine Months

6

BRIARCLIFF MANOR, N.Y., Oct. 25 /PRNewswire-FirstCall/ -- Optionable, Inc (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced today record results from operations for its third quarter and nine months ended September 30, 2006, posting strong gains in revenue, net income and EPS . . . .

CEO Kevin Cassidy commented, "It is clear from the recent news headlines that there is increased interest in derivatives trading. And we feel that the best is yet to come for Optionable. Our record results for the third quarter have primarily been achieved through traditional means of service of delivery, voice-brokerage and open outcry. Our electronic platform, OPEX, which we recently introduced, will gain adherents in the energy commodities markets and, ultimately, with other commodities markets. The latest addition to our services offering, OPEXAnalytics, enables us to offer a broader variety of solutions to satisfy our clients' needs. We certainly would not be where we are without providing consistent, timely, and outstanding quality services to our clients. "

30.    On February 6, 2007, the Company issued a press release announcing its 2006

Fourth Quarter and Full Year results. It stated in part:

Optionable Reports Record Results for the 2006 Fourth Quarter and Full Year Revenue and Net Income Increase to All Time Highs

VALHALLA, N.Y., Feb. 6 /PRNewswire-FirstCall/ -- Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced today record results for its fourth quarter and year ended December 31, 2006. . . .

Commenting on the results, Optionable CEO Kevin Cassidy said, "2006 was a benchmark year for us, with the launch of our electronic trading platform, OPEX(R), as well as our Analytics service. We're particularly happy with these results as they are due almost entirely to our customers' positive response to the innovative and impeccable service we delivered to them. These results also demonstrate a very healthy and largely untapped market for our derivative brokerage services.

31.    On March 9, 2007, the Company issued a press release announcing further growth

in its business. It stated in part:

Optionable Announces Trading of Swap Contracts on OPEX(R)

VALHALLA, N.Y., March 9 /PRNewswire-FirstCall/ -- Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives

7

brokerage services, announced the availability of seven new swap contracts on its OPEX platform.

Optionable President Edward O'Connor said, "We believe that the addition of the swap contracts is a logical extension and outgrowth of our trading services business. We are continuously executing our strategy and diversifying our product line to help our clients maximize the opportunities in the market. By adding the swaps contracts to our platform, it will allow our customers a wider variety of trading products and provide greater volume of trading.

32.    On March 23, 2007, Optionable filed its annual report with the SEC on Form 10-K. The annual report, signed by Defendants Nordlicht, Cassidy and O'Conner, represented that the Bank of Montreal accounted for 24% of its revenues during 2006.

33.    The statements above were materially false and misleading because Defendants failed to disclose the material dependence it had on its largest client, the Bank of Montreal and that Optionable improperly concealed material losses incurred by BMO in connection with trades BMO transacted through Optionable.

## VI.    THE TRUTH BEGINS TO BE REVEALED

34.    On April 27, 2007, the Bank of Montreal ("BMO") disclosed that it had lost between $300 to $400 million in trades executed through Optionable. On that day, the price of Optionable stock declined from a previous day closing price of $8.29 to a closing price of $5.56, a single day decline of $2.73 per shre or 33%.

35.    On April 30, 2007, Mark DeCambre, writing for *TheStreet. com*, explained that as a practical matter, based on fees received by BMO and others related directly to the deals for which Optionable served as BMO's broker, BMO accounted for 86% of Optionable's brokerage fees.

36.    Notwithstanding the material losses incurred by a substantial client of Optionable's, Defendants continued to paint a rosy picture about the current status and outlook of the Company, and its seriously deteriorating relationship with BMO. On a conference call with

8

investors on May 1, 2007, Defendant Cassidy stated that "[w]e [Optionable] still have all of our

customers. They said they are going to stay in the business. They probably have more

supervisory around the risk right now." According to a Bloomberg article about this conference

call,

> There's no indication from the Toronto-based bank [BOM] that it will be doing
> less business with the Valhalla, New York-based brokerage, Chief Executive
> Officer Kevin Cassidy said today in a conference call.

It was also revealed on this conference call that BMO accounted for $2.7 million of Optionable's

$9.1 million of revenue in that quarter.

37.    On May 1, 2007, Defendant Nordlicht resigned.

38.    On May 9, 2007, the Company issued the following statement:

> VALHALLA, NY (May 9, 2007) .... Optionable Inc, (OTCBB: OPBL), a leading
> provider of natural gas and other energy derivatives brokerage services, said today
> that one of its clients recently incurred some losses that have become a subject of
> public discussion. Albert Helmig, Optionable Chairman, said, "Gains and losses are
> both inevitable in trading energy derivatives. We are never pleased when losses
> dominate for one of our clients, but we do not design or help to design their
> strategies, nor are we financial advisors. We provide brokerage and execution
> services for trades that we are instructed to make by our clients. We believe strongly
> that our brokerage and execution services are and have been rendered appropriately,
> professionally and correctly."

39.    Finally, on May 10, 2007, it was disclosed that Deloitte & Touche LLP had

conducted an audit of, and prepared a report in connection with, the trades BMO had conducted

with Optionable. BMO had engaged Deloitte in early February to conduct the audit and received

the final report in late April.

40.    According to the report, Deloitte found there had been "serious mismarking of the

book of natural-gas options," and that it had "never seen such a wide discrepancy in terms of

pricing" between the values marked in BMO's portfolio of natural-gas options and their market

value. According to news reports, the Deloitte report indicated that some of the prices used in BMO's mismarked book of trades were provided by Optionable.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

41.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Optionable's stock price and operated as a fraud or deceit on Class Period purchasers of Optionable common stock by misrepresenting the Company's operating condition and future business prospects. Defendants achieved this by making positive statements about Optionable business and projecting strong earnings for the Company while they knew that the Company was suffering from a variety of adverse factors which were then negatively impacting its financial results, as detailed herein. Later, however, when defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Optionable stock fell precipitously as the prior artificial inflation came out of Optionable's stock price. As a result of their purchases of Optionable common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## VIII.    FRAUD-ON-THE-MARKET DOCTRINE

42.    At all relevant times, the market for Optionable common stock was an efficient market for the following reasons, among others:

(a)    The Company's common stock was actively traded in an efficient market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC; and

(c)    The Company regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

10

43.     As a result, the market for the Company's common stock promptly digested current information with respect to Optionable from all publicly available sources and reflected such information in the price of the Company's common stock. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the common stock of Optionable at artificially inflated prices and a presumption of reliance applies.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

44.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Optionable, their control over, and/or receipt and/or modification of Optionable's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Optionable, participated in the fraudulent scheme alleged herein.

45.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants, who sold Optionable shares at artificially prices for proceeds of over $28 million.

11

46.    Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Optionable, issued statements and press releases on behalf of Optionable and had the opportunity to commit the fraud alleged herein.

## X.    NO SAFE HARBOR

47.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Optionable who knew that those statements were false when made.

## FIRST CLAIM FOR RELIEF

### For Violation of Section 10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

48.    Plaintiff incorporates ¶¶1-47 by reference.

49.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts

12

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

i.     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

ii.     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Optionable common stock during the Class Period.

51.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Optionable's common stock. Plaintiff and the Class would not have purchased Optionable common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

52.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Optionable common stock during the Class Period.

<u>**SECOND CLAIM FOR RELIEF**</u>

**For Violation of Section 20(a) of the 1934 Act**

**Against the Individual Defendants**

53.     Plaintiff incorporates ¶¶1-47 by reference.

54.     The Individual Defendants acted as a controlling person of Optionable within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

55.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

56.    As set forth above, Optionable and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Optionable's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

14

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 17, 2007                    Respectfully submitted,

                                       KAPLAN FOX & KILSHEIMER LLP

                                       By:_____
                                              Donald R. Hall

                                       Frederic S. Fox (FF-9102)
                                       Donald R. Hall (DH-0273)
                                       Jeffrey P. Campisi (JC-7264)
                                       805 Third Avenue, 22nd Floor
                                       New York, NY 10022
                                       Telephone:  (212) 687-1980
                                       Facsimile:  (212) 687-7714

                                              -and-

                                       WITES & KAPETAN, P.A.
                                       Marc A. Wites
                                       4400 North Federal Highway
                                       Lighthouse Point, FL 33064
                                       (954) 570-8989
                                       954-354-0205 (fax)

                                       *Attorneys for Plaintiff*

15

**EXHIBIT E**

Yahoo!  My Yahoo!  Mail                              Search: [                                    ]    **Web Search**

**YAHOO!** FINANCE     **Sign In**          Finance Home - Help                    marketwire
                       New User? Sign Up

**Welcome [Sign In]**                                          To track stocks & more, Register

**Financial News**

            Enter symbol(s) [                ]  [Basic      ▼] [Get]  Symbol Lookup

**Press Release**                                         Source: Kahn Gauthier Swick, LLC

# INVESTOR ALERT: KGS Announces Initial Filing of Shareholder Class Action Lawsuit Against Optionable, Inc.

Friday May 11, 11:45 pm ET

NEW ORLEANS, LA--(MARKET WIRE)--May 11, 2007 -- Kahn Gauthier Swick, LLC ("KGS") has filed the first class action lawsuit against Optionable, Inc. ("Optionable" or the "Company") (OTC BB:OPBL.OB - News), in the United States District Court for the Southern District of New York, Civil Action No. 07cv3753, on behalf of shareholders who purchased shares of the Company in connection with its Initial Public Offering ("IPO") in or about May 9, 2005, or who purchased shares thereafter in the open market (the "Class Period"). No class has yet been certified in this action.

UNTIL A CLASS IS CERTIFIED, YOU ARE NOT PERSONALLY REPRESENTED BY COUNSEL UNLESS YOU RETAIN AN ATTORNEY.

Optionable and certain of its officers and directors are charged with including, or allowing the inclusion of, materially false and misleading statements in the Registration Statement and Prospectus issued in connection with the IPO, in violation of the Securities Act of 1933.

The Complaint alleges that, unbeknownst to investors, defendants failed to conduct an adequate due diligence investigation into the Company prior to the IPO, and failed to disclose at the time of the IPO that: (1) two of the Company's board members, including Chairman Mark Nordlicht, and its only purported independent director, Albert Helmig, were actually related parties and board members of a company called Platinum Energy; (2) the Company's customer base suffered from greater concentration than previously reported, with Bank of Montreal directly connected to over 80% of revenues, higher than the 20% to 30% reported; and (3) defendants had conspired with Bank of Montreal ("BMO") brokers to provide false trade data that was designed to avoid reporting hundreds of millions of dollars in trading losses -- losses that, if disclosed, would have terminated the BMO trading relationship.

It was only beginning in late April 2007 -- after defendants sold $28.94 million of their own shares to NYMEX Holdings in a private sale -- that investors learned the truth about the Company. On April 30, 2007, BMO's announcement of over $300 million in options-related losses shed light on the magnitude of Optionable's reliance on BMO for a large portion of its revenues. Days later on May 10, 2007, BMO suspended trading through Optionable and announced that its private forensic accountants had discovered that its own brokers -- who by then had been terminated -- had conspired to under-report trading losses, in order to maintain trading and avoid accountability to BMO.

On this news, Optionable's shares collapsed from just under $5.00 per share on April 30, 2007 to just over $1.00 per share on May 10, 2007 -- a decline of almost 80% in two trading days, on huge volume of tens of millions of shares.

If you wish to serve as lead plaintiff in this case, you must move the Court no later than July 10, 2007. Any member of the purported class may move the Court to serve as lead plaintiff through counsel of their choice, or may choose to do nothing and remain an absent class member. If you would like to discuss your legal rights, you may e-mail or call KGS, without obligation or cost to you. You may contact Managing Partner Lewis Kahn of KGS direct, toll free 1-866-467-1400, ext. 100, or by email at lewis.kahn@kgscounsel.com. To learn more about this case or KGS, you may visit www.kgscounsel.com.

SPECIAL NOTICE: While federal law does not prohibit other lawyers from "announcing" this class action through the issuance of other press releases, KGS is the law firm that researched, investigated, drafted and filed the securities fraud case against Optionable. If you are an Optionable shareholder who decides to contact one of these lawyers, KGS reminds you to fully interview

any such lawyer to assure that they thoroughly understand the facts surrounding the substantive claims KGS has filed in Court. It is critically important that interested parties carefully evaluate any other firm that may be competing with KGS to prosecute the Optionable class action. Critical components of a law firm's ability to successfully prosecute this action and obtain a strong recovery for you include its knowledge of applicable federal securities laws, the resources it will dedicate to prosecution of the case, including the number of lawyers the firm has available for the Optionable class action, AND especially the quality of the firm's work.

*Contact:*

```
Contact:

Lewis Kahn
KGS
1-866-467-1400, ext. 100
email: lewis.kahn@kgscounsel.com
```

---

Source: Kahn Gauthier Swick, LLC

Copyright © 2007 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Ad Feedback
Copyright © 2007 Marketwire. All rights reserved. All the news releases provided by Marketwire are copyrighted. Any forms of copying other than an individual user's personal reference without express written permission is prohibited. Further distribution of these materials is strictly forbidden, including but not limited to, posting, emailing, faxing, archiving in a public database, redistributing via a computer network or in a printed form.

**EXHIBIT F**



Kaplan Fox & Kilsheimer LLP
805 Third Avenue, 22nd Floor
New York, New York 10022
phone 212.687.1980
fax    212.687.7714
email  mail@kaplanfox.com
www.kaplanfox.com

### KAPLAN FOX & KILSHEIMER LLP
### FIRM AND ATTORNEYS BIOGRAPHIES

Kaplan Fox & Kilsheimer LLP is a firm engaged in the general practice of law with an emphasis on complex securities, antitrust and consumer class action litigation as well as other general commercial litigation. The firm has actively participated in numerous complex class actions throughout the country for the past three decades. It is presently active in major litigations pending in federal and state courts throughout the country including courts in California, New York, Massachusetts, Delaware, Florida, Illinois, Indiana and Georgia.

Members of the firm have served as lead or co-lead counsel, as executive committee member or as liaison counsel, and made significant contributions in many complex class and other multi-party actions in which substantial recoveries were obtained, including the following:

### SECURITIES:

**In re 3Com Securities Litigation**
C-97-21083-EAI (N.D.Ca) ($259 million recovered)

**In re MicroStrategy Securities Litigation**
CV-00-473-A (E.D.Va) ($155 million recovered)

**In re Informix Securities Litigation**
C-97-129-CRB (N.D.Ca) ($136.5 million recovered)

**In re Elan Corporation Securities Litigation**
02-CV-0865-RMB (S.D.N.Y.) ($75 million recovered)

**In re Xcel Energy, Inc. Securities Litigation,**
Master File No. 02-CV-2677-DSD (D.Mn) ($80 million recovered)

**In re L.A. Gear Securities Litigations**
CV-90-2832-KN(Bx); CV-91-0400-KN(Bx); CV-91-4039-MRP(Jrx)
(C.D.Ca.) ($50 million plus recovered)

**Rosen, et al. v. Macromedia, Inc., et al.**
No. 988526  (Sup. Ct. Ca.) ($48 million recovered)


**In re Ames Department Stores Securities Litigation**
MDL No. 924 (S.D.N.Y.) ($46 million recovered)

**In re Genentech, Inc. Securities Litigation**
C-88-4038-DLJ (N.D.Ca.) ($29 million recovered)

**In re Tele-Communications, Inc. Securities Litigation**
C-97-421(C.D.Ca.) ($26.5 million recovered)

**In re Sun Healthcare Group, Inc. Litigation**
C-95-7005-JC/WWD (D.N.M.) ($24 million recovered)

**In re PepsiCo Securities Litigation**
82 Civ. 8288 (S.D.N.Y.) ($21 million recovered)

**In re Centennial Technologies Litigation**
97-10304-REK (D. Mass.) ($21.5 million recovered and other consideration)

**Kensington Capital Management v. Oakley, Inc., et. al.**
SACV97-808 GLT (Eex) (C.D.Ca) ($17.5 million recovered)

**In re Computer Memories Securities Litigation**
C-85-2335 (A)-EFL (N.D.Ca.) ($15.5 million recovered)

**Scheatzle, et al. v. Eubanks, et al.**
C-92-20785-JW(EAI) (N.D.Ca.) ($18.6 million recovered)

**In re Computer Memories Securities Litigation,**
C-85-2335 (A)-EFL (N.D.Ca.) ($15.5 million recovered)

**In re Wyse Technology Securities Litigation,**
C-89-1818-WHO (N.D.Ca.) ($15.5 million recovered)

**Provenz v. Miller, et al.**
C-92-20159-RMW (N.D.Ca.) ($15 million recovered)

**In re Gupta Corporation Securities Litigation**
C-94-1517-FMS (N.D.Ca.) ($14.25 million recovered)

**In re MicroPro Securities Litigation**
C-85-7428-EFL (N.D.Ca.) ($14 million recovered)

**In re Immunex Securities Litigation**
C-92-48 WD (W.D.Wa.) ($14 million recovered)

**Barry Hallet, Jr. v. Li & Fung, Ltd., et al.**

2

95 Civ. 8917 (S.D.N.Y.) ($13.65 million recovered)

**Stuart Markus v. The North Face, Inc., et al.**
No. 97-Z-473 (D.Co) ($12.5 million recovered)

**In re Salomon Analyst Williams Litigation**
C-02-8156-GEL (S.D.N.Y.) ($12.5 million recovered)

**Mel Klein v. Laura L. King, et al.**
C-88-3141-FMS (N.D.Ca.) ($11.65 million recovered)

**Igor Cheredrichenko, et al. v. Quarterdeck Corp., et al.**
Case No. 97-4320 (GHK) (C.D. Ca.) ($11 million recovered)

**In re Cheyenne Software, Inc. Securities Litigation**
94 Civ. 2771 (E.D.N.Y.) ($10.25 million recovered)

## ATTORNEY BIOGRAPHIES

### PARTNERS

**ROBERT N. KAPLAN**   Widely recognized as a leading securities litigator, Robert Kaplan has led the prosecution of numerous securities fraud class actions and shareholder derivative actions, recovering hundreds of millions of dollars for the victims of corporate wrongdoing.  He also has earned a reputation as a leading litigator in the antitrust and consumer protection arenas.  Mr. Kaplan has been with Kaplan Fox for 30 years, joining in 1971.

Mr. Kaplan honed his litigation skills as a trial attorney with the U.S. Department of Justice. There, he gained significant experience litigating both civil and criminal actions.  He also served as law clerk to the Hon. Sylvester J. Ryan, then chief judge of the U.S. District Court for the Southern District of New York.

Mr. Kaplan's published articles include: "Complaint and Discovery In Securities Cases," *Trial,* April 1987; "Franchise Statutes and Rules," *Westchester Bar Topics,* Winter 1983; "Roots Under Attack: *Alexander v. Haley* and *Courlander v. Haley,*" *Communications and the Law,* July 1979; and "Israeli Antitrust Policy and Practice," *Record of the Association of the Bar,* May 1971.

In addition, Mr. Kaplan served as an acting judge of the City Court for the City of Rye, N.Y. from 1990 to 1993.

Mr. Kaplan sits on the boards of several community organizations, including the Board of Directors of the Carver Center in Port Chester, N.Y. and the Board of Directors of the Rye Free Reading Room in Rye, N.Y.

**Education:**
- B.A., Williams College (1961)
- J.D., Columbia University Law School (1964)

**Bar affiliations and court admissions:**
- Bar of the State of New York (1964)
- U.S. Supreme Court
- U.S. Courts of Appeals for the Second, Third, Seventh, Ninth, and Eleventh Circuits
- U.S. District Courts for the Southern, Eastern, and Northern Districts of New York, the Central District of Illinois, and the District of Arizona

**Professional affiliations:**
- National Association of Securities and Commercial Law Attorneys (past President)
- Committee to Support the Antitrust Laws (past President)
- Advisory Group of the U.S. District Court for the Eastern District of New York
- American Bar Association
- Association of Trial Lawyers of America (Chairman, Commercial Litigation Section, 1985-86)
- Association of the Bar of the City of New York (served on the Trade Regulation Committee; Committee on Federal Courts)

*Mr. Kaplan can be reached by email at RKaplan@kaplanfox.com.*

**FREDERIC S. FOX**  Fred Fox first associated with Kaplan Fox in 1984, and became a partner in the firm in 1991.  He has concentrated his work in the area of securities fraud litigation. Mr. Fox has played important roles in many major securities fraud cases.  He was one of the lead trial lawyers in two recent securities class actions, one of which was the first case tried to verdict under the Private Securities Litigation Reform Act of 1995.

Mr. Fox is the author of "Current Issues and Strategies in Discovery in Securities Litigation," ATLA, 1989 Reference Material; "Securities Litigation: Updates and Strategies," ATLA, 1990 Reference Material; and "Contributory Trademark Infringement: The Legal Standard after *Inwood Laboratories, Inc. v. Ives Laboratories,*" University of Bridgeport Law Review, Vol. 4, No. 2.

During law school, Mr. Fox was the notes and comments editor of the University of Bridgeport Law Review.

**Education:**
- B.A., Queens College (1981)
- J.D., Bridgeport School of Law (1984)

**Bar affiliations and court admissions:**
- Bar of the State of New York (1985)
- U.S. Courts of Appeals for the Fourth, Fifth, and Sixth Circuits
- U.S. District Courts for the Southern and Eastern Districts of New York
- U.S. Court of Appeals for the Second Circuit

**Professional affiliations:**
- American Bar Association
- Association of the Bar of the City of New York
- Association of Trial Lawyers of America  (Chairman, Commercial Law Section, 1991-92)

*Mr. Fox can be reached by email at FFox@kaplanfox.com.*

**RICHARD J. KILSHEIMER** first associated with Kaplan Fox in 1976, and became a partner in the firm in 1983.  His practice is concentrated in the area of antitrust litigation, and he has played significant roles in several of the largest antitrust class actions in the country.  He also practices in the areas of securities fraud and commercial litigation.

Prior to joining the firm, Mr. Kilsheimer served as law clerk to the Hon. Lloyd F. MacMahon (1975-76), formerly Chief Judge of the U.S. District Court for the Southern District of New York.

Mr. Kilsheimer is co-author of "Secondary Liability Developments," ABA Litigation Section, Subcommittee on Secondary Liability, 1991-1994.

**Education:**
- A.B., University of Notre Dame (1972)
- J.D., cum laude, St. John's University (1975)

**Bar affiliations and court admissions:**
- State of New York (1976)
- U.S. Court of Appeals for the Second Circuit (1983)
- U.S. District Courts for the Southern and Eastern Districts of New York (1976) and the Northern District of Indiana (1987)

**Professional affiliations:**
- Association of the Bar of the City of New York
- Federal Bar Council
- Committee to Support the Antitrust Laws
- Association of Trial Lawyers of America

*Mr. Kilsheimer can be reached by email at RKilsheimer@kaplanfox.com.*

**GREGORY K. ARENSON** is a seasoned business litigator with experience representing clients in a variety of areas, including antitrust, securities, employee termination, fraud, contract, and unfair competition. His economics background provides unique insights on antitrust liability and damages issues. Mr. Arenson has been a partner in the firm since 1993.

Prior to joining Kaplan Fox, Mr. Arenson was a partner with Proskauer Rose. Earlier in his career, he was a partner with Schwartz Klink & Schreiber, and an associate with Rudnick & Wolfe (now Piper Marbury).

Mr. Arenson writes frequently on discovery issues and the use of experts. Recently published articles include: "Who Should Bear the Burden of Producing Electronic Information?" 7 *Federal Discovery News,* No. 5, at 3 (April 2001); "Work Product vs. Expert Disclosure – No One Wins," 6 *Federal Discovery News,* No. 9, at 3 (August 2000); "Practice Tip: Reviewing Deposition Transcripts," 6 *Federal Discovery News*, No. 5, at 13 (April 2000); and "The Civil Procedure Rules: No More Fishing Expeditions," 5 Federal Discovery News, No. 9, at 3 (August 1999). He was also co-author of "The Good, the Bad and the Unnecessary: Comments on the Proposed Changes to the Federal Civil Discovery Rules," 4 *NYLitigator* 30 (December 1998); co-author of "The Search for Reliable Expertise: Comments on Proposed Amendments to the Federal Rules of Evidence," 4 *NYLitigator* 24 (December 1998); co-editor of *Federal Rules of Civil Procedure, 1993 Amendments, A Practical Guide,* published by the New York State Bar Association; and a co-author of "Report on the Application of Statutes of Limitation in Federal Litigation," 53 *Albany Law Review* 3 (1988).

Mr. Arenson's *pro bono* activities include service as a mediator in the U.S. District Court for the Southern District of New York. In addition, he is an active alumnus of the Massachusetts Institute of Technology, serving as a member of the Corporation, a member of the Corporation Development Committee, vice president of the Association of Alumni/ae, and member of the Alumni/ae Fund Board (of which he was a past chair).

**Education:**
- S.B., Massachusetts Institute of Technology (1971)
- J.D., University of Chicago (1975)

**Bar affiliations and court admissions:**
- Bar of the State of Illinois (1975)
- Bar of the State of New York (1978)
- U.S. Supreme Court
- U.S. Courts of Appeals for the Second and Seventh Circuits
- U.S. District Courts for the Northern and Central Districts of Illinois, and the Southern and Eastern Districts of New York
- U.S. Tax Court

**Professional affiliations:**
- New York State Bar Association, Federal Litigation Section, Committee on Federal Procedure  (Chairman since 1997)
- Association of the Bar of the City of New York
- American Bar Association
- Member, advisory board, Federal Discovery News (1999 – present)

*Mr. Arenson can be reached by email at GArenson@kaplanfox.com.*

**LAURENCE D. KING**  Larry King first associated with Kaplan Fox in 1994, and became a partner in the firm in 1998.  Mr. King, who practices in the areas of securities and consumer litigation, is a resident partner in the firm's San Francisco office.  Mr. King has played a substantial role in cases that have resulted in some of the largest recoveries obtained by Kaplan Fox and was one of the lead trial lawyers in two recent securities class actions, one of which was the first case tried to verdict under the Private Securities Litigation Reform Act of 1995.

Prior to joining Kaplan Fox, Mr. King honed his litigation skills as an assistant district attorney for New York County, where he tried numerous felony prosecutions to a jury verdict.

**Education:**
- B.S., Wharton School of the University of Pennsylvania (1985)
- J.D., Fordham University School of Law (1988)

**Bar affiliations and court admissions:**
- Bar of the State of Connecticut (1988)
- Bar of the State of New York (1989)
- Bar of the State of New Jersey (1993)
- Bar of the Commonwealth of Pennsylvania (1993)
- Bar of the State of California (2000)
- U.S. District Courts for the District of New Jersey, the Eastern District of Pennsylvania, the Southern and Eastern Districts of New York, and the Central District of California

**Professional affiliations:**
- New York State Bar Association
- New Jersey State Bar Association
- San Francisco Bar Association
- American Bar Association

*Mr. King can be reached by email at LKing@kaplanfox.com.*

**JOEL B. STRAUSS** first associated with Kaplan Fox in 1992, and became a partner in the firm in 1999. He practices in the area of securities and consumer fraud class action litigation, with a special emphasis on accounting and auditing issues.

Prior to joining Kaplan Fox, Mr. Strauss served as a senior auditor with one of the former "Big Eight" accounting firms. Combining his accounting background and legal skills, he has played a critical role in successfully prosecuting numerous securities class actions across the country on behalf of shareholders. Mr. Strauss was one of the lead trial lawyers for the plaintiffs in the first case to go to trial and verdict under the Private Securities Litigation Reform Act of 1995.

Although currently practicing exclusively in the area of law, Mr. Strauss is a licensed Certified Public Accountant in the State of New York.

Mr. Strauss has also been a guest lecturer on the topics of securities litigation, auditors' liability and class actions for seminars sponsored by the Practicing Law Institute and the National Consumer Law Center.

**Education:**
- B.A., Yeshiva University (1986)
- J.D., Benjamin N. Cardozo School of Law (1992)

**Bar affiliations and court admissions:**
- Bar of the State of New Jersey
- Bar of the State of New York
- U.S. District Courts for the Southern and Eastern Districts of New York and the District of New Jersey
- U.S. Court of Appeals for the Third Circuit

**Professional affiliations:**
- American Bar Association (member, Litigation Section, Rule 23 Subcommittee)
- Association of the Bar of the City of New York
- New York State Bar Association
- American Institute of Certified Public Accountants

*Mr. Strauss can be reached by email at JStrauss@kaplanfox.com.*

**LINDA P. NUSSBAUM** joined Kaplan Fox in February 2007 as a partner. She previously was the resident Partner of the New York City office of Cohen Milstein Hausfeld & Toll P.L.L.C. from 2001 until joining Kaplan Fox.

She is presently in a leadership position in a number of significant antitrust class actions pending throughout the United States including: In re Plastics Additives Antitrust Litigation (E.D. Pa); In re DDAVP Litigation (S.D.N.Y); In re Aciphex Litigation: (S.D.NY); In re: Ovcon Litigation;(D.D.C.), and In re Plavix Litigation;(S.D.Oh.).

She has recently served as a lead counsel in a number of antitrust class actions that have resolved favorably for the plaintiff class including In re Lorazepam and Clorazepate Antitrust Litigation (D.D.C.), where, in approving the $35 million settlement, Chief Judge Hogan commented,

"Obviously, the skill of the attorneys, and I'm not going to spend the time reviewing it, I'm familiar with counsel, and they, as I said, are among the best antitrust litigators in the country;" In re Relafen Antitrust Squibb Co. (D. Mass); and Oncology Radiation Associates, P.A. v. Bristol Myers Squibb Co. (D.D.C.) ($65 million settlement).

Ms. Nusbaum is a member of the American Law Institute. She has lectured at the ABA Antitrust section Spring Meeting on several occasions and will lecture again this year, and at The University of San Francisco Pharmaceutical Antitrust Seminar.

Ms. Nussbaum received her undergraduate degree in Sociology and Journalism, magna cum laude, from Brooklyn College of the City University of New York in 1974, where she was a member of Phi Beta Kappa. She has received her law degree from the National Law Center at George Washington University, where she graduated with honors in 1977. She received an LL.M. degree in Taxation from the New York University School of Law in 1984.

Ms. Nussbaum is admitted to practice in New York and the District of Columbia.

**Education:**
- B.A., Brooklyn College (1974)
- J.D., George Washington University (1977)
- LL.M., Degree in Taxation from New York University School of Law (1984)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (1974)
- U. S. District Courts for the Southern, Eastern and Northern Districts of New York, and the District of Columbia

**Professional Affiliations:**
- American Bar Association
- New York State Bar Association

*Ms. Nussbaum can be reached by email at LNussbaum@kaplanfox.com.*

**HAE SUNG NAM** first associated with Kaplan Fox in 1999, and became a partner in the firm in 2005. She practices in the areas of securities and antitrust litigation.

Prior to joining the firm, Ms. Nam was an associate with Kronish Lieb Weiner & Hellman LLP, where she trained in corporate securities law and mergers and acquisitions. She also served as an intern for the U.S. Department of Justice, Antitrust Division.

During law school, Ms. Nam was a member of the George Washington University Law Review. She is the author of a case note, "Radio – Inconsistent Application Rule," 64 Geo. Wash. L. Rev. (1996).

**Education:**
- B.A., magna cum laude, Syracuse University (1994)
- J.D., with honors, George Washington University School of Law (1997)

**Bar affiliations and court admissions:**
- Bar of the State of New York (1998)
- U.S. District Court for the Eastern District of Wisconsin

**Professional affiliations:**
- New York State Bar Association
- American Bar Association

*Ms. Nam can be reached by email at HNam@kaplanfox.com.*

**DONALD R. HALL** first associated with Kaplan Fox in 1998, and became a partner in the firm in 2005. He practices in the areas of antitrust, securities, and civil litigation.

During law school, Mr. Hall was a member of the Fordham Urban Law Journal and a member of the Fordham Moot Court Board. He also participated in the Criminal Defense Clinic, representing criminal defendants in federal and New York State courts on a pro-bono basis.

**Education:**
- B.A., College of William and Mary (1995)
- J.D., Fordham University School of Law (1998)

**Bar affiliations and court admissions:**
- Bar of the State of Connecticut (2001)
- Bar of the State of New York (2001)
- U.S. District Court for the Southern District of New York
- U.S Court of Appeals for the Second Circuit

**Professional affiliations:**
- American Bar Association
- Association of Trial Lawyers of America
- New York State Bar Association

*Mr. Hall can be reached by email at DHall@kaplanfox.com.*

**JASON A. ZWEIG** joined Kaplan Fox in January of 2003 and became a partner in the firm in 2007. He practices in the areas of securities, antitrust, and other areas of civil litigation.

Prior to joining the firm, Mr. Zweig was an associate with Proskauer Rose LLP in New York where he practiced in all areas of civil and criminal litigation.

During law school, Mr. Zweig was Executive Editor for the Columbia Journal of Environmental Law.

**Education:**
- B.S., Indiana University (1995)
- J.D., Columbia University School of Law (1998)

**Bar affiliations and court admissions:**
- Bar of the State of New York (1999)

10

- U.S. Dist. Court for the Southern District of New York (2000)
- U.S. Dist. Court for the Eastern District of New York (2000)
- United States Court of Appeals for the Third Circuit (2001)
- United States Court of Appeals for the Second Circuit (2006)

**Professional affiliations:**
- Association of the Bar of the City of New York
- American Bar Association
- New York State Bar Association
- Association of Trial Lawyers of America

*Mr. Zweig can be reached by email at JZweig@kaplanfox.com.*

11

# ASSOCIATES

**CHRISTINE FOX** has been associated with Kaplan Fox since 1995.  She practices in the areas of securities and antitrust litigation.

**Education:**
- B.S., Cornell University (1992)
- J.D., University of Michigan Law School (1994)

**Bar affiliations and court admissions:**
- Bar of the State of New York (1995)
- U.S. District Courts for the Southern and Eastern Districts of New York

**Professional affiliations**:
- American Bar Association
- New York State Bar Association
- New York County Lawyers Association
- Bar Association of the City of New York

*Ms. Fox can be reached by email at CFox@kaplanfox.com.*

**LORI S. BRODY** became associated with Kaplan Fox in 2001 and is resident in the firm's Los Angeles office.  She practices in the area of complex litigation.

**Education:**
- B.A, University of California, Berkeley (1987)
- J.D., University of California, Los Angeles (1990)

**Bar affiliations and court admissions:**
- Bar of the State of California (1990)
- U.S. District Courts for the Northern, Central and Southern Districts of California

*Ms. Brody can be reached by email at LBrody@kaplanfox.com.*

**JEFFREY P. CAMPISI** became associated with Kaplan Fox in February 2004.  He practices in the areas of securities, antitrust, and other areas of civil litigation.

Prior to joining the firm, Mr. Campisi served as law clerk to the Hon. Herbert J. Hutton.  Also, Mr. Campisi was an associate with Dewey Ballantine LLP in New York where he practiced in all areas of civil litigation.

During law school, Mr. Campisi was a member of the Villanova Law Review.

**Education:**
- B.A., cum laude, Georgetown University (1996)
- J.D., summa cum laude, Villanova University School of Law (2000)

**Bar affiliations and court admissions:**
- Bar of the State of New York (2001)

- U.S. Dist. Court for the Southern District of New York (2001)
- U.S. Dist. Court for the Eastern District of New York (2001)

**Professional affiliations:**
- American Bar Association

*Mr. Campisi can be reached by email at JCampisi@kaplanfox.com.*

**LOUIS A. KESSLER** joined the firm's San Francisco office in 2005. Mr. Kessler focuses his practice on Antitrust, Securities Fraud and Consumer Fraud class actions. Prior to joining the firm, Mr. Kessler was an associate at Much Shelist Freed Denenberg Ament & Rubenstein PC in Chicago, Illinois. He also has worked for the Enforcement Division of the United States Securities and Exchange Commission and for Equal Rights Advocates, a public interest law firm, in San Francisco.

**Education:**
- B.A., Physics and Philosophy, Amherst College (1997)
- J.D., The Law School, The University of Chicago (2002)

**Bar affiliations and court admissions:**
- Bar of the State of Illinois (2002)
- United States District Court for the Northern District of Illinois (2002)
- United States District Court for the Eastern District of Wisconsin (2003)
- Bar of the State of California (2006)

**Professional affiliations:**
- American Bar Association
- Chicago Bar Association

*Mr. Kessler can be reached by email at: LKessler@kaplanfox.com.*

**WHITNEY E. STREET** became associated with Kaplan Fox in May 2006. She practices in the areas of securities, antitrust, and other areas of civil litigation. During law school, Ms. Street was a member of the Virginia Journal of Social Policy and the Law and the Virginia Journal of Law and Technology and provided pro bono legal services to the Charlottesville community through the Legal Aid Justice Center.

Prior to joining the firm, Ms. Street was an associate with Pillsbury Winthrop Shaw Pittman LLP in San Francisco where she practiced in all areas of civil litigation.

**Education:**
- B.A., University of Virginia (1999)
- J.D., University of Virginia School of Law (2002)

**Bar Affiliations:**
- Bar of the State of California (2002)
- Bar of the State of Texas (2004)

*Ms. Street can be reached by email at: WStreet@kaplanfox.com*

**MELINDA RODON** has been associated with Kaplan Fox since September 2004. She practices in the areas of securities, antitrust, and other areas of civil litigation.

While attending law school, Ms. Rodon provided pro bono legal services to the Philadelphia community through the Civil Practice Clinic of the University of Pennsylvania Law School as well as the Homeless Advocacy Project. She also conducted pro bono legal research for the Southern Poverty Law Center.

**Education:**
- B.A., cum laude, University of Missouri (2000)
- J.D., University of Pennsylvania Law School (2004)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York, (2005)
- U.S. District Courts for the Southern and Eastern Districts of New York

*Ms. Rodon can be reached by email at: MRodon@kaplanfox.com.*

**AVIAH COHEN PIERSON** has been associated with Kaplan Fox since September 2005. She practices in the areas of antitrust, securities, and other areas of civil litigation.

During law school, Ms. Pierson interned for Judge Mark D. Fox in the Southern District of New York. In addition, she was a member of the Fordham Law Review.

**Education:**
- B.A., summa cum laude, University of Pennsylvania (2000)
- J.D., Fordham University School of Law (2005)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (2006)
- U.S. District Courts for the Southern and Eastern Districts of New York

*Ms. Cohen Pierson can be reached by e-mail at: ACohenpierson@kaplanfox.com*

## OF COUNSEL

**MARY G. MORRIS** practices in the area of securities litigation. She associated with the firm in 2002. Prior to joining Kaplan Fox, Ms. Morris served as Treasurer of Virginia and before that served as Virginia's Senior Assistant Attorney General for Finance and Tax, responsible for all the Commonwealth's tax litigation.

**Education:**
- B.A., with distinction, Christopher Newport College of the College of William and Mary (1976)
- J.D., Marshall-Wythe School of Law, College of William and Mary (1981)
- M.L.& T., Marshall-Wythe School of Law, College of William and Mary (1982)

**Bar affiliations and court admissions:**
- Bar of the State of Virginia (1981)
- U.S. Supreme Court
- U.S. Court of Appeals for the Fourth Circuit
- U.S. District Courts for the Eastern and Western Districts of Virginia

**Professional affiliations:**
- Virginia State Bar Association
- Virginia Women Attorneys Association
- National Association of Bond Lawyers

*Ms. Morris can be reached by email at: MMorris@kaplanfox.com.*

**W. MARK MCNAIR** practices in the area of securities litigation with a special emphasis on institutional investor involvement. He associated with the firm in 2003, and is resident in Washington, D.C. Prior to entering private practice, he was an attorney at the Securities and Exchange Commission and the Municipal Securities Rulemaking Board.

**Education:**
- B.A. with honors, University of Texas at Austin (1972)
- J.D. University of Texas at Austin (1975)
- L.L.M. (Securities) Georgetown University (1989)

*Mr. McNair can be reached at MMcnair@kaplanfox.com*

**LINDA M. FONG** practices in the areas of general business and consumer protection class action litigation. She has been associated with Kaplan Fox since 2001, and is resident in the firm's San Francisco office. Ms. Fong serves on the Board of the San Francisco Trial Lawyers Association and is active in its Women's Caucus.

**Education:**
- J.D., University of San Francisco School of Law (1985)
- B.S., with honors, University of California, Davis

- Elementary Teaching Credential, University of California, Berkeley

**Bar affiliations and court admissions:**
- Bar of the State of California (1986)
- U.S. District Courts for the Northern and Eastern Districts of California
- U.S. Court of Appeals for the Ninth Circuit

**Professional affiliations:**
- San Francisco Trial Lawyers Association
- Asian American Bar Association
- Bar Association of San Francisco
- Trial Lawyers for Public Justice
- Consumer Attorneys of California

**Awards:**
- Presidential Award of Merit
- Consumer Attorneys of California, 2000

*Ms. Fong can be reached by email at: LFong@kaplanfox.com*

**GARY L. SPECKS** practices primarily in the area of complex antitrust litigation. He has represented plaintiffs and class representatives at all levels of litigation, including appeals to the U.S. Courts of Appeals and the U.S. Supreme Court. In addition, Mr. Specks has represented clients in complex federal securities litigation, fraud litigation, civil RICO litigation, and a variety of commercial litigation matters. Mr. Specks is resident in the firm's Chicago office.

During 1983, Mr. Specks served as special assistant attorney general on antitrust matters to Hon. Neil F. Hartigan, then Attorney General of the State of Illinois.

**Education:**
- B.A., Northwestern University (1972)
- J.D., DePaul University College of Law (1975)

**Bar affiliations and court admissions:**
- Bar of the State of Illinois (1975)
- U.S. Courts of Appeals for the Third, Fifth, Seventh, Ninth and Tenth Circuits
- U.S. District Court for the Northern District of Illinois, including Trial Bar

**Professional affiliations:**
- American Bar Association
- Illinois Bar Association
- Chicago Bar Association

*Mr. Specks can be reached by email at: GSpecks@kaplanfox.com*

16

**WILLIAM J. PINILIS** practices in the areas of commercial, consumer and securities class action litigation. He has been associated with Kaplan Fox since 1999, and is resident in the firm's New Jersey office.

In addition to his work at the firm, Mr. Pinilis has served as an adjunct professor at Seton Hall School of Law since 1995, and is a lecturer for the New Jersey Institute for Continuing Legal Education. He has lectured on consumer fraud litigation and regularly teaches the mandatory continuing legal education course Civil Trial Preparation.

Mr. Pinilis is the author of "Work-Product Privilege Doctrine Clarified," *New Jersey Lawyer*, Aug. 2, 1999; "Consumer Fraud Act Permits Private Enforcement," *New Jersey Law Journal*, Aug. 23, 1993; "Lawyer-Politicians Should Be Sanctioned for Jeering Judges," *New Jersey Law Journal*, July 1, 1996; "No Complaint, No Memo – No Whistle-Blower Suit," *New Jersey Law Journal*, Sept. 16, 1996; and "The *Lampf* Decision: An appropriate Period of Limitations?" *New Jersey Trial Lawyer*, May 1992.

**Education:**
- B.A., Hobart College (1989)
- J.D., Benjamin Cardozo School of Law (1992)

**Bar affiliations and court admissions:**
- Bar of the State of New Jersey (1992)
- Bar of the State of New York (1993)
- U.S. District Courts for the District of New Jersey, and the Southern and Eastern Districts of New York

**Professional affiliations:**
- Morris County Bar Association
- New Jersey Bar Association
- Graduate, Brennan Inn of Court

*Mr. Pinilis can be reached by email at WPinilis@kaplanfox.com*

**CHARLES J. MOXLEY, JR.** Charles Moxley practices in the areas of securities, insurance, commercial, corporate, and general civil litigation, as well as performing arbitration and appellate work. He has been associated with Kaplan Fox since 1994.

Mr. Moxley started his career as an associate at Davis Polk & Wardwell, and thereafter was a member of several New York City law firms. He has also served as a law professor at St. John's University School of Law and as an adjunct professor at New York Law School, teaching courses in the litigation area, including federal and New York practice, evidence, and professional responsibility. Mr. Moxley has been an arbitrator on numerous substantial arbitrations before the American Arbitration Association in the securities, contract, intellectual property, employment, construction, and other areas. He has also served extensively as a special master in New York Supreme Court.

He is the author of *International Law and Nuclear Weapons in the Post Cold War World* (Austin & Winfield, 2000) (with forewords by Robert S. McNamara, David W. Leebron, and Kosta Tsipis).

17

Mr. Moxley's pro bono activities include service as Chair of the Independent Judicial Screening Committee for the designation of candidates for New York City Civil Judge. He is also a member of the board of the Lawyers' Committee for Nuclear Policy and a former board member of the Lawyers Alliance for World Security. In addition, he has served as New York City Law Industry Chair for the March of Dimes Walkathon.

During law school, Mr. Moxley served as managing editor of the Columbia Journal of Transnational Law. He then served as law clerk to the Hon. Thomas F. Croake of the U.S. District Court for the Southern District of New York.

**Education:**
- B.A., Fordham University (1965)
- M.A., Fordham University (1966)
- J.D., Columbia University School of Law (1969)

**Bar affiliations and court admissions:**
- Bar of the State of New York (1969)
- U.S. Supreme Court
- U.S. Courts of Appeals for the Second and Seventh Circuits
- U.S. District Courts for the Southern and Eastern Districts of New York

**Professional affiliations:**
- American Bar Association
- Association of the Bar of the City of New York
- New York State Bar Association
- New York County Lawyers Association

*Mr. Moxley can be reached by email at CMoxley@kaplanfox.com*

**SUSAN R. SCHWAIGER** Susan Schwaiger joined Kaplan Fox in February 2007. She practices in the area of antitrust law. Prior to joining the firm, Ms. Schwaiger was Of Counsel with Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Pomerantz, Haudek Block Grossman & Gross LLP, practicing in the antitrust area, and an associate with Shearman & Sterling, where she practiced in all areas of litigation. During law school, Ms. Schwaiger was a member of the Brooklyn Law Review.

**Education:**
- B.S., University of Tennessee (1971)
- M.A., University of Kentucky (1973)
- J.D., Brooklyn Law School (1992)

**Bar Affiliations and Court Admissions:**
- Bar of the State of New York (1993)
- U.S. District Courts for the Southern, Eastern and Northern Districts of New York (1993)

**Professional Affiliations:**
- American Bar Association
- New York State Bar Association

*Ms. Schwaiger can be reached by email at Sschwaiger@kaplanfox.com*

As of 03/20/07

**CERTIFICATE OF SERVICE**

I, Jeffrey P. Campisi, declare that, on July 10, 2007, I caused true and correct

copies of the following:

> ➤ Notice of Motion and Motion of The VLK Group for: (1) Appointment as Lead Plaintiff; and (2) Approval of Lead Plaintiff's Choice of Lead Counsel;

> ➤ Memorandum of Law in Support of the Motion of The VLK Group for: (1) Appointment as Lead Plaintiff; and (2) Approval of Lead Plaintiff's Choice of Lead Counsel; and

> ➤ Declaration of Jeffrey P. Campisi in Support of the Motion of The VLK Group for: (1) Appointment as Lead Plaintiff; and (2) Approval of Lead Plaintiff's Choice of Lead Counsel;

to be served via the Court's ECF system to all counsel of record.

                              /s/ Jeffrey P. Campisi
                              Jeffrey P. Campisi