# EXHIBIT C

EXHIBIT A

**STATEMENT OF FACTS IN SUPPORT OF DAVID J. BERSHAD PLEA AGREEMENT AND INFORMATION**

Defendant DAVID J. BERSHAD ("BERSHAD") represents and admits that the following facts are true. Pseudonyms, capitalized terms, and case names herein have the same meanings as are ascribed to them in the first superseding indictment in <u>United States v. Milberg Weiss Bershad & Schulman LLP, et al.</u>, CR 05-587(A)-JFW (the "FSI").

Introduction

1. At all relevant times, BERSHAD was a name partner in Milberg Weiss & Bershad LLP, formerly known as "Milberg Weiss Bershad & Schulman LLP," "Milberg Weiss Bershad Hynes & Lerach LLP," and "Milberg Weiss Bershad Specthrie & Lerach" (hereinafter "Milberg Weiss"). BERSHAD worked in Milberg Weiss's principal office in New York, New York, was one of the managing partners of Milberg Weiss, and was the senior partner primarily responsible for overseeing Milberg Weiss's financial affairs and accounting department.

2. Milberg Weiss specialized in serving as plaintiff's counsel in class actions and shareholder derivative actions (collectively "Class Actions") brought in federal and state courts throughout the United States, including in the Central District of California.

3. As counsel seeking to represent and representing class

members or shareholders not before the courts (collectively "absent class members"), Milberg Weiss and its attorneys, including BERSHAD, had fiduciary duties of loyalty, honesty, and trust to absent class members. Individuals who sought to be authorized by the courts to serve and who served as representative plaintiffs on behalf of absent class members (hereinafter "named plaintiffs") likewise had fiduciary duties of loyalty, honesty, and trust to those absent class members.

### Overview of Secret Payment Arrangements

4. Beginning in or about the 1970s and continuing through 2005, in order to facilitate the recruitment and retention of named plaintiffs, certain senior Milberg Weiss partners agreed with various individuals that Milberg Weiss would secretly pay those individuals a portion of the attorneys' fees that Milberg Weiss obtained in Class Actions in which such individuals served, or caused a relative or associate to serve, as a named plaintiff.

5. The Milberg Weiss partners who agreed during the relevant times to secretly pay the named plaintiffs included BERSHAD, Partner A, Partner B, Steven G. Schulman ("Schulman"), Partner E, and two other senior Milberg Weiss partners, referred to herein as "Partner F" and "Partner G" (collectively the "Conspiring Partners").

6. The individuals who agreed to serve as named plaintiffs in Class Actions pursuant to the secret payment arrangement with Milberg Weiss included, among others, Seymour M. Lazar ("Lazar"),

Howard J. Vogel ("Vogel"), and Steven G. Cooperman ("Cooperman"), as well as three named plaintiffs who resided, at times, in Florida (hereinafter the "Florida paid plaintiffs"). Generally, these individuals were promised that they would be paid approximately 10% of the net attorneys' fees that Milberg Weiss obtained in their respective Class Actions, although they were also told by BERSHAD and other Conspiring Partners that the amount would be lower if they were paid in cash or if Milberg Weiss had payment obligations on the same case to others.

7. By entering into such secret payment arrangements, BERSHAD and the other Conspiring Partners were able to secure a reliable source of individuals who were ready, willing, and able to serve as named plaintiffs in Class Actions that Milberg Weiss wanted to bring. In addition, some of these individuals would investigate and propose to BERSHAD and other Conspiring Partners potential Class Actions for Milberg Weiss to bring. Such payment arrangements generally enabled Milberg Weiss to file more Class Actions and to file them more quickly than would be possible absent such arrangements. Filing Class Actions more quickly than other competing plaintiffs' law firms enhanced Milberg Weiss's ability to obtain lead counsel status in cases, before and after the passage of the Private Securities Litigation Reform Act of 1995. Lead counsel generally obtained a larger share of the attorneys' fees awarded in a Class Action than other counsel. The secret payments arrangements with paid plaintiffs played a

meaningful role in enabling Milberg Weiss to grow.

8. At all relevant times, BERSHAD, the other Conspiring Partners, and the paid plaintiffs knew that their secret payment arrangements were improper.

9. BERSHAD knew that it was improper for Milberg Weiss to secretly share attorneys' fees with the paid plaintiffs, and that such payment arrangements created conflicts of interest between the paid plaintiffs and the absent class members they purported to represent. BERSHAD believed that discovery in a Class Action of the secret payment arrangement with a named plaintiff could have resulted in, among other things: (a) the disqualification of the named plaintiff from serving as a class representative in that action and other Class Actions; (b) the disqualification of Milberg Weiss, including the Conspiring Partners, from serving as class counsel in that action and other Class Actions; and (c) referral to a disciplinary committee and a risk of revocation or suspension of one or more of the Conspiring Partners' licenses to practice law.

10. At all relevant times, BERSHAD, the other Conspiring Partners, and the paid plaintiffs knew that their payment arrangements had to be concealed from the federal and state courts presiding over their Class Actions. BERSHAD, the other Conspiring Partners, and the paid plaintiffs also understood that, to the extent necessary, they would make or cause to be made false and/or misleading statements in documents filed in

federal and state Class Actions (including complaints, motions, and under-oath certifications) and in under-oath testimony and other discovery in such actions in order to conceal the existence of their secret payment arrangements.

11. When BERSHAD prepared individuals for their Class Action depositions whom he knew had payment arrangements with Milberg Weiss, BERSHAD's practice was to caution them that they would be disqualified from serving as named plaintiffs if it were disclosed that they had received or been promised a share of Milberg Weiss's attorneys' fees. BERSHAD provided this caution with the expectation that these individuals would then conceal in their depositions and elsewhere, as necessary, the existence of their payment arrangements with Milberg Weiss. BERSHAD never advised Lazar or any other paid plaintiffs that the payments made to them or to intermediaries for their benefit was in compliance with applicable law.

12. To further conceal the payments made to various named plaintiffs, BERSHAD, Partner A, Partner B, and Partner E delivered some of them in cash. Regarding the cash used to pay these paid plaintiffs:

(a) In the earlier years of the conspiracy, BERSHAD, Partner A, Partner B, Partner F, and Partner G pooled their personal cash into a fund BERSHAD maintained in his office at Milberg Weiss, which was used by the Conspiring Partners to supply cash for secret payments to paid plaintiffs and others.

-5-

The amounts the Conspiring Partners each contributed were supposed to be approximately proportionate to their respective partnership interests in Milberg Weiss. BERSHAD kept track of the amounts contributed and of the secret cash payments that had been made to paid plaintiffs.

  (b) Later in the conspiracy, BERSHAD, Partner A, Partner B, Partner F, and Partner G caused Milberg Weiss to award "bonuses" to them, amounting to the cash they had contributed, plus additional amounts intended to approximate the income taxes payable by them on such "bonuses." To implement this practice, BERSHAD, Partner A, Partner B, Partner F, and Partner G caused to be included in Milberg Weiss's first written partnership agreement, adopted in 1986, a provision that enabled them to allocate up to 10% in the aggregate of the partnership's net income to one or more partners prior to determining the equity partners' shares of the firm's net income. A comparable bonus provision was maintained in Milberg Weiss's partnership agreements thereafter. A purpose of these bonus provisions was to enable BERSHAD, Partner A, Partner B, Partner F, and Partner G, who determined in their sole discretion the allocation of the bonuses, to use Milberg Weiss profits to compensate themselves for the cash they had contributed to the secret payment fund.

  (c) Schulman did not contribute cash to the fund for paying plaintiffs because he claimed he lacked the money to do so. With the express approval of BERSHAD and Partner A, Partner

-6-

E contributed some cash to the fund on one occasion, and was later compensated by BERSHAD, Partner A and Partner B via a Milberg Weiss bonus award.

(e) BERSHAD personally provided cash payments to two of the Florida paid plaintiffs, and was told by Partner A that Partner A had personally provided cash payments to at least one of the Florida paid plaintiffs. Partner B also told BERSHAD that he should be credited for cash that Partner B had used to pay a plaintiff.

(f) BERSHAD provided cash to Partner E to deliver a cash payment to Vogel.

13. BERSHAD and the other Conspiring Partners also concealed the payments to named plaintiffs in other ways. Among them was to have paid plaintiffs select intermediary law firms, lawyers, and other professionals through whom they would be paid. BERSHAD and other Conspiring Partners would cause Milberg Weiss checks to be issued to these intermediaries, with the understanding and intent that the money would be distributed to or used for the benefit of the paid plaintiffs. BERSHAD and other Conspiring Partners knew that although these payments were variously documented and described as, among other things, "referral fees" and "professional fees" owed by Milberg Weiss to the intermediaries, they were actually for the benefit of the paid plaintiffs. BERSHAD caused false and misleading information to be provided to Milberg Weiss's outside accountants and tax

-7-

return preparers, as well as the Internal Revenue Service, concerning such payments, to describe them as legitimate fees paid for the benefit of the intermediary lawyers and other professionals, rather than as payments for the benefit of the paid plaintiffs.

<u>Secret Payment Arrangement With Seymour Lazar</u>

14. Partner A, on behalf of Milberg Weiss, established a secret payment arrangement with Lazar. Soon after Lazar first became a named plaintiff for Milberg Weiss, Partner A told BERSHAD that Milberg Weiss was to pay Lazar a percentage of the attorneys' fees that Milberg Weiss obtained in Lazar's cases, as described in paragraph 6 above. BERSHAD later discussed the Lazar payment arrangement with other of the Conspiring Partners.

15. When the first payment to Lazar came due, Partner A told BERSHAD that Lazar was willing to have the payment obligation to him satisfied by Milberg Weiss making an investment in a business venture with which Lazar was affiliated. Partner A told BERSHAD that they should satisfy their obligation to Lazar by supporting this business venture and at the same time have an opportunity to make some money. As a result, Milberg Weiss issued a check to Lazar's associated business venture in 1979, to benefit Lazar for serving as a named plaintiff. Also at Lazar's request, another payment to benefit Lazar was made in 1984 via a Milberg Weiss check issued to Lazar's accountant in California.

16. Partner A subsequently told BERSHAD that Partner A had

agreed with Lazar that Milberg Weiss would satisfy its payment obligations to Lazar by paying the intermediary law firms that Lazar designated.

17. Lazar and certain of his relatives served as named plaintiffs for Milberg Weiss in numerous Class Actions. To satisfy Milberg Weiss's payment obligation to Lazar on these cases, BERSHAD caused Milberg Weiss checks to be written to one of Lazar's sons (who was an attorney), the Palm Springs Law Firm, and other intermediary law firms and attorneys, as selected by Lazar. BERSHAD caused these payments to be documented and falsely described as, among other things, "referral fees" and the "share of fees" owed by Milberg Weiss to these intermediaries. Nonetheless, BERSHAD understood that such payments represented monies that Milberg Weiss owed to Lazar, were made to satisfy Milberg Weiss's payment obligation to Lazar, and would be used for Lazar's benefit or at his direction.

### Secret Payment Arrangement With Steven Cooperman

18. Partner B, on behalf of Milberg Weiss, established a secret payment arrangement with Steven Cooperman, pursuant to which Milberg Weiss would pay Cooperman a percentage of the attorneys' fees that Milberg Weiss obtained in Cooperman's cases, as described in paragraph 6 above. BERSHAD discussed Cooperman's payment arrangement with other of the Conspiring Partners.

19. Near the conclusion of Cooperman's <u>Newhall Land</u> class action, Partner B told BERSHAD that Cooperman wanted to be paid

-9-

right away and that the amount Milberg Weiss was going to pay Cooperman on the case was about $175,000. Partner B also told BERSHAD that Cooperman was going to be a very important client for Milberg Weiss going forward.

20. Partner A, Partner B, and BERSHAD discussed the means by which Milberg Weiss could quickly get Cooperman the money the firm owed him on Newhall Land. After some discussion, Partner A, Partner B, and BERSHAD agreed that Partner A would travel to California, meet with Cooperman, and pay him $175,000 from Partner A's own funds. Partner A would do this by either using a strategy involving a phony option to buy art from Cooperman or overpaying for art purchased from Cooperman.

21. Partner A subsequently paid Cooperman $175,000 in 1989, documented as a phony "refundable option" payment for Partner A's right to purchase a painting owned by Cooperman. Partner A waited a period of time and then declined to exercise the phony "option." In truth, the "option" payment by Partner A was a means to get Cooperman money quickly, to compensate him for having served as a plaintiff in Newhall Land. In the meantime, Partner A, Partner B and BERSHAD discussed how to get funds to Cooperman through other means, so that Cooperman could then refund the phony "option" payment to Partner A.

22. Eventually, Partner A, Partner B, and BERSHAD decided that they would cause Milberg Weiss to pay Cooperman through his brother-in-law ("Cooperman Brother-in-Law B"), who had a business

-10-

background.  They further decided that the Milberg Weiss payments would be disguised as compensation to Cooperman Brother-in-Law B for his services as a consultant on Class Action cases when, in fact, the payments were primarily intended to compensate Cooperman for serving as a named plaintiff in Newhall Land.

23.  BERSHAD then met with Schulman and with Partner E to identify Class Actions that Milberg Weiss controlled and had a good likelihood of success, for which they could pay Cooperman Brother-in-Law B consulting fees.  BERSHAD explained to Schulman and to Partner E that Milberg Weiss had an obligation to Cooperman who was serving as a named plaintiff.  After Schulman and Partner E identified suitable cases, BERSHAD caused Milberg Weiss to issue several consulting "retainer" checks to Cooperman Brother-in-Law B in 1989 and 1990 with regard to specific Milberg Weiss cases.  BERSHAD discussed with Partner A and Partner B that Milberg Weiss payments to Cooperman Brother-in-Law B would supply funds to Cooperman so that Cooperman, in turn, would repay Partner A the $175,000 he had provided Cooperman under the guise of the phony "option."

24.  Cooperman, Cooperman Plaintiff 1, Cooperman Plaintiff 2, and certain of Cooperman's relatives and associates served as named plaintiffs for Milberg Weiss in numerous other Class Actions.  To satisfy Milberg Weiss's payment obligation to Cooperman on these cases, BERSHAD caused Milberg Weiss checks to be written to intermediary attorneys and their associated law

-11-

firms selected by Cooperman, namely Richard R. Purtich and James P. Tierney (referred to as Cooperman Intermediary A and Cooperman Intermediary B in the FSI). BERSHAD caused these payments to be documented and falsely described as, among other things, "referral fees" and the "share" of attorneys' fees owed by Milberg Weiss to these intermediaries. Nonetheless, BERSHAD understood that such payments represented monies that Milberg Weiss owed to Cooperman, were made to satisfy Milberg Weiss's payment obligation to Cooperman, and would be used for Cooperman's benefit or at his direction.

<u>Secret Payment Arrangement With Howard Vogel</u>

25. BERSHAD and Partner E, on behalf of Milberg Weiss, established a secret payment arrangement with Howard Vogel, pursuant to which Milberg Weiss would pay Vogel a percentage of the attorneys' fees that Milberg Weiss obtained in Vogel's cases, as described in paragraph 6 above (except that Vogel's percentage of Milberg Weiss's attorneys' fees was sometimes greater than 10%). BERSHAD discussed Vogel's payment arrangement with other of the Conspiring Partners.

26. Initially, Partner E was Vogel's primary contact at Milberg Weiss for initiating new Class Actions and arranging for Vogel's payments. After Partner E left Milberg Weiss at the end of 1999, the maintenance of the relationship with Vogel was taken over by Schulman.

27. Vogel, certain of his relatives, and the Howard Vogel

Retirement Plan served as named plaintiffs for Milberg Weiss in numerous other Class Actions. To satisfy Milberg Weiss's payment obligation to Vogel on these cases, Schulman and Partner E caused Milberg Weiss checks to be written to intermediary attorneys and their associated law firms selected by Vogel, namely Vogel Intermediary A and Vogel Intermediary B. Schulman and Partner E caused these payments to be documented and falsely described as, among other things, "referral fees" and the "share" of attorneys' fees that Milberg Weiss owed to these intermediaries. Nonetheless, BERSHAD understood that any payments to Vogel intermediaries represented monies that Milberg Weiss owed to Vogel, were made to satisfy Milberg Weiss's payment obligation to Vogel, and would be used for Vogel's benefit or at his direction.

28. Around the time of the conclusion of the Oxford Health class action in 2003, Schulman told BERSHAD that Vogel wanted to be paid millions of dollars for having the Howard Vogel Retirement Plan serve as a named plaintiff in that case. BERSHAD discussed with Partner A and Schulman that Vogel's demands were too high.

29. Because of the ongoing grand jury investigation into Milberg Weiss's payment arrangements with named plaintiffs, BERSHAD did not want to deal with Vogel on the Oxford Health secret payment.

30. Based on his contemporaneous discussions with Partner A and Schulman, BERSHAD knows the following:

  (a) Schulman discussed Vogel's payment demands on Oxford Health with Partner A.

  (b) Partner A told Schulman that he did not want to talk directly to Vogel, and said Vogel should get a lawyer.

  (c) Schulman relayed this information to Vogel, who arranged for Vogel Intermediary A, a lawyer in Denver, Colorado, to negotiate the matter on Vogel's behalf.

  (d) Partner A and Vogel Intermediary A met in New York to negotiate the amount of payment for Vogel on Oxford Health.

 31. The payment Milberg Weiss made to Vogel on Oxford Health was approximately $1.1 million. Although it was paid by Milberg Weiss check issued to Vogel Intermediary A in December 2003, at all times BERSHAD understood that the payment was made for the benefit of Vogel, in satisfaction of Milberg Weiss's obligation to Vogel for having the Howard Vogel Retirement Plan serve as a named plaintiff in Oxford Health.

### Overt Acts

 32. In furtherance of the conspiracy described above, BERSHAD and other members of the conspiracy committed and caused to be committed the following acts, among others:

  (a) On or about December 13, 1999, in the Xerox class action, brought by Milberg Weiss in the United States District Court for the District of Connecticut, in which Lazar was a named plaintiff, Lazar falsely certified, under penalty of perjury, that he would "not accept any payment for serving as a

-14-

representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court."

(b) On or about November 6, 1996, in the <u>Individual</u> class action, brought by Milberg Weiss in the United States District Court for the District of Massachusetts, in which Cooperman was a named plaintiff, Cooperman falsely certified, under penalty of perjury, that he would "not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court."

(c) On or about April 9, 2003, in the <u>CIT Group</u> class action, brought by Milberg Weiss in United States District Court for the Southern District of New York, in which Vogel was a named plaintiff, Vogel falsely certified, under penalty of perjury, that Vogel would "not accept any payment for serving as a representative party of behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court."