**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| In re OPTIONABLE, INC. SECURITIES | ) | DOCKET NUMBER: 07-cv-3753-LAK |
| LITIGATION | ) | |
| | ) | |
| | ) | HON. LEWIS A. KAPLAN |
| | ) | |
| | ) | |
| | ) | |

**DECLARATION OF LEWIS S. KAHN IN FURTHER SUPPORT OF THE MOTION OF
KLD INVESTMENT MANAGEMENT, LLC TO BE APPOINTED LEAD PLAINTIFF
AND TO APPROVE PROPOSED LEAD PLAINTIFF'S SELECTION OF COUNSEL**

I, Lewis S. Kahn, hereby declare as follows:

1.     I am a member in good standing of the bar of Louisiana. I am a member of the law firm of Kahn Gauthier Swick, LLC, counsel for Movant, KLD Investment Management, LLC ("KLD") and proposed Lead Counsel for the Class.  I submit this declaration in support of the motion filed by KLD to: (1) consolidate all future related cases; (2) to be appointed as Lead Plaintiff; and (3) approve Lead Plaintiff's selection of Lead Counsel for the Class.

2.     The representations in KGS's resume as submitted in *Bhojwani v. Pistiolis, et al.*, 06-cv-13761 (S.D.N.Y.), concerning its role in *Merck,* were true. After nearly two years of litigation in Louisiana where KGS was liaison counsel, and after further disclosures by Merck that led to the filing of additional lawsuits, the Judicial Panel on Multi-District Litigation transferred the Louisiana securities fraud case to the District of New Jersey – which KGS had noted at the time in its firm biography and website. KGS – a New Orleans-based firm with offices in Louisiana and New York – could not have been liaison counsel in New Jersey as it does not have an office in New Jersey.

3.     Attached as exhibits are true and correct copies of the following:

Exhibit A:    February 26, 2004 order by Judge Kurt Englehardt appointing KGS as liaison counsel in *In re Merck & Co. Sec. Litig.,* 03-3215 (E.D. La.)

Exhibit B:    Initial Complaint in *Bhojwani v. Pistiolis, et al.*, 06-cv-13761 (S.D.N.Y.), filed by KGS and Gardy-Notis

Exhibit C:    Notice of Motion of the Top Tankers Investors Group for Consolidation, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, filed on February 9, 2007 by Milberg and Gardy in *Bhojwani v. Pistiolis, et al.*, 06-cv-13761 (S.D.N.Y.)

Exhibit D:    Motion on Behalf of Proposed Lead Plaintiff in the *In re Hornbeck Securities Litigation*, 07-cv-408 (E.D. La.) filed by KGS and Gardy-Notis

Exhibit E:    Stipulation dated May 1, 2007 and Order adopting Stipulation dated May 8, 2007, appointing KGS as liaison counsel in *In re Hornbeck Securities Litigation*, 07-cv-408 (E.D. La.)

Exhibit F:    Stipulation of Settlement in *In re ARAMARK Corp. S'holders Litig.*, Consol. C.A. No. 2117-N, Delaware Court of Chancery

I declare under penalty of perjury under the laws of the state of Louisiana that the foregoing facts are true and correct. Executed this 10th day of August, 2007, at New Orleans, Louisiana.

DATED: __August 10, 2007__    _____ /s/ Lewis S. Kahn _____
                              LEWIS S. KAHN

# EXHIBIT A



U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    FEB 2 3 2004

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FRANK PRINGLE** | **CIVIL ACTION** |
| **VERSUS** | **NO.  03-3125 c/w**<br>**04-0147, 04-222 & 04-406** |
| **MERCK & CO., INC., ET AL** | **SECTION "N" (2)** |

### STIPULATION AND [PROPOSED] ORDER CONSOLIDATING ACTIONS, APPOINTING LEAD PLAINTIFFS AND APPROVING LEAD PLAINTIFFS' SELECTION OF CO-LEAD COUNSEL AND CO-LIAISON COUNSEL

WHEREAS, on November 5, 2003, the first class action complaint (the "Pringle Action") alleging violations of federal securities laws was filed with this Court on behalf of investors who purchased the common stock of Merck & Co., Inc. ("Merck" or the "Company"), and several related complaints were filed shortly thereafter;

WHEREAS, pursuant to Section 21D(a)(3)(A) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78u-4(a)(3)(A), the plaintiff in the Pringle Action caused notice to be published on *Business Wire* on November 25, 2003, which informed class members of the right to seek appointment as lead plaintiff;

WHEREAS, on January 26, 2004, class members Richard Reynolds, Ian Kimmel, Steven LeVan, Semra Binbol Bilgen, and Ruth Ravnitsky (the "Reynolds

DATE OF ENTRY

MAR  3 2004

___ Fee_____
___ Process___
_X_ Dktd_____
___ CtRmDep___
___ Doc No.___

Group"), pursuant to Private Securities Litigation Reform Act of 1995 ("PSLRA"), timely filed a motion for appointment as Lead Plaintiff and for approval of their choice of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") as Lead Counsel and the Kahn Gauthier Law Group, LLC ("Kahn Gauthier") as Liaison Counsel;

WHEREAS, class members Ian Kimmel, Semra Binbol Bilgen, and Ruth Ravnitsky hereby withdraw their motion for appointment as Lead Plaintiff;

WHEREAS, on January 26, 2004, class members Ruben & Ann Kueffner, Daniel Offutt, Jerome Haber, Steve Vogelzang, Karen Diamond, Angel Fernandez, Robert Stager and Marc Nathanson (the "Nathanson Group"), pursuant to the PSLRA, timely filed a motion for appointment as Lead Plaintiff and for approval of their choice of Stull, Stull & Brody and The Whitehead Law Firm as Co-Lead Counsel;

WHEREAS, class members Ruben & Ann Kueffner, Daniel Offutt, Steve Vogelzang, Karen Diamond, Angel Fernandez, and Robert Stager hereby withdraw their motion for appointment as Lead Plaintiff;

WHEREAS, by Orders dated January 29, 2004 and February 2, 2004, this Court consolidated with action 03-CV-3125 subsequently filed actions 04-CV-0147 and 04-CV-0222, respectively, and directed the Clerk of Court to establish a master file and docket for the consolidated cases bearing the caption for 03-CV-3125;

WHEREAS, Richard Reynolds, Steven LeVan, Marc Nathanson, and Jerome Haber have demonstrated that, as movants, they have the largest financial interest in this action, they understand the importance of supervising and monitoring the case, and otherwise satisfy the

requirements of Section 21D(a)(3)(B)(iii)(I) of the Exchange Act, 15 U.S.C. §78u-4(a)(3)(B)(iii)(I); and

    IT IS HEREBY STIPULATED AND AGREED, by the parties, through their undersigned counsel, as follows:

1.    Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, action 04-CV-0406, and any subsequently filed or transferred actions on behalf of investors who purchased the securities of Merck, arising from facts, events, and transactions alleged in these cases, are hereby consolidated for all purposes.  This action shall be captioned "*In re Merck & Co., Inc. Securities Litigation*," and the file shall be maintained under Master File No. 03-CV-3125 (KDE).  *See Consolidation Orders entered by the Court.*

2.    Richard Reynolds, Steven LeVan, Marc Nathanson and Jerome Haber shall be appointed Lead Plaintiffs pursuant to Section 21D(a)(3)(B) of the Exchange Act, 15 U.S.C. 78u-4(a)(3)(B);

3.    Lead Plaintiffs' selection of Milberg Weiss and Stull, Stull & Brody as Co-Lead Counsel shall be approved pursuant to Section 21D(a)(3)(B)(v) of the Exchange Act, 15 U.S.C. 78u-4(a)(3)(B)(v);

4.    Co-Lead Counsel shall have the authority to speak for all plaintiffs and class members in all matters regarding this litigation including, but not limited to, pre-trial proceedings, motion practice, trial and settlement, and shall make all work assignments in such a manner as to facilitate the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort.  Additionally, Co-Lead Counsel shall have the following responsibilities:

a.      to brief and argue motions;

b.      to initiate and conduct discovery, including, without limitation, coordination of discovery with defendants' counsel, the preparation of written interrogatories, requests for admission, and requests for production of documents;

c.      to direct and coordinate the examination of witnesses in depositions;

d.      to act as spokesperson at pretrial conferences;

e.      to call and chair meetings of plaintiffs' counsel as appropriate or necessary from time to time;

f.      to initiate and conduct any settlement negotiations with counsel for defendants;

g.      to provide general coordination of the activities of plaintiffs' counsel and to delegate work responsibilities to selected counsel as may be required in such a manner as to lead to the orderly and efficient prosecution of this litigation and to avoid duplication or unproductive effort;

h.      to consult and employ experts;

i.      to receive and review periodic time reports of all attorneys on behalf of plaintiffs, to determine if the time is being spent appropriately and for the benefit of plaintiffs, and to determine and distribute plaintiffs' attorneys' fees; and

j.      to perform such other duties as may be expressly authorized by further order of this Court.

4.     Co-Lead Counsel shall be responsible for coordinating all activities and appearances on behalf of the Class and for disseminating notices and orders of this Court.

5.     No motion, application or request for discovery shall be served or filed, or other pretrial proceedings initiated, on behalf of Lead Plaintiffs, except through Co-Lead Counsel.

6.     Co-Lead Counsel for the Class shall be available and responsible for communications to and from the Court.

7.     Defendants' counsel may rely upon all agreements made with Co-Lead Counsel.

8.     Lead Plaintiffs' selection of Kahn Gauthier and The Whitehead Law Firm as Co-Liaison Counsel shall be approved.

DATED:  February 23, 2004

THE WHITEHEAD LAW FIRM

By: _____
C. Mark Whitehead, III (Bar Roll #27682)
610 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 586-8899
Facsimile:  (504) 585-1789

*Proposed Co-Liaison Counsel*

DATED: February 23, 2004

KAHN GAUTHIER LAW GROUP, LLC

By: _Rebecca Z. Matthews_
Lewis Kahn (Bar Roll # 23805)
Rebecca Z. Matthews (Bar Roll #28387)
One Galleria Boulevard, Suite 1726
Metairie, LA 70001
(504) 455-1400

*Proposed Co-Liaison Counsel*

SO ORDERED: New Orleans, Louisiana
DATED: _This 26th_ day of February, 2004
UNITED STATES DISTRICT JUDGE

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing was served by U.S. Mail delivery on the 23rd[th]

day of February, 2004, to the following:

## SERVICE LIST

Aaron L. Brody, Esq.
STULL, STULL & BRODY
6 East 45th Street, 5th Floor
New York, New York 10017

Carlene Rhodes Lewis, Esq.
Shelly A. Sanford, Esq.
GOFORTH, LEWIS, SANFORD &
WILSON, LLP
2200 Heritage Plaza
1111 Bagby
Houston, TX 77002

Hugh P. Lambert, Esq.
Linda J. Nelson, Esq.
LAMBERT & NELSON, PLC
701 Magazine Street
New Orleans, Louisiana 70130

Steven G. Schulman, Esq.
Peter E. Seidman, Esq.
Sharon M. Lee, Esq.
MILBERG WEISS BERSHAD HYNES &
LERACH LLP
One Pennsylvania Plaza
New York, NY 10119-0165

Lewis Kahn, Esq.
Rebecca Matthews, Esq.
KAHN GAUTHIER LAW GROUP, LLC
One Galleria Boulevard, Suite 1726
Metairie, LA 70001

Alfred G. Yates, Jr., Esq.
LAW OFFICE OF ALFRED G. YATES, JR.,
P.C.
429 Forbes Avenue
519 Allegheny Building
Pittsburgh, PA 15219

Mel E. Lifshitz, Esq.
BERNSTEIN, LIEBHARD & LIFSHITZ, LLP
10 East 40th Street
New York, NY 19916

Bryan C. Reuter, Esq.
STANLEY, FLANAGAN & REUTER, LLC
909 Poydras Street, Suite 2630
New Orleans, LA 70112

Curtis V. Trinko, LLP
LAW OFFICES OF CURTIS V. TRINKO,
LLP
16 West 46th Street, 7th Floor
New York, NY 10036

C. Mark Whitehead, III

10

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE CASEY

No. **06 CV 13761**

|  |
|---|
| NARAIN BHOJWANI, Individually and On Behalf of All Others Similarly Situated, |
| Plaintiff, |
| v. |
| EVANGELOS J. PISTIOLIS, STAMATIOS N. TSANTANIS and TOP TANKERS, INC., |
| Defendants. |

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

<u>JURY TRIAL DEMANDED</u>

RECEIVED
DEC 0 5 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Narain Bhojwani, on behalf of all other similarly situated, by his attorneys, hereby alleges, upon knowledge with respect to facts concerning plaintiff and plaintiff's acts and as to all other matters, which generally concern facts not in plaintiff's possession, upon information and belief as follows:

<u>NATURE OF THE ACTION</u>

1.      This is a class action on behalf of purchasers of the common stock of TOP Tankers Inc. ("TOP Tankers" or the "Company") between June 28, 2005, and November 28, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, defendants published a series of materially false and misleading statements that defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

2.      Throughout the Class Period, defendants presented TOP Tankers as a crude oil shipping company experiencing rapid growth and expansion, that was using a unique structured

growth model predicated upon sales and lease back transactions. Defendants represented to investors that the Company maintained adequate internal controls and procedures, to allow it to engage in these complex commercial transactions, while at the same time, complying with Generally Accepted Accounting Principles ("GAAP") and SEC accounting rules.

3.      On November 29, 2006, defendants shocked investors after they announced that Ernst & Young, LLP, ("Ernst & Young") the Company's independent auditors, had resigned over a disagreement related to defendants' accounting for certain sale and lease-back transactions. Defendants also revealed that the Company would be forced to restate its interim financial statements for the entire first half of 2006 that had been previously announced to investors and filed with the SEC, to retroactively eliminate reported earnings. TOP Tankers stock plummeted in response to the November 29, 2006 disclosures, falling almost 15% in the single trading day, to close just above $5.00 per share. This substantial share price decline caused material harm to investors, and also caused substantial losses and damages to TOP Tankers shareholders.

4.      Analysts responded to the shocking news by cutting rankings and estimates for the Company. Cantor Fitzgerald & Co. ("Cantor Fitzgerald"), for instance, cut its rating on TOP Tankers to Sell and lowered its near term price target almost 30%. Cantor Fitzgerald cited the resignation of Ernst & Young, the restatement of its earnings, and an SEC inquiry into the Company's sale/leaseback transactions, among other factors.

5.      Defendants' representations during the Class Period concerning the Company's internal operational controls and financial procedures were either patently untrue, or were made with reckless disregard of the true material adverse facts, which were in stark contrast to the positive statements concerning the Company's strength and profitability.

6.    Indeed, throughout the Class Period, the Company was suffering from a host of undisclosed adverse factors that were negatively impacting its business and that would cause it to report declining financial results, materially less than the market expectations defendants had caused and cultivated.  The undisclosed, material adverse facts about TOP Tankers included the following:

a.    Defendants materially misstated the existence of TOP Tankers' internal operational controls and financial procedures, and defendants had propped up the Company's results by manipulating TOP Tankers' accounting for purported sales and lease backs, revenues and earnings;

b.    Defendants materially overstated the Company's profitability by under-reporting TOP Tankers' true costs of sales and income by failing to make proper, timely adjustments to the Company's stated financial reports; and

c.    Contrary to defendants' representations, TOP Tankers did *not* have adequate systems of internal operational or financial controls, and therefore TOP Tankers' reported financial statements were not true, accurate or reliable.

7.    Defendants were motivated to and did conceal the true operational and financial condition of TOP Tankers, and materially misrepresented and failed to disclose the conditions that were adversely affecting TOP Tankers throughout the Class Period, because the scheme: (i) enabled defendants to artificially inflate the price of Company shares by deceiving the investing public regarding TOP Tankers' business, operations, management and the intrinsic value of TOP Tankers common stock; (ii) enabled defendants to register for sale with the SEC, millions of shares of TOP Tankers stock, as well as to engineer the massive dividend of $7.50 per share – almost $40 million of which was paid to defendants and their families; (iii) and enabled

Kingdom Holdings, an entity owned by the family of defendant Evangelos Pistiolis, to liquidate almost 900,000 shares of Company stock during the Class Period while in possession of material adverse information about the Company.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  TOP Tankers common stock is listed on the Nasdaq stock exchange and trade within the United States and the Company regularly filed quarterly and year-end financial reports with the SEC.

10.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(d).   TOP Tankers is a foreign or "alien" corporation that does significant business in this District, and may properly be sued in any District of the United States, including the Southern District of New York.

11.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

12.    Plaintiff Narain Bhojwani, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of TOP Tankers at artificially inflated prices as alleged herein during the Class Period and has been damaged thereby.

4

13.    Defendant Top Tankers is a corporation organized under the Republic of the Marshall Islands with its principal place of business located in Athens, Greece, at 109-111 Messogion Avenue, Politia Centre.  According to the Company's profile, TOP Tankers provides worldwide seaborne transportation services, carrying refined petroleum products and crude oil worldwide.  TOP Tankers was founded in 2000 by defendant Evangelos J. Pistiolis under the name Ocean Holdings, Inc., and changed its name to TOP Tankers, Inc. in 2004.

14.    Defendant Evangelos J. Pistiolis ("Pistiolis") founded the Company and is, and during the Class Period was, Chief Executive Officer and President of the Company.  During the Class Period, defendant Pistiolis signed the Company's SEC filings.

15.    Defendant Stamatios N. Tsantanis ("Tsantanis") is, and during the Class Period was, Chief Financial Officer of the Company.  During the Class Period, defendant Tsantanis signed the Company's SEC filings.

16.    Defendants Pistiolis and Tsantanis are collectively referred to herein as the "Individual Defendants."

17.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

18.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of TOP Tankers, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

19.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq National Market Exchange (the "Nasdaq"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.   The Individual

Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with TOP Tankers, each of the Individual Defendants had access to the adverse undisclosed information about TOP Tankers' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about TOP Tankers and its business issued or adopted by the Company materially false and misleading.

21.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

22.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of TOP Tankers common stock by disseminating materially false and misleading statements and/or concealing material adverse

facts.   The scheme: (i) deceived the investing public regarding TOP Tankers' business, operations, management and the intrinsic value of TOP Tankers common stock, and allowed defendants to artificially inflate the price of Company shares; (ii) enabled defendants to register for sale with the SEC, millions of shares of TOP Tankers stock, as well as allowing defendants to engineer the payment of almost $40 mi llion to the Individual Defendants and their family members through an unusual dividend paid by the Company; (iii) enabled Kingdom Holdings, an entity owned by the family of defendant Pistiolis, to liquidate almost 900,000 shares of Company stock during the Class Period while in possession of material adverse information about the Company; and (iv) caused plaintiff and other members of the Class to purchase TOP Tankers common stock at artificially-inflated prices.

### CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of TOP Tankers between June 28, 2005, and November 28, 2006, inclusive, and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, TOP Tankers common shares were actively traded on the Nasdaq.  As of April 13, 2006, the Company had over 28.08 million shares of common stock issued and outstanding and traded in the United States. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate

discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TOP Tankers or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

26.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

27.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

     a.    Whether the federal securities laws were violated by defendants' acts as alleged herein;

     b.    Whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of TOP Tankers; and

     c.    To what extent the members of the Class have sustained damages and the proper measure of damages.

28.    A class action is superior to all other available methods for the fair and  efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Materially False and Misleading Statements During the Class Period

29.     On June 28, 2005 (the first day of the Class Period), defendants filed with the SEC, pursuant to Form 20-F, TOP Tankers' financial results for the year-end December 31, 2004.   In addition to other statements about the Company, the 2004 Form 20-F contained statements that attested to the internal financial and operational controls that were purported to be in place at that time including, in part, the following:

**ITEM 15. Controls and procedures**

**Evaluation of disclosure controls and procedures.**

On the date of this report, the Company carried out an evaluation, under the supervision and with the  participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation  of the Company's disclosure controls and procedures pursuant to Rule 13a-14 of the Securities Exchange Act of 1934, as amended. ***Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's  disclosure controls and procedures are effective in alerting them timely to material information relating to the Company required to be included in the Company's periodic Securities and Exchange Commission filings.*** [Emphasis added.]

**Changes in internal controls.**

***There have been no significant changes in our internal controls or in other factors that could have significantly affected those controls subsequent to the date of the Company's most recent  evaluation of internal controls***, including any corrective actions with regard to significant deficiencies and material weaknesses. [Emphasis added.]

30.     The 2004 Form 20-F also contained statements regarding the role of the Audit Committee of the Board of Directors of TOP Tankers, that stated their obligation to monitor and review the Company's accounting controls and procedures.  This included, in part, the following:

### ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT

*We have established an audit committee comprised of three members which is responsible for reviewing our accounting controls and recommending to the board of directors the  engagement of our outside auditors*.  Each member is an independent director under the corporate governance rules of the Nasdaq National Market.  The members of the audit committee are Messrs. Docherty, Gibbs and Thomas.  While the  Company is exempt from the requirement to have an audit committee financial expert, both Mr. Thomas and Mr. Gibbs meet the qualifications of an audit committee financial expert.  [Emphasis added.]

31.     The 2004 Form 20-F represented that the senior officers and directors of the Company comported their behavior to a Code of Ethics.  Defendants were clear to state that this was an additional safeguard that they voluntarily provided to investors to make an investment in TOP Tankers more attractive.  As evidence of this, the Form 20-F stated the following:

### ITEM 16B. CODE OF ETHICS

As a foreign private issuer, we are exempt from the rules of the Nasdaq National *Market that require the adoption of a code of ethics.  However, we have voluntarily adopted a code of ethics that  applies to our principal executive officer, principal financial officer, principal accounting officer and persons performing similar functions*.  We will also provide a hard copy of our code of ethics free of charge upon written  request of a shareholder.  Shareholders may direct their requests to the attention of Mr. Evangelos Pistiolis.  [Emphasis added.]

32.     The statements contained in TOP Tankers' 2004 Form 20-F, referenced above, were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

a.     At all times during the Class Period, the Company's purported success was *not* the result of defendants' competent management.  In fact, throughout the Class Period,

defendants had materially misstated the existence of TOP Tankers' internal operational controls and financial procedures, and defendants had propped up the Company's results by manipulating TOP Tankers' accounting for purported sales and lease backs, revenues and earnings;

b.    At all times during the Class Period, unbeknownst to investors, defendants had materially overstated the Company's profitability by under-reporting TOP Tankers' true costs of sales and income by failing to make proper, timely adjustments to the Company's stated financial reports;

c.    Throughout the Class Period, TOP Tankers did not have adequate systems of internal operational or financial controls, and TOP Tankers' reported financial statements were *not* true, accurate or reliable;

d.    As a result of the foregoing, throughout the Class Period, the Company's financial statements and reports were *not* prepared in accordance with GAAP ad SEC rules; and

e.    As a result of the aforementioned adverse conditions which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that TOP Tankers was operating according to plan, or that TOP Tankers could achieve guidance sponsored and/or endorsed by defendants.

33.    The Company's 2004 Form 20-F also disclosed that defendant Pistiolis and a group owned by his relatives owned almost 20% of the Company's shares issued and outstanding at that time, as follows:

| Title of Class | Identity of Person or Group | Amount Owned | Percent of Class |
| --- | --- | --- | --- |
| Common Stock, par value $.01 per share | Kingdom Holdings Inc.* | 4,007,357 | 14.4% |
| | FMR Corp. | 3,297,400 | 11.8% |
| | Evangelos Pistiolis** | 1,236,130 | 4.4% |

12

\* A company owned primarily by adult relatives of our President, Chief Executive Officer and Director, Evangelos Pistiolis.[1]

\*\* By virtue of the shares owned indirectly through Sovereign Holdings Inc., a company wholly-owned by Evangelos Pistiolis.

34.    On August 1, 2005, defendants attempted to capitalize on the artificial inflation in the price of TOP Tankers shares caused as a result of their publication of materially false and misleading statements.  As evidence of this, defendants then announced the filing of a Shelf Registration of at least $250 million of common stock and assorted securities.  In connection with this Shelf Registration, defendants published a release that stated, in part, the following:

**Tankers Files Universal Shelf Registration**

ATHENS, Greece, Aug. 1 /PRNewswire-FirstCall/ -- TOP Tankers Inc (Nasdaq: TOPT), announced today that it has filed a $250 million universal shelf registration statement with the Securities and Exchange Commission.  The filing will allow TOP Tankers to periodically offer common stock, preferred shares, debt securities, warrants, purchase contracts, units or any combination of the above, up to a total amount of $250 million. ***In addition, one or more of the Company's shareholders may periodically offer up to approximately 4.8 million shares of common stock...*** [Emphasis added.]

Proceeds from any offering, except from the selling shareholders, may be used to finance future acquisitions and for general corporate purposes.

35.    Days after announcing this large Shelf Registration, on August 3, 2005, defendants also announced that the Company had engaged in the purported "sale and lease-back" of two large tankers.   According to defendants, this transaction was designed to strengthen the financial position of TOP Tankers and help achieve foreseeable guidance, that defendants sponsored or endorsed.  Accordingly, this release stated, in part, the following:

---

[1]    Although defendants did not report the timing of certain sales of Company stock by Kingdom Holdings, a comparison the Company's 2004 to 2005 Form 20-F indicates that Kingdom Holdings sold almost 900,000 shares of Top Tankers shares during 2005.

**TOP Tankers Announces Sale and Leaseback of Two Handymax Tankers**

ATHENS, Greece, Aug. 3 /PRNewswire-FirstCall/ -- TOP Tankers Inc (Nasdaq: TOPT) announced the sale and immediate leaseback of the handymax tankers M/T Restless and M/T Sovereign. The vessels have been leased back under seven-year bareboat charters, with TOP Tankers performing the operational and commercial management of the vessels. The vessels will continue their employment under time charter contracts with Vitol and Glencore for the remaining period of two and four years, respectively, under those contracts.

***The Company expects to generate a gain of approximately $7.0 million as a result of the sale/leaseback transactions***, which will be amortized over the seven-year bareboat charter period. The Company believes that the bareboat charters will qualify as operating leases under U.S. GAAP. [Emphasis added.]

Evangelos J. Pistiolis, President and CEO of TOP Tankers Inc commented, ***"The sale and charter back of the M/T Restless and the M/T Sovereign should further strengthen our balance sheet and enhance our ability to pursue further acquisition opportunities in the second-hand tanker market."*** [Emphasis added.]

36.    Similarly, the publication of this release was followed by the publication of another release, on September 14, 2005, that also stated, in part, the following:

**TOP Tankers Announces Sale and Leaseback of Three Handymax Tankers and Acquisition of One Suezmax Tanker and One Handymax Tanker**

ATHENS, Greece, Sept. 14 /PRNewswire-FirstCall/ -- TOP Tankers Inc (Nasdaq: TOPT), announced the sale of the handymax tankers M/T Relentless, M/T Victorious and M/T Invincible, and their immediate leaseback to the Company for a period of seven years. The lease is a bareboat charter, with TOP Tankers performing the operational and commercial management of the vessels. All three vessels will continue their time charter contracts with Glencore for their remaining period of four years.

The Company expects to generate a gain of approximately $9 million, which will be amortized over the seven-year lease period. The bareboat charter rate is $11,500 per ship per day, and the Company expects this sale and leaseback to qualify as an operating lease under the U.S. GAAP.

37.    On February 27, 2006, defendants announced results for the fourth quarter of 2005, the period ended December 31, 2005, with net income of net income of $28.1 million, or $1.00 per share, compared with $19.3 million, or $0.80 per share in the year-earlier period. The

2005 results included a net charge of 13 cents a share, primarily for management bonuses and compensation.[2]

38.     Despite these purported strong financial results, during the conference call for analysts and investors, hosted later the same day by defendant Pistiolis, analyst Natasha Boyden from Cantor Fitzgerald noted that TOP Tankers stock was "trading at a real discount to [its] peer group," and asked defendants to "discuss any strategies that you may implement to try to stimulate the share price." In response, at that time, defendant Pistiolis responded that, "I can assure you that you are working on two possible rates and I'm – I can't really talk more about that at this point in time. But I hope we are going to be able to report something – something nice in a couple of weeks time or three weeks or so."

39.     Later, on March 13, 2006, investors learned what "something nice" consisted of: a massive dividend of $7.50 per share to be paid to shareholders of record of the Company – at least $39.32 million of which would be paid to defendant Pistiolis and members of his family. At that time, defendants published a release that explained the terms of this large leaseback and dividend, in part, as follows:

> **TOP Tankers Announces Sale and Leaseback of Thirteen Vessels and Distribution of $7.50 Per Share Special Dividend**
>
> ATHENS, Greece, March 13 /PRNewswire-FirstCall/ -- TOP Tankers Inc (NASDAQ:TOPT) announced today the sale of thirteen vessels and the immediate leaseback to the Company for a period of five to seven years. The lease is a bareboat charter, with TOP Tankers continuing to operate and commercially manage the vessels….

---

[2]     For the fiscal years ended December 31, 2003 and December 31, 2002, senior management and the directors of the Company received no compensation or benefits. During the fiscal years ended December 31, 2004, and 2005, however, the Company paid members of its senior management and its directors, aggregate compensation of $4.4 million and $8.1 million respectively.

The aggregate sale price of the thirteen vessels is approximately $550 million, and the net cash proceeds from this transaction (after repayment of corresponding vessel loans and other expenses) are expected to be approximately $240 million. The Company expects to generate a book gain of approximately $90 million, which will be amortized over the respective lease period. The leases of the vessels following their sale are expected to qualify as operating leases under U.S. GAAP.

"Evangelos J. Pistiolis, President and CEO of TOP Tankers Inc., commented: *"Since our IPO in July 2004, we have committed to grow our company and create significant value for our shareholders. By entering into this transaction, we capitalize on prevailing high second hand tanker values, while maintaining full commercial and operational control of all our vessels.* [Emphasis added.]

*"In addition, by distributing the majority of the net cash generated by this transaction in the form of a special dividend, we are generating a substantial return for our shareholders.* We intend to continue to pursue similar transactions, whether involving acquisitions, redeployments of existing assets or dispositions, that increase shareholder value. [Emphasis added.]

*    *    *

**Distribution of Special Dividend**

The Company has declared a special dividend of $5.00 per share, payable on March 27, 2006 to shareholders of record as of March 22, 2006. The Company expects to declare an additional special dividend in the amount of $2.50. The declaration of that dividend is expected to be announced towards the end of March 2006. [Emphasis added.]

40.    On April 14, 2006, defendants filed with the SEC, pursuant to Form 20-F, its year-end financial results for the year-end December 31, 2005. The 2005 Form 20-F also contained statements that attested to the internal financial and operational controls that were purported to be in place at the Company at that time including, in part, the following:

**ITEM 15. CONTROLS AND PROCEDURES**

**Evaluation of disclosure controls and procedures.**

On the date of this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls

and procedures pursuant to Rule 13a-14 of the Securities Exchange Act of 1934, as amended. *Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in alerting them timely to material information relating to the Company required to be included in the Company's periodic Securities and Exchange Commission filings.* [Emphasis added.]

**Changes in internal controls.**

*There have been no significant changes in our internal controls or in other factors that could have significantly affected those controls subsequent to the date of the Company's most recent evaluation of internal controls*, including any corrective actions with regard to significant deficiencies and material weaknesses. [Emphasis added.]

41.    The 2005 Form 20-F also stated the role of the Audit Committee of the Board of Directors of TOP Tankers, and again reported their obligation to monitor and review the Company's accounting controls and procedures, as follows:

**ITEM 16A.    AUDIT COMMITTEE FINANCIAL EXPERT**

*We have established an audit committee comprised of three members which is responsible for reviewing our accounting controls and recommending to the board of directors the engagement of our outside auditors.* Each member is an independent director under the corporate governance rules of the Nasdaq National Market. The members of the audit committee are Messrs. Docherty, Gibbs and Thomas. While the Company is exempt from the requirement to have an audit committee financial expert, both Mr. Thomas and Mr. Gibbs meet the qualific-ations of an audit committee financial expert. [Emphasis added.]

42.    The 2005 Form 20-F also stated that the senior officers and directors complied with a Code of Ethics. Again, defendants were clear to state that this was an additional safeguard that they voluntarily provided to investors to make an investment in TOP Tankers more attractive. As evidence of this, the Form 20-F again stated the following:

**ITEM 16B.    CODE OF ETHICS**

As a foreign private issuer, we are exempt from the rules of the Nasdaq National Market that require the adoption of a code of ethics. However, *we have voluntarily adopted a code of ethics that applies to our principal executive officer, principal financial officer, principal accounting officer and persons*

17

*performing similar functions.* We will also provide any person a hard copy of our code of ethics free of charge upon written request. Shareholders may direct their requests to the attention of Mr. Evangelos Pistiolis. [Emphasis added.]

43.     On May 11, 2006, defendants published a release announcing results for the first quarter of 2006 the period ended March 31, 2006. This release reported significant gains in revenues and net income, and also quoted defendant Pistiolis regarding the Company's purported progress and foreseeable near term guidance, in part, as follows:

### TOP TANKERS REPORTS FIRST QUARTER OF 2006 FINANCIAL RESULTS

For the three months ended March 31, 2006, the Company reported net income of $30,404,000, or $1.06 per share, compared with net income of $19,121,000, or $0.69 per share, for the first quarter of 2005. The weighted average numbers of basic shares used in the computations were 28,099,212 and 27,830,990 for the first quarters of 2006 and 2005, respectively. The results for the first quarter of 2006 include net charges of $3,246,000, or $0.12 per share of special items that affected the Company's net income for the first quarter of 2006 that are typically excluded by securities analysts in their published estimates of the Company's financial results, which are described in Appendix A of this release.

For the three months ended March 31, 2006, operating income was $38,213,000, compared with $20,975,000 for the first quarter of 2005. EBITDA(1) for the first quarter of 2006 was $55,850,000, compared with $29,719,000 for the first quarter of 2005. Voyage revenues for the first quarter of 2006 were $101,746,000, compared to $47,291,000 recorded in the first quarter of 2005.

Evangelos J. Pistiolis, President and Chief Executive Officer of TOP Tankers Inc, commented, '*The first quarter of 2006 was one of the most important periods in our history. Not only did we achieve our highest quarterly EPS of $1.06, but we also concluded a significant $550 million sale and leaseback transaction which has resulted in a significant return of $7.50 per share to our shareholders.*' [Emphasis added.]

\*     \*     \*

'I also wish to inform our shareholders that I am currently involved in a project which involves the listing of a real estate fund on the Alternative Investment Market of the London Stock Exchange. It is envisioned that I will act as Chief Executive Officer of a private company that will manage that fund. I discussed my prospective involvement in this management company with our Board of Directors earlier in this year. Both the TOP Tankers Board and I are comfortable

that my duties for the fund will not interfere with the continued performance of my duties for TOP Tankers.'

'You probably have questions relating to the fund, but beyond telling you that this project does not involve a public offering in the United States, I am not able to give you any more details at this time due to regulations governing securities offerings both in London and in the United States.'

44.    Taking further advantage of the artificial inflation in the price of TOP Tankers' shares caused as a result of the publication of defendants' materially false and misleading statements, on June 27, 2006, defendants announced the sale of 2.6 million shares of Company stock pursuant to the Company's shelf registration statement at an average price of approximately $7.50 per share, under the Controlled Equity Offering Sales Agreement, dated April 13, 2006, by and between the Company and Cantor Fitzgerald (the "Sales Agreement").

45.    On August 3, 2006, defendants published a release announcing results for the second quarter and first half of 2006 ended June 30, 2006.  This release stated, in part, the following:

**ATHENS, Greece, Aug. 3 /PRNewswire-FirstCall/ -- TOP Tankers Inc. (NASDAQ:TOPT) today announced its operating results for the second quarter and first half of 2006.**

For the three months ended June 30, 2006, the Company reported net loss of $4,911,000, or $0.17 per share, compared with net income of $13,552,000, or $0.49 per share, for the second quarter of 2005.  The weighted average numbers of basic shares used in the computations were 29,586,783 and 27,830,990 for the second quarters of 2006 and 2005, respectively.  The results for the second quarter of 2006 include net charges of $359,000, or $0.01 per share of special items...

For the six months ended June 30, 2006, the Company reported net income of $25,493,000, or $0.86 per share, compared with net income of $32,673,000, or $1.17 per share, for the first half of 2005.  The weighted average numbers of basic shares used in the computations were 28,847,107 and 27,830,990 for the first half of 2006 and 2005, respectively.  The results for the first half of 2006 include net charges of $3,605,000, or $0.13 per share of special items that affected the Company's net income for the first half of 2006 that are typically excluded by securities analysts in their published estimates of the Company's financial results,

19

which are described in Appendix A of this release. For the six months ended June 30, 2006, operating income was $38,302,000, compared with $40,175,000 for the first half of 2005. EBITDA for the first half of 2006 was $66,038,000, compared with $62,847,000 for the same period last year. Voyage revenues for the six month period ended June 30, 2006 were $171,603,000, compared to $103,620,000 recorded in the first half of 2005.

Evangelos J. Pistiolis, President and Chief Executive Officer of TOP Tankers Inc, commented… 'During the second quarter, we sold 3,053,900 shares of common stock, in 'at-the-market' offerings at an average price of $7.30 per share. Such sales, together with continuing positive cash flows from operations, further increased our cash position to more than $90 million. In addition, our Board of Directors has approved our sale of up to an additional 5,000,000 shares under this program, out of which 453,900 shares were sold during the second quarter. Sales under this program may or may not take place depending on our assessment of the market and other circumstances.'

46.    The Company's August 3, 2006 release also revealed that defendants were cooperating fully with an investigation that was begun by the U.S. Securities and Exchange Commission. According to defendants, the SEC inquiry was only an "informal inquiry," and noting else was required to be reported by defendants at that time.

47.    The statements made by defendants and contained in the Company's press releases and SEC filings made during the remainder of and throughout the Class Period were materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such thereby, for the reasons stated herein in ¶ 32, above.

**The True Financial And Operational Condition
Of TOP Tankers Is Belatedly Disclosed**

48.    On November 29, 2006, defendants shocked investors after they announced that the Company's auditors, Ernst & Young, had resigned over a disagreement related to defendants' accounting for certain sale and leaseback transactions related to at least 13 vessels. At that time, defendants also revealed that the Company would be forced to restate its interim unaudited

financial statements for the first and second quarters of 2006 – cutting first-quarter net income by up to $0.02 and reducing second-quarter earnings by as much as $0.09 per share.

49.    Based on the large disparity between defendants' prior guidance, the Company's past performance, and the restatement by defendants announced that day, when shares began trading, TOP Tankers stock plummeted – immediately falling almost 15%, to just above $5.00 per share.

50.    At that time, Cantor Fitzgerald cut its rating on TOP Tankers to "sell" and lowered its near term price target almost 30%. The brokerage cited concerns over the resignation of TOP Tankers' independent auditors, Ernst & Young, the restatement of its earnings, and a previously announced SEC inquiry into the Company's vessel sale/leaseback transactions, among other factors. At that time, Cantor Fitzgerald also said that it was foreseeable that TOP Tankers' share price would likely decline further on continued financial and operational weakness.

51.    The market for TOP Tankers' common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, TOP Tankers common stock traded at artificially-inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired TOP Tankers common stocking upon the integrity of the market price of TOP Tankers common stock and market information relating to TOP Tankers, and have been damaged thereby.

52.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of TOP Tankers common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

53.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about TOP Tankers' business, prospects and operations.    These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of TOP Tankers and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially-inflated prices, thus causing the damages complained of herein.

## CAUSATION AND ECONOMIC LOSS

54.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated TOP Tankers' stock price and operated as a fraud or deceit on Class Period purchasers of TOP Tankers' stock by misrepresenting the Company's financial results.  Over a period of approximately eight months, defendants improperly inflated the Company's financial results.  Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed to investors, shares of TOP Tankers declined precipitously – evidence that the prior artificial inflation in the price of TOP Tankers' shares was eradicated.  As a result of their purchases of TOP Tankers

stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

55.    By improperly characterizing the Company's financial results and misrepresenting its prospects, defendants presented a misleading image of TOP Tankers' business and future growth prospects.  During the Class Period, defendants repeatedly emphasized the ability of the Company to monitor and control expenses, and consistently reported results within or above expectations.  These claims caused and maintained the artificial inflation in TOP Tankers' stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

56.    On November 29, 2006, however, defendants revealed that the Company would be forced to restate its financial results for the first and second quarters of 2006 as a result of defendants' improper accounting for TOP Tankers' sales/leaseback transactions, and defendants also revealed that the Company's auditors, Ernst & Young, had prematurely terminated its relationship with the Company.  These belated disclosures had an immediate, adverse impact on the price of TOP Tankers shares.

57.    These belated revelations also evidenced defendants' prior falsification of TOP Tankers' business prospects due to defendants' false statements.  As investors and the market ultimately learned, the Company's prior business prospects and financial results for the first full half of 2006 had been overstated.  As this adverse information became known to investors, the prior artificial inflation began to be eliminated from TOP Tankers' share price and caused damage to class members as a result of the related share price decline.

58.    As a direct result of defendants' statements on November 29, 2006, which indicated that the Company would be forced to restate its financial results for at least the first

half of 2006 and that the Company would be forced to engage new auditors this late in the fiscal year, TOP Tankers' stock price collapsed almost 15% in the single trading day – on unusually heavy trading volume of over 2.5 million shares. This dramatic share price decline eradicated much of the artificial inflation from TOP Tankers' share price, causing real economic loss to investors who purchased the Company's stock during the Class Period. In sum, as the truth about defendants' fraud and illegal course of conduct became known to investors, and as the artificial inflation in the price of TOP Tankers shares was eliminated, plaintiff and the other members of the Class were damaged, suffering an economic loss.

59.    The decline in TOP Tankers' stock price at the end of the Class Period was a direct result of the nature and extend of defendants' fraud being revealed to investors and to the market. The timing and magnitude of TOP Tankers' stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.

60.    During the same period in which TOP Tankers' share price fell almost 20% as a result of the revelation of defendants' fraud, the Standard & Poor's 500 securities index remained relatively unchanged. The economic loss, *i.e.*, damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of TOP Tankers' stock and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and other fraudulent conduct was revealed.

## VIOLATIONS OF GAAP AND SEC REPORTING RULES

61.     During the Class period, defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

62.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

63.     SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

64.     In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided. Instructions to Item 303 require that the this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's

ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

65.    Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. . .

66.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28. Paragraph 17 of this authoritative pronouncement states that:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

67.    The Company's financial statements contained in the fiscal 2006 first and second quarter reports filed with the SEC for the quarterly periods throughout the Class Period were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

a.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1);

b.      The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1);

c.      The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2);

d.      The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2);

e.      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2);

f.      The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28);

g.      The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28); and

h.      The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

68.     In addition, during the Class Period, defendants violated SEC disclosure rules, as follows:

a.      Defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing

in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. § 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and

        b.      By failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. § 210.4-01(a)(1).

69.   Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts which indicated that the fiscal 2006 interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth herein. Had the true financial position and results of operations of the Company been disclosed during the Class period, the Company's common stock would have traded at prices well below that which it did.

## ADDITIONAL SCIENTER ALLEGATIONS

70.   As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their

receipt of information reflecting the true facts regarding TOP Tankers, their control over, and/or receipt and/or modification of TOP Tankers' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning TOP Tankers, participated in the fraudulent scheme alleged herein.

71.    Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because the scheme: (i) deceived the investing public regarding TOP Tankers' business, operations, management and the intrinsic value of TOP Tankers common stock, and allowed defendants to artificially inflate the price of Company shares; (ii) enabled defendants to register for sale with the SEC, millions of shares of TOP Tankers stock, as well as allowing defendants to engineer the massive dividend of $7.50 per share – almost $40 million of which was paid to defendants and their families; (iii) enabled Kingdom Holdings, an entity owned by the family of defendant Pistiolis, to liquidate almost 900,000 shares of Company stock during the Class Period while in possession of material adverse information about the Company; and (iv) caused plaintiff and other members of the Class to purchase TOP Tankers common stock at artificially-inflated prices.

72.    Because TOP Tankers is an alien corporation whose stock is registered and listed on an exchange in the United States, stock sales by insiders are not required to be reported by defendants on a timely or regular basis.  Accordingly, absent discovery, there is no way to verify whether defendants also liquidated their personal shares during the Class Period.  What does appear to be known, however, is that Kingdom Holdings liquidated almost 900,000 shares of its stock between the filing of the Company's 2004 Form 20-F and its 2005 Form 20-F, thereby taking further advantage of the artificial inflation in the price of TOP Tankers shares caused as a result of defendants' publication of material false and misleading information about the

Company. Again, Kingdom Holdings is a major shareholder of the Company, owned substantially by the family of defendant Pistiolis.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### THE FRAUD-ON-THE-MARKET DOCTRINE

73.    At all relevant times, the market for TOP Tankers' common stock was an efficient market for the following reasons, among others:

a.    TOP Tankers' stock met the requirements for listing, and was listed and actively traded on the Nasdaq national market exchange, a highly efficient and automated market;

b.    As a regulated issuer, TOP Tankers filed periodic public reports with the SEC and the Nasdaq;

c.    TOP Tankers regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    TOP Tankers was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

74.    As a result of the foregoing, the market for TOP Tankers securities promptly digested current information regarding TOP Tankers from all publicly available sources and reflected such information in TOP Tankers stock price. Under these circumstances, all purchasers of TOP Tankers common stock during the Class Period suffered similar injury

through their purchase of TOP Tankers common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

75.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of TOP Tankers who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

76.    Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by TOP Tankers, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### Violation Of Section 10(b) Of The
### Exchange Act And Rule 10b-5 Against All Defendants

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding TOP Tankers' business, operations, management and the intrinsic value of TOP Tankers common stock, and allow defendants to artificially inflate the price of Company shares; (ii) enable defendants to register for sale with the SEC, millions of shares of TOP Tankers stock, as well as allowing defendants to engineer the massive dividend of $7.50 per share -- almost $40.0 million of which was paid to defendants and their families; (iii) enable Kingdom Holdings, an entity owned by the family of defendant Pistiolis, to liquidate almost 900,000 shares of Company stock during the Class Period while in possession of material adverse information about the Company; and (iv) cause plaintiff and other members of the Class to purchase TOP Tankers common stock at artificially-inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

79.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for TOP Tankers' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary

participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

80.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of TOP Tankers as specified herein.

81.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of TOP Tankers' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about TOP Tankers and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of TOP Tankers common stock during the Class Period.

82.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and

familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

83.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.    Such defendants' material misrepresentations and/or omissions were done knowingly or with recklessly for the purpose and effect of concealing TOP Tankers' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.    As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

84.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of TOP Tankers common stock was artificially inflated during the Class Period.    In ignorance of the fact that market prices of TOP Tankers' publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed

in public statements by defendants during the Class Period, plaintiff and the other members of

the Class acquired TOP Tankers common stock during the Class Period at artificially-high prices

and were damaged thereby.

85.    At the time of said misrepresentations and omissions, plaintiff and other members

of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the

other members of the Class and the marketplace known the truth regarding the problems that

TOP Tankers was experiencing, which were not disclosed by defendants, plaintiff and other

members of the Class would not have purchased or otherwise acquired their TOP Tankers

common stock, or, if they had acquired such common stock during the Class Period, they would

not have done so at the artificially inflated prices which they paid.

86.    By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

87.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and

the other members of the Class suffered damages in connection with their respective purchases

and sales of the Company's common stock during the Class Period.

**COUNT II**

**Violation Of Section 20(a) Of The
Exchange Act Against The Individual Defendants**

88.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

89.    The Individual Defendants acted as controlling persons of TOP Tankers within

the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

91.    As set forth above, TOP Tankers and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  December 5, 2006

**FARUQI & FARUQI, LLP**

By: _Antonio Vozzolo_

Nadeem Faruqi (NF-1184)
Antonio Vozzolo (AV-8773)
320 East 39th Street
New York, NY  10016
Tel: 212-983-9330
Fax: 212-983-9331

**GARDY & NOTIS, LLP**
Mark C. Gardy (MG-0338)
440 Sylvan Avenue, Suite 110
Englewood Cliffs, NJ  07632
Tel: 201-567-7377
Fax: 201-567-7337

**KAHN GAUTHIER SWICK, LLC**
Michael Swick
Kim E. Miller (KM-6996)
114 East 39th Street
New York, NY 10016
Tel: 212-920-4310
Fax: 504-455-1498

**KAHN GAUTHIER SWICK, LLC**
Lewis Kahn
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Tel: 504-455-1400
Fax: 504-455-1498

*Counsel for Plaintiff*

**CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF**

*Narain J. Bhojwani* (name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

      1.    Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

      2.    Plaintiff did not purchase securities of Top Tankers, Inc. at the direction of counsel or in order to participate in a private action under the federal securities laws.

      3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

      4.    During the Class Period, plaintiff has executed transactions in the securities of Top Tankers, Inc. as follows. See Attached Schedule.

      5.    In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

      6.    Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: _1ST_ day of _DEC_, 2006.

_Narain J. Bhojwani_ _____
                                   **Plaintiff**

Name of plaintiff: _____
Schedule of plaintiff's Transaction(s) in
Top Tankers, Inc.

Purchase(s):

| Date | Units | Price |
|------|-------|-------|
| 3/17/2006 | 4000 SHARES OF TOPT | $68806 includes Broker Commission |

Sale(s):

| Date | Units | Price |
|------|-------|-------|

NONE.
I still hold the Stock.