# Exhibit 3, Part I

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-KSB

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the year ended December 31, 2006

or

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number: 000-51837

Optionable, Inc.
----------------------------------
(Name of Small Business Issuer in Its Charter)

| Delaware | 52-2219407 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

465 Columbus Avenue, suite 280, Valhalla, New York 10510
--------------------------------------------------------------------------
(Address of Principal Executive Offices) (Zip Code)

(914)773-1100
----------------------------------
(Issuer's Telephone Number, Including Area Code)

Securities registered under Section 12(b) of the Exchange Act:
None

Securities registered under Section 12(g) of the Exchange Act:
Common Stock, $0.0001 par value

Check whether the issuer is not required to file reports pursuant to Section 13
or 15(d) of the Exchange Act. [ ]

Check whether the issuer (1) filed all reports required to be filed by Section
13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter
period that the registrant was required to file such reports), and (2) has been
subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Check if there is no disclosure of delinquent filers in response to Item 405 of
Regulation S-B contained in this form, and no disclosure will be contained, to
the best of registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-KSB or any
amendment to this Form 10-KSB. [ ]

Indicate by check mark whether the registrant is a shell company (as defined
in Rule 12b-2 of the Exchange Act).    Yes [ ] No [X]

Issuer's revenues for its most recent fiscal year: $16,069,511

The aggregate market value of the issuer's common stock, $0.001 par value, held
by non-affiliates as of March 12, 2007, was approximately $193,322,745.

The total number of shares of the issuer's common stock, $.0001 par value,
outstanding on March 12, 2007, was 52,177,714.

Transitional Small Business Disclosure Format: Yes |_| No |X|

SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this Annual Report constitute forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These include statements about anticipated financial performance, future revenues or earnings, business prospects, projected ventures, new products, anticipated market performance and similar matters. The words "budgeted," "anticipate," "project," "estimate," "expect," "may," "believe," "potential" and similar statements are intended to be among the statements that are forward-looking statements. Because such statements reflect the reality of risk and uncertainty that is inherent in our business, actual results may differ materially from those expressed or implied by such forward-looking statements. Some of these risks and uncertainties are related to our current business situation and include, but are not limited to our lack of sufficient revenues to cover operating expenses, our history of operating losses, our need for additional financing for working capital purposes, the uncertainty about our ability to continue as a going concern and dependence on our current management team. Readers are cautioned not to place undue reliance on these forward-looking statements, which are made as of the date this report was filed with the Securities and Exchange Commission.

Readers are advised that we undertake no obligation to release publicly any revisions to the forward-looking statements to reflect events or circumstances after the date hereof or to reflect unanticipated events or development. To the extent that the information presented in this Annual Report on Form 10-KSB for the year ended December 31, 2006 discusses financial projections, information or expectations about our products or markets, or otherwise makes statements about future events, such statements are forward-looking. We are making these forward-looking statements in reliance on the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Although we believe that the expectations reflected in these forward-looking statements are based on reasonable assumptions, there are a number of risks and uncertainties that could cause actual results to differ materially from such forward-looking statements. These risks and uncertainties are described, among other places in this Annual Report, in "Management's Discussion and Analysis of Financial Condition or Plan of Operation."

PART I

ITEM 1.  DESCRIPTION OF BUSINESS


We were formed in Delaware in February 2000.  Our goal is to be the leader of
commodity derivative brokerage services provider to brokerage firms, financial
institutions, energy traders, and hedge funds worldwide.  We specialize in
providing our services for the brokerage of energy derivatives.  A substantially
portion of all energy derivatives we have brokered in the past were natural gas
derivatives.  We are providing below a summary of elements describing and
impacting our industry to enhance your understanding of our business.


INDUSTRY

The markets for energy commodities trading include trading in both physical
commodities contracts and derivative instruments -- instruments that derive
their value from an underlying energy commodity or index -- across a wide
variety of commodities, including
crude oil, natural gas, electricity or power, coal, chemicals, weather and
emissions. Derivative instruments provide a means to manage exposure to price
risk, asset portfolio allocation, speculation or arbitrage. Contracts for
physical commodities allow counterparties to contract for the delivery of the
underlying physical asset.

Most of the following discussion will specifically address the natural gas
derivatives market.  However, we believe that most of the elements of this
discussion apply to other energy derivative markets as well.

Natural-gas derivatives

Natural gas derivatives are characterized by its underlying commodity
(natural gas), the term of the contract, and the settlement, which can require
physical delivery or financial settlement.  The natural gas derivatives with the
most liquidity are those with shorter settlement or expiration dates (less than
three months).  Derivatives with longer settlement or expiration dates are also
larger in dollar volume and are not as liquid, requiring more extensive
resources to find potential counterparties.  Accordingly, these derivatives tend
to generate higher brokerage transaction fees.

Natural gas is an actively traded commodity.  Natural gas derivatives are
primarily traded based upon the location to which they are delivered ("hub").
The Henry Hub, located in Louisiana, is the most widely-used pricing point for
natural gas derivatives in the United States.

Market Participants

Financial institutions, including bank brokerage houses and hedge funds as well
as eligible individual traders use natural gas derivatives market to weigh their
risk and rewards in: 1) a balanced portfolio asset allocation without investing
in the physical asset, and 2) speculate on the price movement of natural gas
prices or the related derivatives.  Natural gas producers, natural gas
distributors and large natural gas consumers will use natural gas derivatives
market to manage their exposure to future price movements for certain quantity,
time and delivery location, and sometimes, with an expectation that the
derivatives would ultimately provide a financial gain.

Types of Natural Gas Derivatives Markets

There are two types of natural gas derivative markets -- the futures market and
the over-the-counter ("OTC") market.

Futures Market

Most of the transactions on the natural gas futures market are made through an exchange, such as New York Mercantile Exchange ("NYMEX") and Intercontinental Exchange ("ICE").

The trading of natural gas futures is conducted either on an electronic platform or on an open-outcry trading floor. Prices are established publicly either on a screen or on the floor by participants posting bids, or buying indications, and offers, or indications to sell. While the electronic platform provides more transparency to our clients, the open-outcry trading floor provides a better environment for exchange of ideas and solutions to address our clients' needs.

Futures and options are two derivatives available to trade on a futures market. Futures consist of a contract to buy or sell a certain quantity of natural gas, for example, during a specified month and are settled through either physical delivery or cash settlement. Options consist of a right, but not an obligation, to buy or sell a futures contract at a certain price.

OTC Market

Over-the-counter, or OTC, is a term used to describe trading activity that does not take place on a regulated exchange.

Several derivatives are available for trade on the OTC market, such as forwards and swaps, differentials and spreads and options.

Forwards are negotiated agreements between counterparties to deliver a specified quantity of natural gas, on a specified date, and at a specified location.

Swaps are contracts between the holders of two different assets with differing risk and performance profiles in which the risk or performance characteristics are exchanged. Swaps may be settled against the future price of a single commodity or against an index of commodity prices.

Spreads are the simultaneous purchase and sale of forward contracts for different months, different commodities or different grades of the same commodity.

Basis options are contracts that allow counterparties to swap the physical or financial delivery of natural gas commodity between two different delivery points.

Options traded on the OTC market, unlike those traded on the futures market, are contracts that convey to the buyer the right, but not the obligation, to require the seller to make or take delivery of a stated quantity of natural gas at a specified price. Options may also be settled in cash, based on the difference between the market price of, for example, natural gas and the price of the commodity specified in the option.

Besides the types of derivatives traded on those markets, there are several inherent differences between them. For example, the futures market is primarily conducted through an open-outcry market, such as NYMEX, which imposes physical limitations on the number of participants who can trade at the same time. Accordingly, membership on such exchanges becomes a commodity of its own and may require significant resources. The types of derivatives traded on the OTC market are not standardized such as those used on the futures market. Therefore, when one counterparty wants to enter into OTC derivatives transactions, the use of a broker facilitates the search for another counterparty. The OTC-based transactions tend to generate higher brokerage fees due to extensive involvement of a broker.

However, there is a significant similarity between these natural gas derivatives markets in that they lack transparency for the participants, unlike the equity market. Counterparties to a natural gas derivative transaction are unaware of all offers available on either market at any given time under current conditions, unless it is executed on an electronic platform with sufficient liquidity.

Trends

We believe that several factors will impact the natural gas and other energy derivatives market in the future:

o    Natural gas options as asset class: new market participants, such as hedge funds, and institutional investors, such as pension plans, are taking a greater interest in the returns afforded by natural gas derivatives and the asset diversification opportunities it provides.

o    Lesser credit risk using the OTC market: since 2002, natural gas derivatives feature cleared OTC contracts. Cleared OTC contracts allow participants to limit counterparty credit risk and lower the amount of capital required to trade.

o    Larger number of new entrants: both factors have increased the number of market participants in the natural gas derivatives market which improves its liquidity.  While some recent large entrants, such as Amaranth, have already exited the markets, an even larger amount of new entrants in the last few years have contributed to an increase in volume of energy contracts traded.

o    Need for higher transparency in the natural gas derivatives market: the natural gas derivatives market lacks transparency when compared to other markets, such as the equity market. The participants, who are enjoying such transparency in other markets, are requesting the same level of transparency in the natural gas derivatives market without obtaining it with the currently available solutions offered by brokers or exchanges.

o    While industry participants have refined their risk management processes in the last few years, the vast majority of the of holders of OTC energy derivatives continue to use theoretical approaches to value their portfolio. Without a real-time mark-to-market approach, such holders may continue to overstate or understate the true value of their energy derivatives portfolio.

Current Solutions to Energy Derivatives Market

The current solutions offered to energy derivatives market vary widely.

Some brokerage firms offer only services for the futures market or the OTC markets, but not both.  This restricts the choice of market participants who combine futures and swaps, for example, in their hedging or investment strategy which are not traded on the same markets.  If dealing with brokers who only offer services on one of the markets, the market participants are forced to use more than one broker, which creates further lack of market transparency, inefficiencies in the use of resources as well as ineffectiveness in timely trading.

Other brokerage firms offer services on both markets, but most do not have the intent or the resources to address the current lack of transparency and liquidity in the energy derivatives market by using an electronic platform, for example.

While exchanges are used primarily for the futures market, they are also used for clearing OTC trades.  However, none of the larger exchanges provide sufficient support for derivatives trading on the OTC market, such as options, which reduces the liquidity of such market.  Additionally, exchanges do not offer brokerage services which facilitate the search for counterparties.

Some brokerage firms do not provide real-time valuation services to their clients for OTC energy derivatives, which prevents such clients from determining whether their portfolio is properly valued and decreases the likelihood that they maximize their investment strategy.

Other Elements of the Natural Gas Derivatives Market

The energy derivatives market is also impacted by the following elements:

Trading volumes are driven primarily by the degree of volatility in the energy derivatives market.

However, if the volatility of the price of natural gas or oil and their related derivatives is too high, some of the market participants will wait that it declines before entering into transactions, which reduces trading volumes.

Worldwide geopolitical conditions impact the perceived or real supply or demand of a particular energy commodity.

Unexpected weather conditions, such as hurricanes in the Gulf Coast or milder or colder weather in the Northeast United States, impact the perceived or real supply or demand of a particular energy commodity. While hurricanes have recently become more expected, their unpredictable strength and trajectory increase the volatility of energy commodities market.

The delivery of energy commodities is generally seasonal. In parallel, the trading volume of the energy derivatives market, which historically has been higher during the winter and the summer, has been recently skewed by the larger number of entrants in the market as well worldwide geopolitical events and unexpected weather conditions.

Our Solutions

We understand that the participants in the energy derivatives market have various investment needs, some of which may be as simple as trading speculative futures, but most need a brokerage firm to provide the access to a larger amount of counterparties with the highest transparency possible. We provide the following services to our clients:

o        OTC energy derivatives brokerage. Once we receive an order to trade an OTC market derivative from a client, we find through our network the appropriate counterparty for such trade. We also offer our services for lesser used derivatives such as "swaptions", which terms slightly vary from an option for swaps;

o        Energy futures derivatives services on the floor of the NYMEX, which was launched in April 2004. Such services were provided through an affiliate, Capital Energy Services LLC ("CES") in 2006 and are now provided through one of our subsidiaries, OPEX International, Inc., since February 2007;

o        We have completed the initial phase of OPEX, which is an electronic brokerage platform automating the energy derivatives between counterparties. We believe that OPEX significantly improves the liquidity and transparency of natural gas and other energy derivatives market by increasing number of participants in a market in which they receive real-time market data. Since our launch of OPEX in 2006, an increasing number of OTC derivatives have been traded directly by our clients on such platform. For the month of February 2007, trades executed directly on OPEX by our clients constituted 17% of our volume of OTC cleared contracts; and,

o        We also complement our fee-based services with derivatives valuation and mark to market services called OPEX Analytics. At the request of several of our existing clients, and based on our experience and knowledge of the markets as well as wide network of counterparties, we can periodically assist our clients in valuing their positions in the natural gas derivatives market. We believe that the demand for this service from market participants will increase possibly creating new revenue opportunities from 1) subscription fees as well as 2) additional brokerage fees related to price discoveries resulting from the mark to market services.

Those solutions can be applied to the trading of other energy derivatives as well. Additionally, the combination of those services provide for larger choice of investment opportunities for participants in the energy derivatives market, including natural gas.

Generally, the nature and mechanics of our business is to inquire of our clients their needs in the trade of energy options, swaps, and futures. Once we understand their needs: in the case of NYMEX futures or options, the trade is

presented on the NYMEX through OPEX International, Inc.; and in the case of OTC swaps and options, we inquire of other clients whether they are interested in participating in such transaction or they can access such information through our electronic platform, OPEX. Once the counterparties agree on a certain trade, they either execute it directly on OPEX or we match the counterparties and consummate the trade by (i) in the case of a bilateral OTC trade, confirming the details of the executed trade with both counterparties or (ii) in the case of a cleared trade, submitting such trade to an exchange.

Presently, OTC brokerage is facilitated by brokering trades between our clients via telephone and electronic messaging, often referred to as voice brokerage. By building a relationship with our existing and potential clients, our brokers learn about their interests and opportunities they are seeking. We complement our traditional voice brokerage with electronic trading by offering a hybrid combination of voice and electronic transactions; clients move between voice and electronic trading with no loss in liquidity. Our clients are able to transact in the same markets, regardless of whether or not they entered orders electronically or through a broker.

Central to OPEX is the trade-matching engine, which is designed to facilitate real-time trading of derivative products irrespective of a particular market. Based on our experience in trading and brokering OTC swaps and options, we devoted significant attention to the user experience and user-interface ergonomics. In designing the system, we were cognizant of the way traders currently execute their trades and how they could comfortably transition to an electronic trading platform. The outcome is a graphical user interface that is both simple and intuitive to use.

OPEX's trading platform (for which there are pending patents) was designed with the aid of professional options traders to facilitate strategies that are currently executed on the OTC, commodity and equity exchanges. The user can customize the system to execute various options trading strategies.

Strategy

We intend to employ the following key strategies to achieve our goal of being a leading facilitator of energy derivatives:

o    Increase revenues from existing and new clients by offering OPEX, which could automate some of the transactions now handled by voice brokerage and provide more pertinent market information to our clients, improving the liquidity and transparency of the energy derivatives market;

o    Expand the number of clients who actively trade in the energy derivatives market, or "market-makers" and facilitate our search of counterparties for more complex derivatives traded on the OTC market. We could, for example, enter into order flow agreements with certain market makers which would support certain dedicated markets in consideration of warrants in our common stock;

o    Significantly expand our depth in product offerings of other energy derivatives products.  In 2006, we offered several new OTC energy-based derivatives contracts to our client base;

o    Develop new strategic relationships, such as marketing and technical relationships with exchanges and other brokers within the energy derivatives community, which will allow us to brand and market each other's solutions to our industry participants as well as integrate our technology with theirs.  In January 2007, we signed a binding term sheet with NYMEX Holdings, Inc., the parent company of NYMEX, in which both parties have agreed to deepen their cooperation of their marketing and technology relationships.  With brokers, we could license our technology for a share of the brokerage fees;

o    Acquire small brokerage firms in other energy or commodity markets which would accelerate our time to market products in such segments;and

o    Acquire small technology concerns accelerating the development and enhancement of features and functionalities of OPEX.

HOW WE GENERATE REVENUES

We generate revenues by charging commissions fees based on the OTC market transactions we submit for trading on behalf of our clients or that they execute directly on OPEX. Our fees for brokerage services and the use of OPEX are the same.  For options and swaps are up to $5.00 per contract (natural gas-10,000 million British thermal units (mmBtu);crude oil-1,000 barrels) of natural gas or crude oil. Our fees are earned on the date of the trade. Our monthly average fee per OTC natural gas contract varied between $0.90 $1.36 during 2006.

We also receive incentives from NYMEX. The incentives are earned based on a percentage of the total revenues received by the exchange attributable to our volume of OTC market transactions submitted to the respective exchanges. Under this incentive program offered by NYMEX, 25% of the revenues from NYMEX ClearPort are allocated to an intermediary incentive pool. At the end of each month, the qualifying intermediaries, including us, receive their pro-rata share based on the volume for which they were responsible. There is no minimum volume requirement in order to participate.

Furthermore, through CES in 2006 and through OPEX International, Inc. since February 2007, we generate revenues from the futures market, which are commission fees based on transactions they broker on behalf of their clients. Prior to January 2007, in return for such revenues from CES, we assume all expenses associated with the futures market incurred by CES, including brokerage commissions paid by CES to its employees. The transactions facilitated by CES consist mostly of options and futures contracts on natural gas, which fees ranged between $1.00 and $1.50 per 10,000 mmBtu of natural gas, per contract. Effective February 2007, OPEX International, Inc., will earn all revenues and assume all expenses associated with the futures market.

HOW WE MARKET OUR SERVICES

We market our brokerage services through our broker-employees. We market our services by providing information on specific transactions or market conditions to our existing and prospective clients. For example, we provide a daily report of most notable trades and an analysis of the forward six-month volatility of natural gas and crude oil derivatives to over 200 trading desks. Our broker-employees conduct their sales activities from our office facilities in Valhalla, New York and on the floor of the NYMEX. We market our OPEX system primarily by providing demonstrations, training, sales events, advertising, and sales collateral to our existing and potential clients. We will also market OPEX using an arcade on the NYMEX trading floor.

HOW WE OPERATE

Our OTC brokerage operations are conducted from our Valhalla, New York, office and our floor operations are conducted from the floor of the NYMEX. We have 10 brokers who interact heavily with our existing and potential clients. Generally, the nature and mechanics of our business is to inquire of our clients needs in the trading of energy derivatives. Once we understand their needs: in the case of futures market derivatives, the trade is presented on the NYMEX through CES and now OPEX International, Inc.; and in the case of OTC market derivatives, we inquire of other clients whether they are interested in participating in such transaction and facilitate the negotiation and conclusion of an agreement between counterparties or they keep apprised of market conditions using OPEX. Once the counterparties agree on a certain trade, they either trade it directly on OPEX or we match the counterparties and consummate the trade by (i) in the case of a bilateral OTC trade, confirming the details of the executed trade with both counterparties or (ii) in the case of a cleared OTC trade, submitting such trade to an exchange.

We also leverage our employees located at NYMEX, who typically handle futures transactions, to find counterparties for OTC transactions.

We rely heavily on communication technology to interact with our clients, whether by phone, e-mail, and/or instant messaging. We also rely on Internet based communications for the operation of OPEX.

We keep abreast of conditions in the energy trading market by receiving information using a combination of technology, such as analytics software as well as market data services, relevant business news from different wire services and traditional broadcast as well as leveraging the presence of our employees on the NYMEX floor.

BUSINESS ALLIANCES

In April 2004, we entered into a Master Services Agreement with CES. Edward J. O'Connor, our President, is a shareholder of CES. Kevin P. Cassidy, our Chief Executive Officer is also a shareholder of and managing director of CES. We provided CES with marketing and brokerage support services for the NYMEX business. We agreed to pay CES (a) a minimum fixed annual fee of $50,000 payable in 24 bi-monthly installments of $2,083, for the duration of the contract and (b) a deferred payment of $1,525,000. During April 2005, CES assigned its rights to the Company's liability of $1,525,000 equally to Edward O'Connor and Kevin Cassidy.

CES made monthly payments to us equal to (a) the gross receipts of the floor business, which consists of commission fees on natural gas future transactions less (b) brokerage expenses less the amount of the bimonthly fees paid. If gross receipts in any month are less than brokerage expenses less the amount of the bimonthly fees paid, we paid the difference to CES.  This agreement was terminated on January 31, 2007.

On January 22, 2007, we, Mark Nordlicht, our Chairman of the Board, Kevin Cassidy, our Vice Chairman and Chief Executive Officer, and Edward O'Connor, our President (collectively, the "Founding Stockholders"), and NYMEX Holdings, Inc. (the "Investor") entered into a binding term sheet (the "Term Sheet") pursuant to which Messrs. Nordlicht, Cassidy and O'Connor have agreed to sell 7,000,000, 1,491,448 and 1,800,000 shares, respectively, of our common stock, par value $0.0001 per share (the "Common Stock"), to the Investor. This aggregate of 10,291,448 shares (the "Purchased Shares") represents nineteen percent (19%) of the currently outstanding shares of Common Stock on a fully diluted basis (without giving effect to the warrant discussed below). The purchase price to be paid by the Investor for the Purchased Shares is $2.69 per share. Pursuant to the Term Sheet, we agreed to issue the warrant described below to the Investor, in consideration of the Investor's agreement to engage in certain joint marketing and cobranding activities and to provide hosting of our servers and assistance in joint technology development. In addition, the Investor and us agreed to certain arrangements with respect to OTC products which the Company clears through the clearing system.

The warrant to be issued by us (the "Warrant") will permit the Investor to purchase a number of shares of Common Stock sufficient to increase the Investor's ownership of the Company's Common Stock to an amount not to exceed 40% of our then outstanding Common Stock on a fully diluted basis, based on the assumption that the Investor has retained ownership of the Purchased Shares. The Warrant will be exercisable from time to time for a period of 18 months from the closing date of the transactions contemplated by the Term Sheet at an exercise price per share equal to $4.30 (the "Exercise Price"). The Warrant will not contain a cashless exercise feature. The Exercise Price will be subject to certain customary adjustments to protect against dilution.

The transactions contemplated by the Term Sheet will be evidenced by definitive agreements (the "Definitive Agreements") which will contain representations, warranties, covenants, indemnities and conditions precedent customary and appropriate for this type of transaction including, but not limited to, representations, warranties, covenants and indemnities from each of the Founding Stockholders, the Company and the Investors.


The closing of the transactions contemplated by the Term Sheet is subject to certain conditions precedent set forth in the Term Sheet, including,

(i) the Investor being satisfied, in its sole and reasonable discretion, with its legal, accounting, regulatory, business and other due diligence investigation of the Company, which will be completed prior to the execution of the Definitive Agreements,

(ii) the execution and delivery of mutually acceptable Definitive Agreements within sixty (60) days of the date of the execution of the Term Sheet, (iii) the delivery of mutually acceptable employment agreements with our key management and executives, other than Mr.Cassidy, which will include customary non-competition and non-solicitation provisions, and the delivery of a mutually acceptable non-competition agreement with Mr. O'Connor and (iv) Mr. Nordlicht's agreement to waive any obligation on our part to make any prepayment of principal or to begin paying interest upon amounts due to Mr. Nordlicht under the Loan Agreement between him and us, dated March 22, 2004, as a result of any exercise by the Investor of the Warrant.

If the Investor does not inform us within 3 weeks of being provided substantial access to due diligence that it is satisfied with its due diligence review and that it intends to proceed with the transaction, we and the Founding Stockholders will be entitled, in their sole discretion, to terminate the transaction by written notice to the Investor.

Effective upon closing of the transactions contemplated by the Term Sheet and for so long as the Investor owns at least 5,145,724 shares of Common Stock, the Investor will be entitled to designate one (1) person (reasonably acceptable to the Company) that we are required to nominate as a member of our board of directors (the "Investor Director"), and each of the Founding Stockholders shall be required to vote their shares in favor of the election of the Investor's designation. For so long as the Investor owns at least 5,145,724 shares of Common Stock, the Investor will be required to vote its shares in favor of each individual nominated for election as a member of our board of directors by our nominating committee. For so long as the Investor owns at least 5,145,724 shares of Common Stock and subject to certain permitted threshold amounts, the consent of the Investor Director (which may not be unreasonably withheld) will be required before we may take certain actions including (i) issuances of shares of a class of stock ranking senior to the Common Stock, (ii) acquisitions of businesses or assets, (iii) entry into related party transactions, (iv) the payment of dividends on, or the optional redemption of, capital stock or the issuance of debt and (v) entry into any business which is not similar, ancillary or related to any of the businesses in which we are currently engaged.

For so long as the Investor owns at least 5,145,724 shares of Common Stock: (i) each of the Founding Stockholders and the Investor will have a right of first refusal to purchase or subscribe for their pro rata percentage of shares in certain subsequent sales by the us of Common Stock and/or certain other securities convertible into or exchangeable for Common Stock, (ii) each of the Founding Stockholders and the Investor will have certain rights of first refusal with respect to proposed sales of Common Stock by the others and (iii) before they may accept any offer by an independent third party to acquire fifty percent (50%) or more of the total voting power of our Common Stock or voting stock, the Founding Stockholders and we will be required to provide notice of such offer to the Investor and permit the Investor a period of 10 days to make its own offer.

In connection with the Purchased Shares, we will enter into a registration rights agreement with the Investor which, among other things, will provide the Investor, subject to standard exceptions, with (i) unlimited "piggyback" rights subject to standard underwriter lock-up and cutback provisions and (ii) the right to two demand registrations for underwritten offerings or take downs off of a shelf registration statement, provided that (A) a minimum of $5,000,000 of Common Stock are offered in such a demand registration or take down and (B) we shall not be obligated to effectuate more than one underwritten offering pursuant to a demand registration by the Investor in any six-month period. In addition, if are eligible to register its securities on Form S-3 (or any successor form then in effect), the Investor will be entitled to unlimited registrations on Form S-3 (or any successor form then in effect), including shelf registrations, provided that (x) a minimum of $5,000,000 of Common Stock are offered in such an S-3 registration and (y) we will not be obligated to effect more than two S-3 registrations in any twelve month period. An S-3 registration will not count as a demand registration, unless such registration is for an underwritten offering.

The Investor will enter into a standstill agreement with us pursuant to which the Investor, with certain limited exceptions, will agree not to purchase any additional shares of the our Common Stock until the one year anniversary of the closing date of the transactions contemplated by the Term Sheet.

The closing of the transactions contemplated by the Term Sheet is expected to occur as soon as reasonably practicable after the date of execution of the Term Sheet. The provisions of the Term Sheet are subject to, among other things, satisfactory completion of due diligence by the Investor. There can be no assurance that the transactions contemplated by the Term Sheet will close.

CLIENT CONCENTRATION

One of our clients, Bank of Montreal, accounted for 24% and 18% of our revenues during 2006 and 2005, respectively.

COMPETITION

The energy derivatives market has many competitors involved in the brokering of natural gas options. Capital investment for entry into the market is low. Accordingly, a number of small brokerage firms flourish along side of larger more established brokerage firms such as Cantor Fitzgerald, L.P., MAN Group PLC and ICAP PLC.

There are several other well-financed companies who do or may compete with us. In the OTC natural gas derivatives market, our competitors include Choice Energy LP, ICAP PLC, GFI Group, Inc., G.A. Options, MAN Financial, Inc. FIMAT Internationale Banque, S.A., TFS, Inc., Tullet Natsource, Inc. In the futures natural gas derivatives market, our competitors include Clarion Trading, SCS Trading Corp., and ICAP PLC. OPEX competes with offerings from ICE. To date, we do not believe any one company has achieved a dominant position.

As the emerging market for electronic energy derivatives develops, more competitors are likely to emerge.

We believe that the principal competitive factors in our market include:

o        Access to a large number of financially-sound participants;
o        Timeliness in finding willing counterparties;
o        Client service and support;
o        service functionality, quality and performance of the electronic
         trading system;
o        ease of use, reliability and security of electronic trading system;
o        establishing a significant sales force;
o        ability to introduce new products to the market in a timely manner; and
o        pricing.

We currently differentiate from the competition by offering electronic and traditional access to energy derivatives on both the futures market and the OTC market. We also differentiate by offering derivatives products, such as swaptions which are not commonly offered by other brokerage firms. Furthermore, we have a number of blue-chip clients which actively and regularly trade in this market which facilitates our search of counterparties and allows us to trade quickly on behalf of our clients.

EMPLOYEES

We currently have 18 full-time employees. We also have a consultant who serves as the Chief Technology Officer, and a consultant who serves as our Chief Financial Officer as well as five other software engineers who are consultants. The number of employees that we intend to hire is dependent on our clients' needs and the infrastructure required to support such needs. We believe that our relationship with our employees and consultants is good.

PATENTS, TRADEMARKS AND LICENSES

We have four patents pending at this time, most importantly those related to a system and method for real-time trading over a computer network and a system and method for trading selectable market transactions over a network

We have registered a trademark for "Optionable" and use OPEX as a service mark.

11

Although we have several patents pending which relate to our electronic trading system, we do not solely depend on those patents to protect our intellectual property. Furthermore, the benefit that would be afforded by those patents has not been relied upon in our business plan, although we do feel that the patents would benefit our position in the marketplace. We have taken various steps to protect our intellectual property including non-disclosure agreements, confidentiality agreements and other general precautions taken to keep the information confidential.

RESEARCH AND DEVELOPMENT

We incurred approximately $474,000 and $450,000 in expenses on research and development during 2006 and 2005. Most of the key members of our research and development team have been working on OPEX since 2004.

GOVERNMENT REGULATION

The OTC brokerage business is not officially regulated. However, we have given notice to the Commodity Futures Trading Commission ("CFTC") of our intention to operate the OPEX electronic trading platform as an Exempt Commercial Market. Exempt Commercial Markets are subject to certain information access rules established by the CFTC.

The futures derivatives market in which our affiliate, CES, operated, and now our subsidiary, OPEX International, Inc. is regulated by the CFTC and National Futures Association.

ITEM 2. DESCRIPTION OF PROPERTY

Our headquarters are located in Valhalla, New York since January 2007. The offices consist of approximately 5,500 square feet. We moved from a smaller office located in Briarcliff Manor, NY.

The lease in Briarcliff Manor expired in January 2007. The annual base rent was $66,817 payable in monthly installments of $5,568. We also pay our proportionate share of any increase in real estate taxes or common area maintenance charges.

Our new 10-year lease provides for payments of  a monthly base rent of $9,953, increasing gradually to up to $11,684.  The first 6 months of occupancy are free.

We believe our space is adequate for our current and foreseeable future operations.

ITEM 3.        LEGAL PROCEEDINGS

None

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

12

PART II

ITEM 5.              MARKET FOR COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND
                     SMALL BUSINESS ISSUER PURCHASES OF EQUITY SECURITIES


Our common stock is quoted on the Over-the-Counter Bulletin Board operated by
the National Association of Securities Dealers, Inc. Our shares are listed under
the symbol "OPBL."


The following table sets forth, for the fiscal quarters indicated, the high and
low closing prices per share of our common stock as reported on the
Over-the-Counter Bulletin Board. The quotations reflect inter dealer prices,
without retail mark-up, mark-down or commissions and may not represent actual
transactions.

| Year Ended December 31, 2006 | High | Low |
|---|---|---|
| First Quarter | $0.90 | $1.50 |
| Second Quarter | 0.50 | 0.90 |
| Third Quarter | 0.50 | 0.75 |
| Fourth Quarter | 0.60 | 2.84 |
| Year Ended December 31, 2005 | | |
| First Quarter | N/A | N/A |
| Second Quarter | N/A | N/A |
| Third Quarter | 1.25 | 1.00 |
| Fourth Quarter | 1.40 | 0.85 |


At March 12, 2007, the closing price for our common stock was $6.36.


At March 12, 2007, there were 52,182,514 shares of our common stock issued and
52,177,714 shares of our common stock outstanding. There are approximately 14
stockholders of record at March 12, 2007. During the last two fiscal years, no
cash dividends have been declared on our common stock and management does not
anticipate that dividends will be paid in the foreseeable future.

13

Equity Compensation Plan Information

Optionable, Inc.  2004 Stock Option Plan and warrants issued for services

| | Number of securities to be issued upon exercise of outstanding options, warrants, and rights | Weighted-average exercise price of outstanding options, warrants, and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | 941,000 | $0.26 | 6,559,000 |
| Equity compensation plans not approved by security holders | 1,550,000 | 0.68 | - |
| Total | 2,491,000 | $0.52 | 6,559,000 |

ITEM 6.        MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION OR
               PLAN OF OPERATION OVERVIEW AND PLAN OF OPERATIONS

We launched our electronic trading system, OPEX, in 2006. We believe that a
majority of our futures and OTC related revenues will continue to be generated
through voice-brokerage for the foreseeable future. We expect that in 2007,
revenues generated through OPEX will constitute a small but growing portion of
our revenues.  We expect that our research and development expenses to enhance
features and functionalities of OPEX will exceed $500,000 during 2007.

We expect that our cost of revenues will continue to grow at substantially the
same rate as our revenues during 2007, unless we make an acquisition which could
change our business model.  However, we believe that we may not be able to
continue to grow the revenues at the same sequential rate as we did in the last
quarter of 2006.

Pursuant to our binding term sheet with NYMEX- as discussed in
item 1 - Description of Business-Business Alliances, we are issuing
approximately 19,100,000 warrants to NYMEX. A significant portion of the fair
value of the warrants will be expensed during 2007.

We intend to hire brokers with a specialized knowledge of energy derivative
markets or acquire small brokerage firms operating in energy derivative segments
other than natural gas.

This discussion and analysis of our financial condition should be read in
connection with our financial statements and accompanying notes thereto for the
fiscal year ended December 31, 2005, including without limitation the
information set forth under the heading "Critical Accounting Policies and
Estimates".

14

Results of Operations
(Unaudited)

| | For the year ended December 31, | | Increase/ (Decrease) in $ 2006 vs 2005 | Increase/ (Decrease) in % 2006 vs 2005 |
|---|---|---|---|---|
| | 2006 | 2005 | | |
| Brokerage fees | $   8,987,727 | $   2,979,641 | $   6,008,086 | 201.6% |
| Brokerage fees-related parties | 3,994,131 | 2,087,215 | 1,906,916 | 91.4% |
| Incentives | 3,087,653 | 738,558 | 2,349,095 | 318.1% |
| Net revenues | 16,069,511 | 5,805,414 | 10,264,097 | 176.8% |
| Cost of revenues | 5,312,269 | 2,264,110 | 3,048,159 | 134.6% |
| Cost of revenues-related parties | 909,291 | 856,763 | 52,528 | 6.1% |
| | 6,221,560 | 3,120,873 | 3,100,687 | 99.4% |
| Gross profit | 9,847,951 | 2,684,541 | 7,163,410 | 266.8% |
| Operating expenses: | | | | |
| Selling, general and administrative | 1,030,979 | 695,718 | 335,261 | 48.2% |
| Research and development | 473,645 | 450,488 | 23,157 | 5.1% |
| Total operating expenses | 1,504,624 | 1,146,206 | 358,418 | 31.3% |
| Operating income | 8,343,327 | 1,538,335 | 6,804,992 | 442.4% |
| Other income (expense): | | | | |
| Interest income | 102,040 | 21,548 | 80,492 | 373.5% |
| Interest expense-related parties | (780,137) | (300,319) | 479,818 | 159.8% |
| | (678,097) | (278,771) | 399,326 | NM |
| Net income before income tax | 7,665,230 | 1,259,564 | 6,405,666 | 508.6% |
| Income tax | (1,459,052) | - | 1,459,052 | NM |
| Net income | $   6,206,178 | $   1,259,564 | $   4,946,614 | 392.7% |

NM:  Not meaningful

15

RESULTS OF OPERATIONS

Revenues

Revenues consist primarily of fees earned from natural gas derivatives transactions and related incentives arrangements. The increase in brokerage fees and brokerage fees related party during 2006 when compared to 2005 is primarily due to an increase in the brokerage fees resulting from an increased volume of transactions of OTC natural gas derivatives contracts, and to a lesser extent, natural gas derivatives traded on the futures market traded on behalf of existing and new clients.    The increase in incentives revenues in 2006 when compared to 2005 is primarily due to a higher volume of energy contracts cleared on behalf of our clients through NYMEX' clearing system. The increase in revenues resulted from a combination of general increase in volume of natural gas options contract traded on the market as well as an increased share of the market.

Cost of revenues

Cost of revenues and cost of revenues-related party consists primarily of compensation of personnel directly associated with handling the OTC and floor natural gas derivative transactions on behalf of our clients. The increase in cost of revenues and cost of revenues-related party during 2006 when compared to 2005 is primarily attributable to increased commissions paid to our brokers resulting from higher brokerage fees we earned.

Selling, general, and administrative expenses

Selling, general, and administrative expenses consists primarily of compensation of personnel supporting our operations as well as professional fees, such as legal fees, incurred to handle certain matters which occur during the course of operations. The increase in selling, general, and administrative expenses during 2006 when compared to 2005 is primarily attributable to an increase in expenses associated with being a public company, such as investor relations expenses and professional fees.

Research and development

Research and development expenses consist primarily of compensation of personnel and consultants associated with the development of our automated electronic trading system. Our research and development expenses have remained at the same levels during 2006 and 2005.

Interest income

Interest income consists of interest earned on interest-bearing accounts we hold at various financial institutions.  The increase in interest income during 2006 when compared to 2005 is primarily due to higher balances held in such accounts during 2006, resulting from higher cash provided from operating activities.

Interest expense to related parties

Interest expense to related parties consists of interest charges associated with amounts due to related parties, Mark Nordlicht, our Chairman, Kevin Cassidy, our Chief Executive Officer, and Edward O'Connor, our President. The increase in interest expense to related parties is primarily due to the accelerated amortization of debt discount associated with the amount due to Kevin Cassidy. We have accelerated the amortization discount on this debt since we are reimbursing the debt at a faster rate than initially contemplated.

Income Tax

16

Income tax expense consists of federal and state current and deferred income tax based on our net income. The increase in income tax expense during 2006 when compared to 2005 is primarily due to our use of all prior year net operating loss carryforwards during 2006.

LIQUIDITY AND CAPITAL RESOURCES

For the last three fiscal years, we have generated cash flows from our operating activities. Our cash balance as of December 31, 2006 amounts to approximately $7.9 million.

During 2006, we generated cash from operating activities of approximately $7.3 million, primarily resulting from:

o    net income of approximately $6.2 million, adjusted for non-cash interest expense of approximately $780,000 and fair value of warrants, options and shares issued during the period aggregating approximately $247,000; and

o    an increase in accounts receivable, incentive receivable, due from related party, accrued compensation and income tax payable of approximately $1.9 million, $1.2 million, $185,000, $1.5 million, and $1.5 million respectively, resulting from an increase in related revenues and corresponding expenses.

We used our cash generated from operating activities to make principal repayments of approximately $559,000, $200,000 and $400,000 on amounts due to Kevin Cassidy, our Chief Executive Officer, Edward O'Connor, our President and former Chief Executive Officer, and Mark Nordlicht, our Chairman of the Board, respectively.

During 2005, we generated cash of approximately $1.4 million from operating activities, primarily resulting from:

o    net income of approximately $1.3 million, adjusted for non-cash interest expense and the fair value of warrants issued to Kevin Cassidy, our Chief Executive Officer of approximately $300,000 and $160,000, respectively;

o    an increase in accounts receivable of approximately $130,000, resulting from an increase in related revenues;

o    an increase of $150,000 in other receivable, resulting from our funding of security deposits held for the benefit of the NYMEX and a clearing house, to facilitate the trading of futures transactions we submit on behalf of our clients;

During 2005, we used our cash generated from operating activities to make principal repayments of approximately $200,000, $50,000 and $180,000 on amounts due to Kevin Cassidy, our Chief Executive Officer, Edward O'Connor, our President and former Chief Executive Officer, and to Mark Nordlicht, our Chairman of the Board, respectively.

We believe that our office facilities and equipment will be sufficient to meet our needs for the foreseeable future. Accordingly, we anticipate that our capital expenditures over the next twelve months will not be significant and should not exceed $300,000.

We believe that our cash available and estimated cash flows from operations in 2007 will be sufficient to meet our obligations when they become due.

CRITICAL ACCOUNTING POLICIES AND ESTIMATES

A summary of significant accounting policies is included in Note 3 of the accompanying audited financial statements for the year ended December 31, 2006. Management believes that the application of these policies on a consistent basis enables us to provide useful and reliable financial information about our operating results and financial condition. Our financial statements and accompanying notes are prepared in accordance with U.S. GAAP. Preparing financial statements requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, and expenses. These estimates and assumptions are affected by management's application of accounting policies. Critical accounting policies for us include revenue recognition.

17

REVENUE RECOGNITION

Revenue is recognized when earned. Our revenue recognition policies are in compliance with the Securities and Exchange Commission's Staff Accounting Bulletin ("SAB") No. 104 "Revenue Recognition". The application of SAB No. 104 requires us to apply our judgment, including whether our clients receive services over a period of time.

We generally invoice our clients monthly, for all transactions which have been executed during such month. Revenues are recognized on the day of trade-trade date basis. Our revenues derive from a certain predetermined fixed fee of the transactions we execute on behalf of our clients. The fee is based on the volume of financial instruments traded. We base our fees on oral and written contracts and confirm the fees in writing upon the execution of each transaction.

We also receive incentives from NYMEX and ICE for the volume of OTC transactions we submit to their clearing platforms on behalf of our clients. The incentives are based on a percentage of the total revenues received by the exchange attributable to our volume of transactions submitted to the respective exchanges. We also apply our judgment when making estimates monthly of such incentives based on the volumes of transactions submitted to the respective exchanges and the exchanges' published revenues by type of transaction.

We, pursuant to SAB 104, realize the incentive revenues realized or realizable when all of the following criteria are met:

1) Persuasive evidence of an arrangement exists. We have a written separate agreement with one of the exchanges. The other exchange has publicly published the initial terms of its incentive program in 2003 which it modified in 2005 and is offered to all intermediaries in the select transactions;

2) Delivery has occurred or services have been rendered. Under arrangements with both exchanges, the incentives are earned on the day we submit transactions to the respective exchanges based on the revenues generated from such transactions and are no longer subject to minimum volume of transactions to the respective exchanges. We account for all transactions submitted to each exchange on a daily basis. Accordingly, we are able to determine when the incentives are earned based on the date we submit transactions to the exchanges. We have no other obligations to the exchanges to earn the incentives;

3) "Seller's" price to the buyer is fixed or determinable. Based on the incentive program terms of each exchange, their published prices for the type of transactions we submit to them, and our transactions records, we are able to determine an estimate for the revenues each exchange earns in connection with the transactions it submits, and accordingly, the amount, if any of the incentives we earn in connection with such transactions; and

4) Collectibility is reasonably assured. Both exchanges have paid us timely during 2005 for incentives earned in the prior quarter. We have no knowledge that they do not intend to pay these incentives, if earned, in the future. Furthermore, we intend to enforce the payment of any incentives receivable under the incentive programs. Certain risk factors which may impact our business, results of operations and financial condition Our binding term sheet with NYMEX provides that we issue approximately 19,100,000 warrants to them and we will have to expense a significant portion of the fair value of the warrants during 2007 in addition to an increase in our weighted average common share equivalent for earnings per share purposes

Pursuant to our binding term sheet with NYMEX, we will issue approximately 19,100,000 warrants to them and we will have to expense a significant portion of the fair value of the warrants during 2007, which will result in a significant decrease in our net income and possibly, generate a loss. Furthermore, this will increase in our weighted average common share equivalent for earnings per share purposes if we have net income.

We may not be successful in implementing with NYMEX the marketing and technology cooperation programs as contemplated by the binding term sheet

Our relationship with NYMEX is relatively new and we may not be successful in implementing with NYMEX the marketing and technology cooperation programs as contemplated by the binding term sheet.

For example, the binding term sheet provides for the hosting of OPEX by NYMEX. NYMEX may not be able to properly handle the hosting of OPEX to the satisfaction of our clients for a number of reasons- lack of familiarity with the software, lack of interest of a technology not owned by NYMEX, incompatibility of OPEX with the existing NYMEX infrastructure. Should NYMEX not host OPEX to the satisfaction of our clients, it would impact OPEX's market acceptance and have material negative impact on our results, operations, and financial condition.

Most, if not all cooperation programs will depend on our relationship standing with NYMEX and whether the parties perceive that both can contribute to the each other's success. We cannot guarantee that we will continue to have a good relationship with NYMEX and, accordingly, we cannot guarantee that we will be able to implement all cooperation programs successfully. If we are unable to implement one or more of the cooperation programs successfully, it will have a material negative impact on our results, operations, and financial condition.

Our business plan partly relies on market acceptance of our OPEX system to increase our revenues.

While we are presently engaged primarily in voice brokerage, our business plan calls for OPEX to be a major contributor to our success. We must continue to grow our revenues through our existing services and by gaining market acceptance of OPEX. While the initial results of OPEX are promising, it has not reached full market acceptance yet and it make take a few years before it does. If OPEX does not gain market acceptance, it may have a material negative effect on our financial prospects.

Our quarterly financial results will continue to fluctuate making it difficult to forecast our operating results.

Our quarterly operating results have fluctuated in the past and we expect our revenues and operating results may vary significantly from quarter to quarter due to a number of factors, many of which are beyond our control, including the following: geopolitical events, weather, perceived supply and demand imbalances, and the number of trading days in each quarter

We have incurred losses through fiscal 2004 and we may incur losses in the future, which may cause us to curtail our current operations and our development of OPEX.

We have incurred losses through fiscal 2004 and have since become profitable. We may again operate at a loss in the future and we cannot assure you that we will be successful in maintaining positive cash flow and profitable operations. Accordingly, our ability to operate our current business and implement OPEX may be hampered by negative cash flows and liquidity problems in the future, and the value of our stock may decline as a result. For example, in the past, we suspended the development and implementation of OPEX for a year, in part because of our negative cash flow.

Our pricing model for OPEX services is unproven and may be less than anticipated, which may harm our gross margins.

The pricing model of our OPEX services may be lower than expected as a result of competitive pricing pressures, promotional programs and clients who negotiate price reductions in exchange for longer term purchase commitments or otherwise. Our pricing model depends on the specific requirements of the order, purchase volumes, the sales and service support and other contractual agreements. We expect to experience pricing pressure and anticipate that the average selling prices and gross margins for our products may decrease over product life cycles. We may not be successful in developing and introducing on a timely basis new products with enhanced features and services that can be sold at higher gross margins.

The terms of the employment agreement with our Chief Executive Officer may erode our profitability and dilute the price our shareholders could receive in the event another company acquires us.

19

We believe that the employment arrangement with our Chief Executive Officer, Kevin Cassidy, may decrease our profitability and cash flows from operating activities if our revenues decrease or if we are unable to increase our revenues in an amount sufficient to cover the additional cash and stock-based compensation we will pay to Kevin Cassidy. Kevin Cassidy's fixed compensation will gradually increase from the $215,000 we paid him as a consultant to $350,000 by 2009. Also, Kevin Cassidy's compensation agreement provides that beginning with the first month of the quarter in which the amount payable to Kevin Cassidy is fully paid, he will be paid additional cash and stock-based compensation amounting to 5% and 2%, respectively, of our gross revenues. Furthermore, we will issue options to Kevin Cassidy equal to 20% of the number of shares of common stock issuable under warrants which become exercisable pursuant to any Order Flow Agreements (Order Flow Agreements are the agreements under which we issue warrants to a firm based on the volume of orders the firm placed with us). Finally, we will issue to Kevin Cassidy 5,000 options each time a firm registers with and executes its first 10,000 lots on our OPEX platform. The total number of such options will be limited to 2,500,000.   The variable compensation expense pursuant to Kevin Cassidy's employment contract amounted to approximately $970,000 during 2006.

In the event we are acquired by another company, we would have to pay to Kevin Cassidy up to approximately $650,000, which could reduce the amount our shareholders would have otherwise received as part of this potential acquisition.

We may face difficulties in transitioning our clients from voice brokerage to electronic trading or a combination of both.

By launching OPEX, we intend to retain existing clients and attract new clients to our services. Our experience in marketing and supporting electronic trading services is limited. We may need to supplement our existing staff with marketing and support personnel with more extensive experience in these areas, which would increase our operating expenses and cost of revenues. Additionally, management will need to expend significant time and resources to ensure a smooth transition from voice brokerage to electronic trading or a combination of both, which could distract management from maintaining or expanding our operations.

Existing clients may resist the transition to electronic trading. New and existing clients may be unsatisfied with the support we provide for electronic trading and may prefer continuing with voice brokerage or discontinue our relationship based on actual or perceived problems they experienced in using our services. The loss of new or existing clients could decrease the market acceptance of our products, harm our reputation and reduce our revenues from existing clients. This could have a negative effect on our business, operations, and financial condition.

We may face increased credit risks when expanding our client base and from volatile fluctuations in prices of natural gas and related derivatives.

One of our clients accounted for 24% of our revenues during 2006. On OTC transactions, we bill our services to both counterparties. Accordingly, if this client would not have entered into a portion or all of the OTC transactions in which they were involved, our 2006 revenues could have been lower if we wouldn't have been able to find a suitable counterparty to replace them in such transactions.  To mitigate our reliance on this client, we are attempting to expand our client base and our product offerings in other energy derivative products in which they would not be a market maker. In attempting to diversify and expand our client base, some of our new clients, such as hedge funds and individual traders, may have higher credit risks than certain of our existing clients, which are financial institutions.  The financial positions of these new clients may impact our ability to collect our fees generated from the transactions we submit on their behalf.  Additionally, volatile fluctuations in prices of natural gas and related derivatives may adversely impact the financial position of certain of our clients which may not have the resources to pay us for past services or may reduce the volume of transactions we would handle on their behalf in the future.  This could have a negative effect on our business, operations, and financial condition.

20

We cannot be certain that we will be able to protect our proprietary information and intellectual property, which we rely on to maintain our competitive position.

We rely on our proprietary information and intellectual property to maintain our competitive position. We may not be able to protect a significant portion of our proprietary information, such as our client lists, since we do not have confidentiality agreements with some of our employees. Accordingly, we may not be able to effectively prevent disclosure of our proprietary information and we may not have an adequate remedy in the event of unauthorized disclosure of such information. We cannot assure you that measures we take to protect our proprietary information and intellectual property will be successful or that third parties will not develop alternative solutions that do not infringe upon our intellectual property.

We also have patent applications pending, which are intended to protect certain of our proprietary technology relating to our planned OPEX business. We have been cautious in seeking to obtain patent protection for our products, since patents often provide only narrow protection that may not prevent competitors from developing products that function in a manner similar to those covered by our patents. In addition, some of the foreign countries in which we plan to sell our OPEX system do not provide the same level of protection to intellectual property as the laws of the United States.

Potential liability for infringement claims might deter clients from using our OPEX system.

We could be subject to intellectual property infringement claims by others. Potential clients may be deterred from using our OPEX system for fear of infringement claims. If, as a result, potential clients forego using our OPEX system, demand for our services and applications could be reduced which would harm our business. Claims against us, and any resulting litigation, should it occur in regard to any of our services and applications, could subject us to significant liability for damages including treble damages for willful infringement. In addition, even if we prevail, litigation could be time-consuming and expensive to defend and could result in the diversion of our time and attention. Any claims from third parties may also result in limitations on our ability to use the intellectual property subject to these claims. Claims that we are infringing the intellectual property rights of third parties could have a negative effect on our business, revenues, financial condition and results of operations.

We may rely on strategic relationships to promote our OPEX system and for access to licensed technology; if we fail to develop, maintain or enhance these relationships, our ability to serve our clients and develop new features and functionalities could be harmed.

Due to the evolving nature of our industry, we may need to develop relationships to adapt to changing technologies and standards and to work with newly emerging companies with whom we do not have pre-existing relationships. For example, it may be important to our clients that OPEX integrates seamlessly with the technology used by exchanges. While we have a technology-sharing relationship with NYMEX, we do not have one with other exchanges to ensure such seamless meshing of our respective technologies as they now exist or as they may be enhanced in the future. We cannot be certain that we will be successful in maintaining or developing new relationships, technological or otherwise, or that such relationships will view them as significant to their own business or that they will continue their commitment to us in the future. If we are unable to maintain or enhance these relationships, we may have difficulty strengthening our technology development and increasing the adoption of our OPEX system.

If we fail to enhance our OPEX system by introducing new features and functionalities in a timely manner to meet changing client requirements and emerging industry trends or standards, our ability to grow our business will suffer.

21

The market for electronic trading systems is characterized by rapidly changing technologies and short product life cycles. These market characteristics are heightened by the emerging nature of the Internet and the continuing trend of companies from many industries to offer Internet-based applications and services. The widespread adoption of the Internet, networking, electronic option trading, or telecommunications technologies or other technological changes could require us to incur substantial expenditures to modify or adapt our operating practices or infrastructure. Our future success will depend in large part upon our ability to:

o        identify and respond to emerging technological trends in the market;

o        enhance our products by adding innovative features that differentiate services and applications from those of our competitors;

o        acquire and license leading technologies;

o        bring new services and applications to market and scale our business on a timely basis at competitive prices; and

o        respond effectively to new technological changes or new product announcements by others.

We will not be competitive unless we introduce new features and functionalities to our OPEX system that meet evolving industry standards and client needs. In the future, we may not be able to address effectively the compatibility and interoperability issues that arise as a result of technological changes and evolving industry standards. The technical innovations required for us to remain competitive are inherently complex, require long development schedules and are dependent in some cases on sole source suppliers. We will be required to continue to invest in research and development in order to attempt to maintain and enhance our existing technologies and products, but we may not have the funds available to do so. Even if we have sufficient funds, these investments may not serve the needs of clients or be compatible with changing technological requirements or standards. Most development expenses must be incurred before the technical feasibility or commercial viability of new or enhanced services and applications can be ascertained. Revenue from future services and applications or enhancements to services and applications may not be sufficient to recover the associated development costs.

The technology underlying our OPEX system is complex and may contain unknown defects that could harm our reputation, result in product liability or decrease market acceptance of our services and applications.

The technologies underlying financial services and applications are complex and include software that is internally developed. Software products using these technologies may contain errors or defects, particularly when first introduced or when new versions or enhancements are released. We may not discover software defects that affect our current or new services and applications or enhancements until after they are sold. Furthermore, because our services and applications are designed to work in conjunction with various platforms and applications, we are susceptible to errors or defects in third-party applications that can result in a lower quality product for our clients. Because our clients depend on us for digital media management, any interruptions could:

o        damage our reputation;

o        cause our clients to initiate product liability suits against us;

o        increase our product development resources;

o        cause us to lose revenues; and

o        delay market acceptance of our products.

A significant portion of our revenues is from incentives from a U.S. exchange. We may not receive those incentives in the future.

We receive incentives from NYMEX which accounted for 19% of our revenues during 2006. The incentives are earned based on a percentage of the total revenues received by the exchange attributable to our volume of transactions submitted to the respective exchanges. The incentives earned from NYMEX are based on a program offered to all brokers, traders, and energy traders initially launched in 2003. NYMEX has amended the terms of its initial incentive program by decreasing the incentive rate by 50%. NYMEX may amend the terms of the incentives or cancel this program at any time. While we are attempting to secure the long-term continuation of this program with NYMEX, we may not be successful in our attempts. We may agree to some or all of any requested changes. Accordingly, we cannot guarantee that we will continue to receive the level of such incentives in the future, if at all. If we do not receive these incentives, our revenues will decrease.

We rely heavily on the services of our overseas technical staff and consultants which may delay or jeopardize the development and enhancement of OPEX

We rely heavily on the services of our technical staff and consultants. Our technical employees are not presently employed on a full time basis. With the exception of our chief technology officer and a senior developer, all our technical staff, including our software engineers and our software quality assurance team, is located overseas. If we are unable to maintain our relationship with these individuals and if we have to replace them with individuals with similar capabilities, this could delay or jeopardize the development and the enhancement of OPEX.

We face intense and increasing competition in the electronic energy derivatives market. If we do not compete effectively or if we experience reduced market share from increased competition, our business will be harmed.

There are several other well-financed companies who do or may compete with us. In the OTC natural gas derivatives market, our competitors include  ICAP PLC, Choice Energy LP, G.A. Options, MAN Financial, Inc. and Tullet Natsource, Inc. In the futures natural gas derivatives market, our competitors include Clarion Trading, SCS Trading Corp., and ICAP PLC. Some of the features of OPEX compete with some of ICE's offerings.

Substantially all of our competitors have more capital, longer operating histories, greater brand recognition, larger client bases and significantly greater financial, technical and marketing resources than we do. These competitors may also engage in more extensive development of their technologies, adopt more aggressive pricing policies and establish more comprehensive marketing and advertising campaigns than we can. Our competitors may develop products and service offerings that we do not offer or that are more sophisticated or more cost effective than our own. For these and other reasons, our competitors' products and services may achieve greater acceptance in the marketplace than our own, limiting our ability to gain market share and client loyalty and to generate sufficient revenues to achieve a profitable level of operations. Our failure to adequately address any of the above factors could harm our business and operating results.

Dependence on outside clearinghouse for increased revenue.

We are dependent on outside clearinghouses such as NYMEX to provide our clients with OTC Clearing services. We can give no assurance that NYMEX will continue to offer this service to trades brokered by us and should NYMEX cease to offer this service, it would have a material negative effect on us and our prospects.

Reliance on natural gas derivatives.

While our plan is to leverage success of energy options and expand into other markets while maintaining our status as an "exempt commercial market", the success of this plan is subject to market forces outside of our control. At present, substantially all of our revenues are derived from trading in natural gas derivatives. If there should be a significant slowdown in the natural gas derivatives market, it would have a significant negative impact on us.

The continued operations of our business are dependent on the performance and continued service of our executive officers and key employees, and our ability to attract and retain skilled personnel.

23

Our performance and future operating results are substantially dependent on the continued service and performance of Kevin Cassidy, our Chief Executive Officer, Edward J Connor, our President, and Mark Nordlicht, our Chairman. To the extent that the services of those persons become unavailable, our business and prospects would be adversely affected. Should we be required to do so, we do not know whether we would be able to employ equally qualified persons to replace any of these persons. Moreover, we do not currently maintain "key man" insurance on any of our executive officers or other key employees and do not intend to obtain this type of insurance in the near future. Additionally, we do not have written agreements with most of our staff and, other than traditional compensation packages and stock options we contemplate granting to our staff, we do not have other means to ensure the retention of their services. If we are successful in implementing and developing our business, we will require additional managerial, administrative and support personnel. Competition for highly qualified personnel is intense, and we can make no assurances that we can retain our key employees or that we will be able to attract or retain qualified personnel in the future. To the extent we have fewer financial resources available to us than our competitors we may not be able to attract and retain a sufficient number of qualified personnel. The loss of the services of any of our management or other key employees and our inability to attract and retain other necessary personnel could have a material adverse effect on our financial condition, operating results, and cash flows.

Certain employees' efforts currently account for a significant amount of our revenues. Should the services of these individuals, including and particularly Kevin Cassidy, no longer be available to us, and suitable replacements not be hired or retained, we would experience adverse effects of varying degrees.

We could become subject to increased governmental and organizational regulation.

OPEX qualifies as an "exempt commercial market" under the rules of the CFTC. Although an ECM may be required to provide certain trade volume and pricing information to the CFTC, an ECM is not required to register with the CFTC. However, if we were to no longer qualify for the exemption from registration, either because of changes in law or the scope of our business, our businesses would become subject to extensive regulation at both the federal and state levels. In addition, self-regulatory organizations, such as NYMEX and the National Futures Association, require compliance with their extensive rules and regulations. Among other things, these regulatory authorities impose restrictions on sales methods, trading practices, use and safekeeping of client funds and securities, record keeping and the conduct of principals and employees. The extensive regulatory framework applicable to the commodities brokerage industry, the purpose of which is to protect clients and the integrity of the commodities markets, would impose significant compliance burdens and attendant costs on us. The regulatory bodies that administer these rules do not attempt to protect the interests of our stockholders as such, but rather the public and markets generally. Failure to comply with any of the laws, rules or regulations of any independent, state or federal regulatory authority to which we become subject could result in a fine, injunction, suspension or expulsion from the industry, which could materially and adversely impact us. Furthermore, amendments to existing state or federal statutes, rules and regulations or the adoption of new statutes, rules and regulations could require us to alter our methods of operation at costs which could be substantial.

The Penny Stock Rules apply to our common stock. This may make it more difficult for holders of our common stock to resell their shares.

At the present time, our common stock is not listed for trading on any stock exchange.

The Securities Enforcement and Penny Stock Reform Act of 1990 requires special disclosure relating to the market for penny stocks in connection with trades in any stock defined as a "penny stock." Commission regulations generally define a penny stock to be an equity security that has a market price of less that $5.00 per share and is not listed on Nasdaq or a major stock exchange. These regulations subject all broker-dealer transactions involving such securities to the special "Penny Stock Rules" set forth in Rule 15g-9 of the Securities Exchange Act of 1934. While our price per share has been recently more than $5 per share, it may decrease below $5 in the future. Accordingly, any broker-dealer sales of our shares will be subject to the Penny Stock Rules. These Rules affect the ability of broker-dealers to sell our securities and also may affect the ability of purchasers of our common stock to sell their shares in the secondary market.

The Penny Stock Rules also impose special sales practice requirements on broker-dealers who sell securities to persons other than their established clients or "accredited investors." Among other things, the Penny Stock Rules require that a broker-dealer make a special suitability determination respecting the purchaser and receive the purchaser's written agreement to the transaction prior to the sale. In addition, the Penny Stock Rules require that a broker-dealer deliver, prior to any transaction, a disclosure schedule prepared in accordance with the requirements of the Commission relating to the penny stock market. Finally, monthly statements have to be sent to any holder of such penny stocks disclosing recent price information for the penny stock held in the account and information on the limited market in penny stocks. Accordingly, for so long as the Penny Stock Rules are applicable to our common stock, it may be difficult to trade such stock because compliance with such Rules can delay or preclude certain trading transactions. This could have an adverse effect on the liquidity and price of our common stock.

Management substantially controls us and their interests may be different from yours and may be in conflict with yours.

24

The interests of our management could conflict with the interests of our stockholders. Our officers and directors beneficially own approximately 50% of our outstanding common stock. Accordingly, if they exercise all their options and warrants, they will have the power to approve corporate transactions and control the election of all of our directors and other issues for which the approval of our stockholders is required. This concentration of ownership may also delay, deter or prevent a change in control of us and may make some transactions more difficult or impossible to complete without the support of these stockholders. As a result, you may have no effective voice in our management.

Our majority stockholders will be able to take stockholder actions without giving prior notice to any of you. You may, therefore, be unable to take preemptive measures that you believe are necessary to protect your investment in the company.

The majority stockholders are able to take stockholder actions in conformance with Section 228 of the Delaware General Corporation Law and our Certificate of Incorporation, which permits them to take any action which is required to, or may, be taken at an annual or special meeting of the stockholders, without prior notice and without a vote of our stockholders. Instead of a vote, stockholder actions can be authorized by the written consents to such actions, signed by the holders of the number of shares which would have been required to be voted in favor of such action at a duly called stockholders meeting. We would not be required to give prior notice to all stockholders of actions taken pursuant to the written consents of the majority stockholders and our obligations are limited to giving notice at least 20 calendar days prior to the earliest date on which the corporate action so authorized may be taken.

ITEM 7.  FINANCIAL STATEMENTS


Response to this item is submitted as a separate section of this report immediately following the signature page.


ITEM 8.          CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING
                AND FINANCIAL DISCLOSURE


None

25

ITEM 8A.          CONTROLS AND PROCEDURES

Our Chief Executive Officer and Chief Financial Officer (collectively, the
"Certifying Officers") are responsible for establishing
and maintaining disclosure controls and procedures which include controls and
procedures that are designed to ensure that information required to be disclosed
in the reports which we file with or submit to the SEC is recorded, processed,
summarized and reported within the time periods specified by the SEC.  The
Certifying Officers have evaluated these controls and procedures and they have
concluded (based upon their evaluation of these controls and procedures as of
the end of the period covered by this report) that our disclosure controls and
procedures are effective to: i) ensure that information required to be disclosed
by us in this report is accumulated and communicated to management, including
our principal executive officers as appropriate, to allow timely decisions
regarding required disclosure; and ii) ensure that information required to be
disclosed in the reports which we file or submit with the SEC is recorded,
processed, summarized and reported within the time periods specified by the SEC.

The Certifying Officers have indicated that there were no changes in our
internal controls which occurred during our last fiscal quarter that have
materially affected, or are reasonably likely to materially affect, our internal
control over financial reporting, and there were no corrective actions with
regard to significant deficiencies and material weaknesses.

Our management, including the Certifying Officers, does not expect that our
disclosure controls or our internal controls will prevent all error and all
fraud. A control system, no matter how well conceived and operated, can provide
only reasonable, not absolute, assurance that the objectives of the control
system are met. In addition, the design of a control system must reflect the
fact that there are resource constraints, and the benefits of controls must be
considered relative to their costs. Because of the inherent limitations in all
control systems, no evaluation of controls can provide absolute assurance that
all control issues and instances of fraud, if any, within a company have been
detected. These inherent limitations include the realities that judgments in
decision-making can be faulty, and that breakdowns can occur because of simple
error or mistake. Additionally, controls can be circumvented by the individual
acts of some persons, by collusion of two or more people or by management
override of the control. The design of any systems of controls is also based in
part upon certain assumptions about the likelihood of future events, and there
can be no assurance that any design will succeed in achieving its stated goals
under all potential future conditions.  Because of these inherent limitations in
a cost-effective control system, misstatements due to error or fraud may occur
and not be detected.

ITEM 8B.          OTHER INFORMATION.

None.

ITEM 9.  DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS;
         COMPLIANCE WITH SECTION 16 (A) OF THE EXCHANGE ACT


Directors serve until the next annual meeting of the stockholders and until
their successors are elected or appointed and qualified, or until their prior
resignation or removal. Officers serve for such terms as determined by our board
of directors. Each officer holds office until such officer's successor is
elected or appointed and qualified or until such officer's earlier resignation
or removal. Our board currently does not have any committees.

The following table sets forth certain information, as of March 12, 2007, with
respect to our directors and executive officers.


| Name | Positions Held | Age | Date of Election or Appointment as Director |
| ---- | -------------- | --- | ------------------------------------------- |
| Mark Nordlicht | Chairman | 37 | February 2000 |
| Kevin Cassidy | Chief Executive Officer and Vice Chairman | 47 | October 2005 |
| Edward J. O'Connor | President, Treasurer, and Director | 53 | March 2001 |
| Albert Helmig | Director | 55 | September 2004 |
| Marc-Andre Boisseau | Chief Financial Officer | 42 | n.a. |


The following is a brief account of the business experience of each of our
directors and executive officers during the past five years or more.

Mark Nordlicht: Mr. Nordlicht is a founder of the Company and has served as our
Chairman of the Board of Directors since 2000. Mr. Nordlicht has also been the
Managing Partner of the General Partner of Platinum Partners Value Arbitrage
Fund, a market-neutral hedge fund, since January 2003. Mr. Nordlicht also served
as Managing Partner of West End Capital from 1998 through 2002. In his various
positions, Mr. Nordlicht has been responsible for the oversight of all of our
operations. Mr. Nordlicht earned a BA degree from Yeshiva University in 1989.

Kevin Cassidy:  Mr. Cassidy has served as our Chief Executive Officer since
October 2005 and from March 2001 to March 2004. From April 2004 through
September 2005, Mr. Cassidy provided consulting services to us.  Since December
1996, Mr. Cassidy has served as Managing Director of Capital Energy Services,
LLC (formerly Orion Energy Services, LLC), an energy options brokerage firm on
the NYMEX.  Mr. Cassidy's primary responsibilities include business development,
sales and marketing, and oversight of our brokerage operations.

Edward J. O'Connor: Mr. O'Connor has served as our President and as a director
since March 2001 and as our CEO between March 2004 and October 2005. Since
December 1996, Mr. O'Connor has served as Managing Director of Capital Energy
Services, LLC (formerly Orion Energy Services, LLC), an energy options brokerage
business on the NYMEX. Mr. O'Connor's primary responsibilities include
negotiating and entering into contracts for our business and accounting for our
funds. Mr. O'Connor graduated from Georgetown University in 1977 with a BS
degree in Business Administration.

27

Albert Helmig. Mr. Helmig was elected as a director in September 2004. Since 2000, Mr. Helmig has been a principal of Gray House Consulting, a consulting firm to the energy industry. From 1991 through 2000, Mr. Helmig held the following positions with the New York Mercantile Exchange (NYMEX): Chairman or Vice Chairman of over 20 committees, 1991-2000; Member of Board of Directors, 1991-2000; Member of Executive Committee, 1993-2000; and Vice Chairman, 1998-2000. Mr. Helmig is also on the Board of Directors of the International Precious Metals Institute, a member of the International Advisory Committee Board, Energy Intelligence Group, a member of the National Committee on US/China Relations, and a member of the National Futures Association. Mr. Helmig earned a B.S. degree in Finance and Economics from Philadelphia University.

Marc-Andre Boisseau. Mr. Boisseau has served as our Chief Financial Officer since December 2004. Since January 2002, he has served as an advisor to small and medium publicly traded and private companies on financial, tax and accounting matters. Between January 2000 and December 2001, he served as Vice-President Finance of DataCore Software, Inc., a privately held software developer. Prior to that, he served as Chief Accounting Officer (from May 1997 to December 1999) and Vice President Controller (from January 1, 1998 to December 1999) of Citrix Systems, Inc. a publicly traded software developer. Mr. Boisseau is a certified public accountant. Mr. Boisseau graduated with a BA degree in Business Administration in 1987 from the University of Montreal.

DIRECTOR COMPENSATION

Messrs. Cassidy, O'Connor, Nordlicht, and Helmig are the members of our Board of Directors. We have not established standard compensation arrangements for our directors and the compensation payable to each individual for their service on our Board is determined from time to time by our Board of Directors based upon the amount of time expended by each of the directors on our behalf and the nature of their beneficial ownership. None of our board members have received compensation during 2006 and 2005 for their services as director.

DIRECTOR INDEPENDENCE, COMMITTEES OF THE BOARD OF DIRECTORS

One of our members of our Board of Directors, Albert Helmig, is "independent" within the meaning of Marketplace Rule 4200 of the National Association of Securities Dealers, Inc. Our Board of Directors has established a Finance Committee, which oversees the determination and the appropriateness of prepayments on amounts due to Mark Nordlicht, Edward O'Connor, and Kevin Cassidy, if any. Otherwise, we have not established any other committees, including an Audit Committee, a Compensation Committee, a Nominating Committee, or any committee performing a similar function. The functions of those committees are being undertaken by the entire board as a whole. Because we only have one independent director, our Board of Directors believes that the establishment of such committees of the Board would not provide any benefits to our company and could be considered more form than substance.

We do not have an audit committee or a compensation committee. We intend to form such committees once we have selected directors who shall meet the independence requirements and audit committee financial expert requirements under applicable Securities and Exchange Commission rules and regulations. We are developing the criteria we will use in identifying, attracting, and retaining such directors. We are unable to determine when and if we will complete the recruiting of new directors during fiscal year 2007.

28

EXECUTIVE COMPENSATION

The following table summarizes all compensation recorded by us in each of the last two completed fiscal years for our principal executive officer, each other executive officer serving as such whose annual compensation exceeded $100,000 and up to two additional individuals for whom disclosure would have been made in this table but for the fact that the individual was not serving as an executive officer of our company at December 31, 2006. The value attributable to any option awards is computed in accordance with FAS 123R.

SUMMARY COMPENSATION TABLE

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation (3) ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Edward J. O'Connor, President, Director (1) | 2006 | 200,000 | -0- | -0- | -0- | -0- | -0- | 14,905 | 214,905 |
| | 2005 | 200,000 | -0- | -0- | -0- | -0- | -0- | 14,238 | 214,238 |
| Kevin Cassidy, CEO (1)(2) | 2006 | 275,000 | -0- | 273,616 | 240,000 | 691,541 | -0- | 18,285 | 1,480,157 |
| | 2005 | 58,333 | -0- | -0- | -0- | -0- | -0- | 14,238 | 72,571 |
| Thomas Schnell (4) | 2006 | 100,000 | -0- | -0- | -0- | 596,584 | 14,905 | | 711,489 |
| Noah Rottblatt (4) | 2006 | 48,000 | -0- | -0- | -0- | 509,300 | 8,895 | | 566,195 |

(1)    Mr. Cassidy served as our Chief Executive Officer from March 2001 to March 2004 and from October 2005 to present. Mr. O'Connor served as our Chief Executive Officer from April 2004 to October 2005.
(2)    Mr. Cassidy's compensation includes 268,083 shares of common stock valued at $273,616 and 1,200,000 warrants issued to Pierpont Capital, Inc., exercisable at $0.95 and for which we recognized $240,000 in compensation expenses during 2006 pursuant to FAS 123 (R ).  Additionally, the Company pays, on behalf of Mr. Cassidy, a life insurance and health insurance premium, which amounted to $3,380 and $14,905 during 2006.
(3)    The other compensation of Messrs. O'Connor, Schnell, and Rottblatt represent the health insurance premium paid by the Company on their behalf.
(4)    Messrs. Schnell and Rottblatt are brokers and are not executive officers of the Company.


BOARD OF DIRECTORS

Our directors do not receive cash compensation for their services as directors but are reimbursed for their reasonable expenses for attending board and board committee meetings. Mr. Helmig, however, was granted options to purchase a maximum of 250,000 shares of our common stock in connection with his election to our board of directors in 2004. These options vest as follows:  20% in September 2004, and 40% every year thereafter as long as Mr. Helmig remains one of our director.

STOCK OPTION GRANTS

There were no individual grants of stock options to any Executive Officers during the fiscal year ended December 31, 2006

STOCK OPTIONS EXERCISED IN 2006 AND RELATED PERIOD-ENDED STOCK OPTION VALUES

 No stock options were exercised during fiscal 2006

OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END

The following table provides information concerning unexercised options, stock that has not vested and equity incentive plan awards for each named executive officer outstanding as of December 31, 2006:

OUTSTANDING EQUITY AWARDS AT FISCAL YEAR END

| | OPTION AWARDS | | | | | STOCK AWARDS | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name<br>(a) | Number of Securities Underlying Unexercised Options /warrants (#) Exercisable (b) | Number of Securities Underlying Unexercised Options /warrants (#) Unexercisable (c) | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (d) | Option Exercise Price ($) (e) | Expiration Date (f) | Number of Shares or Units of Stock That Have Not Vested (#) (g) | Market Value of Shares or Units of Stock That Have Not Vested ($) (h) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights that Have Not Vested (#) (i) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested (#) (j) |
| Kevin Cassidy | 450,000 | | | 0.20 | 6/30/07 | | | | |
| | 600,000 | 400,000 | | 0.95 | 2/23/09 | | | | |
| Thomas Schnell | 100,000 | | | 0.20 | (1) | | | | |

(1) Upon termination for cause or death


2004 STOCK OPTION PLAN

We adopted our 2004 Stock Option Plan in November 2004. The plan provides for the grant of options intended to qualify as "incentive stock options" and options that are not intended to so qualify or "nonstatutory stock options." The total number of shares of common stock reserved for issuance under the plan is 7,500,000, subject to adjustment in the event of a stock split, stock dividend, recapitalization or similar capital change.

The plan is presently administered by our board of directors, which selects the eligible persons to whom options shall be granted, determines the number of common shares subject to each option, the exercise price therefor and the periods during which options are exercisable, interprets the provisions of the plan and, subject to certain limitations, may amend the plan. Each option granted under the plan is evidenced by a written agreement between us and the optionee.

Options may be granted to our employees (including officers) and directors and certain of our consultants and advisors.

The exercise price for incentive stock options granted under the plan may not be less than the fair market value of the common stock on the date the option is granted, except for options granted to 10% stockholders which must have an exercise price of not less than 110% of the fair market value of the common stock on the date the option is granted. The exercise price for nonstatutory stock options is determined by the board of directors. Incentive stock options granted under the plan have a maximum term of ten years, except for 10% stockholders who are subject to a maximum term of five years. The term of nonstatutory stock options is determined by the board of directors. Options granted under the plan are not transferable, except by will and the laws of descent and distribution.

Employment Contracts, Termination of Employment, and Change-in-Control Arrangements

On March 1, 2001, we entered into an employment agreement with Edward O'Connor, our President and CEO and a member of the board of directors. The agreement was amended on April 1, 2004.

The terms of the agreement, as amended, provide that we will employ Mr. O'Connor for a term of five years with the duties of Chief Executive Officer with an annual salary of $200,000 per year. If we terminate Mr. O'Connor's employment without "cause" or if Mr. O'Connor terminates his employment with "good reason" (as both terms are defined in Mr. O'Connor's employment agreement), we are required to pay him a lump sum equal to nine months' base salary. Following termination of employment for any reason, other than expiration of the term of employment, Mr. O'Connor has agreed not to engage in an electronic OTC business in competition with us for a 90 day period, provided we pay him bi-monthly installments of $8,333.33 and provide full health benefits during the 90 day period. When Kevin Cassidy became our Chief Executive Officer in October 2005, as discussed below, we continued to employ Mr.O'Connor as our President with the same compensation package as when he was our Chief Executive Officer.

Effective October 30, 2005, we named Kevin P. Cassidy our Chief Executive Officer and appointed him as a director. Simultaneously, we entered into an employment agreement with him (the "Agreement"). The initial term of the Agreement is for 50 months, subject to renewal or earlier termination.

Mr. Cassidy's salary ("Fixed Compensation") will be as follows: $20,833 upon entering into the Agreement, $46,875 from October 30, 2005 to December 31, 2005, $275,000 from January 1 to December 31, 2006, $300,000 from January 1, 2007 to December 31, 2007, $325,000 from January 1 to December 31, 2008, $350,000 from January 1, 2009 to December 31, 2009.

In addition, beginning with the first month of the quarter in which the amount payable to Mr. Cassidy, pursuant to the Addendum to Master Service Agreement, dated April 12, 2005, is fully paid, Mr. Cassidy will be paid (i) cash compensation amounting to five percent (5%) of Gross Revenues of the Company, and (ii) stock compensation amounting to two percent (2%) of the Gross Revenues of the Company. Gross Revenue is defined as the total gross revenue related to any and all aspects of the brokerage business, including incentive received from exchanges, based on generally accepted accounting principles. The shares of our common stock will be granted at fair value at the date of grant.

We will issue options to Mr. Cassidy equal to twenty percent (20%) of the number of shares of common stock issuable under warrants which become exercisable pursuant to any Order Flow Agreements (Order Flow Agreements are the agreements for the Company to issue warrants to a firm based on the volume of orders the firm placed with the Company). Those options will be fully vested Non-Statutory Stock Options granted under the Company's 2004 Stock Option Plan at fair value at the date of grant. Also, we will issue to Mr. Cassidy 5,000 options each time a firm registers with and executes its first 10,000 lots on the Company's OPEX platform. The total number of such options will be limited to 2,500,000. Such options will be fully vested Non-Statutory Options granted under the plan at fair value at the date of grant.

31

Mr. Cassidy will be entitled to paid annual vacation, personal leave and
holidays in accordance with our policies, and will be entitled to participate in
health, welfare, and pension plans and any other employee benefit plan of the
Company. In addition, we will advance to or reimburse Mr. Cassidy for the annual
or monthly premium of his life insurance policy of one million dollars
($1,000,000) where the beneficiary is Mr. Cassidy's estate (immediate family).

Upon our sale or merger or other business combination of us and another company
or companies, Mr. Cassidy will be entitled to a lump sum payment of 50% of the
unpaid Fixed Compensation should he desire not to be employed with the new or
successor entity.

We have a consulting agreement with Mr. Boisseau, who serves as our Chief
Financial Officer. The oral agreement provides that we compensate him at $145
per hour, and effective, March 6 2007, $152 per hour. This agreement may be
terminated at will by both parties.

Code of Business Conduct and Ethics

We have adopted a Code of Business Conduct and Ethics to provide guiding
principles to all of our employees. Our Code of Business Conduct and Ethics does
not cover every issue that may arise, but it sets out basic principles to guide
our employees and provides that all of our employees must conduct themselves
accordingly and seek to avoid even the appearance of improper behavior. Any
employee which violates our Code of Business Conduct and Ethics will be subject
to disciplinary action, up to an including termination of his or her employment.
Generally, our Code of Business Conduct and Ethics provides guidelines
regarding:

o        compliance with laws, rules and regulations,

o        conflicts of interest,

o        insider trading,

o        corporate opportunities,

o        competition and fair dealing,

o        discrimination and harassment,

o        health and safety,

o        record keeping,

o        confidentiality,

o        protection and proper use of company assets,

o        payments to government personnel,

o        waivers of the Code of Business Conduct and Ethics,

o        reporting any illegal or unethical behavior, and

o        compliance procedures.

In addition, we have also adopted a Code of Ethics for our Chief Executive
Officer and Senior Financial Officers. In addition to our Code of Business
Conduct and Ethics, our CEO and senior financial officers are also subject to
specific policies regarding:

o        disclosures made in our filings with the SEC,

o        deficiencies in internal controls or fraud involving management or
         other employees who have a significant role in our
         financial reporting, disclosure or internal controls,

o        conflicts of interests, and

o        knowledge of material violations of securities or other laws, rules or
         regulations to which we are subject.

32

CERTAIN LEGAL PROCEEDINGS

To the knowledge of the Company, there are no material proceedings to which any director, executive officer or beneficial owner of more than 5% of any class of voting securities of the Company.

SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

We are required to identify each person who was an officer, director or beneficial owner of more than 10% of our registered equity securities during our most recent fiscal year and who failed to file on a timely basis reports required by Section 16(a) of the Securities Exchange Act of 1934.

To our knowledge, based solely on review of these filings and written representations from the certain reporting persons, we believe that during the fiscal year ended December 31, 2006, our officers, directors and significant stockholders have timely filed the appropriate form under Section 16(a) of the Exchange Act, except Albert Helmig, one of our directors, amended its form 3 in December 2006 to reflect 100,000 additional options which vested in September 2006 and were not vested in March 2006, date of the initial filing of his Form 3.

ITEM 11. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The following table sets forth information regarding the beneficial ownership of our common stock as of March 12, 2007. The information in this table provides the ownership information for:

o each person known by us to be the beneficial owner of more than 5% of our common stock;
o each of our directors;
o each of our executive officers; and
o our executive officers, directors and director nominees as a group.

The percentages in the table have been calculated on the basis of treating as outstanding for a particular person, all shares of our common stock outstanding on that date and all shares of our common stock issuable to that holder in the event of exercise of outstanding options, warrants, rights or conversion privileges owned by that person at that date which are exercisable within 60 days of that date. Except as otherwise indicated, the persons listed below have sole voting and investment power with respect to all shares of our common stock owned by them, except to the extent that power may be shared with a spouse.

33

| Title of Class | Name and Address Of Beneficial Owner | Number of Shares Beneficially Owned | Percentage of class(1) |
|---|---|---|---|
| Common Stock, par value $.0001 per share | Mark Nordlicht 555 Pleasantville Road South Building, Suite 110 Briarcliff Manor, NY 10510 | 15,190,150 | 27.8% |
| Common Stock, par value $.0001 per share | Edward J. O'Connor 555 Pleasantville Road South Building, Suite 110 Briarcliff Manor, NY 10510 | 5,708,016 (1) | 10.4% |
| Common Stock, par value $.0001 per share | Albert Helmig 15 Deer Run Circle Chatham, NJ 07928 | 250,000 (2) | less than 0.5% |
| Common Stock, par value $.0001 per share | Kevin P. Cassidy 555 Pleasantville Rd., Ste 110 Briarcliff Manor, NY 10510 | 3,233,083 (3) | 5.9% |
| Common Stock, par value $.0001 per share | Marc-Andre Boisseau 555 Pleasantville Rd., Ste. 110 Briarcliff Manor, NY 10510 | -0- | 0.0% |
| All directors and officers as a group(4 persons) | | 24,381,249 (1)(2)(3) | 44.1% |

(1) Includes 3,904,158 shares owned by Ridgecrest Capital Corp., Inc., a corporation wholly owned by Mr. O'Connor, 901,929 shares owned by Mr. O'Connor's daughter Kathleen O'Connor and 901,929 shares owned by Mr. O'Connor's daughter Erin O'Connor.

(2) Includes 250,000 shares issuable pursuant to the exercise of stock options exercisable within 60 days.

(3) Includes 2,305,000 shares owned by Pierpont Capital Corp., Inc.("Pierpont"), as well as 50,000 warrants, exercisable at a price of $0.20 per share, and 600,000 warrants exercisable at a price of $0.95 per share, issued to Pierpont, of which Mr. Cassidy is a stockholder, 10,000 options exercisable at a price of $7.17 per share and 113,665 shares owned by Kerry Cassidy, who is Mr. Cassidy's daughter.

ITEM 12.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE

During April 2005, we modified the terms of agreement under which we initially owed $5,762,753, $765,000 and $765,000 to Mark Nordlicht, our Chairman of the Board, Kevin Cassidy, our Chief Executive Officer, and Edward O'Connor, our President, respectively. The modified terms provide that, among other things, in the event of a Capital Raise-defined as we raising more than $1,000,000 additional equity or debt financing, the interest rate accrued after such event is reduced from 12% to 4.68%. Additionally, the modified terms provide that we may make principal repayments towards the due to Chairman of the Board, the due to its Chief Executive Officer, and the due to related party amounting to approximately 25% of its cash flows from operating cash flows less capital expenditures. During 2006, we modified the terms of the agreements to allow prepayments at our discretion.

34

In connection with the modified terms, the Company made principal repayments of $400,000 and $177,243 on the due to Mark Nordlicht during 2006, and 2005, respectively, of which $69,638 was offset in 2005 against an accounts receivable of one of our clients, which is not affiliated with Mr. Nordlicht. Additionally, we made principal repayment of $558,697 and $203,803 on the due to Kevin Cassidy during 2006 and 2005, respectively, and $200,000 and $53,803 on due to Edward O'Connor, during 2006 and 2005, respectively.

We were party to a Master Services Agreement with CES pursuant to which we provide brokerage services on the floor of the New York Mercantile Exchange (see "Description of Business – Business Alliances" for more information about this agreement). Edward J. O'Connor, our president and a director, is a 50% stockholder of CES. Kevin P. Cassidy our Chief Executive Officer until March 31, 2004, is the Managing Director of CES. Pursuant to this arrangement, we were paying to CES a minimum annual fixed fee of $50,000 and assume all expenses directly incurred by CES's associated floor brokerage services. Additionally, we owed to CES $1,525,000  payable on April 1, 2014. However, upon a Capital Raise, we will pay up to 10.67% of the amount raised during the Capital Raise, up to $762,500, to CES, with the remaining principal and accrued interest of 12% from the date of the Capital Raise payable on April 1, 2014.

During April 2005, CES assigned its rights to the Company's liability of $1,525,000 equally to Edward O'Connor and Kevin Cassidy, co-owners of CES. Subsequently, during April 2005, the Company entered into modifications of the terms of the amounts due from it to Mark Nordlicht, Edward O'Connor and Kevin Cassidy. The modified terms provide that, among other things, in the event of a Capital Raise, the interest rate accrued after such event is reduced from 12% to 4.68%. Additionally, the Company may make principal repayments towards such liabilities amounting to approximately 25% of its quarterly cash flows from operating activities less capital expenditures.

Pursuant to this arrangement, our share of revenues and expenses of the floor brokerage services amounted to approximately $3.6 million and $741,000, respectively, during 2006, and $2.0 million and $860,000, respectively, during 2005. We have received $2.6 million and $1.0 million from CES in connection with such floor brokerage services during 2006 and 2005, and CES owes us approximately $488,000 as of December 31, 2006.  This agreement was terminated in January 2007 and our floor operations are now assumed by a subsidiary, OPEX International, Inc.

The Company has recognized revenues from brokerage commissions of approximately $4,000, $206,000 and $63,000 during 2006 and $75,000, $9,000 and $21,000, during 2005, from Northern Lights Energy LLC, Platinum Partners, L.P. and Fenmore Holdings LLC, respectively, entities in which Mark Nordlicht is also the managing partner or a stockholder. The aggregate amount owed to us from such entities amounted to approximately $182,000 as of December 31, 2006.

Pursuant to an agreement providing for the reimbursement of certain administrative expenses for services provided to a coffee bean roaster, Sleepy Hollow Coffee Roasters, Inc. ("Sleepy Hollow"), a company owned by Edward J. O'Connor and by Kevin P. Cassidy, we charged an administrative fee of $17,000 and $17,000 to Sleepy Hollow during 2006 and 2005, respectively. We provide such services to Sleepy Hollow to ensure that Edward O'Connor and Kevin Cassidy can focus as much time and efforts as possible on our operations.

Please see "Item 9.  Directors, Executive Officers, Promoters and Control Persons; Compliance with Section 16(a) of the Exchange Act" for information regarding directors independence required by this item.

Please see "Item 1. Description of Business-Business Alliances" for a description of our term sheet with NYMEX Holdings, Inc., pursuant to which Messrs. Nordlicht, Cassidy, and O'Connor may sell a portion of their common stock to NYMEX Holdings, Inc.

35

ITEM 13. EXHIBITS

     The following exhibits are filed as part of, or are incorporated by reference into, this report:

| Exhibit No. | Description |
| --- | --- |
| 3(i)(a) | Certificate of Incorporation of Optionable, Inc., dated February 4, 2000 (incorporated by reference to Exhibit 3(i)(a) to the Registrant's Registration Statement on Form SB-2, filed December 22, 2004, file no. 333-121543 (the "SB-2"). |
| 3(i)(b) | Certificate of Amendment to the Certificate of Incorporation of Optionable, Inc., dated March 30, 2000 (incorporated by reference to Exhibit 3(i)(b) to the SB-2). |
| 3(i)(c) | Certificate of Amendment to the Certificate of Incorporation of Optionable, Inc., dated May 31, 2000 (incorporated by reference to Exhibit 3(i)(c) to the SB-2). |
| 3(i)(d) | Certificate of Amendment to the Certificate of Incorporation of Optionable, Inc., dated July 21, 2000 (incorporated by reference to Exhibit 3(i)(d) to the SB-2). |
| 3(i)(e) | Corrected Certificate of Amendment to the Certificate of Incorporation of Optionable, Inc., dated January 31, 2003 (incorporated by reference to Exhibit 3(i)(e) to the SB-2). |
| 3(i)(f) | Certificate of Amendment to the Certificate of Incorporation of Optionable, Inc., dated June 9, 2004 (incorporated by reference to Exhibit 3(i)(f) to the SB-2). |
| 3(ii) | Amended and Restated By-laws of Optionable, Inc. (incorporated by reference to Exhibit 3(ii) to the SB-2 |
| 10(i) | Lease Agreement between 24 South Third Avenue Corp. and 60 3rd Ave. Corp., as Lessor, and Optionable, Inc., as Lessee, dated October 3, 2001 (incorporated by reference to Exhibit 10(i) to the SB-2). |
| 10(ii)(a) | Master Services Agreement with Capital Energy Services LLC, dated April 1, 2004 including the Consulting Agreement as a part thereof and Addendum, dated October 7, 2004 (incorporated by reference to Exhibit 10(ii)(a) to the SB-2) |
| 10(ii)(b) | Addendum to Master Services Agreement (incorporated by reference to Exhibit 10(ii)(b) to the SB-2) |
| 10(ii)(c) | Amendment to Master Services Agreement (incorporated by reference to the Registrant's Current Report on Form 8-K, dated as of April 10, 2006) |
| 10(ii)(d) | Termination Agreement (of Master Service Agreement; incorporated by reference to the Registrant's Current Report of Form 8-K, dated as of January 31, 2007) |
| 10(iii)(a) | Options Order Flow Agreement, dated July 1, 2004, between the Company and Intercontinental Exchange, Inc. (incorporated by reference to Exhibit 10(iii)(a) to the SB-2) |
| 10(iii)(b) | Superseding Option Order Flow Agreement, dated as of March 2, 2005 (incorporated by reference to Exhibit 10(iii)(b) to the SB-2) |
| 10(iv)(a) | Employment Agreement, as amended, between the Company and Edward J. O'Connor (incorporated by reference to Exhibit 10(iv)(a) to the SB-2) |
| 10(iv)(b) | Employment Agreement between the Company and Kevin P. Cassidy (incorporated by reference to Exhibit 10(iv)(b) to the SB-2) |

10(iv)(b)(I)          Termination of Employment Agreement between the Company and
                      Kevin P. Cassidy (incorporated by reference to
                      Exhibit 10(iv)(b)(I) to the SB-2)

10(iv)(b)(II)         Employment Agreement between the Company and Kevin P. Cassidy
                      (incorporated by reference to the Registrant's Current Report
                      on Form 8-K, dated as of October 30, 2005)

| Exhibit No. | Description |
| ----------- | ----------- |
| 10(v)(a) | Optionable, Inc. 2004 Stock Option Plan (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-8, file number 333-129853, as filed on November 21, 2005 (the "S-8") |
| 10(v)(b) | Form of Incentive Stock Option Agreement(incorporated by reference to Exhibit 4.2 to the S-8) |
| 10(v)(C) | Nonstatutory Stock Option Agreement(incorporated by reference to Exhibit 4.3 to the S-8) |
| 10(vi) | Prepaid Commission Agreement, dated February 3, 2003, between the Company and Mark Nordlicht (incorporated by reference to Exhibit 10(vi) to the SB-2). |
| 10(vii)(a) | Revolving Credit Facility Agreement, dated June 5, 2003, between the Company and Platinum Value Arbitrage Fund LP (incorporated by reference to Exhibit 10(vii)(a) to the SB-2) |
| 10(vii)(b) | $500,000 Revolving Promissory Note from the Company to Platinum Value Arbitrage Fund LP dated June 5, 2003 (incorporated by reference to Exhibit 10(vii)(b) to the SB-2) |
| *10(viii) | Prepaid Commission Agreement, dated June 9, 2003, between the Company and Platinum Partners Value Arbitrage Fund LLP (incorporated by reference to Exhibit 10(viii) to the SB-2) |
| 10(ix)(a) | Loan Agreement, dated February 13, 2004, between the Company and Mark Nordlicht (incorporated by reference to Exhibit 10(ix)(a) to the SB-2) |
| *10(ix)(b) | $250,000 Promissory Note, dated February 13, 2004, from the Company to Mark Nordlicht (incorporated by reference to Exhibit 10(ix)(b) to the SB-2) |
| 10(ix)(c) | $250,000 Promissory Note Extension Agreement, dated September 9, 2004 (incorporated by reference to Exhibit 10(ix)(c) to the SB-2) |
| 10(x)(a) | Loan Agreement, dated March 8, 2004, between the Company and Mark Nordlicht (incorporated by reference to Exhibit 10(x)(a) to the SB-2) |
| 10(x)(b) | $50,000 Promissory Note, dated March 8, 2004, from the Company to Mark Nordlicht (incorporated by reference to Exhibit 10(x)(b) to the SB-2) |
| 10(x)(c) | $50,000 Promissory Note Extension Agreement, dated September 9, 2004 (incorporated by reference to Exhibit 10(x)(c) to the SB-2) |
| 10(xi)(a) | Loan Agreement, dated March 22, 2004, between the Company and Mark Nordlicht (incorporated by reference to Exhibit 10(xi)(a) to the SB-2) |
| 10(xi)(b) | $5,621,753.18 Promissory Note, dated March 22, 2004, from the Company to Mark Nordlicht (incorporated by reference to Exhibit 10(xi)(b) to the SB-2) |
| 10(xi)(c) | Addendum to Loan Agreement, dated March 22, 2004 (incorporated by reference to Exhibit 10(xi)(c) to the SB-2) |
| 10(xi)(d) | Addendum to Promissory Note, dated March 22, 2004 (incorporated by reference to Exhibit 10(xi)(d) to the SB-2) |
| 10(xii)(a) | Revolving Credit Facility Agreement, dated April 15, 2004, between the Company and Mark Nordlicht (incorporated by reference to Exhibit 10(xii)(a) to the SB-2) |

10(xii)(b)          $50,000 Promissory Note, dated April 15, 2004, from the Company
                    to Mark Nordlicht (incorporated by reference to
                    Exhibit 10(xii)(b) to the SB-2)

10(xiii)            Warrant Agreement for the Purchase of Common Stock
                    (incorporated by reference to the Registrant's Quarterly Report
                    on Form 10-QSB for the quarterly period ended March 31, 2006)

10(xiv)             Service and Repurchase Agreement (incorporated by reference to
                    the Registrant's Current Report on Form 8-K, dated as of
                    January 31, 2007

14                  Code of Business Conduct and Ethics (filed herewith)

| Exhibit No. | Description |
|-------------|-------------|
| 21 | Subsidiaries of the Company. |
| 31.1 | Rule 13a-14(a)/15d-14(a) Certification of the Principal Executive Officer of Optionable, Inc. (filed herewith) |
| 31.2 | Rule 13a-14(a)/15d-14(a) Certification of the Principal Financial Officer of Optionable, Inc.  (filed herwith) |
| 32.1 | Section 1350 Certification of the Principal Executive Officer of Optionable, Inc  The information contained in this Exhibit shall not be deemed filed with the Securities and Exchange Commission nor incorporated by reference in any registration statement filed by the registrant under the Securities Act of 1933, as amended.(filed herewith) |
| 32.2 | Section 1350 Certification of the Principal Financial Officer of Optionable, Inc  The information contained in this Exhibit shall not be deemed filed with the Securities and Exchange Commission nor incorporated by reference in any registration statement filed by the registrant under the Securities Act of 1933, as amended. (filed herewith) |

ITEM 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES

The firm Sherb & Co., LLP, independent registered accounting firm, has audited our financial statements for the years ended December 31, 2006 and 2005.  The Board of Directors has appointed Sherb & Co. to serve as our registered accounting firm for the 2006 year-end audit and to review our quarterly financial reports for filing with the Securities and Exchange Commission during fiscal year 2007.

The following table shows the fees paid or accrued by us for the audit and other services provided by Sherb & Co. for fiscal year 2006 and 2005.

|                       | 2006       | 2005       |
|-----------------------|-----------|-----------|
| Audit Fees(1)         | $  67,000 | $  66,500 |
| Audit-Related Fees    | $    --   | $    --   |
| Tax Fees              | $    --   | $    --   |
| All Other Fees (2)    | $   2,880 | $     645 |
| Total                 | $  69,880 | $  67,145 |

--------------------------

   (1) Audit fees represent fees for professional services provided in
       connection with the audit of our annual financial statements and review
       of our quarterly financial statements and audit services provided in
       connection with other statutory or regulatory filings.

   (2) All Other Fees represent edgarization services related to the certain
       statutory and regulatory filings.

          Pre-Approval of Non-Audit Services

The Company does not currently have an audit committee in place and thus, management must obtain the specific prior approval of the Board of Directors for each engagement of the independent auditor to perform any non-audit services that exceed any pre-approved amounts determined by the Board of Directors.

40

SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on the []th day of March 23, 2007.

                              OPTIONABLE, INC.

                              By: /s/   Kevin Cassidy
                                      Name:  Kevin Cassidy
                              Title:  Chief Executive Officer


In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Mark Nordlicht<br>Mark Nordlicht | Chairman of the Board | March 23, 2007 |
| /s/ Kevin Cassidy<br>Kevin Cassidy | Chief Executive Officer and Director | March 23, 2007 |
| /s/   Edward O'Connor<br>Edward O'Connor | President and Director | March 23, 2007 |
| /s/ Albert Helmig<br>Albert Helmig | Director | March 23, 2007 |
| /s/ Marc-Andre Boisseau<br>Marc-Andre Boisseau | Chief Financial Officer | March 23, 2007 |

41