# Exhibit 3, Part II

OPTIONABLE, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Report of Independent Registered Public Accounting Firm....................F-1

Balance Sheet..............................................................F-2

Statements of Operations...................................................F-3

Statement of Stockholders' Equity (Deficit)................................F-4

Statements of Cash Flows...................................................F-5

Notes to Financial Statements......................................F-6 to F-26

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and Board of Directors
Optionable, Inc.
Briarcliff Manor, New York

We have audited the accompanying balance sheet of Optionable, Inc. as of December 31, 2006 and the related statements of operations, stockholders' equity and cash flows for the years ended December 31, 2006 and 2005. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Optionable, Inc. as of December 31, 2005 and the results of their operations and their cash flows for the years ended December 31, 2006 and 2005, in conformity with accounting principles generally accepted in the United States of America.

/s/ Sherb & Co., LLP
-----------------------------
Sherb & Co., LLP
Certified Public Accountants

New York, New York
January 22, 2007

F-1

OPTIONABLE, INC.
BALANCE SHEET
December 31, 2006

## ASSETS

| | | |
|---|---|---|
| Current Assets: | | |
| Cash and cash equivalents | $ | 7,913,393 |
| Accounts receivable, net | | |
| of provision for doubtful accounts of $29,693 | | 2,100,805 |
| Accounts receivable from related parties | | 182,338 |
| Due from related party | | 488,273 |
| Incentives receivable | | 1,307,859 |
| Other current assets | | 64,162 |
| Total current assets | | 12,056,830 |
| Property and equipment, net | | |
| of accumulated depreciation of $457,204 | | 57,501 |
| Other assets | | 19,900 |
| Other receivable | | 150,000 |
| Total assets | $ | 12,284,231 |

## LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---|
| Current Liabilities: | | |
| Accounts payable and accrued expenses | $ | 192,993 |
| Accrued compensation | | 1,891,885 |
| Income tax payable | | 1,454,246 |
| Total current liabilities | | 3,539,124 |
| Due to chairman of the board, | | |
| net of unamortized discount of $3,256,311 | | 1,788,199 |
| Due to executive officer, | | |
| net of unamortized discount of $441,686 | | 67,011 |
| Total liabilities | | 5,394,334 |
| Stockholders' Equity: | | |
| Preferred Stock; $.0001 par value, | | |
| 5,000,000 shares authorized, none issued | | |
| and outstanding | | - |
| Common stock; $.0001 par value, 100,000,000 | | |
| shares authorized, | | |
| 51,674,514 issued and  51,669,714 outstanding | | 5,167 |
| Additional paid-in capital | | 8,469,567 |
| Treasury stock at cost, 4,800 shares | | (2,506) |
| Accumulated deficit | | (1,582,331) |
| Total stockholders' equity | | 6,889,897 |
| Total liabilities and stockholders' equity | $ | 12,284,231 |

See Notes to Financial Statements.
F-2

OPTIONABLE, INC.
STATEMENTS OF OPERATIONS

|  | For the year ended December 31, | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Revenues: | | |
| Brokerage fees | $ 8,987,727 | $ 2,979,641 |
| Brokerage fees-related parties | 3,994,131 | 2,087,215 |
| Incentives | 3,087,653 | 738,558 |
| Net revenues | 16,069,511 | 5,805,414 |
| Cost of revenues | 5,312,269 | 2,264,110 |
| Cost of revenues-related parties | 909,291 | 856,763 |
|  | 6,221,560 | 3,120,873 |
| Gross profit | 9,847,951 | 2,684,541 |
| Operating expenses: | | |
| Selling, general and administrative | 1,030,979 | 695,718 |
| Research and development | 473,645 | 450,488 |
| Total operating expenses | 1,504,624 | 1,146,206 |
| Operating income | 8,343,327 | 1,538,335 |
| Other income (expense): | | |
| Interest income | 102,040 | 21,548 |
| Interest expense to related parties | (780,137) | (300,319) |
|  | (678,097) | (278,771) |
| Income before income tax | 7,665,230 | 1,259,564 |
| Income tax | (1,459,052) | - |
| Net income | $ 6,206,178 | $ 1,259,564 |
| Basic earnings per common share | $ 0.12 | $ 0.02 |
| Diluted earnings per common share | $ 0.12 | $ 0.02 |
| Basic weighted average common shares outstanding | 51,478,354 | 51,406,431 |
| Diluted weighted average common shares outstanding | 52,559,445 | 51,524,732 |

See Notes to Financial Statements.
F-3

OPTIONABLE, INC.
STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)
From January 1, 2005 to December 31, 2006

| | Common Stock | | Additional | Treasury Stock, | Accumulated | |
| | Shares | $ | Paid-in Capital | at Cost | Deficit | Total |
|---|---|---|---|---|---|---|
| Opening balance, | | | | | | |
| January 1, 2005 | 51,406,431 | $5,141 | $7,784,411 | $- | $(9,048,073) | $(1,258,521) |
| Fair value of warrants issued to related party | - | - | 162,060 | - | - | 162,060 |
| Net income | - | - | - | - | 1,259,564 | 1,259,564 |
| Balance at December 31, 2005 | 51,406,431 | 5,141 | 7,946,471 | - | (7,788,509) | 163,103 |
| Fair value of warrants issued to related party | - | - | 240,000 | - | - | 240,000 |
| Fair value of options | - | - | 6,506 | - | - | 6,506 |
| Fair value of shares issued for compensation to chief executive officer | 268,083 | 26 | 276,590 | - | - | 276,616 |
| Repurchase of shares | (4,800) | - | - | (2,506) | - | (2,506) |
| Net income | - | - | - | - | 6,206,178 | 6,206,178 |
| Ending balance, December 31, 2006 | 51,669,714 | $5,167 | $8,469,567 | $(2,506) | $(1,582,331) | $6,889,897 |

See Notes to Financial Statements
F-4

OPTIONABLE, INC.
STATEMENTS OF CASH FLOWS

| | For the year ended December 31, | |
|---|---|---|
| | 2006 | 2005 |
| Cash flows from operating activities: | | |
| Net income | $ 6,205,178 | $ 1,259,564 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation | 31,508 | 32,519 |
| Amortization of debt discount | 780,137 | 900,320 |
| Provision for doubtful accounts | (17,727) | (22,554) |
| Fair value of warrants and options | 246,506 | 162,080 |
| Fair value of shares issued to chief executive officer | 276,616 | - |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (1,751,941) | (98,854) |
| Accounts receivable-related parties | (141,143) | (34,340) |
| Due from related party | (184,701) | (9,997) |
| Incentives receivable | (1,153,076) | (23,107) |
| Other receivable | - | (150,000) |
| Other current assets | (15,073) | (36,133) |
| Other assets | (19,900) | - |
| Accounts payable and accrued expenses | 138,007 | (25,701) |
| Income tax payable | 1,454,246 | - |
| Accrued compensation | 1,481,330 | 12,838 |
| Net cash provided by operating activities | 7,310,967 | 1,366,615 |
| Cash flows used in investing activity: | | |
| Purchases of property and equipment | (47,824) | (27,439) |
| Net cash used in investing activity | (47,824) | (27,439) |
| Cash flows from financing activities: | | |
| Principal repayments of due to chief executive officer | (558,697) | (203,803) |
| Principal repayments of due to executive officer | (200,000) | (53,803) |
| Principal repayments of due to chairman of the board | (400,000) | (177,243) |
| Repurchase of shares of common stock | (2,506) | - |
| Net cash used in financing activities | (1,161,203) | (434,849) |
| Net increase in cash | 6,101,940 | 904,327 |
| Cash, beginning of year | 1,811,453 | 907,126 |
| Cash, end of year | $ 7,913,393 | $ 1,811,453 |
| Supplemental disclosures of cash flow information: | | |
| Cash paid for taxes | $ 4,806 | $ - |
| Cash paid for interest | $ - | $ - |

See Notes to Financial Statements.
F-5

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 1-Organization and Description of Business

Optionable, Inc. (the "Company") was formed in Delaware in February 2000 and is a trading and brokerage services provider to brokerage firms, financial institutions, energy traders, and hedge funds nationwide. The Company's operations are located in the New York metropolitan area. The Company developed an automated electronic trading system during 2006.

Note 2- Summary of Significant Accounting Policies

Cash and Cash Equivalents

The Company considers all highly liquid investments with original maturities of three months or less to be cash equivalents.

Concentration of Credit Risks

The Company is subject to concentrations of credit risk primarily from cash and cash equivalents, accounts receivable, incentives receivable, and due from related party.

The Company's cash and cash equivalents accounts are held at financial institutions and are insured by the Federal Deposit Insurance Corporation ("FDIC") up to $100,000. During 2006, the Company has reached bank balances exceeding the FDIC insurance limit. To reduce its risk associated with the failure of such financial institutions, the Company periodically evaluates the credit quality of the financial institutions in which it holds deposits.

The Company's accounts receivable are due from energy trading firms, financial institutions, and hedge funds, located primarily in the United States. Collateral is generally not required. One of the Company's customers accounted for 37% of its accounts receivable net of doubtful accounts, respectively, at December 31, 2006. No other customers accounted for more than 10% of its accounts receivable at December 31, 2006.

The Company's incentives receivable are due from a United States exchange providing the Company with incentives to submit customer trades to their respective platform. The incentives receivable are not collateralized. The Company has entered into a binding term sheet with such exchange in January 2007- see Note 10-Subsequent Event.

F-6

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

The due from related party is due from an affiliate owned by the Company's chief executive officer and by an executive officer of the Company, who are both stockholders of the Company. The due from related party is not collateralized.

Customer Concentration

One of the Company's customers accounted for approximately 24% and 18%, respectively of its revenues during 2006 and 2005, respectively. The Company minimizes its customer concentration risks by diversifying its existing customer base.

Product Concentration

All of the Company's revenues are derived from fees earned from energy derivatives transaction fees and related incentives provided by exchanges.

Fair Value of Financial Instruments

The carrying value of cash and cash equivalents, accounts receivables, incentives receivable, due from related party, other receivable, accounts payable and accrued expenses approximate their fair value due to their short-term maturities. The carrying amount of due to Chairman of the board and due to an executive officer approximate their fair value based on the Company's incremental borrowing rate.

Software Development Costs
Costs incurred in the research and development of software products are expensed as incurred until technological feasibility has been established. After technological feasibility is established, any additional costs are capitalized in accordance with Statement of Accounting Financial Standards ("SFAS") No. 86, Accounting for the Costs of Computer Software to Be Sold, Leased or Otherwise Marketed. Costs of maintenance and customer support will be charged to expense when related revenue is recognized or when those costs are incurred, whichever occurs first. The Company believes that the current process for developing software is essentially completed concurrently with the establishment of technological feasibility; accordingly, no software development costs have been capitalized as of December 31, 2006.

F-7

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

Property and Equipment

Property and equipment are recorded at cost and are depreciated on a
straight-line basis over their estimated useful lives of three to five years.
Maintenance and repairs are charged to expense as incurred. Significant renewals
and betterments are capitalized.

Property and equipment consist of the following as of December 31, 2006:

| | |
|---|---:|
| Computer equipment and software | $445,159 |
| Office furniture and equipment | 69,546 |
| | 514,705 |
| Accumulated depreciation | (457,204) |
| | $ 57,501 |

Depreciation expense amounted to approximately $32,000 and $33,000 during 2006
and 2005, respectively.

Income Taxes

Income taxes are accounted for in accordance with SFAS No. 109, Accounting for
Income Taxes. SFAS No. 109 requires the recognition of deferred tax assets and
liabilities to reflect the future tax consequences of events that have been
recognized in the Company's financial statements or tax returns. Measurement of
the deferred items is based on enacted tax laws. In the event the future
consequences of differences between financial reporting bases and tax bases of
the Company's assets and liabilities result in a deferred tax asset, SFAS No.
109 requires an evaluation of the probability of being able to realize the
future benefits indicated by such assets. A valuation allowance related to a
deferred tax asset is recorded when it is more likely than not that some or all
deferred tax assets will not be realized.

Use of Estimates

The preparation of financial statements in accordance with accounting principles
generally accepted in the United States requires management to make estimates
and assumptions that affect the reported amounts of assets and liabilities and
disclosure of contingent assets and liabilities at the date of the financial
statements and the reported amounts of revenues and expenses during the
reporting periods. Significant estimates made by management include, but are not
limited to, the realization of receivables. Actual results will differ from
these estimates.

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

Basic and Diluted Earnings per Share

Basic earnings per share are calculated by dividing income available to
stockholders by the weighted-average number of common shares outstanding during
each period. Diluted earnings per share are computed using the weighted average
number of common and dilutive common share equivalents outstanding during the
period. Dilutive common share equivalents consist of shares issuable upon the
exercise of stock options and warrants (calculated using the modified-treasury
stock method). The outstanding options amounted to 941,000 and 791,000 at
December 31, 2006 and 2005, respectively. The outstanding warrants amounted to
1,550,000 and 550,000 at December 31, 2006 and 2005, respectively.

The following sets forth the computation of basic and diluted earnings per share
for the year ended December 31:

|  | 2006 | 2005 |
|---|---|---|
| Numerator: | | |
| Net income | $6,206,178 | $1,259,564 |
| | | |
| Denominator: | | |
| Denominator for basic earnings per share- | | |
| Weighted average shares outstanding | 51,478,354 | 51,406,431 |
| Effect of dilutive employee stock options | 643,337 | 71,525 |
| Effect of dilutive warrants | 437,755 | 46,776 |
| Denominator for diluted earnings per | | |
| share- Weighted average shares outstanding | 52,559,445 | 51,524,732 |
| | | |
| | | |
| Basic earnings per share | $0.12 | $0.02 |
| Diluted earnings per share | $0.12 | $0.02 |
| | | |
| Anti-dilutive weighted-average shares | - | - |

F-9

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

Revenue Recognition

Revenue is recognized when earned. The Company's revenue recognition policies are in compliance with the Securities and Exchange Commission's ("SEC") Staff Accounting Bulletin ("SAB") No. 104 "Revenue Recognition".

The Company generally invoices its customers monthly, for all transactions which have been executed during such month. Revenues are recognized on the day of trade-trade date basis. The Company's revenues derive from a certain predetermined fixed fee of the transactions it executes on behalf of its customers. The fee is based on the volume of financial instruments traded. The Company bases its fees on oral and written contracts and confirms the fees in writing upon the execution of each transaction.

The Company also receives incentives from United States exchanges for the volume of transactions conducted by the Company using their platform. The incentives are based on a percentage of the total revenues received by the exchange attributable to the Company's volume of transactions submitted to the respective exchanges. The Company estimates monthly such incentives based on the volumes of daily transactions submitted to the respective exchanges using the day of trade-trade date basis, and the exchanges' published revenues by type of transactions. The Company, pursuant to SAB 104, realizes the incentive revenues realized or realizable when all of the following criteria are met:

1) Persuasive evidence of an arrangement exists. The Company has a written separate agreement with one of the exchanges. The other exchange has publicly published the terms of its incentive program in 2003 which is offered to all intermediaries in the select transactions;

2) delivery has occurred or services have been rendered. Under arrangements with both exchanges, the incentives are earned on the day the Company submits transactions to the respective exchanges based on the revenues generated from such transactions and are no longer subject to minimum volume of transactions to the respective exchanges. The Company accounts for all transactions submitted to each exchange on a daily basis. Accordingly, the Company is able to determine when the incentives are earned based on the

F-10

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

date it submits transactions to the exchanges. The Company has no other
obligations to the exchanges to earn the incentives;

3) "seller's" price to the buyer is fixed or determinable. Based on the
incentive program terms of each exchange, their published prices for the type of
transactions the Company submits to them, and the Company's transactions
records, the Company is able to estimate the revenues each exchange earns in
connection with the transactions it submits, and accordingly, the amount, if any
of the incentives the Company earns in connection with such transactions; and

4) collectibility is reasonably assured. Historically, both exchanges have paid
the Company timely on incentives earned. The Company has no knowledge that they
do not intend to pay these incentives, if earned, in the future. Furthermore,
the Company intends to enforce the payment of any incentives receivable under
the incentive programs.

Stock-Based Compensation

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS
No. 123(R), "Share-Based Payment," which replaces SFAS No. 123 and supersedes
APB Opinion No. 25. Under SFAS No. 123(R), companies are required to measure the
compensation costs of share-based compensation arrangements based on the
grant-date fair value and recognize the costs in the financial statements over
the period during which employees are required to provide services. Share-based
compensation arrangements include stock options, restricted share plans,
performance-based awards, share appreciation rights and employee share purchase
plans. In March 2005 the SEC issued Staff Accounting Bulletin No. 107, or "SAB
107". SAB 107 expresses views of the staff regarding the interaction between
SFAS No. 123(R) and certain SEC rules and regulations and provides the staff's
views regarding the valuation of share-based payment arrangements for public
companies. SFAS No. 123(R) permits public companies to adopt its requirements
using one of two methods. On April 14, 2005, the SEC adopted a new rule amending
the compliance dates for SFAS 123R. Companies may elect to apply this statement
either prospectively, or on a modified version of retrospective application
under which financial statements for prior periods are adjusted on a basis
consistent with the pro forma disclosures required for those periods under SFAS
123. Effective January 1, 2006, the Company has fully adopted the provisions of
SFAS No. 123R and related interpretations as provided by SAB 107 prospectively.
As such, compensation cost is measured on the date of grant as its fair value.

F-11

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

Such compensation amounts, if any, are amortized over the respective vesting periods of the option grant. The Company applies this statement prospectively.

Segment reporting

The Company operates in one segment, brokerage services. The Company's chief operating decision-maker evaluates the performance of the Company based upon revenues and expenses by functional areas as disclosed in the Company's statement of operations.

Recent Pronouncements

In September 2006, the FASB issued FASB Statement No. 157. This Statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles (GAAP), and expands disclosures about fair value measurements. This Statement applies under other accounting pronouncements that require or permit fair value measurements, the Board having previously concluded in those accounting pronouncements that fair value is a relevant measurement attribute. Accordingly, this Statement does not require any new fair value measurements. However, for some entities, the application of this Statement will change current practices. This Statement is effective for financial statements for fiscal years beginning after November 15, 2007. Earlier application is permitted provided that the reporting entity has not yet issued financial statements for that fiscal year. Management believes this Statement will have no impact on the financial statements of the Company once adopted.

On July 13, 2006, the Financial Accounting Standards Board (FASB) issued FASB Interpretation No. 48, ("FIN 48"), entitled, "Accounting for Uncertainty in Income Taxes - an Interpretation of FASB Statement No. 109". Concurrently, FASB issued a FASB staff position (FSP) relating to income taxes, (FSP) No. FAS 13-2, "Accounting for a Change or Projected Change in the Timing of Cash Flows Relating to Income Taxes Generated by a Leveraged Lease Transaction." FASB's summary of FIN 48 notes that differences between tax positions recognized in the financial statements and tax positions taken in the tax return (referred to commonly as "book" vs. "tax") will generally result in: (a) an increase in a liability for income taxes payable or a reduction of an income tax refund receivable, (b) a reduction in a deferred tax asset or an increase in a deferred tax liability, or (c) both of the above. FIN 48 requires the affirmative evaluation that it is more likely than not, based on the technical merits of a tax position, that an enterprise is entitled to economic benefits resulting from positions taken in income tax returns. Further, if a tax position does not meet the more-likely-than-not recognition threshold, the benefit of that position is not recognized in the financial statements. Additionally, FIN 48 establishes guidance for "derecognition" of previously recognized deferred tax items, and sets forth disclosure requirements. The effective date of FIN 48 is for fiscal years beginning after December 15, 2006. The Company does not believe that FIN 48, once adopted, will have a significant impact on its financial position, operating results, or cash flows.

F-12

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

In July 2005, the FASB issued FASB Staff Position ("FSP") 150-5, "Accounting Under SFAS 150 for Freestanding Warrants and Other Similar Instruments on Redeemable Shares". FSP 150-5 clarifies that warrants on shares that are redeemable or puttable immediately upon exercise and warrants on shares that are redeemable or puttable in the future qualify as liabilities under SFAS 150, regardless of the redemption feature or redemption price. The FSP is effective for the first reporting period beginning after September 30, 2005, with resulting changes to prior period statements reported as the cumulative effect of an accounting change in accordance with the transition provisions of SFAS 150. We adopted the provisions of FSP 150-5 on July 1, 2005, which did not have a material effect on our financial statements.

In July 2005, the FASB issued EITF 05-6, "Determining the Amortization period for Leasehold Improvements Purchased After Lease Inception or Acquired in a Business Combination", which addressed the amortization period for leasehold improvements made on operating leases acquired significantly after the beginning of the lease. The EITF is effective for leasehold improvements made in periods beginning after June 29, 2005. We adopted the provisions of EITF 05-6 on July 1, 2005, which did not have a material impact to the Company's financial position, results of operations and cash flows.

Note 3-Due from Related Party

In April 2004, under the Master Services Agreement, as amended in April 2005, with a related party, the Company agreed to pay certain fixed and variable fees and support services to such related party entity partly owned by its Chief Executive Officer and by an Executive Officer in exchange for a share of revenues of the floor brokerage services of the related party. The fixed fees the Company has agreed to pay amount to $50,000 per year.

The Company's share of revenues of the floor brokerage services amounted to approximately $3.6 million and $2.0 million during 2006 and 2005, respectively. The Company's share of expenses of the floor brokerage services amounted to approximately $741,000 and $857,000 during 2006 and 2005, respectively. The Company has received approximately $2.6 million and $1.0 million from the related party in connection with such floor brokerage services during 2006 and 2005, respectively, and the related party owed approximately $488,000 at December 31, 2006.

F-13

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 3-Due from Related Party-continued

The Company recognizes its share of revenues of the floor brokerage services based on the commissions earned for such services which are recognized on the day of the trade-trade date basis.

The father of the Company's Chairman of the Board leases to the Company a seat on the exchange through which Capital Energy Services LLC ("CES") maintains its floor operations. The Company assumed the cost of the lease in April 2006. The lease provides for monthly payments of approximately $22,000 through December 31, 2006. The amount paid pursuant to the lease amounted to $188,000 during 2006.

Note 4-Other Receivable

The Company's other receivable consists of amounts due from a broker employed by a related party, an entity owned by our Chief Executive Officer and by an Executive Officer. This other receivable funded security deposits of $100,000 held at a US exchange and $50,000 held at a clearinghouse, which are required to maintain the Company's floor operations.

Note 5-Due to Related Parties

The terms and amounts of due to related parties at December 31, 2006 are as follows:

Due to Chairman of the Board, non-interest bearing, unsecured, payable by March 12, 2014, if the Company obtains additional equity or debt financing of at least $1,000,000 following the private placement which closed in September 2004 ("Capital Raise"), the Company will repay its Chairman of the Board up to 39.33% of the Capital Raise, up to $2,810,877, with the remaining balance and accrued interest of 4.68% from the date of the

| | |
|---|---:|
| Capital Raise due on March 22, 2014: | $5,044,510 |
| Discount, using initial implied rate of 12%: | (3,256,311) |
| | ---------- |
| | $1,788,199 |
| | ========== |

Due to Executive Officer, non-interest bearing, unsecured, payable by March 12, 2014, if the Company obtains additional equity or debt financing of at least $1,000,000 following a Capital Raise, the Company will repay its Executive Officer up to 5.3% of the Capital Raise, up to $381,250, with the remaining balance and accrued interest of 4.68% from the date of the Capital Raise

| | |
|---|---:|
| due on March 22, 2014: | $508,697 |
| Discount, using initial implied rate of 12%: | (441,686) |
| | --------- |
| | $ 67,011 |
| | ========= |

F-14

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 5-Due to Related Parties-continued

During April 2005, the Company modified the terms of its due to related parties. The modified terms provide that, in the event of a Capital Raise, among other things, the interest rate accrued after such event is reduced from 12% to 4.68%. Additionally, the modified terms provide that the Company may make principal repayments towards the due to Chairman of the Board and the due to its Executive Officer amounting to approximately 25% of its cash flows from operating cash flows less capital expenditures. During April 2006, the Company modified the terms of its due to related parties to allow the Company to make principal repayments at its discretion.

The Company satisfied its due to Chief Executive Officer during 2006. The due to Chief Executive Officer had the same terms as the due to Executive Officer.

The amortization of the discount on the due to related parties amounted to approximately $780,000 and $300,000 during 2006 and 2005, respectively.

The Company made principal repayments amounting to approximately $1.2 million towards its due to related parties during 2006.

During 2005, in connection with the modified terms, the Company made principal repayments of $177,243 on the due to its Chairman of the Board, of which $69,638 was offset against an accounts receivable of one of the Company's clients, which is an unrelated party. Additionally, the Company made principal repayment of $203,803 and $53,803 on the due to Chief Executive Officer and due to Executive Officer, respectively.

Note 6- Other Related Party Transactions

The Company provides administrative services to a related party, an entity owned by the Company's Chief Executive Officer and an Executive Officer. The Company charged approximately $17,000 and $17,000 during 2006 and 2005, respectively, for such services. The related party owed the Company approximately $6,000 at December 31, 2006.

The Company has recognized revenues of approximately $273,000 and $106,000 during 2006 and 2005, respectively, from three related parties, entities in which its Chairman of the Board is also the managing director or a shareholder. Such related parties owed the Company approximately $182,000 as of December 31, 2006.

F-15

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 7- Stockholders' Equity

During 2006, the Company issued, in aggregate, 268,083 shares of common stock to
its Chief Executive Officer. The shares were valued at approximately $276,000,
based on the quoted price of the Company's common stock at the date of issuance.
The shares were issued pursuant to the employment agreement with the Company's
Chief Executive Officer.

On May 30, 2006, the Company's Board of Directors authorized the repurchase of
such number of shares of its common stock that have an aggregate purchase price
not in excess of $200,000 at the rate of up to $50,000 worth of common stock
each quarter. The Company repurchased 4,800 shares at a cost aggregating
approximately $2,500 during 2006. Such repurchases have been accounted as
treasury stock in the accompanying balance sheet.

Stock Compensation Plan

During November 2004, the Company adopted the 2004 Stock Option Plan ("2004
Plan"). The 2004 Plan allows for the grant of both incentive stock options and
nonstatutory stock options. The 2004 Plan may be administered, interpreted and
constructed by the Board of Directors or a compensation committee. The maximum
number of shares of common stock which may be issued pursuant to options granted
under the 2004 Plan may not exceed 7,500,000 shares. There are 941,000 options
outstanding at December 31, 2006. The outstanding options are exercisable at a
weighted average price per share of $0.26 per share. The Company granted 150,000
options during 2006. The options outstanding vest over periods ranging between
18 months and three years. During 2006, the Company recorded a share-based
payment expense amounting to approximately $7,000 in connection with all options
outstanding

The share-based payment is based on the fair value of the outstanding options
amortized over the requisite period of service for option holders, which is
generally the vesting period of the options. The fair value of the options is
based on the Black Scholes Model using the following assumptions:

Exercise price:                      $0.20-$0.51
Market price at date of grant:       $0.20-$0.51
Volatility:                          none-57%
Expected dividend rate:              0%
Risk-free interest rate:             2.78%-4.81%

If any options granted under the 2004 Plan expire or terminate without having
been exercised or cease to be exercisable, such options will be available again
under the 2004 Plan. All employees of the Company and its subsidiaries are
eligible to receive incentive stock options and nonstatutory stock options.
Non-employee directors and outside consultants who

F-16

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 7- Stockholders' Equity-continued

provided bona-fide services not in connection with the offer or sale of
securities in a capital raising transaction are eligible to receive nonstatutory
stock options. Incentive stock options may not be granted below their fair
market value at the time of grant or, if to an individual who beneficially owns
more than 10% of the total combined voting power of all stock classes of the
Company or a subsidiary, the option price may not be less than 110% of the fair
value of the common stock at the time of grant. The expiration date of an
incentive stock option may not be longer than ten years from the date of grant.
Option holders, or their representatives, may exercise their vested options up
to three months after their employment termination or one year after their death
or permanent and total disability. The 2004 Plan provides for adjustments upon
changes in capitalization.

Pro Forma Information Under SFAS No. 123 for Periods Prior to January 1, 2006
The following table illustrates the effect on net earnings and earnings per
share if the Company had applied the fair value recognition provisions of SFAS
No. 123 to stock-based awards for 2005:

|  | Year Ended December 31, 2006 | Year Ended December 31, 2005 |
|---|---|---|
| Net income: | | |
| As reported | $ 6,206,178 | $ 1,259,564 |
| Add: Total stock-based employee compensation included in net income as reported, net of related tax effects | - | - |
| Deduct: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | ( - ) | ( 4,338 ) |
| Pro forma | $ 6,206,178 | $ 1,255,226 |
| Basic earnings per share: | | |
| As reported | $ 0.12 | $ 0.02 |
| Pro forma | $ 0.12 | $ 0.02 |
| Diluted earnings per share: | | |
| As reported | $ 0.12 | $ 0.02 |
| Pro forma | $ 0.12 | $ 0.02 |

For purposes of the pro forma calculations, the fair value of each option was
estimated on the date of the grant using the Black-Scholes option-pricing
model, assuming no expected dividends, and the following assumptions: expected
volatility rate: 44%, risk-free interest rate: 3.7%, expected term: 4 years.

F-17

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 7- Stockholders' Equity-continued

A summary of the activity during 2006 and 2005 of the Company's stock option plan is presented below:

|  | Options | Weighted Average Exercise Price |
|---|---|---|
| Outstanding at January 1, 2005 | 780,250 | $0.20 |
| Granted | 150,000 | 0.30 |
| Exercised | - | |
| Expired   or cancelled | (139,250) | 0.24 |
| Outstanding at December 31, 2005 | 791,000 | 0.21 |
| Granted | 150,000 | 0.51 |
| Exercised | - | - |
| Expired   or cancelled | - | - |
| Outstanding at December 31, 2006 | 941,000 | $ 0.26 |
| Exercisable at December 31, 2006 | 666,000 | $0.20 |
| Vested at December 31, 2006 | 666,000 | $0.20 |

The weighted-average grant-date fair value of options granted during 2006 and 2005 amounted to $0.20 and $0, respectively.

Certain of the Company's options, all of which were granted prior to January 1, 2006, terminate upon the earlier of the termination for cause by the Company or the death of the employee. Accordingly, the weighted average remaining contractual term for such options is indefinite. The weighted average remaining contractual life is indefinite for 791,000 outstanding options at December 31, 2006, of which 666,000 are exercisable and vested.

For those options that have a definite contractual term, 150,000 were outstanding at December 31, 2006, of which none were exercisable or vested. The remaining weighted average contractual term for such options is 9.7 years.

The total compensation cost for options amounted to $6,506 and $0 during 2006 and 2005, respectively.

The Company's policy is to issue shares pursuant to the exercise of stock options from its available authorized but unissued shares of common stock. It does not issue shares pursuant to the exercise of stock options from its treasury shares.

F-18

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 7- Stockholders' Equity-continued

The weighted average remaining contractual life and weighted average exercise price of options outstanding at December 31, 2006, for selected exercise price ranges, is as follows:

Options outstanding:

| Range of exercise prices | Number of options | Weighted average remaining contractual life | Weighted average exercise price |
|---|---|---|---|
| $0.20 | 691,000 | indefinite | $ 0.20 |
| $0.30 | 100,000 | indefinite | $ 0.30 |
| $0.51 | 150,000 | 9.7 | $ 0.51 |

Warrants

A summary of the activity during 2006 and 2005 of the Company's warrants is presented below:

| | Warrants | Weighted Average Exercise Price |
|---|---|---|
| Outstanding at January 1, 2005 | 1,000,000 | $ 0.20 |
| Granted | - | 0.20 |
| Exercised | - | - |
| Expired or cancelled | (450,000) | 0.20 |
| Outstanding at December 31, 2005 | 550,000 | 0.20 |
| Granted | 1,200,000 | 0.95 |
| Exercised | - | - |
| Expired or cancelled | (200,000) | 0.95 |
| Outstanding at December 31, 2006 | 1,550,000 | $0.68 |
| Exercisable at December 31, 2006 | 1,150,000 | $0.59 |
| Vested at December 31, 2006 | 1,150,000 | $0.59 |

The weighted-average grant-date fair value of warrants granted during 2006 and 2005 amounted to $0.40 per warrant.

Certain of the Company's warrants, all of which were granted prior to January 1, 2006, terminate upon the earlier of the termination for cause by the Company or the death of the employee. Accordingly, the weighted average remaining contractual term for such warrants

F-19

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 7- Stockholders' Equity-continued

is indefinite. The weighted average remaining contractual life is indefinite for 100,000 warrants at December 31, 2006, all of which are exercisable and vested.

For those warrants that have a definite contractual term, 1,450,000 were outstanding at December 31, 2006, of which 1,050,000 were exercisable or vested. The remaining weighted average contractual term for warrants outstanding, exercisable, vested at December 31, 2006 is 1.5 years, 1.3 years, and 1.3 years, respectively.

The weighted average remaining contractual life and weighted average exercise price of warrants outstanding at December 31, 2006, for selected exercise price ranges, is as follows:

Warrants:

| Range of exercise prices | Number of warrants | Weighted average remaining contractual life | Weighted average exercise price |
|---|---|---|---|
| $0.20 | 550,000 | Indefinite to 0.5 years | $ 0.20 |
| $0.95 | 1,000,000 | 2 years | $0.95 |

During February 2006, the Company issued 1,200,000 warrants to a company wholly-owned by its Chief Executive Officer. The exercise price of the warrants is $0.95 per share. The warrants expire in February 2009. The warrants become exercisable in tranches of up to 400,000 warrants beginning June 30, 2006, and every six months thereafter, upon reaching certain trading milestones by two of the Company's customers. The Company recognizes the fair value of the exercisable warrants when performance has occurred. The fair value of the warrants is based on their fair value at the time of grant. The fair value of the options is based on the Black Scholes Model using the following assumptions:

Exercise price:                    $0.20-$0.95
Market price at date of grant:     $0.20-$0.95
Volatility:                        none-57%
Expected dividend rate:            0%
Risk-free interest rate:           4.37%-5.13%

The total compensation cost related to nonvested awards not yet recognized amounted to approximately $160,000 at December 31, 2006 and the Company expects that it will be recognized over the following weighted-average period of 6 months.

The Company has recognized an expense of approximately $240,000 and $162,000 during 2006 and 2005, respectively, in connection with all warrants which became exercisable during the respective periods.

F-20

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 7- Stockholders' Equity-continued

The Company's policy is to issue shares pursuant to the exercise of warrants
from its available authorized but unissued shares of common stock. It does not
issue shares pursuant to the exercise of warrants from its treasury shares.

Note 8-Income Taxes

The Company has used all of its remaining net operating losses 2006.

The components of the provision for income taxes are as follows:

|                                       | 2006       | 2005 |
|---------------------------------------|-----------|------|
| Current:                              |           |      |
|   Federal                             | $ 1,141,779 | $   - |
|   State                               | 318,273   | -    |
|   Total current                       | 1,459,052 | -    |
| Total provision for income taxes      | $ 1,459,052 | $   - |

A reconciliation of the Company's effective tax rate to the statutory
federal rate is as follows:

|                                              | 2006   | 2005   |
|----------------------------------------------|--------|--------|
| Federal statutory taxes                      | 35.0%  | 35.0%  |
| State income taxes, net of federal tax benefit | 5.7    | 5.7    |
| Permanent differences                        | 4.5    | 0.0    |
| Utilization of net operating losses          | (26.2) | --     |
| Change in valuation allowance                | --     | (40.7) |
|                                              | 19.0%  | 0.0%   |

F-21

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 9- Commitments

During October 2005, the Company named a new Chief Executive Officer, elected him a director, and entered into an employment agreement with him (the "Agreement"). The initial term of the Agreement is for 51 months, subject to renewal or earlier termination.

The Company's Chief Executive Officer's salary will be as follows: $20,833 upon entering into the Agreement, $46,875 from October 30, 2005 to December 31, 2005, $275,000 from January 1 to December 31, 2006, $300,000 from January 1, 2007 to December 31, 2007, $325,000 from January 1 to December 31, 2008, $350,000 from January 1, 2009 to December 31, 2009 ("Fixed Compensation").

In addition, effective April 1, 2006, the Chief Executive Officer is paid (i) cash compensation amounting to five percent (5%) of Gross Revenues of the Company, and (ii) stock compensation amounting to two percent (2%) of the Gross Revenues of the Company, as defined. Gross Revenue is defined as the total gross revenue related to any and all aspects of the brokerage business, including incentives received from the exchanges, based on generally accepted accounting principles. The shares of Company common stock will be granted at fair value at the date of grant.

The Company will issue options to its Chief Executive Officer equal to 20% of the number of shares of common stock issuable under warrants which become exercisable pursuant to any Order Flow Agreements (Order Flow Agreements are the agreements for the Company to issue warrants to a firm based on the volume of orders the firm placed with the Company). Those options will be fully vested Non-Statutory Stock Options granted under the Company's 2004 Plan at fair value at the date of grant. Also, the Company will issue to its Chief Executive Officer 5,000 options each time a firm registers with and executes its first 10,000 lots on the Company's OPEX platform. The total number of such options will be limited to 2,500,000. Such options will be fully vested Non-Statutory Options granted under the Plan at fair value at the date of grant.

Upon the sale or merger or other business combination of the Company and another company or companies, the Company's Chief Executive Officer will be entitled to a lump sum payment of 50% of the unpaid Fixed Compensation should he desire not to be employed with the new or successor entity.

F-22

```
                          OPTIONABLE, INC.
                    NOTES TO FINANCIAL STATEMENTS
                     December 31, 2006 and 2005
```

Note 9- Commitments

Effective February 1, 2007, the Company leases its executive offices under a 10-year leasing arrangement providing for a monthly base rent of $9,953, increasing gradually to up to $11,684. The first 6 months of occupancy are free. The minimum annual payments under such commitment for the next five years and thereafter are as follows:

| Year | Minimum Annual Payments |
| --- | --- |
| 2007 | $  49,765 |
| 2008 | 119,436 |
| 2009 | 124,199 |
| 2010 | 124,632 |
| 2011 | 129,395 |
| 2012 and thereafter | 691,111 |

The Company's rental expense amounted to approximately $74,000 and $80,000 during 2006 and 2005, respectively.


Note 10- Subsequent Events (Unaudited)

On January 22, 2007, the Company, its Chairman of the Board, its Chief Executive Officer, and its President (collectively, the "Founding Stockholders"), and NYMEX Holdings, Inc. (the "Investor") entered into a binding term sheet (the "Term Sheet") pursuant to which the Founding Stockholders have agreed to sell 10,291,448 shares of common stock of the Company (the "Purchased Shares") to the Investor. The Purchases Shares represents 19% of the currently outstanding shares of Common Stock on a fully diluted basis (without giving effect to the warrant discussed below). Pursuant to the Term Sheet, the Company has agreed to issue the warrant described below to the Investor, in consideration of the Investor's agreement to engage in certain joint marketing and cobranding activities and to provide hosting of Company servers and assistance in joint technology development. In addition, the Investor and the Company agreed to certain arrangements with respect to OTC products which the Company clears through the clearport system.

The warrant to be issued by the Company (the "Warrant") will permit the Investor to purchase a number of shares of common stock sufficient to increase the Investor's ownership of the Company's common stock to an amount not to exceed 40% of the Company's then outstanding common stock on a fully diluted basis, based on the assumption that the Investor has retained ownership of the Purchased Shares. The Warrant will be exercisable from time to time for a period of 18 months from the closing date of the transactions contemplated by the Term

F-23

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 10- Subsequent Events (Unaudited) -continued

Sheet at an exercise price per share equal to $4.30. The Warrant will not contain a cashless exercise feature. The exercise price will be subject to certain customary adjustments to protect against dilution.

The transactions contemplated by the Term Sheet will be evidenced by definitive agreements (the "Definitive Agreements") which will contain representations, warranties, covenants, indemnities and conditions precedent customary and appropriate for this type of transaction including, but not limited to, representations, warranties, covenants and indemnities from each of the Founding Stockholders, the Company and the Investors.

The closing of the transactions contemplated by the Term Sheet is subject to certain conditions precedent set forth in the Term Sheet, including, (i) the Investor being satisfied, in its sole and reasonable discretion, with its legal, accounting, regulatory, business and other due diligence investigation of the Company, which will be completed prior to the execution of the Definitive Agreements, (ii) the execution and delivery of mutually acceptable Definitive Agreements within 60 days of the date of the execution of the Term Sheet, (iii) the delivery of mutually acceptable employment agreements with key Company management and executives, other than the Company's Chief Executive Officer, which will include customary non-competition and non-solicitation provisions, and the delivery of a mutually acceptable non-competition agreement with the Company's President and (iv) The Company's Chairman agreement to waive any obligation on the part of the Company to make any prepayment of principal or to begin paying interest upon amounts due to him under the Loan Agreement between him and the Company, dated March 22, 2004, as a result of any exercise by the Investor of the Warrant.

If the Investor does not inform the Company within 3 weeks of being provided substantial access to due diligence that it is satisfied with its due diligence review and that it intends to proceed with the transaction, the Company and the Founding Stockholders will be entitled, in their sole discretion, to terminate the transaction by written notice to the Investor.

Effective upon closing of the transactions contemplated by the Term Sheet and for so long as the Investor owns at least 5,145,724 shares of common stock, the Investor will be entitled to designate one person (reasonably acceptable to the Company) that the Company is required to nominate as a member of the Company's board of directors (the "Investor Director"), and each of the Founding Stockholders shall be required to vote their shares in favor of the election of the Investor's designation. For so long as the Investor owns at least 5,145,724 shares of common stock, the Investor will be required to vote its shares in favor of each individual nominated for election as a member of the Company's board of directors by the nominating committee of the Company. For so long as the

F-24

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 10- Subsequent Events-continued

Investor owns at least 5,145,724 shares of common stock and subject to
certain permitted threshold amounts, the consent of the Investor Director
(which may not be unreasonably withheld) will be required before the
Company may take certain actions including (i) issuances of shares of a
class of stock ranking senior to the common stock, (ii) acquisitions of
businesses or assets, (iii) entry into related party transactions, (iv)
the payment of dividends on, or the optional redemption of, capital stock
or the issuance of debt and (v) entry into any business which is not
similar, ancillary or related to any of the businesses in which the
Company is currently engaged.

For so long as the Investor owns at least 5,145,724 shares of common
stock: (i) each of the Founding Stockholders and the Investor will have a
right of first refusal to purchase or subscribe for their pro rata
percentage of shares in certain subsequent sales by the Company of common
stock and/or certain other securities convertible into or exchangeable for
common stock, (ii) each of the Founding Stockholders and the Investor will
have certain rights of first refusal with respect to proposed sales of
common stock by the others and (iii) before they may accept any offer by
an independent third party to acquire 50% or more of the total voting
power of the common stock or voting stock of the Company, the Founding
Stockholders and the Company will be required to provide notice of such
offer to the Investor and permit the Investor a period of 10 days to make
its own offer.

In connection with the Purchased Shares, the Company will enter into a
registration rights agreement with the Investor which, among other things,
will provide the Investor, subject to standard exceptions, with (i)
unlimited "piggyback" rights subject to standard underwriter lock-up and
cutback provisions and (ii) the right to two demand registrations for
underwritten offerings or take downs off of a shelf registration
statement, provided that (A) a minimum of $5,000,000 of Common Stock are
offered in such a demand registration or take down and (B) the Company
shall not be obligated to effectuate more than one underwritten offering
pursuant to a demand registration by the Investor in any six-month period.
In addition, if the Company is eligible to register its securities on Form
S-3 (or any successor form then in effect), the Investor will be entitled
to unlimited registrations on Form S-3 (or any successor form then in
effect), including shelf registrations, provided that (x) a minimum of
$5,000,000 of common stock are offered in such an S-3 registration and (y)
the Company will not be obligated to effect more than two S-3
registrations in any twelve month period. An S-3 registration will not
count as a demand registration, unless such registration is for an
underwritten offering.

The Investor will enter into a standstill agreement with the Company
pursuant to which the Investor, with certain limited exceptions, will
agree not to purchase any additional shares of the Company's common stock
until the one year anniversary of the closing date of the transactions
contemplated by the Term Sheet.

F-25

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 10- Subsequent Events-continued

The closing of the transactions contemplated by the Term Sheet is expected
to occur as soon as reasonably practicable after the date of execution of
the Term Sheet. The provisions of the Term Sheet are subject to, among
other things, satisfactory completion of due diligence by the Investor.
There can be no assurance that the transactions contemplated by the Term
Sheet will close.

F-26