## Introduction

Defendant Kevin Cassidy (Cassidy) joins the other defendants in moving for dismissal of the Consolidated Amended Class Action Complaint (Complaint or CAC) brought jointly by KLD Investment Management, LLC (KLD), Lead Plaintiff approved by this Court, and Gregg A. Boyer (Boyer), a day trader, not approved by this Court. Relevant facts and authorities contained in the moving briefs of the other defendants, are incorporated by reference, as if fully set forth in this brief.

The Complaint must be dismissed because:

1. It fails to state a claim upon which relief can be granted. (Rule 12(b)(6) of the Federal Rules of Civil Procedure [F.R.Civ.P.]);

2. It fails to plead fraud with particularity (Rule 9(b) F.R.Civ.P.);

3. It fails to plead *scienter* with particularity. (Section 21D(b) of the Securities Exchange Act of 1934 ("Exchange Act"), added as part of the Private Securities Litigation Reform Act of 1995 (PSLRA);[1] and

4. It fails to establish causation.

While well-pleaded facts are deemed true on a dismissal motion, courts are not so bound where "facts"[2] are conclusory or contradicted by documents or records relied upon by the Complaint.  *See*, POINT I A, *infra*. Because the Complaint fails to meet any pleading standards, it must be dismissed with prejudice: the multiple defects are not curable; leave to amend or replead should be denied.

---

[1] Pub. L. No. 104-67, 109 Stat. 737 (codified as amendments to 15 U.S.C. 77-78 and 18 U.S.C. 1964.)

[2] Rather than plead actionable facts, as detailed in this brief, KLD and Boyer instead: (i) rely on the rhetorical use of lurid or emotionally charged adjectival phrases, raw conclusions, innuendo, accusations, rumor, and media/press hearsay,  (ii) fail to meet pleading standards, (iii) engage in circular, bootstrapped and faulty logic, and (iv) duel with common sense.

## Preliminary Statement

Plaintiffs seek redress under the Exchange Act, §10(b) and Rule 10b-5, and also §20(a) (control person liability). Plaintiff Boyer also claims under §20A (insider trading). The claims are for unspecified "damage" from an alleged "scheme" to inflate the stock price of Optionable, Inc. (OPBL), which provides brokerage and related services to the natural gas derivatives market, during a 17-week "Class Period", January 22 - May 14, 2007 (CAC ¶ 1). OPBL, a penny or "small-cap" stock, traded on the volatile OTC Bulletin Board (OTCBB). (CAC ¶74). The Complaint fails to allege if "damage" refers to loss or insufficient profit.[3]

The Complaint sources its allegations from Internet press reports and a mysterious "Confidential Witness #1" (CW1) (CAC ¶ 6(a) n.1). The Complaint fails to describe CW1 as a person with actual knowledge, but rather as "an analyst who followed Optionable during the Class Period." *Id.*[4] The Complaint fails to say who was paying CW1 to analyze OPBL.

## Summary of Allegations of the Complaint

The Complaint theorizes that "omissions" inflated OPBL's stock price. Plaintiffs' factually unsupported conclusions, drawn from hindsight, fall into four categories:

1.    OPBL failed to disclose that its electronic trading platform, OPEX, was a sham. (CAC ¶¶ 8,10,18,26,27,29,69,94).

---

[3] KLD discloses "transactions", not buys, sells or short sales, in a two-week window of the Class Period. Boyer discloses 119 trades in the 82 or so trading days of the Class Period, when he sold 3,350 more shares than he bought.  If Boyer had to later cover the 3,350 excess shares sold, he could have had a profit.

[4] On January 5, 2007, still lacking a factual foundation after an eight month investigatory period, Plaintiffs' counsel issued a public plea, including the following entreaty: " If you have information surrounding Optionable's relationship with the Bank of Montreal that caused Optionable's stock price to collapse in late-April 2007, or any other relevant information, please e-mail or call KGS Managing Partner Lewis Kahn, without obligation or cost to you, toll free 1-866-467-1400, ext. 100, via cell phone after hours at 504-301-7900, or by email at lewis.kahn@kgscounsel.com."

2.    Mr. Cassidy, with Mark Nordlicht (Nordlicht) and Edward O'Connor (O'Connor), profited from an "inflated" OPBL stock price when they privately sold, at a fraction of market prices, some OPBL stock to NYMEX Holdings, Inc., parent of the New York Mercantile Exchange (NYMEX)(CAC ¶¶47, 93).

3.    OPBL failed to disclose the "true" extent of OPBL's revenue from Bank of Montreal (BMO), that BMO's trading losses were OPBL's fault, that OPBL provided "some" erroneous quotes to BMO, and BMO leaving OPBL was OPBL's fault.  (CAC ¶¶7,14,19,27,29,31,36,39,43,50,56-59,65,66,69,94).

4.    OPBL failed to disclose Mr. Cassidy's old non-securities-fraud convictions, which occurred considerably more than five years before OPBL shares were traded on the OTCBB. Also, OPBL had an alleged "undisclosed relationship" with traders at BMO, and Mr. Cassidy and David Lee, a BMO trader, were allegedly "close personal friends". (CAC ¶¶ 6(b), 7, 16, 29).

The Complaint characterizes the omissions as a "fraud-on-the-market". (CAC ¶¶74,75). Plaintiffs laud the integrity of the high risk OTCBB, labeling it "an efficient market." (CAC ¶74(a).)

The Complaint fails to adequately allege any causal connection between the purported omissions and OPBL's stock price.  Mr. Cassidy, the CEO of OPBL during the Class Period, and the other defendants, complied with statutory disclosure obligations, through filings with the Securities and Exchange Commission (SEC).  Their disclosures bespoke caution. They contained warnings about OPEX, about client concentration risks, including BMO, and about other risks. OPBL had no statutory / regulatory obligation to disclose Mr. Cassidy's stale and unrelated convictions. (POINT I A 5, *infra*.) The alleged omissions did not render any statement materially misleading.  Upbeat statements were rather prosaic puffery, and did not alter the total mix of information available to the market.

The Complaint avers, in its one-size-fits-all boilerplate addressing *scienter*, that defendants knew or should have known that the alleged omissions would inflate OPBL's stock price. The Complaint fails to particularize how.

None of the Complaint's conclusions satisfy applicable standards in this Circuit, and as detailed at POINT I, *infra*, require dismissal with prejudice.

## BACKGROUND INFORMATION

### Optionable, Inc.

Defendant OPBL, a Delaware corporation formed in February 2000, provides trading and brokerage services to brokerage firms in the high-risk natural gas and energy derivatives market, as described more fully in its Motion to Dismiss.

The Commodities Futures Trading Commission (CFTC) regulates trading of natural gas and energy derivatives. Under CFTC rules, OPBL is an Exempt Commercial Market (ECM), exempting it from most CFTC regulation, Commodity Exchange Act (CEA) §2(h)(3)-(5), 7 U.S.C. § 2(h)(3)-(5). *See also,* CFTC Regulation 36.3, 17 C.F.R. 36.3.

### Kevin Cassidy

On March 1, 2001, OPBL, still a private company, hired Mr. Cassidy as its CEO, a position he held until termination of his of employment agreement on March 31, 2004.  On April 1, 2004, OPBL and Mr. Cassidy entered into a five-year Consulting Agreement, which was cancelled eighteen months later, October 15, 2005.  On October 30, 2005, OPBL again hired Mr. Cassidy as its CEO, and named him a director.

OPBL's Form 10-KSB[5] for year ending December 31, 2006 (Form 10-KSB), disclosed that Mr. Cassidy was the beneficial owner of 3,233,083 shares of OPBL. As the

---

[5] A court may consider documents integral to or explicitly relied upon in the Complaint, whether or not attached, without converting a motion into one for summary judgment, as well as documents filed with the SEC. *See e.g., Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991), *cert. denied,* 112 S. Ct. 1561 (1992); *eSpeed, Inc. Securities Litigation,* 457 F. Supp. 2d 266 (S.D.N.Y. 2006).  The Court may "take judicial notice of stock prices and press articles (for the fact of their publication)." *Id. See also, Faulkner v. Verizon Comm,* 189 F. Supp. 2d 161, 168 (S.D.N.Y. 2002). Relevant documents are appended to the Declaration of Michael G. Bongiorno, submitted with the motion of Optionable, Inc., and the accompanying Affirmation of Lawrence R. Gelber, Esq.

Complaint admits, on January 22, 2007, when OPBL closed at $4.34, OPBL filed a Form

8-K with the SEC and announced to the press NYMEX's intention to privately purchase

19% of OPBL (CAC ¶9) (including 1,905,000 shares beneficially owned by Mr. Cassidy) for

$2.69 per share. The NYMEX transaction was again disclosed March 23, 2007, when

OPBL closed at $6.25, in OPBL's Form 10-KSB. OPBL announced it would close only

after NYMEX "is satisfied, in its sole and reasonable discretion, with its legal, accounting,

regulatory, business and other due diligence investigation…."[6]

On April 10, 2007, when OPBL closed at $7.29, Mr. Nordlicht and entities owned

respectively by Messrs. O'Connor and Cassidy closed their agreement with NYMEX.

NYMEX bought 1,905,000 shares from Mr. Cassidy's entity, Pierpont Capital, Inc., for

$2.69 per share, the exact terms previously disclosed. Mr. Cassidy beneficially retained

1,328,087 shares. The market value of his beneficially retained shares ($9,681,754.23),

as at April 10, 2007, exceeded, by almost double, his revenue from NYMEX. Mr. Cassidy

thus retained a strong economic interest in OPBL's success. The Complaint fails to allege

that Mr. Cassidy ever sold another share.

To the contrary, as publicly disclosed on Form 4 filed with the SEC on May 7, 2007,

Mr. Cassidy purchased, through the exercise of an option, 55,000 additional shares of

OPBL at $4.63 per share demonstrating his commitment to OPBL and his belief in its

future.

---

[6] Skadden Arps Slate, Meagher & Flom, LLP represented NYMEX in the transaction. Mr. Cassidy, along with the other sellers and OPBL, was represented by Kelley Drye & Warren, LLP.

**The Timing of Public Disclosure versus Plaintiffs' Transactions**

### KLD Investment Management, LLC

Plaintiff KLD is a fewer-than-five-person, registered investment advisor owned and operated out of Oregon by Kerwin L. Doughton (Doughton) that caters primarily to individuals. According to its Form ADV, KLD exercises discretion over its accounts, including the choices and quantities of securities bought or sold, and the broker dealers through which it trades. On July 2, 2007, Doughton submitted his Certification to this Court, listing eleven "executed transactions" in OPBL, in the two-week period April 27, 2007 to May 11, 2007. The Complaint alleges that KLD "was damaged thereby". (CAC ¶3), but Doughton failed to note whether KLD purchased, sold or shorted OPBL, rendering it impossible to see if KLD, which functioned as an institutional investor, is complaining about a loss or insufficient profit inuring to its clients.

### Boyer

Aspiring plaintiff Boyer, in an end-run around the Court's Lead Plaintiff selection process, submits a Certification with exhibits in his application to be Lead Plaintiff.

On Monday, May 14, 2007, Boyer's first pre-market sell - 2,500 shares at $3.038 - was more than triple the closing price of the previous trading session. He then bought 1,500 shares at $3.11, and sold another 2,500 shares at $1.31. Adjusting for his buy, he net sold 3,500 shares at average $1.77, more than double OPBL's highest "efficient market" price on May 14, 2007. Boyer reaped a boondoggle by trading in the pre-market and not relying on the market.

Within the Class Period, Boyer bought 37,850 and sold 41,200 shares. Boyer has failed to disclose if he shorted[7] OPBL. Boyer relied on the technical volatility of OPBL's price. His trades bore no relationship to news or disclosed events. For example:

- January 22 - OPBL announced NYMEX's intention to purchase 19% of OPBL for $2.69 per share. Boyer did not trade. The next day, he bought 1,000 at $4.75 and sold 1,000 at $4.95.

- February 6 - OPBL announced record results for 2006 and the 4th quarter of 2006. Boyer did not trade. The next day he bought 500 at $5.80, sold 1,000 at $5.58 and sold another 1,500 at $5.50.

- March 23 - OPBL filed Form 10-KSB, discussing results of 2006 operations and the imminent NYMEX transaction. Boyer did not trade.

- April 10 - the NYMEX transaction closed. Boyer bought only 50 at $7.17 and 100 at $7.155. The stock closed at $7.29 that day.

- April 13 - **OPBL short interest soared to 3,521,242 shares**. Boyer nevertheless bought 250 at $7.04.

- April 27 - BMO announced its trading losses. Boyer bought 200 at $6.59.

- May 1 - Nordlicht resigned from OPBL's board. Boyer bought 200 at $ $5.40.

- May 7 – Mr. Cassidy bought 55,000 shares at $4.63 (per Form 4). Boyer bought 500 shares at $4.63.

- May 14 - the news of the class actions spread, among other negative releases, including another negative article from The Street.com. Boyer traded in the pre-market, selling 2,500 at $3.038, then buying 1,500 at $3.11 and again selling 2,500 at $1.31, all prices unrelated to the actual market.

It is clear from the foregoing that Boyer traded on his own technical analysis and was immune to news, information and market efficiency. For the foregoing and following

---

[7] An investor sells short when he sells a security he does not own by borrowing the security, typically from a broker. *See Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 700 (2d Cir. 1998). Later, he "covers" his short position by purchasing the security and returning it to the lender. *Id.* A short seller speculates that the price will drop. *Id.* If the price drops, he profits by covering for less than the short sale price. *Id.* If, on the other hand, the price increases, the investor takes a loss.

reasons, and upon the following authorities, the Complaint should be dismissed with prejudice and leave to amend or replead should be denied.

## LEGAL ARGUMENT
### I.    THE COMPLAINT FAILS TO STATE A CLAIM

**A.    Standards of Review**

A securities fraud claim, to survive a Rule 12(b)(6) motion to dismiss, must comport with pleading standards set forth in Rule 9(b).  And so, while in general a Court "must accept all the well-pleaded allegations of the Complaint as true…." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1681 (1974); *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957),  "[b]ald assertions and conclusions of law will not suffice." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). *See also De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996). Allegations unsupported by factual assertions are insufficient, *See Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986). This proposition is widely held. *See, e.g., Aponte-Torres v. University of P.R.,* 445 F.3d 50, 55 (1st Cir. 2006) ("We ought not … credit 'bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like.'"); *Cantor Fitzgerald, Inc.* v. *Lutnick,* 313 F.3d 704, 709 (2d Cir. 2002) ("'[W]e give no credence to plaintiff's conclusory allegations.'"); *Morse* v. *Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss.")

Accordingly, the current standard followed by this Court holds that "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right of relief above the speculative level.'" *In re Parmalat Securities Litigation*, 376 F. Supp.2d 472 (S.D.N.Y 2005)(Kaplan, J.), quoting *ATSI*

*Communications, Inc. v. Shaar Fund, Ltd*. 493 F.3d 87 (2d Cir. 2007)(quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).

In addition, Rule 9(b) obligates Plaintiffs to plead fraud with particularity. *Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 516 (S.D.N.Y. 2007); *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000). A district court must "retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors of Cal., Inc.* v. *California State Council of Carpenters,* 459 U.S. 519, 528 n.17, 103 S. Ct. 897 (1983). Otherwise, a plaintiff could tie up judicial and other resources, and potentially force a substantial settlement, even while advancing a vague and "largely groundless claim." *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627 (2005).

Where, as here, a complaint alleges omissions, Rule 9(b) requires that the plaintiff specify "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd*., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000), *aff'd,* 242 F.3d 366 (2d Cir. 2001). As detailed below, the Complaint fails to do so.

In addition to its obligation to plead facts (i) in support of conclusions and (ii) with particularity pursuant to Rule 9(b), the Complaint must also meet the PSLRA's strict specificity requirements or face dismissal. *See* 15 U.S.C. §§78u-4(b)(1)(B), (b)(2) and (b)(3)(A) (Sections 21D(b)(1) *et seq*. of the Exchange Act). (*See scienter* discussion at POINT I C, *infra*).

As detailed below, and in the contemporaneously filed memoranda of Mr. Cassidy's co-defendants, the Complaint here fails to provide particularized facts sufficient to satisfy either Rule 9(b) or Section 21D(b) of the Exchange Act or to rationally support its conclusory allegations. It violates all applicable pleading standards guiding this Court.

**B.    The Complaint Fails to Plead a Section 10 (b) or Rule 10b-5 Claim.**

The First Count alleges a claim against all defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and its Rule 10b-5, 17 C.F.R. § 240.10b-5.

To state a *prima facie* claim under § 10(b) and Rule 10(b)(5), Plaintiffs must plead, with sufficient particularity, (1) a misstatement or omission; (2) of material fact; (3) made with *scienter*; (4) in connection with the purchase or sale of securities; (5) upon which they relied (6) proximately causing plaintiff's economic loss. *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627 (2005); *ATSI Communications*, *supra* at 105. *See also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir. 1996).

The following subsections of this Memorandum highlight the vast deficiencies of the Complaint. Mr. Cassidy adopts and incorporates the corresponding arguments made by co-defendant Optionable, Inc. in its contemporaneously filed brief regarding the following:

**1.    The Complaint Fails To Identify Any Erroneously Priced Options**

The BMO mis-pricing rumor derives from Plaintiffs' interpretation of a press report that BMO's auditors, Deloitte and Touche LLP (D&T), discovered that BMO's "book of natural gas options" had a discrepancy with market valuations (CAC ¶43) and that the D&T report "indicated that *some* of the prices used in BMO's mismarked book of trades" came

from OPBL. (CAC ¶43 at 17, emphasis provided). As set forth in OPBL's brief, this rumor is inadequate to support a claim.

The Complaint, ignoring that BMO lost money because it took huge risks trading energy derivatives with arguably lax internal controls, is fatally deficient and must be dismissed because, among other things, it fails to identify or allege:

(a)     even one mispriced option quote;

(b)     what the correct option quotes were;

(c)     how many option quotes[8] were erroneous;

(d)     when erroneous option quotes were first provided;

(e)     over what time period erroneous option quotes were provided;

(f)     what benefit inured to Mr. Cassidy;

Moreover, the Complaint fails to allege that BMO, itself a market maker (CAC ¶27 at 11) relied exclusively on OPBL to mark its positions to the market or that it traded exclusively through OPBL. Indeed, the transactions BMO executed through OPBL cleared through NYMEX. The Complaint fails to allege otherwise. This process effectively caused BMO's positions to be marked-to-market daily by NYMEX. This process assures (i) that proper margins are maintained, and (ii) the correct daily reconciliations with prices at which traded contracts must settle. (*See, New York Mercantile Exchange v. Intercontinental Exchange*, 497 F.3d 109 (2nd Cir. 2007). The Complaint fails to allege why or how BMO's risk management department was prevented from earlier discovering its losses.

---

[8] The Plaintiffs cannot decide if OPBL was in a scheme to "misprice options" (CAC ¶¶ 10, 29), "mismark" option prices (CAC ¶43), engage in "mispricing of deals with BMO" (CAC ¶64) or if it "mispriced trades for BMO" (CAC ¶ 69.) Plaintiffs use these variations not in an attempt to plead alternative facts or theories, but rather because they have no reliable facts regarding the cause of BMO's loss.

Plaintiffs fail to adequately allege how Mr. Cassidy personally could have known that BMO was carrying losses. Instead, they *imply* a path to such knowledge by inventing a conclusion - that David Lee (Lee), a BMO trader, (CAC ¶29) and Mr. Cassidy were "close personal friends," [9] despite [I] Mr. Cassidy's denial (CAC ¶ 27] and [ii] no corroborating source.

In short, the allegation of mispriced options is rank speculation, a raw conclusion that fails to meet requisite pleading standards. *In re Parmalat Securities Litigation*, *supra*.

## 2.     The Degree Of BMO's Business Was Long Disclosed

The Complaint, unable to truthfully allege a factual misrepresentation, borrows an arithmetically impossible conclusion inferred by a TheStreet.com reporter after his review of OPBL's publicly filed reports: "Taking Optionable's 24% figure puts revenue from BMO at $3.8 million. That figure in turn represents 43% of the firm's $8.9 million in 2006 brokerage fees…But remember, there are two sides to any counterparty[10] deal. So trading deals involving BMO appear to account for 86% of the firm's brokerage fees…" (CAC ¶36).

The following disclosure, from OPBL's Form 10-QSB for the period ending September 30, 2006, is instructive:  "[t]hree of [OPBL's] customers accounted for 41%, 17% and 13% of its accounts receivable net of doubtful accounts." By the Complaint's logic (borrowed from an Internet reporter's logic) requiring all figures to be doubled, these three customers impossibly accounted for 142% of OPBL's receivables. (CAC ¶¶14, 36, 58).

---

[9] Business relationships do not amount to "close personal" friendships. CW1's purported claim, that OPBL made unspecified payments to Lee and an unidentified sister (CAC ¶7), does not infer impropriety. *In re BISYS Securities Litigation*, 397 F. Supp. 2d 430, 442 (S.D.N.Y 2005) (Kaplan, J.); *In re Axis Capital Holdings Ltd. Sec. Litig.* 456 F. Supp. 2d 576, 591-92 (S.D.N.Y. 2006)

[10] The Form 10-KSB, at 19, of course also fully discloses that on over-the-counter transactions, OPBL bills it "service to both counterparties." *See* OPBL's brief.

Importantly, the Internet reporter admitted that his conclusion, recklessly embraced by the Complaint, was inferred from fully disclosed information in OPBL's Form 10-KSB[11]. Inferences drawn from public disclosures could be drawn by anyone, including the "efficient" OTCBB market.

Indeed, any investor willing to abandon logic could reach Plaintiffs' inferences. *Sable v. Southmark / Envicon Capital Corp.* 819 F. Supp. 324 (E.D.N.Y 1993) (reasonable investor will not be deceived by nondisclosure of inferences if he or she can draw whatever inference might be appropriately based on the disclosed facts.). *See also*, *Wollins v. Antman*, 989 F. Supp. 989 (E.D.N.Y 1986)(failure to disclose percentage of total sales represented by major account that was lost, where previous year's figures included the lost account and described it as major, not an omission of a material fact.)

### 3.    All OPEX Risks Were Repeatedly Disclosed

The Complaint also fails to identify or allege:

(a)    any fact, particular or otherwise, to prop up its conclusion that (i) the OPEX trading platform was a sham or (ii) that Mr. Cassidy knew it was;

(b)    any technical or operational problem with OPEX;

(c)    that the following disclosed risks were somehow concealed:

a.    "investing in our securities involves a high degree of risk" and among pages of specific risk factors, state,: "OPEX is still in the developmental stage" and "might not be successful when launched". Form SB-2 registration statement / prospectus, December 22, 2004, at 6.

b.    "The technology underlying our OPEX system is complex and may contain unknown defects that could harm our reputation, result in product liability of decrease market acceptance…." Amendment No. 1 to Form

---

[11] Fortunately, OPBL's Form 10-KSB had its financial components prepared by Sherb & Co. LLP, Certified Public Accountants, rather than by a TheStreet.com reporter.

SB-2, February 10, 2005, at 10.

c.  "We will not be competitive unless we introduce…new functionalities to our OPEX system…." In Amendment No. 2, April 7, 2005, at 5.

d. "it may be important to our clients that OPEX integrates seamlessly with the technology used by the exchanges. While we have a technology-sharing relationship with NYMEX, we do not have one with the other exchanges to ensure such seamless meshing…." Form 10-KSB, at 16.

In the face of (i) repeated warnings about OPEX, and (ii) failure to plead any fact to prop up the raw conclusion that Mr. Cassidy or anybody else "knew" that OPEX was a sham, the Complaint fails to meet its burden. *In re OPUS360 Corp. Sec. Litig.*, No.01 Civ. 2938 (JGK)(JCF), 2002 WL 3190157, at *8 (S.D.N.Y. Oct 2, 2002). A company has no duty under the securities laws to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions. *Romine v. Acxiom Corp.*, 296 F.3d 701 (8th Cir. 2002).

### 4.  The NYMEX Transaction Was Fully Disclosed

As detailed at page 5, *supra*, NYMEX's intent to purchase stock beneficially owned[12] by Messrs. Cassidy, Nordlicht and O'Connor for $2.69 per share, was fully and repeatedly disclosed, putting the entire Street on notice. The OTCBB market had ample time to adjust accordingly, even allowing for inefficiencies that the Complaint does not believe exist. *See* POINT III, *infra*.

### 5.  OPBL Had No Duty to Disclose Cassidy's History

A fundamental securities law principle holds that before an individual becomes liable for his silence, he must have an underlying duty to speak. *Chiarella v. United States*,

---

[12] The Complaint falsely describes the shares as "personally held", (CAC ¶78), despite public filings to the contrary, at least with respect to Mr. Cassidy.

445 U.S. 222, 227-28, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980). Rule 10b-5 liability for failure to disclose arises only when the duty to disclose exists and the withheld information is material. *Connett v. Justus Enterprises of Kansas, Inc.*, 68 F.3d 382 (10th Cir. 1995) *cert. denied* 116 S. Ct. 1018, 134 L. Ed.2d 98 (1995); *Lorenz v. CSX Corp.*, 1 F.3d 1406 (3d Cir. 1993).  The materiality of allegedly omitted information alone is insufficient to sustain a Rule 10b-5 claim unless there is a duty to disclose it. *Milton v. Van Dorn Co.*, 961 F.2d 965 (1st Cir. 1992). The duty to disclose is statutory.  *H. L. Federman & Co. v. Greenberg*, 405 F. Supp. 1332 (S.D.N.Y. 1975). The disclosure provisions applicable here are set forth in Item 401 of Regulation S-B, *Integrated Disclosure System for Small Business Issuers*, 17 C.F.R. §228.401(d) [13], which, in relevant part, provides:

> d) *Involvement in certain legal proceedings*.  Describe any of the following events that occurred **during the past five years** that are material to an evaluation of the ability or integrity of any director … executive officer, promoter or control person of the small business issuer:
>
>> (2)  Any conviction in a criminal proceeding or being subject to a pending criminal proceeding (excluding traffic violations….)

(Emphasis added.)

Regulation S-B is the "source of disclosure requirements for 'small business issuer' filings under the Securities Act of 1933…and the Securities Exchange Act of 1934…." Reg S-B, Item 10, 17 C.F.R. §228.10(a).  Hence, Regulation S-B governed the disclosure requirements for OPBL's (i) 1933 Act SB-2 prospectus and (ii) Exchange Act Forms 10-QSB and 10-KSB.

OPBL filed its1933 Act SB-2 registration statement, on December 22, 2004. At the time the SB-2 was filed, Mr. Cassidy had not been a director, executive officer, promoter or

---

[13] See also, Item 401 of Regulation S-B 17 C.F.R. §229.401(f).

control person of OPBL for nine months. Also, the SB-2 was filed more than five years after the last of Mr. Cassidy's two alleged convictions, on an unspecified date in 1997. (Compl ¶16).  The Forms 10-QSB and 10-KSB were filed after the SB-2 prospectus.

As noted in multiple press reports, Edward Fleischman, a former SEC Commissioner, discussing Mr. Cassidy's hiatus (18 months) from the Optionable board, observed:  "It is perfectly legal to step off a board and go back on even if you bridge the IPO in doing so."  *See*, Leising, *NYMEX Director Quits* (Update2) Bloomberg, May 15, 2007. [14]

The Complaint fails to allege that any document filed by OPBL or signed by Mr. Cassidy conflicted with SEC instructions for such filings. The *Standard Instructions for Filing Forms under the Securities Act of 1933, Securities Exchange Act of 1934, and Energy Policy and Conservation Act of 1975*, 17 C.F.R. § 229.401, propounded by the SEC (which also includes forms such as proxy statements under Schedule 14A), expressly instruct filers to report convictions within the preceding five years, in accordance with the language of Item 401 of Regulation S-K[15].  Exchange Act Rule 14a-3(b) , advises small business issuers to "refer to the disclosure items in Regulation S-B." 17 C.F.R.§240.14a-3.

The Complaint, acknowledging that OPBL had no obligation to report Mr. Cassidy's alleged convictions in its prospectus (CAC ¶6 [transition from CEO to consultant "enabled the Company to avoid reporting…."]), resorts to hyperbole, for example: "suspiciously timed transition" (CAC ¶16), "felonious background" *Id*., and "multiple fraud based felony

---

[14] Mr. Cassidy resigned on May 12, 2007. The first reports of his old convictions were May 15, 2007, after the Class Period. The disclosure of his past did not affect the price of OPBL stock within the Class Period.

[15] Item 401(f) of Regulation S-K identically tracks the five-year conviction disclosure of Regulation S-B.

convictions" (CAC ¶69) to create prejudice. The Complaint nowhere alleges that Mr. Cassidy was ever convicted of any securities or commodities fraud.[16]

a. **Sarbanes-Oxley and the Form 10-KSB**

Plaintiffs conclusorily assert a violation of "Section 302 of the Sarbanes-Oxley Act of 2002", by leveling the accusation that "defendants concealed Cassidy's fraud convictions from its auditors". (CAC ¶¶23,24). The alleged violation is based on Plaintiffs' distorted interpretation of Sarbanes-Oxley Section 302(a)(5)(A), 15 U.S.C. §7241, which requires certification that signing officers of companies filing "reports under section 13(a) or 15(d)" of the Exchange Act have disclosed to the company's auditors and audit committee "any fraud…that involves management…."[17]

Significantly, 17 C.F.R. § 249.310b – *"Form 10–KSB, Optional Form for Annual and Transition Reports of Small Business issuers Under Sections 13 or 15(d) of the [Exchange Act]*" provides: "A small business issuer defined in Rule 12b–2 of the Exchange Act (§ 240.12b–2 of this chapter), may use this form for its annual and transitional reports under section 13 or 15(d) of the Exchange Act." The General Instructions for Form 10-KSB, at Part III, Item 9, expressly direct the preparers, with respect to "Directors, Executive Officers, promoters and Control Persons…", to "[f]urnish **the information required by Item[] 401…of Regulation S-B**." (Emphasis added.)

---

[16] Rule 232 of the Securities Act, 17 C.F.R. § 230.232, disqualifies a company from taking advantage of a Regulation A filing exemption if an officer has been convicted within 10 years of a felony or misdemeanor in connection with the purchase or sale of a security. The Complaint fails to allege that OPBL sought an exemption or that Mr. Cassidy had such a conviction.

[17] Legal research has failed to uncover a case holding that "any fraud" refers to a prior conviction unrelated to the company's business. And, SEC RELEASE NOS. 33-8810; 34-55929; FR-77; File No. S7-24-06, *Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934*, make clear that the "fraud" referred to is ongoing fraud with the company's financial reporting and financial reporting process.

Here, OPBL, which filed "reports under section 13(a) or 15(d)", specifically the Form 10-KSB, followed SEC instructions, and met the requirements of Item 401 of Regulation S-B. In so doing, OPBL (and Mr. Cassidy) fully complied with Section 302 of Sarbanes-Oxley. A filer, adhering to specific SEC instructions would only disclose convictions within five years. The Complaint fails to allege that any defendant was convicted of any crime within five years of any OPBL public filing.  And, the Complaint nowhere alleges that any alleged convictions were related or material to the business or operations of OPBL, or that they had any impact on the earnings of OPBL.

The Complaint fails to tie the alleged convictions to the oil and gas derivatives business, the securities industry, the commodities industry or the tasks performed by Mr. Cassidy for OPBL.  The alleged convictions were thus (a) immaterial to the accurate descriptions of Mr. Cassidy's relevant job history and duties and (b) subject to the applicable disclosure instructions of the federal securities laws, which instructions did not require disclosure. *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990)(company not obligated to disclose [non-misleading] information even if "interesting" to investors.)

## C.    The Complaint Fails to Plead Scienter

To withstand dismissal, a securities fraud complaint must plead "'facts that give rise to a strong inference of fraudulent intent.'" *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). The requirement was added to the Exchange Act by the PSLRA:

> "(2) *Required State of Mind.* - In any private action arising under this title … the complaint shall, with respect to **each act or omission** alleged to violate this title, state **with particularity facts giving rise to a strong inference** that the defendant acted with the required state of mind." (Emphasis added.)

Exchange Act  §21D(b)(3), 15 U.S.C. § 78u-4(b)(3).

The applicable standard requires a plaintiff to either (i) allege "facts to show that defendants had both motive and opportunity to commit fraud," *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (internal quotation marks omitted), or (ii) allege "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," *id*. *See generally*, *SEC v. First Jersey Secs. Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375 (1976).

The Complaint fails to particularly allege any fact rationally supporting a "strong inference" that Mr. Cassidy had (i) motive to defraud BMO (BMO makes no complaint here) or the OTCBB market, or (ii) opportunity to do so. Wanting a higher stock price is meaningless. *See, e.g., Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 & 68 n.5 (2d Cir. 1996) (generalized motive that issuer wishes to appear profitable, which could be imputed to any public for-profit enterprise, insufficiently concrete to infer scienter); *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 197 (S.D.N.Y. 2006) (similar proposition for insiders).

Also, " the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. _,  127 S. Ct. 2499, 2504-2505 (2007). For an inference of *scienter* to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* [18] The Complaint fails to overcome the more logical inference of nonfraudulent intent; *i.e.*, that Mr. Cassidy believed in OPBL's business model and that hard work would reward it. Indeed, Mr. Cassidy's actions demonstrate this inference to be true by his May 7, 2007 purchase of 55,000 shares of OPBL, as publicly disclosed on his SEC filed Form 4.

---

[18] The Complaint does not allege, but sub-textually implies, that Mr. Cassidy's business relationship with BMO trader Lee (mislabeled by the Complaint as a "close personal friendship") was motive to deceive BMO. The more cogent inference is that business relationships existed to foster good business.

Plaintiffs' only statements directly addressing *scienter* allege in a conclusory-yet-equivocal, cookie-cutter form that: "Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth...." (CAC ¶83).   Such boilerplate is routinely held insufficient. *Hart v. Internet Wire, Inc.*, 50 Fed. Appx. 464, 466 (2d Cir. 2002) (allegations defendants "recklessly ignored or failed to investigate 'red flags'" did not establish scienter); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("frequent conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b)"); *Double Alpha, Inc. v. Mako Partners, L.P.*, Fed. Sec. L. Rep. ¶ 91,033 (S.D.N.Y. July 27, 2000) (scienter lacking where allegation is "defendants 'knew or were reckless in not knowing'").

Plaintiffs, lacking facts, attempt to create the impression of facts, by juxtaposing three elements:

(i)      press and blog reports of decisions by BMO and NYMEX (over which neither Mr. Cassidy nor any other defendant had any control), with

(ii)     the opinions of secret witness CW1, the alleged "stock analyst", with

(iii)    defendants' clairvoyant knowledge that BMO would lose money and discontinue business with OPBL, that NYMEX would announce a competing platform, that NYMEX would abandon OPBL[19] and so on.

Judge Friendly long ago condemned this type of defective pleading method, calling it "fraud by hindsight". Such claims are not actionable under the federal securities laws. *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978 (Friendly, J); *Abbad v. Amman*, 285 F.

---

[19] The Complaint asserts that NYMEX abandoned its position on the OPBL board after it learned of Mr. Cassidy's background. However, Mr. Cassidy left OPBL before NYMEX abandoned its seat. If Mr. Cassidy's background was a negative for OPBL, that factor was eliminated by his departure. Thus the alleged reason for NYMEX's departure makes no sense.

Supp.2d 411, 415 (S.D.N.Y 2003)("defendants' lack of clairvoyance simply does not constitute securities fraud." 285 F. Supp. 2d at 421. *See also, In re NTL, Inc. Securities Litigation*, 347 F. Supp. 2d 15, 26-27 (S.D.N.Y. 2004 (Kaplan, J.)("we have not yet come to the point that lack of clairvoyance constitutes fraud.")

To allege strong circumstantial evidence of recklessness, Plaintiffs must show that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000). A plaintiff "needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *Xerion Partners,* 474 F. Supp. 2d at 516-18 (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)) (granting a motion to dismiss where plaintiffs "fail to identify a single specific report" indicating that public statements were "contemporaneously false"). Here, the Complaint fails to allege Mr. Cassidy received a report from: (a) OPBL's computer programmer that OPEX was doomed to fail, (b) OPBL's accountant that BMO was sitting on losses, or (c) NYMEX, that NYMEX would publicly announce its migration to a competing platform at CME Globex.

Apart from wanting the stock to rise, the sole stab at a "motive"[20] – not wanting to lose BMO's business (Compl ¶10) - contradicts the rest of the Complaint and operational reality. The Complaint alleges that defendants concealed information from BMO to prevent harm to OPBL's business, but yet fraudulently provided some wrong information to BMO,

---

[20] "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the *strength* of the circumstantial allegations must be correspondingly greater." *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987) (internal citations omitted). This standard has not been met because defendants' observable conduct, as revealed in multiple disclosures in documents upon which the Complaint relies, shows that defendants never did anything to artificially inflate the price of the stock.

which could only harm OPBL's business. Operationally, BMO would have had correct information from NYMEX (*see* discussion at 11, 12 *supra*). Common sense is not a pleading requirement, but no precedent requires that it be ignored. This Circuit's adherence to the PSLRA's high pleading standard, not to mention Rule 9(b), requires the Complaint be dismissed with prejudice.

### D.     The Fraud on the Market Claim Fails

Plaintiffs plead "fraud-on-the-market", which presumes reliance on prices established by an "efficient market."  The presumption is rebuttable, *Basic v. Levinson* 485 U.S. 224, 108 S. Ct. 978 (1988), by showing, among other things *that an individual plaintiff traded or would have traded despite his knowing the statement was false*." *Id* at 248. (Emphasis added.)

Here, Boyer bought and sold despite any impact the alleged omissions (or corrections) would have had on the OTCBB. On May 14, 2007, days **after** this class action was announced, Boyer, who now seeks Lead Plaintiff status, completed a buy for 1,500 shares at  $3.11 when the "efficient" market price was under a dollar.  KLD, which functioned as an institutional trader, also seems to have ignored the market.[21] Assuming its first transaction of 165,000 shares was a buy, it did so on April 27, 2007, the day BMO announced losses trading on OPEX.

Such speculative trading implicates questions of reliance and materiality. In *In re Safeguard Scientifics,* 216 F.R.D. 577 (E.D. Pa. 2003), the court noted that while fraud-on-the-market assumes the misrepresentation affected the price on which a purchaser relied,

---

[21] As previously noted, KLD's certification notes eleven discrete "transactions", but fails to identify which were purchases and which were sales, on nine trading days in the final two week window of the Class Period.

a day trader focuses on technical price movements rather than the market price. *Id.* at 582, and concluded that defendants had presented "compelling reason to rebut the reliance presumption." *Id; see also In re MicroStrategy Inc. Sec. Litig.,* 110 F. Supp. 2d 427, 437 (E.D. Va. 2000) (finding an institutional investor "an atypical investor that engages in transactions far beyond the scope of what a typical investor contemplates").

Given the status of each of the Lead Plaintiffs, neither of whom relied on the efficiency of the market, but rather sought to benefit from technical fluctuations in the stock price, the "fraud on the market" theory is disingenuous. It also fails of its own accord.

In *Shaw v. Digital Equipment,* 82 F.3d 1194 (1st Cir. 1996) the First Circuit observed:

> [A] claim that a fraud was perpetrated on the *market* can draw no sustenance from allegations that defendants made overly-optimistic statements, if those statements are ones that any reasonable investor (ergo, the market) would easily recognize as nothing more than a kind of self-directed corporate puffery. The market is not so easily duped....

(Emphasis in original.)  Thus, a fraud-on-the-market theory has to overcome the notion that the "market is not so easily duped." The optimistic statements attributed to defendants in the Complaint are of the sort routinely treated as inactionable puffery. *Rombach v. Chang*, 355 F.3d 164, 174-75 (2d Cir. 2004); *In re Sierra Wireless*, 482 F. Supp. 2d 365, 373 (S.D.N.Y 2007).

For example, the Complaint alleges the following statements defrauded the market:

- OPBL had "high standing within the...derivative community." (CAC ¶9);

- OPBL's "record results" were due to "innovative and impeccable services" and a "largely untapped market for its services." (CAC ¶11);

- OPEX significantly improves the liquidity...of ...derivative markets....:(CAC ¶17);

- The NYMEX transaction was a "major strategic step" for future growth. (CAC ¶25)

None of the foregoing statements, all of which have been classified by various courts as inactionable puffery, are adequate to sustain a claim. *See Payne v. DeLuca*, 433 F. Supp. 2d 547, 599 (W.D. Pa. 2006)("Excellent reputation"); *Fitzer v. Security Dynamics Technologies, Inc.* 119 F. Supp.2d 12, 24 (D. Mass. 2000)("record revenues", "result of continued market demand"); *In re eSpeed, supra* at 286 ("innovative solution"); *In re Wet Seal, Inc., Sec. Litig.* 518 F. Supp.2d 1148, 1168 (C.D. Cal. 2007(statement that new product is "significant improvement"; *In re Bristol-Meyers Squibb Sec. Litig.*, 312 F. Supp.2d 549, 559 (S.D.N.Y. 2004)(product is "one of the most important advances", "broadens our growth opportunities", "significant step toward becoming a leader").

### E.    The Complaint Fails to Adequately Allege Loss Causation

Plaintiffs fail to adequately allege that the post-Class Period disclosure of Mr. Cassidy's old convictions caused the price of the OPBL stock to decline within the Class Period.  A failure to allege loss causation is fatal to a securities fraud claim. *Burke v. Jacoby* , 981 F.2d 1372 (2d Cir. 1992)(failure to show that claimed misrepresentations or nondisclosures caused loss); *Citibank, N.A. v. K-H Corp.* 968 F.2d 1489 (2d Cir. 1992); *In Re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005) (Kaplan, J.) (citing *Lentell v. Merrill Lynch & Co.*, 369 F.3d 161, 175 (2d Cir. 2005).

The Complaint here seeks to connect unrelated dots to comply with pleading requisites regarding causation, giving lip service to the argument that OPBL stock declined due to "corrective disclosure" of allegedly omitted information. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 339-340 (2005).  OPBL's stock price declined after certain events, none of which were in the hands of OPBL or Mr. Cassidy, or related to any "corrective disclosure":

1.  On May 9, 2007, NYMEX announced it would use a platform competing with OPBL and BMO announced that it was pulling its business from OPBL. The stock, which had closed on May 8 at $4.64, closed at $2.81.

2.  On May 10,2007 two articles were published "NYMEX Nails Optionable" (TheStreet.com) and "Optionable Battered When BMO Balks." (New York Post). The stock closed at $0.85.

3.  On Monday, May 14, 2007, The Street.com wrote: "NYMEX said it gave up its Optionable board seat and will take a hard look at its investment in the electronic broker." News about class actions was released. News also broke that Mr. Cassidy had resigned over the weekend. OPBL closed at $0.43.

Mr. Cassidy resigned on May 12, 2007. The Class-Period ended May 14, 2007. The first disclosure of Mr. Cassidy prior convictions was on May 15, 2007. The Complaint fails to allege otherwise. Mr. Cassidy resigned before NYMEX withdrew its board seat. The assumed reason NYMEX withdrew its seat no longer existed.[22] Defendants' alleged non-disclosure of Mr. Cassidy's history had no causative nexus to the decline in the stock price. The Complaint fails to allege one.

BMO, initially reluctant to admit that its own lax standards prevented it from ameliorating its risks, seemingly pointed a finger via the press. (BMO has not leveled any complaint against any defendant). The press hinted at a poor excuse, now adopted by Plaintiffs: some mispriced quotes relating to BMO's "short positions in illiquid natural gas futures and options" (*Bank's $400M Loss on Gas Bets Singes N.Y. Firm*, Roddy Boyd, New York Post, April 28, 2007) that affected the way BMO marked its book to the market - which is of course preposterous in view of (i) BMO's size (ii) the ready existence of multiple

---

[22] Plaintiffs have not properly pleaded the motivation for NYMEX's decision, because they offer *no source at all* for their allegations. CAC ¶¶ 46, 71. *See* 15 U.S.C. § 78u-4; *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 354-55 (S.D.N.Y. 2003). Moreover, such an indirect theory of loss causation is insufficient as a matter of law. *See Dura Pharmaceuticals*, 544 U.S. at 343 ("touching upon" an economic loss is insufficient; what is required is that the fraud *directly* cause the loss).

sources of market information and (iii) the fact that NYMEX marked BMO's book to the

market daily. The press has never offered an explanation as to why BMO's risk

management department failed to timely discover "mispriced quotes".  Mr. Cassidy did not

cause or conceal BMO's losses; he had no means to do either. The Complaint fails to

allege otherwise.

So, even if nondisclosure of Mr. Cassidy's background was otherwise actionable

(and it was not), it did not cause Plaintiffs' unidentified "damage".  *See Internet Law*

*Library, Inc. v. Southridge Capital Mgmt., LLC*, No. 01 Civ. 6600 (RLC), 2007 WL 1222583,

at *4 (S.D.N.Y. Apr. 25, 2007) (rejecting counterclaimant's claim that plaintiff had

defrauded it into making private investment by concealing officers' criminal convictions,

because there was no evidence the "concealed information eventually caused the

transaction to fail").

## II.    THE CONTROL PERSON LIABILITY CLAIMS FAIL

Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a) provides:

"every person who, directly, or indirectly, controls any person liable under
any provision of this chapter or of any rule or regulation thereunder shall also
be liable jointly and severally with and to the same extent as such controlled
person to any person to whom such controlled person is liable, **unless the
controlling person acted in good faith** and did not directly or indirectly
induce the act or acts constituting the violation or cause of action."
("Emphasis added.)

Section 20(a) was modeled on Section 15 of the Securities Act of 1933. (Hearings

on S. Res. 84 [72d Cong.], S. Res. 56 and 97 [73d Cong.] Before the Senate Comm. on

Banking and Currency, 73d Cong., 1st Sess. 6571 [1934]).  Section 15 originally made

controlling persons liable under sections 11 and 12 of the Securities Act of 1933 jointly and

severally with the controlled person to anyone to whom the controlled person was liable.

Congress however specifically rejected the notion of insurer liability under the 1933 Act. *Christoffel v. E.F. Hutton & Co.*, 588 F.2d 665, 668 (9th Cir. 1978) (detailed discussion of legislative history).

In *SEC v. First Jersey Securities, Inc.*, 101 F3d 1450 (2d Cir. 1996), the Second Circuit established a three prong test: "to establish a prima facie case" under §20(a), "a plaintiff must show" (1) a primary violation, (2) control and (3) "that the controlling person was 'in some meaningful sense [a] culpable participant[] in" the wrongdoing. *See also, Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir. 1998).

In 2007, the Second Circuit reiterated: "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, *supra*. And in *Lapin v. Goldman Sachs Group, Inc* ., No. 04-2236, 2006 WL 2850226, at *19 (SDNY Sept. 29, 2006), the Court held that a plaintiff must plead the controlling person's culpable participation in the underlying fraud, and must satisfy the PSLRA by alleging "at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness."

The control person allegations asserted (CAC ¶¶ 88-91) provide no detail and merely assert that the individually named defendants are liable for the alleged Section 10(b) and Rule 10b-5 violations inadequately alleged earlier in the Complaint, utterly ignoring PSLRA and Rule 9(b) pleading requirements.

Here, since the Complaint fails to adequately allege an underlying violation of the securities laws, POINT I, *supra*, this Court should dismiss the Section 20(a) claim. *ATSI, supra;* See *also Suna v. Bailey Corp.,* 107 F.3d 64, 72 (1st Cir. 1997).

### III.    PLAINTIFF BOYER'S INSIDER TRADING CLAIM FAILS

Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, provides, in pertinent part:

> Any person who violates any provision of this Act …by purchasing or selling a security while in possession of material, nonpublic information shall be liable … to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale …) or sold (where such violation is based on a purchase …) securities of the same class.

Mr. Cassidy adopts and incorporates the relevant legal arguments addressing Section 20(A) liability made by co-defendant Nordlicht, as if set forth in this brief, and additionally notes the following:

Plaintiff Boyer (CAC ¶92) labels the publicly disclosed, $2.69-per-share NYMEX transaction, first announced January 22, 2007 and closed on April 10, 2007, an "insider trade", allegedly damaging Plaintiff Boyer. Boyer, who rarely traded in lots of less than 250 shares and often traded in lots of more than one thousand shares, discloses only two "contemporaneous" buys – 50 shares at $7.17 and 100 at 7.22, for a total purchase price of $1,074.00 (one thousand seventy four dollars) plus commissions. Boyer fails to plead any transactional nexus between his open market trades and the privately negotiated NYMEX deal. *See Clay v. Riverwood Intern. Corp.* 964 F. Supp. 1559 N.D. Ga. 1997), *aff'd* 157 F.3d 1381. (Plaintiff had no standing to sue for insider trading where executives exercised stock appreciation rights, because there was no transactional nexus.)

Boyer fails to allege that Mr. Cassidy ever sold a single share of OPBL in the open market. And, apart from the NYMEX transaction, the Complaint fails to allege that Mr.

Cassidy ever sold any of his more than 1.3 million remaining shares privately. To the contrary, the public record discloses, and thus the market and Mr. Boyer both knew, that Mr. Cassidy exercised options to increase his position and purchase 55,000 more shares of OPBL on May 7, 2007. Indeed, on that very day, Mr. Boyer also bought 500 shares, paying the same price as Mr. Cassidy paid, $4.63.

The damages authorized by Section 20A(b)(1) cannot exceed the profit gained or loss avoided in the transaction. There is no provision for a profit avoided.

On January 22, 2007, when the NYMEX transaction was first announced, OPBL closed at $4.34. Mr. Cassidy received $1.65 *less* per share than he would have if he sold at the January 22, 2007 market price. On April 10, OPBL closed at $7.29. Mr. Cassidy received $4.60 per share *less* than he would have if he sold at the April 10, 2007, price. Mr. Cassidy ironically avoided a profit.

On April 11, 2007, the day after the NYMEX transaction closed, Mr. Boyer sold 600 shares of OPBL at $6.99 per share, a price that exceeded what Mr. Cassidy received by $4.39 per share. It represented gross proceeds of $1,048.50 (one thousand forty eight dollars and fifty cents) to Mr. Boyer on the150 shares he bought the previous day. Hence, exclusive of commissions, Boyer lost $26 (twenty-six dollars).

The Complaint conclusorily alleges that Messrs. Cassidy, Nordlicht and O'Connor had the following inside information:

       (i)     OPBL provided false information to BMO;

       (ii)    BMO accounted for 80% of OPBL's revenues;

       (iii)   Cassidy had an undisclosed criminal history;

       (iv)   OPEX was not a viable trading platform; and

(v)    a D&T forensic audit was underway that would soon expose fraud.

The Complaint fails to allege that a "D&T audit " was underway when the NYMEX transaction was announced in January. Indeed, the Complaint alleges that a newspaper reported that BMO engaged D&T in February and that D&T's report was not complete until "late April".  Accordingly, the allegation that Mr. Cassidy would have known in *January* that BMO hired D&T in *February* is temporally impossible.

The Complaint fails to allege that any applicable statute or SEC regulation was violated by the alleged non-disclosures of Mr. Cassidy's history. Mr. Cassidy contractually sold beneficially owned shares to NYMEX at a substantial discount to the market, and any purported non-disclosures about his history had no bearing on the differential between the discounted price NYMEX paid and the market price when Boyer decided to "round up" his already substantial position before selling the next day.

The insider-trading claim brought by Boyer in this class action fail, as do all the claims.

[THIS SPACE INTENTIONALLY LEFT BLANK]

## CONCLUSION

For the foregoing reasons, the claims against Defendant Kevin Cassidy should be dismissed in their entirety, leave to amend or replead should not be granted, and this Court should award to the benefit of Kevin Cassidy such other and further relief as justice and equity require.

Dated: February 15, 2008

Respectfully submitted,

Lawrence R. Gelber
Attorney at Law
The Vanderbilt Plaza
34 Plaza Street – Suite 1107
Brooklyn, New York 11238
Tel:    (718) 638-2363
Fax:    (718) 857-9339

*Attorney for Defendant Kevin Cassidy*

## CERTIFICATE OF SERVICE

I, Lawrence R. Gelber, an attorney duly admitted to practice in the courts of the state of New York, including the United States District Court for the Southern District of New York, do hereby affirm and certify, that on Friday, February 15, 2008, I served a copy of the foregoing "Defendant Kevin Cassidy's Memorandum of Law in Support of Motion to Dismiss The Consolidated Amended Class Action Complaint" on counsel for the plaintiffs, and upon counsel for each defendant by electronic mail, as follows;

Kim Elaine Miller, Esq.
KAHN GAUTHIER SWICK LLC
114 East 39th Street
New York, New York 10016
T: 212 696 3730
Email: kim.miller@kgscounsel.com
Attorneys for Plaintiffs

Eliot Lauer, Esq.
CURTIS, MALLET-PREVOST, COLT
  & MOSLE LLP
101 Park Avenue
New York, New York  10178-0061
T:  212 696 6000
F:  212 697 1559
Email: elauer@cm-p.com
*Attorneys for Defendant Mark Nordlicht*

Liam O'Brien, Esq.
MCCORMICK & O'BRIEN, LLP
42 West 38th Street, 7th Floor
New York, New York 10018
T: 212 286 4471
F; 212 504 9574
Email: lobrien@mcoblaw.com
*Attorneys for Defendant Edward O'Connor*

Michael G. Bongiorno, Esq.
WILMER CUTLER PICKERING HALE
AND DORR LLP
399 Park Avenue
New York, New York 10022
T: 212 330 8800
Email:
michael.bongiorno@wilmerhale.com
*Attorneys for Defendant Optionable, Inc.*

Peter J. Pizzi, Esq.
CONNELL FOLEY LLP
888 Seventh Avenue
New York, New York 10106
T: 973 533 4221
F: 973 535 9217
Email: ppizzi@connellfoley.com
*Attorneys for Defendant Albert Helmig*

Laurie E. Morrison, Esq.
EDWARDS ANGELL PALMER & DODGE LLP
750 Lexington AvenueNew York, New York 10022-1200
T: 212 912 2916
F: 212 308 4844
Email:  lmorrison@eapdlaw.com

-and-

John L. Reed, Esq.
EDWARDS ANGELL PALMER & DODGE LLP
919 North Market Street, 15th Floor
Wilmington, Delaware 19801
T: 302 425 7114
F: 302 777 7263
Email: jreed@eapdlaw.com
*Attorneys for Defendant Marc-Andre Boisseau*

Dated:        Brooklyn, New York
              February 15, 2008

                                        _____
                                          Lawrence R. Gelber
                                          Attorney at Law