# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>**OPTIONABLE, INC. SECURITIES<br>LITIGATION** | **No. 07-cv-3753 (LAK)** |

---

## DEFENDANT ALBERT HELMIG'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS
## THE CONSOLIDATED AMENDED COMPLAINT

---

**CONNELL FOLEY LLP**

Peter J. Pizzi
Christine I. Gannon
Susan Kwiatkowski
888 Seventh Avenue
New York, NY  10106
Telephone: (212) 262-2390
Facsimile:  (212) 262-3118

Attorneys for Defendant Albert Helmig

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

LEGAL ARGUMENT .............................................................................................. 5

I.      PLAINTIFFS FAIL TO PLEAD SCIENTER AS TO HELMIG ...................................... 5

a.     Plaintiffs Fail to Allege Facts Showing Helmig Had Motive And Opportunity To Commit the Securities Fraud Pleaded In The Complaint ............................................................... 6

b.     Lumping Helmig Together With The Other Individual Defendants Fails To Establish Scienter On His Part........................................................................................................ 7

c.     Plaintiffs Have Failed to Allege Facts Constituting "Strong Circumstantial Evidence of Conscious Misbehavior Or Recklessness" By Helmig ..................................................... 10

d.     The Complaint's Scienter Deficiencies ............................................................................ 12

II.     PLAINTIFFS FAIL TO ALLEGE A "SCHEME" BETWEEN OPTIONABLE AND BMO TO MISPRICE OPTIONS WITH THE REQUISITE PARTICULARITY TO MAINTAIN A SECURITIES FRAUD CLAIM AGAINST HELMIG ........................... 13

III.    THE ALLEGATIONS THAT OPTIONABLE MISREPRESENTED ITS DEPENDENCE UPON BMO DO NOT STATE A CLAIM AGAINST HELMIG BECAUSE THE TRUTH WAS FULLY DISCLOSED TO THE MARKET ................. 15

IV.    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST HELMIG RELATING TO CASSIDY'S CRIMINAL CONVICTIONS ................................................................... 17

V.     PLAINTIFFS' ALLEGATIONS ABOUT HELMIG'S SERVICE ON THE BOARD OF PLATINUM ENERGY ARE IRRELEVANT MAKEWEIGHT ..................................... 18

VI.    OTHER DEFENDANTS' SALE OF STOCK TO NYMEX DOES NOT SUPPORT ANY INFERENCE OF SCIENTER ON HELMIG'S PART.......................................... 22

VII.   PLAINTIFFS' SECTION 20(A) CLAIM MUST BE DISMISSED. .............................. 23

CONCLUSION....................................................................................................... 26

i

## **TABLE OF AUTHORITIES**

**Page**

*Cases*

*Abbad v. Amman*, 285 F. Supp. 2d 411 (S.D.N.Y. 2003), *aff'd*, 112 Fed. Appx. 97 (2d Cir. 2004) ........................................................ 9

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) .................................... 5, 9, 17

*ATSI Communications, Inc. v. Shaar Fund, LTD.*, 493 F.3d 87 (2d Cir. 2007) ........................................................................... 23

*Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) ............................................................................................ 19

*Chill v. GE*, 101 F.3d 263 (2d Cir. 1996) .............................................................. 9, 11

*Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992) .................................. 21

*Davidoff v. Farina*, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) .......................................................................................... 15

*Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. (S.D.N.Y. 1981) ......................................................................................... 18

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995) ...................................................................................................... 22

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ........................................ 6

*Glickman v. Alexander & Alexander Svcs., Inc.*, 1996 WL 88570 (S.D.N.Y. Feb. 29, 1996) ................................................ 25

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) ......................................................................................... 8

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004) ...................................................... 24

*In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................................................................ 5

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ......................................................................................... 8

1918534-05

**TABLE OF AUTHORITIES** (Continued)

*In re Cendant Corp. Sec. Litig.* 76 F. Supp. 2d 539
(D.N.J. 1999) ........................................................................................ 12

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp.
2d 367 (S.D.N.Y. 2004) ........................................................................ 8

*In re Criimi Mae, Inc. Sec. Litig.*, 94 F.
Supp. 2d 652 (D. Md. 2000) ................................................................ 12

*In re Espeed, Inc. Sec. Litig.*, 457 F. Supp.
2d 266 (S.D.N.Y. 2006) ........................................................................ 6

*In re Global Crossing*, 2005 WL 2990646
(S.D.N.Y. Nov. 7, 2005) ........................................................................ 24

*In re Global Crossing, Ltd. Sec. Litig.*, 2005
WL 1875445 (S.D.N.Y. Aug. 5, 2005) ................................................ 24

*In re Health Mgmt., Inc., Sec. Litig.*, 970 F. Supp.
192 (E.D.N.Y. 1997) ........................................................................ 8, 12

*In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL
283286 (S.D.N.Y. June 1, 1998) .......................................................... 17

*In re IAC/InterActive Corp Sec. Litig.*, 478 F. Supp.
2d 574 (S.D.N.Y. 2007) ........................................................................ 17

*In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp.
2d 298 (S.D.N.Y. 2005), *aff'd*, 2006 WL
1423785 (2d Cir. May 19 2006), *cert. denied*,
127 S. Ct. 733 (2006) ............................................................................ 21

*In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d
15 (S.D.N.Y. 2004) ...................................................................... 9, 12, 17

*In Re Parmalat Sec. Litig.*, 376 F. Supp. 2d
472 (S.D.N.Y. 2005) .............................................................................. 20

*In re Parmalat Sec. Litig.*, 497 F. Supp. 2d
526 (S.D.N.Y. 2007) .............................................................................. 23

*In re Sierra Wireless, Inc. Sec. Litig.*, 482 F.
Supp. 2d 365 (S.D.N.Y. 2007) ............................................................ 17

*In re Sotheby's Holdings, Inc.*, 2000 WL
1234601 (S.D.N.Y. Aug. 31, 2000) ...................................................... 11

**TABLE OF AUTHORITIES** (Continued)

**Page**

*In re WorldCom Inc., Sec. Litig.*, 294 F.
    Supp. 2d 392 (S.D.N.Y. 2003) ..................................................................... 10

*In re WRT Energy Sec. Litig.*, 1997 WL
    576023 (S.D.N.Y. Sept. 15, 1997) ................................................................ 11

*In Re Yukos Oil Co. Sec. Litig.*, 2006 WL
    3026024 (S.D.N.Y. Oct. 25, 2006) ............................................................... 10

*Jacobs v. Coopers & Lybrand, L.L.P.*, 1999
    WL 101772 (S.D.N.Y. 1999) ........................................................................ 7

*Kalin v. Xanboo, Inc.*, 2007 WL 273546
    (S.D.N.Y. Jan. 31, 2007) .............................................................................. 24

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ........................................... 5, 6, 8, 10

*Lentell v. Merrill Lynch & Co.*, 369 F.3d
    161 (2d Cir. 2005 ......................................................................................... 20

*Mills v. Polar Molecular Corp.*, 12 F.3d
    1170 (2d Cir. 1993) ....................................................................................... 7

*New York Mercantile Exch., Inc. v. Intercontinental
    Exch., Inc.*, 497 F.3d 109 (2d Cir. 2007), *aff'g*
    389 F. Supp. 2d 527 (S.D.N.Y. 2005) ..................................................... 2, 4, 14, 15

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir.), *cert.
    denied*, 531 U.S. 1012 (2000) ................................................................. 6, 9, 10

*O'Brien v. Alexander*, 101 F.3d 1479 (2d Cir. 1996) ...................................... 18

*Pension Comm. Of the Univ. of Montreal Pension
    Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d
    163 (S.D.N.Y. 2006) ...................................................................................... 7

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .................................... 17, 22

*San Leandro Emergency Med. Group Profit
    Sharing Plan v. Philip Morris Co.*, 75 F.3d 801
    (2d Cir. 1996) ............................................................................................... 17

*SEC v. Blavin*, 557 F. Supp. 1304 (E.D. Mich.
    1983) *aff'd*, 760 F.2d 706 (6th Cir. 1985) .................................................. 19

**TABLE OF AUTHORITIES** (Continued)

*SEC v. Capital Gains Research Bureau,*
  *Inc.*, 375 U.S. 180, S. Ct. 275, 11 L. Ed.
  2d 237 (1963)...................................................................................... 19

*SEC v. Moran*, 922 F. Supp. 867 (S.D.N.Y. 1996)...................................... 19

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980)............................................ 19

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d
  Cir. 1994)........................................................................... 6, 11, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551
  U.S. ___, 127 S. Ct. 2499, 168 L. Ed. 2d 179
  (2007)................................................................................. 1, 5, 6

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96
  S. Ct. 2126, 48 L. Ed. 2d 757 (1976) ...................................... 19

**Statutes**

Private Securities Litigation Reform Act of
  1995, 15 U.S.C. § 78u-4(b)(2) ........................................... 1, 23

Securities Exchange Act of 1934, 15 U.S.C.
  § 78t(a)...................................................................................... 23

**Rules**

Fed. R. Civ. P. 9(b) ............................................................. 1, 5, 11, 15

Fed. R. Civ. P. 11 ................................................................... 4, 9, 14, 18

Fed. R. Civ. P. 12(b)(6)........................................................................... 1

NASDAQ Marketplace Rule 4200 ............................................... 4, 19

**Regulations**

17 CFR § 1.3 ......................................................................................... 14

17 CFR § 1.38 ....................................................................................... 14

17 CFR § 240.10b-5 ........................................................................ 19, 21

Defendant Albert Helmig ("Helmig") respectfully submits this memorandum in support of his motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) ("PSLRA"), to dismiss the Consolidated Amended Class Action Complaint filed January 17, 2008 ("Complaint" or "CAC") on the ground that plaintiffs have failed to allege any viable securities fraud claims against him.

## PRELIMINARY STATEMENT

The memorandum of law submitted by defendant Optionable, Inc. in support of its motion to dismiss fully demonstrates the speciousness of each of plaintiffs' claims against Mr. Helmig, who served as an outside director of Optionable for all but the final business day of the putative class period.  Mr. Helmig incorporates by reference the facts set forth in Optionable's Memorandum to the extent that they are applicable to him.  This memorandum seeks to amplify plaintiffs' pleading deficiencies relating to Mr. Helmig, focusing particularly upon alleged statements made by Mr. Helmig in a May 1, 2007 conference call, a May 8, 2007 news article and a May 9, 2007 press release.  This memorandum will also demonstrate that Optionable's 2006 10-KSB properly characterized Mr. Helmig as "independent" under NASDAQ rules and that, regardless, the topic was immaterial to investors.[1]

---

[1] In ruling upon a Rule 12(b)(6) motion to dismiss a §10(b) action, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007). The SEC filings and materials referenced are attachments to the Declaration of Peter J. Pizzi ("Pizzi Decl.") filed concurrently and to the Declaration of Michael G. Bongiorno submitted in support of defendant Optionable, Inc.'s Motion. ("Bongiorno Decl.").  The Complaint is attached as Exhibit 1 to the Bongiorno Decl.

## FACTUAL BACKGROUND

In September 2004, defendant Albert Helmig ("Helmig") agreed to serve on the board of Optionable, Inc., then a small[2] privately-held commodities broker which was in the process of developing an electronic trading platform designed for commodities trading. *See* Bongiorno Decl. Ex. B at pp. 27-28 at Item 9. Helmig was granted options to a total of 250,000 Optionable shares which vested in three segments (50,000 in 2004, 100,000 in 2005, and 100,000 in 2006) but otherwise received no compensation. Pizzi Decl. Exs. 2-3.

By 2006, Optionable's "OPEX" electronic trading platform had been launched and OTC derivatives trading on OPEX began. By February 2007, trades executed on OPEX constituted 17% of Optionable's volume of OTC cleared contracts.[3] The company's revenues also grew dramatically. For the full year 2006, revenues were $16.1 million. In the first quarter of 2007 alone, revenues exceeded $9.1 million.

In January 2007, Optionable, NYMEX and Optionable's founding shareholders – Mark Nordlicht, Kevin Cassidy and Edward O'Connor – signed a binding term sheet and, on April 11, 2007, the parties closed a transaction by which NYMEX acquired a 19% interest in Optionable, with each of the founders selling shares to make up the 19% stake sold to NYMEX. Bongiorno Decl. Ex. C at 2.

On April 27, 2007, the end of Bank of Montreal's ("BMO") second quarter, BMO announced certain trading losses in its commodities portfolio. Pizzi Decl. Ex. 4. In early May

---

[2] Optionable's 2004 sales were $3.4 million. Pizzi Decl. Ex. 1 at p. 12 of 49.

[3] *See* Bongiorno Decl. Ex. B at p. 6. Optionable received incentive fees for trades cleared through NYMEX's ClearPort clearinghouse. *Id.* at p. 8. A clearinghouse such as NYMEX "assumes the credit risk of each party to the transaction by effectively guaranteeing each party's performance obligations and becomes the buyer to every seller and the seller to every buyer through a process known as clearing the contract." *New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 497 F.3d 109, 111 n. 1 (2d Cir. 2007), *aff'g* 389 F. Supp. 2d 527 (S.D.N.Y. 2005) (hereinafter "*NYMEX v. ICE*").

2007, BMO announced that it was changing the way it ran its commodity trading operations and also would terminate its business with Optionable. Pizzi Decl. Ex 5.

On May 1, 2007, Mr. Nordlicht, one of the founders of Optionable, resigned as Chairman and a member of Optionable's Board. Mr. Helmig agreed to replace Nordlicht in that non-executive role. On Friday, May 11, 2007, Mr. Helmig agreed to assume a management role at Optionable, and was appointed Executive Chair effective that day. On Saturday, May 12, 2007, Mr. Cassidy, another of Optionable's founders and also its CEO and Vice Chairman, resigned from the company. After the conclusion of plaintiffs' putative class period, news reports surfaced that Mr. Cassidy had been convicted of one or more criminal convictions long in his past. See Complaint ¶ 50 (citing a May 24, 2007 *New York Post* article).

Thus, prior to May 11, 2007, one business day prior to the expiration of the putative class period on May 14, 2007, Mr. Helmig had never served in a management capacity at Optionable nor received any monetary compensation from the company. At no time during the putative class period did Mr. Helmig ever sell any shares of Optionable stock; to the contrary, on April 4, 2007, in the middle of the putative class period, Mr. Helmig invested in the company by exercising options to purchase 50,000 Optionable shares. Pizzi Decl. Ex. 6.

Optionable's memorandum fully demonstrates the speciousness of each of plaintiffs' theories as grounds for securities fraud claims against Mr. Helmig. Among other failings, no facts are alleged which would support a "scheme to misprice" options and/or "mismark" BMO's book (portfolio) of derivatives, let alone a scheme of which Mr. Helmig was aware. Indeed, because BMO's transactions executed by Optionable were cleared through NYMEX, each was

marked-to-market on a daily basis.[4] Thus, valuations apparently provided to BMO by Optionable were only one of the many sources BMO could rely upon to mark its book to market. There is also no factual allegation in the Complaint that Mr. Helmig had any prior knowledge of Mr. Cassidy's criminal convictions, nor could such an allegation be made consistent with plaintiffs' obligations under Rule 11, Fed. R. Civ. P.

One last topic in the Complaint requires mention with regard to Mr. Helmig. Optionable's 2006 10-KSB designated Mr. Helmig as "'independent' within the meaning of Marketplace Rule 4200[5] of the National Association of Securities Dealers, Inc." Despite the Complaint's insinuations to the contrary, nothing in Mr. Helmig's background renders this statement misleading or inaccurate. While Mr. Helmig and Mr. Nordlicht were each members of the board of an entity known as Platinum Energy Resources, Inc. ("Platinum Energy"), a "special purpose acquisition company" founded by Mr. Nordlicht and others, plaintiffs make no allegation that Platinum Energy did business with Optionable, nor could they do so consistent with Rule 11. Under Marketplace Rule 4200, an outside director of a corporation does not cease to be "independent" merely because he shares common board memberships with one or more other members of that corporation's board.[6]

---

[4] *NYMEX v. ICE*, 497 F.3d at 111 ("For each day when the contract remains open (i.e. before delivery or liquidation), NYMEX's Clearing House evaluates the change in value of its customers' open contracts. This process, known as 'marking-to-market' the customer's open position, determines whether a customer must post additional margin or, instead, receives payments on margin. The settlement prices are used to value the open positions. All margin transactions cleared through NYMEX are marked-to-market daily: 'The margin process functions according to daily reconciliation with settlement prices, known as 'marking-to-market.''").

[5] This rule is available at
http://www.sec.gov/rules/other/nasdaqllcf1a4_5/nasdaqllcamendrules4000.pdf.

[6] As of early 2007, when Optionable's 10-KSB was filed, Platinum Energy was a non-operating blank-check company formed in mid-2005 for the purpose of effecting a merger, capital stock exchange, asset acquisition or other similar business combination with an unidentified operating business engaged in the energy field. Bongiorno Decl. Ex. O at p. 1.

## LEGAL ARGUMENT

Helmig adopts the discussion of the standard applicable to motions to dismiss contained in Optionable's Memorandum, at 10-11.  In addition, Defendant Helmig joins in and hereby incorporates by reference the arguments set forth in Sections III, IV(c), V, VI, VII and VIII of Optionable's Memorandum, as well as any additional arguments made in the memoranda submitted by his co-defendants in this action.

## I.    PLAINTIFFS FAIL TO PLEAD SCIENTER AS TO HELMIG

The Complaint as against Mr. Helmig must be dismissed because plaintiffs have alleged no facts giving rise to a "strong inference" of an intent to commit fraud on his part.  To satisfy Rule 9(b) and PSLRA pleading requirements for scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," which under *Tellabs* requires that "all of the facts alleged taken collectively," give rise to an inference of fraudulent intent that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509-10 (2007); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  To adequately plead scienter plaintiffs must allege particularized facts (1) showing that defendants had both motive and opportunity to commit fraud[7] or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.  *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995); *Kalnit*, 264 F.3d at 138; *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 591

---

[7] *Tellabs* eliminated pleading scienter through motive and opportunity to commit fraud and substituted the "cogent and compelling" standard. *Tellabs*, 127 S. Ct. at 2510.  The Supreme Court preserved motive as a possible "relevant consideration," which relevance is confined to its bearing on the overall question whether "a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.* at 2511.  Even before *Tellabs* the Complaint would have failed to meet the Second Circuit's motive and opportunity standard.

(S.D.N.Y. 2006) (coupling factual statement with conclusory allegation of fraudulent intent insufficient to support inference that defendants acted recklessly or with fraudulent intent).

Even if allegations are deemed cogent, the Court must undertake a comparative analysis taking "into account plausible opposing inferences" that provide nonculpable explanations for the alleged conduct. *Tellabs*, 127 S. Ct. at 2509-10. If plaintiffs' proposed culpable inference is not at least as plausible as nonculpable inferences, the Complaint must be dismissed. *Id.* at 2511. Here, even if an inference of fraudulent intent arises from plaintiffs' allegations, which it does not, it is neither "cogent" nor "as compelling as any opposing inference." *Id.* at 2509-10. Ultimately, the Complaint fails to allege scienter as to Helmig and must be dismissed.

### a.    Plaintiffs Fail to Allege Facts Showing Helmig Had Motive And Opportunity To Commit the Securities Fraud Pleaded In The Complaint

With respect to motive, "[g]eneral allegations that the defendants acted in their economic self-interest are not enough," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000), and "[m]otives that are generally possessed by most corporate directors and officers do not suffice." *Kalnit*, 264 F.3d at 139; *In re Espeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 281 (S.D.N.Y. 2006). In the Second Circuit, "[m]otive [entails] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," while "[o]pportunity [entails] the . . . likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994); *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.), *cert. denied*, 531 U.S. 1012 (2000). Thus, "the desire of individual defendants 'to keep their jobs or increase their compensation by artificially inflating stock price' is not sufficient to establish motive," *In re Axis*, 456 F. Supp. 2d at 594, as such allegations are "too generalized to demonstrate defendants' concrete and personal benefit from the alleged fraud." *Kalnit*, 264 F.3d at 139-40 (rejecting claim based on allegation executives

and board members kept negative information from shareholders to obtain greater compensation by increasing stock price to protect their positions with the company).

Here, plaintiffs have failed to articulate any motive, plausible or otherwise, to satisfy their burden of alleging a "strong inference" of fraudulent intent by Helmig. In fact, the only statements that arguably address scienter do so as to all individual defendants *en masse* without any attempt to allege a motive or opportunity as to Helmig individually. *E.g.* CAC ¶ 83 ("Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth . . ."). Plaintiffs fail to allege with any particularity that Helmig knew of any alleged scheme "to grossly misprice options with BMO" (CAC ¶ 10), of OPEX's purported failings as a "viable platform" (CAC ¶ 18), of any alleged improper personal relationships between Optionable personnel and BMO traders (CAC ¶ 49), or any of plaintiffs' other ruminations.

> ### b.    Lumping Helmig Together With The Other Individual Defendants Fails To Establish Scienter On His Part

Plaintiffs cannot rely upon the group pleading doctrine to imply that Helmig had scienter. To create a strong inference of Helmig's scienter under the securities laws, plaintiffs must allege that Helmig "personally knew of, or participated in, the fraud." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Plaintiffs must allege facts sufficient to show that Helmig had knowledge that alleged misstatements and omissions were material and false at the time they were made. *Id.; see also Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 WL 101772 *16-17 (S.D.N.Y. March 1, 1999). The group pleading doctrine "is extremely limited in scope, applying only to clearly cognizable corporate insiders with *active daily roles* in the relevant companies or transactions." *Pension Comm. Of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 180 (S.D.N.Y. 2006) (bare allegations of inside information insufficient

without allegations defendant had control over content of statements)(emphasis added); *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 440 (S.D.N.Y. 2005) (plaintiff may only invoke group pleading doctrine if individual defendant was a corporate insider with direct, active involvement in daily affairs of company).

Here, plaintiffs simply conclude, without particularized factual allegation, that Helmig had direct and supervisory involvement in the day-to-day operations of the Company. Plaintiffs' claims of Helmig's knowledge are completely conclusory and therefore insufficient properly to plead scienter. *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 382 (S.D.N.Y. 2004). Further, as stated above, an individual's position as an officer or board member alone is insufficient to support an inference of scienter. *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d at 381-82; *see also In re Health Mgmt., Inc., Sec. Litig.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1997). Finally, Helmig was an outside director until May 11, 2007, when he was designated Executive Chairman. Plaintiffs simply cannot rely on the group pleading doctrine against Helmig for any statements or omissions not directly attributed to him prior to May 11, 2007, one business day before the end of the putative class period. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 449 (S.D.N.Y. 2005) (refusing to apply group pleading doctrine against defendant for the time period when he was an "Advisor to the CEO"); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 441 (group pleading doctrine could be invoked against individual defendants only as to statements made during the period when each individual defendant held high level positions, such as CEO, CFO, COO and President).

In the case of Helmig, plaintiffs cannot even point to increased executive compensation as a motive, a theory repeatedly rejected by courts, because Helmig only drew compensation from Optionable for one business day before the putative class period expired. *Cf Kalnit*, 264

F.3d at 139-40; *Novak*, 216 F.3d at 307 (plaintiffs could not proceed based on motives possessed by virtually all insiders, including desire to maintain a high stock price to increase compensation); *Acito*, 47 F.3d at 54 ("existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter").

Significantly, plaintiffs do not allege, nor could they claim consistent with Rule 11, Fed. R. Civ. P., that Helmig sold any securities during the alleged Class Period. *See* Point V, below.

Plaintiffs theorize that defendants embarked upon the purported misprice/mismark scheme in order to gain favor with BMO and that defendants knew of, and failed to disclose, NYMEX's plans to make NYMEX's regulated futures products available to the Chicago Mercantile Exchange's electronic trading platform. This speculation, however, is not supported by any *benefit* Helmig could obtain from keeping material information from the investing public. Instead, it is precisely the sort of generalized corporate benefit that courts routinely reject.[8] *See Chill v. GE*, 101 F.3d 263, 268 (2d Cir. 1996).

Thus, plaintiffs have failed to allege motive cognizable under Second Circuit law. Plaintiffs' reliance on generalized allegations of motive and opportunity fail to give rise to a "strong inference" of scienter under settled PLSRA pleading standards.

---

[8] Plaintiffs' defective pleading is nothing more than "fraud by hindsight," which is inactionable under the federal securities laws. *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 26-27 (S.D.N.Y. 2004). Plaintiffs have done little more than charge defendants with failing to disclose knowledge of future events; however, "lack of clairvoyance simply does not constitute securities fraud." *Abbad v. Amman*, 285 F. Supp. 2d 411, 415 (S.D.N.Y. 2003), *aff'd*, 112 Fed. Appx. 97 (2d Cir. 2004).

**c.**   **Plaintiffs Have Failed to Allege Facts Constituting "Strong Circumstantial Evidence of Conscious Misbehavior Or Recklessness" By Helmig**

To establish a "cogent and compelling" allegation of recklessness or conscious misbehavior, plaintiffs would have to allege particularized facts showing that Helmig engaged in "deliberate illegal behavior," and "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," respectively. *In re WorldCom Inc., Sec. Litig.*, 294 F. Supp. 2d 392, 412 (S.D.N.Y. 2003); *Novak*, 216 F.3d at 308. The business context is crucial in determining what is "highly unreasonable" and what would constitute "an extreme departure from the standards of ordinary care," *Kalnit*, 264 F.3d at 138, yet the Complaint makes no allegations about context, and significantly, no allegations about the proper standard of care for an outside director such as Helmig (who was an outside director until May 11, 2007, one business day before the putative class period expired). Plaintiffs' allegations fall far short of making this showing. Instead, plaintiffs rely upon boilerplate assertions against all the individual defendants, see CAC ¶¶ 82-83, which are utterly insufficient.

While the Complaint asserts at various points that "defendants," presumably including Helmig, "knew" various undisclosed facts, no particularized facts support that charge. In fact, plaintiffs do not specify the content of any of the "information" to which Helmig supposedly had access. "If plaintiffs rely on allegations that the defendants had access to fact[s] contradicting their public statements, plaintiffs must *specifically identify* the reports or statements containing this information." *In re WorldCom*, 294 F. Supp. 2d at 412 (emphasis added); *see also In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024 * 20 (S.D.N.Y. Oct. 25, 2006) (dismissing securities fraud claim where conclusory allegations that executives had "access" to internal

documents and undisclosed information found to be "insufficient as a matter of law to establish [executive's] conscious misbehavior and recklessness"); *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601 *8-9 (S.D.N.Y. Aug. 31, 2000) ("[C]onclusory allegations – that defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things – do not satisfy the requirements of Rule 9(b), such allegations are 'so broad and conclusory as to be meaningless.'" *quoting Shields*, 25 F.3d at 1129). By failing to allege that Helmig had access to specific information even remotely connected to any of plaintiffs' allegations, plaintiffs have failed to show that Helmig engaged in "an egregious refusal to see the obvious, or to investigate the doubtful, [which] may in some cases give rise to an inference of recklessness." *Chill*, 101 F.3d at 269.

As an outside director, Helmig is not alleged to have been aware of any specific "red flags" that might have indicated inappropriate quotes provided by Optionable to BMO for marking its book to market. *See Chill*, 101 F.3d at 269 (defendant ignored significant "red warning flags" that its subsidiary was engaging in sham trades to inflate profits on a massive scale). Allegations of theoretical knowledge do not give rise to an inference of scienter even for a management executive with his hands on the operations of the company, let alone for an outside director like Helmig with no role in day-to-day management of the company. *See In re Sotheby's*, 2000 WL 1234601 at *7-8 ("[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook."); *In re WRT Energy Sec. Litig.*, 1997 WL 576023 *14 (S.D.N.Y. Sept. 15, 1997) ("allegations of access standing alone do not constitute strong circumstantial evidence of conscious misbehavior or recklessness"). Upholding plaintiffs' theory against

Helmig would impose strict liability against an individual who was a mere director for nearly all of the Class Period (as well as against other executives and corporate insiders) and eviscerate the scienter requirement of securities fraud claims. *See, e.g., In re Health Mgt.*, 970 F. Supp. at 205 (if court were to infer scienter merely from "senior management position," "the executives of virtually every corporation in the United States would be subject to fraud allegations").

In addition, although Helmig is alleged to have signed the 2006 10-KSB filed March 23, 2007 (CAC ¶¶ 13, 67[9]), this signature alone is insufficient to allege scienter. *See In re WorldCom*, 294 F. Supp. 2d. at 418-19 (plaintiff failed to allege scienter despite fact that audit committee members signed 10-K forms); *In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 661 (D. Md. 2000) (inference that defendants who signed company's public filings "must have known" statements at issue were false did not establish scienter); *In re Cendant Corp. Sec. Litig.* 76 F. Supp. 2d 539, 547 (D.N.J. 1999) (allegations that officer/director signed public disclosures do not establish scienter, even coupled with allegations of daily involvement in company).

Thus, plaintiffs have failed to allege facts constituting strong circumstantial evidence that Helmig consciously or recklessly engaged in fraudulent acts. Instead, plaintiffs have pleaded fraud by hindsight, which is inactionable under the federal securities laws. *In re NTL*, 347 F. Supp. 2d at 26-27.

### d.    The Complaint's Scienter Deficiencies

As noted at Point I (b) above, the group pleading doctrine is of no help to plaintiffs because Helmig was an outside director until May 11, 2007, when he was designated Executive Chairman. Plaintiffs simply cannot rely on the group pleading doctrine against Helmig for any

---

[9] Though ¶ 67 of the Complaint suggests "Defendants" signed Form 10-QSB reports during the putative class period, a review of Optionable's quarterly filings reveals that Helmig signed none.

statements or omissions not directly attributed to him prior to May 11, 2007, one business day before the end of the putative class period.

Given the absence of any factual allegations that Helmig had motive and opportunity to commit fraud, or that he consciously or recklessly engaged in fraudulent acts, plaintiffs have failed to state a claim for a violation of Section 10(b) against him.  Moreover, plaintiffs fail to allege implausibility for the logical non-fraudulent inferences about actually happened during the Class Period – namely, that defendants, including Helmig, had the normal, run-of-the-mill non-fraudulent intent that Optionable would succeed in its business. In fact, plaintiffs' factual allegations, in conjunction with the additional information defendants have provided that the Court may consider, support inferences of non-fraudulent conduct that are far more persuasive than any inference of scienter.

## II.   PLAINTIFFS FAIL TO ALLEGE A "SCHEME" BETWEEN OPTIONABLE AND BMO TO MISPRICE OPTIONS WITH THE REQUISITE PARTICULARITY TO MAINTAIN A SECURITIES FRAUD CLAIM AGAINST HELMIG

Defendant Helmig joins in and hereby incorporates by reference the arguments set forth in Section I of Optionable's Memorandum, as well as any additional arguments made in the memoranda submitted by his co-defendants in this action.

Additionally, as to defendant Helmig, plaintiffs attempt to support their scheme claim by reference to a May 9, 2007 Optionable press release stating that "one of its clients recently incurred some losses that have become a subject of public discussion."  CAC ¶ 32.  The press release goes on to quote Helmig as follows:

> "Gains and losses are both inevitable in trading energy derivatives. We are never pleased when losses dominate for one of our clients, but we do not design or help to design their strategies, nor are we financial advisors. We provide brokerage and execution services for trades that we are instructed to make by our clients. We believe strongly that our brokerage and

> execution services are and have been rendered appropriately, professionally and correctly." [CAC ¶ 32]

Nothing in this passage is either inaccurate or misleading. As defined by CFTC rules, a commodities broker "engage[s] in soliciting or accepting orders . . . for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market . . .." 17 CFR § 1.3 (mm). The term "execution" refers to the "execution of transactions" on either a competitive or non-competitive basis pursuant to CFTC rules. *See* 17 CFR § 1.38. Electronic trading platforms such as OPEX and ICE generally offer "execution-only" services, *NYMEX v. ICE*, 389 F. Supp. 2d at 533, with clearing taking place on NYMEX or other exchanges. *Id.* The Complaint contains no hint that Optionable's "brokerage and execution services" were defective or objectionable in any way, nor could such an allegation be made consistent with Rule 11.

The Complaint posits that Optionable's brokerage and execution services were "used to provide grossly mispriced trades [to BMO]." CAC ¶ 33. The facile attempt to conflate the *brokerage and execution* of commodity options with the entirely different process of *valuing* derivatives contracts in a customer's inventory or portfolio does not help plaintiffs' case because the May 9, 2007 quotation addressed only Optionable's *brokerage and execution*. Neither the May 9, 2007 press release nor any other statement attributed to Helmig in the Complaint comments upon the techniques used by BMO or any other Optionable customer to determine the value of its derivatives portfolio. Therefore, even if plaintiffs' "scheme to misprice" theory were credited, the May 9, 2007 press release contains no comment on that subject.

Furthermore, the allegation that Optionable used its brokerage and execution services to "provide grossly mispriced trades" to BMO is far too vague to satisfy the specificity requirements of the PSLRA. In fact, as pointed out in Optionable's Memorandum, not a single "mismarked" option is identified. No information is provided about the aggregate number of

such "mismarked" options, or the aggregate dollar amount of any discrepancies. And, plaintiffs do not even attempt to state what the correct marks should have been. Thus, just like the allegations based on the media report of an audit of BMO's book by Deloitte (see Optionable Memorandum at page *), the allegations in CAC ¶¶ 32 and 33 are far too conclusory to comply with the PSLRA or Rule 9(b) absent any specificity as to the "mismarked" options involved in the supposed "scheme," or even as to the overall magnitude of the supposed errors. *See, e.g., Davidoff v. Farina*, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) (court could not determine materiality of alleged wrongful conduct absent specifics about particular transactions).

### III.   THE ALLEGATIONS THAT OPTIONABLE MISREPRESENTED ITS DEPENDENCE UPON BMO DO NOT STATE A CLAIM AGAINST HELMIG BECAUSE THE TRUTH WAS FULLY DISCLOSED TO THE MARKET

Defendant Helmig joins in and hereby incorporates by reference the arguments set forth in Section II of Optionable's Memorandum, as well as any additional arguments made in the memoranda submitted by his co-defendants in this action.

Additionally, as to Defendant Helmig, plaintiffs reference a fleeting comment by Helmig during a May 1, 2007, conference call to support its claim that Optionable "downplay[ed] the significant risk that the loss of revenue from BMO represented." CAC ¶ 27. Specifically, the analyst asked whether Optionable's exposure from a loss of BMO's revenue was more "because of the counter party risk," to which Helmig responded "There is no counter party [risk], because they're clear transactions." CAC ¶ 27. While quoting more than three pages of material from this conference call, plaintiffs fail to state how Helmig's statement on the call was materially false and misleading when made. Further, it is evident from both Optionable and NYMEX's public filings that this statement was in fact true. As the Second Circuit recognized in *NYMEX v. ICE*, there is no counterparty credit risk because the clearing facility – in this case NYMEX –

"becomes the buyer to every seller and the seller to every buyer." 497 F.3d at 111 n.1. Therefore, if either party to the transaction fails to perform, the risk is not borne by the other party.

In addition, plaintiffs point to a May 10, 2007 report from *The Financial Post* of Toronto, which quoted Helmig: "In the extreme scenario, that they go away tomorrow, someone else comes in and fills BMO's place." CAC ¶¶ 30, 43. Plaintiffs claim this statement, made two trading days before the end of the putative class period, was false and misleading when made because, "although Optionable's client base was purportedly growing, Optionable became increasingly dependent on BMO each quarter," and defendants "drastically understated BMO's impact on revenues." CAC ¶¶ 30-31, 43. As set forth fully in Point II of Optionable's Memorandum, Optionable clearly disclosed the nature of its business; fully disclosed the percentage of its revenues that came directly from BMO, including the quarter by quarter growth of Optionable's business with BMO; and stated that BMO's presence as a customer helped Optionable generate commissions from participants in trades with BMO. Moreover, after BMO ceased to rely upon Optionable for brokerage and execution, the OTC options market continued to thrive with BMO as a participant. Bongiorno Decl. Ex. B at p. 38.

As purported evidence of the falsity of Helmig's remark, plaintiffs point out that Optionable earned "99% less net revenues in 3Q:07 – after it lost BMO as a client – as it did just two quarters prior in 1Q:07." Plaintiffs' allegation is facially flawed, however, because it fails to show that Mr. Helmig's May 10, 2007 remark was intentionally false when made.[10] Instead, plaintiffs' allegations at CAC ¶¶ 30-31 are the very model of "fraud by hindsight" and therefore

_____

[10] Plaintiffs' unsourced allegation at CAC ¶ 30 is that Helmig made the statement on May 8, 2007. At CAC ¶ 43, however, plaintiffs cite to the May 10, 2007 article from *The Financial Post* of Toronto that contained the quotation from Helmig, but that article does not contain a date reference for Mr. Helmig's alleged statement.

insufficient to sustain a securities fraud claim. *See, e.g., In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 373 (S.D.N.Y. 2007); *In re IAC/InterActive Corp Sec. Litig.*, 478 F. Supp. 2d 574, 587 (S.D.N.Y. 2007); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286 * 5 (S.D.N.Y. June 1, 1998); *Acito*, 47 F.3d at 53. "[L]ack of clairvoyance," no matter how much plaintiffs would like this Court to hold otherwise, does not constitute fraud. *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d at 26-27.

Mr. Helmig's alleged comment falls squarely within the category of generalized statements of corporate optimism which courts routinely reject as a basis for securities fraud claims. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 174-75 (2d Cir. 2004); *Shields*, 25 F.3d at 1129; *In re Sierra Wireless*, 482 F. Supp. 2d at 373; *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 811 (2d Cir. 1996). In fact, it is well recognized that "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future." *Shields*, 25 F.3d at 1129 ("misguided optimism is not a cause of action, and does not support an inference of fraud"); *In re Sierra Wireless*, 482 F. Supp. 2d at 373 (broadly optimistic pronouncements about the future of the business are expressions of puffery and corporate optimism that do not give rise to securities violations). Helmig's statement, under clear controlling law, is mere puffery and cannot support a securities fraud claim.[11]

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST HELMIG RELATING TO CASSIDY'S CRIMINAL CONVICTIONS

Defendant Helmig joins in and hereby incorporates by reference the arguments set forth in Section IV(A) of Optionable's Memorandum, as well as any additional arguments made in the memoranda submitted by his co-defendants in this action.

---

[11]    Moreover, as set forth above in Point I and II, Helmig's statement is inactionable as well because plaintiffs have not pleaded with particularity that either the statement was false or misleading or that Helmig made the statement with the requisite *scienter*.

As to defendant Helmig, plaintiffs' allegations regarding the nondisclosure of Mr. Cassidy's convictions fail as a matter of law because plaintiffs have not even alleged that Mr. Helmig knew of Cassidy's convictions, nor could any such allegation be made consistent with Rule 11, Fed. R. Civ. P. S*ee O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996) (Rule 11 permits sanctions "upon a finding that a factual allegation had no evidentiary support, unless there was a specific disclaimer that additional investigation is necessary."). For this reason alone, the nondisclosure of Mr. Cassidy's convictions cannot give rise to any claim for securities fraud as against Helmig individually and should be dismissed.

## V.    PLAINTIFFS' ALLEGATIONS ABOUT HELMIG'S SERVICE ON THE BOARD OF PLATINUM ENERGY ARE IRRELEVANT MAKEWEIGHT

Defendant Helmig joins in and hereby incorporates by reference the arguments set forth in Section IV(B) of Optionable's Memorandum, as well as any additional arguments made in the memoranda submitted by his co-defendants in this action. The Complaint insinuates that Optionable's characterization of Mr. Helmig as an independent director was inaccurate because he and Nordlicht served upon the board of a company other than Optionable. CAC ¶ 20. These efforts fail to state a claim against Mr. Helmig for at least the following reasons: (1) Helmig met the NASDAQ definition of "independent;" (2) his service on another corporation's board was immaterial as a matter of law; (3) plaintiffs have failed to allege loss causation; and (4) plaintiffs cannot establish loss causation due to unrelated intervening causes.

As set forth in Section IV(B) of Optionable's Memorandum, Helmig's position on the Board of Platinum Energy was immaterial as a matter of law. The "concept of materiality focuses on the weightiness of the misstated or omitted fact in a reasonable investor's decision to buy or sell." *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 94 (S.D.N.Y. 1981). As argued in Optionable's Memorandum, plaintiffs fail to identify any reason why disclosure of

those relationships would have "significantly altered" the "total mix of information" available to investors. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).  By way of example only, plaintiffs do not allege, nor could they prove, a connection between Optionable and Platinum Energy nor any action by Optionable influenced by Platinum Energy in any way, or even a potential conflict of interest that could have arisen on the part of Helmig or Nordlicht.  Even if the Complaint had alleged an actual or potential conflict of interest due to Nordlicht and Helmig's service on the boards of both companies, which it did not, cases predicating liability on the failure to disclose conflicts of interest involve significantly more egregious and substantial conflicts than the non-existent conflict involved here.  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963) (investment adviser failed to disclose that it had pecuniary interest in stock it was recommending to clients); *SEC v. Moran*, 922 F. Supp. 867, 898-900 (S.D.N.Y. 1996) (issuer failed to disclose its board members were related).  In addition, while there is a presumption of materiality for information concerning the financial condition of a company, *see, e.g., SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980); *SEC v. Blavin*, 557 F. Supp. 1304, 1313 (E.D. Mich. 1983) *aff'd*, 760 F.2d 706 (6th Cir. 1985), here plaintiffs cannot allege *any* financial impact from Helmig's relationship with Platinum Energy.  Because no reasonable investor would believe that Helmig's relationship with Platinum Energy would have any bearing on the financial condition of Optionable, this claim fails for lack of materiality under Rule 10b-5.

Furthermore, contrary to plaintiffs' insinuations, CAC ¶ 20, Helmig was in fact an independent director as stated in Optionable's 2006 10K filing.  That document disclosed that Helmig is "'independent' within the meaning of Marketplace Rule 4200 of the National

Association of Securities Dealers, Inc." Bongiorno Decl. B at p. 28 at Item 9 ("Director Independence, Committees of the Board of Directors"). Plaintiffs have not alleged, nor could they prove, that Helmig did not meet the NASDAQ's definition of "independent director." The CAC does not allege that Helmig (or a member of his family) ever served as executive officer of Platinum Energy. Thus, plaintiffs do not attempt to show that any of the exceptions in Rule 4200 apply.[12] Because the Complaint does not allege that Helmig fails to satisfy Marketplace Rule 4200, plaintiffs' insinuations to the contrary fail as a matter of law, as would any suggestion that Helmig's service on Platinum Energy's board was a material non-disclosure.

Plaintiffs' claim also fails for lack of loss causation. "To plead loss causation, the complaint must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *In Re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005). The loss suffered by the plaintiffs must be foreseeable and caused by the materialization of the harm from the misrepresentation. *Lentell v. Merrill Lynch & Co.*, 369 F.3d 161, 173-74 (2d Cir. 2005). Often loss causation is alleged by showing a decline in stock price following a "corrective disclosure" of information previously misrepresented or concealed. A court will presume loss causation where a plaintiff identifies a corrective disclosing event revealing a misrepresentation, and ties that with a dissipation of the resident price inflation. *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005), *aff'd*, 2006 WL 1423785 (2d Cir. May 19 2006), *cert. denied*, 127 S. Ct. 733

---

[12] Rule 4200(a)(15)(E) notes that a party will not be considered independent if he is "a director of the *issuer* [Optionable, in this instance] who is, or has a Family Member who is, employed as an executive officer of another entity [Platinum Energy] where at any time during the past three years any of the executive officers of the issuer serve on the compensation committee of such other entity."

(2006).  Here, plaintiffs do not even include Helmig's relationship with Platinum Energy as one of the "adverse true facts that Defendants caused to be concealed." CAC ¶ 69.  Further, plaintiffs do not allege that the market corrected after learning of Helmig's position with Platinum Energy. Accordingly, plaintiffs have failed to allege loss causation.

   Moreover, plaintiffs have not pleaded facts sufficient to establish loss causation under Section 10(b) and Rule 10b-5 as against Helmig.  Even assuming that Helmig's relationship with Platinum Energy was material and required disclosure, plaintiffs still have not alleged and simply cannot demonstrate that (1) the loss was foreseeable and (2) that it was caused by the materialization of the harm from the omission.  *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1492, 1494-96 (2d Cir. 1992) (allegation that defendant omitted material facts from a failed credit agreement involving securities insufficient when plaintiff unable to articulate any way defendant's fraudulent omission was related to the failure of the business deal).

   Here, the Complaint, while noting that Helmig was a member of the Platinum Energy board, does not delineate any connection between the disclosure of this fact to the loss suffered. Helmig's position with Platinum Energy was mentioned in a May 10, 2007, report by *The Financial Post* of Toronto.  CAC ¶ 43.  The Complaint contains no allegation that the disclosure of Helmig's association with Platinum Energy had any impact upon the price of Optionable's stock.

   Furthermore, plaintiffs fail to allege that it was foreseeable that the non-disclosure of Helmig's position with Platinum Energy would affect Optionable's market value.  Helmig's position with Platinum Energy is factually immaterial to his position at Optionable. Neither Helmig nor any other individual responsible for Optionable's public filings had any reason to believe that a failure to disclose this information would affect Optionable's market value.  It

simply was not foreseeable (and no reasonable investor would see it as material) that the non-disclosure of a relationship with another unaffiliated corporate entity would cause stock price to correct and drop upon its revelation.[13]

### VI.    OTHER DEFENDANTS' SALE OF STOCK TO NYMEX DOES NOT SUPPORT ANY INFERENCE OF SCIENTER ON HELMIG'S PART.

Defendant Helmig joins in and hereby incorporates by reference the arguments set forth in Section IX of Optionable's Memorandum, as well as any additional arguments made in the memoranda submitted by his co-defendants in this action.

Additionally, as to Helmig, plaintiffs cannot rely on the stock sales by Messrs. Cassidy, Nordlicht, and O'Connor to show scienter by Helmig without running afoul of its obligations under Fed. R. Civ. P. 11, because Helmig sold no shares either as part of the NYMEX transaction or at any other time during the Class Period. In fact, during the Class Period, Helmig actually exercised options to acquire Optionable shares (Pizzi Decl. Ex. 6.), further negating any inference of scienter. *In re Health Mgmt. Sys., Inc.*, 1998 WL 283286 at * 6 (no inference of scienter where, during the class period, seven defendants sold on average in excess of 20% of their holdings, but one defendant (the CFO) sold no shares and actually bought shares along with one other defendant); *see also Rombach*, 355 F.3d at 177 (scienter not alleged where defendants never sold stock or profited in any way during relevant period and, instead, purchased company's stock after price collapsed, were among company's largest shareholders and shared the pain

---

[13]  Any claim relating to Helmig's service on Platinum Energy's board fails for the independent reasons that unrelated intervening causes disrupted any potential flow of causation. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 765 (2d Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995) (no loss causation for allegation defendant misrepresented properties used to secure loans where plaintiff's losses came in wake of downturn on real estate market – an intervening factor).

when company failed); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 440 (two individual defendants actually purchased more stock during the class period than they sold).

To establish scienter, in alleging motive and opportunity, on any of plaintiffs' claims, plaintiffs must allege that Helmig "'benefited in some concrete and personal way from the purported fraud,' such as by profiting from insider sales at artificially inflated prices." *In re Citigroup, Inc.*, 330 F. Supp. 2d at 380; *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 442 ("must demonstrate the presence of 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged' as well as 'the means and likely prospect of achieving concrete benefits by the means alleged.'"). Plaintiffs have pleaded no such concrete benefits to Helmig that are distinct from general profitability of Optionable. Such broad, general allegations are simply insufficient to sustain a securities fraud claim against Helmig.

## VII.    PLAINTIFFS' SECTION 20(A) CLAIM MUST BE DISMISSED.

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) provides:

> Every person who, directly, or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

To plead control-person liability, plaintiffs must allege: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Communications, Inc. v. Shaar Fund, LTD.*, 493 F.3d 87, 108 (2d Cir. 2007); 15 U.S.C. § 78t(a) (*citing SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996).[14]

---

[14] *But see In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 fn. 42 (S.D.N.Y. 2007) (declining to follow the Second Circuit decision in *ATSI Communications, Inc.*, 493 F.3d at 108.

First, plaintiffs have failed to sufficiently plead their underlying Section 10(b) claims, and for that reason alone, their Section 20(a) control persons claim must also fail. *ATSI Communications, Inc.*, 493 F.3d at 108; *see also SEC v. First Jersey Secs., Inc.*, 101 F.3d at 1472-73 ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person.").

Second, plaintiffs have failed to allege either the requisite control by Helmig over Optionable, the "primary violator," *ATSI Communications, Inc.*, 493 F.3d at 108, or culpable participation. Instead, plaintiffs seek to base this claim against the individual defendant by alleging *en masse* satisfies the statutory criteria. See CAC ¶ 89. Though unaided by plaintiffs' Complaint in this case, the Court must undertake an "individualized determination of a defendant's control of the primary violator, as well as of the defendant's particular culpability." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d at 486 (internal quotations omitted). "Actual control is essential to control person liability." *Id.*; *accord In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1875445 *3 (S.D.N.Y. Aug. 5, 2005). Moreover, the heightened pleading requirements of the PSLRA apply to the culpable participation element. *See In re Global Crossing*, 2005 WL 2990646 * 8 (S.D.N.Y. Nov. 7, 2005); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 235 (S.D.N.Y. 2004) (requires particularized allegations of fact giving rise to a strong inference of scienter to satisfy the "culpable participation" element of a Section 20(a) claim). Thus, plaintiffs must "plead **with particularity** facts giving rise to **a strong inference** that the controlling person knew or should have known that the primary violator, over who that person had control, was engaging in fraudulent conduct." *Id.* (emphasis in original); *see also Kalin v. Xanboo, Inc.*, 2007 WL 273546 * 11-12 (S.D.N.Y. Jan. 31, 2007). Plaintiffs have come forth with no such allegations and therefore fail to satisfy their pleading burden.

Moreover, courts routinely reject attempts to premise scienter upon allegations that, by virtue of defendants' board membership and/or executive managerial positions, they had access to information concerning a company's adverse financial outlook or other company information. *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286 at * 6; *Glickman v. Alexander & Alexander Svcs., Inc.*, 1996 WL 88570 * 14 (S.D.N.Y. Feb. 29, 1996). Further, an individual's position as an officer or board member alone is insufficient to support an inference of scienter. *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d at 381-82; *see also In re Health Mgmt., Inc., Sec. Litig.*, 970 F. Supp. at 204.

Here, virtually every allegedly false and misleading statement and/or omission was made *before* Helmig undertook a management position at Optionable and became involved in the daily activities of the company on Friday, May 11, 2007. The putative class period expired on the next business day, Monday, May 14, 2007. Moreover, as set forth fully above, all of the statements attributed to Helmig individually were either true or mere corporate optimism, and plaintiffs have done nothing to show that Helmig knew the statements to be false at the time they were made. Because truthful statements and statements amounting to puffery cannot serve as the basis for a Section 10(b) claim, as discussed in Points II, III, and IV above, these statements fail to support a strong inference of fraudulent intent. Finally, plaintiffs fail to allege any facts establishing that Helmig had any role, much less control, related to plaintiffs' claims regarding failures to disclose (1) purported problems with OPEX (CAC ¶¶ 8, 10, 18, 26-7, 29, 69, 94); (2) certain defendants' sales of Optionable stock at allegedly "inflated" prices (CAC ¶¶ 47, 93); (3) the purported "true" extent of Optionable's reliance on BMO, and that BMO's trading losses were Optionable's fault because Optionable purportedly provided "some" erroneous quotes to BMO (CAC ¶¶ 7, 14, 19, 27, 29, 31, 36, 39, 43, 50, 56-69, 65-66, 69, 94); and (5) Cassidy's old

non-securities fraud convictions and purported "undisclosed relationship" between traders at BMO and Cassidy (CAC ¶¶ 6(b), 7, 16, 29). Nor have plaintiffs pleaded particularized facts that would give rise to a "strong inference" that Mr. Helmig was involved in any decision by Optionable to not disclose any of the foregoing.

Accordingly, plaintiffs' Section 20(a) claim should be dismissed as to Mr. Helmig.

## CONCLUSION

For all of the foregoing reasons, and the reasons stated in the referenced Motions and Memoranda filed by the other Defendants, Albert Helmig respectfully submits that the Complaint should be dismissed with prejudice and without leave to amend as to him.

DATED:        New York, New York
              February 15, 2008

                              Respectfully yours,

                              CONNELL FOLEY LLP


                              By:___/s/ Peter J. Pizzi_____
                                     Peter J. Pizzi
                              888 Seventh Avenue
                              New York, NY  10106
                              Telephone: (212) 262-2390
                              Facsimile:   (212) 262-3118

                              Attorneys for Defendant Albert Helmig