# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | No. 07-cv-3753 (LAK) |
| **OPTIONABLE, INC. SECURITIES LITIGATION** | **DECLARATION OF PETER J. PIZZI** |

PETER J. PIZZI makes this declaration under penalty of perjury and, unless otherwise stated, based upon personal knowledge:

1.      I am an attorney at law of the State of New York and a member of the firm of Connell Foley LLP, attorneys for defendant Albert Helmig.

2.      Attached as exhibits to this Declaration are true and correct copies of the following documents referenced in Defendant Albert Helmig's Memorandum Of Law In Support Of Motion To Dismiss The Consolidated Amended Complaint:

| Exhibit | Description |
|---|---|
| 1. | March 26, 2006 Optionable, Inc. Form 10-KSB for the year 2005. |
| 2. | March 13, 2006 Form 3 for Albert Helmig. |
| 3. | December 7, 2006 Form 3 for Albert Helmig. |
| 4. | April 27, 2007 press release issued by the Bank of Montreal. |
| 5. | May 8, 2007 press release issued by the Bank of Montreal. |
| 6. | April 6, 2007 Form 4 for Albert Helmig. |

Further this declarant sayeth not.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED: February 15, 2008                    /s/ Peter J. Pizzi
                                                            Peter J. Pizzi

1918175-01

EXHIBIT 1

```
<DOCUMENT>
<TYPE>10KSB
<SEQUENCE>1
<FILENAME>form10ksb.txt
<DESCRIPTION>FORM 10-KSB ANNUAL REPORT
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-KSB

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the year ended December 31, 2005

or

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number: 000-51837

Optionable, Inc.
----------------------------------
(Name of Small Business Issuer in Its Charter)

Delaware 52-2219407
------------------------------------    --------------------
(State or Other Jurisdiction of          (I.R.S. Employer
Incorporation or Organization)          Identification No.)

555, Pleasantville Road, Suite 110, Briarcliff Manor, New York 10510
----------------------------------------------------------------------
(Address of Principal Executive Offices) (Zip Code)

(914)773-1100
----------------------------------
(Issuer's Telephone Number, Including Area Code)

Securities registered under Section 12(b) of the Exchange Act:
None

Securities registered under Section 12(g) of the Exchange Act:
Common Stock, $0.0001 par value

Check whether the issuer is not required to file reports  pursuant to Section 13
or 15(d) of the Exchange Act. [ ]

Check  whether the issuer (1) filed all reports  required to be filed by Section
13 or 15(d) of the  Exchange  Act during the past 12 months (or for such shorter
period that the registrant was required to file such reports),  and (2) has been
subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Check if there is no disclosure of delinquent  filers in response to Item 405 of
Regulation  S-B is not  contained  in  this  form,  and no  disclosure  will  be
contained,  to the best of  registrant's  knowledge,  in  definitive  proxy  or
information statements incorporated by reference in Part III of this Form 10-KSB
or any amendment to this Form 10-KSB. [ ]

Indicate by check mark whether the  registrant is a shell company (as defined in
Rule 12b-2 of the Exchange Act). Yes [ ] No [ X]

Issuer's revenues for its most recent fiscal year: $5,805,143

<PAGE>

The aggregate  market value of the voting and  non-voting  common equity held by
non-affiliates as of March 7, 2006, was approximately $17,546,738.

The total  number of shares of the  issuer's  common  stock,  $.0001 par value,
outstanding on March 7, was 51,406,431.

Transitional Small Business Disclosure Format:  Yes |_| No |X|

<PAGE>

Optionable, Inc.
2005 Form 10-KSB Annual Report
TABLE OF CONTENTS

PART I

ITEM 1.      BUSINESS. ................................................2
ITEM 2.      PROPERTIES. .............................................8
ITEM 3.      LEGAL PROCEEDINGS. ......................................8
ITEM 4.      SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS............8

PART II

ITEM 5.      MARKET FOR REGISTRANT'S COMMON..............................9
ITEM 6.      MANAGEMENT'S DISCUSSION ....................................10
ITEM 7.      FINANCIAL STATEMENTS. ......................................20
ITEM 8.      CHANGES IN AND DISAGREEMENT WITH ACCOUNTANTS ON
             ACCOUNTING AND FINANCIAL DISCLOSURE .........................20
ITEM 8A.     CONTROLS AND PROCEDURES.....................................21

PART III

ITEM  9.     DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT............22
ITEM 10.     EXECUTIVE COMPENSATION......................................23
ITEM 11.     SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND ..........25
ITEM 12.     CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS. ..............27
ITEM 13.     EXHIBITS....................................................31
ITEM 14.     PRINCIPAL ACCOUNTANT FEES AND SERVICES ......................34
ITEM 15.     EXHIBITS AND FINANCIAL STATEMENT SCHEDULES...................31

<PAGE>

SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS


Certain statements in this Annual Report constitute  forward-looking  statements
within the meaning of Section 21E of the  Securities  Exchange  Act of 1934,  as
amended  (the  "Exchange  Act").  These  include  statements  about  anticipated
financial  performance,   future  revenues  or  earnings,  business  prospects,
projected  ventures,  new products,  anticipated  market  performance and similar
matters. The words "budgeted," "anticipate," "project," "estimate," "expect,"
"may," "believe," "potential" and similar  statements are intended to be among
the statements  that are  forward-looking  statements.  Because such  statements
reflect the reality of risk and  uncertainty  that is inherent in our  business,
actual  results may differ  materially  from those  expressed or implied by such
forward-looking  statements.  Some of these risks and uncertainties are related to
our  current  business  situation  and include,  but are not limited to our lack of
sufficient  revenues  to cover  operating  expenses,  our history of  operating
losses,  our need for additional  financing for working  capital  purposes,  the
uncertainty  about our ability to continue as a going concern  and  dependence on
our  current  management team.  Readers are cautioned not to place undue reliance
on these forward-looking  statements,  which are made as of the date this report
was filed with the Securities and Exchange Commission.

Readers are advised  that we  undertake no  obligation  to release  publicly any
revisions  to the  forward-looking  statements to reflect events or circumstances
after the date hereof or to reflect unanticipated events or development.  To the
extent that the  information  presented in this Annual Report on Form 10-KSB for
the year ended December 31, 2005 discusses financial projections, information or
expectations  about  our products or markets,  or otherwise makes statements about
future  events,  such  statements  are  forward-looking.  We  are  making  these
forward-looking  statements  in reliance on the safe  harbor  provisions  of the
Private Securities  Litigation Reform Act of 1995.  Although we believe that the

expectations reflected in these forward-looking statements are based on
reasonable assumptions there are a number of risks and uncertainties that could
cause actual results to differ materially from such forward-looking statements.
These risks and uncertainties are described, among other places in this Annual
Report, in "Management's Discussion and Analysis of Financial Condition or Plan
of Operation."

<PAGE>

                                    PART I

ITEM 1.  DESCRIPTION OF BUSINESS

We were formed in Delaware in February 2000. Our goal is to be the leader of
brokerage services provider to brokerage firms, financial institutions, energy
traders, and hedge funds nationwide. We specialize in providing our services for
the trading of energy derivatives. Substantially all energy derivatives we have
brokered in the past were natural gas derivatives. We are providing below a
summary of elements describing and impacting our industry to enhance your
understanding of our business.

INDUSTRY

The markets for energy commodities trading include trading in both physical
commodities contracts and derivative instruments -- instruments that derive
their value from an underlying energy commodity or index -- across a wide
variety of commodities, including crude oil, natural gas, electricity or power,
coal, chemicals, weather and emissions. Derivative instruments provide a means
to manage exposure to price risk, asset portfolio allocation, speculation or
arbitrage. Contracts for physical commodities allow counterparties to contract
for the delivery of the underlying physical asset.

Most of the following discussion will specifically address the natural gas
derivatives market. However, we believe that most of the elements of this
discussion apply to other energy derivative markets as well.

Natural-gas derivatives

Natural gas derivatives are characterized by its underlying commodity (natural
gas), the term of the contract, and the settlement, which can require physical
delivery or financial settlement. The natural gas derivatives with the most
liquidity are those with shorter settlement or expiration dates (less than three
months). Derivatives with longer settlement or expiration dates are also larger
in dollar volume and are not as liquid, requiring more extensive resources to
find potential counterparties. Accordingly, these derivatives tend to generate
higher brokerage transaction fees.

Natural gas is an actively traded commodity. Natural gas derivatives are
primarily traded based upon the location to which they are delivered ("hub").
The Henry Hub, located in Louisiana, is the most widely-used pricing point for
natural gas derivatives in the United States.

Market Participants

Financial institutions, including bank brokerage houses and hedge funds as well
as eligible individual traders use natural gas derivatives market to weigh their
risk and rewards in: 1) a balanced portfolio asset allocation without investing
in the physical asset, and 2) speculate on the price movement of natural gas
prices or the related derivatives. Natural gas producers, natural gas
distributors and large natural gas consumers will use natural gas derivatives
market to manage their exposure to future price movements for certain quantity,
time and delivery location, and sometimes, with an expectation that the
derivatives would ultimately provide a financial gain.

Types of Natural Gas Derivatives Markets

There are two types of natural gas derivative markets -- the futures market and
the over-the-counter ("OTC") market.

Futures Market

Most of the transactions on the natural gas futures market are made through an exchange, such as New York Mercantile Exchange ("NYMEX") and Intercontinental Exchange ("ICE").

The trading of natural gas futures is conducted either on an electronic platform or on an open-outcry trading floor. Prices are established publicly either on a screen or on the floor by participants posting bids, or buying indications, and offers, or indications to sell.

Futures and options are two derivatives available to trade on a futures market. Futures consist of a contract to buy or sell a certain quantity of natural gas, for example, during a specified month and are settled through either physical delivery or cash settlement. Options consist of a right, but not an obligation, to buy or sell a futures contract at a certain price.

2

<PAGE>

OTC Market

Over-the-counter, or OTC, is a term used to describe trading activity that does not take place on a regulated exchange.

Several derivatives are available for trade on the OTC market, such as forwards and swaps, spreads, basis options, and options.

Forwards are negotiated agreements between counterparties to deliver a specified quantity of natural gas, on a specified date, and at a specified location.

Swaps are contracts between the holders of two different assets with differing risk and performance profiles in which the risk or performance characteristics are exchanged. Swaps may be settled against the future price of a single commodity or against an index of commodity prices.

Spreads are the simultaneous purchase and sale of forward contracts for different months, different commodities or different grades of the same commodity.

Basis options are contracts that allow counterparties to swap the physical or financial delivery of natural gas commodity between two different delivery points.

Options traded on the OTC market, unlike those traded on the futures market, are contracts that convey to the buyer the right, but not the obligation, to require the seller to make or take delivery of a stated quantity of natural gas at a specified price. Options may also be settled in cash, based on the difference between the market price of, for example, natural gas and the price of the commodity specified in the option.

Besides the types of derivatives traded on those markets, there are several inherent differences between them. For example, the futures market is primarily conducted through an open-outcry market, such as NYMEX, which imposes physical limitations on the number of participants who can trade at the same time. Accordingly, membership on such exchanges becomes a commodity of its own and may require significant resources. The types of derivatives traded on the OTC market are not standardized such as those used on the futures market. Therefore, when one counterparty wants to enter into OTC derivatives transactions, the use of a broker facilitates the search for another counterparty. The OTC-based transactions tend to generate higher brokerage fees due to extensive involvement of a broker.

However, there is a significant similarity between these natural gas derivatives markets in that they lack transparency for the participants, unlike the equity market. Counterparties to a natural gas derivative transaction are unaware of all offers available on either market at any given time under current conditions.

Trends

We believe that several factors will impact the natural gas derivatives market in the future:

    o   Natural gas options as asset class: new market participants, such as
        hedge funds, and institutional investors, such as pension plans, are
        taking a greater interest in the returns afforded by natural gas
        derivatives and the asset diversification opportunities it provides.

    o   Lesser credit risk using the OTC market: since 2002, natural gas
        derivatives feature cleared OTC contracts. Cleared OTC contracts allow
        participants to limit counterparty credit risk and lower the amount of
        capital required to trade.

o    Larger number of new entrants: both factors have increased the number
     of market participants in the natural gas derivatives market which
     improves its liquidity.

o    Need for higher transparency in the natural gas derivatives market:
     the natural gas derivatives market lacks transparency when compared to
     other markets, such as the equity market. The participants, who are
     enjoying such transparency in other markets, are requesting the same
     level of transparency in the natural gas derivatives market without
     obtaining it with the currently available solutions.

                                   3

<PAGE>

Current Solutions to Natural Gas Derivatives Market

The current solutions offered to natural gas derivatives market vary widely.

Some brokerage firms offer only services for the futures market or the OTC
markets, but not both. This restricts the choice of market participants who
combine futures and swaps, for example, in their hedging or investment strategy
which are not traded on the same markets. If dealing with brokers who only offer
services on one of the markets, the market participants are forced to use more
than one broker, which creates further lack of market transparency,
inefficiencies in the use of resources as well as ineffectiveness in timely
trading.

Other brokerage firms offer services on both markets, but most do not have the
intent or the resources to address the current lack of transparency and
liquidity in the energy derivatives market by using an electronic platform, for
example.

While exchanges are used primarily for the futures market, they are also used
for clearing OTC trades. However, none of the larger exchanges provide
sufficient support for derivatives trading on the OTC market, which reduces the
liquidity of such market. Additionally, exchanges do not offer brokerage
services which facilitate the search for counterparties.

We also believe that this lack of transparency applies to most other energy
derivatives markets.

Other Elements of the Natural Gas Derivatives Market

The energy natural gas derivatives market is also impacted by the following
elements:

Trading volumes are driven primarily by the degree of volatility in the energy
derivatives market. However, if the volatility of the price of natural gas or
related derivatives is too high, some of the market participants will wait that
it declines before entering into transactions, which reduces trading volumes.

Worldwide geopolitical conditions impact the perceived or real supply or demand
of a particular energy commodity.

Unexpected weather conditions, such as hurricanes in the Gulf Coast or milder or
colder weather in the Northeast United States, impact the perceived or real
supply or demand of a particular energy commodity. While hurricanes have
recently become more expected, their unpredictable strength and trajectory
increase the volatility of energy commodities market.

The delivery of energy commodities, such as natural gas, is generally seasonal.
In parallel, the trading volume of the energy derivatives market, which
historically has been higher during the winter and the summer, has been recently
skewed by the larger number of entrants in the market as well worldwide
geopolitical events and unexpected weather conditions.

Our Solutions

We understand that the participants in the energy derivatives market have
various investment needs, some of which may be as simple as trading speculative
futures, but most need a brokerage firm to provide the access to a larger amount
of counterparties with the highest transparency possible. We provide the
following services to our clients:

o    OTC energy derivatives brokerage. Once we receive an order to trade an
     OTC market derivative from a client, we find through our network the
     appropriate counterparty for such trade. We also offer our services
     for lesser used derivatives such as "swaptions", which terms slightly
     vary from an option for swaps;

o   Energy futures derivatives services on the floor of the NYMEX, which
    was launched in April 2004. Such services are provided through an
    affiliate, Capital Energy Services LLC ("CES");

o   We have completed the initial phase of OPEX, which is an electronic
    brokerage platform automating the energy derivatives between
    counterparties. Before we can mass market OPEX, we intend to complete
    its integration with NYMEX ClearPort as well as our confirmation
    system. We believe that OPEX will significantly improve the liquidity
    and transparency of natural gas and other energy derivatives market by
    increasing number of participants in a market in which they receive
    real-time market data, and;

o   We also complement our fee-based services with derivatives valuation
    and mark to market services. At the request of several of our existing
    clients, and based on our experience and knowledge of the markets as
    well as wide network of counterparties, we can periodically assist our
    clients in valuing their positions in the natural gas derivatives
    market. Currently, we provide this service without additional charge.
    We believe that the demand for this service from market participants
    will increase possibly creating new revenue opportunities.

4

<PAGE>

Those solutions can be applied to the trading of other energy derivatives as
well. Additionally, the combination of those services provide for larger choice
of investment opportunities for participants in the energy derivatives market,
including natural gas.

Generally, the nature and mechanics of our business is to inquire of our clients
their needs in the trade of energy options, swaps, and futures. Once we
understand their needs: in the case of NYMEX futures or options, the trade is
presented on the NYMEX through CES; and in the case of OTC swaps and options, we
inquire of other clients whether they are interested in participating in such
transaction. Once the counterparties agree on a certain trade, we match the
counterparties and consummate the trade by (i) in the case of a bilateral OTC
trade, confirming the details of the executed trade with both counterparties or
(ii) in the case of a cleared trade, submitting such trade to an exchange.

Presently, OTC brokerage is facilitated by brokering trades between our clients
via telephone and electronic messaging, often referred to as voice brokerage. By
building a relationship with our existing and potential clients, our brokers
learn about their interests and opportunities they are seeking. We intend to
combine traditional voice brokerage with electronic trading by offering a hybrid
combination of voice and electronic transactions; clients will be able to move
between voice and electronic trading with no loss in liquidity. Our clients will
be able to transact in the same markets, regardless of whether or not they
entered orders electronically or through a broker. We aim to provide a bridge
between OTC Options and Electronic trading. This bridge is provided by our OPEX
trading platform.

Central to OPEX is the trade-matching engine, which is designed to facilitate
real-time trading of derivative products irrespective of a particular market.
Based on our experience in trading and brokering OTC swaps and options, we
devoted significant attention was given to the user experience and
user-interface ergonomics. In designing the system, we were cognizant of the way
traders currently execute their trades and how they could comfortably transition
to an electronic trading platform. The outcome is a graphical user interface
that is both simple and intuitive to use.

OPEX's trading platform (for which there are pending patents) was designed with
the aid of professional options traders to facilitate strategies that are
currently executed on the OTC, commodity and equity exchanges. The user can
customize the system to execute various options trading strategies. We believe
that OPEX will be commercially available in the second half of 2006.

Strategy

We intend to employ the following key strategies to achieve our goal of being a
leading facilitator of energy derivatives:

o   Increase revenues from existing and new clients by offering OPEX,
    which could automate some of the transactions now handled by voice
    brokerage and provide more pertinent market information to our
    clients, improving the liquidity and transparency of the energy and
    natural gas derivatives market;

o   Expand the number of clients who actively trade in the energy
    derivatives market, including natural gas, who become "market-makers"
    and facilitate our search of counterparties for more complex

derivatives traded on the OTC market;

- o  Significantly expand our depth in product offerings of other energy derivatives products such as crude oil derivatives; and

- o  Develop new strategic relationships, such as marketing and technical relationships with exchanges, which will allow us to market their new solutions to our clients as well as integrate our technology with theirs.

HOW WE GENERATE REVENUES

We generate revenues by charging commissions fees based on the OTC market transactions we submit for trading on behalf of our clients. Our fees for brokerage services for options and swaps are up to $5.00 per 10,000 million British thermal units (mmBtu) of natural gas per contract. Our fees are earned on the date of the trade. We anticipate that, initially, our fees in connection with the use of OPEX for options and swaps will be less than $5.00 per 10,000 mmBtu of natural gas per contract.

We also receive incentives from ICE and NYMEX. The incentives are earned based on a percentage of the total revenues received by the exchange attributable to our volume of OTC market transactions submitted to the respective exchanges. For example, under the incentive program offered by NYMEX, 25% of the revenues from NYMEX ClearPort are allocated to an intermediary incentive pool. At the end of each month, the qualifying intermediaries, including us, receive their pro-rata share based on the volume for which they were responsible. There is no minimum volume requirement in order to participate. Under the incentive program offered by ICE, we receive 50% of the revenues earned by ICE from the transactions we have submitted to them. There is no minimum volume requirement in order to participate in such incentives.

5

<PAGE>

Furthermore, through CES, we generate revenues from the futures market, which are commission fees based on transactions they broker on behalf of their clients. In return for such revenues from CES, we assume all expenses associated with the futures market incurred by CES, including brokerage commissions paid by CES to its employees. The transactions facilitated by CES consist mostly of options and futures contracts on natural gas, which fees ranged between $1.00 and $1.50 per 10,000 mmBtu of natural gas, per contract.

HOW WE MARKET OUR SERVICES

We market our brokerage services through our broker-employees. We market our services by providing information on specific transactions or market conditions to our existing and prospective clients. For example, we provide a daily report of most notable trades and an analysis of the forward six-month volatility of natural gas and crude oil derivatives to almost 200 trading desks. Our broker-employees conduct their sales activities from our office facilities in Briarcliff Manor, New York and on the floor of the NYMEX. We will market our OPEX system primarily by providing demonstrations, training, sales events, and sales collateral to our existing and potential clients.

HOW WE OPERATE

Our OTC brokerage operations are conducted from our Briarcliff Manor, New York, office and our floor operations are conducted from the floor of the NYMEX. We have 10 employees at the Briarcliff Manor location, and 3 employees at the NYMEX location who interact heavily with our existing and potential clients. Generally, the nature and mechanics of our business is to inquire of our clients needs in the trading of energy derivatives. Once we understand their needs: in the case of futures market derivatives, the trade is presented on the NYMEX through CES; and in the case of OTC market derivatives, we inquire of other clients whether they are interested in participating in such transaction and facilitate the negotiation and conclusion of an agreement between counterparties. Once the counterparties agree on a certain trade, we match the counterparties and consummate the trade by (i) in the case of a bilateral OTC trade, confirming the details of the executed trade with both counterparties or (ii) in the case of a cleared OTC trade, submitting such trade to an exchange.

Recently, we have leveraged our employees located at NYMEX, who typically handle futures transactions, to find counterparties for OTC transactions.

We rely heavily on communication technology to interact with our clients, whether by phone, e-mail, and/or instant messaging. We anticipate that, in the future, we will further rely on Internet based communications for the operation of OPEX.

We keep abreast of conditions in the natural gas trading market by receiving

information using a combination of technology, such as analytics software as well as market data services, relevant business news from different wire services and traditional broadcast as well as leveraging the presence of our employees on the NYMEX floor.

BUSINESS ALLIANCES

In April 2004, we entered into a Master Services Agreement with CES. Edward J. O'Connor, our President, is a shareholder of CES. Kevin P. Cassidy, our Chief Executive Officer is also a shareholder of and managing director of CES. This agreement enables us to realize the benefits of brokerage services offered on the floor of the NYMEX. Only NYMEX members may offer brokerage services on the floor of NYMEX. For a corporation to become a member of NYMEX, it must either 1) purchase two seats on NYMEX, or 2) be beneficially owned by an individual who has purchased or leased a seat on NYMEX. We are not beneficially owned by an individual, so the second method of obtaining membership was not available to us. With regard to the first method, the current market value of a seat on NYMEX is approximately $3.6 million, so membership would have cost us approximately $7.2 million. Accordingly, by entering into this agreement with CES, we were able to more efficiently use our resources instead of making the large investment of purchasing seats on the NYMEX. Additionally, we could leverage CES' experience in floor brokerage as well as selling our services to CES' client base. We provide CES with marketing and brokerage support services for the NYMEX business. We agreed to pay CES (a) a minimum fixed annual fee of $50,000 payable in 24 bi-monthly installments of $2,083, for the duration of the contract and (b) a deferred payment of $1,525,000. During April 2005, CES assigned its rights to the Company's liability of $1,525,000 equally to Edward O'Connor and Kevin Cassidy.

CES will make monthly payments to us equal to (a) the gross receipts of the floor business, which consists of commission fees on natural gas future transactions less (b) brokerage expenses less the amount of the bimonthly fees paid. If gross receipts in any month are less than brokerage expenses less the amount of the bimonthly fees paid, we pay the difference to CES.

6

<PAGE>

CLIENT CONCENTRATION

One of our clients, Bank of Montreal, accounted for 18% and 10% of our revenues during 2005 and 2004, respectively.

COMPETITION

The natural gas derivatives market has many competitors involved in the brokering of natural gas options. Capital investment for entry into the market is low. Accordingly, a number of small brokerage firms flourish along side of larger more established brokerage firms such as Cantor Fitzgerald, L.P., MAN Group PLC and ICAP PLC.

There are several other well-financed companies who do or may compete with us. In the OTC natural gas derivatives market, our competitors include Amerex Natural Gas Ltd., Choice Energy LP, G.A. Options, MAN Financial, Inc. FIMAT Internationale Banque, S.A., TFS, Inc Tullet Natsource, Inc. In the futures natural gas derivatives market, our competitors include Clarion Trading, SCS Trading Corp., and ICAP PLC. When we implement OPEX, we anticipate that our potential competitors will include NYMEX, ICE, eSpeed and the Chicago Mercantile Exchange. To date, we do not believe any one company has achieved a dominant position.

With the advent of OTC cleared options, we and other OTC brokers have been able to capitalize on this opportunity by using the newly available clearing mechanisms to match previously unmatchable counterparties. With lesser credit concerns resulting from the wider adoption of OTC clearance, it allows more liquidity in the energy derivatives market.

We currently use the traditional OTC broker approach whereby client contact is initiated over the phone and on the Internet instant messaging systems, as do the majority of our competitors. Instead of continuing to compete using the same methodology similar to our competition in our niche market, the OPEX platform will let our clients interact directly with each other, bypassing the traditional brokerage intermediary, with faster and more accurate execution. We believe that this platform will allow us to compete more favorably. We believe that OPEX will be commercially available in the second half of 2006.

As the emerging market for electronic energy derivatives develops, more competitors are likely to emerge.

We believe that the principal competitive factors in our market include:

- o  Access to a large number of financially-sound participants;
- o  Timeliness in finding willing counterparties;
- o  Client service and support;
- o  Service functionality, quality and performance of the electronic trading system;
- o  Ease of use, reliability and security of electronic trading system;
- o  Establishing a significant sales force;
- o  Ability to introduce new products to the market in a timely manner;
- o  Pricing.

We currently differentiate from the competition by offering access to natural gas derivatives on both the futures market and the OTC market. We also differentiate by offering derivatives products, such as swaptions which are not offered by other brokerage firms. Furthermore, we have a number of blue-chip clients which actively and regularly trade in this market which facilitates our search of counterparties and allows us to trade quickly on behalf of our clients. Once OPEX is mass-marketed, we will differentiate from our competitors by offering a higher level of liquidity and transparency in the natural gas derivatives market which may extend to other energy derivatives markets as well.

EMPLOYEES

We currently have 13 full-time employees. The Company also has a consultant who serves as the Chief Technology Officer, and a consultant who serves as our Chief Financial Officer. The number of employees that the Company intends to hire is dependent on our clients' needs and the infrastructure required to support such needs. We believe that our relationship with our employees is good.

7

<PAGE>

PATENTS, TRADEMARKS AND LICENSES

On March 1, 2001, we were assigned rights to a patent pending for a system and method for real-time trading over a computer network from Mark A. Nordlicht, Yechiel Abraham Zucker, Howard A. Feder and David Boim. This patent is pending as of the date of this Annual Report on Form 10-KSB. Mr. Nordlicht is our Chairman and Mr. Zucker is our Executive Vice President.

On August 10, 2001, we were assigned rights to a patent pending for a system and method for trading selectable market transactions over a network from Mark A. Nordlicht. This patent is pending as of the date of this annual report.

We have registered a trademark for "Optionable" and use OPEX as a service mark.

Although we have several patents pending which relate to our electronic trading system, we do not solely depend on those patents to protect our intellectual property. Furthermore, the benefit that would be afforded by those patents has not been relied upon in our business plan, although we do feel that the patents would benefit our position in the marketplace. We have taken various steps to protect our intellectual property including non-disclosure agreements, confidentiality agreements and other general precautions taken to keep the information confidential.

RESEARCH AND DEVELOPMENT

We incurred approximately $450,000 and $116,000 in expenses on research and development during 2005 and 2004. We resumed in late 2004 our research and development efforts to complete the OPEX system and intend to enhance its features and functionalities.

GOVERNMENT REGULATION

The OTC brokerage business is not officially regulated. However, we have given notice to the Commodity Futures Trading Commission ("CFTC") of our intention to operate the OPEX electronic trading platform as an Exempt Commercial Market. Exempt Commercial Markets are subject to certain information access rules established by the CFTC.

The futures derivatives market in which our affiliate, CES, operates is regulated by the CFTC and National Futures Association.

ITEM 2. DESCRIPTION OF PROPERTY

We lease our executive offices located at 555 Pleasantville Road, South Building, Suite 110, Briarcliff Manor, NY 10510. The offices consist of approximately 2,930 square feet.

The lease commenced on October 30, 2001, and it expires in January 2007. The annual rent is $66,817 payable in monthly installments of $5,568. We also pay

our proportionate share of any increase in real estate taxes or common area maintenance charges.

We believe our space is adequate for our current and foreseeable future operations.

ITEM 3.        LEGAL PROCEEDINGS

None

ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

8

<PAGE>

PART II

ITEM 5.    MARKET FOR COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND SMALL
           BUSINESS ISSUER PURCHASES OF EQUITY SECURITIES

Our common stock is quoted on the Over-the-Counter Bulletin Board operated by the National Association of Securities Dealers, Inc. Our shares are listed under the symbol "OPBL."

The following table sets forth, for the fiscal quarters indicated, the high and low closing prices per share of our common stock as reported on the Over-the-Counter Bulletin Board. The quotations reflect inter dealer prices, without retail mark-up, mark-down or commissions and may not represent actual transactions.

| Year Ended December 31, 2005 | High | Low |
|------------------------------|------|-----|
| First Quarter | N/A | N/A |
| Second Quarter | N/A | N/A |
| Third Quarter | 1.25 | 1.00 |
| Fourth Quarter | 1.40 | 0.85 |

At March 7, 2006, the closing price for our common stock was $0.95.

At March 7, 2006, there were 51,406,431 shares of our common stock issued and outstanding as well as 791,000 options and 550,000 warrants outstanding. There are approximately 43 stockholders of record at March 7, 2006. During the last two fiscal years, no cash dividends have been declared on our common stock and management does not anticipate that dividends will be paid in the foreseeable future.

Equity Compensation Plan Information

Optionable, Inc.  2004 Stock Option Plan and warrants issued for services
<TABLE>
<CAPTION>

| | Number of securities to be issued uponexercise exercise of outstanding options, warrants, and rights | Weighted-average price of outstanding options, warrants, and rights | Number of securities remaining available fo future issuance under equity compensation plans ( excluding securities reflected : |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans | | | |
| <S> | <C> | <C> | <C> |
| approved by security holders | 791,000 | $0.21 | 6,709,000 |
| Equity compensation plans not | | | |

| | | |
|---|---|---|
| approved by security holders | 550,000 | 0.20 | – |
| Total | 1,341,000 | $0.21 | 6,709,000 |

</TABLE>

9

<PAGE>

ITEM 6.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION OR PLAN
           OF OPERATION OVERVIEW AND PLAN OF OPERATIONS

In recent years, the energy trading industry changed drastically. Long a
volatile industry, high profile bankruptcies, such as Enron, sparked a flight of
capital and a lack of confidence in the financial position of energy related
market participants, which forced energy companies to depart the energy
derivatives trading markets. We believe that the flow of investment out of
energy trading markets was mostly felt during 2003. During 2004 and 2005, we
have observed a higher level of participants within the financial institutions
and hedge fund community committing capital to energy trading, which has
increased the level of volume within the energy trading markets. Such higher
level of participation has also increased our revenues, net income, and cash
flow from operating activities which has improved our financial condition. We
also believe that we will need to continue to increase our research and
development expenditures in the foreseeable future which would be financed by
our cash flows from operations.

We are developing our electronic trading system, OPEX. We had temporarily
discontinued such efforts in 2003 and resumed them in late 2004. We have
substantially completed the development of the initial version of OPEX. We will
actively market its use once we finalize its integration with NYMEX ClearPort,
enable its electronic confirmation and billing system, and ensure that all
transactions entered in OPEX are properly processed. We believe this will occur
in the second half of 2006. We anticipate that we will continue to invest in
research development for the foreseeable future to at least comparable level of
expenditures we incurred during 2005, which is approximately $500,000. We
believe that the marketing costs associated with the initial launch will be at
least $100,000.

We believe that a majority of our futures and OTC related revenues will continue
to be generated through voice-brokerage for the foreseeable future. Once OPEX is
commercially launched, we expect that revenues generated through OPEX will
constitute a small but growing portion of our revenues.

We expect that our cost of revenues will increase in the foreseeable future as a
result of the new 50-month employment contract we entered with Kevin Cassidy
which provides fixed and variable compensation exceeding the amounts we paid him
as a consultant. For example, Kevin Cassidy's fixed compensation will gradually
increase from the $215,000 we paid him as a consultant to $350,000 by 2009.
Additionally, Kevin's Cassidy's employment agreement provides that beginning
with the first month of the quarter in which the amount payable to Kevin Cassidy
is fully paid, he will be paid additional cash compensation amounting to 5% of
our gross revenues and stock compensation amounting to 2% of our gross revenues.
Furthermore, we will issue options to Kevin Cassidy equal to 20% of the number
of shares of common stock issuable under warrants which become exercisable
pursuant to any Order Flow Agreements (Order Flow Agreements are the agreements
under which we issue warrants to a firm based on the volume of orders the firm
placed with us). Finally, we will issue to Kevin Cassidy 5,000 options each time
a firm registers with and executes its first 10,000 lots on our OPEX platform.
The total number of such options will be limited to 2,500,000.

This discussion and analysis of our financial condition should be read in
connection with our financial statements and accompanying notes thereto for the
fiscal year ended December 31, 2005, including without limitation the
information set forth under the heading "Critical Accounting Policies and
Estimates".

10

<PAGE>

<TABLE>
<CAPTION>

                    Results of Operations


                                                              Increase/
                                    For the Year Ended        (Decrease)
                                       December 31,          in $ 2005
                                   2005          2004         vs 2004
                               --------------  -------------- --------------
<S>                                <C>           <C>            <C>

| | | | |
|---|---|---|---|
| Brokerage fees | $ 3,085,296 | $ 1,885,489 | $ 1,199,807 |
| Brokerage fees-related party | 1,981,560 | 1,011,014 | 970,546 |
| Incentives | 738,558 | 597,734 | 140,824 |
| Net revenues | 5,805,414 | 3,494,237 | 2,311,177 |
| Cost of revenues | 2,264,110 | 1,614,073 | 650,037 |
| Cost of revenues-related party | 856,763 | 466,610 | 390,153 |
| | 3,120,873 | 2,080,683 | 1,040,190 |
| Gross profit | 2,684,541 | 1,413,554 | 1,270,987 |
| Operating expenses: | | | |
| Selling, general and administrative | 695,718 | 776,908 | (81,190) |
| Research and development | 450,488 | 116,520 | 333,968 |
| Total operating expenses | 1,146,206 | 893,428 | 252,778 |
| Operating income | 1,538,335 | 520,126 | 1,018,209 |
| Other income (expense): | | | |
| Gain on extinguishment of debt | – | 238,282 | (238,282) |
| Interest income | 21,548 | 1,836 | 19,712 |
| Interest expense-related parties | (300,319) | (276,471) | 23,848 |
| | (278,771) | (36,353) | 242,418 |
| Net income | $ 1,259,564 | $ 483,773 | $ 775,791 |

</TABLE>

NM: Not meaningful

11

<PAGE>

RESULTS OF OPERATIONS

Revenues

Revenues consist primarily of fees earned from natural gas derivatives
transactions and related incentives arrangements. The increase in brokerage fees
during 2005 when compared to 2004 is primarily due to an increase in the
brokerage fees resulting from increased volume of transactions of natural gas
derivatives traded on the OTC market on behalf of existing clients. The increase
in brokerage fees-related party during 2005 when compared to 2004 is primarily
due to our futures market operations launched in April 2004, of which a full
year was reported during 2005 and nine months were reported during 2004 and, to
a lesser degree, an increase in brokerage fees resulting from higher volume of
natural gas derivatives traded on the futures market on behalf of our clients.
The increase in incentives earned pursuant to agreements with two exchanges was
due to a higher volume of transactions handled by us on such exchanges, slightly
offset by a decrease of the incentive rate offered by NYMEX.

Cost of revenues

Cost of revenues consists primarily of compensation of personnel directly
associated with handling the natural gas derivative transactions on behalf of
our clients as well as expenses associated with our floor brokerage operations.
The increase in cost of revenues and cost of revenues-related party during 2005
when compared to 2004 is primarily attributable to increased commissions paid to
our brokers resulting from higher brokerage fees we earned. Additionally, the
increase in cost of revenues-related party during 2005 when compared to 2004 is
also attributable to increase in costs associated with having a full year of
futures market operations during 2005 and nine-months of operations during 2004.

Selling, general, and administrative expenses

Selling, general, and administrative expenses consists primarily of compensation
of personnel supporting our operations as well as professional fees, such as
legal fees, incurred to handle certain matters which occur during the course of
operations. The decrease in selling, general, and administrative expenses of
approximately $80,000 during 2005 when compared to 2004 is primarily
attributable to a decrease in legal fees incurred in connection with a dispute
related to our contract with the software development firm hired to develop our
electronic trading system. This dispute was settled in early 2004.

Research and development

Research and development expenses consist primarily of compensation of personnel

and consultants associated with the development of our automated electronic trading system. The increase in research and development expenses during 2005 when compared to 2004 is primarily due to the resumption of our OPEX research and development efforts in late 2004 and the continuation of these efforts during 2005.

Interest expense to related parties

Interest expense to related parties consists of interest charges associated with amounts due to related parties, Mark Nordlicht, our Chairman, Kevin Cassidy, our Chief Executive Officer, and Edward O'Connor, our President. Interest expense to related parties has remained consistent during 2005 and 2004.

Gain on extinguishment of debt

Gain on extinguishment of debt consists of gain resulting from the one-time settlement of professional fees owed to our former legal counsel. The settlement occurred during 2004 and no such settlement occurred during 2005.

LIQUIDITY AND CAPITAL RESOURCES

Historically, we have funded our operations primarily from proceeds of notes payable to Mark Nordlicht, our Chairman and one of our principal stockholders, through a private placement of our common stock, and, more recently, from cash generated from operating activities.

During 2005, we generated cash of approximately $1.4 million from operating activities, primarily resulting from:

   o    net income of approximately $1.3 million, adjusted for non-cash interest expense and the fair value of warrants issued to Kevin Cassidy, our Chief Executive Officer of approximately $300,000 and $160,000, respectively;

   o    an increase in accounts receivable of approximately $130,000, resulting from an increase in related revenues;

   o    an increase of $150,000 in other receivable, resulting from our funding of security deposits held for the benefit of the NYMEX and a clearing house, to facilitate the trading of futures transactions we submit on behalf of our clients;

                                    12

<PAGE>

We used our cash generated from operating activities to make principal repayments of approximately $200,000, $50,000 and $180,000 on amounts due to Kevin Cassidy, our Chief Executive Officer, Edward O'Connor, our President and former Chief Executive Officer, and to Mark Nordlicht, our Chairman of the Board, respectively.

During 2004, we generated cash flows from operations of approximately $120,000 in our operating activities, primarily resulting from:
   o    Our net income of approximately $500,000, adjusted by a non-cash interest expense of approximately $203,000, the forfeiture of officers' compensation of $375,000, and a gain on extinguishments of debt of approximately $240,000;
   o    an increase in accounts receivable of approximately $130,000, resulting from an increase in related revenues;
   o    an increase in due from related party of approximately $300,000, resulting from an increase in related revenues;
   o    an increase in incentives receivable of approximately $130,000, resulting from an increase in related revenues;
   o    a decrease in accounts payable and accrued expenses of approximately $560,000 primarily resulting from the settlement of amounts due to our former outside counsel and to a software developer; and
   o    an increase in accrued compensation of approximately $330,000, resulting from an increase in commissions related to higher revenues.

We funded our cash used in operating activities by generating proceeds of approximately $1.3 million from the issuance of shares of our common stock and by generating proceeds of $350,000 from the issuance of a line of credit and a note payable to Mark Nordlicht. We also satisfied notes payable of $800,000 to Mark Nordlicht.

We believe that the employment arrangement with our new Chief Executive Officer, Kevin Cassidy, may decrease our cash flows from operating activities if our revenues decrease or if we are unable to increase our revenues in an amount sufficient to cover the additional cash compensation we will pay to Kevin Cassidy. Kevin Cassidy's fixed compensation will

gradually increase from the $215,000 we paid him as a consultant to
$350,000 by 2009. Additionally, Kevin's Cassidy's compensation agreement
provides that beginning with the first month of the quarter in which the
amount payable to Kevin Cassidy is fully paid, he will be paid incremental
cash compensation amounting to 5% of our gross revenues.

During January 2006, we paid $600,000 to reduce our debt to Kevin Cassidy,
Edward O'Connor, and Mark Nordlicht.

We believe that our office facilities and equipment will be sufficient to meet
our needs for the foreseeable future. Accordingly, we anticipate that our
capital expenditures over the next twelve months will not be significant.

We believe that our cash available and estimated cash flows from operations in
2006 will be sufficient to meet our obligations when they become due.

CRITICAL ACCOUNTING POLICIES AND ESTIMATES

A summary of significant accounting policies is included in Note 3 of the
accompanying audited financial statements for the year ended December 31, 2005.
Management believes that the application of these policies on a consistent basis
enables us to provide useful and reliable financial information about our
operating results and financial condition. Our financial statements and
accompanying notes are prepared in accordance with U.S. GAAP. Preparing
financial statements requires management to make estimates and assumptions that
affect the reported amounts of assets, liabilities, revenue, and expenses. These
estimates and assumptions are affected by management's application of accounting
policies. Critical accounting policies for us include revenue recognition.


REVENUE RECOGNITION

Revenue is recognized when earned. Our revenue recognition policies are in
compliance with the Securities and Exchange Commission's Staff Accounting
Bulletin ("SAB") No. 104 "Revenue Recognition". The application of SAB No. 104
requires us to apply our judgment, including whether our clients receive
services over a period of time.

We generally invoice our clients monthly, for all transactions which have been
executed during such month. Revenues are recognized on the day of trade-trade
date basis. Our revenues derive from a certain predetermined fixed fee of the
transactions we execute on behalf of our clients. The fee is based on the volume
of financial instruments traded. We base our fees on oral and written contracts
and confirm the fees in writing upon the execution of each transaction.

13

<PAGE>

We also receive incentives from NYMEX and ICE for the volume of OTC transactions
we submit to their clearing platforms on behalf of our clients. The incentives
are based on a percentage of the total revenues received by the exchange
attributable to our volume of transactions submitted to the respective
exchanges. We also apply our judgment when making estimates monthly of such
incentives based on the volumes of transactions submitted to the respective
exchanges and the exchanges' published revenues by type of transaction.

We, pursuant to SAB 104, realize the incentive revenues realized or realizable
when all of the following criteria are met:

1)    Persuasive evidence of an arrangement exists. We have a written separate
      agreement with one of the exchanges. The other exchange has publicly
      published the initial terms of its incentive program in 2003 which it
      modified in 2005 and is offered to all intermediaries in the select
      transactions;

2)    Delivery has occurred or services have been rendered. Under arrangements
      with both exchanges, the incentives are earned on the day we submit
      transactions to the respective exchanges based on the revenues generated
      from such transactions and are no longer subject to minimum volume of
      transactions to the respective exchanges. We account for all transactions
      submitted to each exchange on a daily basis. Accordingly, we are able to
      determine when the incentives are earned based on the date we submit
      transactions to the exchanges. We have no other obligations to the
      exchanges to earn the incentives;

3)    "Seller's" price to the buyer is fixed or determinable. Based on the
      incentive program terms of each exchange, their published prices for the
      type of transactions we submit to them, and our transactions records, we
      are able to determine an estimate for the revenues each exchange earns in
      connection with the transactions it submits, and accordingly, the amount,
      if any of the incentives we earn in connection with such transactions; and

4)  Collectibility is reasonably assured. Both exchanges have paid us timely during 2005 for incentives earned in the prior quarter. We have no knowledge that they do not intend to pay these incentives, if earned, in the future. Furthermore, we intend to enforce the payment of any incentives receivable under the incentive programs.

Certain risk factors which may impact our business, results of operations and financial condition

Our business plan relies on market acceptance of our OPEX system, which has not been commercially launched, to increase our revenues.

While we are presently engaged primarily in voice brokerage, our business plan calls for OPEX to be a major contributor to our success. We must continue to grow our revenues through our existing services and by gaining market acceptance of our OPEX system when it is commercially launched. When OPEX system is commercially launched, we must gain market acceptance of the OPEX system with our existing and potential clients to achieve acceptable revenue growth. However, OPEX might not be successful when it is launched. Our failure to fully launch OPEX may have a material negative effect on our financial prospects.

Our quarterly financial results will continue to fluctuate making it difficult to forecast our operating results.

Our quarterly operating results have fluctuated in the past and we expect our revenues and operating results may vary significantly from quarter to quarter due to a number of factors, many of which are beyond our control, including the following: geopolitical events, weather, perceived supply and demand imbalances, and the number of trading days in each quarter

We have historically lost money and our losses may continue in the future, which may cause us to curtail our current operations and our development and implementation of OPEX.

We have incurred losses through fiscal 2004 and have since become profitable. We may again operate at a loss in the future and we cannot assure you that we will be successful in maintaining positive cash flow and profitable operations. Accordingly, our ability to operate our current business and implement OPEX may be hampered by negative cash flows and liquidity problems in the future, and the value of our stock may decline as a result. For example, in the past, we suspended the development and implementation of OPEX for a year, in part because of our negative cash flow.

14

<PAGE>

Our pricing model for OPEX services is unproven and may be less than anticipated, which may harm our gross margins.

The pricing model of our OPEX services may be lower than expected as a result of competitive pricing pressures, promotional programs and clients who negotiate price reductions in exchange for longer term purchase commitments or otherwise. Our pricing model depends on the specific requirements of the order, purchase volumes, the sales and service support and other contractual agreements. We expect to experience pricing pressure and anticipate that the average selling prices and gross margins for our products may decrease over product life cycles. We may not be successful in developing and introducing on a timely basis new products with enhanced features and services that can be sold at higher gross margins.

The terms of the employment agreement with our new Chief Executive Officer may erode our profitability and dilute the price our shareholders could receive in the event another company acquires us.

We believe that the employment arrangement with our new Chief Executive Officer, Kevin Cassidy, may decrease our profitability and cash flows from operating activities if our revenues decrease or if we are unable to increase our revenues in an amount sufficient to cover the additional cash and stock-based compensation we will pay to Kevin Cassidy. Kevin Cassidy's fixed compensation will gradually increase from the $215,000 we paid him as a consultant to $350,000 by 2009. Also, Kevin Cassidy's compensation agreement provides that beginning with the first month of the quarter in which the amount payable to Kevin Cassidy is fully paid, he will be paid additional cash and stock-based compensation amounting to 5% and 2%, respectively, of our gross revenues. Furthermore, we will issue options to Kevin Cassidy equal to 20% of the number of shares of common stock issuable under warrants which become exercisable pursuant to any Order Flow Agreements (Order Flow Agreements are the agreements under which we issue warrants to a firm based on the volume of orders the firm placed with us). Finally, we will issue to Kevin Cassidy 5,000 options each time a firm registers with and executes its first 10,000 lots on our OPEX platform.

The total number of such options will be limited to 2,500,000.

In the event we are acquired by another company, we would have to pay to Kevin Cassidy up to approximately $650,000, which could reduce the amount our shareholders would have otherwise received as part of this potential acquisition.

We may face difficulties in transitioning our clients from voice brokerage to electronic trading or a combination of both.

By launching OPEX, we intend to retain existing clients and attract new clients to our services. Our experience in marketing and supporting electronic trading services is limited. We may need to supplement our existing staff with marketing and support personnel with more extensive experience in these areas, which would increase our operating expenses and cost of revenues. Additionally, management will need to expend significant time and resources to ensure a smooth transition from voice brokerage to electronic trading or a combination of both, which could distract management from maintaining or expanding our operations.

Existing clients may resist the transition to electronic trading. New and existing clients may be unsatisfied with the support we provide for electronic trading and may prefer continuing with voice brokerage or discontinue our relationship based on actual or perceived problems they experienced in using our services. The loss of new or existing clients could decrease the market acceptance of our products, harm our reputation and reduce our revenues from existing clients. This could have a negative effect on our business, operations, and financial condition.

We may face increased credit risks when expanding our client base and from volatile fluctuations in prices of natural gas and related derivatives.

One of our clients accounted for 18% of our revenues during 2005. On OTC transactions, we bill our services to both counterparties. Accordingly, if this client would not have entered into a portion or all of the OTC transactions in which they were involved, our 2005 revenues would have been lower. To mitigate our reliance on this client, we are attempting to expand our client base. In attempting to diversify and expand our client base, some of our new clients, such as hedge funds and individual traders, may have higher credit risks than certain of our existing clients, which are financial institutions. The financial positions of these new clients may impact our ability to collect our fees generated from the transactions we submit on their behalf. Additionally, volatile fluctuations in prices of natural gas and related derivatives may adversely impact the financial position of certain of our clients which may not have the resources to pay us for past services or may reduce the volume of transactions we would handle on their behalf in the future. This could have a negative effect on our business, operations, and financial condition.

15

<PAGE>

We cannot be certain that we will be able to protect our proprietary information and intellectual property, which we rely on to maintain our competitive position.

We rely on our proprietary information and intellectual property to maintain our competitive position. We may not be able to protect a significant portion of our proprietary information, such as our client lists, since we do not have confidentiality agreements with some of our employees. Accordingly, we may not be able to effectively prevent disclosure of our proprietary information and we may not have an adequate remedy in the event of unauthorized disclosure of such information. We cannot assure you that measures we take to protect our proprietary information and intellectual property will be successful or that third parties will not develop alternative solutions that do not infringe upon our intellectual property.

We also have patent applications pending, which are intended to protect certain of our proprietary technology relating to our planned OPEX business. We have been cautious in seeking to obtain patent protection for our products, since patents often provide only narrow protection that may not prevent competitors from developing products that function in a manner similar to those covered by our patents. In addition, some of the foreign countries in which we plan to sell our OPEX system do not provide the same level of protection to intellectual property as the laws of the United States.

Potential liability for infringement claims might deter clients from using our OPEX system.

We could be subject to intellectual property infringement claims by others. Potential clients may be deterred from using our OPEX system for fear of

infringement claims. If, as a result, potential clients forego using our OPEX system, demand for our services and applications could be reduced which would harm our business. Claims against us, and any resulting litigation, should it occur in regard to any of our services and applications, could subject us to significant liability for damages including treble damages for willful infringement. In addition, even if we prevail, litigation could be time-consuming and expensive to defend and could result in the diversion of our time and attention. Any claims from third parties may also result in limitations on our ability to use the intellectual property subject to these claims. Claims that we are infringing the intellectual property rights of third parties could have a negative effect on our business, revenues, financial condition and results of operations.

We may rely on strategic relationships to promote our OPEX system and for access to licensed technology; if we fail to develop, maintain or enhance these relationships, our ability to serve our clients and develop new features and functionalities could be harmed.

Due to the evolving nature of our industry, we may need to develop relationships to adapt to changing technologies and standards and to work with newly emerging companies with whom we do not have pre-existing relationships. For example, it may be important to our clients that OPEX integrates seamlessly with the technology used by exchanges. While we have a technology-sharing relationship with NYMEX, we do not have one with other exchanges to ensure such seamless meshing of our respective technologies as they now exist or as they may be enhanced in the future. We cannot be certain that we will be successful in maintaining or developing new relationships, technological or otherwise, or that such relationships will view them as significant to their own business or that they will continue their commitment to us in the future. If we are unable to maintain or enhance these relationships, we may have difficulty strengthening our technology development and increasing the adoption of our OPEX system.

If we fail to enhance our OPEX system by introducing new features and functionalities in a timely manner to meet changing client requirements and emerging industry trends or standards, our ability to grow our business will suffer.

The market for electronic trading systems is characterized by rapidly changing technologies and short product life cycles. These market characteristics are heightened by the emerging nature of the Internet and the continuing trend of companies from many industries to offer Internet-based applications and services. The widespread adoption of the Internet, networking, electronic option trading, or telecommunications technologies or other technological changes could require us to incur substantial expenditures to modify or adapt our operating practices or infrastructure. Our future success will depend in large part upon our ability to:

    o    identify and respond to emerging technological trends in the market;

    o    enhance our products by adding innovative features that differentiate services and applications from those of our competitors;

    o    acquire and license leading technologies;

    o    bring new services and applications to market and scale our business on a timely basis at competitive prices; and

    o    respond effectively to new technological changes or new product announcements by others.

                                    16

<PAGE>

We will not be competitive unless we introduce new features and functionalities to our OPEX system that meet evolving industry standards and client needs. In the future, we may not be able to address effectively the compatibility and interoperability issues that arise as a result of technological changes and evolving industry standards. The technical innovations required for us to remain competitive are inherently complex, require long development schedules and are dependent in some cases on sole source suppliers. We will be required to continue to invest in research and development in order to attempt to maintain and enhance our existing technologies and products, but we may not have the funds available to do so. Even if we have sufficient funds, these investments may not serve the needs of clients or be compatible with changing technological requirements or standards. Most development expenses must be incurred before the technical feasibility or commercial viability of new or enhanced services and applications can be ascertained. Revenue from future services and applications or enhancements to services and applications may not be sufficient to recover the associated development costs.

The technology underlying our OPEX system is complex and may contain unknown

defects that could harm our reputation, result in product liability or decrease market acceptance of our services and applications.

The technologies underlying financial services and applications are complex and include software that is internally developed. Software products using these technologies may contain errors or defects, particularly when first introduced or when new versions or enhancements are released. We may not discover software defects that affect our current or new services and applications or enhancements until after they are sold. Furthermore, because our services and applications are designed to work in conjunction with various platforms and applications, we are susceptible to errors or defects in third-party applications that can result in a lower quality product for our clients. Because our clients depend on us for digital media management, any interruptions could:

- o   damage our reputation;

- o   cause our clients to initiate product liability suits against us;

- o   increase our product development resources;

- o   cause us to lose revenues; and

- o   delay market acceptance of our products.

A significant portion of our revenues is from incentives from two U.S. exchanges. We may not receive those incentives in the future.

We receive incentives from ICE and NYMEX which accounted collectively for 13% of our revenues during 2005. The incentives are earned based on a percentage of the total revenues received by the exchange attributable to our volume of transactions submitted to the respective exchanges. The incentives are earned based on a written agreement with ICE expiring by June 2006 or earlier if our separate brokerage agreement with ICE is terminated. The incentives earned from NYMEX are based on a program offered to all brokers, traders, and energy traders initially launched in 2003. NYMEX has amended the terms of its initial incentive program by decreasing the incentive rate by 50%. NYMEX may amend the terms of the incentives or cancel this program at any time. ICE also may request that we amend the terms of our agreement. We may agree to some or all of any requested changes. Accordingly, we cannot guarantee that we will continue to receive the level of such incentives in the future, if at all. If we do not receive these incentives, our revenues will decrease.

We depend on our relationship with Capital Energy Services to maintain our futures market operations.

Our income from floor brokerage operations amounted to approximately $2.0 million during fiscal 2005. We depend on our relationship with CES to maintain or increase the profitability of such operations. Edward J. O'Connor, our President and a director, is a 50% shareholder of CES. Kevin P. Cassidy, our new Chief Executive Officer and a director since October 2005, is the Managing Director of CES. To maintain our futures market operations, CES may need to provide certain financial guarantees to NYMEX or other exchanges. CES may not have the resources to provide such financial guarantees and we may not be able to assist CES financially. Additionally, CES may be prevented from trading based on certain government regulations. If CES loses its ability to trade on NYMEX or other exchanges, we cannot maintain our futures market operations. If we are unable to maintain our futures market operations, our revenues will decrease and it would adversely impact our financial condition.

17

<PAGE>

We rely heavily on the services of our overseas technical staff and consultants which may delay or jeopardize the development and enhancement of OPEX

We rely heavily on the services of our technical staff and consultants. Our technical employees are not presently employed on a full time basis. With the exception of our chief technology officer, all our technical staff, including our software engineers and our software quality assurance team, is located overseas. If we are unable to maintain our relationship with these individuals and if we have to replace them with individuals with similar capabilities, this could delay or jeopardize the development and the enhancement of OPEX.

We face intense and increasing competition in the electronic energy derivatives market. If we do not compete effectively or if we experience reduced market share from increased competition, our business will be harmed.

The natural gas derivatives market has many competitors involved in the brokering of natural gas options. Capital investment for entry into the market is low. Accordingly, a number of small brokerage firms flourish along side of

larger more established brokerage firms such as Cantor Fitzgerald, L.P., MAN Group PLC and ICAP PLC.

There are several other well-financed companies who do or may compete with us. In the OTC natural gas derivatives market, our competitors include Amerex Natural Gas Ltd., Choice Energy LP, G.A. Options, MAN Financial, Inc. and Tullet Natsource, Inc. In the futures natural gas derivatives market, our competitors include Clarion Trading, SCS Trading Corp., and ICAP PLC. When we implement OPEX, we anticipate that our potential competitors will include NYMEX, ICE, eSpeed and the Chicago Mercantile Exchange.

Substantially all of our competitors have more capital, longer operating histories, greater brand recognition, larger client bases and significantly greater financial, technical and marketing resources than we do. These competitors may also engage in more extensive development of their technologies, adopt more aggressive pricing policies and establish more comprehensive marketing and advertising campaigns than we can. Our competitors may develop products and service offerings that we do not offer or that are more sophisticated or more cost effective than our own. For these and other reasons, our competitors' products and services may achieve greater acceptance in the marketplace than our own, limiting our ability to gain market share and client loyalty and to generate sufficient revenues to achieve a profitable level of operations. Our failure to adequately address any of the above factors could harm our business and operating results.

Dependence on outside clearinghouses for increased revenue.

We are dependent on outside clearinghouses such as NYMEX and, through a relationship with the ICE, the London Clearinghouse to provide us with OTC Clearing services. We can give no assurance that these companies will continue to offer this service to trades brokered by us and should those outside clearinghouses cease to offer this service, it would have a material negative effect on us and our prospects.

Reliance on natural gas derivatives.

While our plan is to leverage success of energy options and expand into other markets while maintaining our status as an "exempt commercial market", the success of this plan is subject to market forces outside of our control. At present, substantially all of our revenues are derived from trading in natural gas derivatives. If there should be a significant slowdown in the natural gas derivatives market, it would have a significant negative impact on us.

The continued operations of our business are dependent on the performance and continued service of our executive officers and key employees, and our ability to attract and retain skilled personnel.

Our performance and future operating results are substantially dependent on the continued service and performance of Kevin Cassidy, our Chief Executive Officer, Edward J. Connor, our President, and Mark Nordlicht, our Chairman. To the extent that the services of those persons become unavailable, our business and prospects would be adversely affected. Should we be required to do so, we do not know whether we would be able to employ equally qualified persons to replace any of these persons. Moreover, we do not currently maintain "key man" insurance on any of our executive officers or other key employees and do not intend to obtain this type of insurance in the near future. Additionally, we do not have written agreements with most of our staff and, other than traditional compensation packages and stock options we contemplate granting to our staff, we do not have other means to ensure the retention of their services. If we are successful in implementing and developing our business, we will require additional managerial, administrative and support personnel. Competition for highly qualified personnel is intense, and we can make no assurances that we can retain our key employees or that we will be able to attract or retain qualified personnel in the future. To the extent we have fewer financial resources available to us than our competitors we may not be able to attract and retain a sufficient number of qualified personnel. The loss of the services of any of our management or other key employees and our inability to attract and retain other necessary personnel could have a material adverse effect on our financial condition, operating results, and cash flows.

18

<PAGE>

Certain employees' efforts currently account for a significant amount of our revenues. Should the services of these individuals, including and particularly Kevin Cassidy, no longer be available to us, and suitable replacements not be hired or retained, we would experience adverse effects of varying degrees.

We could become subject to increased governmental and organizational regulation.

We intend for our OPEX platform, when implemented, to qualify as an "exempt

commercial market" under the rules of the CFTC. Although an ECM may be required to provide certain trade volume and pricing information to the CFTC, an ECM is not required to register with the CFTC. However, if we were to no longer qualify for the exemption from registration, either because of changes in law or the scope of our business, our businesses would become subject to extensive regulation at both the federal and state levels. In addition, self-regulatory organizations, such as NYMEX and the National Futures Association, require compliance with their extensive rules and regulations. Among other things, these regulatory authorities impose restrictions on sales methods, trading practices, use and safekeeping of client funds and securities, record keeping and the conduct of principals and employees. The extensive regulatory framework applicable to the commodities brokerage industry, the purpose of which is to protect clients and the integrity of the commodities markets, would impose significant compliance burdens and attendant costs on us. The regulatory bodies that administer these rules do not attempt to protect the interests of our stockholders as such, but rather the public and markets generally. Failure to comply with any of the laws, rules or regulations of any independent, state or federal regulatory authority to which we become subject could result in a fine, injunction, suspension or expulsion from the industry, which could materially and adversely impact us. Furthermore, amendments to existing state or federal statutes, rules and regulations or the adoption of new statutes, rules and regulations could require us to alter our methods of operation at costs which could be substantial.

Our cash flows and capital resources may be insufficient to make required payments on our substantial indebtedness and future indebtedness.

We have a significant amount of debt. At December 31, 2005, we had approximately $2.7 million of debt, a substantial portion of which is due to our Chairman, Mark Nordlicht.

Our substantial debt could have important consequences to you. For example, it could:

    o    make it difficult for us to satisfy our debt obligations;

    o    make us more vulnerable to general adverse economic and industry conditions;

    o    limit our ability to obtain additional financing for working capital, capital expenditures, acquisitions and other general corporate requirements;

    o    require us to dedicate a substantial portion of our cash flow from operations to payments on our debt, thereby reducing the availability of our cash flow for operations and other purposes;

    o    limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate; and

    o    place us at a competitive disadvantage compared to competitors that may have proportionately less debt.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay capital expenditures, sell material assets or operations, obtain additional capital or restructure our debt. In the event that we are required to dispose of material assets or operations to meet our debt service and other obligations, the value realized on such assets or operations will depend on market conditions and the availability of buyers. Accordingly, any such sale may not, among other things, be for a sufficient dollar amount.

The Penny Stock Rules apply to our common stock. This may make it more difficult for holders of our common stock to resell their shares.

At the present time, our common stock is not listed for trading on any stock exchange.

19

<PAGE>

The Securities Enforcement and Penny Stock Reform Act of 1990 requires special disclosure relating to the market for penny stocks in connection with trades in any stock defined as a "penny stock." Commission regulations generally define a penny stock to be an equity security that has a market price of less that $5.00 per share and is not listed on Nasdaq or a major stock exchange. These regulations subject all broker-dealer transactions involving such securities to the special "Penny Stock Rules" set forth in Rule 15g-9 of the Securities Exchange Act of 1934. It may be necessary for the Selling Stockholders to utilize the services of broker-dealers who are members of the NASD. The current

market price of our common stock is substantially less that $5 per share and
such stock can, for the foreseeable future, be expected to continue to trade in
the over-the-counter market at a per share market price of substantially less
than $5. Accordingly, any broker-dealer sales of our shares will be subject to
the Penny Stock Rules. These Rules affect the ability of broker-dealers to sell
our securities and also may affect the ability of purchasers of our common stock
to sell their shares in the secondary market.

The Penny Stock Rules also impose special sales practice requirements on
broker-dealers who sell securities to persons other than their established
clients or "accredited investors." Among other things, the Penny Stock Rules
require that a broker-dealer make a special suitability determination respecting
the purchaser and receive the purchaser's written agreement to the transaction
prior to the sale. In addition, the Penny Stock Rules require that a
broker-dealer deliver, prior to any transaction, a disclosure schedule prepared
in accordance with the requirements of the Commission relating to the penny
stock market. Finally, monthly statements have to be sent to any holder of such
penny stocks disclosing recent price information for the penny stock held in the
account and information on the limited market in penny stocks. Accordingly, for
so long as the Penny Stock Rules are applicable to our common stock, it may be
difficult to trade such stock because compliance with such Rules can delay or
preclude certain trading transactions. This could have an adverse effect on the
liquidity and price of our common stock.

Management substantially controls us and their interests may be different from
yours and may be in conflict with yours.

The interests of our management could conflict with the interests of our
stockholders. Our officers and directors beneficially own approximately 50% of
our outstanding common stock. Accordingly, if they exercise all their options
and warrants, they will have the power to approve corporate transactions and
control the election of all of our directors and other issues for which the
approval of our stockholders is required. This concentration of ownership may
also delay, deter or prevent a change in control of us and may make some
transactions more difficult or impossible to complete without the support of
these stockholders. As a result, you may have no effective voice in our
management.

Our majority stockholders will be able to take stockholder actions without
giving prior notice to any of you. You may, therefore, be unable to take
preemptive measures that you believe are necessary to protect your investment in
the company.

The majority stockholders are able to take stockholder actions in conformance
with Section 228 of the Delaware General Corporation Law and our Certificate of
Incorporation, which permits them to take any action which is required to, or
may, be taken at an annual or special meeting of the stockholders, without prior
notice and without a vote of our stockholders. Instead of a vote, stockholder
actions can be authorized by the written consents to such actions, signed by the
holders of the number of shares which would have been required to be voted in
favor of such action at a duly called stockholders meeting. We would not be
required to give prior notice to all stockholders of actions taken pursuant to
the written consents of the majority stockholders and our obligations are
limited to giving notice of such actions promptly after any action has been
taken.

ITEM 7.  FINANCIAL STATEMENTS


Response to this item is submitted as a separate section of this report
immediately following the signature page.


ITEM 8.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
         FINANCIAL DISCLOSURE


None


                                    20


<PAGE>

ITEM 8A.        CONTROLS AND PROCEDURES

Our Chief Executive Officer and Chief Financial Officer (collectively, the
"Certifying Officers") are responsible for establishing and maintaining
disclosure controls and procedures which include controls and procedures that
are designed to ensure that information required to be disclosed in the reports
which we file with or submit to the SEC is recorded, processed, summarized and
reported within the time periods specified by the SEC. The Certifying Officers
have evaluated these controls and procedures and they have concluded (based upon

their evaluation of these controls and procedures as of the end of the period covered by this report) that our disclosure controls and procedures are effective to: i) ensure that information required to be disclosed by us in this report is accumulated and communicated to management, including our principal executive officers as appropriate, to allow timely decisions regarding required disclosure; and ii) ensure that information required to be disclosed in the reports which we file or submit with the SEC is recorded, processed, summarized and reported within the time periods specified by the SEC.

The Certifying Officers have indicated that there were no changes in our internal controls which occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting, and there were no corrective actions with regard to significant deficiencies and material weaknesses.

Our management, including our Certifying Officers, does not expect that our disclosure controls or our internal controls will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. In addition, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the control. The design of any systems of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Because of these inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

ITEM 8B.       OTHER INFORMATION.


None.




                                       21


<PAGE>


ITEM 9.   DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

          DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS

Directors serve until the next annual meeting of the stockholders and until their successors are elected or appointed and qualified, or until their prior resignation or removal. Officers serve for such terms as determined by our board of directors. Each officer holds office until such officer's successor is elected or appointed and qualified or until such officer's earlier resignation or removal. Our board currently does not have any committees.

The following table sets forth certain information, as of March 7, 2006, with respect to our directors and executive officers.
<TABLE>
<CAPTION>

| Name | Positions Held | Age | Date of Election or Appointment as Director |
| ---- | ------------- | ----------- | --------------- |
| <S> | | <C> | <C> |
| Mark Nordlicht | Chairman | 36 | February 2000 |
| Kevin Cassidy | Chief Executive Officer and Vice Chairman | 46 | October 2005 |
| Edward J. O'Connor | President, Treasurer, and Director | 52 | March 2001 |
| Albert Helmig | Director | 53 | September 2004 |
| Yechiel Abraham Zucker | Executive Vice President and Secretary | 31 | n.a. |

| Marc-Andre Boisseau | Chief Financial Officer | 41 | n.a. |

</TABLE>

The following is a brief account of the business experience of each of our directors and executive officers during the past five years or more.

Mark Nordlicht: Mr. Nordlicht is a founder of the Company and has served as our Chairman of the Board of Directors since 2000. Mr. Nordlicht has also been the Managing Partner of the General Partner of Platinum Partners Value Arbitrage Fund, a market-neutral hedge fund, since January 2003. Mr. Nordlicht also served as Managing Partner of West End Capital from 1998 through 2002. In his various positions, Mr. Nordlicht is also the Chairman of the Board of Platinum Energy Resources, Inc., a publicly-traded company, since April 2005. Mr. Nordlicht has been responsible for the oversight of all of our operations. Mr. Nordlicht earned a BA degree from Yeshiva University in 1989.

Kevin Cassidy: Mr. Cassidy has served as our Chief Executive Officer since October 2005 and from March 2001 to March 2004. From April 2004 through September 2005, Mr. Cassidy provided consulting services to us. Since December 1996, Mr. Cassidy has served as Managing Director of Capital Energy Services, LLC ( formerly Orion Energy Services, LLC), an energy options brokerage firm on the NYMEX. Mr. Cassidy's primary responsibilities include business development, sales and marketing, and oversight of our brokerage operations. Mr. Cassidy attended Catholic University

Edward J. O'Connor: Mr. O'Connor has served as our President and as a director since March 2001 and as our CEO between March 2004 and October 2005. Since December 1996, Mr. O'Connor has served as Managing Director of Capital Energy Services, LLC (formerly Orion Energy Services, LLC), an energy options brokerage business on the NYMEX. Mr. O'Connor's primary responsibilities include negotiating and entering into contracts for our business and accounting for our funds. Mr. O'Connor graduated from Georgetown University in 1977 with a BS degree in Business Administration.

Albert Helmig. Mr. Helmig was elected as a director in September 2004. Since 2000, Mr. Helmig has been a principal of Gray House Consulting, a consulting firm to the energy industry. From 1991 through 2000, Mr. Helmig held the following positions with the New York Mercantile Exchange (NYMEX): Chairman or Vice Chairman of over 20 committees, 1991-2000; Member of Board of Directors, 1991-2000; Member of Executive Committee, 1993-2000; and Vice Chairman, 1998-2000. Mr. Helmig is also on the Board of Directors of the International Precious Metals Institute, a member of the International Advisory Committee Board, Energy Intelligence Group, a member of the National Committee on US/China Relations, and a member of the National Futures Association. Mr. Helmig is also a Director of Platinum Energy Resources, Inc., a publicly-traded company, since April 2005. Mr. Helmig earned a B.S. degree in Finance and Economics from Philadelphia University.

Yechiel Abraham Zucker: Mr. Zucker has served as our Executive Vice President and Secretary since April 2004. Previously, he served as our Senior Vice President from 2000 through March 2004. Mr. Zucker's responsibilities include operations and product development. Mr. Zucker also served as Executive Vice President of iDerive, Inc. from February 2000 to January 2001. Prior to that, he served as an analyst at West End Capital, a private investment fund, from 1999 through January 2000. Mr. Zucker graduated from Yeshiva University in 1997 with a B.A. degree.

Marc-Andre Boisseau. Mr. Boisseau has served as our Chief Financial Officer since December 2004. Since January 2002, he has served as an advisor to small and medium publicly traded and private companies on financial, tax and accounting matters. Between January 2000 and December 2001, he served as Vice-President Finance of DataCore Software, Inc., a privately held software developer. Prior to that, he served as Chief Accounting Officer (from May 1997 to December 1999) and Vice President Controller (from January 1, 1998 to December 1999) of Citrix Systems, Inc. a publicly traded software developer. Mr. Boisseau is a certified public accountant. Mr. Boisseau graduated with a BA degree in Business Administration in 1987 from the University of Montreal.

22

<PAGE>

ITEM 10.    EXECUTIVE COMPENSATION

EXECUTIVE COMPENSATION

The following table sets forth information concerning the total compensation paid or accrued by us during the three fiscal years ended December 31, 2005, 2004, 2003 to (i) all individuals that served as our chief executive officer or acted in a similar capacity for us at any time during the fiscal year ended December 31, 2005 and (ii) all individuals that served as executive officers of ours at any time during the fiscal year ended December 31, 2005 that received

annual compensation during the fiscal year ended December 31, 2005, in excess of $100,000.

SUMMARY COMPENSATION TABLE

<TABLE>
<CAPTION>

| | | Annual Compensation | | | Long-Term Compensation | | | Payouts |
| | | | | | Awards | | | All Ot |
| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Other Annual Compensation ($) | Restricted Stock Awards ($) | Securities Underlying Options (#) | LTIP Payouts | Compens ($) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Edward J. O'Connor, President, Director (1) | 2005 | $200,000 | $-0- | $-0- | $-0- | -0- | $-0- | $-0- |
| | 2004 | $150,000 | $-0- | $-0- | $-0- | -0- | $-0- | $-0- |
| | 2003 | $442,308 | $-0- | $-0- | $-0- | -0- | $-0- | $-0- |
| Kevin Cassidy, CEO (1) | 2005 | $ 58,333 | $-0- | $-0- | $-0- | -0- | $-0- | $-0- |
| | 2004 | $ -0- | $-0- | $-0- | $-0- | -0- | $-0- | $-0- |
| | 2003 | $442,308 | $-0- | $-0- | $-0- | -0- | $-0- | $-0- |
| Yechiel Abraham Zucker | 2005 | $120,000 | $-0- | $-0- | $-0- | -0- | $-0- | $-0- |
| | 2004 | $109,103 | $-0- | $-0- | $-0- | 175,000 | $-0- | $-0- |
| | 2003 | $100,000 | $-0- | $-0- | $-0- | -0- | $-0- | $-0- |

</TABLE>

(1)  Mr. Cassidy served as our Chief Executive Officer from March 2001 to March 2004 and from October 2005 to present. Mr. O'Connor served as our Chief Executive Officer from April 2004 to October 2005.

BOARD OF DIRECTORS

Our directors do not receive cash compensation for their services as directors but are reimbursed for their reasonable expenses for attending board and board committee meetings. Mr. Helmig, however, was granted options to purchase a maximum of 250,000 shares of our common stock in connection with his election to our board of directors in 2004. These options vest as follows: 20% in September 2004, and 40% every year thereafter as long as Mr. Helmig remains one of our director.

STOCK OPTION GRANTS

There were no individual grants of stock options to any Executive Officers during the fiscal year ended December 31, 2005, and 791,000 options were outstanding at December 31, 2005.

During 2005, the board of directors granted 150,000 stock options under our 2004 Stock Option Plan. All of the options issued are exercisable at $.30 per share.

STOCK OPTIONS EXERCISED IN 2005 AND RELATED PERIOD-ENDED STOCK OPTION VALUES

The following table sets forth selected option exercise information for the year ended December 31, 2005 and the number of value of stock options as of December 31, 2005 related to our Chief Executive Officer and each of our two most highly compensated executive officers.

<TABLE>
<CAPTION>

| | | | Number of Unexercised Options at Period-End | | Value of Unexercised Options at Period-End | |
| Name | Shares Acquired on Exercise | Value Realized | Exercisable | Unexercisable | Exercisable | Unexerc |
| --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | < |
| Kevin Cassidy | - | - | - | - | - | |
| Edward O'Connor | - | - | - | - | - | |
| Yechiel Abraham Zucker | - | - | 116,667 | 59,333 | 87,500 | 43,75 |

</TABLE>

(a) Value of unexercised "in the money" options is determined by multiplying the number of shares subject to such options by the difference between the exercise price per share and $0.95, the average of the bid and asked price per share of the Common Stock on The OTC Bulletin Board on December 30, 2005.

23

<PAGE>

2004 STOCK OPTION PLAN

We adopted our 2004 Stock Option Plan in November 2004. The plan provides for the grant of options intended to qualify as "incentive stock options" and options that are not intended to so qualify or "nonstatutory stock options." The total number of shares of common stock reserved for issuance under the plan is 7,500,000, subject to adjustment in the event of a stock split, stock dividend, recapitalization or similar capital change.

The plan is presently administered by our board of directors, which selects the eligible persons to whom options shall be granted, determines the number of common shares subject to each option, the exercise price therefor and the periods during which options are exercisable, interprets the provisions of the plan and, subject to certain limitations, may amend the plan. Each option granted under the plan is evidenced by a written agreement between us and the optionee.

Options may be granted to our employees (including officers) and directors and certain of our consultants and advisors.

The exercise price for incentive stock options granted under the plan may not be less than the fair market value of the common stock on the date the option is granted, except for options granted to 10% stockholders which must have an exercise price of not less than 110% of the fair market value of the common stock on the date the option is granted. The exercise price for nonstatutory stock options is determined by the board of directors. Incentive stock options granted under the plan have a maximum term of ten years, except for 10% stockholders who are subject to a maximum term of five years. The term of nonstatutory stock options is determined by the board of directors. Options granted under the plan are not transferable, except by will and the laws of descent and distribution.

Employment Contracts, Termination of Employment, and Change-in-Control Arrangements

On March 1, 2001, we entered into an employment agreement with Edward O'Connor, our President and CEO and a member of the board of directors. The agreement was amended on April 1, 2004.

The terms of the agreement, as amended, provide that we will employ Mr. O'Connor for a term of five years with the duties of Chief Executive Officer with an annual salary of $200,000 per year. If we terminate Mr. O'Connor's employment without "cause" or if Mr. O'Connor terminates his employment with "good reason" (as both terms are defined in Mr. O'Connor's employment agreement), we are required to pay him a lump sum equal to nine months' base salary. Following termination of employment for any reason, other than expiration of the term of employment, Mr. O'Connor has agreed not to engage in an electronic OTC business in competition with us for a 90 day period, provided we pay him bi-monthly installments of $8,333.33 and provide full health benefits during the 90 day period. We hen Kevin Cassidy became our Chief Executive Officer in October 2005, as discussed below, we continued to employ Mr.O'Connor as our President with the same compensation package as when he was our Chief Executive Officer.

Effective October 30, 2005, Optionable, Inc. (the "Company") named Kevin P. Cassidy its Chief Executive Officer, elected him a director. Simultaneously, we entered into an employment agreement with him (the "Agreement"). The initial term of the Agreement is for fifty months, subject to renewal or earlier termination.

Mr. Cassidy's salary ("Fixed Compensation") will be as follows: $20,833 upon entering into the Agreement, $46,875 from October 30, 2005 to December 31, 2005, $275,000 from January 1 to December 31, 2006, $300,000 from January 1, 2007 to December 31, 2007, $325,000 from January 1 to December 31, 2008, $350,000 from January 1, 2009 to December 31, 2009.

In addition, beginning with the first month of the quarter in which the amount payable to Mr. Cassidy, pursuant to the Addendum to Master Service Agreement, dated April 12, 2005, is fully paid, Mr. Cassidy will be paid (i) cash compensation amounting to five percent (5%) of Gross Revenues of the Company, and (ii) stock compensation amounting to two percent (2%) of the Gross Revenues of the Company. Gross Revenue is defined as the total gross revenue related to any and all aspects of the brokerage business, including incentive received from exchanges, based on generally accepted accounting principles. The shares of our common stock will be granted at fair value at the date of grant.

The Company will issue options to Mr. Cassidy equal to twenty percent (20%) of the number of shares of common stock issuable under warrants which become exercisable pursuant to any Order Flow Agreements (Order Flow Agreements are the agreements for the Company to issue warrants to a firm based on the volume of

orders the firm placed with the Company). Those options will be fully vested Non-Statutory Stock Options granted under the Company's 2004 Stock Option Plan at fair value at the date of grant. Also, the Company will issue to Mr. Cassidy 5,000 options each time a firm registers with and executes its first 10,000 lots on the Company's OPEX platform. The total number of such options will be limited to 2,500,000. Such options will be fully vested Non-Statutory Options granted under the plan at fair value at the date of grant.

Mr. Cassidy will be entitled to paid annual vacation, personal leave and holidays in accordance with the policies of the Company, and will be entitled to participate in health, welfare, and pension plans and any other employee benefit plan of the Company. In addition, the Company will advance to or reimburse Mr. Cassidy for the annual or monthly premium of his life insurance policy of one million dollars ($1,000,000) where the beneficiary is Mr. Cassidy's estate (immediate family).

24

<PAGE>

Upon the sale or merger or other business combination of the Company and another company or companies, Mr. Cassidy will be entitled to a lump sum payment of 50% of the unpaid Fixed Compensation should he desire not to be employed with the new or successor entity.

We have a consulting agreement with Mr. Boisseau, who serves as our Chief Financial Officer. The oral agreement provides that we compensate him at $145 per hour. This agreement may be terminated at will by both parties.

We have an employment agreement with Mr. Zucker. The oral agreement provides that we compensate him at $120,000 per year. This agreement may be terminated at will by both parties.

Committees

We do not have an audit committee or a compensation committee. We intend to form such committees once we have selected directors who shall meet the independence requirements and audit committee financial expert requirements under applicable Securities and Exchange Commission rules and regulations. We are developing the criteria we will use in identifying, attracting, and retaining such directors. We are unable to determine when and if we will complete the recruiting of new directors during fiscal year 2006.

Code of Business Conduct and Ethics

The Company has adopted a Code of Business Conduct and Ethics that applies to its directors, officers and employees. A copy of the Code of Business Conduct and Ethics is attached as an exhibit to our Annual Report on Form 10-KSB. If the Company grants any waiver from a provision of this Code, the Company will disclose the nature of such waiver in a Current Report on Form 8-K.

CERTAIN LEGAL PROCEEDINGS

To the knowledge of the Company, there are no material proceedings to which any director, executive officer or beneficial owner of more than 5% of any class of voting securities of the Company.

SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

The Company 's directors, executive officers, and 10% or greater stockholders were not subject to the beneficial ownership reporting requirements of Section 16(a) during the year ended December 31, 2005.

ITEM 11.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The following table sets forth information regarding the beneficial ownership of our common stock as of March 7, 2006. The information in this table provides the ownership information for:

    o    each person known by us to be the beneficial owner of more than 5% of our common stock;
    o    each of our directors;
    o    each of our executive officers; and
    o    our executive officers, directors and director nominees as a group.

The percentages in the table have been calculated on the basis of treating as outstanding for a particular person, all shares of our common stock outstanding on that date and all shares of our common stock issuable to that holder in the event of exercise of outstanding options, warrants, rights or conversion privileges owned by that person at that date which are exercisable within 60 days of that date. Except as otherwise indicated, the persons listed below have sole voting and investment power with respect to all shares of our common stock owned by them, except to the extent that power may be shared with a spouse.

25

<PAGE>
<TABLE>
<CAPTION>

| Title of Class | Name and Address Of Beneficial Owner | Number of Shares Beneficially Owned | Percentage Outstanding(1) |
|---|---|---|---|
| <S> | | <C>        <C> | <C> |
| Common Stock, par value $.0001 per share | Mark Nordlicht 555 Pleasantville Road South Building, Suite 110 Briarcliff Manor, NY 10510 | 16,440,150 (1) | 31.4% |
| Common Stock, par value $.0001 per share | Edward J. O'Connor 555 Pleasantville Road South Building, Suite 110 Briarcliff Manor, NY 10510 | 5,708,016 (2) | 10.9% |
| Common Stock, par value $.0001 per share | Yechiel Abraham Zucker 555 Pleasantville Road South Building, Suite 110 Briarcliff Manor, NY 10510 | 1,958,167 (3) | 3.7% |
| Common Stock, par value $.0001 per share | Albert Helmig 15 Deer Run Circle Chatham, NJ 07928 | 150,000 (4) | 0.3% |
| Common Stock, par value $.0001 per share | Kevin P. Cassidy 555 Pleasantville Rd., Ste 110 Briarcliff Manor, NY 10510 | 2,468,665 (5) | 4.7% |
| Common Stock, par value $.0001 per share | Steel Styles Sales, Inc. 401 South Water Street Newburgh, NY | 4,451,350 | 8.5% |
| Common Stock, par value $.0001 per share | East Holdings LLC 4 Gel Court Monsey, NY 10952 | 4,318,000 | 8.2% |
| Common Stock, par value $.0001 per share | Marc-Andre Boisseau 555 Pleasantville Rd., Ste. 110 Briarcliff Manor, NY 10510 | -0- | 0.0% |
| All directors and officers as a group (5 persons) | | 26,724,998 (1)(2)(3)(4)(5) | 51.0% |

</TABLE>

(1) Excludes 2,190,750 shares owned by Jules Nordlicht, Mr. Nordlicht's father, with respect to which Mr. Nordlicht disclaims beneficial ownership.

(2) Includes 3,904,158 shares owned by Ridgecrest Capital Corp., Inc., a corporation wholly owned by Mr. O'Connor, 901,929 shares owned by Mr. O'Connor's daughter Kathleen O'Connor and 901,929 shares owned by Mr. O'Connor's daughter Erin O'Connor.

(3) Includes 95,250 shares owned by AYD Equity Group, Ltd., a corporation wholly owned by Mr. Zucker and 116,667 options which are exercisable within 60 days.

(4) Includes 150,000 shares issuable pursuant to the exercise of stock options exercisable within 60 days.

(5) Includes 1,905,000 shares owned by Pierpont Capital Corp., Inc.("Pierpont"), as well as 450,000 warrants, exercisable at a price of $0.20 per share, issued to Pierpont, of which Mr. Cassidy is a stockholder and 113,665 shares owned by Kerry Cassidy, who is Mr. Cassidy's daughter.

26

<PAGE>

ITEM 12.          CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

On February 3, 2003, we entered into a Prepaid Commission Agreement with Mr.
Nordlicht (the "Prepaid Commission Agreement") whereby Mr. Nordlicht agreed to
pay us non-refundable prepaid commission payments of not less than $1,200,000.
In consideration thereof, we agreed to extend a 20% discount on all commissions
charged by us to Mr. Nordlicht. The agreement terminates when the prepaid
commission balance is brought to $0. We are no longer obligated to grant the
discount upon the first to occur of 24 months passing since the last prepaid
commission is received by us or there is a change in control of the Company. The
original intent of the Prepaid Commission Agreement was to grant the additional
20% commission discount to Mark Nordlicht for services performed using OPEX.
OPEX was not launched in the timeframe originally planned. Accordingly, the
Prepaid Commission Agreement has never materialized. In the interest of pursuing
a fruitful relationship with Mark Nordlicht, we agreed to consolidate amounts
due under the Prepaid Commission Agreement with other amounts due to Mark
Nordlicht. Amounts paid to us under the Prepaid Commission Agreement were
consolidated into the Loan Agreement dated March 22, 2004, described below.

On June 5, 2003, we entered into a Revolving Credit Facility Agreement (the
"Agreement) with Platinum Value Arbitrage Fund LP ("Platinum") whereby Platinum
agreed to make loans to us, on a revolving basis, in the aggregate principal
amount of up to $500,000. $75,000 of the loan amount was provided to us in
advance of the Agreement. Mr. Nordlicht, our chairman, is the Managing Partner
of Platinum. In connection with that Agreement, we issued a $500,000 Revolving
Promissory Note to Platinum dated June 5, 2003. The promissory note, which was
unsecured, bore interest at the rate of 20% per year and was payable by
September 30, 2004. The Agreement was confirmed on March 8, 2004, and all
amounts owed thereunder ($570,000) were paid in full on September 9, 2004.

On June 9, 2003 we entered into a Prepaid Commission Agreement with Platinum
whereby Platinum agreed to pay us non-refundable prepaid commission payments
totaling $500,000 no later than December 31, 2003. In consideration of that
Agreement, we agreed to extend a 20% discount on all commissions charged by us
to Platinum. The agreement terminates when the prepaid commission balance is
brought to $0. We are no longer obligated to grant the discount upon the first
to occur of 24 months passing since the last prepaid commission is received by
broker or there is a change in control of the Company. Mr. Nordlicht, our
chairman is the Managing Partner of Platinum. This agreement was cancelled on
March 8, 2004.

On February 13, 2004, we entered into a Loan Agreement with Mr. Nordlicht,
whereby Mr. Nordlicht loaned us $250,000 for the purpose of funding a settlement
agreement with Random Walk Computing, Inc.. In connection with that Agreement,
we issued a $250,000 promissory note to Mr. Nordlicht, dated February 13, 2004.
The promissory note we issued to Mr. Nordlicht in connection with this loan was
unsecured and did not bear interest. The loan was repayable on the earlier of
February 13, 2014 or the 15th day after we received a cash investment of at
least $250,000. On October 27, 2004, this loan was repaid out of the proceeds of
a private placement of our securities which closed in October 2004.

On March 8, 2004, we entered into a Loan Agreement with Mr. Nordlicht whereby
Mr. Nordlicht loaned us $50,000 for the purpose of retaining securities counsel.
In connection with that Agreement, we issued a $50,000 promissory note to Mr.
Nordlicht, dated March 8, 2004. This promissory note was unsecured and did not
bear interest. The loan was repayable on the earlier of March 9, 2014 or the
15th day after we received a cash investment of at least $300,000. This loan was
repaid out of the proceeds of the private placement of our securities closed in
October 2004.

On March 22, 2004, we entered into a Loan Agreement with Mark Nordlicht pursuant
to which we consolidated (a) $3,722,561.48 of principal and $519,191.70 in
accrued and unpaid interest of loans previously made to us by Mr. Nordlicht
pursuant to the Credit Facility entered into on March 1, 2001 and (b) $1,380,000
that Mr. Nordlicht previously paid to us pursuant to the Prepaid Commission
Agreement, into a single loan of $5,621,753.18. In connection with the Loan
Agreement, we issued a $5,621,753.18 promissory note to Mr. Nordlicht, dated
March 22, 2004. This promissory note, which is unsecured, will be due and
payable on the first to occur of: (i) March 22, 2014, at which time we will pay
Mr. Nordlicht $5,621,753.18 or (ii) if through our first financing or sale of
our stock in a private placement excluding our private placement which closed in
the fourth quarter of 2004, we raise at least $1,000,000 (the "Capital Raise");
in equity or debt; then within 30 days after the closing of the Capital Raise,
we will pay off the principal of the note in an amount equal to at least 39.33%
of the Capital Raise, provided however, that such amount will not exceed
$2,810,877, and any remaining unpaid principal balance will begin to accrue
interest at the rate of 12% annually; and the outstanding principal amount and
accrued interest will be due and payable on March 22, 2014.

On April 15, 2004, we entered into a revolving Credit Facility Agreement (the "Credit Facility") with Mr. Nordlicht, pursuant to which Mr. Nordlicht agreed to lend up to $100,000 to us from time to time as required. In connection with the Credit Facility we issued a $50,000 promissory note, without interest to Mr. Nordlicht, dated April 15, 2004. The note, which was unsecured, was due on August 1, 2004, which was subsequently extended to December 31, 2004. The note was repaid in December 2004.

28

<PAGE>

We are parties to a Master Services Agreement with CES pursuant to which we provide brokerage services on the floor of the New York Mercantile Exchange (see "Description of Business - Business Alliances" for more information about this agreement). Edward J. O'Connor, our president and a director, is a 50% stockholder of CES. Kevin P. Cassidy our Chief Executive Officer until March 31, 2004, is the Managing Director of CES. Pursuant to this arrangement, we will pay to CES a minimum annual fixed fee of $50,000 and assume all expenses directly incurred by CES's associated floor brokerage services. Additionally, we will pay to CES $1,525,000 on April 1, 2014. However, upon a Capital Raise, we will pay up to 10.67% of the amount raised during the Capital Raise, up to $762,500, to CES, with the remaining principal and accrued interest of 12% from the date of the Capital Raise payable on April 1, 2014.

During April 2005, CES assigned its rights to the Company's liability of $1,525,000 equally to Edward O'Connor and Kevin Cassidy, co-owners of CES. Subsequently, during April 2005, the Company entered into modifications of the terms of the amounts due from it to Mark Nordlicht, Edward O'Connor and Kevin Cassidy. The modified terms provide that, among other things, in the event of a Capital Raise, the interest rate accrued after such event is reduced from 12% to 4.68%. Additionally, the Company may make principal repayments towards such liabilities amounting to approximately 25% of its quarterly cash flows from operating activities less capital expenditures.

During April 2005, we modified the terms of agreement under which we initially owed $5,762,753, $765,000 and $765,000 to Mark Nordlicht, our Chairman of the Board, Kevin Cassidy, our Chief Executive Officer, and Edward O'Connor, our President, respectively. The modified terms provide that, among other things, in the event of a Capital Raise-defined as the Company raising more than $1,000,000 additional equity or debt financing, the interest rate accrued after such event is reduced from 12% to 4.68%. Additionally, the modified terms provide that the Company may make principal repayments towards the due to Chairman of the Board, the due to its Chief Executive Officer, and the due to related party amounting to approximately 25% of its cash flows from operating cash flows less capital expenditures.

During 2005, in connection with the modified terms, the Company made principal repayments of $177,243 on the due to Mark Nordlicht, of which $69,638 was offset against an accounts receivable of one of the Company's clients, which is not affiliated with Mr. Nordlicht. Additionally, the Company made principal repayment of $203,803 and $53,803 on the due to Kevin Cassidy and due to Edward O'Connor, respectively.

During January 2006, in connection with the aforementioned agreements, The Company paid $600,000, which is in excess of the 25% of quarterly cash flow called for by the Agreements. The amounts repaid to each of the executive officers were as follows: Mr. Nordlicht, $200,000; Mr. O'Connor, $100,000; and Mr. Cassidy, $300,000.

We are parties to a Master Services Agreement with CES pursuant to which we provide brokerage services on the floor of the NYMEX (see "Description of Business - Business Alliances" for more information about this agreement). Edward O'Connor and Kevin Cassidy are co-owners of CES. Pursuant to this arrangement, our share of revenues and expenses of the floor brokerage services amounted to approximately $2.0 million and $860,000, respectively, during 2005, and $1.0 million and $467,000, respectively, during 2004. We have received $1.0 million and $250,000 from CES in connection with such floor brokerage services during 2005 and 2004, and CES owes us approximately $350,000 as of December 31, 2005.

The Company has recognized revenues from brokerage commissions of approximately $75,000, $9,000 and $21,000 during 2005 and $0, $36,000 and $29,000 from Northern Lights Energy LLC, Platinum Partners, L.P. and Fenmore Holdings LLC, respectively, entities in which Mark Nordlicht is also the managing partner. The aggregate amount owed to us from such entities amounted to approximately $41,000 as of December 31, 2005.

Pursuant to an agreement providing for the reimbursement of certain administrative expenses for services provided to a coffee bean roaster, Sleepy Hollow Coffee Roasters, Inc. ("Sleepy Hollow"), a company owned by Edward J. O'Connor and by Kevin P. Cassidy, we charged an administrative fee of $17,000

and $5,700 to Sleepy Hollow during 2005 and 2004, respectively. We provide such services to Sleepy Hollow to ensure that Edward O'Connor and Kevin Cassidy can focus as much time and efforts as possible on our operations.

29

On April 1, 2004, we entered into a Consulting Agreement with Kevin P. Cassidy whereby Mr. Cassidy was engaged by us for a period of five years as an OTC broker, marketing manager, and management consultant for $215,000 per year total compensation. We also reimburse Mr. Cassidy for his health insurance and a $1,000,000 life insurance policy during the term of the Consulting Agreement. Mr. Cassidy is also a Managing Director of CES. This agreement was terminated upon retaining Mr. Cassidy's services as our Chief Executive Officer in October 2005.Furthermore, we issued warrants to purchase 1,200,000 shares of our common stock to Pierpont Capital Corp., an entity owned by Mr. Cassidy. The warrants are exercisable at a price of $0.20 per share and expire in June 2007. The warrants are exercisable in six tranches of up to 200,000 warrants if certain trading milestones are met during three six-month periods following the issuance of such warrants, and were intended to induce Mr. Cassidy to introduce additional customers to us. We did not receive any cash consideration for the issuance of these warrants.

During April 2004, Edward O'Connor and Kevin P. Cassidy forfeited aggregate compensation of $375,000.

30

<PAGE>

ITEM 13. EXHIBITS

     The following exhibits are filed as part of, or are incorporated by reference into, this report:

Exhibit No.                        Description
-----------                        -----------

3(i)(a)          Certificate of Incorporation of Optionable, Inc., dated
                 February 4, 2000 (incorporated by reference to Exhibit 3(i)(a) to
                 the Registrant's Registration Statement on Form SB-2, filed
                 December 22, 2004, file no. 333-121543 (the "SB-2").

3(i)(b)          Certificate of Amendment to the Certificate of Incorporation
                 of Optionable, Inc., dated March 30, 2000 (incorporated by
                 reference to Exhibit 3(i)(b) to the SB-2).

3(i)(c)          Certificate of Amendment to the Certificate of Incorporation
                 of Optionable, Inc., dated May 31, 2000 (incorporated by
                 reference to Exhibit 3(i)(c) to the SB-2).

3(i)(d)          Certificate of Amendment to the Certificate of Incorporation
                 of Optionable, Inc., dated July 21, 2000 (incorporated by
                 reference to Exhibit 3(i)(d) to the SB-2).

3(i)(e)          Corrected Certificate of Amendment to the Certificate of
                 Incorporation of Optionable, Inc., dated January 31, 2003
                 (incorporated by reference to Exhibit 3(i)(e) to the SB-2).

3(i)(f)          Certificate of Amendment to the Certificate of Incorporation
                 of Optionable, Inc., dated June 9, 2004 (incorporated by
                 reference to Exhibit 3(i)(f) to the SB-2).

3(ii)            Amended and Restated By-laws of Optionable, Inc. (incorporated
                 by reference to Exhibit 3(ii) to the SB-2)

10(i)            Lease Agreement between 24 South Third Avenue Corp. and 60 3rd
                 Ave. Corp., as Lessor, and Optionable, Inc., as Lessee, dated
                 October 3, 2001 (incorporated by reference to Exhibit 10(i) to
                 the SB-2).

10(ii)(a)        Master Services Agreement with Capital Energy Services LLC,
                 dated April 1, 2004 including the Consulting Agreement as a part
                 thereof and Addendum, dated October 7, 2004 (incorporated by
                 reference to Exhibit 10(ii)(a) to the SB-2)

10(ii)(b)        Addendum to Master Services Agreement (incorporated by
                 reference to Exhibit 10(ii)(b) to the SB-2)

10(iii)(a)       Options Order Flow Agreement, dated July 1, 2004, between
                 the Company and Intercontinental Exchange,Inc. (incorporated by
                 reference to Exhibit 10(iii)(a) to the SB-2)

10(iii)(b)       Superseding Option Order Flow Agreement, dated as of March
                 2, 2005 (incorporated by reference to Exhibit 10(iii)(b) to the
                 SB-2

10(iv)(a)        Employment Agreement, as amended, between the Company and
                 Edward J. O'Connor (incorporated by reference to Exhibit
                 10(iv)(a) to the SB-2)

10(iv)(b)        Employment Agreement between the Company and Kevin P.
                 Cassidy (incorporated by reference to Exhibit 10(iv)(b) to the
                 SB-2)

10(iv)(b)(I)     Termination of Employment Agreement between the Company
                 and Kevin P. Cassidy (incorporated by reference to Exhibit
                 10(iv)(b)(I) to the SB-2)

10(iv)(b)(II)    Employment Agreement between the Company and Kevin P.
                 Cassidy (incorporated by reference to the Registrant's Current
                 Report on Form 8-K, dated as of October 30, 2005)

                                        31

<PAGE>

Exhibit No.                              Description
-----------                              -----------

10(v)(a)         Optionable, Inc. 2004 Stock Option Plan (incorporated by
                 reference to Exhibit 4.1 to the Registrant's Registration
                 Statement on Form S-8, file number 333-129853, as filed on
                 November 21, 2005 (the "S-8")

10(v)(b)         Form of Incentive Stock Option Agreement(incorporated by
                 reference to Exhibit 4.2 to the S-8)

10(v)(C)         Nonstatutory Stock Option Agreement(incorporated by reference
                 to Exhibit 4.3 to the S-8)

10(vi)           Prepaid Commission Agreement, dated February 3, 2003, between
                 the Company and Mark Nordlicht (incorporated by reference to
                 Exhibit 10(vi) to the SB-2).

10(vii)(a)       Revolving Credit Facility Agreement, dated June 5, 2003,
                 between the Company and Platinum Value Arbitrage Fund LP
                 (incorporated by reference to Exhibit 10(vii)(a) to the SB-2)

10(vii)(b)       $500,000 Revolving Promissory Note from the Company to
                 Platinum Value Arbitrage Fund LP dated June 5, 2003 (incorporated
                 by reference to Exhibit 10(vii)(b) to the SB-2)

10(viii)         Prepaid Commission Agreement, dated June 9, 2003, between
                 the Company and Platinum Partners Value Arbitrage Fund LLP
                 (incorporated by reference to Exhibit 10(viii) to the SB-2)

10(ix)(a)        Loan Agreement, dated February 13, 2004, between the Company
                 and Mark Nordlicht (incorporated by reference to Exhibit
                 10(ix)(a) to the SB-2)

10(ix)(b)        $250,000 Promissory Note, dated February 13, 2004, from the
                 Company to Mark Nordlicht (incorporated by reference to Exhibit
                 10(ix)(b) to the SB-2)

10(ix)(c)        $250,000 Promissory Note Extension Agreement, dated
                 September 9, 2004 (incorporated by reference to Exhibit 10(ix)(c)
                 to the SB-2)

10(x)(a)         Loan Agreement, dated March 8, 2004, between the Company and
                 Mark Nordlicht (incorporated by reference to Exhibit 10(x)(a) to
                 the SB-2)

10(x)(b)         $50,000 Promissory Note, dated March 8, 2004, from the
                 Company to Mark Nordlicht (incorporated by reference to Exhibit
                 10(x)(b) to the SB-2)

10(x)(c)         $50,000 Promissory Note Extension Agreement, dated September
                 9, 2004 (incorporated by reference to Exhibit 10(x)(c) to the
                 SB-2)

10(xi)(a)        Loan Agreement, dated March 22, 2004, between the Company
                 and Mark Nordlicht (incorporated by reference to Exhibit
                 10(xi)(a) to the SB-2)

10(xi)(b)      $5,621,753.18 Promissory Note, dated March 22, 2004, from
               the Company to Mark Nordlicht (incorporated by reference to
               Exhibit 10(xi)(b) to the SB-2)

10(xi)(c)      Addendum to Loan Agreement, dated March 22, 2004
               (incorporated by reference to Exhibit 10(xi)(c) to the SB-2)

10(xi)(d)      Addendum to Promissory Note, dated March 22, 2004
               (incorporated by reference to Exhibit 10(xi)(d) to the SB-2)

10(xii)(a)     Revolving Credit Facility Agreement, dated April 15, 2004,
               between the Company and Mark Nordlicht (incorporated by reference
               to Exhibit 10(xii)(a) to the SB-2)

10(xii)(b)     $50,000 Promissory Note, dated April 15, 2004, from the
               Company to Mark Nordlicht (incorporated by reference to Exhibit
               10(xii)(b) to the SB-2)

14             Code of Business Conduct and Ethics (filed herewith)

                                      32

<PAGE>

Exhibit No.                        Description
-----------                        -----------

23             Consent of Sherb & Co., LLP (filed herewith)

31.1           Rule 13a-14(a)/15d-14(a) Certification of the Principal Executive
               Officer of Optionable, Inc. (filed herewith)

31.2           Rule 13a-14(a)/15d-14(a) Certification of the Principal Financial
               Officer of Optionable, Inc. (filed herwith)

32.1           Section 1350 Certification of the Principal Executive Officer of
               Optionable, Inc The information contained in this Exhibit shall
               not be deemed filed with the Securities and Exchange Commission
               nor incorporated by reference in any registration statement filed
               by the registrant under the Securities Act of 1933, as amended.
               (filed herewith)

32.2           Section 1350 Certification of the Principal Financial Officer of
               Optionable, Inc The information contained in this Exhibit shall
               not be deemed filed with the Securities and Exchange Commission
               nor incorporated by reference in any registration statement filed
               by the registrant under the Securities Act of 1933, as amended.
               (filed herewith)


ITEM 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES

The firm Sherb & Co., independent auditor, has audited our financial statements
for the years ended June 30, 2004 and 2005. The Board of Directors has appointed
Sherb & Co. to serve as our independent auditors for the 2004 year-end audit and
to review our quarterly financial reports for filing with the Securities and
Exchange Commission during fiscal year 2005.

The following table shows the fees paid or accrued by us for the audit and other
services provided by Sherb & Co. for fiscal year 2005 and 2004.

|                         |     | 2005   |     | 2004   |
|-------------------------|-----|--------|-----|--------|
| Audit Fees(1)           | $   | 66,500 | $   | 38,000 |
| Audit-Related Fees      |     | --     |     | --     |
| Tax Fees                |     | --     |     | --     |
| All Other Fees (2)      |     | 645    |     | 590    |
| Total                   | $   | 67,145 | $   | 38,590 |

------------------
(1)  Audit fees represent fees for professional services provided in connection
     with the audit of our annual financial statements and review of our
     quarterly financial statements and audit services provided in connection
     with other statutory or regulatory filings.

(2)  All Other Fees represent edgarization services related to the certain
     statutory and regulatory filings.

          Pre-Approval of Non-Audit Services

The Company does not currently have an audit committee in place and thus,

management must obtain the specific prior approval of the Board of Directors for each engagement of the independent auditor to perform any non-audit services that exceed any pre-approved amounts determined by the Board of Directors.

34

<PAGE>

SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on the 15th day of March, 2006.

OPTIONABLE, INC.

By: /s/ Kevin Cassidy
Name: Kevin Cassidy
Title: Chief Executive Officer

In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|-----------|-------|------|
| /s/ Mark Nordlicht<br>------------------<br>Mark Nordlicht | Chairman of the Board | March 15, 2006 |
| /s/ Kevin Cassidy<br>-----------------<br>Kevin Cassidy | Chief Executive Officer and Director | March 15, 2006 |
| /s/ Edward O'Connor<br>---------------------<br>Edward O'Connor | President and Director | March 15, 2006 |
| /s/ Albert Helmig<br>-----------------<br>Albert Helmig | Director | March 15, 2006 |
| s/s Marc-Andre Boisseau<br>-----------------------<br>Marc-Andre Boisseau | Chief Financial Officer | March 15, 2006 |

35

<PAGE>

OPTIONABLE, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Report of Independent Registered Public Accounting Firm.....................F-1

Balance Sheet..............................................................F-2

Statements of Operations...................................................F-3

Statement of Stockholders' Deficit.........................................F-4

Statements of Cash Flows...................................................F-5

Notes to Financial Statements..............................................F-6

<PAGE>

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and Board of Directors

Optionable, Inc.
Briarcliff Manor, New York

We have audited the accompanying balance sheet of Optionable, Inc. as of
December 31, 2005 and the related statements of operations, stockholders' equity
and cash flows for the years ended December 31, 2005 and 2004. These financial
statements are the responsibility of the Company's management. Our
responsibility is to express an opinion on these financial statements based on
our audit.

We conducted our audit in accordance with the standards of the Public Company
Accounting Oversight Board (United States). Those standards require that we plan
and perform the audit to obtain reasonable assurance about whether the financial
statements are free of material misstatement. An audit includes examining, on a
test basis, evidence supporting the amounts and disclosures in the financial
statements. An audit also includes assessing the accounting principles used and
significant estimates made by management, as well as evaluating the overall
financial statement presentation. We believe that our audits provide a
reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in
all material respects, the financial position of Optionable, Inc. as of December
31, 2005 and the results of their operations and their cash flows for the years
ended December 31, 2005 and 2004, in conformity with accounting principles
generally accepted in the United States of America.

                                    /s/ Sherb & Co., LLP
                                    ----------------------------
                                    Sherb & Co., LLP
                                    Certified Public Accountants

New York, New York
February 16, 2006

                              F-1

<PAGE>


                         OPTIONABLE, INC.
                          BALANCE SHEET
                        December 31, 2005


                             ASSETS
Current Assets:
Cash                                          $      1,811,453
Accounts receivable, net of provision
 for doubtful accounts of $67,420                     352,332
Due from related party                                303,572
Incentives receivable                                 154,783
                                              ------------------

     Total current assets                           2,622,140

 Property and equipment, net of accumulated
 depreciation of $425,696                              41,185
Other receivable                                      150,000
Other assets                                           49,089
                                              ------------------

     Total assets                             $     2,862,414
                                              ==================

                  LIABILITIES AND STOCKHOLDERS' EQUITY

Current Liabilities:
 Accounts payable and accrued expenses        $       104,985
 Accrued compensation                                 360,555
                                              ------------------

     Total current liabilities                        465,540

Due to chairman of the board, net of unamortized
discount of $3,522,542                              1,921,968
Due to executive officer, net of unamortized
discount of $477,796                                  230,902
Due to chief executive officer, net of
unamortized discount of $477,796                       80,901
                                              ------------------

| | |
|---|---:|
| Total liabilities | 2,699,311 |

Stockholders' Equity:
  Preferred Stock; $.0001 par value, 5,000,000
  shares authorized, none issued
    and outstanding                                                    –
  Common stock; $.0001 par value, 100,000,000
  shares authorized,
    51,406,431 issued and outstanding                            5,141
  Additional paid-in capital                                  7,946,471
  Accumulated deficit                                        (7,788,509)
                                                             ------------------

      Total stockholders' equity                               163,103
                                                             ------------------

      Total liabilities and stockholders' equity         $   2,862,414
                                                             ==================


                    See Notes to Financial Statements.
                                  -F-2-

<PAGE>

                              OPTIONABLE, INC.
                         STATEMENTS OF OPERATIONS

|  | For the Year Ended December 31, | |
|---|---:|---:|
|  | 2005 | 2004 |
| Brokerage fees | $  3,085,296 | $  1,885,489 |
| Brokerage fees-related party | 1,981,560 | 1,011,014 |
| Incentives | 738,558 | 597,734 |
| Net revenues | 5,805,414 | 3,494,237 |
| Cost of revenues | 2,264,110 | 1,614,073 |
| Cost of revenues-related party | 856,763 | 466,610 |
|  | 3,120,873 | 2,080,683 |
| Gross profit | 2,684,541 | 1,413,554 |
| Operating expenses: |  |  |
| Selling, general and administrative | 695,718 | 776,908 |
| Research and development | 450,488 | 116,520 |
| Total operating expenses | 1,146,206 | 893,428 |
| Operating income | 1,538,335 | 520,126 |
| Other income (expense): |  |  |
| Gain on extinguishment of debt | – | 238,282 |
| Interest income | 21,548 | 1,836 |
| Interest expense to related parties | (300,319) | (276,471) |
|  | (278,771) | (36,353) |
| Net income | $  1,259,564 | $  483,773 |
| Basic earnings per common share | $  0.02 | $  0.01 |

```
Diluted earnings per common share    $        0.02    $        0.01
                                     ===================  ===================
```

```
Basic weighted average common
shares outstanding                        51,406,431        47,170,951
                                     ===================  ===================
```

```
Diluted weighted average common
shares outstanding                        51,524,732        47,170,951
                                     ===================  ===================
```

See Notes to Financial Statements.
-F-3-

<PAGE>

OPTIONABLE, INC.
STATEMENT OF CHANGES IN SHAREHOLDERS' EQUITY (DEFICIT) From
January 1, 2004 to December 31, 2005

<TABLE>
<CAPTION>

|  | Common Stock | | Additional | Accumulated |
|  | Shares | $ | Paid-in Capital | Losses |
| --- | --- | --- | --- | --- |
| <S>                              <C> | <C> | <C> | <C> | <C> |
| Opening balance, January 1, 2004 | 45,096,430 | $    4,510 | $   2,698,938 | $  (9,531,846 |
| Issuance of common stock pursuant to a private placement | 6,310,001 | 631 | 1,251,369 | - |
| Distribution | - | - | (462,067) | - |
| Fair value of unamortized discount on due to chairman of the board | - | - | 3,918,391 | - |
| Fair value of warrants issued to related party | - | - | 2,780 | - |
| Forfeiture of officers' compensation | - | - | 375,000 | - |
| Net income | - | - | - | 483,773 |
| Balance at December 31, 2004 | 51,406,431 | 5,141 | 7,784,411 | (9,048,073 |
| Fair value of warrants issued to related party | - | - | 162,060 | - |
| Net income | - | - | - | 1,259,564 |
| Ending balance, December 31, 2005 | 51,406,431 | $    5,141 | $   7,946,471 | $  (7,788,509 |

</TABLE>

See Notes to Financial Statements
-F-4-

<PAGE>

OPTIONABLE, INC.
STATEMENTS OF CASH FLOWS

|  | For the Year Ended December 31, | |
| --- | --- | --- |
|  | 2005 | 2004 |

```
Cash flows from operating activities:
Net income                              $    1,259,564    $      483,773
Adjustments to reconcile net income to net
```

cash provided by
operating activities:

| | | |
|---|---:|---:|
| Depreciation | 32,519 | 51,921 |
| Amortization of debt discount | 300,320 | 202,869 |
| Forfeiture of officers' compensation | – | 375,000 |
| Gain on extinguishment of debt | – | (238,282) |
| Provision for doubtful accounts | (22,554) | 35,251 |
| Fair value of warrants issued to consultant | 162,060 | 2,780 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (133,194) | (128,998) |
| Due from related party | (9,997) | (293,575) |
| Incentives receivable | (23,107) | (131,676) |
| Other receivable | (150,000) | – |
| Other assets | (36,133) | (11,349) |
| Accounts payable and accrued expenses | (25,701) | (556,075) |
| Accrued compensation | 12,838 | 325,297 |
| Accrued interest on notes payable to related parties | – | 3,628 |
| | ---------------- | ---------------- |
| Net cash provided by operating activities | 1,366,615 | 120,564 |
| | ---------------- | ---------------- |
| Cash flows used in investing activity: | | |
| Purchases of property and equipment | (27,439) | (28,479) |
| | ---------------- | ---------------- |
| Net cash used in investing activity | (27,439) | (28,479) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from line of credit payable to chairman of the board | – | 50,000 |
| Proceeds from issuance of shares of common stock | – | 1,252,000 |
| Principal repayments of due to chief executive officer | (203,803) | (500,000) |
| Principal repayments of line of credit payable to chairman of the board | – | (50,000) |
| Principal repayments of due to executive officer | (53,803) | – |
| Principal repayments of note payable to chairman of the board | – | (300,000) |
| Principal repayment of due to chairman of the board | (177,243) | – |
| Proceeds from issuance of notes payable to chairman of the board | – | 300,000 |
| | ---------------- | ---------------- |
| Net cash (used in) provided by financing activities | (434,849) | 752,000 |
| | ---------------- | ---------------- |
| Net increase in cash | 904,327 | 844,085 |
| Cash, beginning of year | 907,126 | 63,041 |
| | ---------------- | ---------------- |
| Cash, end of year | $ 1,811,453 | $ 907,126 |
| | ================ | ================ |
| Supplemental disclosures of cash flow information: | | |
| Cash paid for taxes | $ – | $ – |
| | ================ | ================ |
| Cash paid for interest | $ – | $ 69,972 |
| | ================ | ================ |
| Supplemental disclosures for non-cash financing activity: | | |
| Increase in due to related party and corresponding increase in additional paid-in capital | $ – | $ 462,067 |

```
                                         ===============  ===============

Increase in discount on due to chairman
of the board and corresponding increase
in additional paid-in capital            $            -  $    3,918,391
                                         ===============  ===============
```

See Notes to Financial Statements.

-F5-

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004

Note 1-Organization and Description of Business

Optionable, Inc. (the "Company") was formed in Delaware in February 2000 and is a trading and brokerage services provider to brokerage firms, financial institutions, energy traders, and hedge funds nationwide. The Company's operations are located in the New York metropolitan area. The Company is in the process of finalizing the development of an automated electronic trading system.

Note 2- Summary of Significant Accounting Policies

Cash and Cash Equivalents

The Company considers all highly liquid investments with original maturities of three months or less to be cash equivalents.

Concentration of Credit Risks

The Company is subject to concentrations of credit risk primarily from cash and cash equivalents, accounts receivable, incentives receivable, due from related party and other receivable.

The Company's cash and cash equivalents accounts are held at financial institutions and are insured by the Federal Deposit Insurance Corporation ("FDIC") up to $100,000. During 2005, the Company has reached bank balances exceeding the FDIC insurance limit. To reduce its risk associated with the failure of such financial institutions, the Company periodically evaluates the credit quality of the financial institutions in which it holds deposits.

The Company's accounts receivable are due from energy trading firms, financial institutions, and hedge funds, located primarily in the United States. Collateral is generally not required. Three of the Company's customers accounted for 27%, 14%, and 12%, respectively, of its accounts receivable at December 31, 2005. No other customers accounted for more than 10% of its accounts receivable at December 31, 2005.

-F6-

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004

Note 2- Summary of Significant Accounting Policies-Continued

The Company's incentives receivable are due from two United States exchanges providing the Company with incentives to submit customer trades to their respective platform. The incentives receivable are not collateralized.

The due from related party is due from an affiliate owned by the Company's chief executive officer and by an executive officer of the Company, who are both stockholders of the Company. The due from related party is not collateralized.

The other receivable is due from an employee of a related party, a company owned by the Company's chief executive officer and by an executive officer. It is used as a $100,000 deposit with a United States exchange and a $50,000 deposit with a clearinghouse. It is secured by cash accounts.

Customer Concentration

One of the Company's customers accounted for 18% and 10% of its revenues during 2005 and 2004, respectively. The Company minimizes its customer concentration risks by diversifying its existing customer base.

Product Concentration

All of the Company's revenues are derived from fees earned from energy derivatives transaction fees and related incentives provided by exchanges.

Fair Value of Financial Instruments

The carrying value of cash and cash equivalents, accounts receivables, incentives receivable, due from related party, other receivable, accounts payable and accrued expenses, and accrued compensation approximate their fair value due to their short-term maturities. The carrying amount of due to Chairman of the board, due to chief executive officer, and due to related party approximate fair value based on the Company's incremental borrowing rate.

Provision for Doubtful Accounts

The Company establishes a provision for estimated doubtful accounts concurrently with the recognition of revenues. The provision is established based upon consideration of various factors, including recent and historical payment rates for each of the Company's clients and in aggregate and the impact of new financial and economic conditions on its client base.

Reclassifications

Certain reclassifications of items in the prior years' financial statements have been made to conform to the current year's presentation.

-F7-

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004

Note 2- Summary of Significant Accounting Policies-Continued

Software Development Costs

Costs incurred in the research and development of software products are expensed as incurred until technological feasibility has been established. After technological feasibility is established, any additional costs are capitalized in accordance with Statement of Accounting Financial Standards ("SFAS") No. 86, Accounting for the Costs of Computer Software to Be Sold, Leased or Otherwise Marketed. Costs of maintenance and customer support will be charged to expense when related revenue is recognized or when those costs are incurred, whichever occurs first. The Company believes that the current process for developing software is essentially completed simultaneously with the establishment of technological feasibility; accordingly, no software development costs have been capitalized at December 31, 2005.

The Company has outsourced the research and development of its software to outside consultants under agreements which can be terminated under short notices and provide for fees based on the Company's use of the consultants' resources. The Company has incurred expenses of approximately $350,000 and $115,000, during 2005 and 2004, respectively, pursuant to such agreements.

Property and Equipment

Property and equipment are recorded at cost and are depreciated on a straight-line basis over their estimated useful lives of three to five years. Maintenance and repairs are charged to expense as incurred. Significant renewals and betterments are capitalized.

Property and equipment consist of the following as of December 31, 2005:

| | |
|---|---|
| Computer equipment and software | $418,461 |
| Office furniture and equipment | 48,420 |
| | -------- |
| | 466,881 |

```
Accumulated depreciation                                          425,696
                                                                 - -------
                                                                 $ 41,185
                                                                 ========
```

Depreciation expense amounted to approximately $33,000 and $52,000 during 2005 and 2004, respectively.

Income Taxes

Income taxes are accounted for in accordance with SFAS No. 109, Accounting for Income Taxes. SFAS No. 109 requires the recognition of deferred tax assets and liabilities to reflect the future tax consequences of events that have been recognized in the Company's financial statements or tax returns. Measurement of the deferred items is based on enacted tax laws. In the event the future consequences of differences between financial reporting bases and tax bases of the Company's assets and liabilities result in a deferred tax asset, SFAS No. 109 requires an evaluation of the probability of being able to realize the future benefits indicated by such assets. A valuation allowance related to a deferred tax asset is recorded when it is more likely than not that some or the entire deferred tax asset will not be realized.

-F8-

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004

Note 2- Summary of Significant Accounting Policies-Continued

Use of Estimates

The preparation of financial statements in accordance with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Significant estimates made by management include, but are not limited to, the realization of receivables. Actual results will differ from these estimates.

Basic and Diluted Earnings per Share

Basic earnings per share are calculated by dividing income available to stockholders by the weighted-average number of common shares outstanding during each period. Diluted earnings per share are computed using the weighted average number of common and dilutive common share equivalents outstanding during the period. Dilutive common share equivalents consist of shares issuable upon the exercise of stock options and warrants (calculated using the modified-treasury stock method). The outstanding options amounted to 791,000 and 780,250 at December 31, 2005 and 2004, respectively. The outstanding warrants amounted to 1,000,000 and 550,000 at December 31, 2005 and 2004, respectively. The outstanding options and warrants at December 31, 2004 are excluded from the loss per share computation for the respective periods due to their antidilutive effect.

The following sets forth the computation of basic and diluted earnings per share:

|  | 2005 | 2004 |
|---|---|---|
| | ---- | ---- |
| Numerator: | | |
| Net income | $1,259,564 | $483,773 |
| | ========== | ======== |
| Denominator: | | |
| Denominator for basic earnings per share- | | |
| Weighted average shares outstanding | 51,406,431 | 47,170,591 |
| Effect of dilutive employee stock options | 71,525 | 0 |
| Effect of dilutive warrants | 46,776 | 0 |
| | ---------- | ---------- |
| Denominator for diluted earnings per share- | | |
| Weighted average shares outstanding | 51,524,732 | 47,170,591 |
| | ========== | ========== |

```
Basic earnings per share                        $0.01          $0.02
                                                =====          =====
Diluted earnings per share                      $0.01          $0.02
                                                =====          =====
Anti-dilutive weighted-average shares               0        100,000
                                                =====        =======
```

The share amounts included in the financial statements, including the basic and
diluted loss per share have been retroactively restated to reflect the stock
splits discussed below.


                                      -F9-

<PAGE>

                               OPTIONABLE, INC.
                         NOTES TO FINANCIAL STATEMENTS
                          December 31, 2005 and 2004

Note 2- Summary of Significant Accounting Policies-Continued

Stock Splits

The Company's board of directors declared the following split of the Company's
common stock:

          June 10, 2004                   1.27 for 1

The basic and diluted earnings per share have been adjusted retroactively to
give effect to this stock spilt.

Revenue Recognition

Revenue is recognized when earned. The Company's revenue recognition policies
are in compliance with the Securities and Exchange Commission's Staff Accounting
Bulletin ("SAB") No. 104 "Revenue Recognition".

The Company generally invoices its customers monthly, for all transactions which
have been executed during such month. Revenues are recognized on the day of
trade-trade date basis. The Company's revenues derive from a certain
predetermined fixed fee of the transactions it executes on behalf of its
customers. The fee is based on the volume of financial instruments traded. The
Company bases its fees on oral and written contracts and confirms the fees in
writing upon the execution of each transaction.

The Company also receives incentives from United States exchanges for the volume
of transactions conducted by the Company using their platform. The incentives
are based on a percentage of the total revenues received by the exchange
attributable to the Company's volume of transactions submitted to the respective
exchanges. The Company estimates monthly such incentives based on the volume of
daily transactions submitted to the respective exchanges using the day of
trade-trade date basis, and the exchanges' published revenues by type of
transactions. The Company, pursuant to SAB 104, realizes the incentive revenues
realized or realizable when the all of the following criteria are met:

     1) Persuasive evidence of an arrangement exists. The Company has a written
separate agreement with one of the exchanges. The other exchange has publicly
published the terms of its incentive program in 2003, which were modified in
2005 and are offered to all intermediaries in the select transactions;

     2) Delivery has occurred or services have been rendered. Under arrangements
with both exchanges, the incentives are earned on the day the Company submits
transactions to the respective exchanges based on the revenues generated from
such transactions and are no longer subject to minimum volume of transactions to
the respective exchanges. The Company accounts for all transactions submitted to
each exchange on a daily basis. Accordingly, the Company is able to determine
when the incentives are earned based on the date it submits transactions to the
exchanges. The Company has no other obligations to the exchanges to earn the
incentives;

     3) "Seller's" price to the buyer is fixed or determinable. Based on the
incentive program terms of each exchange, their published prices for the type of
transactions the Company submits to them, and the Company's transactions
records, the Company is able to estimate the revenues each exchange earns in
connection with the transactions it submits, and accordingly, the amount, if any
of the incentives the Company earns in connection with such transactions; and

4) Collectibility is reasonably assured. Historically, both exchanges have paid the Company timely on incentives earned. The Company has no knowledge that they do not intend to pay these incentives, if earned, in the future. Furthermore, the Company intends to enforce the payment of any incentives receivable under the incentive programs.

Stock-Based Compensation

The Company accounts for stock options issued to employees in accordance with the provisions of Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations. As such, compensation cost is measured on the date of grant as the excess of the current market price of the underlying

-F10-

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004

Note 2- Summary of Significant Accounting Policies-Continued

stock over the exercise price. Such compensation amounts, if any, are amortized over the respective vesting periods of the option grant. The Company adopted the disclosure provisions of SFAS No. 123, "Accounting for Stock-Based Compensation" and SFAS 148, "Accounting for Stock-Based Compensation -Transition and Disclosure", which permits entities to provide pro forma net income and pro forma earnings per share disclosures for employee stock option grants as if the fair-valued based method defined in SFAS No. 123 had been applied. The Company accounts for stock options and stock issued to non-employees for goods or services in accordance with the fair value method of SFAS 123.

Accounts Payable and Accrued Expenses

Accounts payable and accrued expenses at December 31, 2005 consist primarily of accrued trade payables.

Segment reporting

The Company operates in one segment, brokerage services. The Company's chief operating decision-maker evaluates the performance of the Company based upon revenues and expenses by functional areas as disclosed in the Company's statements of operations.

Recent Pronouncements

In December 2004, the FASB issued SFAS 123 (revised 2004) "Share-Based Payment". This Statement requires that the cost resulting from all share-based transactions be recorded in the financial statements. The Statement establishes fair value as the measurement objective in accounting for share-based payment arrangements and requires all entities to apply a fair-value-based measurement in accounting for share-based payment transactions with employees. The Statement also establishes fair value as the measurement objective for transactions in which an entity acquires goods or services from non-employees in share-based payment transactions. The Statement replaces SFAS 123 "Accounting for Stock-Based Compensation" and supersedes APB Opinion No. 25 "Accounting for Stock Issued to Employees". The provisions of this Statement will be effective for the Company beginning in the first quarter of 2006. The Company is currently evaluating the impact this new Standard will have on its financial position, results of operations or cash flows.

Note 3-Due from Related Party

In April 2004, under the Master Services Agreement, the Company agreed to pay certain fixed and variable fees and support services to a related party entity partly owned by its Chief Executive Officer and by an Executive Officer in exchange for a share of revenues of the floor brokerage services of the related party. The fixed fees the Company has agreed to pay amount to $50,000 per year.

The Company's share of revenues and expenses of the floor brokerage services amounted to approximately $2.0 million and $850,000, during 2005 and 2004, respectively. The Company has received approximately $1.0 million from the related party in connection with such floor brokerage services during 2005 and the related party owed approximately $300,000 at December 31, 2005.

-F11-

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004


Note 3-Due from Related Party-continued

The Company recognizes its share of revenues of the floor brokerage services based on the commissions earned for such services which are recognized on the day of the trade-trade date basis.


Note 4-Other Receivable

The Company's other receivable consists of amounts due from a broker employed by a related party, an entity owned by our Chief Executive Officer and by an Executive Officer. This other receivable funded security deposits of $100,000 held at a US exchange and $50,000 held at a clearinghouse, which are required for the Company's floor operations.

Note 5-Due to Related Parties

The terms and amounts of due to related parties at December 31, 2005 are as follows:

Due to Chairman of the Board, non-interest bearing, unsecured, payable by March 12, 2014, if the Company obtains additional equity or debt financing of at least $1,000,000 following the private placement which closed in September 2004 ("Capital Raise"), the Company will repay its Chairman of the Board up to 39.33% of the Capital Raise, up to $2,810,877, with the remaining balance and accrued interest of 4.68% from the date of the Capital Raise due on March 22, 2014:                                                              $5,444,510
Discount, using initial implied rate of 12%:                   (3,522,542)
                                                               -----------
                                                                $1,921,968
                                                               ===========


Due to Executive Officer, non-interest bearing, unsecured, payable by March 12, 2014, if the Company obtains additional equity or debt financing of at least $1,000,000 following a Capital Raise, the Company will repay its Executive Officer up to 5.3% of the Capital Raise, up to $381,250, with the remaining balance and accrued interest of 4.68% from the date of the Capital Raise due on March 22, 2014:                 $708,698
Discount, using initial implied rate of 12%:                     (477,796)
                                                                 ---------
                                                                  $230,902
                                                                 =========


-F12-

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004


Note 5-Due to Related Parties-continued

Due to Chief Executive Officer, non-interest bearing, unsecured, payable by March 12, 2014, if the Company obtains additional equity or debt financing of at least $1,000,000 following a Capital Raise, the Company will repay its Chief Executive Officer up to 5.3% of the Capital Raise, up to $381,250, with the remaining balance and accrued interest of 4.68% from the date of the Capital Raise due on March 22, 2014:                                         $558,697
Discount, using initial implied rate of 12%:                     (477,796)
                                                                 ---------
                                                                 $ 80,901
                                                                 =========


During March 2004, the Company entered into a loan agreement with its Chairman

of the Board pursuant to which we consolidated various amounts due to him into a single loan of $5,621,753. The due to Chairman of the Board does not currently bear interest and will only bear interest if the Capital Raise occurs. Accordingly, in March 2004, the Company recorded a discount on the due to Chairman of the Board of approximately $3.9 million and a corresponding increase in additional paid-in capital. The due to Chairman of the board was discounted using the initial implied rate of 12% over ten years.

During March 2004, the Company entered into a Master Services Agreement pursuant to which the Company will pay to a related party owned by its Chief Executive Officer and Executive Officer $1,525,000. The Company has recorded a discount on this due to related party of approximately $1.0 million in April 2004 and a corresponding decrease in additional paid-in capital. The payable to the related party was discounted using the implied rate of 12% over ten years

During April 2005, the Company modified the terms of its due to related parties comprising of amounts owed to the Chairman of the Board and pursuant to the Master Services Agreement. The modified terms provide that, in the event of a Capital Raise, among other things, the interest rate accrued after such event is reduced from 12% to 4.68%. Additionally, the modified terms provide that the Company may make principal repayments towards the due to Chairman of the Board, the due to its Chief Executive Officer, and the due to related party amounting to approximately 25% of its cash flows from operating cash flows less capital expenditures.

In June 2003, the Company issued a $500,000 note payable to a related party, an entity in which its Chairman of the Board is also the managing director. The note payable bore interest at 20% and was payable by September 30, 2004. Such note payable was unsecured. The Company repaid the principal and related accrued interest amounting to approximately $70,000 during 2004.

In February and March 2004, the Company's Chairman of the Board advanced the Company $250,000 and $50,000, respectively, to finance the settlement amount related to obligations with a former contractor and with the payment of certain legal fees incurred in connection with the retention of their corporate counsel. Such advances were non-interest bearing and were due on or before December 31, 2004. The Company repaid the advances of $250,000 and $50,000 in October 2004 and December 2004, respectively.

In April 2004, the Company secured a $100,000 credit facility with its Chairman of the Board. The Company has drawn $50,000 under such credit facility. The credit facility was non-interest bearing and was due on or before December 31, 2004. The Company repaid the credit facility of $50,000 in December 2004.

The amortization of the discount on the due to related parties amounted to approximately $300,000 and $200,000 during 2005 and 2004, respectively, and has been recorded as interest expense to related parties in the accompanying statements of operations.

Interest expense, other than the amortization of discount, in connection with the various amounts due to Chairman of the Board and note payable to a related party, an entity in which the Company's Chairman of the Board is also the managing director amounted to approximately $0 and $74,000 during 2005 and 2004, respectively.

-F13-

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004

Note 5-Due to Related Parties-continued

During 2005, in connection with the modified terms, the Company made principal repayments of $177,243 on the due to its Chairman of the Board, of which $69,638 was offset against an accounts receivable of one of the Company's clients, which is an unrelated party. Additionally, the Company made principal repayment of $203,803 and $53,803 on the due to Chief Executive Officer and due to Executive Officer, respectively.

During January 2006, the Company made principal repayments amounting to $600,000 towards its due to related parties.

Note 6- Other Related Party Transactions

The Company has recognized revenues of approximately $106,000 and $65,000 during 2005 and 2004, respectively, from three related parties, entities in which its Chairman of the Board is also the managing director. Such related parties owe the Company approximately $41,000 at December 31, 2005.

The Company provides administrative services to a related party, an entity owned by the Company's Chief Executive Officer and an Executive Officer. The Company charged approximately $17,000 and $6,000 during 2005 and 2004, respectively, for such services. The related party owes the Company approximately $7,000 at December 31, 2005. Furthermore, the Company has purchased goods of approximately $1,000 from this related party during 2005.

Note 7-Other Transactions

The Company has recognized revenues of approximately $150,000 during 2004 from two unrelated customers. These customers used the services of the Company at the request of its Chairman of the Board, who is also unrelated to the customers. Such customers do not owe money to the Company as of December 31, 2005.

Note 8- Stockholders' Equity

Stock Compensation Plan

During November 2004, the Company adopted its 2004 Stock Option Plan ("2004 Plan"). The 2004 Plan allows for the grant of both incentive stock options and nonstatutory stock options. The 2004 Plan may be administered, interpreted and construed by the Board of Directors or a compensation committee. The maximum number of shares of common stock which may be issued pursuant to options granted under the 2004 Plan may not exceed 7,500,000 shares.

If any options granted under the 2004 Plan expire or terminate without having been exercised or ceased to be exercisable, such options will be available again under the 2004 Plan. All employees of the Company and its subsidiaries are eligible to receive incentive stock options and nonstatutory stock options. Non-employee directors and outside consultants who provided bona-fide services not in connection with the offer or sale of securities in a capital raising transaction are eligible to receive nonstatutory stock options. Incentive stock options may not be granted below their fair market value at the time of grant or, if to an individual who beneficially owns more than 10% of the total combined voting power of all stock classes of the Company or a subsidiary, the option price may not be less than 110% of the fair value of the common stock at the time of grant. The expiration date of an incentive stock option may not be longer than ten years from the date of grant. Option holders, or their representatives, may exercise their vested options up to three months after their employment termination or one year after their death or permanent and total disability. The 2004 Plan provides for adjustments upon changes in capitalization.

The following pro forma information regarding stock-based compensation has been determined as if the Company had accounted for its employee stock options under the fair value method pursuant to SFAS 123. For purposes of the proforma calculations, the fair value of each option granted in 2005 and 2004 was estimated at the date of grant using the Black-Scholes model with the following assumptions used: risk-free interest rate: 4.04% and 2.78%, respectively; dividend yield: none; volatility: none (at the date of grant) ; expected lives: 3 years.

-F14-

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004

Note 8- Stockholders' Equity-continued

No stock-based employee compensation cost is reflected in net income, as all options granted under the Company's plans had an exercise price equal to or above market value of the underlying common stock on the date of grant. Had compensation cost for the Company's stock-based compensation plans been determined based on the fair value at the grant dates for grants under those plans consistent with the method of SFAS No. 123, the Company's cash flows would have remained unchanged; however net income and earnings per share would have been reduced to the pro forma amounts indicated below:

<TABLE>
<CAPTION>

|  | 2005 | 2004 |
|---|---|---|
| <S> | <C> | <C> |
| Net income as reported: | $1,259,564 | $ 483,773 |
| Deduct: Total stock-base employee compensation expense determined under fair value based method for all awards, net of related tax effects | ( 4,338) | ( -) |
| Net income pro forma | $1,255,226 | $ 483,773 |

```
                                                    ============    ===========
Earnings per share:
Basic                                                  $0.02           $0.01
                                                       =====           =====
Diluted                                                $0.02           $0.01
                                                       =====           =====
</TABLE>
```

The fair value per option attributed to options issued during 2005 and 2004 amounted to $0.02 and $0, respectively.

A summary of the activity during 2005 and 2004 of the Company's stock option plan is presented below:

|                                       | Options        | Weighted Average Exercise Price |
|---------------------------------------|----------------|---------------------------------|
| Outstanding at January 1, 2004        | 1,104,900      | $0.09                           |
| Granted                               | 780,250        | 0.20                            |
| Exercised                             | -              | -                               |
| Expired   or cancelled                | ( 1,104,900)   | 0.09                            |
| Outstanding at December 31, 2004      | 780,250        | 0.20                            |
| Granted                               | 150,000        | 0.30                            |
| Exercised                             | -              | -                               |
| Expired   or cancelled                | ( 139,250)     | 0.24                            |
| Outstanding at December 31, 2005      | 791,000        | $0.21                           |
| Exercisable at December 31, 2004      | 261,833        | $0.20                           |
| Exercisable at December 31, 2005      | 432,667        | $0.20                           |

The weighted average remaining contractual life and weighted average exercise price of options outstanding at December 31, 2005, for selected exercise price ranges, is as follows:

Options outstanding:
```
<TABLE>
<CAPTION>
```

| Range of exercise prices | Number of options | Weighted average remaining contractual life | Weighted average exercise price |
|--------------------------|-------------------|---------------------------------------------|---------------------------------|
| <S>        <C>           | <C>               |                                             | <C>                             |
| $0.20                    | 691,000           | indefinite                                  | $ 0.20                          |
| 0.30                     | 100,000           | indefinite                                  | 0.30                            |

```
</TABLE>
```

                                    -F15-

```
<PAGE>
```

                            OPTIONABLE, INC.
                    NOTES TO FINANCIAL STATEMENTS
                      December 31, 2005 and 2004

Note 8- Stockholders' Equity-continued

Warrants

In June and July 2004, the Company issued warrants to one of its shareholders. The warrants are exercisable for up to 1,200,000 shares of common stock at an exercise price of $0.20 per share and expire in June 2007. The warrants are exercisable in six trunches of up to 200,000 warrants if certain trading milestones are met during three six-month periods following the issuance of such warrants. There are 450,000 warrants exercisable as of December 31, 2005.

In June 2004, the Company cancelled the grant of 1,104,900 options made to a former employee and replaced it with the issuance of 100,000 warrants. The warrants are convertible into 100,000 shares of common stock at an exercise price of $0.20 per share and expire in July 2010.

The value attributed to such warrants amounted to approximately $162,000 and

$3,000 during 2005 and 2004, respectively, and is included in selling, general, and administrative expenses. The fair value of such warrants at the date they became exercisable was determined using the Black-Scholes model with the following assumptions used: risk-free interest rate: 2.78% to 4.37%; dividend yield: none; volatility: none to 57%; expected lives: 3 years.

A summary of the activity during 2005 and 2004 of the Company's warrants is presented below:

|  | Warrants | Weighted Average Exercise Price |
|---|---|---|
| Outstanding at January 1, 2004 | - | $ - |
| Granted | 1,300,000 | 0.20 |
| Exercised | - | - |
| Expired or cancelled | (300,000) | 0.20 |
| Outstanding at December 31, 2004 | 1,000,000 | 0.20 |
| Granted | - | 0.20 |
| Exercised | - | - |
| Expired or cancelled | (450,000) | 0.20 |
| Outstanding at December 31, 2005 | 550,000 | $0.20 |
| Exercisable at December 31, 2004 | 200,000 | $0.20 |
| Exercisable at December 31, 2005 | 550,000 | $0.20 |

The weighted average remaining contractual life and weighted average exercise price of warrants outstanding at December 31, 2005, for selected exercise price ranges, is as follows:

Warrants:

| Range of exercise prices | Number of warrants | Weighted average remaining contractual life | Weighted average exercise price |
|---|---|---|---|
| $0.20 | 550,000 | 2.06 years | $ 0.20 |

-F16-

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004

Note 9- Commitments

During October 2005, the Company named a new Chief Executive Officer, elected him a director, and entered into an employment agreement with him (the "Agreement"). The initial term of the Agreement is for 51 months, subject to renewal or earlier termination.

The Company's Chief Executive Officer's salary will be as follows: $20,833 upon entering into the Agreement; $46,875 from October 30, 2005 to December 31, 2005, $275,000 from January 1 to December 31, 2006, $300,000 from January 1, 2007 to December 31, 2007, $325,000 from January 1 to December 31, 2008, $350,000 from January 1, 2009 to December 31, 2009 ("Fixed Compensation").

In addition, beginning with the first month of the quarter in which the amount payable to the Chief Executive Officer is fully paid, the Chief Executive Officer will be paid (i) cash compensation amounting to five percent (5%) of Gross Revenues of the Company, and (ii) stock compensation amounting to two percent (2%) of the Gross Revenues of the Company, as defined. Gross Revenue is defined as the total gross revenue related to any and all aspects of the brokerage business, including incentive received from exchanges, based on generally accepted accounting principles. The shares of Company common stock will be granted at fair value at the date of grant.

The Company will issue options to its Chief Executive Officer equal to 20% of

the number of shares of common stock issuable under warrants which become exercisable pursuant to any Order Flow Agreements (Order Flow Agreements are the agreements for the Company to issue warrants to a firm based on the volume of orders the firm placed with the Company). Those options will be fully vested Non-Statutory Stock Options granted under the Company's 2004 Plan at fair value at the date of grant. Also, the Company will issue to its Chief Executive Officer 5,000 options each time a firm registers with and executes its first 10,000 lots on the Company's OPEX platform. The total number of such options will be limited to 2,500,000. Such options will be fully vested Non-Statutory Options granted under the Plan at fair value at the date of grant.

Upon the sale or merger or other business combination of the Company and another company or companies, the Company's Chief Executive Officer will be entitled to a lump sum payment of 50% of the unpaid Fixed Compensation should he desire not to be employed with the new or successor entity.

The Company leases its executive offices under a 5-year leasing arrangement providing for a monthly base rent of $5,568. The minimum annual payments under such commitment for the next five years are as follows:

| Year | Minimum Annual Payments |
| ---- | ----------------------- |
| 2006 | $66,816 |
| 2007 and thereafter | -- |

The Company's rental expense amounted to approximately $80,000 and $60,000 during 2005 and 2004, respectively.


-F17-

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004

Note 10-Income Taxes

Deferred income taxes reflect the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the net deferred taxes, as of December 31, 2005, are as follows:

| Deferred tax assets: | |
| --- | --- |
| Net operating loss carryforward | $ 3,720,000 |
| Less valuation allowance | (3,720,000) |
| Total net deferred tax assets: | $ - |

As of December 31, 2005, the Company has a net operating losses amounting to approximately $9.1 million which expire at various times through 2023.

SFAS No. 109 requires a valuation allowance to reduce the deferred tax assets reported, if any, based on the weight of the evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Management has determined that a valuation allowance of $3,720,000 at December 31, 2005 is necessary to reduce the deferred tax assets to the amount that will more likely than not be realized. The change in the valuation allowance during 2005 and 2004 was a decrease of approximately $1.1 million and $449,000, respectively.

The federal statutory tax rate reconciled to the effective tax rate during 2005 and 2004, respectively, is as follows:

| | 2005 | 2004 |
| --- | --- | --- |
| Tax at U.S Statutory Rate: | 35.0% | 35.0% |
| State tax rate, net of federal benefits | 5.7 | 5.7 |
| Change in valuation allowance | (40.7) | (40.7) |
| Effective tax rate | 0.0% | 0.0% |

========      ========

Note 11-Legal Proceedings

During 2004, the Company settled claims from a vendor for $250,000.  The Company
has also agreed to indemnify  such vendor up to  approximately  $460,000 plus 9%
interest  from March 1, 2004 in the event the Company  breaches  its warranty or
representation of financial information provided to such vendor. The Company had
provided  for this  settlement  by  recording  $250,000 in accounts  payable and
accrued  expenses as of December  31,  2003.  Amounts due under the  settlement,
which amounted to $250,000,  were paid in February 2004. The Company believes it
has not breached its warranty or representations  of its financial  information.
Accordingly,  the Company does not provide for additional  provision  related to
this matter.

In May 2004, the Company settled outstanding  professional fees of approximately
$663,000 due to its former counsel, of which approximately $62,000 were incurred
in 2004.  The Company has agreed to pay $425,000 in  settlement  of such claims,
which was paid in September 2004.  Additionally,  as part of the  settlement,  a
partner of the Company's former legal counsel's firm has acquired 375,000 shares
of the Company's  common stock for $75,000 in September  2004.  This  settlement
generated a gain on settlement of obligations of approximately $238,000 which is
included in other income for 2004.

-F18-

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2005 and 2004

Note 12- Subsequent Event

During January 2006, the Company amended its agreements with its Chairman of the
Board, its Chief Executive Officer, and its Executive Officer to allow principal
repayments higher than required by such agreements to retain their services. The
Company  made  principal  repayments  amounting  to $600,000  towards its due to
related parties.

-F19-

</TEXT>
</DOCUMENT>

EXHIBIT 2

SEC Form 3

# FORM 3

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## INITIAL STATEMENT OF BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0104 |
| Expires: | January 31, 2008 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Date of Event Requiring Statement (Month/Day/Year) | 3. Issuer Name **and** Ticker or Trading Symbol |
|---|---|---|
| Helmig Albert | 03/13/2006 | Optionable Inc [ OPBL.OB ] |

1. Name and Address of Reporting Person*

Helmig Albert

(Last)      (First)      (Middle)

C/O OPTIONABLE, INC.
555 PLEASANTVILLE ROAD

(Street)

BRIARCLIFF MANOR      NY      10510

(City)      (State)      (Zip)

4. Relationship of Reporting Person(s) to Issuer (Check all applicable)

X   Director          10% Owner

    Officer (give title below)      Other (specify below)

5. If Amendment, Date of Original Filed (Month/Day/Year)

6. Individual or Joint/Group Filing (Check Applicable Line)

X   Form filed by One Reporting Person

    Form filed by More than One Reporting Person

### Table I - Non-Derivative Securities Beneficially Owned

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| | | | |

### Table II - Derivative Securities Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |
| Non-Statutory Stock Options | 09/24/2004 | (1) | Common stock | 50,000 | 0.2 | D | |
| Non-Statutory Stock Options | 09/24/2005 | (1) | Common stock | 100,000 | 0.2 | D | |

**Explanation of Responses:**

1. At the discretion of the Board, the options shall terminate, even if vested, upon (i) the death of the optionee; (ii) the termination of the optionee's services to the Company; or (iii) the conviction or plea of nolo contendere by the optionee to certain crimes.

Albert Helmig          03/13/2006

Case 1:07-cv-03753-LAK     Document 88-2     Filed 02/15/2008     Page 54 of 65

** Signature of Reporting
Person                                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 5 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

EXHIBIT 3

SEC Form 3

**FORM 3**

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## INITIAL STATEMENT OF BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0104 |
| Expires: | January 31, 2008 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person[*] | 2. Date of Event Requiring Statement (Month/Day/Year) | 3. Issuer Name **and** Ticker or Trading Symbol |
|---|---|---|
| Helmig Albert | 09/24/2006 | Optionable Inc [ OPBL.OB ] |

| | 4. Relationship of Reporting Person(s) to Issuer (Check all applicable) | 5. If Amendment, Date of Original Filed (Month/Day/Year) |
|---|---|---|
| (Last)  (First)  (Middle) | X  Director    10% Owner | 03/13/2006 |
| C/O OPTIONABLE, INC. | Officer (give title below)    Other (specify below) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| 555 PLEASANTVILLE ROAD, SUITE 110 | | X  Form filed by One Reporting Person |
| (Street) | | Form filed by More than One Reporting Person |
| BRIARCLIFF MANOR   NY    10510 | | |
| (City)  (State)  (Zip) | | |

| Table I - Non-Derivative Securities Beneficially Owned | | | |
|---|---|---|---|
| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
| | | | |

| Table II - Derivative Securities Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities) | | | | | | |
|---|---|---|---|---|---|---|
| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |
| Non-Statutory Stock Options [1] | 09/24/2006 | [2] | Common stock | 100,000 | 0.2 | D | |

**Explanation of Responses:**

1. In November 2004, the Company adopted the 2004 Stock Option Plan ("2004 Plan"), under which Mr. Helmig was granted 250,000 options, of which 150,000 options previously vested and were reported on Mr. Helmig's Form 3 filed March 13, 2006.

2. At the discretion of the Board, the options shall terminate, even if vested, upon (i) the death of the optionee; (ii) the termination of the optionee's services to the Company; or (iii) the conviction or plea of nolo contendere by the optionee to certain crimes.

Albert Helmig                    12/07/2006

** Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 5 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

EXHIBIT 4

**BMO Financial Group To Report Mark-to-Market Commodity Trading Losses Estimated To Be Between $350 Million and $450 Million (Pre-Tax) In The Second Quarter**

**TORONTO, April 27, 2007** – BMO Financial Group (NYSE: BMO, TSX: BMO) said today that mark-to-market commodity trading losses estimated at between CDN$350 million and CDN$450 million, pre-tax, will be recorded in the second quarter of its 2007 fiscal year. The impact of this to BMO Financial Group's second quarter earnings, which will be announced on May 23, 2007, is estimated in the range of 45 cents to 55 cents per share.

A number of factors contributed to these mark-to-market commodity trading losses. During the quarter, positions held by BMO Financial Group in the energy market, primarily for natural gas, were negatively impacted by changes in market conditions. In particular, the market became increasingly illiquid and volatility dropped to historically low levels. In conjunction with this, there was a refinement in BMO's approach to estimating the market value of this portfolio.

Bill Downe, President and Chief Executive Officer of BMO Financial Group, said: "The commodity trading losses were the result of decisions that did not adequately recognize the vulnerability of the portfolio to changes in market volatility. We are conducting a thorough review and actions have been taken to address the current situation and reduce the likelihood of a recurrence. The commodity trading losses are particularly disappointing as our company continues to experience good operating momentum. We remain committed to providing the high level of service that our clients in the energy sector have come to expect from BMO Capital Markets."

BMO will continue to reposition this portfolio to a lower and sustainable level, consistent with maintaining its core business of serving its energy client franchise. Going forward, the value of this portfolio will be subject to market conditions.

It is possible that as this portfolio is repositioned it could experience subsequent gains or losses depending on future market conditions. However, BMO's expectation is that, even using adverse assumptions, any losses would be in a substantially lower range than those announced today.

BMO also said that its Tier 1 capital ratio at the end of the first quarter was 9.90 percent and the impact of these losses will be less than 20 basis points on that ratio. As a result this loss does not impair the ability of the company to pursue its strategic agenda.

There will be a conference call for Bill Downe, President and Chief Executive Officer, BMO Financial Group; Karen Maidment, Chief Financial and Administrative Officer, BMO Financial Group; Yvan Bourdeau, Chief Executive Officer, BMO Capital Markets and Head of Investment Banking Group; and Bob McGlashan, Chief Risk Officer, BMO Financial Group, to comment on this announcement and to respond to questions from the investor community on Friday April 27, 2007 from 9:00 a.m. (EDT) to 9:30 a.m. (EDT).

Interested parties are invited to listen to this call. The call may be accessed by telephone at 416-695-9753 (from within Toronto) or 1-888-789-0089 (toll-free outside Toronto). A replay of the conference call can be accessed until May 11, 2007 by calling 416-695-5275 (from within Toronto) or 1-888-509-0081 (toll-free outside Toronto) and entering passcode 643819#.

A live webcast of the call can be accessed on our web site at
www.bmo.com/investorrelations. A replay can be accessed on the site until
Thursday, July 12, 2007.

**CAUTION REGARDING FORWARD-LOOKING STATEMENTS**
Bank of Montreal's public communications often include written or oral
forward-looking statements. Statements of this type are included in this
document, and may be included in other filings with Canadian securities
regulators or the U.S. Securities and Exchange Commission, or in other
communications. All such statements are made pursuant to the 'safe harbor'
provisions of, and are intended to be forward-looking statements under, the
United States Private Securities Litigation Reform Act of 1995 and any
applicable Canadian securities legislation. Forward-looking statements may
involve, but are not limited to, comments with respect to our objectives and
priorities for 2007 and beyond, our strategies or future actions, our targets,
expectations for our financial condition or share price, and the results of or
outlook for our operations or for the Canadian and U.S. economies.

By their nature, forward-looking statements require us to make assumptions and
are subject to inherent risks and uncertainties. There is significant risk that
predictions, forecasts, conclusions or projections will not prove to be accurate,
that our assumptions may not be correct and that actual results may differ
materially from such predictions, forecasts, conclusions or projections. We
caution readers of this document not to place undue reliance on our
forward-looking statements as a number of factors could cause actual future
results, conditions, actions or events to differ materially from the targets,
expectations, estimates or intentions expressed in the forward-looking
statements.

The future outcomes that relate to forward-looking statements may be influenced
by many factors, including but not limited to: general economic conditions in the
countries in which we operate; interest rate and currency value fluctuations;
changes in monetary policy; the degree of competition in the geographic and
business areas in which we operate; changes in laws; judicial or regulatory
proceedings; the accuracy and completeness of the information we obtain with
respect to our customers and counterparties; our ability to execute our strategic
plans and to complete and integrate acquisitions; critical accounting estimates;
operational and infrastructure risks; general political conditions; global capital
market activities; the possible effects on our business of war or terrorist
activities; disease or illness that impacts on local, national or international
economies; disruptions to public infrastructure, such as transportation,
communications, power or water supply; and technological changes.

We caution that the foregoing list is not exhaustive of all possible factors. Other
factors could adversely affect our results. For more information, please see the
discussion on pages 28 and 29 of BMO's 2006 Annual Report, which outlines in
detail certain key factors that may affect BMO's future results. When relying on
forward-looking statements to make decisions with respect to Bank of Montreal,
investors and others should carefully consider these factors, as well as other
uncertainties and potential events, and the inherent uncertainty of
forward-looking statements. Bank of Montreal does not undertake to update any
forward-looking statement, whether written or oral, that may be made, from time
to time, by the organization or on its behalf.

Assumptions about the performance of the natural gas and crude oil commodity
markets and how that will affect the performance of our commodity business
were material factors we considered when establishing our estimates of the

trading losses set out in this release. Key assumptions included that commodity prices and implied volatility would be stable and our positions would continue to be managed with a view to reposition the portfolio to a lower and sustainable level.

- 30 -

**Media Relations Contacts:**

Ralph Marranca, Toronto, ralph.marranca@bmo.com, (416) 867-3996
Ronald Monet, Montreal, ronald.monet@bmo.com, (514) 877-1101

**Investor Relations Contacts**

Viki Lazaris, Senior Vice-President, Investor Relations, viki.lazaris@bmo.com, 416-867-6656
Steven Bonin, Director, Investor Relations, steven.bonin@bmo.com, 416-867-5452
Krista White, Senior Manager, Investor Relations, krista.white@bmo.com, 416-867-7019

EXHIBIT 5

**Updated Statement by BMO Financial Group Related to Commodity Trading Losses**

**TORONTO, May 8, 2007** – BMO is suspending all of its business relationships with the brokerage firm, Optionable, Inc., as well as all derivatives trading through that firm, pending the results of a full external review which is ongoing.

In addition, the company said that it has changed the operating structure of BMO Capital Markets in order to provide additional oversight of the Commodities business, which now reports within a business line most experienced in the trading and valuation of derivatives.

BMO confirmed that two of its commodity trading professionals are on leave pending the results of the external review.

- 30 -

**Media Relations Contacts:**

Ralph Marranca, Toronto, ralph.marranca@bmo.com, 416-867-3996
Ronald Monet, Montreal, ronald.monet@bmo.com, 514-877-1101

**Investor Relations Contacts**

Viki Lazaris, Senior Vice-President, viki.lazaris@bmo.com, 416-867-6656
Steven Bonin, Director, steven.bonin@bmo.com, 416-867-5452
Krista White, Senior Manager, krista.white@bmo.com, 416-867-7019

EXHIBIT 6

Case 1:07-cv-03753-LAK    Document 88-2    Filed 02/15/2008    Page 65 of 65

SEC Form 4

**FORM 4**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2008 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Helmig Albert | Optionable Inc [ OPBL.OB ] | X Director ☐ 10% Owner |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 04/04/2007 | ☐ Officer (give title below) ☐ Other (specify below) |
| 465 COLUMBUS AVE. SUITE 280 | | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| (Street) VALHALLA    NY    10595 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | X Form filed by One Reporting Person ☐ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 04/04/2007 | | X | | 50,000 | A | $0.2 | 50,000 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Non-Statutory Stock Options (Right to Buy) | $0.2 | 04/04/2007 | | X | | | 50,000 | (1) | (2) | Common Stock | 50,000 | $0 | 200,000 (1) | D | |

**Explanation of Responses:**

1. Reporting Person previously reported beneficially owning Non-Statutory Stock Options to purchase 50,000 shares of common stock which options vested September 24, 2004, Non-Statutory Stock Options to purchase 100,000 shares of common stock which options vested September 24, 2005 and Non-Statutory Stock Options to purchase 100,000 shares of common stock which options vested September 24, 2006, each with an exercise price of $0.20 per share. All such reported options are vested and consolidated in this report and, after this transaction, Reporting Person beneficially owns Non-Statutory Stock Options to purchase 200,000 shares of common stock currently exercisable at $.20 per share.

2. At the discretion of the Board, the options shall terminate, even if vested, upon (1) the death of the optionee; (ii) the termination of the optionee's services to the Company; or (iii) the conviction or plea of nolo contendre by the optionee to certain crimes.

**Remarks:**

/s/Albert Helmig        04/06/2007
** Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**