Michael G. Bongiorno
WILMER CUTLER PICKERING HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
212-330-8800

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------x
:
In re OPTIONABLE, INC. SECURITIES  :     No. 07 Civ. 3753 (LAK)
LITIGATION                         :
                                   :     ORAL ARGUMENT REQUESTED
---------------------------------------------------x

<u>DEFENDANT OPTIONABLE, INC.'S MEMORANDUM IN SUPPORT OF MOTION
TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................4

    Optionable's Business.............................................................................................4

    Optionable's Disclosures Concerning
        BMO, OPEX, NYMEX, and its management ........................................5

    NYMEX Transaction ..............................................................................................7

    BMO's Trading Losses ..........................................................................................8

ARGUMENT .......................................................................................................................10

I.     Plaintiffs Fail to Allege a "Scheme" Between Optionable and
       BMO to Misprice Options With the Requisite Particularity...............................11

II.    The Allegations that Optionable Misrepresented Its Dependence on
       BMO, and Thereby Violated SEC Regulation S-K, Do Not State a
       Claim Because The Truth Was Fully Disclosed to the Market .........................17

III.   Plaintiffs Fail to Plead With Particularity that OPEX Was a "Sham" or Was
       Not "Viable" or that Optionable Concealed NYMEX's Plans to Offer
       Trading On a Competing Platform ......................................................................19

IV.   Plaintiffs Fail to State a Claim for Nondisclosure of Criminal Convictions
       and Relationships.................................................................................................23

          A.    Mr. Cassidy's Convictions......................................................23

          B.    Platinum Energy.....................................................................25

          C.    Personal Relationships ..........................................................26

V.    Optionable Disclosed the Supposed Weaknesses in its Internal Controls.........27

VI.   Plaintiffs Have Not Adequately Alleged False Sarbanes-Oxley Certifications.................29

VII.  Plaintiffs Have Not Adequately Alleged GAAP Violations................................30

VIII. Many of the Challenged Statements Are Inactionable "Puffery" ......................30

IX.    The Individual Defendants' Stock Sales Do Not Support A Strong Inference
       of Scienter ................................................................................................................... 32

CONCLUSION ............................................................................................................................ 33

TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*ATSI Comm., Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..........................................................................10

*Acito v. Imcera Group.*,
    47 F.3d 47 (2d Cir. 1995) .....................................................................16, 31

*In re Allscripts, Inc. Sec Litig*,
    Civ. A. No. 00-6796, 2001 WL 743411 (N.D. Ill. June 29, 2001) ..............20

*In re Apple Computer, Inc.*,
    127 Fed. Appx. 296 (9th Cir. 2005)..........................................................22

*In re Ashanti Goldfields Sec. Litig.*,
    184 F. Supp. 2d 247 (E.D.N.Y. 2002) .......................................................27

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006).........................................................13

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005).........................................................13

*Basic, Inc. v. Levinson*,
    485 U.S. 224, 108 S. Ct. 978 (1988)...........................................................25

*Bell Atl. Corp. v. Twombly*,
    127 S. Ct. 1955 (2007).................................................................................10

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004).........................................................30

*In re Buca Inc. Sec. Litig.*,
    No. 05 Civ. 1762 (DWF) (AJB), 2006 WL 3030886 (D. Minn. Oct 16,
    2006) ...........................................................................................................24

*Catton v. Defense Tech. Sys., Inc.*,
    No. 05 Civ. 6594, 2006 WL 27470 (S.D.N.Y. Jan. 3, 2006)......................23

*Chill v. General Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996).......................................................................29

*In re Coca-Cola Enterprises Inc. Sec. Litig.*,

510 F. Supp. 2d 1187 (N.D. Ga. 2007) .......................................................................14

*Commodity Futures Trading Com'n v. Delay*,
    No. 7:05 CV 5026, 2006 WL 3359076 (D. Neb. Nov. 16, 2006)................................21

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991)...........................................................................................9

*Davidoff v. Farina*,
    Civ. A. No. 04-7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)..........................15

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336, 125 S. Ct. 1627 (2005)................................................................4, 23, 24

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006).................................................................19, 30

*Feasby v. Industri-Matematik Int'l Corp.*,
    No. 99 Civ. 8761, 2000 WL 977673 (S.D.N.Y. July 17, 2000) .................................31

*Fitzer v. Security Dynamics Technologies, Inc.*,
    119 F. Supp. 2d 12 (D. Mass. 2000) .........................................................................30

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004).......................................................................19

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) ................................................................................28

*Genna v. Digital Link Corp.*,
    25 F. Supp. 2d 1032 (N.D. Cal. 1997) ......................................................................19

*In re Gilat Satellite Networks, Ltd.*,
    Civ. A. No. 02-1510, 2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) .........................19

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
    Civ. A. No. 97-1865, 1998 WL 283286 (S.D.N.Y. June 1, 1998) ..............................15

*In re Hypercom Corp. Sec. Litig.*,
    CV-05-0455 PHX (NVM), 2006 WL 1836181 (D. Ariz. July 5, 2006).....................28

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007).................................................................16, 29

*In re Initial Public Offering Sec. Litig.*,

241 F. Supp. 2d 281 (S.D.N.Y. 2003)................................................................12, 24

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*,
No. 01 Civ. 6600 (RLC), 2007 WL 1222583 (S.D.N.Y. Apr. 25, 2007) ...................24

*Iqbal v. Hasty*,
490 F.3d 143 (2d Cir. 2007).....................................................................................10

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001).................................................................................15, 31

*Kinsey v. Cendant Corp.*,
Civ. A. No. 04-0582, 2004 WL 2591946 (S.D.N.Y. Nov. 16, 2004).........................22

*Kowal v. MCI Communications Corp.*,
16 F.3d 1271 (D.C. Cir. 1994)...................................................................................27

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991).......................................................................................4

*Lentell v. Merrill Lynch & Co.*,
369 F.3d 161 (2d Cir. 2005).......................................................................................23

*Lirette v. Shiva Corp.*,
27 F. Supp. 2d 268 (D. Mass. 1998) .........................................................................15

*Miller v. Lazard*,
473 F. Supp. 2d 571 (S.D.N.Y. 2007).........................................................................14

*In re Mobile Telecommunication Technologies Corp. Securities
Litigation*,
915 F. Supp. 828 (S.D. Miss. 1995)............................................................................26

*In re NTL, Inc. Sec. Litig.*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004)............................................................................16

*New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc.*,
497 F.3d 109 (2d Cir. 2007)........................................................................................11

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006).........................................................................19

*Nolte v. Capital One Fin. Corp.*,
390 F.3d 311 (4th Cir. 2004) ......................................................................................22

- vi -

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..........................................................................13, 15, 31

*In re Omnicom Group, Inc. Sec. Lit.*,
    No. 02 Civ. 4483 (WHP), 2008 WL 243788 (S.D.N.Y. Jan. 29, 2008) ....................24

*In re OPUS360 Corp. Sec. Litig.*,
    No. 01 Civ. 2938 (JGK)(JCF), 2002 WL 31190157 (S.D.N.Y. Oct. 2,
    2002) ............................................................................................................................20

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005).........................................................................23

*Payne v. DeLuca*,
    433 F. Supp. 2d 547 (W.D. Pa. 2006).........................................................................30

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).......................................................................................29

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) .....................................................................................32

*Roots Partnership v. Lands' End, Inc.*,
    965 F.2d 1411 (7th Cir. 1992) ...................................................................................14

*Roth v. Jennings*,
    489 F.3d 499 (2d. Cir. 2007).......................................................................................4

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180, 84 S. Ct. 275 (1963)............................................................................25

*SEC v. Moran*,
    922 F. Supp. 867 (S.D.N.Y. 1996).............................................................................26

*Shields v. Citytrust Bancorp.*,
    25 F.3d 1124 (2d Cir. 1994)........................................................................................16

*Shushany v. Allwaste, Inc.*,
    992 F.2d 517 (5th Cir. 1993) .....................................................................................14

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007)............................................................... *passim*

*Stevelman v. Alias Research, Inc.*,

174 F.3d 79 (2d Cir. 1999)........................................................................................29

*Sulzer v. Associated Madison Cos., Inc.*,
No. 84-516-Civ-3-12, 1985 WL 5856 (M.D. Fla. May 10, 1985)............................26

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438, 96 S. Ct. 2126 (1976)..........................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
127 S. Ct. 2499 (2007)........................................................................................15, 32

*Tuchman v. DSC Comms. Corp.*,
14 F.3d 1061 (5th Cir. 1994) ....................................................................................27

*Tuchman v. DSC Comms. Corp.*,
818 F. Supp. 971 (N.D. Tex. 1993) ...........................................................................15

*In re Vantive Corp.*,
283 F.3d 1079 (9th Cir. 2002) ...................................................................................19

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ....................................................................30

*In re Winstar Commc'ns*,
No. 01 Civ 3014, 01 Civ. 11522, 2006 WL 473885 (S.D.N.Y. Feb.
27, 2006) ....................................................................................................................23

*Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*,
474 F. Supp. 2d 505 (S.D.N.Y. 2007)........................................................................16

## **STATUTES**

15 U.S.C. § 78u-4 ..........................................................................................10, 12, 24

15 U.S.C. § 78u-4(b)...................................................................................................11

17 C.F.R. § 228.401(a).................................................................................................23

17 C.F.R. § 228.401(d) ................................................................................................23

17 C.F.R. § 229.303(a)(3)(ii)........................................................................................18

17 C.F.R. § 229.401(a)..................................................................................................23

17 C.F.R. § 229.401(f) .................................................................................................23

17 C.F.R. § 240.10b-5.................................................................................................10

**<u>RULES</u>**

Fed. R. Civ. P. 9(b) ...................................................................................................10

Fed. R. Civ. P 12(b)(6)..............................................................................................10

Michael G. Bongiorno
WILMER CUTLER PICKERING HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
212-330-8800

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------x
                                                    :
In re OPTIONABLE, INC. SECURITIES  :          No. 07 Civ. 3753 (LAK)
LITIGATION                               :
                                                    :          ORAL ARGUMENT REQUESTED
--------------------------------------------------x


DEFENDANT OPTIONABLE, INC.'S MEMORANDUM IN SUPPORT OF MOTION
TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT


INTRODUCTION

On April 27, 2007, the Bank of Montreal ("BMO"), an important customer of

Defendant Optionable, Inc. ("Optionable"),[1] discovered that it had suffered significant

losses on wrong-way bets on natural gas options.  By early May 2007, two of its traders

were placed on leave in connection with the losses, and BMO suspended its business

relationship with and its trading through Optionable "pending the results of a full external

review" of the losses.  At about the same time, the New York Mercantile Exchange

("NYMEX"), which had made a recent and substantial investment in and formed a

strategic relationship with Optionable, announced it would be offering trading of natural

gas options on CME Globex, a trading platform that competed with Optionable's OPEX

_____

[1]      Also Defendants in this lawsuit are Mark Nordlicht ("Mr. Nordlicht"), chairman
of Optionable's board of directors ("Board") during the Class Period; Kevin Cassidy
("Mr. Cassidy"), Optionable's CEO and a vice-chairman during the Class Period; Edward
O'Connor ("Mr. O'Connor"), Optionable's president and a director during the Class
Period (now also CEO); and Albert Helmig ("Mr. Helmig"), a member of Optionable's
Board during the Class Period.

1

platform.  Not surprisingly, these events led to a significant decline in Optionable's stock price.

In an attempt to concoct claims of fraud from these business reversals, Plaintiffs cobble together a host of unsubstantiated -- and unrelated -- charges.  Tellingly, they do not claim that Optionable overstated even a single dollar of revenue, or that any line item on a financial statement was inaccurate.  Instead, they make the sensational and implausible accusation that Optionable had "schemed" with a BMO trader to "misprice options" in order to conceal losses from BMO.  In addition, they: assert that Optionable misrepresented the extent to which it depended on revenues from BMO; claim that Optionable had prior knowledge of but concealed NYMEX's plans to pursue competing natural gas options trades on a platform other than OPEX; allege that Optionable misrepresented the adequacy of its internal controls; and fault Optionable for not disclosing remote convictions of its then-CEO, Mr. Cassidy, *14 and 10 years* before the Class Period.

Conspicuously missing from all these implausible allegations is support from well-pleaded, contemporaneous facts that would establish either that Optionable (or any Defendant) made a materially false misstatement or acted with scienter.  With one trivial exception,  Plaintiffs do not offer a single confidential source.  Nor do they cite a single internal document, email, meeting, or conversation.  Instead, they rely largely on unsourced, conclusory, and sometimes patently false allegations.

For example, the only support offered for the "scheme" between Optionable and BMO to misprice options is (1) a meaningless allegation about a personal friendship between Mr. Cassidy and the BMO traders in question, and (2) a vague media report that

according to an unidentified source, BMO's accountant had reported that "some" unspecified number of the many valuations in BMO's mismarked book of natural gas options had been provided by Optionable as well as other sources. The contention that Optionable concealed NYMEX's plans from investors rests entirely on the unremarkable fact that NYMEX had a representative on Optionable's board of directors ("Board") for approximately one month. The assertion that Optionable understated its dependence on BMO is demonstrably false. The Company not only accurately disclosed the percentage of its revenues from BMO, but also specifically disclosed the very risk Plaintiffs say was concealed -- namely that if it lost BMO as a customer, Optionable could lose the fees from the other party to counterparty transactions involving BMO. The claim that Optionable misrepresented the adequacy of its internal controls because it had no audit or compensation committees is belied by specific discussion of the Company's lack of such committees in the very document Plaintiffs say was fraudulent.

Plaintiffs also gratuitously besmirch Mr. Cassidy by repeatedly mentioning his remote convictions, and shamelessly try to bootstrap those convictions into securities fraud by claiming they were concealed. However, there was no duty to disclose 14- and 10-year old convictions, and in any case, because they were not known to the market during the Class Period, they could not have caused Plaintiffs' losses.

As is usually the case when particularized factual support is completely lacking, the Complaint-- stripped of rhetoric and conclusions -- amounts to nothing more than fraud-by-hindsight: bad things happened, so Defendants *must* have known earlier that they were going to happen and concealed them. But hindsight alone cannot sustain a complaint under the securities laws. And, as the Supreme Court has explicitly cautioned,

the securities laws cannot be used by plaintiffs as an insurance policy against their investment losses. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345; 125 S. Ct. 1627, 1633 (2005). For these and other reasons set out below, the Consolidated Amended Class Action Complaint ("Complaint" or "CAC") should be dismissed.

FACTUAL BACKGROUND

Optionable's Business

Optionable is a Delaware corporation formed in 2000. Throughout the Class Period, its shares were traded over-the-counter ("OTC"), on the OTC Bulletin Board ("OTCBB"), where the shares have been traded since they became publicly available. Companies on the Bulletin Board have no quantitative standards in order to be traded. It is simply a quotation system, not a listing service like the NYSE or NASDAQ.

Optionable is a commodity derivative brokerage services provider, specializing in energy derivatives, and more particularly in natural gas options. *See* March 23, 2007 Form 10-KSB ("10-KSB") at 3 (Declaration of Michael G. Bongiorno ("Decl."), Exhibit B).[2] During the relevant time period, the Company was an options house, providing services to a range of market participants worldwide, including brokerage firms, financial institutions, energy traders, and hedge funds. *See id.* Optionable focused on providing brokerage services to customers executing trades in the OTC market, which is not regulated. *See id.* at 3-4, 6-7. Optionable also provided services to customers executing

---

[2]    It is appropriate for the Court to consider the full text of the Form 10-KSB, as well as any other documents quoted in the CAC, in determining this motion. "When a complaint alleges. . . that a document filed with the SEC failed to disclose certain facts, it is appropriate for the court, in considering a Rule 12(b)(6) motion, to examine the document to see whether or not those facts were disclosed. . . . Similarly, where public records that are integral to a fraud complaint are not attached to it, the court, in considering a Rule 12(b)(6) motion, is permitted to take judicial notice of those records." *Roth v. Jennings*, 489 F.3d 499, 509 (2d. Cir. 2007) (internal citation omitted); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (same).

trades in the OTC futures and options market, which involves transactions executed over a regulated exchange, such as NYMEX or the Intercontinental Exchange ("ICE"). Optionable's services included locating counterparties for customers placing orders for execution of trades on NYMEX, ICE or OPEX (an electronic trading platform that Optionable launched in 2006), and providing mark-to-market services for customers' positions in the natural gas derivatives market, called OPEX Analytics. *See id.* Optionable earned its revenues from commissions for executing trades and from incentive payments from NYMEX. *See id.* at 8. Optionable operated its OTC brokerage services from its office in Valhalla, New York, and traded regulated instruments (both options and futures) from its floor operations on the floor of NYMEX.

Optionable's Disclosures Concerning BMO, OPEX, NYMEX, and its management

In its annual report for 2006, Optionable accurately disclosed the percentage of revenues it received from its largest customer, BMO, *e.g.*, 24% in 2006. *See id.* at 20. Optionable was candid with investors about the risk that, if it lost BMO as a customer, Optionable could lose fees not only from BMO but also from the counterparties to the trades that Optionable executed for BMO. *See id.* at 20 (stating that if BMO "would not have entered into a portion or all of the OTC transactions in which they were involved, our 2006 revenues could have been lower if we wouldn't have been able to find a suitable counterparty to replace them in such transactions"); *see also id.* at F-7.

Similarly, Optionable disclosed that it received incentive payments from NYMEX based on a fee per lot (the amount of which was within NYMEX's sole discretion) for trades submitted to the exchange, and that these payments accounted for 19% of the Company's revenues for 2006. *Id.* at 8, 23. The Company cautioned that "we cannot

guarantee that we will continue to receive this level of such incentives in the future, if at all. If we do not receive these incentives, our revenues will decrease." *Id*. at 23.

Optionable also informed investors of the many hurdles to the viability and success of its newly launched OPEX electronic trading platform. As an initial matter, the Company stated that "for the foreseeable future" the majority of its trading revenues would continue to be generated through voice-brokerage, as opposed to OPEX. *See id.* at 14. Optionable also cautioned that OPEX had not reached "full market acceptance" and that such acceptance might never occur (*see id.* at 19), that its "pricing model for OPEX services is unproven and may be less than anticipated" (*see id.*), that customers may not be interested in transitioning to OPEX services (*see id.* at 20), that Optionable had "limited" experience in marketing and supporting electronic trading services (*see id.* at 20), that "[m]ost developmental expenses must be incurred before the technical feasibility or commercial viability of new or enhanced services and applications can be ascertained" (*see id* at 22), that the OPEX software may "contain errors or defects" (*see id.*), and that these risk factors could have negative effects including a "material negative effect on [Optionable's] financial prospects" (*see id.* at 19). Additionally, Optionable warned that its strategic relationship with NYMEX might not last, and that in turn could threaten OPEX's very existence. *See id.* at 17-19.

Optionable also was forthright that, as a small company, its management was centralized and that it did not have some of the internal controls common to larger publicly -held corporations. For instance, the 10-KSB clearly stated that the Company had no audit committee or compensation committee. *See id.* at 28. Companies that trade

on the Bulletin Board are not required to have such committees. Indeed, such companies are not subject to the rules of FINRA or the NASDAQ.

NYMEX Transaction

In early 2007, Optionable entered into a strategic relationship with NYMEX to benefit Optionable by promoting its newly launched OPEX electronic trading platform and allowing it access to certain licensed technology, and to benefit NYMEX by providing an opportunity to expand its presence in the options market. On January 22, 2007, when the closing price per share of Optionable was $4.34, Mr. Nordlicht, Mr. Cassidy, and Mr. O'Connor entered into a binding term sheet with NYMEX pursuant to which they agreed to sell shares of their stock to NYMEX for $2.69 per share (19% of Optionable's outstanding common stock), and pursuant to which Optionable agreed to issue NYMEX warrants to increase its ownership of Optionable to as much as 40%. *See id.* at 9. On April 10, 2007, when the closing price per share of Optionable was $7.29, the sale was consummated as planned at $2.69 per share: —Mr. Cassidy sold 1,905,000 shares for which he was a beneficial owner through Pierpont Capital Corp., Inc.; Mr. Nordlicht sold 7,000,000 shares; and Mr. O'Connor sold 1,853,886 shares. *See* CAC ¶ 47; 8-K filed on April 10, 2007 by Optionable ("April, 10, 2007 8-K") at EX-99 (Decl., Exh. C); Forms 4 filed by Mr. Cassidy on April 10, 2007 (Decl., Exh. D), and by Mr. Nordlicht (Decl., Exh. E) and Mr. O'Connor (Decl., Exh. F) on April 11, 2007; LEXIS Historical Stock Prices for Optionable (Decl., Exh. G). Pursuant to the agreement, NYMEX was permitted to and did nominate one director -- Ben Chesir -- to Optionable's Board. April, 10, 2007 8-K at EX-99 (Decl., Exh. C). NYMEX Chairman Richard Schaeffer stated that the closing of the agreement "mark[ed] an important milestone for

NYMEX" and that NYMEX was "looking forward to working with Optionable as a key contributor to [NYMEX's] future expansion in options trading." *Id.*

Nevertheless, on May 9, 2007, NYMEX suddenly announced that it would begin to offer options trading on the Chicago Mercantile Exchange ("CME") Globex trading platform in June 2007, and Optionable reported that some of these new offerings might compete with trading contracts on Optionable's OPEX platform. 8-K filed May 9, 2007 by Optionable ("May 9, 2007 8-K") (Decl., Exh. H). The share price of Optionable stock declined from a $4.64 closing price on May 8, 2007 to a $2.81 closing price on May 9, 2007. *See* Decl., Exh. G. On May 14, the last day of the putative Class Period, Mr. Chesir resigned from Optionable's Board. *See Statement from NYMEX Holdings Regarding Optionable,* NYMEX Press Release, May 14, 2007 (Decl., Exh. I). Following these events, NYMEX refused to discuss with Optionable their strategic relationship and initiatives. *See* Form 10-QSB filed by Optionable on August 14, 2007, at 17 (Decl., Exh. J).

BMO's Trading Losses

On April 27, 2007, the last day of its second fiscal quarter, BMO announced in a press release that it would record trading losses for that quarter estimated between $350 million to $450 million (Canadian dollars). *See* BMO Press Release dated April 27, 2007 (Decl., Exh. K); CAC ¶ 34. BMO attributed the loss to a "number of factors," the first of which BMO identified as "changes in market conditions, in particular, the market became increasingly illiquid and volatility dropped to historically low levels." *See* BMO Press Release dated April 27, 2007 (Decl., Exh. K). BMO also identified another factor as a "refinement in BMO's approach to estimating the market value" of BMO's portfolio at

issue.  *See id.*  BMO made no mention in that press release of Optionable, much less that Optionable was responsible for any valuations that BMO believed contributed to the mismarking of its books.  *See id.*  Optionable's closing share price on April 27, 2007 was $5.56, down from $7.01 the prior day.  (*See* Decl., Exh. G).

On May 8, 2007, BMO announced it was suspending its business relationship with and its trading through Optionable "pending the results of a full external review of certain trading losses incurred by BMO."  Optionable 8-K filed May 9, 2007 (Decl., Exh. H).  On May 10, a Toronto newspaper highlighted BMO's then-estimated $350 million and $450 million (Canadian dollars) trading losses and described a report issued to BMO in late April 2007 by Deloitte and Touche LLP ("Deloitte").  *See Report Flagged BMO Loss*, National Post's Financial Post & FP Investing, May 10, 2007, at FP 1 (Decl., Exh. L); CAC ¶ 43.  According to an anonymous source purportedly "familiar with the report" (as reported by the Toronto newspaper), the Deloitte report indicated that there had been "serious mismarking" of BMO's book of natural gas options, and that an unspecified *"some* of the prices in BMO's mismarked book of trades were provided" by Optionable.  *See id.* (emphasis added).  As BMO itself has reported, BMO relied on multiple independent sources, not solely on Optionable, to value its natural gas options portfolio.  *See* BMO 190th Annual Report 2007, at 38 (Decl., Exh. M).[3]

Significantly, the news article reported that BMO CEO Bill Downe once again attributed BMO's losses to market conditions and stated that *BMO* had "refined its method" of estimating the value of its book.  Nowhere did the article suggest that the

---

[3]      The Court may take judicial notice of public filings.  *See, e.g., Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991) (court may review and consider SEC filings).

anonymous source claimed that the report commissioned by BMO blamed Optionable for mismarking options, much less for intentionally doing so. *See id.* This lawsuit was filed the next day, May 11, 2007, when the share price of Optionable was down to $1.01. *See* Decl., Exh. G. Although BMO's estimated trading losses later rose to $680 million (Canadian dollars) and BMO has allegedly since expressed "increased concerns with the reliability of quotes" received by Optionable, BMO has never indicated that it found any evidence that the quotes were indeed unreliable, and certainly has not suggested that Optionable *intentionally* provided unreliable quotes. *See BMO Raises trading loss to $680 million*, The Gazette, May 18, 2007, at B5 (Decl., Exh. N); CAC ¶ 48.

<u>ARGUMENT</u>

To state a claim for violation of Section 10(b) or Rule 10b-5, Plaintiffs must plead that Defendants (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which Plaintiffs relied, (5) causing their loss. 15 U.S.C. § 78u-4; *ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007). The Complaint must comply with the heightened pleading requirements of Fed. R. Civ. P. 9(b) ("Rule 9(b)") and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").[4] *See, e.g., id.* at 99*; In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 372 (S.D.N.Y. 2007). Rule 9(b) requires plaintiffs to plead particularized facts sufficient to support their fraud allegations, including specifying the alleged fraudulent statements, who made them, where and when, and explaining why the

---

[4]    In addition, to survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must provide the grounds upon which their claims rest through factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). The Second Circuit has declined to read *Twombly's* flexible "plausibility standard" as relating only to antitrust cases. *See Iqbal v. Hasty*, 490 F.3d 143, 158 (2d Cir. 2007)).

statements were fraudulent. *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at

372. The PSLRA requires plaintiffs to "specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-

4(b). The statute further requires plaintiffs to plead with particularity facts giving rise to

a strong inference that the defendants acted with scienter. *Id.* The Complaint and each of

its allegations fail to satisfy these requirements.

I.    Plaintiffs Fail to Allege a "Scheme" Between Optionable and BMO to Misprice
      Options With the Requisite Particularity

Plaintiffs allege that various statements made during the Class Period were

materially false and misleading because Optionable failed to disclose that "Defendants

had engaged in a scheme to grossly misprice options with BMO in order to prevent BMO

from promptly realizing the full extent of its losses." CAC ¶ 10; *see also, e.g., id.* ¶¶ 7, 9-

10, 23-24, 32-33, 64.[5]  Despite the seriousness (not to mention the implausibility) of their

charge, Plaintiffs fail to support it with a single named or adequately identified witness, a

description of even one written or oral communication between Optionable and BMO, or

any description of any internal Optionable document, meeting or conversation.  Instead,

Plaintiffs rely mostly on media reports about events *at BMO* or about the *effect* of those

events on Optionable.  CAC ¶¶ 36-40, 42-44.

There are only two allegations even purporting to link Optionable with any

problems at BMO, neither of which (separately or together) comes close to alleging fraud

with the requisite particularity.  First, Plaintiffs allege that Mr. Cassidy had a "personal

relationship" with two individuals at BMO, Robert Moore (Executive Managing Director

of Commodity Products) and David Lee (a natural gas trader).  CAC ¶ 7.  No source is

offered for this allegation.  As a matter of law, allegations in securities fraud complaints

made on information and belief[6] must identify, at a minimum, the source of the

information (e.g. a witness, a document, etc.).  *See* 15 U.S.C. § 78u-4 (if allegation is

---

[5]      Plaintiffs variously allege that Defendants schemed to "misprice options" (CAC ¶ 10), schemed to "mismark" option prices (CAC ¶ 43), engaged in "mispricing of options for BMO" (CAC ¶ 18), were involved in "mispricing of deals with BMO" (CAC ¶ 64), and provided "mispriced trades for BMO" (CAC ¶ 69).  Plaintiffs seem not to know whether they are alleging that Optionable provided inaccurate marks (valuations) for natural gas options that BMO already held, or whether they are alleging that Optionable somehow mispriced the underlying trades.  The confusion of Plaintiffs' "scheme" allegations underscores their lack of substance.  Additionally, if Plaintiffs are really claiming that Optionable mispriced the underlying trades, such a claim makes absolutely no sense in light of Plaintiffs' other allegations or the nature of Optionable's business, and because NYMEX marked-to-market and cleared the trades that Optionable executed for BMO.  As the Court explained in *New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc.*, 497 F.3d 109, 111 (2d Cir. 2007), "[f]or each day when the contract remains open (i.e. before delivery or liquidation), NYMEX's Clearing House evaluates the change in value of its customers' open contracts. This process, known as 'marking-to-market' the customer's open position, determines whether a customer must post additional margin or, instead, receives payments on margin. The settlement prices are used to value the open positions. All margin transactions cleared through NYMEX are marked-to-market daily: 'The margin process functions according to daily reconciliation with settlement prices, known as 'marking-to-market.'"
[6]      All allegations in the Complaint necessarily are made on information and belief, as the named Plaintiffs do not purport to have first-hand knowledge.

- 12 -

made on information and belief, complaint must state with particularity "all facts on which that belief is formed"); *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 354-55 (S.D.N.Y. 2003). The wholly unsourced "personal relationship" allegations, which are not meaningful in any event, therefore should not be credited.

Even if credited, the allegation about friendships (which are of course commonplace in the context of business relationships) does not come even close to pleading (much less with particularity) that Mr. Cassidy intentionally mispriced options in order to help Mr. Lee conceal losses from BMO. The statement from Confidential Witness #1 that Mr. Lee and his sister "received payments from Optionable" certainly does not support the alleged "scheme." No information is supplied to show that the "analyst who followed Optionable," CAC ¶ 7, was in a position to know about any financial dealings between the Company and Mr. Lee or his sister. *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at 376; *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *see also In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 442 (S.D.N.Y. 2005) (Kaplan, J.) (Plaintiff's burden of describing informants not met when "Court cannot infer that [ ] witnesses possess the information contained in their alleged statements."). And even if the source had been adequately described, the allegation is so vague as to be meaningless, because it does not even specify the nature or amount of any "payments," much less suggest the "payments" were material or improper. *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 591-92 (S.D.N.Y. 2006) (dismissing conspiracy allegations for plaintiffs' failure to allege facts from which to infer that payments defendant made to third party were improper).

- 13 -

Plaintiffs also rely on a media report about an audit of BMO's book of natural gas options by Deloitte. CAC ¶ 43. The media report states that according to an unnamed source identified only as someone "familiar with [Deloitte's] report," the report stated that "some" (whatever that means) of the prices for "mismarked" transactions in BMO's book had been provided by Optionable. *Id*. This allegation is fatally defective, for two compelling reasons.

First, as just explained, where the source of information is an anonymous individual, sufficient information must be provided so that a court can assess whether she is in a position to know the information ascribed to her. *In re In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at 376.[7] As a matter of law, the conclusory statement in the media report that the anonymous individual was "familiar" with the Deloitte report does not satisfy this standard. *See id.*; *Miller v. Lazard,* 473 F. Supp. 2d at 586 (news articles cited must themselves include sufficiently particularized facts). Accordingly, the allegation about the Deloitte report may not be considered.

Second, even if somehow considered, the allegation is far too vague to satisfy the specificity requirements of the PSLRA. Not a single "mismarked" option is identified. Nor is any information provided about the aggregate number of such "mismarked" options, or the aggregate dollar amount of the discrepancies. Nor do Plaintiffs say what the "right" marks should have been. Absent any specificity as to the "mismarked"

---

[7]     Unnamed sources in media reports must satisfy the same standard as anonymous confidential witnesses, *see Miller v. Lazard*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007) (news articles cited must themselves include sufficiently particularized facts), and without *any* information verifying the source was in a position to know and accurately convey the contents of the Deloitte report, the Court must reject the allegation. *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at 376. Indeed, if anything, the unnamed source is even less reliable than a confidential witness who presumably spoke to counsel.

options involved in the supposed "scheme," or even as to the overall magnitude of the

supposed errors, the allegation is too conclusory to comply with the PSLRA or Rule 9(b).

*See Shushany v. Allwaste, Inc.*, 992 F.2d 517, 522 (5th Cir. 1993) (allegations about

accounting adjustments too vague where complaint did not explain, *inter alia*, how

adjustments affected company's financial statements and whether they were material in

light of company's overall financial position); *Roots Partnership v. Lands' End, Inc.*, 965

F.2d 1411, 1419 (7th Cir. 1992) (allegation about inadequate reserves did not satisfy Rule

9(b) where plaintiff did not allege "what the reserves were or suggest how great the

reserves should have been"); *In re Coca-Cola Enterprises Inc. Sec. Litig.*, 510 F. Supp.

2d 1187, 1197 (N.D. Ga. 2007) (in order to meet heightened pleading standard, plaintiff

must "relate specific transactions to specific misstatements").[8]

Perhaps more importantly, the allegations also fail for lack of allegations

supporting any suggestion of scienter.[9]  Given the absence of any transactional detail or

_____

[8]     *See also Davidoff v. Farina*, Civ. A. No. 04-7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) (court could not determine materiality of alleged wrongful conduct absent specifics about particular transactions); *In re Health Mgmt Sys., Inc. Sec. Litig.*, Civ. A. No. 97-1865, 1998 WL 283286, at *4 (S.D.N.Y. June 1, 1998) (allegations that defendant was having difficulty collecting payments failed as "conclusory" and "wholly insufficient" because plaintiffs failed to provide specifics regarding the alleged transactions, including, *inter alia*, which customers were involved and the nature of the customer's supposed payment problems); *Tuchman v. DSC Comms. Corp.*, 818 F. Supp. 971, 977 (N.D. Tex. 1993) (dismissing customer defection allegation and chastising plaintiffs for their "inability to distinguish facts from mere opinions and conclusions" where plaintiffs failed to allege how many and which customers defected, which orders were cancelled, or what equipment was returned); *Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 277 (D. Mass. 1998) (dismissing allegations for failure to provide specifics of allegedly fraudulent transactions, including dates, terms and amounts).

[9]     In the Second Circuit, the scienter requirement can be satisfied "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001)(internal citations omitted). To allege strong circumstantial evidence of recklessness, Plaintiffs must show that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d at 311.

any other direct evidence of a conspiracy between Optionable and BMO, no strong

inference of "conscious misbehavior or recklessness" can be drawn.[10]  Similarly, as just

discussed, the unsourced allegation that Mr. Cassidy's "friendship" with Mr. Lee was the

"motive" for him to commit fraud is baseless.[11]  On the face of the Complaint, the far

more  "cogent" and "compelling" inference is that any incorrect prices provided by

Optionable were the result of mistake.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

127 S. Ct. 2499, 2504-2505 (2007) ("To qualify as "strong" within the intendment of [the

PSLRA], we hold, an inference of scienter must be more than merely plausible or

reasonable – it must be cogent and at least as compelling as any opposing inference of

*nonfraudulent* intent.") (emphasis added).

     At the end of the day, the "scheme" allegations are prototypical "fraud-by-

hindsight" allegations for which courts universally express disdain.  *See, e.g., In re Sierra

Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at 373 (citing *Shields v. Citytrust Bancorp.*, 25

F.3d 1124, 1127-28 (2d Cir. 1994));  *Xerion Partners, I LLC v. Resurgence Asset Mgmt.*,

LLC, 474 F. Supp. 2d 505, 517 (S.D.N.Y. 2007); *In re IAC/InterActiveCorp Sec. Litig.*,

478 F. Supp. 2d 574, 587 (S.D.N.Y. 2007).  As this Court has noted in dismissing such

"fraud-by-hindsight" allegations, "[w]e have not yet come to the point that a lack of

clairvoyance constitutes fraud."  *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 26-27

---

[10]    While "recklessness" can constitute scienter, *see* fn. 9 *supra*, by their very nature,
Plaintiffs' allegations of concerted activity between Optionable and traders at BMO
necessarily require intentional conduct on the part of at least one individual from
Optionable.  It is difficult to conceive how one could affirmatively *conspire* without
intending to do so.  In any case, even if the recklessness test applied, the conclusory
allegations here do not come close to satisfying it with respect to any Individual
Defendant.

[11]    Plaintiffs' allegations that the Individual Defendants sold stock at inflated prices,
CAC ¶ 47, presumably are intended to furnish a "motive" for all the misstatements
alleged in the Complaint, and are addressed separately *infra* at Section IX.

(S.D.N.Y. 2004) (Kaplan, J.) (citing *Acito v. Imcera Group*, 47 F.3d 47, 53 (2d Cir. 1995)).

II.    The Allegations that Optionable Misrepresented Its Dependence on BMO, and Thereby Violated SEC Regulation S-K, Do Not State a Claim Because The Truth Was Fully Disclosed to the Market

Plaintiffs allege that Optionable somehow misrepresented its dependence on BMO by reporting, *accurately*, the percentage of its revenues that came directly from BMO. According to the Complaint, those undisputed, accurate figures were "misleading" because they did not include commissions from counterparties for transactions where Optionable received fees from both parties, or incentive payments from NYMEX for transactions placed through NYMEX. CAC ¶¶ 13-14, 58, 60, 66.

This theory cannot withstand scrutiny. Optionable clearly explained the nature of its business, including that it received commissions from both counterparties to bilateral over-the-counter trades. *See* Form 10-KSB at 7 (Decl., Exh. B), stating under the caption "HOW WE OPERATE" that "in the case of future market derivatives, . . . . we inquire of other clients whether they are interested in participating . . . and facilitate the negotiation and conclusion of an agreement between counterparties." Optionable also fully disclosed (in a portion of the Form 10-KSB conveniently omitted by Plaintiffs) that in the event it lost BMO as a customer and could not replace it, both sets of fees were at risk:

> One of our clients accounted for 24% of our revenue during 2006 [BMO]. ***On OTC transactions, we bill our services to both counterparties. Accordingly, if this client would not have entered into a portion of all of the OTC transactions in which they were involved, our 2006 revenues could have been lower if we wouldn't have been able to find a suitable counterparty to replace them in***

- 17 -

> *such transactions.* Form 10-KSB at 19, under heading
> "Revenue Recognition" (emphasis added).

Similarly, Optionable disclosed that it received incentive payments from NYMEX based on a percentage of the total revenues received by NYMEX for trades submitted to the exchange, and that these payments accounted for 19% of revenues during 2006. *See* Form 10-KSB at 22 (Decl., Exh. B). The Company cautioned that "we cannot guarantee that we will continue to receive the level of such incentives in the future, if at all. If we do not receive these incentives, our revenues will decrease." *Id.*

Plaintiffs' claim that Optionable misrepresented its dependence on BMO is therefore pure fabrication. Indeed, it is irresponsible given counsel's representation that they reviewed Optionable's public filings. *See* CAC at Page 30, "Basis of Allegations." The allegations are also defective because Plaintiffs point to no facts from which a strong inference (or even a weak one) can be drawn that any Defendant intended to deceive investors, or was reckless, by accurately reporting revenues from BMO.

These same defects mandate rejection of the allegation that Optionable violated Item 303 of Regulation S-K[12] by "fail[ing] to disclose that OPEX's contribution to the Company's revenue 'mix' would be diluted because BMO's contribution to Optionable's revenue was greater than the 30% reported . . . once incentives and counterparty transactions are taken into account." CAC ¶ 60. Item 303 of Regulation S-K requires a registrant to discuss "any known trends or uncertainties that have had or that the registrant *reasonably expects will have* a material favorable or unfavorable impact on net

---

[12] Because Optionable is a small business, it is required to comply with Item 303 of Regulation S-B, not Item 303 of Regulation S-K. Because the relevant portions of these Regulations are virtually identical, Optionable has addressed Plaintiff's Item 303 argument.

sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii)

(emphasis added).  To begin with, any contingent risk from dependence on BMO was

not, at the time of the filing in question, "reasonably likely" to have a material effect on

Optionable's financial condition.  *See* SEC Interpretive Release No. 34-26831, quoted in

CAC ¶ 63.  There are no well-pleaded allegations that Optionable "schemed" with BMO

to misprice options or that Optionable otherwise should have *expected* to lose BMO as a

customer.  *See* CAC ¶ 64.  Furthermore, as explained above, Optionable accurately

disclosed the risk of losing BMO as a customer, including the possibility of losing fees

from the other parties to counterparty transactions and incentive payments from

NYMEX.  Finally, no well-pleaded facts support a strong inference of scienter, and "even

if a plaintiff properly alleges a violation of Item 303 of Regulation S-K, such a violation

cannot alone [absent a strong inference of scienter] create a § 10(b) violation."  *In re Flag*

*Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 263 (S.D.N.Y. 2004).

III.   Plaintiffs Fail to Plead With Particularity that OPEX Was a "Sham" or Was Not
       "Viable" or that Optionable Concealed NYMEX's Plans to Offer Trading On a
       Competing Platform

       Plaintiffs allege that Optionable's positive statements about its OPEX electronic

trading platform were false and misleading because OPEX was a "sham" (CAC ¶ 10) and

was not "viable" (CAC ¶¶ 18, 29).  Allegations of product problems must be pleaded

with particularity.  *See, e.g., In re Vantive Corp.*, 283 F.3d 1079, 1088-89 (9th Cir. 2002)

(allegations that defendant's software was "not well received by customers" and known

to be a "disaster" inside company too conclusory to challenge defendant's statement that

it was "successfully developing" software);  *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp.

2d 266, 292-93 (S.D.N.Y. 2006) (allegation that product was not viable failed because plaintiff did not allege "*when* or by direct quote *what*" defendant was told by confidential source about alleged problems); *In re Gilat Satellite Networks, Ltd.,* Civ. A. No. 02-1510, 2005 WL 2277476, at *18 (E.D.N.Y. Sept. 19, 2005) (product defect allegations unclear because confidential sources failed to specify extent of problems or to identify any internal reports or memoranda concerning problems); *Genna v. Digital Link Corp.*, 25 F. Supp. 2d 1032, 1041-42 (N.D. Cal. 1997) (dismissing as conclusory allegation that software encountered "serious and persistent difficulties" and was "defective and deficient and did not work"); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.,* 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (conclusory allegations that defendant knew that product was not fully competitive failed).

To the extent Plaintiffs claim that OPEX was a vehicle to commit fraud, they fail to allege the existence of any "scheme" to misprice options (*see supra* at Section I), much less to explain *how* OPEX facilitated any such "scheme" or "caused" BMO to sustain "massive trading losses" (CAC ¶ 18). To the extent Plaintiffs may be claiming that OPEX was not "viable" for other reasons, they fail to allege – even in conclusory fashion – a single technical or operational problem with the platform, or any Individual Defendant's knowledge of any such problem.[13]

Plaintiffs' claims about OPEX are also barred by Optionable's specific warnings about risks inherent in the new platform. *Compare In re Allscripts, Inc. Sec. Litig.*, Civ.

---

[13]    Plaintiffs' suggestion that the allegedly mismarked options in BMO's portfolio resulted from some flaw in OPEX makes no sense, *see, e.g.,* CAC ¶ 18, because OPEX is a platform to execute trades, not a system to mark portfolio positions to market. Further, such a suggestion certainly belies any notion of scienter.

A. No. 00-6796, 2001 WL 743411, at *2, *6, *8-*9 (N.D. Ill. June 29, 2001) (SEC filings cautioning that product was new, had not achieved market acceptance, and could contain bugs that would preclude market acceptance rendered inactionable alleged subsequent failure to disclose problems attributable to technological issues) and *In re OPUS360 Corp. Sec. Litig.*, No. 01 Civ. 2938(JGK)(JCF), 2002 WL 31190157, at *8 (S.D.N.Y. Oct. 2, 2002) (oft-repeated warnings, including that the product may contain defects or errors, "put investors on notice that [ ] new software was still in development and subject to failure, and constituted sufficient disclosure on the part of the defendants") *with* Optionable's Form 10-KSB (disclosing, *inter alia*, that OPEX had not reached "full market acceptance" and acknowledging such acceptance might never occur, at 19-20, that OPEX software may "contain errors or defects," at 22, and that Optionable's strategic relationship with NYMEX might not last, which in turn could threaten OPEX's very existence, at 17-19) (Decl., Exh. B).

The allegation that Optionable knew in advance, but did not disclose, that NYMEX was developing a new, competing electronic trading platform to be unveiled in June 2007 is equally defective. CAC ¶ 29 (alleging that NYMEX revealed "competing platform as soon as the fraud was exposed"). To begin with, the allegation that NYMEX developed a new, competing platform, which it launched shortly after the Class Period, is demonstrably false. *See* CAC ¶ 29. Optionable's Form 8-K, filed May 9, 2007 and quoted in the Complaint at ¶ 41, indicates that NYMEX announced that it would begin to offer natural gas options trading on the *CME Globex* trading platform in June 2007. May 9, 2007 8-K, Exh. H. CME is an acronym for the *Chicago* Mercantile Exchange and Globex is *its* platform, not one developed by NYMEX. *Commodity Futures Trading*

*Com'n v. Delay*, No. 7:05 CV 5026, 2006 WL 3359076, at \*4 (D. Neb. Nov. 16, 2006)

(noting that "[t]he Chicago Mercantile Exchange, Inc., is a registered entity and . . . [that]

[t]he trading venues for the feeder cattle futures contract include the CME's trading floor

in Chicago, and the CME GLOBEX electronic trading platform.")  In any case, the only

purported "fact" (other than pure hindsight) offered to show contemporaneous knowledge

of NYMEX's plans is that NYMEX very briefly (4-5 weeks) had a member on

Optionable's Board.  CAC ¶ 29.  There is no allegation – particularized or otherwise –

that that representative told any of the Individual Defendants about NYMEX's plans or

that they were somehow reckless in not discovering NYMEX's confidential business

plans.[14]  Thus, there is no basis to conclude that NYMEX's announcement was any less a

surprise to Defendants than to investors.

---

[14]    None of the statements at issue is attributed to the NYMEX representative, and his knowledge of NYMEX's confidential plans cannot be imputed to the Individual Defendants or to Optionable.  *In re Apple Computer, Inc.*, 127 Fed. Appx. 296, 303 (9th Cir. 2005) ("A corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time that he or she makes the statement . . . We have squarely rejected the concept of 'collective scienter' in attributing scienter to an officer and, through him, to the corporation.") (internal citation omitted); *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315-16 (4th Cir. 2004) (allegations based on state of mind of person who made no statements inadequate to allege scienter, absent allegations that he conveyed his beliefs to managers who adopted them and then made contrary statements); *Kinsey v. Cendant Corp.*, Civ. A. No. 04-0582, 2004 WL 2591946, at \*13 (S.D.N.Y. Nov. 16, 2004) ("It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false.  A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter. . . .").  This is particularly true where Mr. Chesir was an outside director representing an investor and not a member of management, and the information in question concerned the investor's confidential plans, not any activities of Optionable.

IV.    <u>Plaintiffs Fail to State a Claim for Nondisclosure of Criminal Convictions and Relationships</u>

    A.    <u>Mr. Cassidy's Convictions</u>

Plaintiffs repeatedly take Optionable to task for not disclosing that Mr. Cassidy had been convicted 14 years before the Class Period for income tax evasion and 10 years before the Class Period for credit card fraud.  CAC ¶16.  Plaintiffs also allege that Mr. Cassidy had transitioned from CEO to consultant at the time the Company went public in order to avoid disclosing those convictions.  *Id.*  The nondisclosure of Mr. Cassidy's convictions does not give rise to any claim for securities fraud, for two reasons.

First, Mr. Cassidy's remote convictions were not disclosable, even if he had been an officer at the time of the relevant filings.  Item 401 of Regulation S-B, which is identical in relevant part to Item 401 of Regulation S-K, requires small businesses to disclose certain legal proceedings during the past *five years* that are "material to an evaluation of the ability and integrity" of its officers and directors, including a conviction in a criminal proceeding. 17 C.F.R. § 228.401(a),(d); 17 C.F.R. § 229.401(a),(f)(emphasis added). Item 9 of Form 10-KSB requires the information required by Item 401.  Because Mr. Cassidy's convictions were both older than five years, neither would have been required disclosures under Item 9.

Second*,* even assuming Mr. Cassidy's convictions were disclosable, which is not the case, Plaintiffs fail to allege loss causation.  "To plead loss causation, the complaint must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the

- 23 -

fraud." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005) (Kaplan, J.) (citing *Lentell v. Merrill Lynch & Co.*, 369 F.3d 161, 175 (2d Cir. 2005)). Often loss causation is alleged by showing a decline in stock price following a "corrective disclosure" of information previously misrepresented or concealed. *See, e.g.*, *Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6594, 2006 WL 27470, at *10 (S.D.N.Y. Jan. 3, 2006) ("To establish such a link [between decline in value of Company's stock and defendants' misconduct], plaintiffs could mention the price of the Company's stock on specific dates, indicating that the stock price went up after misstatements and went down after disclosures."); *In re Winstar Commc'ns,* No. 01 Civ. 3014, 01 Civ. 11522, 2006 WL 473885, at *15-16 (S.D.N.Y. Feb. 27, 2006) (holding that complaint established loss causation where plaintiffs alleged that securities at issue sharply declined in price after corrective disclosure); *Dura Pharmaceuticals, Inc.*, 544 U.S. at 339-40 (insufficient for plaintiffs to allege economic loss based solely upon paying artificially inflated prices, without also alleging that a corrective disclosure later caused stock price to decline). Here, Plaintiffs do not allege that the market became aware of Mr. Cassidy's convictions at any time during the Class Period. Instead, they cite a post-Class Period, May 24, 2007 *New York Post* report, CAC ¶ 50, which by Plaintiffs' own terms, was 10 days after "the full truth was revealed" on May 14, 2007, *see* CAC ¶ 46. Accordingly, they are not relying on a theory of "corrective disclosure," or if they are, it is plainly contrary to fact.[15]

---

[15]     Plaintiff cannot even plead a loss *indirectly* traceable to Mr. Cassidy's convictions. *See Dura Pharmaceuticals*, 544 U.S. at 343 ("touching upon" an economic loss is insufficient; what is required is that the fraud *directly* cause the loss). While they allege that NYMEX removed its director from the Optionable board after discovering

Thus, even if disclosure was required, which it was not, any nondisclosure is not the cause of Plaintiffs' loss. *See Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, No. 01 Civ. 6600 (RLC), 2007 WL 1222583, at *4 (S.D.N.Y. Apr. 25, 2007) (rejecting counterclaimant's claim that counterclaim defendant had defrauded it into making private investment by concealing officers' criminal convictions, because there was no evidence that "concealed information eventually caused the transaction to fail.") (internal citation omitted.)

Plaintiffs also allege that concealment of Mr. Cassidy's convictions rendered the Form 10-KSB Sarbanes-Oxley certifications false and misleading. CAC ¶¶ 23-24. The statute requires the signatories to certify that they have disclosed to their auditors "any fraud, whether or not material, that involves management or other employees who have a significant role in the . . . issuer's internal control over financial reporting." *See* CAC ¶¶ 23, 24. Plainly, the intent of the statute is to require disclosure of fraud involving *the issuer*. Mr. Cassidy's convictions occurred years before Optionable even existed. *See* CAC ¶ 16. Accordingly, any failure to disclose Mr. Cassidy's convictions did not violate Sarbanes-Oxley.

B.    Platinum Energy

---

those convictions, they offer no supporting source at all. CAC ¶¶ 46, 71; *see* 15 U.S.C. § 78u-4; *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 354-55. Moreover, the press release at the very end of the Class Period disclosing NYMEX's decision to remove its board member said nothing about NYMEX's reason for doing so. *See Statement from NYMEX Holdings Regarding Optionable,* NYMEX Press Release, May 14, 2007 (Decl., Exh. I). Thus, even if Mr. Cassidy's convictions were the reason for NYMEX's action, their concealment from the market did not *cause* any part of Plaintiffs' loss. *See In re Omnicom Group, Inc. Sec. Lit.*, No. 02 Civ. 4483 (WHP), 2008 WL 243788, at *6 (S.D.N.Y. Jan. 29, 2008) ("a director's resignation cannot constitute a corrective disclosure when the resignation is not connected to the alleged fraud."), citing *In re Buca Inc. Sec. Litig.*, No. 05 Civ. 1762 (DWF) (AJB), 2006 WL 3030886, at *9 (D. Minn. Oct. 16, 2006) (press release disclosing director's resignation "mentioned no investigation or accounting issues and thus disclosed nothing of the alleged fraud").

Plaintiffs' insinuations about an undisclosed relationship between Messrs. Helmig and Nordlicht and a company called Platinum Energy Resources, Inc., *see* CAC ¶ 20, are not actionable because that information was immaterial as a matter of law. Platinum Energy is a "blank check" company whose business has nothing to do with the brokerage of options contracts. *See* Platinum's Preliminary Prospectus filed June 9, 2005 (Decl., Exh. O). Not surprisingly, Plaintiffs conspicuously fail to identify any reason why disclosure concerning Platinum Energy would have "significantly altered" the "total mix of information" available to investors about Optionable. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449; 96 S. Ct. 2126, 2132 (1976), *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32; 108 S. Ct. 978, 983 (1988). They do not allege, for example, a single action (much less a detrimental one) Optionable took that was influenced by Platinum Energy. Nor do they allege even a potential conflict of interest that might have arisen on Mr. Helmig's or Mr. Nordlicht's part. Cases predicating liability on failure to disclose conflicts of interest involve far more serious and tangible conflicts. *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180; 84 S. Ct. 275 (1963) (investment adviser failed to disclose that it had pecuniary interest in stock it was recommending to clients); *SEC v. Moran,* 922 F. Supp. 867, 898-900 (S.D.N.Y. 1996) (issuer failed to disclose that its board members were related).

C.    Personal Relationships

Optionable had no duty to disclose any "personal relationship" between Mr. Cassidy and Messrs. Moore or Lee. CAC ¶ 7, 43, 49. Obviously it is commonplace for friendships to develop in the context of business relationships, and investors understand

this without specific disclosure.[16]  *See, e.g., In re Mobile Telecommunication Technologies Corp. Securities Litigation*, 915 F. Supp. 828, 838 & n.7 (S.D. Miss. 1995) (no duty to disclose obvious); *Sulzer v. Associated Madison Cos., Inc.*, No. 84-516-Civ-3-12, 1985 WL 5856, at *3 (M.D. Fla. May 10, 1985) (no duty to disclose fact which would be obvious to ordinary investor).  As noted above, Plaintiffs offer nothing concrete to support their rank speculation that these friendships somehow led Mr. Cassidy to "scheme" with Mr. Lee to disguise his trading losses from BMO.

V.      Optionable Disclosed the Supposed Weaknesses in its Internal Controls

Plaintiffs allege that Optionable misrepresented that its internal controls were adequate to ensure accurate and timely SEC disclosures because (1) Messrs. Cassidy, Nordlicht, and O'Connor controlled 50 percent of the Company's common stock and held three of its four Board seats, and (2) the Company had no audit or compensation committees.  CAC ¶ 20.[17]  These two matters were plainly disclosed.  The same  Form 10-KSB about which Plaintiffs complain stated that "Messrs. Cassidy, O'Connor, Nordlicht and Helmig are the members of our Board of Directors" (p. 27) and that "[o]ur officer and directors beneficially own approximately 50% of our outstanding common stock," and made clear the potential conflict this raised with the interests or public stockholders (p. 24).  The Form 10-KSB also plainly disclosed that "[w]e do not have an audit committee or a compensation committee."  Form 10-KSB at 27 (Decl., Exh. B).

---

[16]      Compare *SEC v. Moran*, 922 F. Supp. at 898-900 (disclosure that board members were *related* required).
[17]      Plaintiffs also allege that the "conflict" with Platinum Energy was a weakness in Optionable's internal controls.  As explained above, this contention is baseless.  *See supra* Section IV B.

As a matter of law, where the underlying facts are fully disclosed, there can be no claim for misrepresentation based on how an issuer *characterizes* (or fails to characterize) those facts. *See Tuchman v. DSC Comms. Corp.,* 14 F.3d 1061, 1069 (5th Cir. 1994) ("defendants [ ] under no duty to 'employ the adjectorial characterization' that the plaintiffs believe is more accurate") (internal citation omitted); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1277 (D.C. Cir. 1994) ("[s]ince the use of a particular pejorative adjective will not alter the total mix of information available to the investing public, . . . such statements are immaterial as a matter of law and cannot serve as the basis of a 10b-5 action under any theory.) (internal citation omitted); *In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 267-68 (E.D.N.Y. 2002) (same, granting motion to dismiss with respect to allegation that press statement falsely claimed that hedge book was "actively managed" and "tightly controlled"). Thus, no claim can be premised on Optionable's characterization of its internal controls as "effective" to ensure accurate and timely SEC disclosures.

The internal controls allegations are further defective because Plaintiffs have not alleged *how* a different management structure (for example, the existence of an audit or compensation committee) would have changed anything about Optionable's SEC disclosures.

Finally, because the internal controls allegations assume faulty SEC disclosures, they necessarily fail if the Court rejects – as it must – the other allegations in the Complaint.

VI.    <u>Plaintiffs Have Not Adequately Alleged False Sarbanes-Oxley Certifications</u>

Plaintiffs allege in boilerplate fashion that by virtue of the alleged misrepresentations and omissions discussed above, Sarbanes-Oxley certifications signed by Messrs. Cassidy and Boisseau in connection with Optionable's Form 10-KSB were false and misleading.  CAC ¶¶ 23-24 (certifications false and misleading because they concealed dependence on BMO, concealed "gross mispricing practices," failed to disclose that OPEX was not "viable," failed to acknowledge internal controls weaknesses, and concealed Mr. Cassidy's fraud convictions).  These purely additive allegations fail because, as set forth in the preceding sections, (1) any nondisclosure of Mr. Cassidy's convictions did not render the certifications false or misleading, and (2) Plaintiffs cannot establish with the requisite particularity any of the other matters they say rendered the certifications defective.  Moreover, without more, even a false Sarbanes-Oxley certification does not give rise to a strong inference of scienter.  *See, e.g., Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265-66 (11th Cir. 2006) (certification probative of scienter only if signatory was severely reckless in certifying accuracy of financial statements); *In re Hypercom Corp. Sec. Litig.,* CV-05-0455-PHX (NVW), 2006 WL 1836181, at *11 (D. Ariz. July 5, 2006) ("[A]n incorrect Sarbanes-Oxley certification does not, by itself, create a strong inference of scienter").  Plaintiffs have pleaded no facts from which a strong inference (or even a weak one) can be drawn that Messrs. Cassidy or

Boisseau knew or were reckless in not knowing that the Form 10-KSB was inaccurate or incomplete.[18]

VII.    Plaintiffs Have Not Adequately Alleged GAAP Violations

Plaintiffs allege, again in purely additive fashion, that by understating its dependence on BMO, Optionable violated paragraphs 21 and 22 of Statements of Position ("SOP") No. 94-6, entitled "Disclosure of Certain Significant Risks and Uncertainties."  CAC ¶¶ 56-58, Exh. A.  But as shown in Section II *supra*, Optionable clearly disclosed that in transactions involving BMO, it also earned fees from counterparties and incentive payments from NYMEX.  Contrary to Plaintiffs' fanciful claims, there were no undisclosed risks here.  *See* CAC ¶ 27.  In any event, even if Plaintiffs had pleaded a GAAP violation, which they have not, that would not by itself give rise to a strong inference of scienter.  *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996); *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir. 1999).  Again, no facts are pleaded permitting a strong inference (or a weak one) that Defendants intended to deceive anyone by reporting accurately the revenues received directly from BMO.

VIII.    Many of the Challenged Statements Are Inactionable "Puffery"

Courts routinely dismiss securities fraud claims based on vague statements of corporate optimism.  *See, e.g., Rombach v. Chang*, 355 F.3d 164, 173-74 (2d Cir. 2004); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at 373; *In re IAC/InterActiveCorp.*

---

[18]    The allegations concerning the description in the 2006 Form 10-KSB of the Company's "Code of Business Conduct and Ethics," CAC ¶¶ 21-22, are essentially identical to the Sarbanes-Oxley allegations and fail for the same reasons.

*Sec. Litig.*, 478 F. Supp. 2d at 594.  Several of the challenged statements fall squarely
within this category:

- Optionable had a "high standing within the energy and other commodity
  derivative community."  CAC ¶ 9; *see Payne v. DeLuca*, 433 F. Supp. 2d
  547, 599 (W.D. Pa. 2006) (defendant's statement about its "excellent
  reputation" inactionable puffery).

- Optionable's "record results" were due to its "innovative and impeccable
  services" and a "healthy and largely untapped market for its services."
  CAC ¶ 11; *see Fitzer v. Security Dynamics Technologies, Inc.*, 119 F.
  Supp. 2d 12, 24 (D. Mass. 2000) (classifying as puffery statement that
  "record revenues" are "result of continued market demand" for defendant
  company's product); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d at 286
  (characterizing product that turned out not to be viable as "innovative
  solution[]" inactionable puffery).

- "OPEX significantly improves the liquidity and transparency of natural
  gas and other energy derivatives markets…" CAC ¶ 17; *see In re Wet
  Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007)
  (labeling as "mere corporate puffery" statement that new product is
  "significant improvement").

- The NYMEX transaction was a "major strategic step" and an "important
  catalyst" for future growth.  CAC ¶ 25**;** *see In re Bristol-Myers Squibb
  Sec. Litig.***,** 312 F. Supp. 2d 549, 559 (S.D.N.Y. 2004) (statements that
  product "represents one of the most important advances" in defendant

company's industry, "broadens our growth opportunities" and is

"significant step toward becoming a leader" in field constitute non-

actionable opinion, corporate optimism and puffery).

Accordingly, all claims based on these statements must be dismissed.[19]

## IX.    The Individual Defendants' Stock Sales Do Not Support A Strong Inference of Scienter

As noted throughout this memorandum, Plaintiffs offer no particularized evidence

permitting a strong inference that any Defendant engaged in conscious or reckless

misconduct.  Plaintiffs' apparent reliance on stock sales by Messrs. Cassidy, Nordlicht,

and O'Connor to show scienter via the "motive and opportunity" prong of the Second

Circuit test, *see Kalnit v. Eisner*, 264 F.3d at 138, is equally unavailing. Only insider

trading that is "unusual" in timing and amount can support a strong inference of scienter.

*Acito,* 47 F.3d at 54.  Here, however, *all* the sales in question were to NYMEX in the

transaction in which NYMEX acquired a stake in Optionable.  CAC ¶ 8.  That transaction

served a clear corporate purpose of creating a strategic relationship between Optionable

and NYMEX (*see* Optionable's January 22, 2007 Press Release, Exh. P), and there is

nothing "unusual" about stock sales for such a purpose.  *See Novak,* 216 F.3d at 307

(motive to benefit corporation does not suffice to plead scienter); *Feasby v. Industri-*

*Matematik Int'l Corp.,* No. 99 Civ. 8761, 2000 WL 977673, at *4 (S.D.N.Y. July 17,

2000) (defendant's stock sales upon resignation not "unusual").  Indeed, the Individual

Defendants' stock sales were at a huge discount to the then-current market price ($2.69

---

[19]    As set out above, each of these statements also is inactionable for the fundamental reasons that Plaintiffs have not pleaded with particularity either that they were false or misleading or that they were made with scienter.

per share compared to $7.29 per share), *see* Decl., Exh. G; April, 10, 2007 8-K at EX-99

(Decl., Exh. C), further underscoring that their purpose was to help the corporation and

not to profit from fraud.  *See Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir. 2001) (no

scienter where defendants' stock sales were at prices well below where they could have

maximized profits).[20]

In short, similar to the rest of the allegations in the Complaint, the insider trading

allegations lack merit. [21]

<u>CONCLUSION</u>

There is not a shred of factual support for the notion that Plaintiffs' losses resulted

from fraud by Optionable or any other Defendant.  The claims in the Complaint are pure

---

[20]     Even if there was a plausible inference that the Individual Defendants sold their
stock to NYMEX at prices far below market in order to profit from their statements
inflating its price – which is strongly denied – any such inference is far less "cogent" than
the nonfraudulent explanation that they sold their stock to benefit the Company and all its
shareholders by forging an important relationship.  *See Tellabs*, 127 S. Ct. at 2510.
[21]     To the extent the Individual Defendants  make additional arguments about their
own sales that even further undermine any suggestion of scienter (such as shares retained
at the end of the Class Period), Optionable joins in those arguments.

fabrication from hindsight, and do not state a claim under the securities laws.  For the reasons set out above, the Complaint should be dismissed with prejudice and without leave to amend.[22]

Respectfully Submitted,

Dated: New York, New York
February 15, 2008

WILMER CUTLER PICKERING
HALE AND DORR LLP

By: /s/ Michael G. Bongiorno
Michael G. Bongiorno
399 Park Avenue
New York, New York 10022
Tel.: 212-230-8800
Fax: 212-230-8888

*Attorney for Defendant Optionable, Inc.*

---

[22]    Because Counts II and III are asserted only against the Individual Defendants, Optionable does not address them but agrees with the Individual Defendants' arguments explaining why those claims are also defective.