**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re OPTIONABLE SECURITIES LITIGATION | **NO. 07-cv-3753 (LAK)** <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

**KAHN GAUTHIER SWICK, LLC**
Kim E. Miller (KM-6996)
12 E. 41st St., 12th Fl.
Telephone: (212) 696-3730
Facsimile:  (504) 455-1498

– and –

Lewis S. Kahn
650 Poydras Street, Suite 2150
New Orleans, LA  70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498

**Lead Counsel for the Class**

## NATURE OF THE ACTION

1.    This is a federal class action brought on behalf of purchasers of Optionable Inc. ("Optionable" or the "Company") securities between January 22, 2007 and May 14, 2007 (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under §§10(b), 20(a), and 20A of the Exchange Act and Rule 10b-5 promulgated by the SEC. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1331. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), because many of the acts and transactions alleged herein occurred in substantial part in this Judicial District. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities exchange.

## THE PARTIES

3.    Lead Plaintiff, **KLD INVESTMENT MANAGEMENT, LLC,** purchased shares of Optionable securities at artificially-inflated prices during the Class Period and was damaged thereby.

4.    Plaintiff **GREG BOYER** purchased Optionable common stock at artificially-inflated prices during the Class Period and contemporaneously with sales by Defendants Cassidy, O'Connor, and Nordlicht as set forth in his certification attached hereto as Exhibit A and was damaged thereby.

5.    Defendant **OPTIONABLE INC.**, is a Delaware Corporation with its principal executive offices located in Valhalla, NY. According to its profile, Optionable provides services for the brokerage of energy derivatives to brokerage firms, financial institutions, energy traders, and hedge funds in the United States. The Company offers over-the-counter ("OTC") natural gas and energy derivatives trading and brokerage services, energy futures derivatives services, and voice and floor brokerage services at the New York Mercantile Exchange ("NYMEX"). Optionable created OPEX, which, according to the Company, is an electronic trading platform "that can be seamlessly integrated across a wide array of electronic marketplaces and an unlimited number of underlying instruments." Optionable finds counterparties for energy trades -- meaning it matches buyers with sellers – and charges a commission to both parties. It also receives incentive payments from

1

NYMEX when the Company uses NYMEX to perform these trades.

6.    The Individual Defendants identified in subparagraphs (a) - (e) below are each liable both as direct participants in the wrongdoing and as controlling persons by reason of their status as senior executive officers and/or directors with access to non-public information about the Company.

(a)    Defendant **MARK NORDLICHT** ("Nordlicht") was a founder of the Company and Chairman of the Board of Optionable from 2000 until his abrupt departure from the Company in April 2007. During the Class Period, Defendant Nordlicht liquidated 7.0 million shares of Optionable stock for proceeds over $18.83 million.[1] During the Class Period, Nordlicht made or was responsible for materially false and misleading statements.

(b)    Defendant **KEVIN CASSIDY** ("Cassidy") was CEO and Vice-Chairman of the Board of Optionable between March 2001 and March 2004 and again between October 2005 until his resignation in May 2007 immediately prior to the Company's revelation that he had been convicted of multiple federal fraud offenses and spent time in prison. During the Class Period, he liquidated 1.905 million shares of Optionable stock for proceeds $5.124 million. Defendant Cassidy served as a "consultant" rather than CEO between April 2004 and September 2005 – around the same time the Company went public and had to face SEC reporting requirements that would have forced the Company to disclose Cassidy's criminal history. Cassidy had an undisclosed relationship with traders at Bank of Montreal and made or was responsible for materially false and misleading statements during the Class Period and certified SEC filings pursuant to Sarbanes Oxley ("SOX").

(c)    Defendant **EDWARD J. O'CONNOR** ("O'Connor") has been President of the Company and a member of the Board of Optionable since March 2001. During the Class Period, he sold 1.853 million shares of Optionable stock for proceeds over $4.986 million. O'Connor made or was responsible for materially false and misleading statements during the Class Period.

(d)    Defendant **ALBERT HELMIG** ("Helmig") was a member of the Board of Optionable from September 2004 until his termination in November 2007. Helmig, the Company's only purported "independent" director, was also a member of the Board of Directors of Platinum

---

1 In the IPO, Jules Nordlicht, father of Nordlicht, liquidated 2.19 million shares -- 100% of his holdings in the Company. Jules Nordlicht pleaded guilty to price rigging the crude oil market in 1978 and creating over $27 million in fraudulent tax losses through prearranged trading of commodity futures and price manipulation. In connection with NYMEX Holding Inc.'s March 2007 IPO, Jules Nordlicht liquidated 100,000 shares of his common stock for proceeds of over $13.3 million. According to Confidential Witness #1, an analyst who followed Optionable during the Class Period, Jules

Energy, an entity founded and chaired by Nordlicht. Helmig made or was responsible for materially false and misleading statements during the Class Period.

(e)    Defendant **MARC-ANDRE BOISSEAU** ("Boisseau") has been CFO of the Company since December 2004. Boisseau made or was responsible for materially false and misleading statements during the Class Period and certified SEC filings pursuant to SOX.

### RELEVANT THIRD PARTIES

7.   **BANK OF MONTREAL** ("BMO") is Canada's oldest bank and is headquartered in Toronto. BMO was Optionable's largest client during the Class Period and it placed natural gas options trades through the Company. It lost approximately $680 million from what BMO auditor Deloitte & Touche ("D&T") called a "serious mismarking of the book of natural-gas options." D&T indicated it had "never seen such a wide discrepancy in terms of pricing" between the values marked in BMO's portfolio of natural-gas options and their market value – many of which prices were provided by Optionable. Cassidy had an undisclosed personal relationship with Robert ("Bob") Moore, BMO's Executive Managing Director of Commodity Products, and David Lee ("Lee"), a BMO natural gas trader at the center of the mispriced trading scandal. Moore's son also spent summers working for Optionable as an OTC Office Intern and for Capital Energy (a company owned by Cassidy and O'Connor) as a Floor Clerk and had duties that included submitting trades for clearing, distributing markets to clients, and updating volume records. According to Confidential Witness #1, an analyst who followed Optionable during the relevant time period, Lee and his sister received payments from Optionable.

8.   The **NEW YORK MERCANTILE EXCHANGE, INC.** ("NYMEX") is the world's largest physical commodity futures exchange. During the Class Period, NYMEX acquired a 19% stake in the Company with warrants to expand its stake to 40% . In exchange, the Individual Defendants pocketed proceeds of almost $29M and decreased their own exposure regarding the Company's OPEX platform, which was neither viable nor transparent, as the Company claimed, but rather enabled Defendants' fraudulent mispricing scheme. NYMEX paid Optionable incentives based on the volume of OTC transactions that Optionable submitted to NYMEX's clearing platform on behalf of its clients, such as BMO. After BMO's mega losses were announced and NYMEX discovered

---

Nordlicht was influential in convincing NYMEX to go forward with the doomed $29M Optionable investment.

that Optionable failed to disclose Defendant Cassidy's criminal history, NYMEX cut ties with the Company and announced it would develop its own trading platform that would compete with OPEX.

## MATERIALLY FALSE & MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

9.    On January 22, 2007, Optionable issued a Form 8-K and a press release announcing that three of the Company's founding stockholders, Defendants Nordlicht, Cassidy, and O'Connor, agreed to sell over 10.2 million shares of Optionable common stock to NYMEX Holdings, Inc. This agreement would give NYMEX a 19% stake in Optionable. The release stated, in part:

> Optionable CEO Kevin Cassidy said, "This strategic relationship between Optionable and NYMEX … will propel our growth in energy and other commodity markets. The combination of having NYMEX as a stakeholder in our success and the development of joint technology programs will enhance our high standing within the energy and other commodities derivatives community…. We believe that this cooperation between both companies will be extremely favorable to our business, and consequently will be well-received by our existing and potential clients."

10.    This statement was materially false and misleading when made because it failed to disclose that Optionable's "high standing with the energy and other commodities derivatives community" was illusory because Defendants had engaged in a scheme to grossly misprice options with BMO in order to prevent BMO from promptly realizing the full extent of its losses which would have an immediate adverse impact on Optionable's bottom line and indeed threaten the viability of its entire brokerage service. It further failed to reveal that Defendants Cassidy, Nordlicht, and O'Connor – who would liquidate over $29 million in stock during this transaction – knew that the OPEX trading platform was a sham and that Optionable's success was dependent on its ability to keep BMO as its largest client. BMO contributed to more than 80% of Optionable's revenue through direct and counterparty commissions as well as NYMEX incentive fees.

11.    On February 6, 2007, Optionable issued a press release announcing "Record Results":

> … record results for its fourth quarter and year ended December 31, 2006. The Company said that revenues increased 310 percent for the fourth quarter and 177 percent for the full year compared to prior-year periods, and net income reached all-time highs, increasing 859 percent for the fourth quarter and 393 percent for the full year compared to prior-year periods.
>                                             ***
> Commenting on the results, Optionable CEO Kevin Cassidy said, "2006 was a

4

benchmark year for us, with the launch of our electronic trading platform, OPEX(R), as well as our Analytics service. We're particularly happy with these results as they are due almost entirely to our customers' positive response to the innovative and impeccable service we delivered to them. These results also demonstrate a very healthy and largely untapped market for our derivative brokerage services.

... OPEX, which we launched in July 2006, is beginning to add to our overall revenue mix. We expect that the efficiency of OPEX in executing trades, will cause its contribution to revenue to become a substantial portion of the mix as we progress into 2007 and even 2008, particularly as we begin to open up the market for our services."

Cassidy continued, "We intend to build on the success we've enjoyed to date, adding products and services beyond our capabilities in the energy derivative market and Analytics. We intend to look at expanding our relationship with NYMEX, and increase the traction of OPEX. In short, there are a number of strategic opportunities in front of us and we will examine each one thoroughly and carefully in order to continue building Optionable into a force in the derivatives brokerage business."

12. These statements were materially false and misleading when made because Optionable's "record results" were not due to its "innovative and impeccable service" and a "healthy and largely untapped market" for its services, but instead a result of its gross mispricing of deals with its largest customer, BMO. Also, the Company did not disclose that OPEX's contribution to the Company's revenue "mix" would be diluted because BMO's contribution to Optionable's revenue was vastly greater than the 30% reported – and was actually closer to 80%.

13. On March 23, 2007, the Company filed its 2006 10-K, which Defendants Nordlicht, Cassidy, O'Connor, Helmig, and Boisseau signed. With regard to BMO, the 10-K stated:

**CLIENT CONCENTRATION**
One of our clients, Bank of Montreal, accounted for 24% and 18% of our revenues during 2006 and 2005, respectively.

14. This statement was materially false and misleading when made because it failed to disclose that BMO actually accounted for roughly 80% or more of the Company's revenues. The impact of BMO upon Optionable was drastically understated by the Company. For example, net revenue reported in Optionable's Q1:07 10Q was over $9 million; 30% of those revenues – amounting to over $2.7 million -- is directly attributed to BMO. However, when Optionable completed a deal with BMO, the Company was paid both by BMO, and by the counterparty on the other side of the transaction. In other words, the profits lost (or earned) from BMO must be doubled – because those

5

profits are also being earned at the hand of BMO from the counterparty. These transactions alone equate to approximately 60% of Optionable revenues. Further, Optionable also earned incentive fees – paid to the Company from the NYMEX. These fees were paid for directing these deals (a large portion of which were transacted with BMO) to NYMEX. As a result, approximately 80% (or more) of Optionable's 1Q revenues were directly related to BMO.

15. Regarding Defendant Cassidy, the 2006 10-K stated:

> Mr. Cassidy has served as our Chief Executive Officer since October 2005 and from March 2001 to March 2004. From April 2004 through September 2005, Mr. Cassidy provided consulting services to us…. Mr. Cassidy's primary responsibilities include business development, sales and marketing, and oversight of our brokerage operations.

16. These statements were materially false and misleading when made because they failed to disclose that Cassidy had been convicted and sentenced to 30 months for felony credit card fraud in 1997 and to six months for income tax evasion in 1993. They also failed to disclose that Cassidy's suspiciously-timed transition from CEO to "consultant" conveniently enabled the Company to avoid reporting Cassidy's highly relevant felonious background in the Company's IPO Registration Statement. In fact, Cassidy temporarily ceased his position as CEO just a few months before the Company began selling securities and returned to his position just four months after the IPO.

17. Regarding OPEX, the Company's electronic trading platform, the 2006 10-K stated:

> We have completed the initial phase of OPEX, which is an electronic brokerage platform automating the energy derivatives between counterparties. We believe that OPEX significantly improves the liquidity and transparency of natural gas and other energy derivatives market by increasing number of participants in a market in which they receive real-time market data. Since our launch of OPEX in 2006, an increasing number of OTC derivatives have been traded directly by our clients on such platform.

18. These statements were materially false and misleading because they failed to disclose that OPEX was not a viable platform as it did not "improve… transparency" but rather enabled defendants to commit fraud. The mispricing of options for BMO on the platform was not transparent but went undetected until D&T uncovered the truth. In fact, despite Optionable delaying the launch of OPEX over a year, the system's lack of viability was evidenced just months after its release by the massive trading losses it caused BMO and the Company's subsequent inability to maintain revenues. In introducing legislation regarding accountability in energy markets in April 2006, Senator Dianne

Feinstein warned that placing trades through an electronic platform undermined transparency: "If you make a trade on NYMEX, a record is kept, an audit trail is there. But if you make a trade on an electronic trading platform, no records are kept, and there is no audit trail." When trades are placed on a platform like OPEX, "manipulation and fraud are more difficult to discover."

19. The 2006 10-K also discussed Optionable's purported internal controls and procedures:

> **ITEM 8A. CONTROLS AND PROCEDURES**
> Our Chief Executive Officer and Chief Financial Officer (collectively, the "Certifying Officers") are responsible for establishing and maintaining disclosure controls and procedures which include controls and procedures that are designed to ensure that information required to be disclosed in the reports which we file with or submit to the SEC is recorded, processed, summarized and reported within the time periods specified by the SEC. The Certifying Officers have evaluated these controls and procedures and they have concluded ... that our disclosure controls and procedures are effective to: i) ensure that information required to be disclosed by us in this report is accumulated and communicated to management, including our principal executive officers as appropriate, to allow timely decisions regarding required disclosure; and ii) ensure that information required to be disclosed in the reports which we file or submit with the SEC is recorded, processed, summarized and reported within the time periods specified by the SEC.

20. These statements were materially false and misleading because the Company lacked adequate internal and financial controls as the three founding stockholders of Optionable, Defendants Cassidy, O'Connor, and Nordlicht controlled 50% of the Company's common stock and held three of the Company's four board seats. There was no audit committee, no compensation committee and therefore decisions were exclusively in control of these defendants, who engaged in a scheme to defraud to their great personal profit. Further, the single independent director, Defendant Helmig, was not truly independent because he, like Nordlicht, was a board member of Platinum Energy.

21. The 2006 Form 10-K also contained a "Code of Business Conduct and Ethics" that assured:

> ... Our Code ... sets out basic principles to guide our employees and provides that all of our employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior. Any employee which violates our Code of Business Conduct and Ethics will be subject to disciplinary action, up to an including termination of his or her employment. Generally, our Code of Business Conduct and Ethics provides guidelines regarding: compliance with laws, rules and regulations, conflicts of interest, insider trading ... reporting any illegal or unethical behavior, and compliance procedures.
>
> In addition, we have also adopted a Code of Ethics for our Chief Executive Officer

7

and Senior Financial Officers.

22. These statements were materially false and misleading when made because there were insufficient controls and procedures in place as evidenced by the Company's failure to disclose Cassidy's criminal history, the Company's overwhelming dependence on a single client (BMO) for the vast majority of its revenues, and Optionable's gross mispricing of options with BMO. These failures to disclose, along with Defendants' insider profits fail to evidence any purported "compliance with laws, rules and regulations, conflicts of interest, insider trading … reporting any illegal or unethical behavior, and compliance procedures."

23. The 2006 10-K contained Certifications "Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002" dated March 23, 2007 and signed by Defendants Cassidy and Biosseau. Defendants Cassidy and Biosseau purported to certify that the report "does not contain any untrue statement of a material fact or omit to state a material fact….," that the financial statements "fairly present in all material respects the financial condition, results of operations and cash flows…," and that they disclosed to their auditors "all significant deficiencies and material weaknesses [and] any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting."

24. These certifications were false and misleading because the Company did not fairly represent the financial condition and results of the Company but rather concealed the extent of BMO's massive contribution to Optionable's revenue, concealed Optionable's gross mispricing practices and failed to disclose that OPEX was not a viable or transparent platform. These certifications also failed to acknowledge material control weaknesses – including lack of meaningful, independent board oversight, and the non-existence of a proper audit committee – which further enabled the fraud through which the Individual Defendants made $29 million in proceeds. Further, Defendants concealed Cassidy's multiple fraud convictions from its auditors despite the above certifications that fraud involving "management…who have a significant role" be disclosed.

25. On April 10, 2007, the Company issued a press release announcing that it had completed the transaction for NYMEX to purchase a 19% stake in Optionable. The release stated, in part:

> Optionable CEO Kevin Cassidy said, "The completion of this transaction is a major strategic step for the Company, allying us closely with the world's largest exchange for the trading of energy futures and options contracts. I am convinced that our close relationship with NYMEX will be an important catalyst in helping drive and

8

accelerate our future growth."

26. This statement was false and misleading when made because this was not a "major strategic step" nor an "important catalyst." Rather, the transaction simply enabled the Individual Defendants to pocket over $29 million in exchange for selling stock in Optionable to NYMEX and thereby diluting their personal exposure resulting from the fact that Optionable's core technology platform OPEX was not viable nor transparent and was doomed to fail when Defendants' mispricing scheme, enabled by the OPEX platform, as well as Cassidy's criminal history, were revealed.

27. Even after news of BMO's catastrophic losses and Optionable's failure to disclose the extent of its dependence on BMO began to be revealed, Defendants continued to represent to investors that the Company's current status was favorable and continued to downplay the significant risk that the loss of revenue from BMO represented. On a May 1, 2007, conference call with financial analysts and investors, Defendants O'Connor, Boisseau, Helmig, and Cassidy stated, in relevant part:

### Relationship Between David Lee & Optionable[2]

ANALYST: ...There's a lot of talk in the press about David Lee being responsible at BMO for the transactions with Optionable. And I was just curious, was David Lee compensated by Optionable with either receiving options or warrants in the past or other compensation in connection with these transactions that he was doing with Optionable?

CASSIDY: Absolutely not. ... He has no ownership in the company and no relationship, besides a broker/client relationship.

### Nordlicht Resignation

ANALYST: ... Just came out of the blue that Mark Nordlicht resigned. Does that have anything to do with any conflict of interest with his father and his role at NYMEX?

CASSIDY: No. He - - we've been working on getting Albert to come and join us for quite some time. He's been on our board. We've asked him in the past to be the Chairman. And Mark finally agreed.

### BMO: Exposure for Optionable; Counterparty Risk

ANALYST: ... Can you give us a sense, in terms of the exposure, in terms of the first quarter from BMO, in terms of their revenue?

BOISSEAU: Well, they accounted for 30% of our revenues.

ANALYST: And is it fair to say that, the right way to look at this from your vantage point that it's more than that, the exposure's more than that because of the counter party risk? Or is that the wrong way to think about it?

---

[2] For clarity, subject headings have been added to excerpts from the conference call transcript.

HELMIG: This is Albert Helmig. There is no counter party, because they're clear transactions.

ANALYST: I'm sorry, not counter party risks, but in terms of overall transactions, they are-- because you, two-thirds or three-quarters of your trades are done on a counter party basis, I'm in the understanding that that, the overall exposure to transactions that are related with BMO is higher than 30%. Is that fair to say?

CASSIDY: You really can't make a statement that way, because not all of those transactions are brokered by counter party.

*** 

ANALYST: Well, what I'm trying to figure out is how much of your growth is attributed to BMO. ...

BOISSEAU: I think we have to be careful when we analyze. Just forget about BMO, but any given client in our industry. What happens is that, when two market participants enter into a trade, it doesn't mean that because one of them would not make the trade that there's not another one that would enter into it or that would enter into a similar trade. So, whether it's BMO or any other client that we have, it doesn't necessarily mean that because it's BMO or a third client that makes that trade, that we wouldn't be able to make another one with a different client. Now, I can't tell you that those would be, that we can replace any given client for a hundred percent of the trade. But there is enough market participants to enter into a trade to accommodate them.

ANALYST: Right. So, if BMO today ceased to exist, do you think you would still, you would be able to capture at least more than half?

BOISSEAU: First of all, I think this is a hypothetical question. I don't think that BMO is going away. They certainly didn't indicate that they're going away. They're a solid company. They have a strong financial position.

*** 

ANALYST: Okay. I mean, is business good right now? Is it [the problems with BMO] creating some volatility which is bringing new players in?

CASSIDY: We haven't seen any trend change.

### Status of BMO/Optionable Relationship

ANALYST: Okay. Second question, in a New York Post on Saturday, I hate to bring this up, but they mentioned BMO not using you guys for unwinding their positions. I listened to the BMO conference call and they made it very clear that they will continue with their natural gas trading operations. It's a major money maker for them and a huge part of their business. But do you see any signs that they would not be using you in the future?

CASSIDY: No, absolutely not.

*** 

10

ANALYST: But you will say they're [BMO] also your customers and you're still in good standing with them as of today? Because, I mean, the recent press that's come out has made it seem that they're going to pull the plug on your guys.

CASSIDY: We're still, well, nobody's pulled the plug on us and we're [sic] still have all of our customers.

*** 

ANALYST: ... So, as far as you know, obviously, they're [BMO] still doing business with you. They're still in the market. They've said that they're not closing out business or anything like that. So, do you have a sense of what they, just from your color and your contacts, what they may be doing with their operations? Would that be taking more risk off their books? Or would that be doing less transactions? ... [W]ould you expect, just as you said, somebody else to come in and fill their role in the market?

CASSIDY: Well, traditionally our largest client, if you went back ten years to even the forerunner of Optionable, you would see that there has been, it's a moving front runner client. There's always a bigger client, especially if they happen to be a market maker in the natural gas options market. So, there's several big clients that we have that are bigger than anybody else because they happen to be in the role of a market maker. And so, around that I wouldn't want to make any other comments than what we made about BMO, except- - they made their comments. They said that they were going to stay in the business. I do believe them. I believe the same people are still there, but probably they have more, you know, supervisory around risk at this point, which is very understandable. The natural gas market is a very volatile market and it has volatility and volume vacuums. So, you could easily have it be extremely volatile where people are short options are getting their eyes ripped out or you can have just no volatility, it sits and you have a volume vacuum and a volatility vacuum at the same time, which if you're a long ball player is painful.

### OPEX Technology & Platform

ANALYST: ...[I]s there a danger of NYMEX building their own platform in a few months and making the OPEX platform obsolete in some way?

CASSIDY: We don't think so.

ANALYST: Okay. And do you have any assurances of that or are they free to take your technology and then just build their own in three months?

CASSIDY: No, they're not free to take our technology. No. We're in a somewhat of a joint venture. The NYMEX alliance and we have some marketing initiatives around that. We view the NYMEX relationship as a win/win scenario.

ANALYST: So, do you expect it to help you improve the OPEX platform in the future?

CASSIDY: Absolutely. It already is. We have an OPEX screen in the ring on the NYMEX with our markets up there. And as our, as the crude oil options business that's

11

being, is the floor contract, as it grows, we expect that our growth will continue at a good pace.

***

ANALYST: What is the opportunity there [in crude oil] in terms of the- -

CASSIDY: Well, we believe they're all moving to electronic auction. It's- - as having a somewhat first mover advantage, at least with NYMEX clearing, we believe that we can get traction on our screen and can continue to get people signed up for our platform and have our screen populated and more of the transactions going on the electronic platform.

ANALYST: And what are the daily volumes today in those markets?

CASSIDY: Well, crude oil options, yesterday it was in the 70 to 80,000 options range on the floor.

ANALYST: So you think you could ultimately get to, what, 20 to 25,000 of that? What's your goal in terms of margin?

CASSIDY: We would, in our analysis, we think we can get somewhere in the 25 to 30% range. We think that's very possible.

ANALYST: So, clearly that, just that opportunity alone could more than make up for any loss of potential revenue from BMO?

CASSIDY: That's possible.

28. In fact, after the conference call a financial news and analysis company issued an article entitled *Optionable Conference Call Erases Doubts* which stated, in part:

> Fresh off the Optionable conference call, the company discussed its phenomenal quarter and offered what seemed to be a pretty bright outlook going forward. **We also learned a few things that should calm the nerves of shareholders** that have been rattled following news reports fearing the loss of the Bank of Montreal's energy trading that would cut into the company's business which accounted for a hefty 30 percent of Optionable's revenue in the first quarter. ... [Emphasis added].
>
> - The company's strategic partnership with the NYMEX (NYMEX currently has a 19 percent stake in Optionable and has been issued a warrant to boost its stake to 40 percent) is generating broader interest, especially with the offering of new energy contracts as Optionable's OPEX trading platform gains acceptance (OPEX now accounts for 15 percent of revenue and that number is expected to grow)....
>
> - In regards to the Bank of Montreal's energy portfolio losses that could affect the trading it does with Optionable (30 percent of first quarter revenues were attributed to

12

the bank), the company responded by saying that the Bank of Montreal has not yet exited the market nor stopped its trading activities. Optionable recognizes its exposure to large clients, but emphatically stated that even if the Bank of Montreal ceased its operations, the company would likely be able to capture that percentage of revenue elsewhere, for instance in its increasing share of crude oil options.

29. The conference call statements were materially false and misleading when made because:

- Defendants concealed that the Company's revenues *and indeed the very sustainability of its brokerage service* faced substantial risk from the disclosure that BMO would face a massive loss as a result of Optionable's gross mispricing of options.

- Defendants failed to disclose that OPEX was not a viable, transparent platform and could not be sustained by other clients if BMO cut ties. *Optionable's unsustainable business model is evidenced by the fact that net revenues dropped from $9.1 million in the Company's first quarter of 2007 to under $64,000 in third quarter 2007 after BMO cut its ties.*

- Defendants concealed the extent of Optionable's extreme dependence on BMO, its largest client, stating that BMO accounted for just 30% of Optionable's revenues when it actually contributed closer to 86%. Though specifically questioned about it, both Helmig and Cassidy affirmatively discounted and concealed the counter party risk and heightened exposure due to BMO's involvement in such a high volume of Optionable's transactions.

- Cassidy stated that David Lee had no relationship with the Company other than a broker/client relationship, even though he and Lee were close personal friends.

- Defendants repeatedly falsely stated that they did not expect BMO to cut its ties with the Company despite knowing that a D&T audit had just exposed the mispricing scheme on the part of Optionable and that Cassidy had an undisclosed relationship with BMO's biggest trader and his supervisor as well as an undisclosed criminal history. BMO cut its ties with Optionable a week later.

- Defendants' statements that they did not believe NYMEX would cut its ties with Optionable were false and misleading because Cassidy's criminal background and relationship with BMO's tainted Lee and Moore remained undisclosed. The failure of the OPEX platform and Optionable's plummeting stock value meant that NYMEX's newly-acquired stake in Optionable would become worthless and its warrants useless, as evidenced by NYMEX's immediate write down of over $26M of the $29M investment. Just over a week later NYMEX cut ties with Optionable and pulled its representative from the board.

- Defendants stated there was no danger of NYMEX building a competing platform even though the NYMEX executive on Optionable's board was NYMEX's VP of New Product Development. NYMEX revealed a competing platform as soon as the fraud was exposed.

30. On May 8, 2007, Helmig dismissed concerns about the loss of its biggest client and stated: "In the extreme scenario, that they go away tomorrow, someone else comes in and fills BMO's place."

31. This statement was false and misleading when made because, although Optionable's client base was purportedly growing, Optionable became increasingly dependent on BMO each quarter.

13

Defendants had drastically understated BMO's impact on revenues as evidenced by the fact that Optionable earned 99% less net revenues in 3Q:07 – after it lost BMO as a client -- as it did just two quarters prior in 1Q:07; quarterly net revenues dropped from $9.1 million to less than $64,000.

32. On May 9, 2007, Optionable issued a release stating that "one of its clients recently incurred some losses that have become a subject of public discussion." The release quoted Helmig:

> Gains and losses are both inevitable in trading energy derivatives. We are never pleased when losses dominate for one of our clients, but we do not design or help to design their strategies, nor are we financial advisors. We provide brokerage and execution services for trades that we are instructed to make by our clients. We believe strongly that our brokerage and execution services are and have been rendered appropriately, professionally and correctly.

33. This statement was materially false and misleading when made because Defendants' brokerage and execution services were far from "appropriate" or "correct," but rather, had been used to provide grossly mispriced trades to the Company's largest client.

**The True Financial and Operational Condition of
Optionable Begins to be Revealed**

34. On April 27, 2007, BMO informed investors that it had between $350 million and $450 million (Canadian) in trading losses stemming from natural gas options trades made through Optionable. In a press release, BMO Financial Group President and CEO Bill Downe stated:

> "The commodity trading losses were the result of decisions that did not adequately recognize the vulnerability of the portfolio to changes in market volatility. We are conducting a thorough review and actions have been taken to address the current situation and reduce the likelihood of a recurrence. The commodity trading losses are particularly disappointing as our company continues to experience good operating momentum. We remain committed to providing the high level of service that our clients in the energy sector have come to expect from BMO Capital Markets."

35. On this news, shares of Optionable shock fell 20.6 percent to close at $5.56 per share on unusually heavy trading volume on April 27, 2007.

36. On April 30, 2007, *TheStreet.Com* published an article entitled "Optionable's BMO Bite" tying the catastrophic losses of BMO to Optionable. The article also disclosed that Optionable had drastically understated the profits it earned from transactions with BMO:

> **BMO Financial's natural gas blowup could yet singe commodities broker Optionable.**
>
> BMO, also known as Bank of Montreal, admitted Friday that it lost more than $300 million on natural gas trades that went bad. Optionable, a Valhalla, N.Y., broker of

14

energy options and derivatives trades to U.S. hedge funds and other financial institutions, said in a recent federal filing that BMO accounted for 24% of net revenue last year. But that figure could significantly understate the extent of Optionable's dependence on Bank of Montreal, its largest customer, for business.

Optionable is in the business of finding so-called counterparties for energy trades -- meaning it matches buyers with sellers. The broker charges a commission to both parties.

A spokesman says counterparty deals represent 75% of Optionable's trading revenue. In such transactions, revenue from any given party represents just half of the company's potential revenues. That's a key point in assessing Optionable's dependence on BMO.

A look at Optionable filings from last year show that net revenue for 2006 was $16 million. Taking Optionable's 24% figure puts revenue from BMO at $3.8 million. That figure, in turn, represents 43% of the firm's $8.9 million in 2006 brokerage fees, according to filings with the Securities and Exchange Commission.

But remember, there are two sides to any counterparty deal. So **trading deals involving BMO appear to account for 86% of the firm's brokerage fees,** even if half of those fees aren't actually from BMO itself.

An external spokesman for Optionable agrees that BMO's impact is likely more than the 24% when factoring in counterparties. He says counterparty trading, in which Optionable gets paid on both sides, represents about three-quarters of its trading revenues. Floor trading makes up the remainder, says the spokesman, declining to provide a further breakdown of Optionable's business with BMO on the floor trades. In floor trades, brokers are only paid once, by the exchange. [Emphasis added].

37. On this news, the value of Optionable shares fell 5.49% from the opening price on April 30, 2007 to close at $5.34 per share on May 1, 2007.

38. On May 2, 2007, shares of the Company began to precipitously decline after the Company announced the abrupt departure of its Chairman, Nordlicht. Thereafter, shares of the Company fell from $6.00 per share to $4.81 per share: a single day decline of almost 20% on huge volume.

39. On May 8, 2007, BMO issued a press release updating its commodity trading losses announcing that it would suspend trading with Optionable immediately:

BMO is suspending all of its business relationships with the brokerage firm, Optionable, Inc., as well as all derivatives trading through that firm, pending the results of a full external review which is ongoing.

In addition, the company said that it has changed the operating structure of BMO Capital Markets in order to provide additional oversight of the Commodities business, which now reports within a business line most experienced in the trading

15

and valuation of derivatives.

BMO confirmed that two of its commodity trading professionals are on leave pending the results of the external review.

40. On May 9, 2007, *TheStreet.com* reported on the BMO announcement:

**BMO Move Bashes Optionable**
**BMO Financial has suspended its relationship with Optionable.**

In a statement on Tuesday, the Canadian bank said it is "suspending all of its business relationships" and "all derivatives trading through that firm, pending the results of a full external review which is ongoing."

The move comes just over a week after the Toronto-based financial institution, also called Bank of Montreal, reported that its commodities trading operation took a hit of about $315 million to $404 million on wrong-way bets on natural gas options.

Wednesday's news sent Optionable shares plunging 41% on the bulletin board.
***

Canada's fourth largest bank, BMO said commodities traders involved in the natural gas losses are on leave pending an external review of its trading. It did not name names. Early reports pegged the bank's losses to BMO natural gas trader David Lee.

The announcement could be a big hit to Valhalla, N.Y.-based Optionable's business, which stated during a first-quarter earnings call that BMO represented 30% of its revenues. The electronic options trading operation has said it has been trying to wean itself from its dependence on one client, but even during Optionable's earnings call there was no indication that BMO would suspend its business with Optionable.

41. On May 9, 2007, Optionable filed an 8-K regarding NYMEX's competing electronic platform:

The New York Mercantile Exchange, Inc., a subsidiary of the NYMEX Holdings, Inc., announced that it will offer options trading for crude oil, natural gas, gold, and silver on the CME Globex electronic trading platform beginning in June 2007. We believe that some of the contracts trading on the CME Globex platform may compete with contracts trading on the Company's OPEX platform. The Company is unable to quantify the impact of this potential competition on its business, including its future results of operations and financial condition.

42. Following the publication of these reports, Optionable traded a huge volume (over 11 million shares) and the price of the Company's stock declined by almost 40%. Following the publication of the report that BMO would abandon Optionable, Company shares sank to $2.81 per share.

43. The following day, May 10, 2007, investors learned that the Company had, in collaboration with BMO's biggest natural gas trader with close personal ties to Cassidy, grossly mismarked options prices it provided to BMO. That day, *The Financial Post* of Toronto reported:

16

**BMO moves on auditors' report: Auditors had 'never seen such a wide discrepancy in terms of pricing'**

TORONTO -- The decision by Bill Downe, BMO's new chief executive, to act decisively on its $350-million to $450-million natural-gas trading blunder was the result of a tough report from forensic auditors Deloitte and Touche LLP into the activity of BMO's former star commodities trader, David Lee, it emerged on Wednesday.

BMO engaged Deloitte in early February and received the final report in late April.

Deloitte found there had been **"serious mismarking of the book of natural-gas options,"** said a source familiar with the report.

The forensic auditors indicated they had **"never seen such a wide discrepancy in terms of pricing"** between the values marked in BMO's portfolio of natural-gas options and their market value, the source said.

The Deloitte report also indicated that **some of the prices used in BMO's mismarked book of trades were provided by Valhalla, N.Y.-based brokerage Optionable Inc.,** the source said.

***

BMO has also confirmed that Mr. Lee, the man at the centre of the money-losing trades, is on a leave of absence, along with Bob Moore, the bank's executive head of commodity products.

On Tuesday, BMO also said it has suspended its business relationship with Optionable.

Shares of the brokerage, which was dependent on Mr. Lee for as much as 30% of its revenue, have tumbled 60% since BMO announced the trading losses.

Sources close to Mr. Lee and Optionable say the BMO trader, widely regarded as the biggest natural-gas options trader in the market, had a close personal relationship with the senior management of Optionable, including Kevin Cassidy, the chief executive.

Meanwhile, the brokerage's new chairman, Albert Helmig, dismissed concerns about the loss of its biggest customer on Tuesday. "In the extreme scenario, that they go away tomorrow, someone else comes in and fills BMO's place," Mr. Helmig said.

Optionable's stock price has soared from $1.34 six months ago to as high as $8.63 in February this year, when it was revealed the New York Mercantile Exchange (Nymex) -- one of the foremost commodities exchanges in the world -- had bought a 19% stake in the company.

However, there was more bad news for Optionable yesterday after the company filed a document with the U.S. Securities and Exchange Commission (SEC) indicating that its options trading platform, known as OPEX, is under threat from the Nymex's own electronic trading platform.

17

"The company is unable to quantify the impact of this potential competition on its business, including its future results of operations and financial condition," the Optionable statement said.

Mr. Helmig, a former vice-chairman of Nymex, -took over as Optionable's chairman last week following the resignation of Mark Nordlicht.

Mr. Nordlicht said his resignation was not linked to BMO's trading losses. Both Mr. Helmig and Mr. Nordlicht are also on the board of directors of Platinum Energy Resources Inc. an oil and gas business that uses hedge financing to profit from energy price volatility. [Emphasis added.]

44. On May 10, 2007, *TheStreet.com*, in an article entitled *Nymex Nails Optionable* reported:

Optionable investors just got burned again.

The Valhalla, N.Y. based electronic options trader plunged for the second day in a row Thursday after a big shareholder [NYMEX] said it would compete with Optionable in the commodities trading business. After dropping 41% Wednesday, Optionable hemorrhaged 50% Thursday to $1.40. Shares traded as high as $8.63 earlier this year.

The latest blow comes from the [NYMEX], which said it plans to electronically trade options and futures in natural gas, crude oil, gold and silver via its CME Globex trading platform.

45. Following these reports, shares of the Company further collapsed on huge volume. On May 10, 2007, Optionable common stock closed at a mere $.85 per share.

46. The full truth was revealed on May 14, 2007 when Optionable announced that Vice Chairman, CEO, and Director Defendant Cassidy resigned effective May 12, 2007, and Board Chairman Defendant Helmig would be taking over his role. On that same day, NYMEX removed its representative, Ben Chesir, from Optionable's board of directors pending a review of the brokerage firm after discovering that Cassidy was sentenced to 30 months for a felony conviction of credit card fraud in 1997 and six months for income tax evasion in 1993. These prior felony convictions were not disclosed in any of the Company's public filings or press releases. Upon these announcements, shares of the Company's stock continued to fall, closing at $0.425 per share on May 14, 2007.

## INSIDER SALES DURING THE CLASS PERIOD

47. On April 10, 2007 – just days prior to Optionable's mispriced trades becoming public -- Defendants Cassidy, O'Connor and Nordlicht cashed in nearly $29 million in Optionable stock, pawning off 19% of the Company on NYMEX just before the fraud came to light:

  
| INSIDER SALES | | | |
|---|---|---|---|
| Date | Insider | Shares | Value |
| April 10, 2007 | KEVIN CASSIDY | 1,905,000 | $5,124,450 |
| April 10, 2007 | EDWARD O'CONNOR | 1,853,886 | $4,986,953 |
| April 10, 2007 | MARK NORDLICHT | 7,000,000 | $18,830,000 |
| | **TOTAL:** | **10,758,886** | **$28,944,403** |

## POST-CLASS PERIOD DEVELOPMENTS AND INVESTIGATIONS

48.  On May 18, 2007, in an article entitled *"BMO raises trading losses to $680 million; Probing 'potential irregularities.' Says it has increased concerns with the reliability of quotes from principal broker,"* The Gazette reported that BMO engaged forensic auditors D&T in February to investigate its natural gas trading portfolio.  The article reported that in a report to BMO in mid-April, D&T questioned the valuations provided by BMO's broker, Optionable, and reported that BMO had increased concerns with the reliability of Optionable's quotes.

49.  Sources reported to the press that Cassidy had close personal relationships with Lee – the trader "pegged for" and "at the center of the money-losing trades"—and Moore, the bank's executive head of commodity products.  Plaintiffs' investigation confirmed that Moore's son, Robert Moore III, was also employed at Optionable during at least the summer of 2006 as an OTC Office Intern and employed at Capital Energy, a company in which Cassidy and O'Connor were each 50% stockholders and Cassidy is the Managing Director, as Floor Clerk during the summer of 2005.

50.  On August 14, 2007, Optionable disclosed that it had been subpoenaed by a grand jury and by the district attorney for New York County and that it had received requests for information from the US Commodity Futures Trading Commission, the US Securities and Exchange Commission, and the US Department of Justice.  Months earlier, however, on May 24, 2007, the *NY Post* reported in an article entitled *SEC Said to Join Scrutiny of Optionable*, the following:

> The Securities and Exchange Commission has begun an investigation into events that have led to the near collapse of once high-flying commodities broker Optionable Inc., according to a source familiar with the matter.
>
> **Casting a wide net, the SEC is probing a variety of transactions that have bedeviled Optionable,** a Valhalla, N.Y.-based energy broker. Last week, The Wall Street Journal reported that the Commodity and Futures Trading Commission has

also begun an inquiry into the company.

**These probes include looking at the possible grant of warrants to key Nymex energy traders as well as the company's decision not to disclose that its former chief executive, Kevin Cassidy, served prison time in the 1990s following a conviction for using money that should have been sent to the IRS for personal expenditures. Cassidy stepped down on May 1.**

Lawyers from the SEC's enforcement division also have looked at Optionable's relationship with Sleepy Hollow Coffee Roasters Inc., a coffee company that's jointly owned by Cassidy and President Ed O'Connor.

Just over a month ago, Optionable was trading for just under $7.50 a share and was sporting a $27 million investment from the Nymex in exchange for a 19 percent stake in the company.

But when BMO - which accounted for 30 percent of its business - disclosed a $400 million trading loss from bad valuations provided by Optionable, investors began bailing out. Soon after, its chairman and founder, Mark Nordlicht, unexpectedly resigned.

The rush by investors out of Optionable turned into a stampede when BMO said it was suspending its business relationship with the company. BMO later revised its trading loss to $618 million.

Then Nymex began making noises about suing to get its money back. A Nymex official who served on the board has stepped down. [Emphasis added].

51. On August 14, 2007, NYMEX announced it would write down $26 million of its $28.9 million investment in OPEX that quarter.

52. On November 13, 2007, Optionable reported in its 8-K that Defendant Helmig was terminated from Optionable effective November 6, 2007.

## DEFENDANTS' GAAP AND SEC VIOLATIONS

53. During the Class Period, defendants represented that Optionable's financial statements were prepared in conformity with GAAP. However, defendants used improper accounting practices in violation of GAAP and SEC reporting to artificially inflate the price of Optionable's stock.

54. As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Statement No. 1, paragraph 42.

20

55.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).  As noted by the AICPA professional standards, "the fair presentation of financial statements in conformity with GAAP is an implicit and integral part of management's responsibility."

**Defendants Materially Understated Business Volume Conducted with BMO**

56.  During the Class Period, Defendants failed to disclose that BMO actually accounted for roughly 80% or more of the Company's revenues. Accordingly, the financial vulnerability of BMO withdrawing its relationship with Optionable was materially understated.

57.  According to paragraph 21 and 22 of Statements of Position ("SOP") No. 94-6, *Disclosure of Certain Significant Risks and Uncertainties*:

> Vulnerability from concentrations arises because an entity is exposed to risk of loss greater than it would have had it mitigated its risk through diversification. Such risks of loss manifest themselves differently, depending on the nature of the concentration, and vary in significance.
>
> Financial statements should disclose the concentrations described in paragraph .22 if, based on information known to management prior to issuance of the financial statements, all of the following criteria are met:
>> a. The concentration exists at the date of the financial statements;
>>
>> b. The concentration makes the enterprise vulnerable to the risk of a near-term severe impact.
>>
>> c. It is at least reasonably possible that the events that could cause the severe impact will occur in the near term.

58.  Defendants knew or recklessly disregarded that they were ignoring the guidance in SOP 94-6 concerning group concentrations. SOP 94-6 states that "[]Group concentrations exist if a number of counterparties or items that have similar economic characteristics collectively expose the reporting entity to a particular kind of risk." SOP 94-6 ¶ 22. Because Optionable earned revenues at the hand of BMO from the counterparty - the revenue earned from BMO must be doubled. These transactions alone equated to approximately 60% of Optionable revenues.  Further, Optionable also earns incentive fees – paid to the Company from NYMEX. These fees are paid for directing these deals (a large portion of which were transacted with BMO) to NYMEX. As a result, approximately 80% (or more) of Optionable's 1Q revenues were directly related to BMO.