```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 M90wS6NXbjTiXOlHx8K+TkqSToZ1ZS/2/C8YVGObEhE0MbZc/4zGg7mczmSRoCcq
 bH58g5tYA+eDkLt9p72cVg==
```

```
<SEC-DOCUMENT>0001172665-07-000078.txt : 20070323
<SEC-HEADER>0001172665-07-000078.hdr.sgml : 20070323
<ACCEPTANCE-DATETIME>20070323160452
ACCESSION NUMBER:                 0001172665-07-000078
CONFORMED SUBMISSION TYPE:        10KSB
PUBLIC DOCUMENT COUNT:            6
CONFORMED PERIOD OF REPORT:       20061231
FILED AS OF DATE:                 20070323
DATE AS OF CHANGE:                20070323

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:          Optionable Inc
                CENTRAL INDEX KEY:               0001303433
                STANDARD INDUSTRIAL CLASSIFICATION:  SECURITY & COMMODITY BROKERS
                IRS NUMBER:                      522219407

        FILING VALUES:
                FORM TYPE:           10KSB
                SEC ACT:             1934 Act
                SEC FILE NUMBER:     000-51837
                FILM NUMBER:         07715343

        BUSINESS ADDRESS:
                STREET 1:            465 COLUMBUS AVENUE
                STREET 2:            SUITE 280
                CITY:                VALHALLA
                STATE:               NY
                ZIP:                 10595
                BUSINESS PHONE:      914-773-1100

        MAIL ADDRESS:
                STREET 1:            465 COLUMBUS AVENUE
                STREET 2:            SUITE 280
                CITY:                VALHALLA
                STATE:               NY
                ZIP:                 10595
</SEC-HEADER>
<DOCUMENT>
<TYPE>10KSB
<SEQUENCE>1
<FILENAME>form10ksb.txt
<DESCRIPTION>FORM10-KSB
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549


FORM 10-KSB

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the year ended December 31, 2006

or

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number: 000-51837

Optionable, Inc.
----------------------------------
(Name of Small Business Issuer in Its Charter)

Delaware                              52-2219407
-------------------                   --------------------
(State or Other Jurisdiction of       (I.R.S. Employer
Incorporation or Organization)         Identification No.)

465 Columbus Avenue, suite 280, Valhalla, New York 10510
-------------------------------------------------------------------------------
(Address of Principal Executive Offices) (Zip Code)

(914)773-1100
----------------------------------
(Issuer's Telephone Number, Including Area Code)

Securities registered under Section 12(b) of the Exchange Act:
          None

Securities registered under Section 12(g) of the Exchange Act:
Common Stock, $0.0001 par value

Check whether the issuer is not required to file reports pursuant to Section 13
or 15(d) of the Exchange Act. [ ]

Check whether the issuer (1) filed all reports required to be filed by Section
13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter
period that the registrant was required to file such reports), and (2) has been
subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Check if there is no disclosure of delinquent filers in response to Item 405 of
Regulation S-B contained in this form, and no disclosure will be contained, to
the best of registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-KSB or any
amendment to this Form 10-KSB. [ ]

Indicate by check mark whether the registrant is a shell company (as defined
in Rule 12b-2 of the Exchange Act).    Yes  [ ] No  [X]

Issuer's revenues for its most recent fiscal year: $16,069,511

The aggregate market value of the issuer's common stock, $0.001 par value, held
by non-affiliates as of March 12, 2007, was approximately $193,322,745.

The total number of shares of the issuer's common stock, $.0001 par value, outstanding on March 12, 2007, was 52,177,714.

Transitional Small Business Disclosure Format:  Yes |_| No |X|

<PAGE>


                    SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS


Certain statements in this Annual Report constitute forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These include statements about anticipated financial performance, future revenues or earnings, business prospects, projected ventures, new products, anticipated market performance and similar matters. The words "budgeted," "anticipate," "project," "estimate," "expect," "may," "believe," "potential" and similar statements are intended to be among the statements that are forward-looking statements.  Because such statements reflect the reality of risk and uncertainty that is inherent in our business, actual results may differ materially from those expressed or implied by such forward-looking statements.  Some of these risks and uncertainties are related to our current business situation and include, but are not limited to our lack of sufficient revenues to cover operating expenses, our history of operating losses, our need for additional financing for working capital purposes, the uncertainty about our ability to continue as a going concern and dependence on our current management team.  Readers are cautioned not to place undue reliance on these forward-looking statements, which are made as of the date this report was filed with the Securities and Exchange Commission.

Readers are advised that we undertake no obligation to release publicly any revisions to the forward-looking statements to reflect events or circumstances after the date hereof or to reflect unanticipated events or development. To the extent that the information presented in this Annual Report on Form 10-KSB for the year ended December 31, 2006 discusses financial projections, information or expectations about our products or markets, or otherwise makes statements about future events, such statements are forward-looking. We are making these forward-looking statements in reliance on the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.  Although we believe that the expectations reflected in these forward-looking statements are based on reasonable assumptions, there are a number of risks and uncertainties that could cause actual results to differ materially from such forward-looking statements. These risks and uncertainties are described, among other places in this Annual Report, in "Management's Discussion and Analysis of Financial Condition or Plan of Operation."


                                    2
<PAGE>

                                 PART I

ITEM 1.  DESCRIPTION OF BUSINESS


We were formed in Delaware in February 2000.  Our goal is to be the leader of commodity derivative brokerage services provider to brokerage firms, financial

institutions, energy traders, and hedge funds worldwide.  We specialize in
providing our services for the brokerage of energy derivatives.  A substantially
portion of all energy derivatives we have brokered in the past were natural gas
derivatives.  We are providing below a summary of elements describing and
impacting our industry to enhance your understanding of our business.


INDUSTRY

The markets for energy commodities trading include trading in both physical
commodities contracts and derivative instruments -- instruments that derive
their value from an underlying energy commodity or index -- across a wide
variety of commodities, including
crude oil, natural gas, electricity or power, coal, chemicals, weather and
emissions. Derivative instruments provide a means to manage exposure to price
risk, asset portfolio allocation, speculation or arbitrage. Contracts for
physical commodities allow counterparties to contract for the delivery of the
underlying physical asset.

Most of the following discussion will specifically address the natural gas
derivatives market.  However, we believe that most of the elements of this
discussion apply to other energy derivative markets as well.

Natural-gas derivatives

Natural gas derivatives are characterized by its underlying commodity
(natural gas), the term of the contract, and the settlement, which can require
physical delivery or financial settlement.  The natural gas derivatives with the
most liquidity are those with shorter settlement or expiration dates (less than
three months).  Derivatives with longer settlement or expiration dates are also
larger in dollar volume and are not as liquid, requiring more extensive
resources to find potential counterparties.  Accordingly, these derivatives tend
to generate higher brokerage transaction fees.

Natural gas is an actively traded commodity.  Natural gas derivatives are
primarily traded based upon the location to which they are delivered ("hub").
The Henry Hub, located in Louisiana, is the most widely-used pricing point for
natural gas derivatives in the United States.

Market Participants

Financial institutions, including bank brokerage houses and hedge funds as well
as eligible individual traders use natural gas derivatives market to weigh their
risk and rewards in: 1) a balanced portfolio asset allocation without investing
in the physical asset, and 2) speculate on the price movement of natural gas
prices or the related derivatives.  Natural gas producers, natural gas
distributors and large natural gas consumers will use natural gas derivatives
market to manage their exposure to future price movements for certain quantity,
time and delivery location, and sometimes, with an expectation that the
derivatives would ultimately provide a financial gain.

Types of Natural Gas Derivatives Markets

There are two types of natural gas derivative markets -- the futures market and
the over-the-counter ("OTC") market.

Futures Market

3

<PAGE>

Most of the transactions on the natural gas futures market are made through an exchange, such as New York Mercantile Exchange ("NYMEX") and Intercontinental Exchange ("ICE").

The trading of natural gas futures is conducted either on an electronic platform or on an open-outcry trading floor. Prices are established publicly either on a screen or on the floor by participants posting bids, or buying indications, and offers, or indications to sell. While the electronic platform provides more transparency to our clients, the open-outcry trading floor provides a better environment for exchange of ideas and solutions to address our clients' needs.

Futures and options are two derivatives available to trade on a futures market. Futures consist of a contract to buy or sell a certain quantity of natural gas, for example, during a specified month and are settled through either physical delivery or cash settlement.  Options consist of a right, but not an obligation, to buy or sell a futures contract at a certain price.

OTC Market

Over-the-counter, or OTC, is a term used to describe trading activity that does not take place on a regulated exchange.

Several derivatives are available for trade on the OTC market, such as forwards and swaps, differentials and spreads and options.

Forwards are negotiated agreements between counterparties to deliver a specified quantity of natural gas, on a specified date, and at a specified location.

Swaps are contracts between the holders of two different assets with differing risk and performance profiles in which the risk or performance characteristics are exchanged. Swaps may be settled against the future price of a single commodity or against an index of commodity prices.

Spreads are the simultaneous purchase and sale of forward contracts for different months, different commodities or different grades of the same commodity.

Basis options are contracts that allow counterparties to swap the physical or financial delivery of natural gas commodity between two different delivery points.

Options traded on the OTC market, unlike those traded on the futures market, are contracts that convey to the buyer the right, but not the obligation, to require the seller to make or take delivery of a stated quantity of natural gas at a specified price. Options may also be settled in cash, based on the difference between the market price of, for example, natural gas and the price of the commodity specified in the option.

Besides the types of derivatives traded on those markets, there are several inherent differences between them.  For example, the futures market is primarily conducted through an open-outcry market, such as NYMEX, which imposes physical limitations on the number of participants who can trade at the same time. Accordingly, membership on such exchanges becomes a commodity of its own and may require significant resources.  The types of derivatives traded on the OTC market are not standardized such as those used on the futures market. Therefore, when one counterparty wants to enter into OTC derivatives transactions, the use of a broker facilitates the search for another counterparty.  The OTC-based transactions tend to generate higher brokerage fees due to extensive involvement of a broker.

However, there is a significant similarity between these natural gas derivatives markets in that they lack transparency for the participants, unlike the equity market.  Counterparties to a natural gas derivative transaction are unaware of all offers available on either market at any given time under current conditions, unless it is executed on an electronic platform with sufficient liquidity.

4

<PAGE>

Trends

We believe that several factors will impact the natural gas and other energy derivatives market in the future:

o       Natural gas options as asset class:  new market participants, such as hedge funds, and institutional investors, such as pension plans, are taking a greater interest in the returns afforded by natural gas derivatives and the asset diversification opportunities it provides.

o       Lesser credit risk using the OTC market:  since 2002, natural gas derivatives feature cleared OTC contracts. Cleared OTC contracts allow participants to limit counterparty credit risk and lower the amount of capital required to trade.

o       Larger number of new entrants: both factors have increased the number of market participants in the natural gas derivatives market which improves its liquidity.  While some recent large entrants, such as Amaranth, have already exited the markets, an even larger amount of new entrants in the last few years have contributed to an increase in volume of energy contracts traded.

o       Need for higher transparency in the natural gas derivatives market: the natural gas derivatives market lacks transparency when compared to other markets, such as the equity market. The participants, who are enjoying such transparency in other markets, are requesting the same level of transparency in the natural gas derivatives market without obtaining it with the currently available solutions offered by brokers or exchanges.

o       While industry participants have refined their risk management processes in the last few years, the vast majority of the of holders of OTC energy derivatives continue to use theoretical approaches to value their portfolio. Without a real-time mark-to-market approach, such holders may continue to overstate or understate the true value of their energy derivatives portfolio.

Current Solutions to Energy Derivatives Market

The current solutions offered to energy derivatives market vary widely.

Some brokerage firms offer only services for the futures market or the OTC markets, but not both.  This restricts the choice of market participants who combine futures and swaps, for example, in their hedging or investment strategy which are not traded on the same markets.  If dealing with brokers who only offer services on one of the markets, the market participants are forced to use more than one broker, which creates further lack of market transparency, inefficiencies in the use of resources as well as ineffectiveness in timely trading.

Other brokerage firms offer services on both markets, but most do not have the intent or the resources to address the current lack of transparency and liquidity in the energy derivatives market by using an electronic platform, for example.

While exchanges are used primarily for the futures market, they are also used for clearing OTC trades.  However, none of the larger exchanges provide sufficient support for derivatives trading on the OTC market, such as options, which reduces the liquidity of such market.  Additionally, exchanges do not offer brokerage services which facilitate the search for counterparties.

Some brokerage firms do not provide real-time valuation services to their clients for OTC energy derivatives, which prevents such clients from determining whether their portfolio is properly valued and decreases the likelihood that they maximize their investment strategy.

Other Elements of the Natural Gas Derivatives Market

The energy derivatives market is also impacted by the following elements:

Trading volumes are driven primarily by the degree of volatility in the energy derivatives market.

5

<PAGE>

However, if the volatility of the price of natural gas or oil and their related derivatives is too high, some of the market participants will wait that it declines before entering into transactions, which reduces trading volumes.

Worldwide geopolitical conditions impact the perceived or real supply or demand of a particular energy commodity.

Unexpected weather conditions, such as hurricanes in the Gulf Coast or milder or colder weather in the Northeast United States, impact the perceived or real supply or demand of a particular energy commodity.  While hurricanes have recently become more expected, their unpredictable strength and trajectory increase the volatility of energy commodities market.

The delivery of energy commodities is generally seasonal.  In parallel, the trading volume of the energy derivatives market, which historically has been higher during the winter and the summer, has been recently skewed by the larger number of entrants in the market as well worldwide geopolitical events and unexpected weather conditions.

Our Solutions

We understand that the participants in the energy derivatives market have various investment needs, some of which may be as simple as trading speculative futures, but most need a brokerage firm to provide the access to a larger amount of counterparties with the highest transparency possible.  We provide the following services to our clients:

o        OTC energy derivatives brokerage.  Once we receive an order to trade an OTC market derivative from a client, we find through our network the appropriate counterparty for such trade. We also offer our services for lesser used derivatives such as "swaptions", which terms slightly vary from an option for swaps;

o        Energy futures derivatives services on the floor of the NYMEX, which
         was launched in April 2004. Such services were provided through an
         affiliate, Capital Energy Services LLC ("CES") in 2006 and are now
         provided through one of our subsidiaries, OPEX International, Inc.,
         since February 2007;

o        We have completed the initial phase of OPEX, which is an electronic
         brokerage platform automating the energy derivatives between
         counterparties. We believe that OPEX significantly improves the
         liquidity and transparency of natural gas and other energy derivatives
         market by increasing number of participants in a market in which they
         receive real-time market data. Since our launch of OPEX in 2006, an
         increasing number of OTC derivatives have been traded directly by our
         clients on such platform.  For the month of February 2007, trades
         executed directly on OPEX by our clients constituted 17% of our volume
         of OTC cleared contracts; and,

o        We also complement our fee-based services with derivatives valuation
         and mark to market services called OPEX Analytics.  At the request of
         several of our existing clients, and based on our experience and
         knowledge of the markets as well as wide network of counterparties, we
         can periodically assist our clients in valuing their positions in the
         natural gas derivatives market.  We believe that the demand for this
         service from market participants will increase possibly creating new
         revenue opportunities from 1) subscription fees as well as
         2) additional brokerage fees related to price discoveries resulting
         from the mark to market services.

Those solutions can be applied to the trading of other energy derivatives as
well.  Additionally, the combination of those services provide for larger choice
of investment opportunities for participants in the energy derivatives market,
including natural gas.

Generally, the nature and mechanics of our business is to inquire of our clients
their needs in the trade of energy options, swaps, and futures. Once we
understand their needs: in the case of NYMEX futures or options, the trade is

                                        6

<PAGE>

presented on the NYMEX through OPEX International, Inc.; and in the case of OTC
swaps and options, we inquire of other clients whether they are interested in
participating in such transaction or they can access such information through
our electronic platform, OPEX. Once the counterparties agree on a certain trade,
they either execute it directly on OPEX or we match the counterparties and
consummate the trade by (i) in the case of a bilateral OTC trade, confirming the
details of the executed trade with both counterparties or (ii) in the case of a
cleared trade, submitting such trade to an exchange.

Presently, OTC brokerage is facilitated by brokering trades between our clients
via telephone and electronic messaging, often referred to as voice brokerage.
By building a relationship with our existing and potential clients, our brokers
learn about their interests and opportunities they are seeking. We complement
our traditional voice brokerage with electronic trading by offering a
hybrid combination of voice and electronic transactions; clients move between
voice and electronic trading with no loss in liquidity. Our clients are able to
transact in the same markets, regardless of whether or not they entered orders
electronically or through a broker.

Central to OPEX is the trade-matching engine, which is designed to facilitate

real-time trading of derivative products irrespective of a particular market.
Based on our experience in trading and brokering OTC swaps and options, we
devoted significant attention to the user experience and user-interface
ergonomics. In designing the system, we were cognizant of the way traders
currently execute their trades and how they could comfortably transition to an
electronic trading platform. The outcome is a graphical user interface that is
both simple and intuitive to use.

OPEX's trading platform (for which there are pending patents) was designed with
the aid of professional options traders to facilitate strategies that are
currently executed on the OTC, commodity and equity exchanges. The user can
customize the system to execute various options trading strategies.

Strategy

We intend to employ the following key strategies to achieve our goal of being a
leading facilitator of energy derivatives:

o       Increase revenues from existing and new clients by offering OPEX, which
        could automate some of the transactions now handled by voice brokerage
        and provide more pertinent market information to our clients, improving
        the liquidity and transparency of the energy derivatives market;
o       Expand the number of clients who actively trade in the energy
        derivatives market, or "market-makers" and facilitate our search of
        counterparties for more complex derivatives traded on the OTC market.
        We could, for example, enter into order flow agreements with certain
        market makers which would support certain dedicated markets in
        consideration of warrants in our common stock;
o       Significantly expand our depth in product offerings of other energy
        derivatives products.  In 2006, we offered several new OTC energy-based
        derivatives contracts to our client base;
o       Develop new strategic relationships, such as marketing and technical
        relationships with exchanges and other brokers within the energy
        derivatives community, which will allow us to brand and market each
        other's solutions to our industry participants as well as integrate our
        technology with theirs.  In January 2007, we signed a binding term
        sheet with NYMEX Holdings, Inc., the parent company of NYMEX, in which
        both parties have agreed to deepen their cooperation of their
        marketing and technology relationships.  With brokers, we could license
        our technology for a share of the brokerage fees;
o       Acquire small brokerage firms in other energy or commodity markets
        which would accelerate our time to market products in such segments;and
o       Acquire small technology concerns accelerating the development and
        enhancement of features and functionalities of OPEX.

HOW WE GENERATE REVENUES

                                       7

<PAGE>

We generate revenues by charging commissions fees based on the OTC market
transactions we submit for trading on behalf of our clients or that they execute
directly on OPEX. Our fees for brokerage services and the use of OPEX are the
same.  For options and swaps are up to $5.00 per contract (natural gas-10,000
million British thermal units (mmBtu);crude oil-1,000 barrels) of natural gas or
crude oil. Our fees are earned on the date of the trade. Our monthly average fee
per OTC natural gas contract varied between $0.90 $1.36 during 2006.

We also receive incentives from NYMEX. The incentives are earned based on a
percentage of the total revenues received by the exchange attributable to our

volume of OTC market transactions submitted to the respective exchanges. Under this incentive program offered by NYMEX, 25% of the revenues from NYMEX ClearPort are allocated to an intermediary incentive pool. At the end of each month, the qualifying intermediaries, including us, receive their pro-rata share based on the volume for which they were responsible. There is no minimum volume requirement in order to participate.

Furthermore, through CES in 2006 and through OPEX International, Inc. since February 2007, we generate revenues from the futures market, which are commission fees based on transactions they broker on behalf of their clients. Prior to January 2007, in return for such revenues from CES, we assume all expenses associated with the futures market incurred by CES, including brokerage commissions paid by CES to its employees. The transactions facilitated by CES consist mostly of options and futures contracts on natural gas, which fees ranged between $1.00 and $1.50 per 10,000 mmBtu of natural gas, per contract. Effective February 2007, OPEX International, Inc., will earn all revenues and assume all expenses associated with the futures market.

HOW WE MARKET OUR SERVICES

We market our brokerage services through our broker-employees. We market our services by providing information on specific transactions or market conditions to our existing and prospective clients. For example, we provide a daily report of most notable trades and an analysis of the forward six-month volatility of natural gas and crude oil derivatives to over 200 trading desks. Our broker-employees conduct their sales activities from our office facilities in Valhalla, New York and on the floor of the NYMEX. We market our OPEX system primarily by providing demonstrations, training, sales events, advertising, and sales collateral to our existing and potential clients. We will also market OPEX using an arcade on the NYMEX trading floor.

HOW WE OPERATE

Our OTC brokerage operations are conducted from our Valhalla, New York, office and our floor operations are conducted from the floor of the NYMEX. We have 10 brokers who interact heavily with our existing and potential clients. Generally, the nature and mechanics of our business is to inquire of our clients needs in the trading of energy derivatives. Once we understand their needs: in the case of futures market derivatives, the trade is presented on the NYMEX through CES and now OPEX International, Inc.; and in the case of OTC market derivatives, we inquire of other clients whether they are interested in participating in such transaction and facilitate the negotiation and conclusion of an agreement between counterparties or they keep apprised of market conditions using OPEX. Once the counterparties agree on a certain trade, they either trade it directly on OPEX or we match the counterparties and consummate the trade by (i) in the case of a bilateral OTC trade, confirming the details of the executed trade with both counterparties or (ii) in the case of a cleared OTC trade, submitting such trade to an exchange.

We also leverage our employees located at NYMEX, who typically handle futures transactions, to find counterparties for OTC transactions.

We rely heavily on communication technology to interact with our clients, whether by phone, e-mail, and/or instant messaging. We also rely on Internet based communications for the operation of OPEX.

We keep abreast of conditions in the energy trading market by receiving information using a combination of technology, such as analytics software as well as market data services, relevant business news from different wire services and traditional broadcast as well as leveraging the presence of our

employees on the NYMEX floor.

BUSINESS ALLIANCES

8

<PAGE>

In April 2004, we entered into a Master Services Agreement with CES.
Edward J. O'Connor, our President, is a shareholder of CES. Kevin P. Cassidy,
our Chief Executive Officer is also a shareholder of and managing director of
CES. We provided CES with marketing and brokerage support services for the NYMEX
business. We agreed to pay CES (a) a minimum fixed annual fee of $50,000
payable in 24 bi-monthly installments of $2,083, for the duration of the
contract and (b) a deferred payment of $1,525,000. During April 2005, CES
assigned its rights to the Company's liability of $1,525,000 equally to Edward
O'Connor and Kevin Cassidy.

CES made monthly payments to us equal to (a) the gross receipts of the floor
business, which consists of commission fees on natural gas future transactions
less (b) brokerage expenses less the amount of the bimonthly fees paid. If gross
receipts in any month are less than brokerage expenses less the amount of the
bimonthly fees paid, we paid the difference to CES.  This agreement was
terminated on January 31, 2007.

On January 22, 2007, we, Mark Nordlicht, our Chairman of the Board,
Kevin Cassidy, our Vice Chairman and Chief Executive Officer, and
Edward O'Connor, our President (collectively, the "Founding Stockholders"), and
NYMEX Holdings, Inc. (the "Investor") entered into a binding term sheet (the
"Term Sheet") pursuant to which Messrs. Nordlicht, Cassidy and O'Connor have
agreed to sell 7,000,000, 1,491,448 and 1,800,000 shares, respectively, of our
common stock, par value $0.0001 per share (the "Common Stock"), to the Investor.
This aggregate of 10,291,448 shares (the "Purchased Shares") represents nineteen
percent (19%) of the currently outstanding shares of Common Stock on a fully
diluted basis (without giving effect to the warrant discussed below). The
purchase price to be paid by the Investor for the Purchased Shares is $2.69 per
share. Pursuant to the Term Sheet, we agreed to issue the warrant described
below to the Investor, in consideration of the Investor's agreement to engage in
certain joint marketing and cobranding activities and to provide hosting of our
servers and assistance in joint technology development. In addition, the
Investor and us agreed to certain arrangements with respect to OTC products
which the Company clears through the clearing system.

The warrant to be issued by us (the "Warrant") will permit the Investor to
purchase a number of shares of Common Stock sufficient to increase the
Investor's ownership of the Company's Common Stock to an amount not to exceed
40% of our then outstanding Common Stock on a fully diluted basis, based on the
assumption that the Investor has retained ownership of the Purchased Shares. The
Warrant will be exercisable from time to time for a period of 18 months from the
closing date of the transactions contemplated by the Term Sheet at an exercise
price per share equal to $4.30 (the "Exercise Price"). The Warrant will not
contain a cashless exercise feature. The Exercise Price will be subject to
certain customary adjustments to protect against dilution.

The transactions contemplated by the Term Sheet will be evidenced by definitive
agreements (the "Definitive Agreements") which will contain representations,
warranties, covenants, indemnities and conditions precedent customary and
appropriate for this type of transaction including, but not limited to,
representations, warranties, covenants and indemnities from each of the Founding
Stockholders, the Company and the Investors.

The closing of the transactions contemplated by the Term Sheet is subject to certain conditions precedent set forth in the Term Sheet, including,

(i) the Investor being satisfied, in its sole and reasonable discretion, with its legal, accounting, regulatory, business and other due diligence investigation of the Company, which will be completed prior to the execution of the Definitive Agreements,

9

<PAGE>

(ii) the execution and delivery of mutually acceptable Definitive Agreements within sixty (60) days of the date of the execution of the Term Sheet, (iii) the delivery of mutually acceptable employment agreements with our key management and executives, other than Mr.Cassidy, which will include customary non-competition and non-solicitation provisions, and the delivery of a mutually acceptable non-competition agreement with Mr. O'Connor and (iv) Mr. Nordlicht's agreement to waive any obligation on our part to make any prepayment of principal or to begin paying interest upon amounts due to Mr. Nordlicht under the Loan Agreement between him and us, dated March 22, 2004, as a result of any exercise by the Investor of the Warrant.

If the Investor does not inform us within 3 weeks of being provided substantial access to due diligence that it is satisfied with its due diligence review and that it intends to proceed with the transaction, we and the Founding Stockholders will be entitled, in their sole discretion, to terminate the transaction by written notice to the Investor.

Effective upon closing of the transactions contemplated by the Term Sheet and for so long as the Investor owns at least 5,145,724 shares of Common Stock, the Investor will be entitled to designate one (1) person (reasonably acceptable to the Company) that we are required to nominate as a member of our board of directors (the "Investor Director"), and each of the Founding Stockholders shall be required to vote their shares in favor of the election of the Investor's designation. For so long as the Investor owns at least 5,145,724 shares of Common Stock, the Investor will be required to vote its shares in favor of each individual nominated for election as a member of our board of directors by our nominating committee. For so long as the Investor owns at least 5,145,724 shares of Common Stock and subject to certain permitted threshold amounts, the consent of the Investor Director (which may not be unreasonably withheld) will be required before we may take certain actions including (i) issuances of shares of a class of stock ranking senior to the Common Stock, (ii) acquisitions of businesses or assets, (iii) entry into related party transactions, (iv) the payment of dividends on, or the optional redemption of, capital stock or the issuance of debt and (v) entry into any business which is not similar, ancillary or related to any of the businesses in which we are currently engaged.

For so long as the Investor owns at least 5,145,724 shares of Common Stock: (i) each of the Founding Stockholders and the Investor will have a right of first refusal to purchase or subscribe for their pro rata percentage of shares in certain subsequent sales by the us of Common Stock and/or certain other securities convertible into or exchangeable for Common Stock, (ii) each of the Founding Stockholders and the Investor will have certain rights of first refusal with respect to proposed sales of Common Stock by the others and (iii) before they may accept any offer by an independent third party to acquire fifty percent (50%) or more of the total voting power of our Common Stock or voting stock, the Founding Stockholders and we will be required to provide notice of such offer to

the Investor and permit the Investor a period of 10 days to make its own offer.

In connection with the Purchased Shares, we will enter into a registration rights agreement with the Investor which, among other things, will provide the Investor, subject to standard exceptions, with (i) unlimited "piggyback" rights subject to standard underwriter lock-up and cutback provisions and (ii) the right to two demand registrations for underwritten offerings or take downs off of a shelf registration statement, provided that (A) a minimum of $5,000,000 of Common Stock are offered in such a demand registration or take down and (B) we shall not be obligated to effectuate more than one underwritten offering pursuant to a demand registration by the Investor in any six-month period. In addition, if are eligible to register its securities on Form S-3 (or any successor form then in effect), the Investor will be entitled to unlimited registrations on Form S-3 (or any successor form then in effect), including shelf registrations, provided that (x) a minimum of $5,000,000 of Common Stock are offered in such an S-3 registration and (y) we will not be obligated to effect more than two S-3 registrations in any twelve month period. An S-3 registration will not count as a demand registration, unless such registration is for an underwritten offering.

The Investor will enter into a standstill agreement with us pursuant to which the Investor, with certain limited exceptions, will agree not to purchase any additional shares of the our Common Stock until the one year anniversary of the closing date of the transactions contemplated by the Term Sheet.

The closing of the transactions contemplated by the Term Sheet is expected to occur as soon as reasonably practicable after the date of execution of the Term Sheet. The provisions of the Term Sheet are subject to, among other things, satisfactory completion of due diligence by the Investor. There can be no assurance that the transactions contemplated by the Term Sheet will close.

CLIENT CONCENTRATION

10

<PAGE>

One of our clients, Bank of Montreal, accounted for 24% and 18% of our revenues during 2006 and 2005, respectively.

COMPETITION

The energy derivatives market has many competitors involved in the brokering of natural gas options. Capital investment for entry into the market is low. Accordingly, a number of small brokerage firms flourish along side of larger more established brokerage firms such as Cantor Fitzgerald, L.P., MAN Group PLC and ICAP PLC.

There are several other well-financed companies who do or may compete with us. In the OTC natural gas derivatives market, our competitors include Choice Energy LP, ICAP PLC, GFI Group, Inc., G.A. Options, MAN Financial, Inc. FIMAT Internationale Banque, S.A., TFS, Inc., Tullet Natsource, Inc. In the futures natural gas derivatives market, our competitors include Clarion Trading, SCS Trading Corp., and ICAP PLC. OPEX competes with offerings from ICE. To date, we do not believe any one company has achieved a dominant position.

As the emerging market for electronic energy derivatives develops, more competitors are likely to emerge.

We believe that the principal competitive factors in our market include:

o        Access to a large number of financially-sound participants;
o        Timeliness in finding willing counterparties;
o        Client service and support;
o        service functionality, quality and performance of the electronic
         trading system;
o        ease of use, reliability and security of electronic trading system;
o        establishing a significant sales force;
o        ability to introduce new products to the market in a timely manner; and
o        pricing.

We currently differentiate from the competition by offering electronic and
traditional access to energy derivatives on both the futures market and the OTC
market.  We also differentiate by offering derivatives products, such as
swaptions which are not commonly offered by other brokerage firms.  Furthermore,
we have a number of blue-chip clients which actively and regularly trade in this
market which facilitates our search of counterparties and allows us to trade
quickly on behalf of our clients.

EMPLOYEES

We currently have 18 full-time employees. We also have a consultant who serves
as the Chief Technology Officer, and a consultant who serves as our Chief
Financial Officer as well as five other software engineers who are consultants.
The number of employees that we intend to hire is dependent on our clients'
needs and the infrastructure required to support such needs. We believe that our
relationship with our employees and consultants is good.

PATENTS, TRADEMARKS AND LICENSES

We have four patents pending at this time, most importantly those related to a
system and method for real-time trading over a computer network and a system and
method for trading selectable market transactions over a network

We have registered a trademark for "Optionable" and use OPEX as a service mark.

                                   11

<PAGE>

Although we have several patents pending which relate to our electronic trading
system, we do not solely depend on those patents to protect our intellectual
property. Furthermore, the benefit that would be afforded by those patents has
not been relied upon in our business plan, although we do feel that the patents
would benefit our position in the marketplace. We have taken various steps to
protect our intellectual property including non-disclosure agreements,
confidentiality agreements and other general precautions taken to keep the
information confidential.

RESEARCH AND DEVELOPMENT

We incurred approximately $474,000 and $450,000 in expenses on research and
development during 2006 and 2005. Most of the key members of our research and
development team have been working on OPEX since 2004.

GOVERNMENT REGULATION

The OTC brokerage business is not officially regulated. However, we have given
notice to the Commodity Futures Trading Commission ("CFTC") of our intention to
operate the OPEX electronic trading platform as an Exempt Commercial Market.

Exempt Commercial Markets are subject to certain information access rules established by the CFTC.

The futures derivatives market in which our affiliate, CES, operated, and now our subsidiary, OPEX International, Inc. is regulated by the CFTC and National Futures Association.

ITEM 2. DESCRIPTION OF PROPERTY

Our headquarters are located in Valhalla, New York since January 2007. The offices consist of approximately 5,500 square feet. We moved from a smaller office located in Briarcliff Manor, NY.

The lease in Briarcliff Manor expired in January 2007. The annual base rent was $66,817 payable in monthly installments of $5,568. We also pay our proportionate share of any increase in real estate taxes or common area maintenance charges.

Our new 10-year lease provides for payments of  a monthly base rent of $9,953, increasing gradually to up to $11,684.  The first 6 months of occupancy are free.

We believe our space is adequate for our current and foreseeable future operations.

   ITEM 3.        LEGAL PROCEEDINGS

None


ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS


None.

                            12

<PAGE>

                         PART II

ITEM 5.        MARKET FOR COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND
               SMALL BUSINESS ISSUER PURCHASES OF EQUITY SECURITIES


Our common stock is quoted on the Over-the-Counter Bulletin Board operated by the National Association of Securities Dealers, Inc. Our shares are listed under the symbol "OPBL."


The following table sets forth, for the fiscal quarters indicated, the high and low closing prices per share of our common stock as reported on the Over-the-Counter Bulletin Board. The quotations reflect inter dealer prices, without retail mark-up, mark-down or commissions and may not represent actual transactions.

| Year Ended December 31, 2006 | High | Low |
|---|---|---|
| First Quarter | $0.90 | $1.50 |
| Second Quarter | 0.50 | 0.90 |

| | | |
|---|---|---|
| Third Quarter | 0.50 | 0.75 |
| Fourth Quarter | 0.60 | 2.84 |
| Year Ended December 31, 2005 | | |
| First Quarter | N/A | N/A |
| Second Quarter | N/A | N/A |
| Third Quarter | 1.25 | 1.00 |
| Fourth Quarter | 1.40 | 0.85 |

At March 12, 2007, the closing price for our common stock was $6.36.

At March 12, 2007, there were 52,182,514 shares of our common stock issued and 52,177,714 shares of our common stock outstanding. There are approximately 14 stockholders of record at March 12, 2007. During the last two fiscal years, no cash dividends have been declared on our common stock and management does not anticipate that dividends will be paid in the foreseeable future.

13

<PAGE>

Equity Compensation Plan Information

<TABLE>
<CAPTION>

Optionable, Inc.   2004 Stock Option Plan and warrants issued for services

| <S> | <C> | <C> | <C> |
|---|---|---|---|
| | Number of securities to be issued upon exercise of outstanding options, warrants, and rights | Weighted-average exercise price of outstanding options, warrants, and rights | Number of se remaining av future issua equity compe plans (exclu securities r column (a)) |
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | 941,000 | $0.26 | 6,55 |
| Equity compensation plans not approved by | | | |

| security holders | 1,550,000 | 0.68 | - |
|---|---|---|---|
| Total | 2,491,000 | $0.52 | 6,55 |

</TABLE>

ITEM 6.         MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION OR
                PLAN OF OPERATION OVERVIEW AND PLAN OF OPERATIONS

We launched our electronic trading system, OPEX, in 2006. We believe that a
majority of our futures and OTC related revenues will continue to be generated
through voice-brokerage for the foreseeable future. We expect that in 2007,
revenues generated through OPEX will constitute a small but growing portion of
our revenues.  We expect that our research and development expenses to enhance
features and functionalities of OPEX will exceed $500,000 during 2007.

We expect that our cost of revenues will continue to grow at substantially the
same rate as our revenues during 2007, unless we make an acquisition which could
change our business model.  However, we believe that we may not be able to
continue to grow the revenues at the same sequential rate as we did in the last
quarter of 2006.

Pursuant to our binding term sheet with NYMEX- as discussed in
item 1 - Description of Business-Business Alliances, we are issuing
approximately 19,100,000 warrants to NYMEX. A significant portion of the fair
value of the warrants will be expensed during 2007.

We intend to hire brokers with a specialized knowledge of energy derivative
markets or acquire small brokerage firms operating in energy derivative segments
other than natural gas.

This discussion and analysis of our financial condition should be read in
connection with our financial statements and accompanying notes thereto for the
fiscal year ended December 31, 2005, including without limitation the
information set forth under the heading "Critical Accounting Policies and
Estimates".

                                    14
<PAGE>

<TABLE>
<CAPTION>
                            Results of Operations
                                 (Unaudited)

|  | For the year ended December 31, | |
|---|---|---|
|  | 2006 | 2005 |
| <S> | <C> | <C> |

| | | | |
|---|---:|---|---:|
| Brokerage fees | $ 8,987,727 | $ | 2,979,641 |
| Brokerage fees-related parties | 3,994,131 | | 2,087,215 |
| Incentives | 3,087,653 | | 738,558 |
| Net revenues | 16,069,511 | | 5,805,414 |
| | - | - | |
| Cost of revenues | 5,312,269 | | 2,264,110 |
| Cost of revenues-related parties | 909,291 | | 856,763 |
| | 6,221,560 | | 3,120,873 |
| Gross profit | 9,847,951 | | 2,684,541 |
| Operating expenses: | | | |
| Selling, general and administrative | 1,030,979 | | 695,718 |
| Research and development | 473,645 | | 450,488 |
| Total operating expenses | 1,504,624 | | 1,146,206 |
| Operating income | 8,343,327 | | 1,538,335 |
| Other income (expense): | | | |
| Interest income | 102,040 | | 21,548 |
| Interest expense-related parties | (780,137) | | (300,319) |
| | (678,097) | | (278,771) |
| Net income before income tax | 7,665,230 | | 1,259,564 |
| Income tax | (1,459,052) | - | |
| Net income | $ 6,206,178 | $ | 1,259,564 |

NM:  Not meaningful
</TABLE>

15

<PAGE>

RESULTS OF OPERATIONS

Revenues

Revenues consist primarily of fees earned from natural gas derivatives
transactions and related incentives arrangements. The increase in brokerage fees
and brokerage fees related party during 2006 when compared to 2005 is primarily
due to an increase in the brokerage fees resulting from an increased volume of
transactions of OTC natural gas derivatives contracts, and to a lesser extent,
natural gas derivatives traded on the futures market traded on behalf of
existing and new clients.   The increase in incentives revenues in 2006 when
compared to 2005 is primarily due to a higher volume of energy contracts cleared
on behalf of our clients through NYMEX' clearing system. The increase in

revenues resulted from a combination of general increase in volume of natural gas options contract traded on the market as well as an increased share of the market.

Cost of revenues

Cost of revenues and cost of revenues-related party consists primarily of compensation of personnel directly associated with handling the OTC and floor natural gas derivative transactions on behalf of our clients. The increase in cost of revenues and cost of revenues-related party during 2006 when compared to 2005 is primarily attributable to increased commissions paid to our brokers resulting from higher brokerage fees we earned.

Selling, general, and administrative expenses

Selling, general, and administrative expenses consists primarily of compensation of personnel supporting our operations as well as professional fees, such as legal fees, incurred to handle certain matters which occur during the course of operations. The increase in selling, general, and administrative expenses during 2006 when compared to 2005 is primarily attributable to an increase in expenses associated with being a public company, such as investor relations expenses and professional fees.

Research and development

Research and development expenses consist primarily of compensation of personnel and consultants associated with the development of our automated electronic trading system. Our research and development expenses have remained at the same levels during 2006 and 2005.

Interest income

Interest income consists of interest earned on interest-bearing accounts we hold at various financial institutions.  The increase in interest income during 2006 when compared to 2005 is primarily due to higher balances held in such accounts during 2006, resulting from higher cash provided from operating activities.

Interest expense to related parties

Interest expense to related parties consists of interest charges associated with amounts due to related parties, Mark Nordlicht, our Chairman, Kevin Cassidy, our Chief Executive Officer, and Edward O'Connor, our President. The increase in interest expense to related parties is primarily due to the accelerated amortization of debt discount associated with the amount due to Kevin Cassidy. We have accelerated the amortization discount on this debt since we are reimbursing the debt at a faster rate than initially contemplated.

Income Tax

16

<PAGE>

Income tax expense consists of federal and state current and deferred income tax based on our net income.  The increase in income tax expense during 2006 when compared to 2005 is primarily due to our use of all prior year net operating loss carryforwards during 2006.


LIQUIDITY AND CAPITAL RESOURCES

For the last three fiscal years, we have generated cash flows from our operating activities.  Our cash balance as of December 31, 2006 amounts to approximately $7.9 million.

During 2006, we generated cash from operating activities of approximately $7.3 million, primarily resulting from:

o        net income of approximately $6.2 million, adjusted for non-cash interest expense of approximately $780,000 and fair value of warrants, options and shares issued during the period aggregating approximately $247,000; and

o        an increase in accounts receivable, incentive receivable, due from related party, accrued compensation and income tax payable of approximately $1.9 million, $1.2 million, $185,000, $1.5 million, and $1.5 million respectively, resulting from an increase in related revenues and corresponding expenses.

We used our cash generated from operating activities to make principal repayments of approximately $559,000, $200,000 and $400,000 on amounts due to Kevin Cassidy, our Chief Executive Officer, Edward O'Connor, our President and former Chief Executive Officer, and Mark Nordlicht, our Chairman of the Board, respectively.

During 2005, we generated cash of approximately $1.4 million from operating activities, primarily resulting from:

o        net income of approximately $1.3 million, adjusted for non-cash interest expense and the fair value of warrants issued to Kevin Cassidy, our Chief Executive Officer of approximately $300,000 and $160,000, respectively;

o        an increase in accounts receivable of approximately $130,000, resulting from an increase in related revenues;

o        an increase of $150,000 in other receivable, resulting from our funding of security deposits held for the benefit of the NYMEX and a clearing house, to facilitate the trading of futures transactions we submit on behalf of our clients;

During 2005, we used our cash generated from operating activities to make principal repayments of approximately $200,000, $50,000 and $180,000 on amounts due to Kevin Cassidy, our Chief Executive Officer, Edward O'Connor, our President and former Chief Executive Officer, and to Mark Nordlicht, our Chairman of the Board, respectively.


We believe that our office facilities and equipment will be sufficient to meet our needs for the foreseeable future. Accordingly, we anticipate that our capital expenditures over the next twelve months will not be significant and should not exceed $300,000.

We believe that our cash available and estimated cash flows from operations in 2007 will be sufficient to meet our obligations when they become due.

CRITICAL ACCOUNTING POLICIES AND ESTIMATES

A summary of significant accounting policies is included in Note 3 of the accompanying audited financial statements for the year ended December 31, 2006. Management believes that the application of these policies on a consistent basis enables us to provide useful and reliable financial information about our operating results and financial condition. Our financial statements and accompanying notes are prepared in accordance with U.S. GAAP. Preparing financial statements requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, and expenses. These

estimates and assumptions are affected by management's application of accounting
policies. Critical accounting policies for us include revenue recognition.

                                    17
<PAGE>

REVENUE RECOGNITION

Revenue is recognized when earned. Our revenue recognition policies are in
compliance with the Securities and Exchange Commission's Staff Accounting
Bulletin ("SAB") No. 104 "Revenue Recognition". The application of SAB No. 104
requires us to apply our judgment, including whether our clients receive
services over a period of time.

We generally invoice our clients monthly, for all transactions which have been
executed during such month. Revenues are recognized on the day of trade-trade
date basis. Our revenues derive from a certain predetermined fixed fee of the
transactions we execute on behalf of our clients. The fee is based on the volume
of financial instruments traded. We base our fees on oral and written contracts
and confirm the fees in writing upon the execution of each transaction.

We also receive incentives from NYMEX and ICE for the volume of OTC transactions
we submit to their clearing platforms on behalf of our clients. The incentives
are based on a percentage of the total revenues received by the exchange
attributable to our volume of transactions submitted to the respective
exchanges. We also apply our judgment when making estimates monthly of such
incentives based on the volumes of transactions submitted to the respective
exchanges and the exchanges' published revenues by type of transaction.

We, pursuant to SAB 104, realize the incentive revenues realized or realizable
when all of the following criteria are met:

1) Persuasive evidence of an arrangement exists. We have a written separate
agreement with one of the exchanges. The other exchange has publicly published
the initial terms of its incentive program in 2003 which it modified in 2005 and
is offered to all intermediaries in the select transactions;

2) Delivery has occurred or services have been rendered. Under arrangements with
both exchanges, the incentives are earned on the day we submit transactions to
the respective exchanges based on the revenues generated from such transactions
and are no longer subject to minimum volume of transactions to the respective
exchanges. We account for all transactions submitted to each exchange on a daily
basis. Accordingly, we are able to determine when the incentives are earned
based on the date we submit transactions to the exchanges. We have no other
obligations to the exchanges to earn the incentives;

3) "Seller's" price to the buyer is fixed or determinable. Based on the
incentive program terms of each exchange, their published prices for the type of
transactions we submit to them, and our transactions records, we are able to
determine an estimate for the revenues each exchange earns in connection with
the transactions it submits, and accordingly, the amount, if any of the
incentives we earn in connection with such transactions; and

4) Collectibility is reasonably assured. Both exchanges have paid us timely
during 2005 for incentives earned in the prior quarter. We have no knowledge
that they do not intend to pay these incentives, if earned, in the future.
Furthermore, we intend to enforce the payment of any incentives receivable under
the incentive programs. Certain risk factors which may impact our business,
results of operations and financial condition Our binding term sheet with NYMEX
provides that we issue approximately 19,100,000 warrants to them and we will

have to expense a significant portion of the fair value of the warrants during 2007 in addition to an increase in our weighted average common share equivalent for earnings per share purposes

Pursuant to our binding term sheet with NYMEX, we will issue approximately 19,100,000 warrants to them and we will have to expense a significant portion of the fair value of the warrants during 2007, which will result in a significant decrease in our net income and possibly, generate a loss. Furthermore, this will increase in our weighted average common share equivalent for earnings per share purposes if we have net income.

We may not be successful in implementing with NYMEX the marketing and technology cooperation programs as contemplated by the binding term sheet

Our relationship with NYMEX is relatively new and we may not be successful in implementing with NYMEX the marketing and technology cooperation programs as contemplated by the binding term sheet.

                                    18
<PAGE>

For example, the binding term sheet provides for the hosting of OPEX by NYMEX. NYMEX may not be able to properly handle the hosting of OPEX to the satisfaction of our clients for a number of reasons- lack of familiarity with the software, lack of interest of a technology not owned by NYMEX, incompatibility of OPEX with the existing NYMEX infrastructure. Should NYMEX not host OPEX to the satisfaction of our clients, it would impact OPEX's market acceptance and have material negative impact on our results, operations, and financial condition.

Most, if not all cooperation programs will depend on our relationship standing with NYMEX and whether the parties perceive that both can contribute to the each other's success. We cannot guarantee that we will continue to have a good relationship with NYMEX and, accordingly, we cannot guarantee that we will be able to implement all cooperation programs successfully. If we are unable to implement one or more of the cooperation programs successfully, it will have a material negative impact on our results, operations, and financial condition.

Our business plan partly relies on market acceptance of our OPEX system to increase our revenues.

While we are presently engaged primarily in voice brokerage, our business plan calls for OPEX to be a major contributor to our success. We must continue to grow our revenues through our existing services and by gaining market acceptance of OPEX. While the initial results of OPEX are promising, it has not reached full market acceptance yet and it make take a few years before it does. If OPEX does not gain market acceptance, it may have a material negative effect on our financial prospects.

Our quarterly financial results will continue to fluctuate making it difficult to forecast our operating results.

Our quarterly operating results have fluctuated in the past and we expect our revenues and operating results may vary significantly from quarter to quarter due to a number of factors, many of which are beyond our control, including the following: geopolitical events, weather, perceived supply and demand imbalances, and the number of trading days in each quarter

We have incurred losses through fiscal 2004 and we may incur losses in the future, which may cause us to curtail our current operations and our development of OPEX.

We have incurred losses through fiscal 2004 and have since become profitable. We may again operate at a loss in the future and we cannot assure you that we will be successful in maintaining positive cash flow and profitable operations. Accordingly, our ability to operate our current business and implement OPEX may be hampered by negative cash flows and liquidity problems in the future, and the value of our stock may decline as a result. For example, in the past, we suspended the development and implementation of OPEX for a year, in part because of our negative cash flow.

Our pricing model for OPEX services is unproven and may be less than anticipated, which may harm our gross margins.

The pricing model of our OPEX services may be lower than expected as a result of competitive pricing pressures, promotional programs and clients who negotiate price reductions in exchange for longer term purchase commitments or otherwise. Our pricing model depends on the specific requirements of the order, purchase volumes, the sales and service support and other contractual agreements. We expect to experience pricing pressure and anticipate that the average selling prices and gross margins for our products may decrease over product life cycles. We may not be successful in developing and introducing on a timely basis new products with enhanced features and services that can be sold at higher gross margins.

The terms of the employment agreement with our Chief Executive Officer may erode our profitability and dilute the price our shareholders could receive in the event another company acquires us.

19

<PAGE>
We believe that the employment arrangement with our Chief Executive Officer, Kevin Cassidy, may decrease our profitability and cash flows from operating activities if our revenues decrease or if we are unable to increase our revenues in an amount sufficient to cover the additional cash and stock-based compensation we will pay to Kevin Cassidy. Kevin Cassidy's fixed compensation will gradually increase from the $215,000 we paid him as a consultant to $350,000 by 2009. Also, Kevin Cassidy's compensation agreement provides that beginning with the first month of the quarter in which the amount payable to Kevin Cassidy is fully paid, he will be paid additional cash and stock-based compensation amounting to 5% and 2%, respectively, of our gross revenues. Furthermore, we will issue options to Kevin Cassidy equal to 20% of the number of shares of common stock issuable under warrants which become exercisable pursuant to any Order Flow Agreements (Order Flow Agreements are the agreements under which we issue warrants to a firm based on the volume of orders the firm placed with us). Finally, we will issue to Kevin Cassidy 5,000 options each time a firm registers with and executes its first 10,000 lots on our OPEX platform. The total number of such options will be limited to 2,500,000.   The variable compensation expense pursuant to Kevin Cassidy's employment contract amounted to approximately $970,000 during 2006.

In the event we are acquired by another company, we would have to pay to Kevin Cassidy up to approximately $650,000, which could reduce the amount our shareholders would have otherwise received as part of this potential acquisition.

We may face difficulties in transitioning our clients from voice brokerage to electronic trading or a combination of both.

By launching OPEX, we intend to retain existing clients and attract new clients to our services. Our experience in marketing and supporting electronic trading services is limited. We may need to supplement our existing staff with marketing and support personnel with more extensive experience in these areas, which would increase our operating expenses and cost of revenues. Additionally, management will need to expend significant time and resources to ensure a smooth transition from voice brokerage to electronic trading or a combination of both, which could distract management from maintaining or expanding our operations.

Existing clients may resist the transition to electronic trading. New and existing clients may be unsatisfied with the support we provide for electronic trading and may prefer continuing with voice brokerage or discontinue our relationship based on actual or perceived problems they experienced in using our services. The loss of new or existing clients could decrease the market acceptance of our products, harm our reputation and reduce our revenues from existing clients. This could have a negative effect on our business, operations, and financial condition.

We may face increased credit risks when expanding our client base and from volatile fluctuations in prices of natural gas and related derivatives.

One of our clients accounted for 24% of our revenues during 2006. On OTC transactions, we bill our services to both counterparties. Accordingly, if this client would not have entered into a portion or all of the OTC transactions in which they were involved, our 2006 revenues could have been lower if we wouldn't have been able to find a suitable counterparty to replace them in such transactions. To mitigate our reliance on this client, we are attempting to expand our client base and our product offerings in other energy derivative products in which they would not be a market maker. In attempting to diversify and expand our client base, some of our new clients, such as hedge funds and individual traders, may have higher credit risks than certain of our existing clients, which are financial institutions. The financial positions of these new clients may impact our ability to collect our fees generated from the transactions we submit on their behalf. Additionally, volatile fluctuations in prices of natural gas and related derivatives may adversely impact the financial position of certain of our clients which may not have the resources to pay us for past services or may reduce the volume of transactions we would handle on their behalf in the future. This could have a negative effect on our business, operations, and financial condition.

20

<PAGE>

We cannot be certain that we will be able to protect our proprietary information and intellectual property, which we rely on to maintain our competitive position.

We rely on our proprietary information and intellectual property to maintain our competitive position. We may not be able to protect a significant portion of our proprietary information, such as our client lists, since we do not have confidentiality agreements with some of our employees. Accordingly, we may not be able to effectively prevent disclosure of our proprietary information and we may not have an adequate remedy in the event of unauthorized disclosure of such information. We cannot assure you that measures we take to protect our proprietary information and intellectual property will be successful or that third parties will not develop alternative solutions that do not infringe upon our intellectual property.

We also have patent applications pending, which are intended to protect certain of our proprietary technology relating to our planned OPEX business. We have

been cautious in seeking to obtain patent protection for our products, since patents often provide only narrow protection that may not prevent competitors from developing products that function in a manner similar to those covered by our patents. In addition, some of the foreign countries in which we plan to sell our OPEX system do not provide the same level of protection to intellectual property as the laws of the United States.

Potential liability for infringement claims might deter clients from using our OPEX system.

We could be subject to intellectual property infringement claims by others. Potential clients may be deterred from using our OPEX system for fear of infringement claims. If, as a result, potential clients forego using our OPEX system, demand for our services and applications could be reduced which would harm our business. Claims against us, and any resulting litigation, should it occur in regard to any of our services and applications, could subject us to significant liability for damages including treble damages for willful infringement. In addition, even if we prevail, litigation could be time-consuming and expensive to defend and could result in the diversion of our time and attention. Any claims from third parties may also result in limitations on our ability to use the intellectual property subject to these claims. Claims that we are infringing the intellectual property rights of third parties could have a negative effect on our business, revenues, financial condition and results of operations.

We may rely on strategic relationships to promote our OPEX system and for access to licensed technology; if we fail to develop, maintain or enhance these relationships, our ability to serve our clients and develop new features and functionalities could be harmed.

Due to the evolving nature of our industry, we may need to develop relationships to adapt to changing technologies and standards and to work with newly emerging companies with whom we do not have pre-existing relationships. For example, it may be important to our clients that OPEX integrates seamlessly with the technology used by exchanges. While we have a technology-sharing relationship with NYMEX, we do not have one with other exchanges to ensure such seamless meshing of our respective technologies as they now exist or as they may be enhanced in the future. We cannot be certain that we will be successful in maintaining or developing new relationships, technological or otherwise, or that such relationships will view them as significant to their own business or that they will continue their commitment to us in the future. If we are unable to maintain or enhance these relationships, we may have difficulty strengthening our technology development and increasing the adoption of our OPEX system.

If we fail to enhance our OPEX system by introducing new features and functionalities in a timely manner to meet changing client requirements and emerging industry trends or standards, our ability to grow our business will suffer.

21

<PAGE>

The market for electronic trading systems is characterized by rapidly changing technologies and short product life cycles. These market characteristics are heightened by the emerging nature of the Internet and the continuing trend of companies from many industries to offer Internet-based applications and services. The widespread adoption of the Internet, networking, electronic option trading, or telecommunications technologies or other technological changes could require us to incur substantial expenditures to modify or adapt our operating practices or infrastructure. Our future success will depend in large part upon our ability to:

o    identify and respond to emerging technological trends in the market;

o    enhance our products by adding innovative features that differentiate services and applications from those of our competitors;

o    acquire and license leading technologies;

o    bring new services and applications to market and scale our business on a timely basis at competitive prices; and

o    respond effectively to new technological changes or new product announcements by others.

We will not be competitive unless we introduce new features and functionalities to our OPEX system that meet evolving industry standards and client needs. In the future, we may not be able to address effectively the compatibility and interoperability issues that arise as a result of technological changes and evolving industry standards. The technical innovations required for us to remain competitive are inherently complex, require long development schedules and are dependent in some cases on sole source suppliers. We will be required to continue to invest in research and development in order to attempt to maintain and enhance our existing technologies and products, but we may not have the funds available to do so. Even if we have sufficient funds, these investments may not serve the needs of clients or be compatible with changing technological requirements or standards. Most development expenses must be incurred before the technical feasibility or commercial viability of new or enhanced services and applications can be ascertained. Revenue from future services and applications or enhancements to services and applications may not be sufficient to recover the associated development costs.

The technology underlying our OPEX system is complex and may contain unknown defects that could harm our reputation, result in product liability or decrease market acceptance of our services and applications.

The technologies underlying financial services and applications are complex and include software that is internally developed. Software products using these technologies may contain errors or defects, particularly when first introduced or when new versions or enhancements are released. We may not discover software defects that affect our current or new services and applications or enhancements until after they are sold. Furthermore, because our services and applications are designed to work in conjunction with various platforms and applications, we are susceptible to errors or defects in third-party applications that can result in a lower quality product for our clients. Because our clients depend on us for digital media management, any interruptions could:

o    damage our reputation;

o    cause our clients to initiate product liability suits against us;

o    increase our product development resources;

o    cause us to lose revenues; and

o    delay market acceptance of our products.

A significant portion of our revenues is from incentives from a U.S. exchange. We may not receive those incentives in the future.

22

<PAGE>

We receive incentives from NYMEX which accounted for 19% of our revenues during 2006. The incentives are earned based on a percentage of the total revenues received by the exchange attributable to our volume of transactions submitted to the respective exchanges. The incentives earned from NYMEX are based on a program offered to all brokers, traders, and energy traders initially launched in 2003. NYMEX has amended the terms of its initial incentive program by decreasing the incentive rate by 50%. NYMEX may amend the terms of the incentives or cancel this program at any time. While we are attempting to secure the long-term continuation of this program with NYMEX, we may not be successful in our attempts. We may agree to some or all of any requested changes. Accordingly, we cannot guarantee that we will continue to receive the level of such incentives in the future, if at all. If we do not receive these incentives, our revenues will decrease.

We rely heavily on the services of our overseas technical staff and consultants which may delay or jeopardize the development and enhancement of OPEX

We rely heavily on the services of our technical staff and consultants. Our technical employees are not presently employed on a full time basis. With the exception of our chief technology officer and a senior developer, all our technical staff, including our software engineers and our software quality assurance team, is located overseas.  If we are unable to maintain our relationship with these individuals and if we have to replace them with individuals with similar capabilities, this could delay or jeopardize the development and the enhancement of OPEX.

We face intense and increasing competition in the electronic energy derivatives market. If we do not compete effectively or if we experience reduced market share from increased competition, our business will be harmed.

There are several other well-financed companies who do or may compete with us. In the OTC natural gas derivatives market, our competitors include  ICAP PLC, Choice Energy LP, G.A. Options, MAN Financial, Inc. and Tullet Natsource, Inc. In the futures natural gas derivatives market, our competitors include Clarion Trading, SCS Trading Corp., and ICAP PLC. Some of the features of OPEX compete with some of ICE's offerings.

Substantially all of our competitors have more capital, longer operating histories, greater brand recognition, larger client bases and significantly greater financial, technical and marketing resources than we do. These competitors may also engage in more extensive development of their technologies, adopt more aggressive pricing policies and establish more comprehensive marketing and advertising campaigns than we can. Our competitors may develop products and service offerings that we do not offer or that are more sophisticated or more cost effective than our own. For these and other reasons, our competitors' products and services may achieve greater acceptance in the marketplace than our own, limiting our ability to gain market share and client loyalty and to generate sufficient revenues to achieve a profitable level of operations. Our failure to adequately address any of the above factors could harm our business and operating results.

Dependence on outside clearinghouse for increased revenue.

We are dependent on outside clearinghouses such as NYMEX to provide our clients with OTC Clearing services. We can give no assurance that NYMEX will continue to offer this service to trades brokered by us and should NYMEX cease to offer this service, it would have a material negative effect on us and our prospects.

Reliance on natural gas derivatives.

While our plan is to leverage success of energy options and expand into other markets while maintaining our status as an "exempt commercial market", the success of this plan is subject to market forces outside of our control. At present, substantially all of our revenues are derived from trading in natural gas derivatives. If there should be a significant slowdown in the natural gas derivatives market, it would have a significant negative impact on us.

The continued operations of our business are dependent on the performance and continued service of our executive officers and key employees, and our ability to attract and retain skilled personnel.

23

<PAGE>

Our performance and future operating results are substantially dependent on the continued service and performance of Kevin Cassidy, our Chief Executive Officer, Edward J. Connor, our President, and Mark Nordlicht, our Chairman. To the extent that the services of those persons become unavailable, our business and prospects would be adversely affected. Should we be required to do so, we do not know whether we would be able to employ equally qualified persons to replace any of these persons. Moreover, we do not currently maintain "key man" insurance on any of our executive officers or other key employees and do not intend to obtain this type of insurance in the near future. Additionally, we do not have written agreements with most of our staff and, other than traditional compensation packages and stock options we contemplate granting to our staff, we do not have other means to ensure the retention of their services. If we are successful in implementing and developing our business, we will require additional managerial, administrative and support personnel. Competition for highly qualified personnel is intense, and we can make no assurances that we can retain our key employees or that we will be able to attract or retain qualified personnel in the future. To the extent we have fewer financial resources available to us than our competitors we may not be able to attract and retain a sufficient number of qualified personnel. The loss of the services of any of our management or other key employees and our inability to attract and retain other necessary personnel could have a material adverse effect on our financial condition, operating results, and cash flows.

Certain employees' efforts currently account for a significant amount of our revenues. Should the services of these individuals, including and particularly Kevin Cassidy, no longer be available to us, and suitable replacements not be hired or retained, we would experience adverse effects of varying degrees.

We could become subject to increased governmental and organizational regulation.

OPEX qualifies as an "exempt commercial market" under the rules of the CFTC. Although an ECM may be required to provide certain trade volume and pricing information to the CFTC, an ECM is not required to register with the CFTC. However, if we were to no longer qualify for the exemption from registration, either because of changes in law or the scope of our business, our businesses would become subject to extensive regulation at both the federal and state levels. In addition, self-regulatory organizations, such as NYMEX and the National Futures Association, require compliance with their extensive rules and regulations. Among other things, these regulatory authorities impose restrictions on sales methods, trading practices, use and safekeeping of client funds and securities, record keeping and the conduct of principals and employees. The extensive regulatory framework applicable to the commodities

brokerage industry, the purpose of which is to protect clients and the integrity of the commodities markets, would impose significant compliance burdens and attendant costs on us. The regulatory bodies that administer these rules do not attempt to protect the interests of our shareholders as such, but rather the public and markets generally. Failure to comply with any of the laws, rules or regulations of any independent, state or federal regulatory authority to which we become subject could result in a fine, injunction, suspension or expulsion from the industry, which could materially and adversely impact us. Furthermore, amendments to existing state or federal statutes, rules and regulations or the adoption of new statutes, rules and regulations could require us to alter our methods of operation at costs which could be substantial.

The Penny Stock Rules apply to our common stock. This may make it more difficult for holders of our common stock to resell their shares.

At the present time, our common stock is not listed for trading on any stock exchange.

The Securities Enforcement and Penny Stock Reform Act of 1990 requires special disclosure relating to the market for penny stocks in connection with trades in any stock defined as a "penny stock." Commission regulations generally define a penny stock to be an equity security that has a market price of less that $5.00 per share and is not listed on Nasdaq or a major stock exchange. These regulations subject all broker-dealer transactions involving such securities to the special "Penny Stock Rules" set forth in Rule 15g-9 of the Securities Exchange Act of 1934. While our price per share has been recently more than $5 per share, it may decrease below $5 in the future. Accordingly, any broker-dealer sales of our shares will be subject to the Penny Stock Rules. These Rules affect the ability of broker-dealers to sell our securities and also may affect the ability of purchasers of our common stock to sell their shares in the secondary market.

The Penny Stock Rules also impose special sales practice requirements on broker-dealers who sell securities to persons other than their established clients or "accredited investors." Among other things, the Penny Stock Rules require that a broker-dealer make a special suitability determination respecting the purchaser and receive the purchaser's written agreement to the transaction prior to the sale. In addition, the Penny Stock Rules require that a broker-dealer deliver, prior to any transaction, a disclosure schedule prepared in accordance with the requirements of the Commission relating to the penny stock market. Finally, monthly statements have to be sent to any holder of such penny stocks disclosing recent price information for the penny stock held in the account and information on the limited market in penny stocks. Accordingly, for so long as the Penny Stock Rules are applicable to our common stock, it may be difficult to trade such stock because compliance with such Rules can delay or preclude certain trading transactions. This could have an adverse effect on the liquidity and price of our common stock.

Management substantially controls us and their interests may be different from yours and may be in conflict with yours.

24

<PAGE>

The interests of our management could conflict with the interests of our stockholders. Our officers and directors beneficially own approximately 50% of our outstanding common stock. Accordingly, if they exercise all their options and warrants, they will have the power to approve corporate transactions and control the election of all of our directors and other issues for which the

approval of our stockholders is required. This concentration of ownership may
also delay, deter or prevent a change in control of us and may make some
transactions more difficult or impossible to complete without the support of
these stockholders. As a result, you may have no effective voice in our
management.

Our majority stockholders will be able to take stockholder actions without
giving prior notice to any of you. You may, therefore, be unable to take
preemptive measures that you believe are necessary to protect your investment in
the company.

The majority stockholders are able to take stockholder actions in conformance
with Section 228 of the Delaware General Corporation Law and our Certificate of
Incorporation, which permits them to take any action which is required to, or
may, be taken at an annual or special meeting of the stockholders, without prior
notice and without a vote of our stockholders. Instead of a vote, stockholder
actions can be authorized by the written consents to such actions, signed by the
holders of the number of shares which would have been required to be voted in
favor of such action at a duly called stockholders meeting. We would not be
required to give prior notice to all stockholders of actions taken pursuant to
the written consents of the majority stockholders and our obligations are
limited to giving notice at least 20 calendar days prior to the earliest date on
which the corporate action so authorized may be taken.

ITEM 7.  FINANCIAL STATEMENTS


Response to this item is submitted as a separate section of this report
immediately following the signature page.


ITEM 8.           CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING
                  AND FINANCIAL DISCLOSURE


None

                                      25


<PAGE>


ITEM 8A.          CONTROLS AND PROCEDURES

Our Chief Executive Officer and Chief Financial Officer (collectively, the
"Certifying Officers") are responsible for establishing
and maintaining disclosure controls and procedures which include controls and
procedures that are designed to ensure that information required to be disclosed
in the reports which we file with or submit to the SEC is recorded, processed,
summarized and reported within the time periods specified by the SEC.  The
Certifying Officers have evaluated these controls and procedures and they have
concluded (based upon their evaluation of these controls and procedures as of
the end of the period covered by this report) that our disclosure controls and
procedures are effective to: i) ensure that information required to be disclosed
by us in this report is accumulated and communicated to management, including
our principal executive officers as appropriate, to allow timely decisions
regarding required disclosure; and ii) ensure that information required to be
disclosed in the reports which we file or submit with the SEC is recorded,
processed, summarized and reported within the time periods specified by the SEC.

The Certifying Officers have indicated that there were no changes in our internal controls which occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting, and there were no corrective actions with regard to significant deficiencies and material weaknesses.

Our management, including the Certifying Officers, does not expect that our disclosure controls or our internal controls will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. In addition, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the control. The design of any systems of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions.  Because of these inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

ITEM 8B.          OTHER INFORMATION.


None.

                                      26


<PAGE>

ITEM 9.   DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS;
          COMPLIANCE WITH SECTION 16 (A) OF THE EXCHANGE ACT


Directors serve until the next annual meeting of the stockholders and until their successors are elected or appointed and qualified, or until their prior resignation or removal. Officers serve for such terms as determined by our board of directors. Each officer holds office until such officer's successor is elected or appointed and qualified or until such officer's earlier resignation or removal. Our board currently does not have any committees.

The following table sets forth certain information, as of March 12, 2007, with respect to our directors and executive officers.


| Name | Positions Held | Age | Date of Election or Appointment as Director |
| ---- | ------------- | ---------- | --------------- |
| Mark Nordlicht | Chairman | 37 | February 2000 |
| Kevin Cassidy | Chief Executive Officer and Vice Chairman | 47 | October 2005 |
| Edward J. O'Connor | President, Treasurer, | | |

```
                        and Director          53        March 2001
Albert Helmig           Director              55        September 2004
Marc-Andre Boisseau     Chief Financial Officer   42    n.a.
```

The following is a brief account of the business experience of each of our directors and executive officers during the past five years or more.

Mark Nordlicht: Mr. Nordlicht is a founder of the Company and has served as our Chairman of the Board of Directors since 2000. Mr. Nordlicht has also been the Managing Partner of the General Partner of Platinum Partners Value Arbitrage Fund, a market-neutral hedge fund, since January 2003. Mr. Nordlicht also served as Managing Partner of West End Capital from 1998 through 2002. In his various positions, Mr. Nordlicht has been responsible for the oversight of all of our operations. Mr. Nordlicht earned a BA degree from Yeshiva University in 1989.

Kevin Cassidy:  Mr. Cassidy has served as our Chief Executive Officer since October 2005 and from March 2001 to March 2004. From April 2004 through September 2005, Mr. Cassidy provided consulting services to us.  Since December 1996, Mr. Cassidy has served as Managing Director of Capital Energy Services, LLC (formerly Orion Energy Services, LLC), an energy options brokerage firm on the NYMEX.  Mr. Cassidy's primary responsibilities include business development, sales and marketing, and oversight of our brokerage operations.

Edward J. O'Connor: Mr. O'Connor has served as our President and as a director since March 2001 and as our CEO between March 2004 and October 2005. Since December 1996, Mr. O'Connor has served as Managing Director of Capital Energy Services, LLC (formerly Orion Energy Services, LLC), an energy options brokerage business on the NYMEX. Mr. O'Connor's primary responsibilities include negotiating and entering into contracts for our business and accounting for our funds. Mr. O'Connor graduated from Georgetown University in 1977 with a BS degree in Business Administration.

27

<PAGE>

Albert Helmig. Mr. Helmig was elected as a director in September 2004. Since 2000, Mr. Helmig has been a principal of Gray House Consulting, a consulting firm to the energy industry. From 1991 through 2000, Mr. Helmig held the following positions with the New York Mercantile Exchange (NYMEX): Chairman or Vice Chairman of over 20 committees, 1991-2000; Member of Board of Directors, 1991-2000; Member of Executive Committee, 1993-2000; and Vice Chairman, 1998-2000. Mr. Helmig is also on the Board of Directors of the International Precious Metals Institute, a member of the International Advisory Committee Board, Energy Intelligence Group, a member of the National Committee on US/China Relations, and a member of the National Futures Association. Mr. Helmig earned a B.S. degree in Finance and Economics from Philadelphia University.

Marc-Andre Boisseau. Mr. Boisseau has served as our Chief Financial Officer since December 2004. Since January 2002, he has served as an advisor to small and medium publicly traded and private companies on financial, tax and accounting matters. Between January 2000 and December 2001, he served as Vice-President Finance of DataCore Software, Inc., a privately held software developer. Prior to that, he served as Chief Accounting Officer (from May 1997 to December 1999) and Vice President Controller (from January 1, 1998 to December 1999) of Citrix Systems, Inc. a publicly traded software developer. Mr.

Boisseau is a certified public accountant. Mr. Boisseau graduated with a BA degree in Business Administration in 1987 from the University of Montreal.

## DIRECTOR COMPENSATION

Messrs. Cassidy, O'Connor, Nordlicht, and Helmig are the members of our Board of Directors. We have not established standard compensation arrangements for our directors and the compensation payable to each individual for their service on our Board is determined from time to time by our Board of Directors based upon the amount of time expended by each of the directors on our behalf and the nature of their beneficial ownership. None of our board members have received compensation during 2006 and 2005 for their services as director.

## DIRECTOR INDEPENDENCE, COMMITTEES OF THE BOARD OF DIRECTORS

One of our members of our Board of Directors, Albert Helmig, is "independent" within the meaning of Marketplace Rule 4200 of the National Association of Securities Dealers, Inc. Our Board of Directors has established a Finance Committee, which oversees the determination and the appropriateness of prepayments on amounts due to Mark Nordlicht, Edward O'Connor, and Kevin Cassidy, if any. Otherwise, we have not established any other committees, including an Audit Committee, a Compensation Committee, a Nominating Committee, or any committee performing a similar function. The functions of those committees are being undertaken by the entire board as a whole. Because we only have one independent director, our Board of Directors believes that the establishment of such committees of the Board would not provide any benefits to our company and could be considered more form than substance.

We do not have an audit committee or a compensation committee.  We intend to form such committees once we have selected directors who shall meet the independence requirements and audit committee financial expert requirements under applicable Securities and Exchange Commission rules and regulations.  We are developing the criteria we will use in identifying, attracting, and retaining such directors.  We are unable to determine when and if we will complete the recruiting of new directors during fiscal year 2007.

28

<PAGE>

## EXECUTIVE COMPENSATION

The following table summarizes all compensation recorded by us in each of the last two completed fiscal years for our principal executive officer, each other executive officer serving as such whose annual compensation exceeded $100,000 and up to two additional individuals for whom disclosure would have been made in this table but for the fact that the individual was not serving as an executive officer of our company at December 31, 2006. The value attributable to any option awards is computed in accordance with FAS 123R.

<TABLE>
<CAPTION>

SUMMARY COMPENSATION TABLE

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equit Incentiv Plan Compensati ($) |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Edward J. O'Connor, | 2006 | 200,000 | -0- | -0- | -0- | -0- |
| President, Director (1) | 2005 | 200,000 | -0- | -0- | -0- | -0- |
| Kevin Cassidy, CEO (1)(2) | 2006 | 275,000 | -0- | 273,616 | 240,000 | 691,54 |
| | 2005 | 58,333 | -0- | -0- | -0- | -0- |
| Thomas Schnell (4) | 2006 | 100,000 | -0- | -0- | -0- | 596,58 |
| Noah Rottblatt (4) | 2006 | 48,000 | -0- | -0- | -0- | 509,30 |

(1)     Mr. Cassidy served as our Chief Executive Officer from March 2001 to March
        O'Connor served as our Chief Executive Officer from April 2004 to October 2
(2)     Mr. Cassidy's compensation includes 268,083 shares of common stock valued a
        Pierpont Capital, Inc., exercisable at $0.95 and for which we recognized $2
        pursuant to FAS 123 (R ).  Additionally, the Company pays, on behalf of Mr.
        premium, which amounted to $3,380 and $14,905 during 2006.
(3)     The other compensation of Mesrrs. O'Connor, Schnell, and Rothblatt represen
        Company on their behalf.
(4)     Mesrrs. Schnell and Rottblatt are brokers and are not executive officers of
</TABLE>

BOARD OF DIRECTORS

Our directors do not receive cash compensation for their services as directors
but are reimbursed for their reasonable expenses for attending board and board
committee meetings. Mr. Helmig, however, was granted options to purchase a
maximum of 250,000 shares of our common stock in connection with his election to
our board of directors in 2004. These options vest as follows:  20% in September
2004, and 40% every year thereafter as long as Mr. Helmig remains one of our
director.

STOCK OPTION GRANTS

There were no individual grants of stock options to any Executive Officers
during the fiscal year ended December 31, 2006

STOCK OPTIONS EXERCISED IN 2006 AND RELATED PERIOD-ENDED STOCK OPTION VALUES

 No stock options were exercised during fiscal 2006

                                      29
<PAGE>

OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END

The following table provides information concerning unexercised options, stock

that has not vested and equity incentive plan awards for each named executive
officer outstanding as of December 31, 2006:

```
<TABLE>
<CAPTION>
```

OUTSTANDING EQUITY AWARDS AT FISCAL YEAR END

| | OPTION AWARDS | | | | | ST |
|---|---|---|---|---|---|---|
| | ----------------------------- | | | | | ---------- |
| `<S>` `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| Name<br>(a) | Number of<br>Securities<br>Underlying<br>Unexercised<br>Options<br>/warrants<br>(#)<br>Exercisable<br>(b) | Number of<br>Securities<br>Underlying<br>Unexercised<br>Options<br>/warrants<br>(#)<br>Unexercisable<br>(c) | Equity<br>Incentive<br>Plan<br>Awards:<br>Number of<br>Securities<br>Underlying<br>Unexercised<br>Unearned<br>Options<br>(#)<br>(d) | Option<br>Exercise<br>Price<br>($)<br>(e) | Number<br>of<br>Shares<br>or<br>Units<br>of<br>Stock<br>That<br>Have<br>Not<br>Expiration<br>Date<br>(f) | Marke<br>Value<br>of<br>Share<br>or<br>Units<br>of<br>Stock<br>That<br>Have<br>Not<br>Veste<br>(#)<br>(g) |
| - ------------- | ----------- | ------------- | ----------- | -------- | ---------- | --- |
| Kevin Cassidy | 450,000 | | | 0.20 | 6/30/07 | |
| | 600,000 | 400,000 | | 0.95 | 2/23/09 | |
| Thomas Schnell | 100,000 | | | 0.20 | (1) | |

(1) Upon termination for cause or death

```
</TABLE>
```

2004 STOCK OPTION PLAN

We adopted our 2004 Stock Option Plan in November 2004. The plan provides for
the grant of options intended to qualify as "incentive stock options" and
options that are not intended to so qualify or "nonstatutory stock options." The
total number of shares of common stock reserved for issuance under the plan is
7,500,000, subject to adjustment in the event of a stock split, stock dividend,
recapitalization or similar capital change.

The plan is presently administered by our board of directors, which selects the
eligible persons to whom options shall be granted, determines the number of
common shares subject to each option, the exercise price therefor and the
periods during which options are exercisable, interprets the provisions of the
plan and, subject to certain limitations, may amend the plan. Each option
granted under the plan is evidenced by a written agreement between us and the
optionee.

```
<PAGE>
```

Options may be granted to our employees (including officers) and directors and certain of our consultants and advisors.

The exercise price for incentive stock options granted under the plan may not be less than the fair market value of the common stock on the date the option is granted, except for options granted to 10% stockholders which must have an exercise price of not less than 110% of the fair market value of the common stock on the date the option is granted. The exercise price for nonstatutory stock options is determined by the board of directors. Incentive stock options granted under the plan have a maximum term of ten years, except for 10% stockholders who are subject to a maximum term of five years. The term of nonstatutory stock options is determined by the board of directors. Options granted under the plan are not transferable, except by will and the laws of descent and distribution.

Employment Contracts, Termination of Employment, and Change-in-Control Arrangements

On March 1, 2001, we entered into an employment agreement with Edward O'Connor, our President and CEO and a member of the board of directors. The agreement was amended on April 1, 2004.

The terms of the agreement, as amended, provide that we will employ Mr. O'Connor for a term of five years with the duties of Chief Executive Officer with an annual salary of $200,000 per year. If we terminate Mr. O'Connor's employment without "cause" or if Mr. O'Connor terminates his employment with "good reason" (as both terms are defined in Mr. O'Connor's employment agreement), we are required to pay him a lump sum equal to nine months' base salary. Following termination of employment for any reason, other than expiration of the term of employment, Mr. O'Connor has agreed not to engage in an electronic OTC business in competition with us for a 90 day period, provided we pay him bi-monthly installments of $8,333.33 and provide full health benefits during the 90 day period. When Kevin Cassidy became our Chief Executive Officer in October 2005, as discussed below, we continued to employ Mr.O'Connor as our President with the same compensation package as when he was our Chief Executive Officer.

Effective October 30, 2005, we named Kevin P. Cassidy our Chief Executive Officer and appointed him as a director.  Simultaneously, we entered into an employment agreement with him (the "Agreement"). The initial term of the Agreement is for 50 months, subject to renewal or earlier termination.

Mr. Cassidy's salary ("Fixed Compensation") will be as follows: $20,833 upon entering into the Agreement, $46,875 from October 30, 2005 to December 31, 2005, $275,000 from January 1 to December 31, 2006, $300,000 from January 1, 2007 to December 31, 2007, $325,000 from January 1 to December 31, 2008, $350,000 from January 1, 2009 to December 31, 2009.

In addition, beginning with the first month of the quarter in which the amount payable to Mr. Cassidy, pursuant to the Addendum to Master Service Agreement, dated April 12, 2005, is fully paid, Mr. Cassidy will be paid (i) cash compensation amounting to five percent (5%) of Gross Revenues of the Company, and (ii) stock compensation amounting to two percent (2%) of the Gross Revenues of the Company. Gross Revenue is defined as the total gross revenue related to any and all aspects of the brokerage business, including incentive received from exchanges, based on generally accepted accounting principles. The shares of our common stock will be granted at fair value at the date of grant.

We will issue options to Mr. Cassidy equal to twenty percent (20%) of the number

of shares of common stock issuable under warrants which become exercisable pursuant to any Order Flow Agreements (Order Flow Agreements are the agreements for the Company to issue warrants to a firm based on the volume of orders the firm placed with the Company). Those options will be fully vested Non-Statutory Stock Options granted under the Company's 2004 Stock Option Plan at fair value at the date of grant. Also, we will issue to Mr. Cassidy 5,000 options each time a firm registers with and executes its first 10,000 lots on the Company's OPEX platform. The total number of such options will be limited to 2,500,000. Such options will be fully vested Non-Statutory Options granted under the plan at fair value at the date of grant.

31

<PAGE>

Mr. Cassidy will be entitled to paid annual vacation, personal leave and holidays in accordance with our policies, and will be entitled to participate in health, welfare, and pension plans and any other employee benefit plan of the Company. In addition, we will advance to or reimburse Mr. Cassidy for the annual or monthly premium of his life insurance policy of one million dollars ($1,000,000) where the beneficiary is Mr. Cassidy's estate (immediate family).

Upon our sale or merger or other business combination of us and another company or companies, Mr. Cassidy will be entitled to a lump sum payment of 50% of the unpaid Fixed Compensation should he desire not to be employed with the new or successor entity.

We have a consulting agreement with Mr. Boisseau, who serves as our Chief Financial Officer.  The oral agreement provides that we compensate him at $145 per hour, and effective, March 6 2007, $152 per hour.  This agreement may be terminated at will by both parties.

Code of Business Conduct and Ethics

We have adopted a Code of Business Conduct and Ethics to provide guiding principles to all of our employees. Our Code of Business Conduct and Ethics does not cover every issue that may arise, but it sets out basic principles to guide our employees and provides that all of our employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior. Any employee which violates our Code of Business Conduct and Ethics will be subject to disciplinary action, up to an including termination of his or her employment. Generally, our Code of Business Conduct and Ethics provides guidelines regarding:

o        compliance with laws, rules and regulations,

o        conflicts of interest,

o        insider trading,

o        corporate opportunities,

o        competition and fair dealing,

o        discrimination and harassment,

o        health and safety,

o        record keeping,

o        confidentiality,

o          protection and proper use of company assets,

o          payments to government personnel,

o          waivers of the Code of Business Conduct and Ethics,

o          reporting any illegal or unethical behavior, and

o          compliance procedures.


In addition, we have also adopted a Code of Ethics for our Chief Executive
Officer and Senior Financial Officers. In addition to our Code of Business
Conduct and Ethics, our CEO and senior financial officers are also subject to
specific policies regarding:

o          disclosures made in our filings with the SEC,

o          deficiencies in internal controls or fraud involving management or
           other employees who have a significant role in our
           financial reporting, disclosure or internal controls,

o          conflicts of interests, and

o          knowledge of material violations of securities or other laws, rules or
           regulations to which we are subject.

                                  32
<PAGE>

CERTAIN LEGAL PROCEEDINGS


To the knowledge of the Company, there are no material proceedings to which any
director, executive officer or beneficial owner of more than 5% of any class of
voting securities of the Company.


SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

We are required to identify each person who was an officer, director or
beneficial owner of more than 10% of our registered equity securities during our
most recent fiscal year and who failed to file on a timely basis reports
required by Section 16(a) of the Securities Exchange Act of 1934.

To our knowledge, based solely on review of these filings and written
representations from the certain reporting persons, we believe that during the
fiscal year ended December 31, 2006, our officers, directors and significant
stockholders have timely filed the appropriate form under Section 16(a) of the
Exchange Act, except Albert Helmig, one of our directors, amended its form 3 in
December 2006 to reflect 100,000 additional options which vested in September
2006 and were not vested in March 2006, date of the initial filing of his
Form 3.


ITEM 11. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND
          RELATED STOCKHOLDER MATTERS

The following table sets forth information regarding the beneficial ownership of

our common stock as of March 12, 2007. The information in this table provides
the ownership information for:

o each person known by us to be the beneficial owner of more than 5% of our
  common stock;
o each of our directors;
o each of our executive officers; and
o our executive officers, directors and director nominees as a group.

The percentages in the table have been calculated on the basis of treating as
outstanding for a particular person, all shares of our common stock outstanding
on that date and all shares of our common stock issuable to that holder in the
event of exercise of outstanding options, warrants, rights or conversion
privileges owned by that person at that date which are exercisable within 60
days of that date. Except as otherwise indicated, the persons listed below have
sole voting and investment power with respect to all shares of our common stock
owned by them, except to the extent that power may be shared with a spouse.

33

<PAGE>

<TABLE>
<CAPTION>

| Title of Class | Name and Address Of Beneficial Owner | Number of Shares Beneficially Owned |
|----------------|--------------------------------------|-------------------------------------|
| <S>            <C> | <C> | <C> |
| Common Stock, par value $.0001 per share | Mark Nordlicht 555 Pleasantville Road South Building, Suite 110 Briarcliff Manor, NY 10510 | 15,190,150 |
| Common Stock, par value $.0001 per share | Edward J. O'Connor 555 Pleasantville Road South Building, Suite 110 Briarcliff Manor, NY 10510 | 5,708,016 (1) |
| Common Stock, par value $.0001 per share | Albert Helmig 15 Deer Run Circle Chatham, NJ 07928 | 250,000 (2) |
| Common Stock, par value $.0001 per share | Kevin P. Cassidy 555 Pleasantville Rd., Ste 110 Briarcliff Manor, NY 10510 | 3,233,083 (3) |
| Common Stock, par value $.0001 per share | Marc-Andre Boisseau 555 Pleasantville Rd., Ste. 110 Briarcliff Manor, NY 10510 | -0- |
| All directors and officers as a group(4 persons) | | 24,381,249 (1)(2)(3) |

</TABLE>

(1) Includes 3,904,158 shares owned by Ridgecrest Capital Corp., Inc., a
corporation wholly owned by Mr. O'Connor, 901,929 shares owned by Mr. O'Connor's
daughter Kathleen O'Connor and 901,929 shares owned by Mr. O'Connor's daughter

Erin O'Connor.


(2) Includes 250,000 shares issuable pursuant to the exercise of stock options
exercisable within 60 days.


(3) Includes 2,305,000 shares owned by Pierpont Capital Corp., Inc.("Pierpont"),
as well as 50,000 warrants, exercisable at a price of $0.20 per share, and
600,000 warrants exercisable at a price of $0.95 per share, issued to Pierpont,
of which Mr. Cassidy is a stockholder, 10,000 options exercisable at a price of
$7.17 per share and 113,665 shares owned by Kerry Cassidy, who is Mr. Cassidy's
daughter.


ITEM 12.        CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS
                AND DIRECTOR INDEPENDENCE


During April 2005, we modified the terms of agreement under which we initially
owed $5,762,753, $765,000 and $765,000 to Mark Nordlicht, our Chairman of the
Board, Kevin Cassidy, our Chief Executive Officer, and Edward O'Connor, our
President, respectively. The modified terms provide that, among other things, in
the event of a Capital Raise-defined as we raising more than $1,000,000
additional equity or debt financing, the interest rate accrued after such event
is reduced from 12% to 4.68%.  Additionally, the modified terms provide that we
may make principal repayments towards the due to Chairman of the Board, the due
to its Chief Executive Officer, and the due to related party amounting to
approximately 25% of its cash flows from operating cash flows less capital
expenditures. During 2006, we modified the terms of the agreements to allow
prepayments at our discretion.

                                    34

<PAGE>

In connection with the modified terms, the Company made principal repayments of
$400,000 and $177,243 on the due to Mark Nordlicht during 2006, and 2005,
respectively, of which $69,638 was offset in 2005 against an accounts receivable
of one of our clients, which is not affiliated with Mr. Nordlicht. Additionally,
we made principal repayment of $558,697 and $203,803 on the due to Kevin Cassidy
during 2006 and 2005, respectively, and $200,000 and $53,803 on due to Edward
O'Connor, during 2006 and 2005, respectively.

We were party to a Master Services Agreement with CES pursuant to which we
provide brokerage services on the floor of the New York Mercantile Exchange (see
"Description of Business - Business Alliances" for more information about this
agreement). Edward J. O'Connor, our president and a director, is a 50%
stockholder of CES. Kevin P. Cassidy our Chief Executive Officer until March 31,
2004, is the Managing Director of CES. Pursuant to this arrangement, we were
paying to CES a minimum annual fixed fee of $50,000 and assume all expenses
directly incurred by CES's associated floor brokerage services. Additionally, we
owed to CES $1,525,000  payable on April 1, 2014. However, upon a Capital Raise,
we will pay up to 10.67% of the amount raised during the Capital Raise, up to
$762,500, to CES, with the remaining principal and accrued interest of 12% from
the date of the Capital Raise payable on April 1, 2014.

During April 2005, CES assigned its rights to the Company's liability of
$1,525,000 equally to Edward O'Connor and Kevin Cassidy, co-owners of CES.
Subsequently, during April 2005, the Company entered into modifications of the

terms of the amounts due from it to Mark Nordlicht, Edward O'Connor and Kevin
Cassidy. The modified terms provide that, among other things, in the event of a
Capital Raise, the interest rate accrued after such event is reduced from 12% to
4.68%. Additionally, the Company may make principal repayments towards such
liabilities amounting to approximately 25% of its quarterly cash flows from
operating activities less capital expenditures.

Pursuant to this arrangement, our share of revenues and expenses of the floor
brokerage services amounted to approximately $3.6 million and $741,000,
respectively, during 2006, and $2.0 million and $860,000, respectively, during
2005. We have received $2.6 million and $1.0 million from CES in connection with
such floor brokerage services during 2006 and 2005, and CES owes us
approximately $488,000 as of December 31, 2006.  This agreement was terminated
in January 2007 and our floor operations are now assumed by a subsidiary, OPEX
International, Inc.

The Company has recognized revenues from brokerage commissions of approximately
$4,000, $206,000 and $63,000 during 2006 and $75,000, $9,000 and $21,000, during
2005, from Northern Lights Energy LLC, Platinum Partners, L.P. and Fenmore
Holdings LLC, respectively, entities in which Mark Nordlicht is also the
managing partner or a stockholder. The aggregate amount owed to us from such
entities amounted to approximately $182,000 as of December 31, 2006.

Pursuant to an agreement providing for the reimbursement of certain
administrative expenses for services provided to a coffee bean
roaster, Sleepy Hollow Coffee Roasters, Inc. ("Sleepy Hollow"), a company owned
by Edward J. O'Connor and by Kevin P. Cassidy, we charged an administrative fee
of $17,000 and $17,000 to Sleepy Hollow during 2006 and 2005, respectively. We
provide such services to Sleepy Hollow to ensure that Edward O'Connor and Kevin
Cassidy can focus as much time and efforts as possible on our operations.

Please see "Item 9.  Directors, Executive Officers, Promoters and Control
Persons; Compliance with Section 16(a) of the Exchange Act" for information
regarding directors independence required by this item.

Please see "Item 1. Description of Business-Business Alliances" for a
description of our term sheet with NYMEX Holdings, Inc., pursuant to which
Messrs. Nordlicht, Cassidy, and O'Connor may sell a portion of their common
stock to NYMEX Holdings, Inc.

                                     35

<PAGE>

ITEM 13. EXHIBITS


        The following exhibits are filed as part of, or are incorporated by
reference into, this report:


Exhibit No.          Description
- -----------          -----------


3(i)(a)              Certificate of Incorporation of Optionable, Inc., dated
                     February 4, 2000 (incorporated by reference to Exhibit 3(i)(a)
                     to the Registrant's Registration Statement on Form SB-2,
                     filed  December 22, 2004, file no. 333-121543 (the "SB-2").

3(i)(b)              Certificate of Amendment to the Certificate of Incorporation

|          |                                                                                                                                                                 |
|----------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------|
|          | of Optionable, Inc., dated March 30, 2000 (incorporated by reference to Exhibit 3(i)(b) to the SB-2).                                                           |
| 3(i)(c)  | Certificate of Amendment to the Certificate of Incorporation of Optionable, Inc., dated May 31, 2000 (incorporated by reference to Exhibit 3(i)(c) to the SB-2). |
| 3(i)(d)  | Certificate of Amendment to the Certificate of Incorporation of Optionable, Inc., dated July 21, 2000 (incorporated by reference to Exhibit 3(i)(d) to the SB-2). |
| 3(i)(e)  | Corrected Certificate of Amendment to the Certificate of Incorporation of Optionable, Inc., dated January 31, 2003 (incorporated by reference to Exhibit 3(i)(e) to the SB-2). |
| 3(i)(f)  | Certificate of Amendment to the Certificate of Incorporation of Optionable, Inc., dated June 9, 2004 (incorporated by reference to Exhibit 3(i)(f) to the SB-2). |
| 3(ii)    | Amended and Restated By-laws of Optionable, Inc. (incorporated by reference to Exhibit 3(ii) to the SB-2) |
| 10(i)    | Lease Agreement between 24 South Third Avenue Corp. and 60 3rd Ave. Corp., as Lessor, and Optionable, Inc., as Lessee, dated October 3, 2001 (incorporated by reference to Exhibit 10(i) to the SB-2). |
| 10(ii)(a) | Master Services Agreement with Capital Energy Services LLC, dated April 1, 2004 including the Consulting Agreement as a part thereof and Addendum, dated October 7, 2004 (incorporated by reference to Exhibit 10(ii)(a) to the SB-2) |
| 10(ii)(b) | Addendum to Master Services Agreement (incorporated by reference to Exhibit 10(ii)(b) to the SB-2) |
| 10(ii)(c) | Amendment to Master Services Agreement (incorporated by reference to the Registrant's Current Report on Form 8-K, dated as of April 10, 2006) |
| 10(ii)(d) | Termination Agreement (of Master Service Agreement; incorporated by reference to the Registrant's Current Report of Form 8-K, dated as of January 31, 2007) |
| 10(iii)(a) | Options Order Flow Agreement, dated July 1, 2004, between the Company and Intercontinental Exchange,Inc. (incorporated by reference to Exhibit 10(iii)(a) to the SB-2) |
| 10(iii)(b) | Superseding Option Order Flow Agreement, dated as of March 2, 2005 (incorporated by reference to Exhibit 10(iii)(b) to the SB-2) |
| 10(iv)(a) | Employment Agreement, as amended, between the Company and Edward J. O'Connor (incorporated by reference to Exhibit 10(iv)(a) to the SB-2) |
| 10(iv)(b) | Employment Agreement between the Company and Kevin P. Cassidy (incorporated by reference to Exhibit 10(iv)(b) to the SB-2) |

36

<PAGE>

| | |
|---|---|
| 10(iv)(b)(I) | Termination of Employment Agreement between the Company and Kevin P. Cassidy (incorporated by reference to Exhibit 10(iv)(b)(I) to the SB-2) |
| 10(iv)(b)(II) | Employment Agreement between the Company and Kevin P. Cassidy (incorporated by reference to the Registrant's Current Report on Form 8-K, dated as of October 30, 2005) |

37

<PAGE>

| Exhibit No. | Description |
|---|---|
| 10(v)(a) | Optionable, Inc. 2004 Stock Option Plan (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-8, file number 333-129853, as filed on November 21, 2005 (the "S-8") |
| 10(v)(b) | Form of Incentive Stock Option Agreement(incorporated by reference to Exhibit 4.2 to the S-8) |
| 10(v)(C) | Nonstatutory Stock Option Agreement(incorporated by reference to Exhibit 4.3 to the S-8) |
| 10(vi) | Prepaid Commission Agreement, dated February 3, 2003, between the Company and Mark Nordlicht (incorporated by reference to Exhibit 10(vi) to the SB-2). |
| 10(vii)(a) | Revolving Credit Facility Agreement, dated June 5, 2003, between the Company and Platinum Value Arbitrage Fund LP (incorporated by reference to Exhibit 10(vii)(a) to the SB-2) |
| 10(vii)(b) | $500,000 Revolving Promissory Note from the Company to Platinum Value Arbitrage Fund LP dated June 5, 2003 (incorporated by reference to Exhibit 10(vii)(b) to the SB-2) |
| *10(viii) | Prepaid Commission Agreement, dated June 9, 2003, between the Company and Platinum Partners Value Arbitrage Fund LLP (incorporated by reference to Exhibit 10(viii) to the SB-2) |
| 10(ix)(a) | Loan Agreement, dated February 13, 2004, between the Company and Mark Nordlicht (incorporated by reference to Exhibit 10(ix)(a) to the SB-2) |
| *10(ix)(b) | $250,000 Promissory Note, dated February 13, 2004, from the Company to Mark Nordlicht (incorporated by reference to Exhibit 10(ix)(b) to the SB-2) |
| 10(ix)(c) | $250,000 Promissory Note Extension Agreement, dated September 9, 2004 (incorporated by reference to Exhibit 10(ix)(c) to the SB-2) |
| 10(x)(a) | Loan Agreement, dated March 8, 2004, between the Company and Mark Nordlicht (incorporated by reference to Exhibit 10(x)(a) to the SB-2) |

| | |
|---|---|
| 10(x)(b) | $50,000 Promissory Note, dated March 8, 2004, from the Company to Mark Nordlicht (incorporated by reference to Exhibit 10(x)(b) to the SB-2) |
| 10(x)(c) | $50,000 Promissory Note Extension Agreement, dated September 9, 2004 (incorporated by reference to Exhibit 10(x)(c) to the SB-2) |
| 10(xi)(a) | Loan Agreement, dated March 22, 2004, between the Company and Mark Nordlicht (incorporated by reference to Exhibit 10(xi)(a) to the SB-2) |
| 10(xi)(b) | $5,621,753.18 Promissory Note, dated March 22, 2004, from the Company to Mark Nordlicht (incorporated by reference to Exhibit 10(xi)(b) to the SB-2) |
| 10(xi)(c) | Addendum to Loan Agreement, dated March 22, 2004 (incorporated by reference to Exhibit 10(xi)(c) to the SB-2) |
| 10(xi)(d) | Addendum to Promissory Note, dated March 22, 2004 (incorporated by reference to Exhibit 10(xi)(d) to the SB-2) |
| 10(xii)(a) | Revolving Credit Facility Agreement, dated April 15, 2004, between the Company and Mark Nordlicht (incorporated by reference to Exhibit 10(xii)(a) to the SB-2) |

38

<PAGE>

| | |
|---|---|
| 10(xii)(b) | $50,000 Promissory Note, dated April 15, 2004, from the Company to Mark Nordlicht (incorporated by reference to Exhibit 10(xii)(b) to the SB-2) |
| 10(xiii) | Warrant Agreement for the Purchase of Common Stock (incorporated by reference to the Registrant's Quarterly Report on Form 10-QSB for the quarterly period ended March 31, 2006) |
| 10(xiv) | Service and Repurchase Agreement (incorporated by reference to the Registrant's Current Report on Form 8-K, dated as of January 31, 2007 |
| 14 | Code of Business Conduct and Ethics (filed herewith) |

39

<PAGE>

| Exhibit No. | Description |
|---|---|
| - ----------- | ----------- |
| 21 | Subsidiaries of the Company. |
| 31.1 | Rule 13a-14(a)/15d-14(a) Certification of the Principal Executive Officer of Optionable, Inc. (filed herewith) |
| 31.2 | Rule 13a-14(a)/15d-14(a) Certification of the Principal |

Financial Officer of Optionable, Inc.  (filed herwith)

32.1          Section 1350 Certification of the Principal Executive Officer
              of Optionable, Inc  The information contained in this Exhibit
              shall not be deemed filed with the Securities and Exchange
              Commission nor incorporated by reference in any registration
              statement filed by the registrant under the Securities Act of
              1933, as amended.(filed herewith)

32.2          Section 1350 Certification of the Principal Financial Officer
              of Optionable, Inc  The information contained in this Exhibit
              shall not be deemed filed with the Securities and Exchange
              Commission nor incorporated by reference in any registration
              statement filed by the registrant under the Securities Act of
              1933, as amended. (filed herewith)

ITEM 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES

The firm Sherb & Co., LLP, independent  registered  accounting firm, has audited
our  financial  statements  for the years ended  December 31, 2006 and 2005.  The
Board  of  Directors  has  appointed  Sherb & Co.  to  serve  as our  registered
accounting  firm  for the  2006  year-end  audit  and to  review  our  quarterly
financial reports for filing with the Securities and Exchange  Commission during
fiscal year 2007.

The following table shows the fees paid or accrued by us for the audit and other
services provided by Sherb & Co. for fiscal year 2006 and 2005.

|                      | 2006      | 2005      |
|----------------------|-----------|-----------|
| Audit Fees(1)        | $  67,000 | $  66,500 |
| Audit-Related Fees   | $     --  | $     --  |
| Tax Fees             | $     --  | $     --  |
| All Other Fees (2)   | $   2,880 | $     645 |
| Total                | $  69,880 | $  67,145 |

    (1) Audit fees represent fees for professional services provided in
        connection with the audit of our annual financial statements and review
        of our quarterly financial statements and audit services provided in
        connection with other statutory or regulatory filings.

    (2) All Other Fees represent edgarization services related to the certain
        statutory and regulatory filings.

Pre-Approval of Non-Audit Services

The Company does not currently have an audit committee in place and thus,
management must obtain the specific prior approval of the Board of Directors for
each engagement of the independent auditor to perform any non-audit services
that exceed any pre-approved amounts determined by the Board of Directors.

40

<PAGE>

SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant
caused this report to be signed on its behalf by the undersigned, thereunto duly
authorized on the []th day of March 23, 2007.

                                    OPTIONABLE, INC.

                                    By: /s/   Kevin Cassidy
                                         Name:  Kevin Cassidy
                                    Title:  Chief Executive Officer


In accordance with the Exchange Act, this report has been signed below by the
following persons on behalf of the registrant and in
the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Mark Nordlicht<br>Mark Nordlicht | Chairman of the Board | March 23, 2007 |
| /s/ Kevin Cassidy<br>Kevin Cassidy | Chief Executive Officer and<br>Director | March 23, 2007 |
| /s/   Edward O'Connor<br>Edward O'Connor | President and Director | March 23, 2007 |
| /s/ Albert Helmig<br>Albert Helmig | Director | March 23, 2007 |
| /s/ Marc-Andre Boisseau<br>Marc-Andre Boisseau | Chief Financial Officer | March 23, 2007 |

41

<PAGE>


OPTIONABLE, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS


Report of Independent Registered Public Accounting Firm.....................F-1

Balance Sheet..............................................................F-2

Statements of Operations...................................................F-3

Statement of Stockholders' Equity (Deficit)................................F-4

Statements of Cash Flows...................................................F-5

Notes to Financial Statements.......................................F-6 to F-26

<PAGE>

                    REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and Board of Directors
Optionable, Inc.
Briarcliff Manor, New York

We have audited the accompanying balance sheet of Optionable, Inc. as of
December 31, 2006 and the related statements of operations, stockholders' equity
and cash flows for the years ended December 31, 2006 and 2005. These financial
statements are the responsibility of the Company's management. Our
responsibility is to express an opinion on these financial statements based on
our audit.

We conducted our audit in accordance with the standards of the Public Company
Accounting Oversight Board (United States). Those standards require that we plan
and perform the audit to obtain reasonable assurance about whether the financial
statements are free of material misstatement. The Company is not required to
have, nor were we engaged to perform, an audit of its internal control over
financial reporting as a basis for designing audit procedures that are
appropriate in the circumstances, but not for the purpose of expressing an
opinion on the effectiveness of the Company's internal control over financial
reporting. Accordingly we express no such opinion. An audit includes examining,
on a test basis, evidence supporting the amounts and disclosures in the
financial statements. An audit also includes assessing the accounting principles
used and significant estimates made by management, as well as evaluating the
overall financial statement presentation. We believe that our audits provide a
reasonable basis for our opinion.


In our opinion, the financial statements referred to above present fairly, in
all material respects, the financial position of Optionable, Inc. as of December
31, 2005 and the results of their operations and their cash flows for the years
ended December 31, 2006 and 2005, in conformity with accounting principles
generally accepted in the United States of America.


                                        /s/ Sherb & Co., LLP
                                        ----------------------------
                                        Sherb & Co., LLP
                                        Certified Public Accountants

New York, New York
January 22, 2007

                                    F-1

<PAGE>

                             OPTIONABLE, INC.
                              BALANCE SHEET
                            December 31, 2006


                                  ASSETS

```
Current Assets:
Cash and cash equivalents                         $         7,913,393
Accounts receivable, net
of provision for doubtful accounts of $29,693               2,100,805
Accounts receivable from related parties                      182,338
Due from related party                                        488,273
Incentives receivable                                       1,307,859
Other current assets                                           64,162
                                                  ----------------------

     Total current assets                                  12,056,830

Property and equipment, net
of accumulated depreciation of $457,204                        57,501
Other assets                                                   19,900
Other receivable                                              150,000
                                                  ----------------------

     Total assets                                 $        12,284,231
                                                  ======================
```

LIABILITIES AND STOCKHOLDERS' EQUITY

```
Current Liabilities:
Accounts payable and accrued expenses             $           192,993
Accrued compensation                                        1,891,885
Income tax payable                                          1,454,246
                                                  ----------------------

     Total current liabilities
                                                            3,539,124


Due to chairman of the board,
net of unamortized discount of $3,256,311                   1,788,199

Due to executive officer,
net of unamortized discount of $441,686                        67,011
                                                  ----------------------

 Total liabilities                                          5,394,334

Stockholders' Equity:
Preferred Stock; $.0001 par value,
5,000,000 shares authorized, none issued
and outstanding                                                     -
Common stock; $.0001 par value, 100,000,000
shares authorized,
51,674,514 issued and  51,669,714 outstanding                   5,167
Additional paid-in capital                                  8,469,567
Treasury stock at cost, 4,800 shares                           (2,506)

Accumulated deficit                                        (1,582,331)
                                                  ----------------------

     Total stockholders' equity                             6,889,897
                                                  ----------------------

     Total liabilities and stockholders' equity  $        12,284,231
                                                  ======================
```

See Notes to Financial Statements.
F-2

<PAGE>

OPTIONABLE, INC.
STATEMENTS OF OPERATIONS

| | For the year ended December 31, | |
|---|---|---|
| | 2006 | 2005 |
| Revenues: | | |
| Brokerage fees | $  8,987,727 | $  2,979,641 |
| Brokerage fees-related parties | 3,994,131 | 2,087,215 |
| Incentives | 3,087,653 | 738,558 |
| Net revenues | | |
| | 16,069,511 | 5,805,414 |
| Cost of revenues | 5,312,269 | 2,264,110 |
| Cost of revenues-related parties | 909,291 | 856,763 |
| | 6,221,560 | 3,120,873 |
| Gross profit | 9,847,951 | 2,684,541 |
| Operating expenses: | | |
| Selling, general and administrative | 1,030,979 | 695,718 |
| Research and development | 473,645 | 450,488 |
| Total operating expenses | 1,504,624 | 1,146,206 |
| Operating income | 8,343,327 | 1,538,335 |
| Other income (expense): | | |
| Interest income | 102,040 | 21,548 |
| Interest expense to related parties | (780,137) | (300,319) |
| | (678,097) | (278,771) |
| Income before income tax | 7,665,230 | 1,259,564 |

| | | |
|---|---|---|
| Income tax | (1,459,052) | - |
| | ------------------ | ------------------ |
| Net income | $  6,206,178 | $  1,259,564 |
| | ================== | ================== |
| Basic earnings per common share | $    0.12 | $    0.02 |
| | ================== | ================== |
| Diluted earnings per common share | $    0.12 | $    0.02 |
| | ================== | ================== |
| Basic weighted average common | | |
| shares outstanding | 51,478,354 | 51,406,431 |
| | ================== | ================== |
| Diluted weighted average common | | |
| shares outstanding | 52,559,445 | 51,524,732 |
| | ================== | ================== |

See Notes to Financial Statements.
F-3


<PAGE>

<TABLE>
<CAPTION>

OPTIONABLE, INC.
STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)
From January 1, 2005 to December 31, 2006

| | Common Stock | | Additional | Treasury Stock, |
|---|---|---|---|---|
| | Shares | $ | Paid-in Capital | at Cost |
| | ----------- | ------ | --------------- | -------- |
| Opening balance, | | | | |
| <S>      <C> | <C> | <C> | <C> | <C> |
|  January 1, 2005 | 51,406,431 | $5,141 | $7,784,411 | $- |
| Fair value of warrants | | | | |
|  issued to related party | - | - | 162,060 | - |
| Net income | - | - | - | - |
| | ----------- | ------ | --------------- | ------- |
| Balance at | | | | |
|  December 31, 2005 | 51,406,431 | 5,141 | 7,946,471 | - |
| Fair value of warrants | | | | |
|  issued to related party | - | - | 240,000 | - |
| Fair value of options | - | - | 6,506 | - |
| Fair value of shares | | | | |
|  issued for compensation | | | | |
|  to chief executive officer | 268,083 | 26 | 276,590 | - |
| Repurchase of shares | (4,800) | - | - | (2,506 |
| Net income | - | - | - | - |

```
                         -----------      ------      ---------------      -------
Ending balance,
December 31, 2006        51,669,714     $5,167        $8,469,567          $(2,506
                         ===========     ======       ===============      =======
```

</TABLE>

See Notes to Financial Statements
F-4

<PAGE>

OPTIONABLE, INC.
STATEMENTS OF CASH FLOWS

| | For the year ended December 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| Cash flows from operating activities: | | |
| Net income | $ 6,206,178 | $ 1,259,564 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation | 31,508 | 32,519 |
| Amortization of debt discount | 780,137 | 300,320 |
| Provision for doubtful accounts | (37,727) | (22,554) |
| Fair value of warrants and options | 246,506 | 162,060 |
| Fair value of shares issued to chief executive officer | 276,616 | - |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (1,751,941) | (98,854) |
| Accounts receivable-related parties | (141,143) | (34,340) |
| Due from related party | (184,701) | (9,997) |
| Incentives receivable | (1,153,076) | (23,107) |
| Other receivable | - | (150,000) |
| Other current assets | (15,073) | (36,133) |
| Other assets | (19,900) | - |
| Accounts payable and accrued expenses | 138,007 | (25,701) |
| Income tax payable | 1,454,246 | - |
| Accrued compensation | 1,481,330 | 12,838 |
| Net cash provided by operating activities | 7,310,967 | 1,366,615 |

| | | |
|---|---:|---:|
| Cash flows used in investing activity: | | |
| Purchases of property and equipment | (47,824) | (27,439) |
| | -------------- | -------------------- |
| | | |
| Net cash used in investing activity | (47,824) | (27,439) |
| | -------------- | -------------------- |
| Cash flows from financing activities: | | |
| | | |
| Principal repayments of due to chief executive officer | (558,697) | (203,803) |
| Principal repayments of due to executive officer | (200,000) | (53,803) |
| Principal repaymentS of due to chairman of the board | (400,000) | (177,243) |
| Repurchase of shares of common stock | (2,506) | - |
| | -------------- | -------------------- |
| | | |
| Net cash used in financing activities | (1,161,203) | (434,849) |
| | -------------- | -------------------- |
| | | |
| Net increase in cash | 6,101,940 | 904,327 |
| Cash, beginning of year | 1,811,453 | 907,126 |
| | -------------- | -------------------- |
| Cash, end of year | $ 7,913,393 | $ 1,811,453 |
| | ============== | ==================== |
| Supplemental disclosures of cash flow information: | | |
| Cash paid for taxes | $ 4,806 | $ - |
| | ============== | ==================== |
| Cash paid for interest | $ - | $ - |
| | ============== | ==================== |

See Notes to Financial Statements.
                    F-5

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 1-Organization and Description of Business

Optionable, Inc. (the "Company") was formed in Delaware in February 2000 and is a trading and brokerage services provider to brokerage firms, financial institutions, energy traders, and hedge funds nationwide. The Company's operations are located in the New York metropolitan area. The Company developed an automated electronic trading system during 2006.

Note 2- Summary of Significant Accounting Policies

Cash and Cash Equivalents

The Company considers all highly liquid investments with original maturities of three months or less to be cash equivalents.

Concentration of Credit Risks

The Company is subject to concentrations of credit risk primarily from cash and cash equivalents, accounts receivable, incentives receivable, and due from related party.

The Company's cash and cash equivalents accounts are held at financial institutions and are insured by the Federal Deposit Insurance Corporation ("FDIC") up to $100,000. During 2006, the Company has reached bank balances exceeding the FDIC insurance limit. To reduce its risk associated with the failure of such financial institutions, the Company periodically evaluates the credit quality of the financial institutions in which it holds deposits.

The Company's accounts receivable are due from energy trading firms, financial institutions, and hedge funds, located primarily in the United States. Collateral is generally not required. One of the Company's customers accounted for 37% of its accounts receivable net of doubtful accounts, respectively, at December 31, 2006. No other customers accounted for more than 10% of its accounts receivable at December 31, 2006.

The Company's incentives receivable are due from a United States exchange providing the Company with incentives to submit customer trades to their respective platform. The incentives receivable are not collateralized. The Company has entered into a binding term sheet with such exchange in January 2007- see Note 10-Subsequent Event.

F-6

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

The due from related party is due from an affiliate owned by the Company's chief executive officer and by an executive officer of the Company, who are both stockholders of the Company. The due from related party is not collateralized.

Customer Concentration

One of the Company's customers accounted for approximately 24% and 18%, respectively of its revenues during 2006 and 2005, respectively. The Company minimizes its customer concentration risks by diversifying its existing customer base.

Product Concentration

All of the Company's revenues are derived from fees earned from energy derivatives transaction fees and related incentives provided by exchanges.

Fair Value of Financial Instruments

The carrying value of cash and cash equivalents, accounts receivables, incentives receivable, due from related party, other receivable, accounts payable and accrued expenses approximate their fair value due to their short-term maturities. The carrying amount of due to Chairman of the board and due to an executive officer approximate their fair value based on the Company's incremental borrowing rate.

Software Development Costs
Costs incurred in the research and development of software products are expensed as incurred until technological feasibility has been established. After technological feasibility is established, any additional costs are capitalized in accordance with Statement of Accounting Financial Standards ("SFAS") No. 86, Accounting for the Costs of Computer Software to Be Sold, Leased or Otherwise Marketed. Costs of maintenance and customer support will be charged to expense when related revenue is recognized or when those costs are incurred, whichever occurs first. The Company believes that the current process for developing software is essentially completed concurrently with the establishment of technological feasibility; accordingly, no software development costs have been capitalized as of December 31, 2006.

F-7


<PAGE>


OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

Property and Equipment

Property and equipment are recorded at cost and are depreciated on a straight-line basis over their estimated useful lives of three to five years. Maintenance and repairs are charged to expense as incurred. Significant renewals and betterments are capitalized.

Property and equipment consist of the following as of December 31, 2006:

```
Computer equipment and software                    $445,159
Office furniture and equipment                       69,546
                                                   ---------
                                                     514,705
Accumulated depreciation                           (457,204)
                                                   ---------
                                                   $ 57,501
                                                   =========
```

Depreciation expense amounted to approximately $32,000 and $33,000 during 2006 and 2005, respectively.


Income Taxes

Income taxes are accounted for in accordance with SFAS No. 109, Accounting for Income Taxes. SFAS No. 109 requires the recognition of deferred tax assets and liabilities to reflect the future tax consequences of events that have been recognized in the Company's financial statements or tax returns. Measurement of the deferred items is based on enacted tax laws. In the event the future consequences of differences between financial reporting bases and tax bases of the Company's assets and liabilities result in a deferred tax asset, SFAS No. 109 requires an evaluation of the probability of being able to realize the future benefits indicated by such assets. A valuation allowance related to a deferred tax asset is recorded when it is more likely than not that some or all deferred tax assets will not be realized.

Use of Estimates

The preparation of financial statements in accordance with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Significant estimates made by management include, but are not limited to, the realization of receivables. Actual results will differ from these estimates.


                                    F-8


<PAGE>


                            OPTIONABLE, INC.
                     NOTES TO FINANCIAL STATEMENTS
                      December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

Basic and Diluted Earnings per Share

Basic earnings per share are calculated by dividing income available to stockholders by the weighted-average number of common shares outstanding during each period. Diluted earnings per share are computed using the weighted average number of common and dilutive common share equivalents outstanding during the period. Dilutive common share equivalents consist of shares issuable upon the

exercise of stock options and warrants (calculated using the modified-treasury stock method). The outstanding options amounted to 941,000 and 791,000 at December 31, 2006 and 2005, respectively. The outstanding warrants amounted to 1,550,000 and 550,000 at December 31, 2006 and 2005, respectively.

The following sets forth the computation of basic and diluted earnings per share for the year ended December 31:

|  | 2006 | 2005 |
|---|---|---|
| **Numerator:** | | |
| Net income | $6,206,178 | $1,259,564 |
| | ========== | ========== |
| **Denominator:** | | |
| Denominator for basic earnings per share- | | |
| Weighted average shares outstanding | 51,478,354 | 51,406,431 |
| Effect of dilutive employee stock options | 643,337 | 71,525 |
| Effect of dilutive warrants | 437,755 | 46,776 |
| | ---------- | ---------- |
| Denominator for diluted earnings per share- Weighted average shares outstanding | 52,559,445 | 51,524,732 |
| | ========== | ========== |
| Basic earnings per share | $0.12 | $0.02 |
| | ===== | ===== |
| Diluted earnings per share | $0.12 | $0.02 |
| | ===== | ===== |
| Anti-dilutive weighted-average shares | - | - |
| | ===== | ===== |

F-9

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

Revenue Recognition

Revenue is recognized when earned. The Company's revenue recognition policies are in compliance with the Securities and Exchange Commission's ("SEC") Staff Accounting Bulletin ("SAB") No. 104 "Revenue Recognition".

The Company generally invoices its customers monthly, for all transactions which have been executed during such month. Revenues are recognized on the day of trade-trade date basis. The Company's revenues derive from a certain predetermined fixed fee of the transactions it executes on behalf of its customers. The fee is based on the volume of financial instruments traded. The Company bases its fees on oral and written contracts and confirms the fees in

writing upon the execution of each transaction.

The Company also receives incentives from United States exchanges for the volume of transactions conducted by the Company using their platform. The incentives are based on a percentage of the total revenues received by the exchange attributable to the Company's volume of transactions submitted to the respective exchanges. The Company estimates monthly such incentives based on the volumes of daily transactions submitted to the respective exchanges using the day of trade-trade date basis, and the exchanges' published revenues by type of transactions. The Company, pursuant to SAB 104, realizes the incentive revenues realized or realizable when all of the following criteria are met:

1) Persuasive evidence of an arrangement exists. The Company has a written separate agreement with one of the exchanges. The other exchange has publicly published the terms of its incentive program in 2003 which is offered to all intermediaries in the select transactions;

2) delivery has occurred or services have been rendered. Under arrangements with both exchanges, the incentives are earned on the day the Company submits transactions to the respective exchanges based on the revenues generated from such transactions and are no longer subject to minimum volume of transactions to the respective exchanges. The Company accounts for all transactions submitted to each exchange on a daily basis. Accordingly, the Company is able to determine when the incentives are earned based on the

F-10

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

date it submits transactions to the exchanges. The Company has no other obligations to the exchanges to earn the incentives;

3) "seller's" price to the buyer is fixed or determinable. Based on the incentive program terms of each exchange, their published prices for the type of transactions the Company submits to them, and the Company's transactions records, the Company is able to estimate the revenues each exchange earns in connection with the transactions it submits, and accordingly, the amount, if any of the incentives the Company earns in connection with such transactions; and

4) collectibility is reasonably assured. Historically, both exchanges have paid the Company timely on incentives earned. The Company has no knowledge that they do not intend to pay these incentives, if earned, in the future. Furthermore, the Company intends to enforce the payment of any incentives receivable under the incentive programs.

Stock-Based Compensation

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123(R), "Share-Based Payment," which replaces SFAS No. 123 and supersedes APB Opinion No. 25. Under SFAS No. 123(R), companies are required to measure the compensation costs of share-based compensation arrangements based on the grant-date fair value and recognize the costs in the financial statements over the period during which employees are required to provide services. Share-based compensation arrangements include stock options, restricted share plans, performance-based awards, share appreciation rights and employee share purchase plans. In March 2005 the SEC issued Staff Accounting Bulletin No. 107, or "SAB 107". SAB 107 expresses views of the staff regarding the interaction between SFAS No. 123(R) and certain SEC rules and regulations and provides the staff's views regarding the valuation of share-based payment arrangements for public companies. SFAS No. 123(R) permits public companies to adopt its requirements using one of two methods. On April 14, 2005, the SEC adopted a new rule amending the compliance dates for SFAS 123R. Companies may elect to apply this statement either prospectively, or on a modified version of retrospective application under which financial statements for prior periods are adjusted on a basis consistent with the pro forma disclosures required for those periods under SFAS 123. Effective January 1, 2006, the Company has fully adopted the provisions of SFAS No. 123R and related interpretations as provided by SAB 107 prospectively. As such, compensation cost is measured on the date of grant as its fair value.

F-11

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

Such compensation amounts, if any, are amortized over the respective vesting periods of the option grant. The Company applies this statement prospectively.

Segment reporting

The Company operates in one segment, brokerage services. The Company's chief operating decision-maker evaluates the performance of the Company based upon revenues and expenses by functional areas as disclosed in the Company's statement of operations.

Recent Pronouncements

In September 2006, the FASB issued FASB Statement No. 157. This Statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles (GAAP), and expands disclosures about fair value measurements. This Statement applies under other accounting pronouncements that require or permit fair value measurements, the Board having previously concluded in those accounting pronouncements that fair value is a relevant measurement attribute. Accordingly, this Statement does not require any new fair value measurements. However, for some entities, the application of this Statement will change current practices. This Statement is effective for financial statements for fiscal years beginning after November 15, 2007. Earlier application is permitted provided that the reporting entity has not yet issued

financial statements for that fiscal year. Management believes this Statement
will have no impact on the financial statements of the Company once adopted.

On July 13, 2006, the Financial Accounting Standards Board (FASB) issued FASB
Interpretation No. 48, ("FIN 48"), entitled, "Accounting for Uncertainty in
Income Taxes - an Interpretation of FASB Statement No. 109". Concurrently, FASB
issued a FASB staff position (FSP) relating to income taxes, (FSP) No. FAS 13-2,
"Accounting for a Change or Projected Change in the Timing of Cash Flows
Relating to Income Taxes Generated by a Leveraged Lease Transaction." FASB's
summary of FIN 48 notes that differences between tax positions recognized in the
financial statements and tax positions taken in the tax return (referred to
commonly as "book" vs. "tax") will generally result in: (a) an increase in a
liability for income taxes payable or a reduction of an income tax refund
receivable, (b) a reduction in a deferred tax asset or an increase in a deferred
tax liability, or (c) both of the above. FIN 48 requires the affirmative
evaluation that it is more likely than not, based on the technical merits of a
tax position, that an enterprise is entitled to economic benefits resulting from
positions taken in income tax returns. Further, if a tax position does not meet
the more-likely-than-not recognition threshold, the benefit of that position is
not recognized in the financial statements. Additionally, FIN 48 establishes
guidance for "derecognition" of previously recognized deferred tax items, and
sets forth disclosure requirements. The effective date of FIN 48 is for fiscal
years beginning after December 15, 2006. The Company does not believe that FIN
48, once adopted, will have a significant impact on its financial position,
operating results, or cash flows.

F-12

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 2- Summary of Significant Accounting Policies-Continued

In July 2005, the FASB issued FASB Staff Position ("FSP") 150-5, "Accounting
Under SFAS 150 for Freestanding Warrants and Other Similar Instruments on
Redeemable Shares". FSP 150-5 clarifies that warrants on shares that are
redeemable or puttable immediately upon exercise and warrants on shares that are
redeemable or puttable in the future qualify as liabilities under SFAS 150,
regardless of the redemption feature or redemption price. The FSP is effective
for the first reporting period beginning after September 30, 2005, with
resulting changes to prior period statements reported as the cumulative effect
of an accounting change in accordance with the transition provisions of SFAS
150. We adopted the provisions of FSP 150-5 on July 1, 2005, which did not have
a material effect on our financial statements.

In July 2005, the FASB issued EITF 05-6, "Determining the Amortization period
for Leasehold Improvements Purchased After Lease Inception or Acquired in a
Business Combination", which addressed the amortization period for leasehold
improvements made on operating leases acquired significantly after the beginning
of the lease. The EITF is effective for leasehold improvements made in periods
beginning after June 29, 2005. We adopted the provisions of EITF 05-6 on July 1,
2005, which did not have a material impact to the Company's financial position,
results of operations and cash flows.

Note 3-Due from Related Party

In April 2004, under the Master Services Agreement, as amended in April 2005, with a related party, the Company agreed to pay certain fixed and variable fees and support services to such related party entity partly owned by its Chief Executive Officer and by an Executive Officer in exchange for a share of revenues of the floor brokerage services of the related party. The fixed fees the Company has agreed to pay amount to $50,000 per year.

The Company's share of revenues of the floor brokerage services amounted to approximately $3.6 million and $2.0 million during 2006 and 2005, respectively. The Company's share of expenses of the floor brokerage services amounted to approximately $741,000 and $857,000 during 2006 and 2005, respectively. The Company has received approximately $2.6 million and $1.0 million from the related party in connection with such floor brokerage services during 2006 and 2005, respectively, and the related party owed approximately $488,000 at December 31, 2006.

F-13

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 3-Due from Related Party-continued

The Company recognizes its share of revenues of the floor brokerage services based on the commissions earned for such services which are recognized on the day of the trade-trade date basis.

The father of the Company's Chairman of the Board leases to the Company a seat on the exchange through which Capital Energy Services LLC ("CES") maintains its floor operations. The Company assumed the cost of the lease in April 2006. The lease provides for monthly payments of approximately $22,000 through December 31, 2006. The amount paid pursuant to the lease amounted to $188,000 during 2006.

Note 4-Other Receivable

The Company's other receivable consists of amounts due from a broker employed by a related party, an entity owned by our Chief Executive Officer and by an Executive Officer. This other receivable funded security deposits of $100,000 held at a US exchange and $50,000 held at a clearinghouse, which are required to maintain the Company's floor operations.

Note 5-Due to Related Parties

The terms and amounts of due to related parties at December 31, 2006 are as follows:

Due to Chairman of the Board, non-interest bearing, unsecured, payable by March 12, 2014, if the Company obtains additional equity or debt financing of at least

$1,000,000 following the private placement which closed in September 2004
("Capital Raise"), the Company will repay its Chairman of the Board up to 39.33%
of the Capital Raise, up to $2,810,877, with the remaining balance and accrued
interest of 4.68% from the date of the

| | |
|---|---:|
| Capital Raise due on March 22, 2014: | $5,044,510 |
| Discount, using initial implied rate of 12%: | (3,256,311) |
| | ----------- |
| | $1,788,199 |
| | =========== |

Due to Executive Officer, non-interest bearing, unsecured, payable by March 12,
2014, if the Company obtains additional equity or debt financing of at least
$1,000,000 following a Capital Raise, the Company will repay its Executive
Officer up to 5.3% of the Capital Raise, up to $381,250, with the remaining
balance and accrued
 interest of 4.68% from the date of the Capital Raise

| | |
|---|---:|
| due on March 22, 2014: | $508,697 |
| Discount, using initial implied rate of 12%: | (441,686) |
| | --------- |
| | $ 67,011 |
| | ========= |

F-14

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 5-Due to Related Parties-continued

During April 2005, the Company modified the terms of its due to related parties.
The modified terms provide that, in the event of a Capital Raise, among other
things, the interest rate accrued after such event is reduced from 12% to 4.68%.
Additionally, the modified terms provide that the Company may make principal
repayments towards the due to Chairman of the Board and the due to its Executive
Officer amounting to approximately 25% of its cash flows from operating cash
flows less capital expenditures. During April 2006, the Company modified the
terms of its due to related parties to allow the Company to make principal
repayments at its discretion.

The Company satisfied its due to Chief Executive Officer during 2006. The due to
Chief Executive Officer had the same terms as the due to Executive Officer.

The amortization of the discount on the due to related parties amounted to
approximately $780,000 and $300,000 during 2006 and 2005, respectively.

The Company made principal repayments amounting to approximately $1.2 million
towards its due to related parties during 2006.

During 2005, in connection with the modified terms, the Company made principal
repayments of $177,243 on the due to its Chairman of the Board, of which $69,638
was offset against an accounts receivable of one of the Company's clients, which
is an unrelated party. Additionally, the Company made principal repayment of
$203,803 and $53,803 on the due to Chief Executive Officer and due to Executive
Officer, respectively.

Note 6- Other Related Party Transactions

The Company provides administrative services to a related party, an entity owned by the Company's Chief Executive Officer and an Executive Officer. The Company charged approximately $17,000 and $17,000 during 2006 and 2005, respectively, for such services. The related party owed the Company approximately $6,000 at December 31, 2006.

The Company has recognized revenues of approximately $273,000 and $106,000 during 2006 and 2005, respectively, from three related parties, entities in which its Chairman of the Board is also the managing director or a shareholder. Such related parties owed the Company approximately $182,000 as of December 31, 2006.

F-15

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 7- Stockholders' Equity

During 2006, the Company issued, in aggregate, 268,083 shares of common stock to its Chief Executive Officer. The shares were valued at approximately $276,000, based on the quoted price of the Company's common stock at the date of issuance. The shares were issued pursuant to the employment agreement with the Company's Chief Executive Officer.

On May 30, 2006, the Company's Board of Directors authorized the repurchase of such number of shares of its common stock that have an aggregate purchase price not in excess of $200,000 at the rate of up to $50,000 worth of common stock each quarter. The Company repurchased 4,800 shares at a cost aggregating approximately $2,500 during 2006. Such repurchases have been accounted as treasury stock in the accompanying balance sheet.

Stock Compensation Plan

During November 2004, the Company adopted the 2004 Stock Option Plan ("2004 Plan"). The 2004 Plan allows for the grant of both incentive stock options and nonstatutory stock options. The 2004 Plan may be administered, interpreted and constructed by the Board of Directors or a compensation committee. The maximum number of shares of common stock which may be issued pursuant to options granted under the 2004 Plan may not exceed 7,500,000 shares. There are 941,000 options outstanding at December 31, 2006. The outstanding options are exercisable at a weighted average price per share of $0.26 per share. The Company granted 150,000 options during 2006. The options outstanding vest over periods ranging between 18 months and three years. During 2006, the Company recorded a share-based payment expense amounting to approximately $7,000 in connection with all options outstanding

The share-based payment is based on the fair value of the outstanding options

amortized over the requisite period of service for option holders, which is
generally the vesting period of the options. The fair value of the options is
based on the Black Scholes Model using the following assumptions:

| | |
|---|---|
| Exercise price: | $0.20-$0.51 |
| Market price at date of grant: | $0.20-$0.51 |
| Volatility: | none-57% |
| Expected dividend rate: | 0% |
| Risk-free interest rate: | 2.78%-4.81% |

If any options granted under the 2004 Plan expire or terminate without having
been exercised or cease to be exercisable, such options will be available again
under the 2004 Plan. All employees of the Company and its subsidiaries are
eligible to receive incentive stock options and nonstatutory stock options.
Non-employee directors and outside consultants who

F-16

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 7- Stockholders' Equity-continued

provided bona-fide services not in connection with the offer or sale of
securities in a capital raising transaction are eligible to receive nonstatutory
stock options. Incentive stock options may not be granted below their fair
market value at the time of grant or, if to an individual who beneficially owns
more than 10% of the total combined voting power of all stock classes of the
Company or a subsidiary, the option price may not be less than 110% of the fair
value of the common stock at the time of grant. The expiration date of an
incentive stock option may not be longer than ten years from the date of grant.
Option holders, or their representatives, may exercise their vested options up
to three months after their employment termination or one year after their death
or permanent and total disability. The 2004 Plan provides for adjustments upon
changes in capitalization.

Pro Forma Information Under SFAS No. 123 for Periods Prior to January 1, 2006
The following table illustrates the effect on net earnings and earnings per
share if the Company had applied the fair value recognition provisions of SFAS
No. 123 to stock-based awards for 2005:

| | Year Ended December 31, 2006 | Year Ended December 31, 2005 |
|---|---|---|
| Net income: | | |
| As reported | $ 6,206,178 | $ 1,259,564 |
| Add: Total stock-based employee compensation included in net income as reported, net of related tax effects | - | - |
| Deduct: Total stock-based employee compensation expense | | |

```
determined under fair value based
 method for all awards,
net of related tax effects           (         -     )      ( 4,338 )
                                     -------------------     ----------------

Pro forma                            $ 6,206,178            $ 1,255,226
                                     ==================     ================

Basic earnings per share:
As reported                          $  0.12                $ 0.02
                                     ==================     ================

Pro forma                            $  0.12                $ 0.02
                                     ==================     ================

Diluted earnings per share:
As reported                          $  0.12                $ 0.02
                                     ==================     ================

Pro forma                            $  0.12                $ 0.02
                                     ==================     ================
```

For purposes of the pro forma calculations, the fair value of each option was
estimated on the date of the grant using the Black-Scholes option-pricing
model, assuming no expected dividends, and the following assumptions: expected
volatility rate:  44%, risk-free interest rate:  3.7%, expected term: 4 years.

F-17

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 7- Stockholders' Equity-continued

A summary of the activity during 2006 and 2005 of the Company's stock option
plan is presented below:

|  | Options | Weighted Average Exercise Price |
|---|---|---|
| Outstanding at January 1, 2005 | 780,250 | $0.20 |
| Granted | 150,000 | 0.30 |
| Exercised | - | |
| Expired   or cancelled | (139,250) | 0.24 |
| Outstanding at December 31, 2005 | 791,000 | 0.21 |
| Granted | 150,000 | 0.51 |
| Exercised | - | - |
| Expired   or cancelled | - | - |
| Outstanding at December 31, 2006 | 941,000 | $ 0.26 |

```
Exercisable at December 31, 2006          666,000            $0.20
                                          =======            ======
Vested at December 31, 2006               666,000            $0.20
                                          =======            ======
```

The weighted-average grant-date fair value of options granted during 2006 and 2005 amounted to $0.20 and $0, respectively.

Certain of the Company's options, all of which were granted prior to January 1, 2006, terminate upon the earlier of the termination for cause by the Company or the death of the employee. Accordingly, the weighted average remaining contractual term for such options is indefinite. The weighted average remaining contractual life is indefinite for 791,000 outstanding options at December 31, 2006, of which 666,000 are exercisable and vested.

For those options that have a definite contractual term, 150,000 were outstanding at December 31, 2006, of which none were exercisable or vested. The remaining weighted average contractual term for such options is 9.7 years.

The total compensation cost for options amounted to $6,506 and $0 during 2006 and 2005, respectively.

The Company's policy is to issue shares pursuant to the exercise of stock options from its available authorized but unissued shares of common stock. It does not issue shares pursuant to the exercise of stock options from its treasury shares.

F-18

<PAGE>

OPTIONABLE, INC.<br/>
NOTES TO FINANCIAL STATEMENTS<br/>
December 31, 2006 and 2005

Note 7- Stockholders' Equity-continued

The weighted average remaining contractual life and weighted average exercise price of options outstanding at December 31, 2006, for selected exercise price ranges, is as follows:

Options outstanding:
<TABLE>
<CAPTION>

| Range of exercise prices | Number of options | Weighted average remaining contractual life |
|---|---|---|
| <S>         <C> | <C> | <C> |
| $0.20 | 691,000 | indefinite |
| $0.30 | 100,000 | indefinite |
| $0.51 | 150,000 | 9.7 |

</TABLE>

Warrants

A summary of the activity during 2006 and 2005 of the Company's warrants is presented below:

|  | Warrants | Weighted Average Exercise Price |
|---|---|---|
| Outstanding at January 1, 2005 | 1,000,000 | $ 0.20 |
| Granted | - | 0.20 |
| Exercised | - | - |
| Expired or cancelled | (450,000) | 0.20 |
| Outstanding at December 31, 2005 | 550,000 | 0.20 |
| Granted | 1,200,000 | 0.95 |
| Exercised | - | - |
| Expired or cancelled | (200,000) | 0.95 |
| Outstanding at December 31, 2006 | 1,550,000 | $0.68 |
| Exercisable at December 31, 2006 | 1,150,000 | $0.59 |
| Vested at December 31, 2006 | 1,150,000 | $0.59 |

The weighted-average grant-date fair value of warrants granted during 2006 and 2005 amounted to $0.40 per warrant.

Certain of the Company's warrants, all of which were granted prior to January 1, 2006, terminate upon the earlier of the termination for cause by the Company or the death of the employee. Accordingly, the weighted average remaining contractual term for such warrants

F-19

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 7- Stockholders' Equity-continued

is indefinite. The weighted average remaining contractual life is indefinite for 100,000 warrants at December 31, 2006, all of which are exercisable and vested.

For those warrants that have a definite contractual term, 1,450,000 were outstanding at December 31, 2006, of which 1,050,000 were exercisable or vested. The remaining weighted average contractual term for warrants outstanding, exercisable, vested at December 31, 2006 is 1.5 years, 1.3 years, and 1.3 years, respectively.

The weighted average remaining contractual life and weighted average exercise price of warrants outstanding at December 31, 2006, for selected exercise price ranges, is as follows:

Warrants:

| Range of exercise prices | Number of warrants | Weighted average remaining contractual life |
| --- | --- | --- |
| $0.20 | 550,000 | Indefinite to 0.5 years |
| $0.95 | 1,000,000 | 2 years |

During February 2006, the Company issued 1,200,000 warrants to a company wholly-owned by its Chief Executive Officer. The exercise price of the warrants is $0.95 per share. The warrants expire in February 2009. The warrants become exercisable in tranches of up to 400,000 warrants beginning June 30, 2006, and every six months thereafter, upon reaching certain trading milestones by two of the Company's customers. The Company recognizes the fair value of the exercisable warrants when performance has occurred. The fair value of the warrants is based on their fair value at the time of grant. The fair value of the options is based on the Black Scholes Model using the following assumptions:

| | |
| --- | --- |
| Exercise price: | $0.20-$0.95 |
| Market price at date of grant: | $0.20-$0.95 |
| Volatility: | none-57% |
| Expected dividend rate: | 0% |
| Risk-free interest rate: | 4.37%-5.13% |

The total compensation cost related to nonvested awards not yet recognized amounted to approximately $160,000 at December 31, 2006 and the Company expects that it will be recognized over the following weighted-average period of 6 months.

The Company has recognized an expense of approximately $240,000 and $162,000 during 2006 and 2005, respectively, in connection with all warrants which became exercisable during the respective periods.

F-20

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 7- Stockholders' Equity-continued

The Company's policy is to issue shares pursuant to the exercise of warrants from its available authorized but unissued shares of common stock. It does not issue shares pursuant to the exercise of warrants from its treasury shares.

Note 8-Income Taxes

The Company has used all of its remaining net operating losses 2006.

The components of the provision for income taxes are as follows:

|  | 2006 | 2005 |
|---|---|---|
| Current: |  |  |
|     Federal | $   1,141,779 | $     - |
|     State | 318,273 | - |
|        Total current | 1,459,052 | - |
|        Total provision for income taxes | $   1,459,052 | $     - |

A reconciliation of the Company's effective tax rate to the statutory federal rate is as follows:

|  | 2006 | 2005 |
|---|---|---|
| Federal statutory taxes | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | 5.7 | 5.7 |
| Permanent differences | 4.5 | 0.0 |
| Utilization of net operating losses | (26.2) | -- |
| Change in valuation allowance | -- | (40.7) |
|  | 19.0% | 0.0% |

F-21

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 9- Commitments

During October 2005, the Company named a new Chief Executive Officer, elected him a director, and entered into an employment agreement with him (the "Agreement"). The initial term of the Agreement is for 51 months, subject to renewal or earlier termination.

The Company's Chief Executive Officer's salary will be as follows: $20,833 upon entering into the Agreement, $46,875 from October 30, 2005 to December 31, 2005, $275,000 from January 1 to December 31, 2006, $300,000 from January 1, 2007 to December 31, 2007, $325,000 from January 1 to December 31, 2008, $350,000 from January 1, 2009 to December 31, 2009 ("Fixed Compensation").

In addition, effective April 1, 2006, the Chief Executive Officer is paid (i) cash compensation amounting to five percent (5%) of Gross Revenues of the Company, and (ii) stock compensation amounting to two percent (2%) of the Gross Revenues of the Company, as defined. Gross Revenue is defined as the total gross revenue related to any and all aspects of the brokerage business, including incentives received from the exchanges, based on generally accepted accounting principles. The shares of Company common stock will be granted at fair value at the date of grant.

The Company will issue options to its Chief Executive Officer equal to 20% of the number of shares of common stock issuable under warrants which become exercisable pursuant to any Order Flow Agreements (Order Flow Agreements are the agreements for the Company to issue warrants to a firm based on the volume of orders the firm placed with the Company). Those options will be fully vested Non-Statutory Stock Options granted under the Company's 2004 Plan at fair value at the date of grant. Also, the Company will issue to its Chief Executive Officer 5,000 options each time a firm registers with and executes its first 10,000 lots on the Company's OPEX platform. The total number of such options will be limited to 2,500,000. Such options will be fully vested Non-Statutory Options granted under the Plan at fair value at the date of grant.

Upon the sale or merger or other business combination of the Company and another company or companies, the Company's Chief Executive Officer will be entitled to a lump sum payment of 50% of the unpaid Fixed Compensation should he desire not to be employed with the new or successor entity.

F-22

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 9- Commitments

Effective February 1, 2007, the Company leases its executive offices under a 10-year leasing arrangement providing for a monthly base rent of $9,953, increasing gradually to up to $11,684. The first 6 months of occupancy are free. The minimum annual payments under such commitment for the next five years and thereafter are as follows:

Year                                              Minimum Annual Payments

```
- ----                                  -----------------------
2007                                     $  49,765
2008                                        119,436
2009                                        124,199
2010                                        124,632
2011                                        129,395
2012 and thereafter                         691,111
```

The Company's rental expense amounted to approximately $74,000 and $80,000 during 2006 and 2005, respectively.


Note 10- Subsequent Events (Unaudited)

     On January 22, 2007, the Company, its Chairman of the Board, its Chief
     Executive Officer, and its President (collectively, the "Founding
     Stockholders"), and NYMEX Holdings, Inc. (the "Investor") entered into a
     binding term sheet (the "Term Sheet") pursuant to which the Founding
     Stockholders have agreed to sell 10,291,448 shares of common stock of the
     Company (the "Purchased Shares") to the Investor. The Purchases Shares
     represents 19% of the currently outstanding shares of Common Stock on a
     fully diluted basis (without giving effect to the warrant discussed
     below). Pursuant to the Term Sheet, the Company has agreed to issue the
     warrant described below to the Investor, in consideration of the
     Investor's agreement to engage in certain joint marketing and cobranding
     activities and to provide hosting of Company servers and assistance in
     joint technology development. In addition, the Investor and the Company
     agreed to certain arrangements with respect to OTC products which the
     Company clears through the clearport system.

     The warrant to be issued by the Company (the "Warrant") will permit the
     Investor to purchase a number of shares of common stock sufficient to
     increase the Investor's ownership of the Company's common stock to an
     amount not to exceed 40% of the Company's then outstanding common stock on
     a fully diluted basis, based on the assumption that the Investor has
     retained ownership of the Purchased Shares. The Warrant will be
     exercisable from time to time for a period of 18 months from the closing
     date of the transactions contemplated by the Term

                              F-23


<PAGE>


                         OPTIONABLE, INC.
                    NOTES TO FINANCIAL STATEMENTS
                     December 31, 2006 and 2005

Note 10- Subsequent Events (Unaudited) -continued

     Sheet at an exercise price per share equal to $4.30. The Warrant will not
     contain a cashless exercise feature. The exercise price will be subject to
     certain customary adjustments to protect against dilution.

     The transactions contemplated by the Term Sheet will be evidenced by
     definitive agreements (the "Definitive Agreements") which will contain
     representations, warranties, covenants, indemnities and conditions
     precedent customary and appropriate for this type of transaction

including, but not limited to, representations, warranties, covenants and indemnities from each of the Founding Stockholders, the Company and the Investors.

The closing of the transactions contemplated by the Term Sheet is subject to certain conditions precedent set forth in the Term Sheet, including, (i) the Investor being satisfied, in its sole and reasonable discretion, with its legal, accounting, regulatory, business and other due diligence investigation of the Company, which will be completed prior to the execution of the Definitive Agreements, (ii) the execution and delivery of mutually acceptable Definitive Agreements within 60 days of the date of the execution of the Term Sheet, (iii) the delivery of mutually acceptable employment agreements with key Company management and executives, other than the Company's Chief Executive Officer, which will include customary non-competition and non-solicitation provisions, and the delivery of a mutually acceptable non-competition agreement with the Company's President and (iv) The Company's Chairman agreement to waive any obligation on the part of the Company to make any prepayment of principal or to begin paying interest upon amounts due to him under the Loan Agreement between him and the Company, dated March 22, 2004, as a result of any exercise by the Investor of the Warrant.

If the Investor does not inform the Company within 3 weeks of being provided substantial access to due diligence that it is satisfied with its due diligence review and that it intends to proceed with the transaction, the Company and the Founding Stockholders will be entitled, in their sole discretion, to terminate the transaction by written notice to the Investor.

Effective upon closing of the transactions contemplated by the Term Sheet and for so long as the Investor owns at least 5,145,724 shares of common stock, the Investor will be entitled to designate one person (reasonably acceptable to the Company) that the Company is required to nominate as a member of the Company's board of directors (the "Investor Director"), and each of the Founding Stockholders shall be required to vote their shares in favor of the election of the Investor's designation. For so long as the Investor owns at least 5,145,724 shares of common stock, the Investor will be required to vote its shares in favor of each individual nominated for election as a member of the Company's board of directors by the nominating committee of the Company. For so long as the

F-24

<PAGE>

OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 10- Subsequent Events-continued

Investor owns at least 5,145,724 shares of common stock and subject to certain permitted threshold amounts, the consent of the Investor Director (which may not be unreasonably withheld) will be required before the Company may take certain actions including (i) issuances of shares of a class of stock ranking senior to the common stock, (ii) acquisitions of businesses or assets, (iii) entry into related party transactions, (iv)

the payment of dividends on, or the optional redemption of, capital stock or the issuance of debt and (v) entry into any business which is not similar, ancillary or related to any of the businesses in which the Company is currently engaged.

For so long as the Investor owns at least 5,145,724 shares of common stock: (i) each of the Founding Stockholders and the Investor will have a right of first refusal to purchase or subscribe for their pro rata percentage of shares in certain subsequent sales by the Company of common stock and/or certain other securities convertible into or exchangeable for common stock, (ii) each of the Founding Stockholders and the Investor will have certain rights of first refusal with respect to proposed sales of common stock by the others and (iii) before they may accept any offer by an independent third party to acquire 50% or more of the total voting power of the common stock or voting stock of the Company, the Founding Stockholders and the Company will be required to provide notice of such offer to the Investor and permit the Investor a period of 10 days to make its own offer.

In connection with the Purchased Shares, the Company will enter into a registration rights agreement with the Investor which, among other things, will provide the Investor, subject to standard exceptions, with (i) unlimited "piggyback" rights subject to standard underwriter lock-up and cutback provisions and (ii) the right to two demand registrations for underwritten offerings or take downs off of a shelf registration statement, provided that (A) a minimum of $5,000,000 of Common Stock are offered in such a demand registration or take down and (B) the Company shall not be obligated to effectuate more than one underwritten offering pursuant to a demand registration by the Investor in any six-month period. In addition, if the Company is eligible to register its securities on Form S-3 (or any successor form then in effect), the Investor will be entitled to unlimited registrations on Form S-3 (or any successor form then in effect), including shelf registrations, provided that (x) a minimum of $5,000,000 of common stock are offered in such an S-3 registration and (y) the Company will not be obligated to effect more than two S-3 registrations in any twelve month period. An S-3 registration will not count as a demand registration, unless such registration is for an underwritten offering.

The Investor will enter into a standstill agreement with the Company pursuant to which the Investor, with certain limited exceptions, will agree not to purchase any additional shares of the Company's common stock until the one year anniversary of the closing date of the transactions contemplated by the Term Sheet.

F-25


<PAGE>


OPTIONABLE, INC.
NOTES TO FINANCIAL STATEMENTS
December 31, 2006 and 2005

Note 10- Subsequent Events-continued

The closing of the transactions contemplated by the Term Sheet is expected to occur as soon as reasonably practicable after the date of execution of the Term Sheet. The provisions of the Term Sheet are subject to, among

other things, satisfactory completion of due diligence by the Investor.
There can be no assurance that the transactions contemplated by the Term
Sheet will close.

F-26

<PAGE>

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-21
<SEQUENCE>2
<FILENAME>ex21.txt
<DESCRIPTION>THE COMPANY'S SUBS.
<TEXT>
Exhibit 21

Subsidiaries of the Company

OPEX International, Inc.                                              New York
Hydra Commodity Services, Inc.                                       New York

<PAGE>
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31
<SEQUENCE>3
<FILENAME>ex311.txt
<DESCRIPTION>CEO CERT.
<TEXT>
Exhibit 31.1

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Kevin Cassidy, certify that:

1. I have reviewed this Annual Report on Form 10-KSB of the Company for the fiscal year ended December 31, 2006;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

    (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

    (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: March 23, 2007

                                    /s/ Kevin Cassidy
                                    Kevin Cassidy
                                    Chief Executive Officer

</TEXT>

```
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31
<SEQUENCE>4
<FILENAME>ex312.txt
<DESCRIPTION>CFO CERT.
<TEXT>
EXHIBIT 31.2
```

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Marc-Andre Boisseau, certify that:

1. I have reviewed this Annual Report on Form 10-KSB of the Company for the fiscal year ended December 31, 2006;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

          (b) any fraud, whether or not material, that involves
management or other employees who have a significant role in the small business
issuer's internal control over financial reporting.

Date: March 23, 2007

                                             /s/ Marc-Andre Boisseau
                                             Marc-Andre Boisseau
                                             Chief Financial Officer

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-32
<SEQUENCE>5
<FILENAME>ex321.txt
<DESCRIPTION>CEO 1350 CERT.
<TEXT>
EXHIBIT 32.1


                        CERTIFICATION PURSUANT TO
                      18 U.S.C. SECTION 1350,
                      AS ADOPTED PURSUANT TO
                 SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002


In connection with the Annual Report on Form 10-KSB of Optionable, Inc. (the
"Company") for the fiscal year ended December 31, 2006, as filed with the
Securities and Exchange Commission on the date hereof (the "Report"), the
undersigned hereby certifies, pursuant to 18 U.S.C. Section 1350:

        (1) The Report fully complies with the requirements of Section 13(a) or
15(d) of the Securities Exchange Act of 1934; and

        (2) The information contained in the Report fairly presents, in all
material respects, the financial condition and results of operations of the
Company.


Date:  March  23, 2007                        /s/ Kevin Cassidy
                                              Kevin Cassidy
                                              Chief Executive Officer




</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-32
<SEQUENCE>6
<FILENAME>ex322.txt
<DESCRIPTION>CFO 1350 CERT.
<TEXT>
EXHIBIT 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002


In connection with the Annual Report on Form 10-KSB of Optionable, Inc. (the "Company") for the fiscal year ended December 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned hereby certifies, pursuant to 18 U.S.C. Section 1350:

        (1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

        (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date:  March  23, 2007                          /s/ Marc-Andre Boisseau
                                                Marc-Andre Boisseau
                                                Chief Financial Officer

</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----