# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re OPTIONABLE SECURITIES
LITIGATION

No. 07-cv-3753 (LAK)

## DEFENDANT EDWARD J. O'CONNOR'S

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

**McCormick & O'Brien, LLP**

Liam O'Brien (LO-3930)
Jeffrey B. Silverstein (JS-4818)
42 West 38th Street, 7th Floor
New York, New York 10018
Phone: 212-286-4471
Fax: 212-504-9574

**Attorneys for Defendant
Edward J. O'Connor**

<u>**TABLE OF CONTENTS**</u>

I.      INTRODUCTION..................................................................1

II.     PRELIMINARY STATEMENT..............................................1

III.    FACTUAL BACKGROUND...................................................3

        A.      Optionable' Business.................................................3

        B.      Mr. O'Connor's Duties at Optionable..........................4

        C.      Mr. O'Connor's Participation in the NYMEX Stock Transaction.........4

        D.      Optionable's Disclosures Concerning Its Business ...................6

        E.      BMO's Problems........................................................6

IV.     ARGUMENT.....................................................................8

        A.      The Standards For Pleading a Primary Securities Fraud Claim...........8

        (i)     Plaintiffs Have Failed to Plead Falsity With Particularity.................9

                (a)     Optionable's Disclosures Concerning its
                        Business with BMO..............................................12

                (b)     Disclosures Concerning NYMEX..................................13

                (c)     Optionable's Disclosures Regarding
                        OPEX-related Business Risks.....................................14

                (d)     No Duty to Disclose Mr. Cassidy's Prior
                        Remote Convictions..............................................14

                (e)     Plaintiffs Have Not Adequately Alleged
                        False Sarbanes-Oxley Certifications...............................16

                (f)     Optionable Disclosed Its Internal Controls.........................16

                (g)     Plaintiffs Have Not Adequately Alleged
                        GAAP Violations.................................................17

                (h)     Many of the Challenged Statements Are Puffery...................17

        (ii)    Plaintiffs Have Failed to Plead Scienter..............................17

                (a)     Motive and Opportunity.........................................17

(b)     No Knowledge or Extreme Recklessness
        Has Been Pleaded…………………………………………19

(iii)   Plaintiffs Have Failed to Plead Loss Causation…………………..……21

B.      Plaintiff Have Failed to Plead a Violation §20(a)
        of the Exchange Act……………………………………………23

C.      Plaintiff Have Failed to Plead a Violation §20A
        of the Exchange Act……………………………………………25

V.      CONCLUSION………………………………………………….........29

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*Acito v. Imcera Group*, 47 F.3d 47 (2d Cir. 1995)..............................................................21

*Aldus  Sec. Litig.*, No. C92-885C, 1993  WL 121478   (W.D.Wash. Mar. 1, 1993).............27

*ATSI Communications, Inc. v. Shaar Fund, Ltd.,*493 F.3d 87 (2d Cir. 2007)..............24-25

*Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, (S.D.N.Y. 2006)................11

*BISYS Securities Litigation*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005)...............................11

*Blech Sec. Litig.*, 961 F. Supp. 569 (S.D.N.Y. 1997)..............................................25

*Buban v. O'Brien*, No. C 94-0331 (FMS), 1994 WL 324093 (N.D. Cal. June 22, 1994)...................................................................................................27

*Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6594 2006 WL 27470 (S.D.N.Y. Jan. 3, 2006)................................................................................22

*Coca-Cola Enterprises Inc. Sec. Litig.*, 510 F. Supp. 2d 1187 (N.D. Ga. 2007)..............12

*Chill v. General Elec. Co.*, 101 F.3d 263 (2d Cir. 1996)..........................................19

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991)..........................3

*Dura Pharmaceuticals Inc. v. Broudo*, 544 U.S. 336 (2005).........................8, 21, 22

*eSpeed, Inc. Securities Litigation*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006).......................3

*Faulkner v. Verizon Communications, Inc.,* 189 F. Supp. 2d 161 (S.D.N.Y. 2002)............3

*Harrison v. Rubinstein*, No. 02 Civ. 9356 (DAB) 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007)..........................................................................24-26

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, No. 01 Civ. 6600 (RLC), 2007 WL 1222583 (S.D.N.Y. Apr. 25, 2007)......................................23

*Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697 (2d. Cir. 1994)............26

*Jacobs v. Coopers & Lybrand, LLP*, No. 97 Civ. 3374 (RPP) 1999 WL 101772 (S.D.N.Y. March 1, 1999).................................................................19

*Kowal v. MCI Communications Corp.*, 16 F.3d 1271 (D.C. Cir. 1994)..........................16

*Lapin v. Goldman Sachs Group, Inc.*, No. 04-2236, 2006 WL 2850226 (S.D.N.Y. Sept. 29, 2006)..........................................................................24

*Lentell v. Merrill Lynch & Co.*, 369 F.3d 161 (2d Cir. 2005)..............................21

*Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194 (S.D.N.Y. 1999)...............................24

*Marsh & McLennan Cos., Inc.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006)...............11, 19, 28

*Miller v. Lazard*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007).....................................11

*Neubronner v. Milken*, 6 F.3d 666 (9th Cir.1993)..........................................27

*Novak v. Kasaks*, 216 F.3d 307 (2nd Cir. June 21, 2000)....................................17

*NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15 (S.D.N.Y. 2004)................................21

*Omnicom Group, Inc. Sec. Lit.*, No. 02 Civ. 4483 (WHP), 2008 WL 243788,
(S.D.N.Y. Jan. 29, 2008)....................................................................23

*OPUS360 Corp. Sec. Litig.*, No. 01Civ. 2938 (JGK) 2002 WL 3190157
N.Y. October 2, 2002).......................................................................14

*Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005).................................21

*Parmalat Sec. Litig.*, 474 F. Supp. 2d 547 (S.D.N.Y. 2007).................................24

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)...........................................17

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001)..........................................18

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip
Morris Cos.*, 75 F.3d 801 (2d Cir. 1996)....................................................8

*Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365 (S.D.N.Y. 2007)...............9, 11

*Silva Run v. Worldwide Ltd. v. Gaming Lottery Corp.*, 1998 WL
167330 (S.D.N.Y. 1998).....................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ___U.S.___,127
S. Ct. 2499 (2007).....................................................................9, 18-20

*Tuchman v. DSC Communications Corp.*, 14 F.3d 1061 (5th Cir. 1994).......................16

*VeriFone Sec. Litig.*, 784 F. Supp. 1471 (N.D.Cal.1992)...................................25

## **Rules**

Rule 10b-5 of the Securities and Exchange Act of 1934..............1, 2, 8, 12, 16, 24, 26

Rule 12(b)(6) of the Securities and Exchange Act of 1934...................................1

Item 401 of Regulation S-B and Regulation S-K…………………………………………15

Federal Rule of Civil Procedure 12(b)(6)…………………………………………………3

Federal Rule of Civil Procedure 9(b)……………………………………….............8-12

Section 302 of Sarbanes-Oxley…………………………………………...……………16

**Statutes**

§10(b) of the Securities Exchange Act of 1934………………………......8, 12, 19, 24, 26

§20(a) of the Securities Exchange Act of 1934……………............………...1, 2, 8, 23-25

§20A of the Securities Exchange Act of 1934…………………………....………1-2, 8, 25-27

15 U.S.C. § 78u-4(b)(1)………………………………………………………….......9

15 U.S.C. § 78u-4(b)(2)……………………………………………………….....9

15 U.S.C. § 78u-4………………………………………………………………...10

17 C.F.R. § 229.303(a)(3)(ii)……………………………………………….....14

17 C.F.R. § 228.401(a)……………………………………………………….........15

17 C.F.R. § 228.401(d)………………………………………………………….....15

17 C.F.R. § 229.401(a)…………………………………………………………….15

17 C.F.R. § 229.401(f)…………………………………………………………….15

15 U.S.C. §78t(a)………………………………………………………………….23

15 U.S.C. § 78t-1………………………………………………………………….25

## I.    INTRODUCTION

Individual Defendant Edward O'Connor ("O'Connor") joins Defendant Optionable, Inc. ("Optionable" or "OPL" or the "Company"), as well as the other named Individual Defendants in this action, in seeking the dismissal of Plaintiffs' Consolidated Amended Complaint (the "CAC").  A true and correct copy of the CAC is attached as Exhibit A to the Declaration of Michael G. Bongiorno in Support of Defendant Optionable, Inc.'s Motion to Dismiss the Consolidated Amended Class Action Complaint (the "Bongiorno Decl.").

The CAC accuses Optionable and each of the Individual Defendants, including Mr. O'Connor, of having defrauded Optionable's shareholders during a proposed class period (January 22, 2007 to May 14, 2007), in violation of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. The CAC also accuses the individual defendants, including Mr. O'Connor, of having violated §20(a) of the Exchange Act (control person liability) and §20A of the Exchange Act (for "insider trading").

As explained in greater detail below, each of the Plaintiffs' federal securities law claims fail as a matter of law.  Accordingly, Defendant O'Connor respectfully requests that the Court order that the claims asserted against him in the CAC be dismissed in their entirety, pursuant to Rule 12(b)(6).

## II.    PRELIMINARY STATEMENT

Plaintiffs have failed to sufficiently plead the elements of their Exchange Act claims, including their failure to plead a "primary" violation of §10(b) of the Securities

Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.
Plaintiffs' assert that Mr. O'Connor, as well as the other Defendants:

- engaged in and failed to disclose fraudulent conduct with Bank of Montreal ("BMO") traders to misprice certain options, in order to assist such traders in concealing their trading losses from BMO;

- misrepresented the extent to which OPL depended on revenues from BMO;

- had prior knowledge of but concealed NYMEX's plans to offer trading on a competing platform, OPEX;

- misrepresented the adequacy of Optionable's internal controls; and,

- failed to disclose two criminal convictions of Optionable's CEO Kevin Cassidy ("Mr. Cassidy"), which convictions occurred 14 and 10 years before the commencement of the proposed Class Period.

As is discussed in greater detail below, Plaintiffs' unsourced, conclusory, and false allegations, rarely mention Mr. O'Connor by name, and they fail to describe in sufficient detail Mr. O'Connor's role in the alleged fraud.

Plaintiffs' failure to sufficiently plead a "primary" violation of the Exchange Act dooms their other claims, as well. As explained in greater detail below, Plaintiffs have failed to plead a secondary, control person violation under §20(a) of the Exchange Act. Moreover, Plaintiffs' failure to plead a "predicate" violation of the Exchange Act, *inter alia*, dooms their claim for insider trading under §20A of the Exchange Act.

For the foregoing reasons, which will be analyzed below in greater detail, each of the federal securities law claims asserted against Mr. O'Connor in the CAC is without merit. Thus, Mr. O'Connor respectfully requests that the Court dismiss all claims asserted against him in the CAC.

### III.    FACTUAL BACKGROUND

Mr. O'Connor expressly incorporates herein the discussion of the factual background and arguments made in Defendant Optionable's Memorandum of Law in Support of its Motion to Dismiss the Consolidated Amended Class Action Complaint (the "Optionable Memorandum"), portions of which are included herein below, as well.

### A.    Optionable' Business

Optionable is a Delaware corporation located in Valhalla, New York. The Company was formed in 2000, and its common stock was traded on the over-the-counter market (the "OTC") under the symbol "OPBL." In its Form 10-KSB for the year ending 2006, filed with the Securities Exchange Commission (the "SEC") on March 23, 2007 ("2007 Form 10-KSB"), the Company stated that "[p]enny stock rules apply to our common stock." A true and correct copy of the 2007 Form 10-KSB is attached to the Bongiorno Decl. as Exhibit B. It further noted that: "At the present time, our common stock in not listed on any stock exchange."[1]

Optionable provides trading and brokerage services to brokerage firms, financial institutions, energy traders, and hedge funds, primarily for natural gas and energy derivative securities. Optionable provided services to customers placing trades in the futures market, which involves transactions executed over a regulated exchange, such as

---

[1] In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may consider documents integral to or explicitly relied upon in the Complaint, as well as documents filed with the SEC. *See e.g., Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), cert. denied, 112 S. Ct. 1561 (1992); *eSpeed, Inc. Securities Litigation*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006). The Court may also "take judicial notice of stock prices and press articles (for the fact of their publication)." *Id. See also, Faulkner v. Verizon Communications, Inc.*, 189 F. Supp. 2d 161, 168 (S.D.N.Y. 2002).

NYMEX. Optionable also provided brokerage services to customers placing trades in the OTC market, which is not regulated. Optionable's services included locating counterparties for customers placing orders for trades, executing trades on NYMEX or OPEX (an electronic trading platform that Optionable launched in or about year 2006), and providing derivative mark-to-market services for customers' positions, called OPEX Analytics. Optionable earned most of its revenues from commissions for executing trades and from incentive payments from NYMEX.

**B.**    **Mr. O'Connor's Duties at Optionable**

As of March 12, 2007, Mr. O'Connor served as Optionable's President and Treasurer, and he also served on Optionable's Board of Directors. *See* 2007 Form 10KSB, at 27. Mr. O'Connor's primary responsibilities at Optionable involved entering into contracts for Optionable's business and accounting for Optionable's funds. *Id.* Mr. O'Connor was not designated as having responsibility for Optionable's overall business operations or Optionable's brokerage operations. *Id.*

**C.**    **Mr. O'Connor's Participation in the NYMEX Stock Transaction**

As of March 12, 2007, Mr. O'Connor beneficially owned and/or controlled approximately 5.7 million shares of Optionable stock. On January 22, 2007, Optionable filed its Form 8-K with the SEC and issued a press release announcing a private stock transaction between NYMEX and Optionable. A copy of the January 22, 2007 Form 8-K is attached to the Declaration of Liam O'Brien (the "O'Brien Decl."), as Exhibit A. The terms of the transaction contemplated that NYMEX would purchase 19%, or 10,291,448 shares, of Optionable's stock for $2.69 per share. On January 22, 2007, Optionable's stock price was quoted on the OTC Bulletin Board at $4.34 per share.

Of the 10,291,448 shares sold to NYMEX, Mr. O'Connor would sell approximately 1.8 million shares. The remaining shares would be sold by Mark Nordlicht, the Chairman of Optionable's Board of Directors, and Kevin Cassidy, Optionable's Chief Executive Officer. The stated purpose of the transaction was to expand the scope of Optionable's business, including the facilitation of "joint marketing and cobranding activities" between Optionable and NYMEX. See 2007 Form 10-KSB. NYMEX Chairman Richard Schaeffer commented that the transaction "mark[ed] an important milestone for NYMEX," and that NYMEX was "looking forward to working with Optionable as a key contributor to [NYMEX's] future expansion in options trading." See 8-K filed on April 10, 2007 by Optionable ("April, 10, 2007 8-K"), which is attached to the Bongiorno Decl. as Exhibit C. Forms 4 filed with the SEC by Edward J. O'Connor, as well as Kevin Cassidy on April 10, 2007, and by Mark Nordlicht on April 11, 2007; LEXIS Historical Stock Prices for Optionable. The O'Connor, Cassidy, and Nordlicht Forms 4 and the LEXIS Historical Stock Prices for Optionable are attached to the Bongiorno Decl. as Exhibits F, D, E, and G, respectively. These stock sales were the result of a well-developed strategic business transaction performed by both Optionable and NYMEX in order to benefit their respective future business success.

On or about April 10, 2007, the aforementioned private stock transaction with NYNEX was consummated as planned at $2.69 per share. Pursuant to the transaction, as indicated above, Mr. O'Connor sold approximately 1.8 million shares to NYMEX. After the transaction was consummated, Mr. O'Connor and/or the entities controlled by him continued to own approximately 3.9 million Optionable shares.

On April 10, 2007, Optionable's per share stock price was quoted on the OTC Bulletin Board at $7.29, well in excess of the $2.69 per share paid by NYMEX to Mr. O'Connor and other Defendants.

**D.    Optionable's Disclosures Concerning Its Business**

Contrary to Plaintiffs' assertions, Defendants made numerous disclosures concerning Optionable's business, including disclosures concerning Optionable's relationship with BMO. These disclosures are fatal to Plaintiffs' allegations of fraud (See Optionable Memorandum, p. 5-8).

**E.    BMO's Problems**

On April 27, 2007, BMO issued a press release stating that it would suffer trading losses estimated to be between $350 million to $450 million (Canadian dollars) in the second fiscal quarter of 2007. CAC at 34.  BMO attributed the losses to a "number of [negative] factors," none of which related to conduct by Mr. O'Connor (or any other defendant). BMO cited to the following negative factors:

- "changes" in market conditions;

- increasing market "illiquidity and volatility";

- market levels, which had "dropped to historically low levels;" and,

- the "refinement in BMO's approach to estimating the market value" regarding BMO's portfolio, including the portfolio at issue here.

*Id.*  On the same day, in apparent reaction to this news, Optionable's closing per share stock price fell from the previous day closing per share price of $7.01 to $5.56 per share.

On May 10, 2007, a news article was published which discussed BMO's trading losses and a report provided to BMO regarding such losses, in late April 2007, by its auditors, Deloitte & Touche LLP ("Deloitte").  See *Report Flagged BMO Loss*, National

Post's Financial Post & FP Investing, dated May 10, 2007 (CAC at 43). The news article reported that BMO's Chief Executive Officer had again attributed BMO's trading losses to the aforementioned negative market-related factors, but he did not blame Optionable or Mr. O'Connor for his company's losses. *See Id.* According to an anonymous source, the Deloitte report apparently indicated that there had been "serious mismarking" of BMO's book of natural gas options, and that an unspecified amount, i.e., "some," of the purported mismarked trades, were provided by Optionable. *Id.* There was no indication, however, in the Deloitte report that these purportedly mismarked trades were somehow the result of intentional wrongdoing, or that Optionable or Mr. O'Connor had in any way participated in a "scheme" related to BMO's losses. Nor was there any indication as to which trades were mismarked, or that Optionable and/or Mr. O'Connor had somehow mismarked them, intentionally or otherwise. The report apparently did not rule out that such trades, as with many highly speculative trading scenarios involving futures and options, failed for other reasons, including mistake, bad luck, incompetence, or simply the result of the volatility and illiquidity of certain financial instruments.

Indeed, BMO has never indicated that it has found any evidence that the quotes provided by Optionable were fraudulent or merely unreliable; nor has it suggested that Optionable or Mr. O'Connor participated in a fraud. *See BMO Raises trading loss to $680 million*, The Gazette, May 18, 2007, at B5; CAC at 48. A true and correct copy of the May 18, 2007 Gazette article is attached to the Bongiorno Decl. as Exhibit L. Nonetheless, in reaction to these unspecific reports, Plaintiffs filed their original lawsuit, on May 11, 2007.

## IV.    **ARGUMENT**

As discussed in greater detail below, Plaintiffs have failed to plead with sufficient particularity – in contravention of Federal Rule of Civil Procedure 9(b) and the PSLRA -- a "primary" violation of §10(b) and Rule 10b-5, promulgated thereunder, with regard to Optionable or Mr. O'Connor.    Plaintiffs' failure to plead such a "primary" violation dooms their claims for secondary, or "control person" liability under §20(a) of the Exchange Act, as well as their claims for "insider trading" under §20(A) of the Exchange Act, each of which claims have improperly been asserted against Mr. O'Connor.    The CAC provides a level of detail no greater than that provided in the original complaint and, thus, the CAC suffers from the same pleading defects as those found in the original. Therefore, the CAC's claims against Mr. O'Connor should be dismissed in their entirety.

### A.    **The Standards For Pleading a Primary Securities Fraud Claim**

In order to avoid dismissal of their primary Exchange Act claims under §10(b) and Rule 10(b)(5), promulgated thereunder, Plaintiffs are required to plead the following elements with particularity: (1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) in connection with the purchase or sale of securities; (5) upon which they relied; (6) causing plaintiff's economic loss. *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336, 341, (2005); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996).

The CAC fails to comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), as well as the PSLRA. Under Rule 9(b) of the Federal Rules of Civil Procedure: "the circumstances constituting fraud or mistake shall be stated

with particularity." *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 372 (S.D.N.Y. 2007). The particularity requirement of Rule 9(b) is substantial: Plaintiffs must specifically allege misstatements or omissions of material fact, identify who made them, and explain where and when they were made, and why the statements were fraudulent. *See Id.* The Plaintiffs have failed in this task.

Under the PSLRA, the plaintiff must not only plead falsity with particularity with respect to each defendant (i.e., identify who made the misleading statement or omission, and specify when and where such misstatement or omission was made, 15 U.S.C. § 78u-4(b)(1)), he or she must also plead scienter with particularity with respect to each defendant. As such, the plaintiff must provide "strong," meaning "cogent" and "compelling," facts "giving rise to a strong inference that the defendant acted with the required state of mind." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,-- U.S. --,127 S. Ct. 2499, 2504-2505 (2007) ("To qualify as "strong" within the intendment of [the PSLRA], we hold, an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.") (emphasis added); 15 U.S.C. § 78u-4(b)(2)). The Plaintiffs have failed to meet their pleading obligations under the PSLRA. Additionally, as shown below, the Plaintiffs have failed to plead loss causation.

**(i)      Plaintiffs Have Failed to Plead Falsity With Particularity**

Plaintiffs must plead with particularity that defendants (i.e., Optionable and Mr. O'Connor) made material misstatements of fact or otherwise failed to disclose the truth regarding "a scheme to grossly misprice options with BMO in order to prevent BMO from promptly realizing the full extent of its losses." CAC at 10; *see also* CAC at 7, 9,

23-24, 32-33, 47-48, 64.    Plaintiffs base their accusations of fraud largely on un-sourced media reports, rumor, and innuendo.  Plaintiffs have not supplied any evidence, through media reports or otherwise, of any communications or meetings that took place regarding this purported massive fraud.  Plaintiffs have also failed to provide any facts concerning the alleged role that Mr. O'Connor played in the alleged fraud.

Plaintiffs' only support for their "scheme" allegation is that Defendant Cassidy was "friends" with two individuals at BMO, namely Robert Moore (Executive Managing Director of Commodity Pricing) and David Lee (a natural gas trader). CAC at 7. Plaintiffs provide no proof or verifiable source outlining the nature of these purported friendships, particularly how such friendships developed into a massive fraudulent conspiracy. Securities fraud complaints made on information and belief must identify, at a minimum, the source of the information (e.g. a witness, a document, etc.).  See 15 U.S.C. § 78u-4 (if an allegation is made on information and belief, the complaint must state with particularity "all facts on which that belief is formed").  Without much more particularization, these allegations regarding "friendships" are insufficient to plead fraud under Rule 9(b) and the PSLRA.

Moreover, Plaintiffs fail to plead with particularity that Mr. Cassidy or any other Defendant actually mispriced options in order to assist Lee or Moore to hide trading losses.  Likewise, the CAC is completely devoid of any facts concerning the role that Mr. O'Connor might have played in such mispricing.    The closest the Plaintiffs come to alleging that Mr. O'Connor engaged in a scheme to defraud Optionable's investors is their allegation that he was a "high-level" executive and director at Optionable, and thus he knew or should have known of such purported wrongdoing.  Such allegations are

insufficient to support a claim for scheme liability under Rule 9(b) and the PSLRA. *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006).

Consequently, Plaintiffs are forced to rely on a so-called "Confidential Witness No. 1," a financial analyst who "followed Optionable," which witness made the unsupported claim that Mr. Lee (the BMO trader) and his sister "received payments from Optionable." CAC at 7. The CAC is devoid of any facts as to how, if at all, Confidential Witness No. 1 possessed any information regarding the alleged financial dealings between the Company and Mr. Lee or his sister, including how and why these purported payments were improper, what amounts they received, and when and where all this fraudulent conduct took place. *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at 376; *In re BISYS Securities Litigation*, 397 F. Supp. 2d 430, 442 (S.D.N.Y. 2005) (Kaplan, J.) (the "[c]ourt cannot infer that [ ] witnesses possess the information contained in their alleged statements."); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 591-92 (S.D.N.Y. 2006) (Plaintiffs' failed to allege facts that payments defendant made to third party were improper).

Moreover, the media report about Deloitte's audit of BMO's book of natural gas options is apparently derived from unnamed sources, and merely states that "some" prices for "mismarked" trades had been provided by Optionable. CAC at 43. Such an allegation does not pass the particularization test under Rule 9(b) and the PSLRA because it is impossible to determine whether such anonymous individual actually possessed any material information. *In re In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d at 376. Statements in the media report to the effect that the anonymous individual was "familiar" with the Deloitte report fails for lack of particularization. *Miller v. Lazard*, 473 F. Supp.

2d 571, 586 (S.D.N.Y. 2007) (news articles cited to by plaintiff must include sufficiently particularized facts).

Further, not one "mismarked" option is actually identified by Plaintiffs. One can only guess what amount "some" of the "mismarked" options referred to in the CAC actually is, whether the aggregate dollar amount involved was large or small, or precisely how and when this allegedly fraudulent conduct transpired. Nor do Plaintiffs indicate what the proper prices of the purportedly mismarked trades should have been. Plaintiffs have also failed to plead that Mr. O'Connor possessed and failed to disclose any information concerning these matters. *See In re Coca-Cola Enterprises Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1197 (N.D. Ga. 2007) (in order to meet heightened pleading standards for pleading fraud with particularity, a plaintiff must link "specific transactions to specific misstatements"). In sum, Plaintiffs have failed to plead falsity with particularity, as required by Rule 9(b) and the PSLRA. For this reason alone, Plaintiffs' claims for securities fraud asserted against Mr. O'Connor under Section 10(b), and Rule 10b-5, promulgated thereunder, should be dismissed.

### (a)    Optionable's Disclosures Concerning its Business with BMO

Contrary to Plaintiffs' assertions, Defendants made numerous disclosures concerning Optionable's business, including disclosures concerning Optionable's relationship with BMO. These disclosures effectively doom Plaintiffs' allegations of fraud.

According to the CAC, Defendants misled the Plaintiffs by failing to disclose that Optionable received commissions not just from BMO, but from the "counterparties" to

transactions with BMO; and, that Optionable received incentive payments from NYMEX

for transactions placed through NYMEX.  CAC at 14, 58, 60, 66.

Plaintiffs' allegations of deception are erroneous because Optionable disclosed

that it received revenues from the counterparties to trades involving BMO.  In its 2007

Form 10-KSB (at 7), Optionable stated as follows:

> HOW WE OPERATE
> in the case of future market derivatives, . . . we inquire of *other clients* whether
> they are interested in participating . . . and facilitate the negotiation and
> conclusion of an agreement *between counterparties*.

(emphasis added).  Optionable also disclosed (in a portion of the 2007 Form 10-KSB

conveniently omitted by Plaintiffs) that:

- the percentage of revenues Optionable received from its largest customer, BMO
  (e.g., that in year 2006 BMO represented 24% of its revenues (see 10-KSB at
  20));

- if Optionable lost BMO as a customer, Optionable risked losing fees not only
  from BMO but also from the counterparties to the trades that Optionable executed
  for BMO (See 10-KSB at 20 (stating that if BMO "would not have entered into a
  portion or all of the OTC transactions in which they were involved, our 2006
  revenues could have been lower if we wouldn't have been able to find *a suitable
  counterparty* to replace them in such transactions").

(emphasis added).  Plaintiffs' claim that Optionable or Mr. O'Connor misrepresented or

failed to disclose the revenue it received from BMO or that counterparties would provide

part of their revenue is simply wrong.

### (b)    Disclosures Concerning NYMEX

Similarly, Optionable fully disclosed its relationship with NYMEX, including the

fact that it received incentive payments from NYMEX, based on a percentage of the total

revenues received by NYMEX for trades submitted to the exchange, and that these

payments accounted for 19% of Optionable's revenue during 2006 (See 2007 Form 10-KSB at 22):

- Optionable received incentive payments from NYMEX based on a fee "per lot," which fee amount was in Optionable's sole discretion, and that these payments accounted for 19% of the Company's revenues for 2006 (Id. at 8, 23);

- "we cannot guarantee that we will continue to receive the level of such incentives [from NYMEX] in the future, if at all;" Id.

- if Optionable does not "receive these incentives [from NYMEX], our revenues will decrease." Id. at 23;

Plaintiffs' claim that Optionable or Mr. O'Connor misrepresented the truth concerning its relationship with NYMEX is erroneous.

### (c)    Optionable's Disclosures Regarding OPEX-related Business Risks

The CAC also erroneously alleges that the Defendants failed to disclose risks associated with the OPEX trading platform, including that they had violated Item 303 of Regulation S-K. Item 303 of Regulation S-K requires a registrant to discuss "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) (emphasis added). The risks associated with OPEX were disclosed in the 2007 Form 10-KSB. See Optionable Memorandum p5-7. In light of these repeated warnings about OPEX, Plaintiffs' allegations that Optionable or Mr. O'Connor defrauded the Plaintiffs with respect to OPEX in untenable. *See In re OPUS360 Corp. Sec. Litig.*, No. 01Civ. 2938 (JGK), 2002 WL 3190157, at *8 (S.D.N.Y. October 2, 2002).

**(d)**    <u>**No Duty to Disclose Mr. Cassidy's Prior Remote Convictions**</u>

Plaintiffs allege that Defendants, including Mr. O'Connor, failed to disclose that Mr. Cassidy had been convicted for income tax evasion (14 years before the commencement of the proposed class period) for credit card fraud (10 years before the commencement of the proposed class period). CAC at 16. Plaintiffs also insinuate, without providing any particularized facts, that Mr. Cassidy had transitioned out of being Optionable's Chief Executive Officer to become a consultant to the Company purely in order avoid disclosing those convictions in the Company's Registration Statement. CAC at 16. These allegations do not pass muster.

Mr. Cassidy's prior convictions, which were remote in time, were not deemed to be mandatory disclosures pursuant to Item 401 of Regulation S-B and Regulation S-K, which statutes require companies to disclose certain legal proceedings during the ***past five years*** that are "material to an evaluation of the ability and integrity" of its officers and directors, including a conviction in a criminal proceeding. 17 C.F.R. §228.401(a),(d); 17 C.F.R. §229.401(a), (f) (emphasis added). Mr. Cassidy's convictions occurred more than five years prior to the filing of this lawsuit. Thus, the disclosure of these convictions would not have been required under the statutes. Moreover, as discussed in greater detail below, even if, *arguendo,* Mr. Cassidy's convictions were deemed to be mandatory disclosures, Plaintiffs have failed to plead loss causation with respect to such disclosures, which disclosures, in any event, by Plaintiffs' own reckoning, occurred after the close of the proposed class period.

(e)     **Plaintiffs Have Not Adequately Alleged False Sarbanes-Oxley Certifications**

Plaintiffs attempt to plead a violation of Section 302 of Sarbanes-Oxley against the Defendants, including Mr. O'Connor.  Plaintiffs do not allege, nor can they, that Mr. O'Connor signed the relevant Sarbanes-Oxley (CAC at 23).   Nonetheless, Plaintiffs allege that the certifications were false and misleading.  For a further discussion of Plaintiffs' allegations regarding Section 302, see Optionable Memorandum, p. 29-30.

(f)     **Optionable Disclosed Its Internal Controls**

Plaintiffs erroneously allege that Defendants, including Mr. O'Connor, misrepresented that its internal controls were adequate. Optionable disclosed, in its documents filed with the SEC, that it, as a small company, had not yet instituted some of the internal control mechanisms common to larger publicly-held corporations, including audit and compensation committees (2007 Form 10-KSB at 28).   Thus, whether Optionable characterized its internal controls as "effective" is of no moment.  The truth about its internal controls was, in fact, disclosed.  *See Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994) ("the defendants were under no duty to 'employ the adjectorial characterization' that the plaintiffs believe is more accurate") (internal citation omitted); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) ("[s]ince the use of a particular pejorative adjective will not alter the total mix of information available to the investing public, . . .  such statements are immaterial as a matter of law and cannot serve as the basis of a 10b-5 action under any theory") (internal citation omitted).

### (g)    Plaintiffs Have Not Adequately Alleged GAAP Violations

Plaintiffs' allegations that Defendants, including Mr. O'Connor, violated paragraphs 21 and 22 of Statements of Position ("SOP") No. 94-6, entitled "Disclosure of Certain Significant Risks and Uncertainties" (CAC  56-58) is redundant.  For a further discussion of Plaintiffs' GAAP allegations, see Optionable Memorandum, p. 30.

### (h)    Many of the Challenged Statements Are Puffery

Numerous challenged statements made by Optionable fall within the "puffery" category.  Such statements are not actionable.  For a further discussion of this argurment, see Optionable Memorandum, p 30-32.

### (ii)    Plaintiffs Have Failed to Plead Scienter

### (a)    Motive and Opportunity

Plaintiffs theorize that the stock transactions involving Mr. O'Connor and two other Defendants, Mr. Cassidy and Mr. Nordlicht, and NYMEX provide a "motive and opportunity" to commit fraud. *See Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004). The problem with Plaintiffs' theory is that the stock sales were the product of a well-developed and legitimate business transaction.  The Defendants' purpose for the stock transactions was to engage with NYMEX regarding "joint marketing and cobranding activities." *See* 2007 Form 10-KSB.  In fact, NYMEX's Chairman, on the day the stock sales were announced, stated that the stock transactions "mark[ed] an important milestone for NYMEX" and that NYMEX was "looking forward to working with Optionable as a key contributor to [NYMEX's] future expansion in options trading." *See* 8-K  filed on April 10, 2007 by Optionable.  *See Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

(a purported "motive" to defraud which actually serves to benefit a corporation does not suffice to plead scienter).

Moreover, Mr. O'Connor (and the other Defendants) sold their stock at $2.69 per share. On the date the stock transactions with NYMEX was consummated, April 10, 2007, Optionable's stock price was valued at $7.29 per share. Thus, Plaintiffs' scienter allegations beg the following question: if Mr. O'Connor (or the other Defendants) intended to commit fraud against Optionable's shareholders, why would he agree to accept $2.69 per share when he easily could have sold his Optionable shares, and, in fact, many more of his shares, at prices of at least $7.29 per share on the open market? The answer to this question is that Plaintiffs' scienter allegations make no sense. Mr. O'Connor did not come close to maximizing his profits through this transaction, which fact subverts Plaintiffs' allegations of fraudulent intent. *See Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (plaintiff's scienter allegations were rejected by the court where defendants' stock sales were sold at prices well below prices at which they could have maximized their profits).

On the face of the Complaint, Plaintiffs have failed to proffer any "cogent" and "compelling" inference that the stock sales were the result of fraud. *See Tellabs, Inc.*, -- U.S. at -- , 127 S. Ct. at 2504-2505 ("To qualify as "strong" within the intendment of [the PSLRA], we hold, an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.") (emphasis added). Accordingly, Plaintiffs' scienter allegations are less cogent and compelling than the clear and compelling inference that the NYMEX

18

stock transaction was the result of a legitimate business judgment, and thus they should be given no credit.

### (b)    No Knowledge or Extreme Recklessness Has Been Pleaded

Likewise, Plaintiffs offer no particularized facts which would permit a strong (i.e., a cogent and compelling) inference that Optionable or Mr. O'Connor engaged in conscious or extremely reckless misconduct. *Tellabs*, -- U.S. at --, 127 S. Ct. at 2504-2505. Reckless conduct in a §10(b) claim has been defined as "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill*, 101 F.3d at 269. Courts located within the Second Circuit have determined that, "by themselves, general allegations regarding the magnitude of the fraud or the organizational role of a defendant are insufficient to raise a strong inference of scienter.*" In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. at 483. "[J]ust because a defendant is a director . . . does not lead automatically to an inference that the person acted with conscious disregard of a known risk as opposed to with gross negligence or even negligence." *Jacobs v. Coopers & Lybrand, LLP*, No. 97 Civ. 3374 (RPP), 1999 WL 101772, at *16 (S.D.N.Y. March 1, 1999).

Plaintiffs allege that Mr. O'Connor possessed the requisite fraudulent scienter due to his "high-level" position at Optionable. CAC at 82. Plaintiffs provide no indication that Mr. O'Connor had in any way participated in a "scheme" related to BMO's trading losses, including the purported mismarking of BMO-related trades. Also, the CAC is devoid of "specific allegations that evidence of . . . misconduct was brought to" Mr. O'Connor's attention during the proposed class period. *In re Marsh & McLennan Cos.,*

*Inc. Sec. Litig.*, 501 F. Supp. 2d at 486.    In any event, even if a fraudulent scheme was properly pled, and it has not been, Mr. O'Connor was not responsible for all aspects of Optionable's day-to-day operations, including Optionable's brokerage-related business. *See* Form 10-KSB (at 27).

Moreover, Plaintiffs have failed to provide any "cogent and compelling" explanation for the losses suffered by BMO, other than their insufficient and conclusory accusations of fraud.  As is often the case with other highly speculative, volatile, and illiquid trading instruments, a more likely explanation for BMO's losses was "changes" in market conditions, increasing market "illiquidity and volatility," market levels which had "dropped to historically low levels," the "refinement in BMO's approach to estimating the market value" regarding BMO's portfolio, and BMO's failure to be sufficiently conservative and cautious in light of recent, commonly-reported, and volatile energy-related world events.

Likewise, given Plaintiffs' failure to particularize an alleged "scheme" by which Optionable "mismarked" BMO's options trades, or that Mr. O'Connor caused fraudulent trades to come about, no strong inference of "conscious misbehavior or recklessness" can possibly be drawn.  On the face of the Complaint, Plaintiffs have failed to proffer any "cogent" and "compelling" inferences that any incorrect prices provided by Optionable. *See Tellabs, Inc.*, -- U.S. --, 127 S. Ct. at 2504-2505 ("To qualify as "strong" within the intendment of [the PSLRA], we hold, an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.") (emphasis added).  As such, Plaintiffs have failed to plead scienter.

20

Plaintiffs have failed to provide sufficient particularized facts to support their allegations that Defendants defrauded them. Some of the Plaintiffs may have lost money, but the federal securities laws are not intended to function as an insurance policy for disgruntled shareholders. *Dura Pharmaceuticals*, 544 U.S. at 348, 125 S.Ct. at 1634. Plaintiffs' "scheme" allegations amount to nothing more than "fraud by hindsight" allegations, which allegations courts reject. For example, as this Court has noted in dismissing such "fraud by hindsight" allegations, "[w]e have not yet come to the point that a lack of clairvoyance constitutes fraud." *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 26-27 (S.D.N.Y. 2004) (Kaplan, J.) (*citing Acito v. Imcera Group*, 47 F.3d 47, 53 (2d Cir. 1995). Accordingly, Plaintiffs' scienter allegations, as pled in the CAC, are insufficient.

(iii)    **Plaintiffs Have Failed to Plead Loss Causation**

The Plaintiffs have failed to plead loss causation. The Second Circuit Court of Appeals has often stated that to establish loss causation a plaintiff must establish a "sufficiently direct" connection between a misstatement of omission of material fact and harm actually suffered. If, however, "the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection" . . . a fraud claim will not lie." *Lentell v. Merrill Lynch & Co.*, 369 F.3d 161, 174 (2d Cir. 2005); *In Re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005) (Kaplan, J.) (citing *Lentell*, 369 F.3d at 175)("To plead loss causation, the complaint must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that

loss absent the fraud."). The failure to plead loss causation is "fatal under Second Circuit precedent." *Lentell*, 369 F.3d at 174.

Plaintiffs' loss causation allegations make no sense because, *inter alia*, Optionable made numerous disclosures concerning its business dealings and operations during the proposed class period. As noted in previous sections of this memorandum, Optionable made disclosures and cautionary statements regarding the BMO transactions, NYMEX, and OPEX (including its revenues relating to such entities), as well as its internal controls. Such information was properly disclosed by Optionable. Plaintiffs have failed to particularize any wrongful acts by Optionable or Mr. O'Connor concerning the alleged "scheme." Thus, it is logically impossible for the disclosure of such a non-event to have caused Plaintiffs' economic losses, if any. *Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6594, 2006 WL 27470, at *10 (S.D.N.Y. Jan. 3, 2006) ("To establish such a link [between decline in value of Company's stock and defendants' misconduct], plaintiffs could mention the price of the Company's stock on specific dates, indicating that the stock price went up after misstatements and went down after disclosures"). Plaintiffs' highly "indirect theory" of loss causation is insufficient as a matter of law. *Dura Pharmaceuticals*, 544 U.S. at 343, 125 S.Ct. at 1632 ("touching upon" an economic loss is insufficient; what is required is that the fraud directly cause the loss).

Further, Plaintiffs cannot, as a matter of law, properly plead loss causation with respect to the disclosure of Mr. Cassidy's convictions at any time during the proposed Class Period. According to allegations contained in the CAC, the truth concerning Mr. Cassidy's convictions was fully revealed to the public on May 24, 2007, in a New York Post article. *See* CAC at 50. The New York Post article was published 10 days after the

*Plaintiffs allege* that "the full truth was revealed, on May 14, 2007. (CAC at 46).

Plaintiffs simply cannot "fit" the disclosure of Mr. Cassidy's convictions into the timeline

of their case. Plaintiffs allege that NYMEX removed its director from the Optionable

board after discovering Cassidy's convictions, but the press release announcing the

removal, dated May 14, 2007, did not discuss the reasons for the removal. CAC 46, 71.

*See* NYMEX Press Release, May 14, 2007, attached to the Bongiorno Decl., as Exhibit I.

Plaintiffs, therefore, have not pled that the alleged concealment of Mr. Cassidy's

convictions actually caused any loss suffered by Plaintiffs. *See In re Omnicom Group,*

*Inc. Sec. Lit.*, No. 02 Civ. 4483 (WHP), 2008 WL 243788, at *6 (S.D.N.Y. Jan. 29,

2008). Accordingly, even if any nondisclosure concerning Mr. Cassidy's prior conviction

was otherwise actionable, which it was not, Plaintiffs do not sufficiently plead that such

nondisclosure caused Plaintiffs' economic loss, if any. *See Internet Law Library, Inc. v.*

*Southridge Capital Mgmt., LLC*, No. 01 Civ. 6600 (RLC), 2007 WL 1222583, at *4

(S.D.N.Y. Apr. 25, 2007) (rejecting counterclaimant's claim that plaintiff had defrauded

it into making a private investment by concealing officers' criminal convictions, because

there was no evidence that the allegedly "concealed information eventually caused the

transaction to fail"). Thus, Plaintiffs' loss causation allegations fail as a matter of law.

**B.**      **Plaintiff Have Failed to Plead a Violation §20(a) of the Exchange Act**

Plaintiff charges Mr. O'Connor and other Individual Defendants with having

violated §20(a) of the Exchange Act, 15 U.S.C. §78t (a), which provides as follows: :

> every person who, directly, or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person to any
> person to whom such controlled person is liable, unless the controlling person
> acted in good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

Recently, the Second Circuit Court of Appeals held that to establish a *prima facie* case of control person liability, a plaintiff must show: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir. 2007)*; accord Harrison v. Rubinstein,* No. 02 Civ. 9356 (DAB) 2007 WL 582955, at *19 (S.D.N.Y. Feb. 26, 2007); *accord Lapin v. Goldman Sachs Group, Inc.,* No. 04-2236, 2006 WL 2850226, at *19 (S.D.N.Y. Sept. 29, 2006); *but see In re Parmalat Sec. Litig.,* 474 F. Supp. 2d 547, 554 (S.D.N.Y. 2007) (Kaplan, J.) ("culpable participation" is not an element of a §20(a) claim).

Plaintiffs' control person liability claims against Mr. O'Connor fail for a number of reasons. First, as described at length herein above, Plaintiffs have failed to plead a "primary" violation of §10(b) and Rule 10b-5 against Optionable or Mr. O'Connor. For this reason alone, the Plaintiffs' control person liability claim asserted against Mr. O'Connor should be dismissed.

Plaintiffs also make the conclusory assertion that Mr. O'Connor is liable as a "control person" due to his status as an officer and director of Optionable. CAC at 89 – 91. Pleading officer or director status alone (which is, in essence, just what Plaintiffs have pled regarding Mr. O'Connor) is insufficient. *See In re Livent, Inc. Sec. Litig.,* 78 F. Supp. 2d 194, 221(S.D.N.Y. 1999).

The complaint must allege facts from which it can be inferred that a defendant possessed actual control over the controlled person. *Silva Run v. Worldwide Ltd. v. Gaming Lottery Corp.,* 1998 WL 167330, at *13 (S.D.N.Y. 1998). The CAC (at 90)

erroneously alleges that Mr. O'Connor was a control person because he "had direct supervisory involvement in the day-to-day operations of the Company . . ." According to the 2007 Form 10KSB, at 27, Mr. O'Connor's primary responsibilities involved entering into contracts for Optionable's business and accounting for Optionable's funds; he was not designated as being responsible for Optionable's day-to-day operations.    Actual control is essential finding control person liability.  *See In re Blech Sec. Litig.*, 961 F. Supp. 569, 586 (S.D.N.Y. 1997) (a defendant must be found actually control *the transactions* in question).  The CAC fails to plead that Mr. O'Connor had actual control over Optionable's allegedly fraudulent conduct.

Further, it has often been held that a [p]laintiff must plead 'culpable participation' in the alleged fraud.  *See e.g., ATSI Communications, Inc.,* 493 F.3d at 108; *Harrison v. Rubinstein,* 2007 WL 582955, at *19. Here, the CAC fails to describe any "culpable" or intentional (i.e., scienter) conduct by Mr. O'Connor with respect to *either* the "primary" Exchange Act claims or the "secondary" control person Exchange Act claims.  For these reasons, as well, Plaintiffs' control person liability claim under §20(a) of the Exchange Act asserted against Mr. O'Connor should be dismissed in its entirety.

**C.**     **Plaintiff Have Failed to Plead a Violation §20A of the Exchange Act**

Plaintiff charges Mr. O'Connor with having violated §20A of the Exchange Act, 15 U.S.C. § 78t-1.  §20A provides, in pertinent part:

> Any person who violates any provision of this Act …by purchasing or selling a security while in possession of material, nonpublic information shall be liable … to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale …) or sold (where such violation is based on a purchase …) securities of the same class.

To survive a motion to dismiss of a §20A claim, a complaint must contain a well-pled, independent predicate violation of the Exchange Act. *See, e.g., In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1488-89 (N.D.Cal.1992) ("A careful parsing of the somewhat tangled initial sentence of 20A discloses that an insider ... is liable only where an independent violation of another provision of the securities laws has occurred."), *aff'd,* 11 F.3d 865 (9th Cir.1993); *Harrison v. Rubinstein,* 2007 WL 582955, at *20 (*quoting Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F3d 697 703 (2d. Cir. 1994)) ("'to state a claim under §20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations' that is independent of the 20A claim.").

Plaintiffs' insider trading claim fails for a number of reasons, including their failure to plead an independent predicate violation of the Exchange Act. As noted above, Plaintiffs have failed to plead falsity, scienter, and loss causation with respect to their claims asserted under §10(b) and Rule 10b-5 promulgated thereunder. The essential problem with Plaintiffs' insider trading theory, however, is that Mr. O'Connor's stock sales to NYMEX were the product of Optionable's well-developed, legitimate, and private business transaction. The Defendants' primary purpose for the stock transactions was to engage with NYMEX regarding "joint marketing and cobranding activities." *See* Optionable's 2007 Form 10KSB. NYMEX's Chairman Richard Schaeffer stated that the stock transactions "mark[ed] an important milestone for NYMEX" and that NYMEX was "looking forward to working with Optionable as a key contributor to [NYMEX's] future expansion in options trading." See 8-K, filed on April 10, 2007. Had Mr. O'Connor wished to maximize ill-gotten proceeds through insider trading, he simply would have sold his shares on the open market and made substantially greater profits. Ironically, by

engaging in the NYMEX transaction, Mr. O'Connor and the other Defendants avoided a financial windfall. Accordingly, the Plaintiffs have failed, at the very least, to a predicate violation of §10(b) and Rule 10b-5 promulgated thereunder.

Section 20A also limits claims to buyers and sellers of securities who trade "contemporaneously" with an insider "in possession of material nonpublic information". *See, e.g., Neubronner v. Milken*, 6 F.3d 666, 669 (9th Cir.1993); *In re Aldus Sec. Litig.*, No. C92-885C, 1993 WL 121478, at *7 (W.D. Wash. Mar. 1, 1993). Section 20A does not define "contemporaneous," but rather courts resolve the issue on a case-by-case basis.[2] "The requirement of contemporaneousness developed as a proxy for the traditional requirement of contractual privity between plaintiffs and defendants," since establishing privity is "virtually impossible in transactions occurring **on an anonymous public market** . . ." *Buban v. O'Brien*, No. C 94-0331 (FMS), 1994 WL 324093, *3 (N.D. Cal. June 22, 1994) (emphasis added).

The contemporaneous standard, if applied here, would be subverted to the point of meaninglessness because there was nothing approaching contemporaneous trading as between Plaintiff Boyer, a professional "day trader," who engaged in multiple open market trades in Optionable's stock, and Mr. O'Connor, who sold his shares in the privately negotiated NYMEX stock transaction and not on any anonymous public market. Due to the private nature of the NYMEX stock transaction and Mr. Boyer's numerous open market "day trades," during the proposed class period, there was virtually no chance, *ab initio*, that Mr. Boyer and Mr. O'Connor could have traded

---

[2] Indeed, a 1988 House Report indicates that Congress specifically contemplated a case-by-case approach to defining "contemporaneousness." H.R.Rep. No. 910, 100th Cong., 2d Sess. 27 (1988).

contemporaneously in any meaningful sense. Plaintiffs' standing to assert a claim for contemporaneous insider selling is specious. *See Id.* at *3 (The fact that plaintiff bought shares at a lower price than that at which defendant sold suggests that "plaintiff could not have traded with defendant."). Plaintiffs make no allegation that Mr. O'Connor sold any of his Optionable shares on the open market.

The requirement of contemporaneous trading is further subverted here because Plaintiff Boyer did not purchase or sell any Optionable shares on January 22, 2007, the date that the NYMEX stock transaction was announced. (*See* Plaintiff Boyer's list of stock trades, annexed to the CAC., as Exhibit A). On the next day, January 23, 2007, however, Boyer, a day trader, actually purchased and quickly sold 1000 shares of Optionable at a profit. *Id.*

Moreover, Plaintiffs have failed to allege that Mr. O'Connor possessed material non-public information when the NYMEX stock transaction was conducted. Such an allegation is meaningless because the NYMEX stock transaction was the result of manifestly legitimate business decision by both Optionable and NYMEX.

Moreover, Plaintiffs provide no indication that Mr. O'Connor had in any way participated in a "scheme" related to BMO's trading losses, including the purported mismarking of BMO-related trades. Also, the CAC is devoid of "specific allegations that evidence of . . . misconduct was brought to" Mr. O'Connor's attention during the proposed class period. *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d at 486. As, such the Plaintiffs have failed to plead a violation of §20A of the Exchange Act.

## VI.  <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant Edward J. O'Connor respectfully requests that the Court dismiss the claims asserted against him in the CAC in their entirety.

Dated: February 19, 2008

By:  /s/      Liam O'Brien
Liam O'Brien (LO- 3930 )
Jeffrey B. Silverstein (JS-4818)
McCormick & O'Brien, LLP
42 West 38th Street, 7th Floor
New York, New York 10018
Phone: 212-286-4471
Fax: 212-504-9574
Email: lobrien@mcoblaw.com
        jsilverstein@mcoblaw.com

**Attorneys for Defendant**
**Edward J. O'Connor**