**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE OPTIONABLE SECURITIES LITIGATION** ) ) ) ) ) ) ) ) ) ) ) ) ) | **CIVIL ACTION NO. 07-3753 (LAK)** <br><br> **LEAD PLAINTIFFS' OPPOSITION TO MOTION OF DEFENDANT OPTIONABLE, INC. TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

PRELIMINARY STATEMENT .............................................................................1

FACTUAL BACKGROUND ...................................................................................4

ARGUMENT ..........................................................................................................9

   I.   Relevant Legal Standards ..........................................................................9

   II.   Plaintiffs Have Adequately Alleged a Section 10(b) Claim.....................11

      A.  Plaintiffs Meet the Pleading Requirements of Rule 9(b)...........................11

      B.  Defendants Made Materially False and Misleading Statements and Omissions During the Class Period.........................................................................12

          1.  Material Misstatements Regarding Percentage of Optionable's Revenues Attributable to BMO ................................................................12

          2.  Defendants Materially Understated the Risks to the Company Should it Lose BMO as a Client .......................................................................13

          3.  Defendants Failed to Disclose the Material Fact of their Arrangements to Pay Kickbacks and Inflate Options Valuations with BMO Traders .................15

          4.  Optionable Went To Great Lengths To Conceal the Material Fact of Cassidy's Prior Fraud-Based Felony Convictions ..................................18

          5.  Defendants Failed to Disclose the Material Fact that Defendant Cassidy Had a Close Personal Relationship with Traders at BMO and that Defendants Made Undisclosed Payments to Optionable Trader David Lee and His Sister ........................................................................20

          6.  Defendants Made False and Misleading Statements Regarding its OPEX Trading Platform .....................................................................21

          7.  Defendants' Sarbanes-Oxley Certifications and Representations about Internal Controls Were Materially False and Misleading .....................23

          8.  Defendants Made Materially False and Misleading Statements that the Company Was in Compliance with GAAP and SEC Reporting Rules .............25

      C.  None of the Challenged Statements Constitutes "Puffery"........................26

   CONCLUSION ..................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Akerman v. Oryx Communications*, Inc., 609 F. Supp. 363 (S.D.N.Y. 1984) .............................. 20

*Allaire Corp. Sec. Litig.*, 224 F.Supp. 2d 319 (D.Mass. 2002)................................................... 29

*Bank of Am. Corp. v. Braga Lemgruber*, 385 F. Supp. 2d 200 (S.D.N.Y. 2005) ........................ 10

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988).............................................................................. 19

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2006) ................................................................... 10

*Brumbaugh v. Wave Systems Corp.*, 416 F.Supp. 2d 239 (D. Mass. 2006)................................. 27

*Davidoff v. Farina,* 2005 U.S. Dist. LEXIS 17638 (S.D.N.Y. Aug. 22, 2005) ........................... 18

*DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003) ................................................................... 19

*Gross v. Medaphis Corp.*, 977 F. Supp. 1463 (N.D. Ga. 1997)................................................... 20

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997)......................................................... 27

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) ................................................................. 27

*Huddleston v. Herman & MacLean*, 640 F.2d 534 (5th Cir. 1981).............................................. 23

*In re Allscripts, Inc. Sec. Litig.*, 2001 U.S. Dist. LEXIS 8897 (N.D. Ill. June 29, 2001)............ 22

*In re Alstom, Inc. Sec. Litig.,* 406 F.Supp.2d 433 (S.D.N.Y. 2005) ............................................ 10

*In re Ashanti Goldfields Sec. Litig*, 184 F. Supp. 2d 247 (E.D.N.Y. 2002)................................. 25

*In re Boston Technology, Inc. Sec. Litig.*, 8 F.Supp 2d 43 (D. Mass 1998) ................................. 29

*In re Cardinal Health Sec. Litig.*, 426 F.Supp. 2d 688 (S.D. Ohio 2006) ................................... 28

*In re Cendant Corp. Litig.*, 60 F.Supp. 2d 354 (D.N.J. 1999) ..................................................... 11

*In re Coca-Cola Enterprises, Inc. Sec. Litig.*, 510 F. Supp. 2d 1187 (N.D. Ga. 2007) ............... 18

*In re Computer Associates Class Action Sec. Litig.*, 75 F.Supp. 2d 68 (E.D.N.Y. 1999) ...... 29, 30

*In re Convergent Tech. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991) ............................................... 24

*In re eSpeed, Inc. Sec. Litig.,* 457 F.Supp. 2d 266 (S.D.N.Y. 2006) ........................................... 23

*In re IBM Securities Litigation*, 163 F.3d 102 (2d Cir. 1998) ..................................................... 10

*In re Initial Pub. Offering Sec. Litig.*, Civ. No. 21 MC 92 (SAS), 2008 U.S. Dist. LEXIS 24148 (S.D.N.Y. March 28, 2008) ................................................................................................. 16

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.,* 423 F.Supp. 2d 364 (S.D.N.Y. 2006) ........................ 23

*In re Northern Telecom Sec. Litig.*, 1994 U.S. Dist. LEXIS 11730 (S.D.N.Y. Aug. 22, 1994) ... 28

*In re NTL Inc. Sec. Litig.,* 347 F. Supp. 2d 15 (S.D.N.Y. 2004) .................................................. 12

*In re Vantive Corp.*, 283 F.3d 1079 (9th Cir. 2002) .................................................................... 23

*Kowal v. MCI Comm. Corp.,* 163 F.3d 1271 (D.C. Cir 1994) ................................................. 25, 30

*Lapin v. Goldman Sachs & Co.*, 506 F.Supp. 2d 221 (S.D.N.Y. 2006) ................................ 27, 28

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ........................................................... 10

*McMahan & Co. v. Wherehouse Enm't., Inc.*, 900 F.2d 576 (2d. Cir. 1990) .............................. 24

*Morgan v. AXT, Inc.*, 2005 U.S. Dist. LEXIS 42346 (N.D. Cal. Sep. 23, 2005) ................... 27, 28

*NYMEX v. ICE*, 497 F.3d 109 (2d Cir. 2007) ........................................................................ 13, 14

*Rosen v. Textron*, 321 F.Supp. 2d 308 (D.R.I. 2004) ................................................................. 27

*Scritchfield v. Paolo*, 274 F.Supp. 2d 163 (D.R.I. 2003) ...................................................... 27, 28

*SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007) ...................................... 11

*SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450 (2d Cir. 1996) ...................................................... 10

*Shushany v. Allwaste, Inc.*, 992 F.2d 517 (5th Cir. 1993) .......................................................... 17

*Slayton v. Am. Express Co.* 460 F.3d 215 (2d Cir 2006) ............................................................ 30

*Stiegele v. Bailey*, 2007 U.S. Dist. LEXIS 86469 (D. Mass. Aug. 23, 2007) .............................. 23

*Telenor East Invest AS v. Altimo Holdings & Invs. Ltd.*, Civ. No. 07 Civ. 4829 (DC), 2008 U.S. Dist. LEXIS 23458 (S.D.N.Y. March 25, 2008) ........................................................................ 11

*Tellabs v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ............................................. 2, 9

*Tuchman v. DSC Comms. Corp.*, 14 F.3d 1061 (5th Cir. 1994) .................................................. 25

*United States v. Hirsch*, 239 F.3d 221 (2d Cir. 2001) ............................................................... 21

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) .................................................. 27

*Winn v. Schafer*, 499 F. Supp. 2d 390 (S.D.N.Y. 2007) ............................................................ 30

**STATUTES**

15 U.S.C. §78u-4(b)(1) ........................................................................................................... 10

17 C.F.R. §210.5-01(a)(1) ...................................................................................................... 25

17 C.F.R. §240.12b-2 ............................................................................................................. 10

Lead Plaintiff KLD Investment Management, LLC and Plaintiff Greg Boyer ("Plaintiffs") respectfully submit their opposition to the motion to dismiss filed by Optionable, Inc. ("Optionable" or "the Company").[1]

## PRELIMINARY STATEMENT

In an unusual move, Defendants in this action attempt to sandbag Plaintiffs with a separate motion to dismiss for every single one of the six Defendants, for an aggregate of six briefs totaling a staggering 169 pages, plus copious attachments. By contrast, the Complaint itself, pursuant to Court order, is a concise 30 pages. While very long on repetition and filled with technical minutiae in order to distract the Court from the big picture, each of these motions is short on viable reasons for which the Complaint should not be sustained. In fact, no such reasons exist.

In order to refute Defendants' myriad piecemeal arguments, Plaintiffs will file a total of just three opposition briefs. The briefing is organized as follows:

1. The current brief, Plaintiffs' Opposition to the Company's Motion to Dismiss ("Co. Opp."), will focus on the following issues:

   - Factual Background of the Litigation;

   - Applicable Legal Standards;

   - Plaintiffs have met the requirements of Rule 9(b); and

   - Plaintiffs have alleged materially false and misleading statements and omissions, and none of the challenged statements constitutes "puffery."

2. Plaintiffs' Opposition to the Motions to Dismiss of Defendants Nordlicht, Cassidy, and

---

[1] This brief incorporates by reference Plaintiffs' opposition to the motions to dismiss filed by Defendants Nordlicht, Cassidy, and Helmig, submitted concurrently herewith, as well as Plaintiffs' opposition to the motions to dismiss filed by Defendants O'Connor and Boisseau, which will be filed on April 4, 2008. The motions to dismiss of Defendants O'Connor, Cassidy, and Boisseau were filed on February 19, 2008, while the other Defendants filed their motions on February 15, 2008. This resulted in slightly different briefing schedules.

Helmig ("Opp. to NCH"), filed concurrently with the Co. Opp., will address the following arguments:

- Plaintiffs have adequately alleged scienter in accordance with the Private Securities Litigation Reform Act ("PSLRA") and *Tellabs v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007);

- Plaintiffs have adequately alleged reliance. This argument addresses the inapplicability of the fraud on the market doctrine as well as the inapplicability of a premature affirmative defense, the so-called "Truth on the Market" doctrine;

- While each Individual Defendant is alleged to have made materially false and misleading statements during the Class Period, he Group Pleading Doctrine also applies; and

- Plaintiffs have adequately alleged violations of Section 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against the Individual Defendants.

3. Finally, Plaintiffs' Opposition to the Motions to Dismiss of Defendants O'Connor and Boisseau ("Opp. to OB"), to be filed on April 4, 2008, will address the following remaining issues:

- Plaintiffs' loss causation is adequately pleaded;

- Plaintiffs' Section 20(A) Exchange Act claims against Defendants Cassidy, Nordlicht, and O'Connor are viable; and

- This brief will also address remaining arguments raised by O'Connor and Boisseau regarding the materially false and misleading statements and scienter to the extent not previously discussed in the earlier briefing.

As discussed in detail below, this case involves a company and individual directors and officers with a lot to hide. Not surprisingly, Defendants' briefs are careful to hide from the facts alleged and attempt to bury them in meritless technical arguments. The Complaint alleges that Optionable's CEO, Defendant Cassidy, had multiple fraud-based convictions, resulting in prison time, that the Company took aggressive steps to conceal during its Initial Public Offering

("IPO"). A few months before the IPO, Cassidy transitioned seamlessly into a "consulting" position, removing himself as the focus of the due diligence of the Company while investors remained in the dark throughout the Class Period about material information concerning his background. Cassidy was also friends with two key traders at the Bank of Montreal ("BMO"), Optionable's largest client. These traders were David Lee and his boss, Bob Moore. During the Class Period Optionable made payments not only directly to David Lee but also to his sister. Lee was also allegedly friends with other members of the senior management of Optionable, which itself was intertwined and burdened by conflicts of interest. During the Class Period, David Lee conducted a massive number of BMO trades through Optionable. The Company further provided inflated valuation of trades to allow David Lee to hide tremendous BMO trading losses amounting to $680 million Canadian, and appear to be the most successful and profitable trader at BMO. At the same time, Bob Moore's son received a variety of jobs at Optionable, as well as in other companies owned or controlled by the Individual Defendants.

To further Defendants' fraudulent scheme, Optionable dramatically understated in its public statements the percentage of Optionable's total revenue attributable to BMO. Throughout the Class Period, Defendants repeatedly stated that no more than 30% of its revenues were attributable to BMO when in truth that figure was approximately 86%. In an effort to make as much money as possible and to dilute their losses once such information became public, Defendants sold US$29 million in stock to NYMEX, at the behest of large shareholder Jules Nordlicht, who coincidentally is also Defendant Nordlicht's father, recklessly placing a NYMEX product development executive on its board while Optionable was in the process of releasing its electronic trading platform, OPEX, which NYMEX ultimately competed with. These profits from sales of stock were handily locked in by Defendants Cassidy, Nordlicht, and O'Connor just

before the true adverse facts were revealed and the Company's stock tanked. In the end, the dominoes quickly fell as BMO announced it would take a massive hit of C$680 million for trading losses performed largely through Optionable, placed David Lee and Bob Moore on leave and dropped Optionable, and Deloitte & Touche came out with a report noting "a serious mismarking of the book of natural-gas options," the magnitude of the discrepancy of which they "had never seen." NYMEX was forced to write off nearly all of its nearly $29 million investment in Optionable—a loss cleverly avoided by Optionable insiders. Defendants Nordlicht and Cassidy stepped down just as Cassidy's felonious background came to light. Not surprisingly, investigations were commenced by the U.S. Commodity Futures Trading Commission, the U.S. Securities and Exchange Commission, and the U.S. Department of Justice.

This lawsuit followed.  For the reasons discussed herein, and in the additional opposition briefs filed by Plaintiffs, which are incorporated by reference herein, Defendants' motions to dismiss should be denied in full.

## FACTUAL BACKGROUND

This federal class action seeks remedies under the Exchange Act against Optionable and certain directors and officers of the Company (the "Individual Defendants")[2] on behalf of those

---

[2] The Individual Defendants, ¶¶6(a)-(e), are:

- Mark Nordlicht ("Nordlicht"), founder of the Company and Chairman of the Board from 2000 until his abrupt departure in April 2007. Nordlicht liquidated 7.0 million shares of Optionable stock during the Class Period and, as a result, profited by over $18.83 million.

- Kevin Cassidy ("Cassidy"), CEO and Vice-Chairman of the Board between March 2001 and March 2004 and again between October 2005 until May 2007. Cassidy had been convicted and sentenced to 30 months for felony credit card fraud in 1997 and to six months for income tax evasion in 1993. ¶16. Cassidy's suspiciously-timed transition from CEO to "consultant" conveniently enabled the Company to avoid reporting Cassidy's felonious background in the Company's IPO Registration Statement. ¶16. In fact, Cassidy temporarily ceased his position as CEO just a few months before the Company began selling securities and returned to his position just four months after the IPO. ¶16.

- Edward J. O'Connor ("O'Connor"), President and a member of the Board since March 2001. During the Class Period, he sold 1.853 million shares of Optionable stock to profit over $4.986 million.

- Albert Helmig ("Helmig"), a former vice-chairman of NYMEX and member of the Board from September 2004 until November 2007. Although a putative "independent" director, Helmig also served on the board of Platinum Energy, an entity founded and chaired by Nordlicht.

who purchased the Company's securities between January 22, 2007 and May 14, 2007 (the "Class Period"). ¶5.[3] Defendants' fraudulent scheme, discussed in detail below, precipitated the downfall of Optionable common stock from a Class Period high of $8.62 per share to an abysmal low of $0.425 on the last day of the Class Period, when the true adverse facts that Defendants had concealed were ultimately revealed. ¶¶70, 71, 74(d).

Optionable provides over-the-counter and voice and floor brokerage services at the New York Mercantile Exchange ("NYMEX") for energy derivatives to brokerage firms, financial institutions, energy traders, and hedge funds in the United States. ¶5. In July 2006, Optionable debuted an electronic trading platform, OPEX, which finds counterparties for energy trades. ¶5, 11. OPEX matches buyers and sellers, charging a commission to both parties; if NYMEX was used to affect the trades, NYMEX awarded incentive payments to Optionable. ¶¶5, 8, 9, 25, 36. Optionable extolled OPEX as the vehicle to improve liquidity and transparency in the natural gas and other energy derivatives markets. ¶17.

On February 6, 2007, Optionable announced that the Company had achieved "record results" for the last quarter of 2006. ¶11. Revenues increased 310% for the quarter and 177% for the year compared to prior years; net income reached "all time highs," increasing 859% in the fourth quarter, and 393% for the year as compared to previous years. ¶11. Optionable attributed these results to the launch of both OPEX and the Company's Analytics service, as well as the positive response to the "innovative and impeccable" service of Optionable. ¶11.

What Optionable consistently failed to disclose in its public filings, press releases, and conference calls was that the Company drastically understated the total percentage of revenue

---

- Marc-Andre Boisseau ("Boisseau"), CFO.

[3] All "¶__" references are to Plaintiffs' Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint").

generated from its dealings with its largest client, BMO, and thereby discounted Optionable's near-total dependence on BMO, which placed natural gas options trades with Optionable. Cassidy had personal relationships with Robert Moore, BMO's Executive Managing Director of Commodity Products, and David Lee, a BMO natural gas trader. ¶7. Moore's son, Robert Moore III, worked at Optionable during the summer of 2006 as an OTC Office Intern. He also worked at Capital Energy, a company in which Cassidy and O'Connor were each 50% stockholders in which Cassidy served as Managing Director. ¶49. Tellingly, both Lee and his sister received payments from Optionable during the Class Period. ¶7.

In its 2006 10-K statement, filed in March 2007, Optionable claimed that BMO accounted for 24% of revenues in 2006 and 18% of total revenues in 2005. ¶¶13, 36. Revenues generated from BMO, according to Boisseau, were 30%. ¶27. The reality was, however, the revenue generated by BMO accounted for over 80% of Optionable's revenues. ¶14. Optionable's fuzzy and deceptive accounting method purposely ignored the manner in which the Company executed trades and reaped revenues in order to downplay the crucial importance of BMO to Optionable's bottom line.

Net revenue reported in Optionable's Q1:07 10Q was over $9 million; 30% of those revenues–amounting to over $2.7 million—were directly attributable to BMO. ¶14. When Optionable completed a trade with BMO, however, both BMO and the counterparty paid the Company a commission. ¶14. Therefore, the revenue generated through every BMO trade was twice as high as the Company admitted precisely because Optionable took in profits from two parties rather than just one. ¶14. These transactions alone equate to approximately 60% of Optionable revenues. ¶14. In addition, Optionable earned incentive fees from NYMEX on certain trades. ¶14. These fees were paid for directing deals to NYMEX, a substantially large

proportion of which were BMO trades. ¶14.

On April 10, 2007, Optionable trumpeted the fact that NYMEX acquired a 19% stake in the Company, *i.e.*, 10.2 million shares at a total price of $29 million. ¶25. It is no wonder that Optionable viewed the NYMEX alliance as a "win/win scenario. ¶27. The very day of the NYMEX announcement, Cassidy, O'Connor, and Nordlicht sold their own shares in the Company on NYMEX for nearly $29 million, 19% of the Company. ¶47. This series of events, not coincidentally, took place only days before Optionable's mispriced trades became public. ¶47.

On April 27, 2007, BMO publicly informed its investors that BMO sustained between C$350 million and C$450 million in trading losses stemming from natural gas options trades effected through Optionable.[4] ¶34. There had been a wide discrepancy in terms of pricing between the values marked in BMO's portfolio of natural gas options and their actual market value. ¶¶7, 43. It was learned that the Company mismarked options prices that were provided to BMO, making the BMO book of trades grossly inaccurate. ¶43. BMO placed the commodities traders involved in the natural gas losses (Robert Moore and David Lee) on leave pending an external review. ¶¶40, 43. BMO subsequently raised its trading losses to approximately C$680 million. ¶48. Optionable suffered a staggering blow when BMO terminated its relationship with the Company. Shares of Optionable common stock plummeted 20.6% that day to close at $5.56 per share. ¶35. The downward spiral continued unabated as more bad news about Optionable emerged.

Shares fell again to close at $5.34 per share on May 1, 2007, the day after *thestreet.com* released an article explaining that Optionable grossly understated revenues generated through the

---

[4] On May 8, 2007, BMO announced that it would suspend all business relationships with Optionable, change the operating structure of its commodities business, and place two commodity trading professionals on leave. ¶¶ 39, 40.

BMO trades by failing to factor the profits generated through counterparty sales. ¶36. To reiterate, Optionable never disclosed at any time before and during the Class Period the fact that BMO actually accounted for the vast bulk of the Company's revenue. Furthermore, in a telephone conference held on May 1, 2007 with financial analysts and investors, despite knowing that Optionable was almost entirely dependent upon BMO, the Company sought to assuage worried investors by falsely claiming that it could recoup the 25-30% lost revenue in crude oil options. ¶¶27, 28. Termination of the BMO relationship thus had a hefty impact on Optionable's bottom line.[5] The following day, May 2, 2007, Nordlicht abruptly departed the Company. Shares declined even more, by 20%, to close at $4.81 per share. ¶38.

On May 9, 2007, Optionable filed an 8-K regarding NYMEX's competing electronic trading platform. ¶41. Called CME Globex, the NYMEX platform planned to severely undercut OPEX by also offering options trading for crude oil, natural gas, gold, and silver, beginning in June 2007. ¶41. Optionable could not "quantify the impact" of this potential competition on the results of its future operations and financial condition. ¶41. Optionable's shares sank further to a shallow $2.81 per share. ¶42.

On May 10, 2007, *The Financial Post* of Toronto reported that Optionable mismarked options prices provided to BMO. ¶43. The report recounted that BMO hired the accounting firm Deloitte & Touche ("D&T"), who conducted a forensic audit beginning in February 2007. ¶43. The article indicated that "forensic auditors" said they have "never seen such a wide discrepancy in terms of pricing" between the values marked in BMO's portfolio of natural gas options and their market value. ¶43. That same day, another post on *thestreet.com* described Optionable stock as having "hemorrhaged" at $1.40 per share from when the Company's stock once traded as high

---

[5] Net revenues dropped from $9.1 million in the first quarter of 2007 to under $64,000 in the third quarter of 2007 after BMO cut its ties. ¶¶ 29, 31.

as $8.63 per share earlier in the year. ¶44. The very day these reports emerged, Optionable common stock tanked to a mere $0.85 per share.

Four days later, Cassidy resigned, Helmig took over Cassidy's role, and NYMEX removed its representative from Optionable's board of directors. NYMEX discovered that Cassidy had been sentenced to 30 months for a felony conviction for credit card fraud in 1997 and six months for income tax evasion in 1993, convictions never disclosed by Optionable in any form whatsoever. ¶46. Optionable's shares closed at a negligible $0.425 per share on May 14, 2007.

On August 14, 2007, NYMEX announced that it would write down $26 million of its $28.9 million investment in OPEX. ¶51. That same day, Optionable disclosed that it had been subpoenaed by a grand jury and the district attorney for New York County. ¶50. The Company also received requests for information from the U.S. Commodity Futures Trading Commission, the SEC[6], and the U.S. Department of Justice. ¶50.

When Defendants' scheme unraveled and the truth was ultimately revealed to the market, Plaintiffs and the Class were damaged when the artificial inflation in the price of Optionable common stock was removed and the stock price plunged.

## ARGUMENT

### I.    Relevant Legal Standards

On a motion to dismiss for failure to state a claim, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 127 S. Ct. at 2509. "[A] district court must read the complaint generously, accepting as true the factual allegations in the complaint and

---

[6] The SEC began its investigation months earlier, on May 24, 2007, as reported in the *New York Post*. ¶50.

making all reasonable inferences in favor of the plaintiff." *Bank of Am. Corp. v. Braga Lemgruber*, 385 F. Supp. 2d 200, 228 (S.D.N.Y. 2005) (citing *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000)). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.… [A] plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2006) (internal quotation omitted).

Fed. R. Civ. P. 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." A complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006); *In re Alstom, Inc. Sec. Litig.*, 406 F.Supp.2d 433, 454 (S.D.N.Y. 2005); 15 U.S.C. §78u-4(b)(1).

To state a claim for relief under Section 10(b) of the Exchange Act, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re IBM Securities Litigation*, 163 F.3d 102, 106 (2d Cir. 1998).

To establish a prima facie case of Section 20(a) liability, Plaintiff must show a primary violation by the controlled person—here, a Section 10(b) violation by the Company, which has been adequately alleged—and show the controlling person was "in some meaningful sense [a] culpable participant[] in the fraud…." *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). Control may be established by showing defendant had "the power to direct or cause the direction of the management and policies of a person." *Id*. at 1473, citing 17 C.F.R. §240.12b-2.

10

To sustain a claim under Section 20(A) of the Exchange Act, a plaintiff must plead a predicate violation of the Exchange Act or its rules, alleged trading by a corporate insider, allege that the plaintiff traded contemporaneously with the insider, and that the insider traded while in possession of material, nonpublic information. *In re Cendant Corp. Litig.*, 60 F.Supp. 2d 354, 378 (D.N.J. 1999).

For the reasons discussed herein, or in the additional opposition briefs submitted by Plaintiffs, Plaintiffs have met these standards and the Complaint should be sustained.

## II.    Plaintiffs Have Adequately Alleged a Section 10(b) Claim[7]

### A.    Plaintiffs Meet the Pleading Requirements of Rule 9(b)

Rule 9(b) requires that a plaintiff provide a defendant with fair notice of a plaintiff's claim. *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 484 (S.D.N.Y. 2007). In order to meet this requirement**,** a plaintiff must allege "the circumstances constituting fraud" with "particularity." FRCP 9(b). "In short, a plaintiff must set forth the who, what, when**,** where and how of the alleged fraud." *Telenor East Invest AS v. Altimo Holdings & Invs. Ltd*., Civ. No. 07 Civ. 4829 (DC), 2008 U.S. Dist. LEXIS 23458 at *19 (S.D.N.Y. March 25, 2008) (internal quotations omitted).

Rule 9(b) does *not* require Plaintiffs to plead the minutiae of violations at the pleading stage. Rather, it is sufficient to allege with specificity defendants' fraudulent actions. *Collins & Aikman*, 524 F. Supp 2d at 484; *see also Telenor*, 2008 U.S. Dist. LEXIS 23458 at *19 ("the PSLRA does not require plaintiffs to plead 'every single fact upon which their beliefs concerning false or misleading statements are based;'" allegations need only be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission.") (quoting *Novak v.*

---

[7] As noted in the Preliminary Statement, Defendants' arguments regarding scienter and reliance are addressed in Opp. to NCH. Loss causation will be addressed in Opp. to OB.

*Kasaks*, 216 F.3d 300, 313-14 & n.1 (2d Cir. 2000)). Moreover, where, as here, certain of "the information is exclusively within the opposing party's knowledge, pleading requirements are somewhat relaxed." *In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 28 n.76 (S.D.N.Y. 2004) (Kaplan, J.) (citing *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974) ("the rule relating to information and belief may be relaxed as to matters peculiarly within the opposing party's knowledge").

Plaintiffs readily meet their burden. Plaintiffs allege in detail "who" is responsible for the fraud: Optionable and each of the Individual Defendants. *See, e.g.,* ¶¶6, 27. Plaintiffs allege in detail "what" statements and actions defendants made that were fraudulent – including the identification of specific public statements made in SEC filings, press releases, and conference calls. *See, e.g.,* ¶¶11, 19, 27. Plaintiffs further allege "when" the fraudulent conduct took place – identifying when each false and misleading statement was made to the investing public during the Class Period. *See, e.g.,* ¶¶ 9, 11, 13. Plaintiffs also allege "where" these false and misleading statements were published. *See, e.g.,* 10-KSB ¶13-23, conference call ¶27, press releases ¶25. And finally, Plaintiffs allege how these statements and omissions were materially false and misleading to investors, as detailed below.

### B.   Defendants Made Materially False and Misleading Statements and Omissions During the Class Period

#### 1.   Material Misstatements Regarding Percentage of Optionable's Revenues Attributable to BMO

In the Company's 2006 10-K, which Defendants Nordlicht, Cassidy, O'Connor, Helmig, and Boisseau signed, defendants stated that BMO accounted for 24% and 18% of revenues during 2006 and 2005 respectively. ¶13. These percentages were materially false and misleading. The numbers reported in the 10-K failed to take into account the massive revenues BMO is responsible for because of the counterparty trades (and commissions generated thereby) and

because of the incentive payments the Company received when its trades were brought to NYMEX. ¶29, 36. With these additional revenues taken into account, BMO accounted for a staggering 86% of Optionable's brokerage fees. ¶29, 36.[8] Even an Optionable spokesperson later conceded BMO's impact is likely more than 24% when factoring in counterparties – which make up 75% of Optionable's transactions. ¶36.

### 2.  Defendants Materially Understated the Risks to the Company Should it Lose BMO as a Client

Defendants Helmig and Boisseau argue that there is "'no counterparty credit risk because the clearing facility – in this case NYMEX – becomes the buyer to every seller and the seller to every buyer.' Therefore, if either party to the transaction fails to perform, the risk is not borne by the other party." Helmig at 16; Boisseau at 15 (quoting *NYMEX v. ICE*, 497 F.3d 109, 111 n.1 (2d Cir. 2007)). Likewise, during the Class Period, Helmig stated on the May 2007 conference call that: "There is no counter party, because they're clear transactions." ¶27.

These statements – made in the defendants' briefs and at the end of the Class Period in the May 2007 conference call – run contrary to a number of earlier statements made by defendants during the Class Period. For example:

- "[O]ur 2006 revenues could have been lower if we wouldn't have been able to find a suitable counterparty to replace them [BMO] in such transactions." 3/23/07 10-KSB at 20.

- Cleared OTC contracts [as opposed to bilateral OTC trades, which Optionable also

---

[8] Defendant Cassidy makes a premature and factually wrong mathematical argument that the determination that BMO accounted for roughly 86% of the firm's brokerage fees is impossible because three of Optionable's customers accounted for 41%, 17%, and 31% of its accounts receivable. Cassidy argues that if all figures could merely be doubled, "these three customers impossibly accounted for 142% of Optionable's receivables." Cassidy Br. at 12. Of course, Cassidy cites no evidence for this proposition. His argument is fundamentally flawed as it fails to consider that many of the transactions from these three largest customers could be performed together – as counterparties to a single transaction. In other words, if every transaction of the customer responsible for 17% of revenues conducted trades only with BMO (the customer responsible for 41%), then Optionable risked losing all 58% of those revenues if BMO cuts ties with the Company – as well as a large percentage of revenue from other counterparties and the related NYMEX incentive payments.

performed] allow participants to **limit** counterparty credit risk and lower the amount of capital required to trade. 3/23/07 10-KSB at 5 (emphasis added).

- On April 27, 2007, an Optionable spokesman said that counterparty deals represent 75% of Optionable's revenue and agreed that BMO's impact is likely more than 24% when factoring in counterparties. ¶36.

With various contradictory statements made by defendants about these crucial issues during the Class Period, logic dictates that not all of them can be true.

Further, *NYMEX v. ICE,* the authority cited by defendants for the proposition that Optionable faced no risk *from* its counterparties, actually addressed the risk *to* counterparties of a trade when placed directly through NYMEX. When a match is made directly on NYMEX, NYMEX "interposes itself between the **original parties** and becomes the buyer to every seller and the seller to every buyer. The clearing house thus assumes the credit risk of **each party** to the transaction by effectively guaranteeing each party's performance obligations." *ICE*, 323 F. Supp. 2d at 562 (emphasis added). This analysis does not address how the risk to a broker (who is neither the buyer nor the seller) – such as Optionable – is magnified when it loses a single client. Such a risk is present because the broker also loses revenue from the counterparty to that client's trades. If Optionable were to lose one party, it would not be able to bring that trade to NYMEX at all without finding another counterparty, and loses the revenue from the parties, as well as the incentive payment from NYMEX.

Defendant Helmig argues that his very specific statement that someone else would fill BMO's place was not materially misleading because the Company disclosed the nature of its business, revenues from BMO, and that BMO's presence helped Optionable generate commissions from counterparties. Br. at 16. These arguments not only contradict the Complaint's well-pleaded allegations, but also do nothing to abrogate the misleading nature of

14

Helmig's statement.[9] The ability to replace the Company's largest client, responsible for such a vast amount of revenue, is a key issue; for a member of the Company's board of directors not to have a grasp on the fact that there is no major client waiting in the wings – as evidenced by the Company's growing dependence on BMO – is at minimum reckless as discussed in the Scienter section in Opp. to NCH.

In further support of these assertions, however, Helmig states that "after BMO ceased to rely upon Optionable for brokerage end execution, **the OTC options market** continued to thrive with BMO as a participant." Br. at 16 (emphasis added). The fact that BMO and the OTC options market were able to thrive, while Optionable lost 99% of revenues, seriously undermines Defendants' arguments. This assertion demonstrates that Optionable failed to disclose the risks of losing BMO (and that its losses were not attributable to other market factors, since BMO and the market went unaffected) and Optionable engaging in a securities fraud that caused BMO to lose C$680 million (once BMO cut ties with Optionable, the Company could not thrive with dramatic losses). Finally, in support of its statements that the OTC options market continued to thrive, Helmig cites Bongiorno Decl. Ex. B at p. 38 – the Company's 3/23/07 form 10-K – which provides no support for this statement whatsoever.

### 3.  Defendants Failed to Disclose the Material Fact of their Arrangements to Pay Kickbacks and Inflate Options Valuations with BMO Traders

Defendant Cassidy, commenting on Optionable's "record" results for the fourth quarter and year ended December 31, 2006 stated in a Company press release that defendants were "particularly happy with these results as they are due almost entirely to [their] customers' positive response to the innovative and impeccable service we delivered to them." ¶11. According to Cassidy, these results also demonstrated a "very healthy and largely untapped

---

[9] Optionable's net revenue indeed fell 99% after losing BMO as a client, as Helmig concedes. Helmig Br. at 16-17.

market for our derivative brokerage service." ¶11. These statements were materially false and misleading because, in truth, these results were achieved not because of the positive response from customers to "impeccable" derivative brokerage service, but rather because defendants had mispriced options with BMO, its largest customer, in order to artificially inflate profits for both companies. ¶12. At the time he made those statements, Defendant Cassidy had undisclosed personal friendships with David Lee, a BMO trader, and Lee's boss, Bob Moore. ¶7. Further, Optionable made undisclosed payments to Lee, and his sister, further encouraging Lee to conduct BMO trades through Optionable.

Defendants repeatedly argue that the "scheme" between BMO and Optionable is not adequately pleaded. (Co. Br. at 11; Helmig Br. at 13) The continual references to a "scheme" between BMO and Optionable reveal a fundamental misunderstanding of Section 10(b), its elements, and the requirements of the PSLRA and Rule 9(b) as they relate to adequate pleading of this violation of the Exchange Act. Defendants violated Section 10(b) and Rule 10b-5 "by carrying out a scheme to artificially inflate the price of the company's stock by making material misrepresentations and omissions to conceal [defendants'] behavior." *See In re Initial Pub. Offering Sec. Litig.*, Civ. No. 21 MC 92 (SAS), 2008 U.S. Dist. LEXIS 24148, *7-8 (S.D.N.Y. March 28, 2008). The participants in this scheme to defraud include Optionable and the Individual Defendants – who are alleged to have made materially false and misleading statements and omitted material facts during the Class Period while at the same time paying kickbacks to Lee and his sister and curried favor with Moore in order to ensure the wrongful pricing of BMO's natural-gas options would continue and delay the discovery of the truth. As a result, once the truth was revealed, Optionable's artificially-inflated stock plummeted and Optionable investors were faced with significant losses.

Defendants argue that Plaintiffs must plead such particulars as each individual mispriced trade and the amount thereof and other minutiae in the exclusive possession of defendants and BMO. This argument rings hollow here, where Plaintiffs have alleged that Optionable's actual dependence on BMO accounted for 86% of revenues and that as a result of Defendants' scheme, BMO was forced to restate its financials and take a loss in the amount of C$680 million. Given that Plaintiffs have pleaded the specific total dollar amount of the loss to BMO from all mispriced and/or mismarked trades, the language and spirit of Rule 9(b) does not support Defendants' position that the each of the potentially thousands of underlying transactions at issue needs to be laid out, particularly when defendants of course possess this information themselves.

Defendants cite *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 522 (5th Cir. 1993), for the proposition that Plaintiffs' allegations about the mispricing are too vague, but that case supports Plaintiffs. In *Shushany*, the complaint did not identify who was responsible for the fraud, the accounting adjustments that were made, how those adjustments were improper, and whether the adjustments were material. *Id.* The Court noted that plaintiff "surprisingly" deleted allegations of GAAP violations from its amended Complaint, and noted that plaintiffs insufficiently argued that the adjustments must have been material, or defendants would not have concealed them. *Id.* Here, there are express allegations that Optionable and the Individual Defendants mispriced and/or mismarked options that contributed both to a loss of the client responsible for up to 86% of the Company's revenue (certainly a material loss) and the loss of over C$680 million to BMO via the defendants' inflated valuation of trades, also leading to violations of GAAP and SEC reporting rules.

Defendants' additional cases are distinguishable because plaintiffs in those cases did not make meaningfully detailed allegations. In *Davidoff v. Farina,* 2005 U.S. Dist. LEXIS 17638,

*41 (S.D.N.Y. Aug. 22, 2005), for example, the allegations failed to detail what the affect the wrongful conduct had on the company's statements regarding its financial health. *Id.* at *42. Thus, the court could not identify, *inter alia*, how much revenue was improperly recognized for plaintiffs to sustain in a materiality determination. *Id.; see also, In re Coca-Cola Enterprises, Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1197 (N.D. Ga. 2007). The opposite is true here. The Complaint alleges that, among other things, the mispriced options resulted in a loss of C$680 million to BMO, and that resulting loss led to BMO's termination of the business relationship with Optionable. As alleged, BMO accounted for as much as 86% of the Company's revenue. The allegations are more than sufficient to withstand muster under the pleading rules. In addition, *Davidoff* recognized:

> [P]laintiffs rely heavily on *In re Computer Associates Class Action Securities Litigation,* 75 F. Supp. 2d 68 (E.D.N.Y. 1999). However, the court in that case found that plaintiffs had alleged a "widespread" and "pervasive fraudulent scheme." *Id.* at 73-74. If we could say the same here, we would have less hesitation to assume, as the court in that case did, that materiality existed as a "huge net effect in error as to the company's overall figures," *id.* at 73, and thus to overlook plaintiffs' failure to point to specific instances of improperly backdated or "multi-year" contracts, "last minute deals" or "phony sales orders."

2005 U.S. Dist. LEXIS 17638 at *44. As alleged here, Defendants engaged in a vast scheme which included the mispricing options. The gravamen of the allegations (when taken as true for purpose of the motion to dismiss) is that there was a significant affect on the Company's overall figures. It is not difficult to imagine that losing a client that accounts for as much as 86% of the revenue stream will have a significant impact on profits and survival of the Company. Ultimately, Optionable lost 99% of revenue after BMO cut ties with the Company. ¶31.

### 4.  Optionable Went To Great Lengths To Conceal the Material Fact of Cassidy's Prior Fraud-Based Felony Convictions

Optionable argues that Defendant Cassidy's fraud and tax evasion convictions – which both go to the issue of fraud which is at the center of this case and which resulted in prison time -

18

- were somehow "nondisclosable." (Co. Br. at 23). To the contrary, Defendants were *required* to disclose this material information.

> The 1934 Act was designed to protect investors against manipulation of stock prices. Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." This Court "repeatedly has described the fundamental purpose' of the Act as implementing a philosophy of full disclosure.'"

*Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) (citing S. Rep. No. 792, 73d Cong., 2d Sess., 1-5 (1934); H. R. Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934); *Santa Fe Industries, Inc. v. Green*, 430 U. S. 462, 477-478 (1977)).

Further, SEC Rule 10b-5 explicitly deems it unlawful for a person to, "by the use of any means or instrumently of interstate commerce," "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading**.**" 17 CFR 240.10b-5. Further, regarding Optionable's disclosure obligations, Form 10-KSB makes clear on the first page of the "General Instructions" that:

> The General Rules and Regulations under the Exchange Act (§240.0-1 *et seq*.), particularly Regulation 12B (§240.12b-1 *et seq*.) contain certain general requirements for reports on any form **which should be carefully read and observed in the preparation and filing of reports on this Form.** (emphasis added).[10]

Regulation 12B requires:

> In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be **necessary to make the required statements, in the light of the circumstances under which they are made not misleading**. 17 C.F.R. §240.12b-20 (emphasis

---

[10] Defendants argue that they were not required to disclose the convictions on the Form 10-KSB and cherry pick a single disclosure requirement (Item 401 – found on the sixth page of general instructions). (Co. Br. at 23, Nordlicht Br. at 9, Cassidy Br. at 5). Of course, Item 401 is not the only operative SEC requirement; Defendants must also comply with the SEC's general regulations. *See DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003). Further, SEC form disclosure requirements provide mere minimum guidelines for disclosure and meeting them does not shield Defendants where they violate federal securities laws.

added).

The Company's discussion of Defendant Cassidy's role with the Company, as in the 2006 10-K (¶15), triggered a duty under explicit SEC reporting rules, to disclose information necessary to make those statements not misleading.[11] 17 C.F.R. §240.12b-20. Investors would certainly find material that Defendant Cassidy, as Chief Executive Officer and the executive in charge of overseeing brokerage operations, had been convicted and sentenced to 30 months for felony credit card fraud in 1997 and to six moths for income tax evasion in 1993. ¶16. In fact, Cassidy left prison just two years before becoming CEO of Optionable. Cassidy's credibility and prior involvement in fraud are crucial to an investor's evaluation of the Company and deciding whether to purchase its stock. *See, e.g., Gross v. Medaphis Corp.*, 977 F. Supp. 1463 (N.D. Ga. 1997) (emphasizing the importance of management credibility to investor confidence); *Akerman v. Oryx Communications*, Inc., 609 F. Supp. 363, 368 (S.D.N.Y. 1984) (finding that failure to disclose first quarter losses is material since it bears upon management's credibility).

### 5. Defendants Failed to Disclose the Material Fact that Defendant Cassidy Had a Close Personal Relationship with Traders at BMO and that Defendants Made Undisclosed Payments to Optionable Trader David Lee and His Sister

Defendant Cassidy stated on the May 2007 conference call that BMO trader David Lee had "no relationship, besides a broker/client relationship" with the Company. ¶27. In truth, Defendant Cassidy is alleged to have had a personal friendship with Lee. ¶7. When questioned on the same call whether David Lee was compensated by Optionable, Defendant Cassidy replied: "Absolutely not." ¶27. This too was false. According to a Confidential Witness who was an analyst following the Company, David Lee and his sister received undisclosed payments from Optionable. ¶7. Also undisclosed to investors, Defendant Cassidy was close friends with both

---

[11] Defendant Nordlicht concedes that the biography of Optionable's CEO (and its nondisclosures) are attributable to him. Nordlicht Br. at 7.

David Lee's supervisor at BMO, Bob Moore. ¶7. Moore's son spent summers interning with companies owned by Cassidy and O'Connor. ¶49.

Optionable argues that there is no duty to disclose such personal relationships because it is "obvious" and "commonplace" that friendships develop in the context of business relationships. Co. Br. at 26-27. However, these were not ordinary business friendships – Cassidy, who had prior fraud convictions, is alleged to be close personal friends with the two BMO traders who were making profits from conducting mispriced fraudulent trades with Optionable. Such personal friendships in the context of business are material. [12] Importantly, Plaintiffs allege more than a failure to disclose – they allege that Cassidy lied about Lee receiving payments or having any relationship with the Company other than that of a broker. ¶29.

### 6. Defendants Made False and Misleading Statements Regarding its OPEX Trading Platform

The Company stated that "the efficiency of OPEX in executing trades, will cause its contribution to revenue to become a substantial portion of the [revenue] mix as [the Company progresses] into 2007 and even 2008." ¶11. What Defendants failed to disclose, however, is that OPEX's contribution to the Company's revenue "mix" would be diluted because BMO's contribution to Optionable's revenue was vastly greater than reported. ¶12. The Company also made representations in the May 2007 conference call that it expected it could get a quantity equal to "somewhere in the 25 to 30% range" of its crude oil options trades transacted on the floor, to trade on OPEX, which Cassidy agreed could possibly "more than make up for any loss of potential revenue for BMO." ¶27. What Cassidy failed to reveal in order to make this statement not misleading to investors, is: 1) BMO was actually responsible for over 80% of

---

[12] *See, e.g., United States v. Hirsch*, 239 F.3d 221, 228 (2d Cir. 2001) (distinguishing (in a mail fraud case) between "garden-variety borrowers" and a defendant who had developed "personal relationships" with his clients– creating a position of reliance and trust that exceeded that of the fiduciary relationship and entrustment in an arms-length relationship).

21

Optionable's revenues, and therefore OPEX trades in the amount of 25-30% of floor trades would not come close to making up for the potential loss of revenue from BMO, and 2) BMO was nearly solely responsible for the volume on OPEX, such that the loss of BMO as a client would decimate the volume on OPEX, further discouraging new clients from using the platform. Optionable had already delayed the release of OPEX over a year, and the platform could not survive if not for BMO inflating its trading volume. ¶18.

The Company also stated that OPEX significantly improved the transparency of natural gas and energy derivative markets. ¶17. These statements were materially false and misleading when made. At the end of the Class Period, it became clear that OPEX was far from transparent and Defendants had in fact used the platform and its lack of a paper trail to commit a massive securities fraud that continued undetected until the end of the Class Period when truth was revealed, including BMO's massive $680M Canadian loss and the revelations by D&T concerning shocking mispricing and mismarking of trades.

Defendants argue that they disclosed that: investing in Optionable involves a high degree of risk, OPEX is still in the development stage and might not be successful when launched, and could contain unknown effects that could harm Optionable's reputation. Cassidy Br. at 13-14, Co. Br. at 21). These boilerplate risk factors ignore that problems with OPEX were *already* in existence, and that OPEX was touted as "transparent" when, in fact, it was a means to facilitate fraud. In *In re Allscripts, Inc. Sec. Litig.*, 2001 U.S. Dist. LEXIS 8897 *15 (N.D. Ill. June 29, 2001), cited by Optionable (Co. Br. at 20-21), plaintiffs never challenged the veracity and forthrightness of the SEC filings. That is exactly what the Complaint has done here. Furthermore, any cautionary language advocated by Defendants is simply too boilerplate and non-revelatory in any significant way. "To warn that the untoward may occur when the event

is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 543-544 (5th Cir. 1981), *rev'd in part on other grounds*, 459 U.S. 375 (1983).

Defendants' suggestion that "allegations of product problems must be pleaded with particularity," Co. Br. at 19, misconstrues the nature of the allegations regarding OPEX. The Complaint does not attempt to allege that the electronic platform was physically defective. As a result, the cases cited by Defendants are inapposite because they detail allegations about some inherent problem in a product that causes slumping sales. That is not the issue here. For example, in *In re Vantive Corp.*, 283 F.3d 1079, 1088-89 (9th Cir. 2002), plaintiffs alleged with no corroborating facts that "Vantive's salesforce automation products … all suffered from technological and performance short-comings compared to competitive products." Thus, the court concluded, "there are no facts alleged to show how the imprecise deficiencies asserted to hamper the product affected Vantive's competitive position[.]" *See also In re eSpeed, Inc. Sec. Litig.,* 457 F.Supp. 2d 266, 292-93 (S.D.N.Y. 2006); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.,* 423 F.Supp. 2d 364, 406 (S.D.N.Y. 2006). To the contrary, Plaintiffs argue here that the statements made regarding OPEX's contribution to revenue and its transparency were false, not that the product itself was defective.

### 7. Defendants' Sarbanes-Oxley Certifications and Representations about Internal Controls Were Materially False and Misleading

False or misleading Sarbanes-Oxley certifications, and/or misrepresentations concerning the effectiveness of a company's internal controls may serve as the basis for liability under Section 10(b). *See Stiegele v. Bailey*, 2007 U.S. Dist. LEXIS 86469 at *22 (D. Mass. Aug. 23, 2007). Here, Defendants represented that Optionable's internal disclosure controls and procedures were

effective[13] and released Sarbanes-Oxley Certifications that its 10-KSB "does not contain any untrue statement of a material fact or omit to state a material fact....," that the financial statements "fairly present in all material respects the financial condition, results of operations and cash flows ... ," and that they disclosed to their auditors "all significant deficiencies and material weaknesses [and] any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting." ¶¶19, 23. In truth, the Company's lack of internal controls and procedures allowed for the false and misleading statements detailed above to be made publicly and permitted the mispricing scandal to knowingly and/or recklessly continue while Defendants reaped profits from investors relying on inflated revenue and understated risk. Further, the Sabanes-Oxley certifications were materially misleading in that the financial statements were riddled with untrue statements and omissions of material fact and misrepresented the Company's financial condition in regard to the revenue stemming from BMO, the risk of losing any of its primary clients, and the fact that its revenues were inflated by the mispriced trading scandal, as discussed in detail above.

Optionable cites a number of cases for the proposition that it cannot be held liable for calling its internal controls "effective" because there can be no claim for misrepresentation based on

---

[13] Helmig argues that his statement, made *after* BMO lost C$680 million as a result of Optionable's mispricing of trades, that the Company's "brokerage and execution services are and have been rendered appropriately, professionally and correctly" is not materially false and misleading. Helmig Br. at 13-14. Under Helmig's theory, this statement has no implication for Optionable's valuation of derivatives contracts. First, Plaintiffs' allegations center around misstatements regarding Optionable's brokerage services, including Defendants' failure to disclose the risk of reliance on a single customer and the percentage of revenue that primary customer contributed. Second, Helmig's semantics-based argument that "brokerage and execution" services are completely unrelated to valuation fails. Even if Helmig's contention were accurate, reasonable investors cannot be expected to distinguish between these two roles of this 18-employee firm. Helmig's statement touts the accuracy and professionalism of Optionable's "brokerage and execution services" in the same paragraph that he addresses BMO's Optionable-induced losses – creating the clear implication that the two are related. Even where literally accurate, a statement may become, through context and manner of presentation, a device which may mislead investors. *McMahan & Co. v. Wherehouse Enm't., Inc.*, 900 F.2d 576, 579 (2d. Cir. 1990), *cert. denied*, 501 U.S. 1249 (1991). "For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective investors." *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).

how an issuer characterizes underlying facts. Co. Br. at 28. The cases however, each conclude that the use of a particular adjective, *where not false and misleading*, does not affect the total mix of information. *See Tuchman v. DSC Comms.* Corp., 14 F.3d 1061, 1069 (5th Cir. 1994) (plaintiff did not allege that defendants concealed or misrepresented material information but rather disagreed with defendants' characterization of a contract as a "particular success." The Court stated that defendants were under no duty to "employ the adjectorial characterization" plaintiffs preferred); *Kowal v. MCI Comm. Corp.,* 163 F.3d 1271, 1277 (D.C. Cir 1994) (a particular pejorative adjective will not alter the total mix of information); *In re Ashanti Goldfields Sec. Litig*, 184 F. Supp. 2d 247, 267-68 (E.D.N.Y. 2002) (same; the statements at issue were merely positive descriptive phrases). Defendants' assertion that its internal controls were "effective" was materially false; they provided grossly mispriced valuations, concealed the felonious history of Optionable's CEO, lied to the public about their reliance on BMO, and released a trading platform in furtherance of a scheme to defraud customers. Calling these reckless and intentionally fraudulent actions "effective" is a complete mischaracterization of the underlying facts – not a simple disagreement over word choice.

### 8.  Defendants Made Materially False and Misleading Statements that the Company Was in Compliance with GAAP and SEC Reporting Rules

Financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading or inaccurate. ¶55; 17 C.F.R. §210.5-01(a)(1). Defendants materially understated business volume conducted with BMO in violation of Statements of Position ("SOP") No. 94-6 by ignoring that that counterparties expose a reporting entity to a particular kind of risk. ¶58. Defendants also omitted that revenue was not sustainable because it was artificially inflated as a result of the mispricing scandal. ¶60. Optionable further failed to disclose, as required by SEC Regulation S-K, the known uncertainties associated with the

mispricing of deals with BMO and the potential loss of its most significant customer. ¶¶61-64.

Plaintiffs alleged that Defendants failed to meet their duty under SEC Interpretive Release No. 34-26831 to disclose when an "event or uncertainty is both presently known to management and is reasonably likely to have material effect on the registrant's financial condition or results of operations." ¶63. Defendants argue that the Company was not required to disclose the risk resulting from Optionable's dependence on BMO because the Company had no reason to expect it would lose BMO as a customer. Co. Br. at 19. This argument is flawed for two reasons. First, that Defendants could argue that losing BMO was not foreseeable when it was allegedly inflating its own revenues by paying BMO traders to conduct mispriced trades with the Company – with knowledge or reckless disregard that exposure of this fraud would result in hundreds of millions of dollars in losses for BMO – is astounding. The disclosure of the CEO's felonious background alone could be reasonably expected to cause BMO to cut ties with Optionable, and certainly the revelation of undisclosed payments to a BMO trader and his sister would have caused BMO to think twice about dealing with Optionable. Second, under the plain language of the SEC release, the uncertainty itself (loss of BMO), must not be reasonably likely to *occur*, but instead be reasonably likely to *"have a material effect"* on Optionable's financial condition. Certainly, the loss of BMO was an uncertainty that defendants *knew* was reasonably likely to materially damage Optionable's financial condition.

### C.    None of the Challenged Statements Constitutes "Puffery"

Defendants make the bare assertion, with no meaningful argument, that various statements made by the Company are inactionable puffery.[14] *See* Co. Br. at 30-32; O'Connor Br.

---

[14] Defendants make virtually no argument really, instead preferring only to cite cases and including parentheticals to analogize specific words that have been held as inactionable puffery. Defendants' citations and parentheticals are meaningless as they fail to recognize that the puffery analysis considers the context in which words or phrases are uttered, and the meaning such words and phrases have contextually to the reasonable investor.

at 17; Helmig Br. at 16-17[15]; Cassidy Br. at 23-24. As at least one court has concluded, interposing a puffery defense is tantamount to conceding that the statements at issue are inaccurate.[16] *Scritchfield v. Paolo*, 274 F.Supp. 2d 163, 172 n.13 (D.R.I. 2003).

Courts well recognize that "whether a particular statement is mere puffery or actionable misstatement must be determined by looking not only to the challenged language itself, but also the context in which the statement was made." *Rosen v. Textron*, 321 F.Supp. 2d 308, 320 (D.R.I. 2004); *see, e.g.*, *In re Marsh & McLennan Co. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006); *Scritchfield,* 274 F.Supp. 2d at 174-76 (reconciling cases on puffery and concluding that the inquiry is contextual, based on objectively reasonable inferences, and focuses on a careful and subtle scrutiny of the challenged words). Optimistic statements can be actionable if Defendants did not genuinely or reasonably believe what they touted or the statements imply certainty. *Lapin v. Goldman Sachs & Co.*, 506 F.Supp. 2d 221, 239-40 (S.D.N.Y. 2006).[17]

Defendants first challenge the statement "high standing within the energy and other commodity derivative community." ("Statement 1"). Statements of leadership position are actionable when tied to a specific event. *In re Northern Telecom Sec. Litig.*, 1994 U.S. Dist.

---

[15] Helmig challenges the following as puffery: "In the extreme scenario, that they go away tomorrow, someone else comes in and fills BMO's place." As a former NYMEX vice-chairman and member of Optionable's Board, Helmig is in the unique position of knowing just how reliant the Company was upon BMO, and the large percentage of revenue being generated by BMO, as much as 86%. *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091 (1991) ("directors usually have knowledge and expertness far exceeding the normal investor's resources"). As a result, it would have been difficult for another company to contribute that large a revenue stream quickly to make up for the loss of BMO as a client.

[16] "Puffery" means statements of "corporate optimism" that "are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). Statements of corporate optimism, however, are now viewed with disfavor and the "recent trend is to consider expressions of corporate optimism carefully." *See Brumbaugh v. Wave Systems Corp.*, 416 F.Supp. 2d 239, 250 (D. Mass. 2006) (citing authority and noting that the puffing concept has "gone the way of the dodo").

[17] Of course, determining the truth or falsity of the statement should be reserved for the trier of fact, *Helwig v. Vencor, Inc.*, 251 F.3d 540, 558 (6th Cir. 2001), for "factual disputes are not properly decided at this stage of the proceedings." *In re Marsh & McLennan Co. Sec. Litig.*, 501 F. Supp. 2d at 474; *Morgan v. AXT, Inc.*, 2005 U.S. Dist. LEXIS 42346, *31 (N.D. Cal. Sep. 23, 2005) ("Such statements strike the Court as information that an investor would consider when making investment decisions. However, to make such a determination would require the Court to make factual findings which, at this stage in the litigation, would not be appropriate.").

LEXIS 11730, **21-*22 (S.D.N.Y. Aug. 22, 1994); *see also, Lapin*, 506 F.Supp. 2d at 239 (finding actionable, *inter alia*, the statement that "we will maximize our standing in the U.S. investment community and strengthen our reputation[.]"). Thus, when a company states that an expansion will "continue strengthening the Company's leadership position" or when a company promises to "enhance our leadership position in the high-performance commercial open systems market[,]" a puffery defense will not be sustained. *Id.* (citations omitted). In *Scritchfield*, 274 F.Supp. 2d at 175, the court found actionable statements that reflected the company was a "premier provider" of DSL services and "dominant" in the field because these statements reflected present status and capabilities, and connoted comparative superiority to other companies. Similarly, in this case, Optionable's statement is tied to the combination of having NYMEX as a stakeholder and the development of joint technology programs. Complaint at ¶9. Optionable touts its position in the market and states that it will be "enhance[d]" by the NYMEX alliance and specifically claims that the alliance will be "extremely favorable" to the Company's business. *Id.* There is no question that Optionable ties its market position to the NYMEX alliance.[18]

Defendants next challenge the phrases "record results," "innovative and impeccable services," and "healthy and untapped market for its services." ("Statement 2"). A statement reflecting the overall economic health of the company is material to an investor and, therefore, actionable. *Morgan,* 2005 U.S. Dist. LEXIS at *30 (citation omitted); *In re Computer Associates*

---

[18] Moreover, it is appropriate for the Court to look to the share price after publication of the offending statements, as there is no better indication as to what a reasonable investor considers material. "'Soft,' 'puffing' statements . . . generally lack materiality because the ***market price of the share is not inflated by vague statements***." *In re Cardinal Health Sec. Litig.*, 426 F.Supp. 2d 688, 747 (S.D. Ohio 2006) (emphasis added) (citations omitted); *Morgan v. AXT, Inc.*, 2005 U.S. Dist. LEXIS 42346 at *29-*31 (noting that a statement is actionable if it would significantly alter the mix of information available to investors). After Statement 1 issued, in conjunction with a securities filing, Optionable common stock rose 60% in two days from an opening price on January 22, 2007 of $4.11 per share to close on January 24, 2007 at $6.51 per share. ¶74(d). Clearly, the market reaction signifies the materiality of Statement 1 to investment decisions.

*Class Action Sec. Litig.*, 75 F.Supp. 2d 68, 73 (E.D.N.Y. 1999) (finding statements about the company's health actionable). Optionable has consistently failed to mention that BMO was the largest source of revenue for the Company, not untapped markets or impeccable service (because, as noted above, Cassidy also had personal relationships with two BMO traders which, again, were never made public). "[T]here are inherent problems with having one very large customer which the reasonable investor can be expected to understand." *In re Boston Technology, Inc. Sec. Litig.*, 8 F.Supp 2d 43, 60 n.20 (D. Mass 1998).

Defendants also challenge the statement that "OPEX significantly improves the liquidity and transparency of natural gas and other energy derivatives markets…" ("Statement 3"). This statement, when viewed in its context,[19] ¶17, asserts that OPEX is comparatively superior to whatever other products are in the market. In *Allaire Corp. Sec. Litig.*, 224 F.Supp. 2d 319, 331-32 (D.Mass. 2002) (discussed in *Scritchfield v. Paolo*, 274 F.Supp. 2d at 174-75), the statement "faster than ever before" was deemed actionable because it indicated that the new product was better than a previously available product. Again, from a contextual approach, Defendants gave the wrong impression (stating that "an increasing number of OTC derivatives have been traded directly", ¶17) of unfettered potential for OPEX. Defendants gave assurances despite the potential competition from NYMEX's platform and the (negative) interest electronic platforms received from Senator Feinstein, *i.e.*, potential legislation against the electronic platform due to potential lack of transparency.

Defendants last challenge the statement that the NYMEX transaction was a "major strategic step" and an "important catalyst" for future growth. This statement concerns the

---

[19] Statement 3 was contained in a 10-K filing, which included the "Code of Business Conduct and Ethics" ("Code"), Complaint ¶ 21, which expressly states that the Code "provides guidelines regarding: compliance with laws, rules and regulations, conflicts of interest, insider trading…reporting any illegal or unethical behavior, and compliance procedures."

supposed health of the company, *supra*, and is actionable on that basis. Statements "regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact." *In re International Bus. Mach. Corporate Sec. Litig.*, (*Kowal v. IBM*) 163 F.3d at 107 (citations omitted); *see also In re Computer Associates Class Action Sec. Litig.*, 75 F.Supp. 2d at 73 (finding actionable the statement, *inter alia*, "solidly positioned for growth"). When viewed in context, Complaint at ¶25, the statement is a guarantee to a reasonable investor that the alliance with the "world's largest exchange" will "drive and accelerate our future growth." The statement thus creates a measure of certainty in propelling the Company's growth.

## CONCLUSION

For the foregoing reasons, Optionable's Motion to dismiss should be denied in its entirety.[20]

Dated: April 1, 2008                              Respectfully Submitted,

                                                  KAHN GAUTHIER SWICK, LLC

                                                  /s/ Kim E. Miller

                                                  Kim E. Miller (KM-9669)
                                                  12 East 41st Street, 12th Floor
                                                  New York, NY 10017
                                                  Telephone: (212) 696-3730
                                                  Facsimile: (504) 455-1498

                                                  -and-

                                                  KAHN GAUTHIER SWICK, LLC
                                                  Lewis S. Kahn

---

[20] In the event that this Court determines that any portion of this Complaint should be dismissed, Plaintiff respectfully requests leave to replead pursuant to FRCP 15(a). "Leave to replead is to be liberally granted." *Slayton v. Am. Express Co.* 460 F.3d 215, 230 (2d Cir 2006). "It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Winn v. Schafer*, 499 F. Supp. 2d 390, 395 (S.D.N.Y. 2007).

650 Poydras St., Suite 2150
New Orleans, Louisiana 70130
Telephone (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that this Memorandum was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on April 1, 2008.


                                            <u>/s/ Kim E. Miller</u>