# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE OPTIONABLE SECURITIES LITIGATION | **CIVIL ACTION NO. 07-3753 (LAK)**<br><br>**LEAD PLAINTIFFS' OPPOSITION TO MOTIONS OF DEFENDANTS NORDLICHT, CASSIDY, AND HELMIG TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................. 2

   I.    Plaintiffs Have Adequately Alleged a Section 10(b) Claim ............................... 2

     A.  Plaintiffs Have Adequately Alleged Scienter as to the Company and Individual Defendants Nordlicht, Cassidy, and Helmig ............................. 2

       1. The Legal Standard for Scienter ................................................................ 2

       2. Plaintiffs Have Adequately Alleged Scienter as To All Defendants ..................... 4

     B.  Plaintiffs Have Adequately Alleged Reliance ......................................... 16

       1. The Fraud on the Market Doctrine Applies .............................................. 16

       2. The So-Called Truth on the Market Defense Is Both Premature and Inapplicable ................................................................................... 19

     C.  The Individual Defendants Are Responsible for False and Misleading Statements Under the Group Pleading Doctrine ...................... 22

   II.   Plaintiffs Have Adequately Pleaded Violations of 20(a) against the Individual Defendants ................................................................................... 23

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Acito v. Imcera Group*, 47 F.3d 47 (2d Cir. 1995) ...................................................13, 14

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (U.S. 1972)...............................16

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)...................................................1, 17, 21

*Compudyne Corp. v. Shane,* 453 F. Supp. 2d 807 (S.D.N.Y. 2006)...............................24

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)........................................................21

*Feasby v. Industri-Matematik Int'l Corp.*, 2000 U.S. Dist. LEXIS 9792 (S.D.N.Y. July 17, 2000) .........................................................................................................................14

*Ganino v. Citizens Utils. Co.,* 228 F.3d 154 (2d Cir. 2000) ....................................19, 20

*Houbigant, Inc. v. Dev. Specialists, Inc.*, 229 F. Supp. 2d 208 (S.D.N.Y. 2002).........19

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) ..............................23

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005).....................................23

*In re Boston Technology, Inc. Sec. Litig.*, 8 F.Supp 2d 43 (D. Mass 1998) ....................5

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ...............2

*In re Columbia Sec. Litig.,* 155 F.R.D. 466 (S.D.N.Y. 1994).......................................19

*In re Computer Associates Class Action Sec. Litig.*, 75 F. Supp. 2d 68 (E.D.N.Y. 1999) ..............5

*In re Glenayre Techs., Inc. Sec. Litig.*, 982 F. Supp. 294 (S.D.N.Y. 1997) ...................2

*In re Group Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007) ....................................10

*In re Health Mgmt. Inc. Sec. Litig.*, 970 F. Supp. 192 (E.D.N.Y. 1997) ......................12

*In re Initial Public Offering Sec. Litig.*, 227 F.R.D. 65 (S.D.N.Y. 2004)......................18

*In Re MicroStrategy Inc. Sec. Litig.,* 110 F. Supp. 2d 427 (E.D. Va. 2000).................18

*In re Nash Finch Co. Sec. Litig.*, 2007 U.S. Dist. LEXIS 31987 (D. Minn. May 1, 2007)...........11

*In re Rent-Way Secs. Litig.*, 209 F. Supp. 2d 493 (W.D. Pa. 2002)...............................12

*In re Safeguard Scientifics*, 216 F.R.D. 577 (E.D. Pa. 2003) .......................................18

*In re Syncor Int'l Corp. Secs. Litig.,* 327 F. Supp. 2d 1149 (C.D.Cal 2004) ................11

*In re Triton Energy Ltd. Secs. Litig.*, 2001 U.S. Dist. LEXIS 5920 (E.D. Tex. 2001) .................13

*In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006)................................12

*In re Yukos Oil co. Sec. Litig.*, 2006 U.S. Dist. LEXIS 78067 (S.D.N.Y. Oct. 25, 2006).............20

*Lapin v. Goldman Sachs Group, Inc.,* 506 F.2d 221 (S.D.N.Y. 2006).........................................19

*Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir. 1980).........................................24, 25

*Miller v. Lazard*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007) ...............................................................8

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding
    Corp.,* 320 F.3d 920 (9th Cir. 2003) ...........................................................................................11

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000).........................................................9, 12, 14, 15, 16

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Labranche & Co, Inc*., 229
    F.R.D. 395 (S.D.N.Y. 2004) ........................................................................................................18

*Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225 (S.D.N.Y. 2000)..............................22

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996),.......................................................................19

*Ronconi v. Larkin,* 253 F.3d 423 (9th Cir. 2001),.......................................................................14

*Sable v. Southmark / Envicon Capital Corp.*, 819 F. Supp. 324 (E.D.N.Y 1993).........................22

*Schlanger v. Four-Phase Sys. Inc.*, 555 F. Supp. 535 (S.D.N.Y. 1982).......................................18

*SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450 (2d Cir. 1996)..................................................24, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (U.S. 2007) ...........................1,2, 3

*Wollins v. Antman*, 638 F. Supp. 989 (E.D.N.Y. 1986)................................................................22

**STATUTES**

15 U.S.C. §78(t) ............................................................................................................................24

15 U.S.C. §78u-4(b)(2) ...................................................................................................................2

17 C.F.R. §240.12b-2......................................................................................................................24

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit their Opposition to the three motions to dismiss filed by defendants Nordlicht, Cassidy, and Helmig.  This brief incorporates herein Plaintiffs' opposition to the motion to dismiss filed by Optionable ("Co. Opp.") as well as Plaintiffs' Opposition to the motions to dismiss filed by Defendants O'Connor and Boisseau.[1]

In light of the six separate motions filed by each of the six defendants in this action – one for the Company and one for each of the five individual officers and/or directors named in the 30-page Complaint – Plaintiffs, in an attempt to replicate the concise nature of the Complaint itself, have endeavored to address the 169 pages of Defendants' briefing in just three opposition briefs with no page limit extensions.  (In fact, each brief is under length).

In light of the fact that the opposition to the Company's motion contains the organizational structure of each of the three opposition briefs, the detailed factual overview of the case, and the applicable legal standards, Plaintiffs respectfully request that the Co. Opp. should be read first, followed by this brief, and finally the later-filed opposition to the motions filed by Defendants O'Connor and Boisseau.

This brief will address the following arguments: with respect to the Section 10(b) claim, Plaintiffs have adequately alleged scienter as to the Company and Individual Defendants Nordlicht, Cassidy, and Helmig in accordance with *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (U.S. 2007); Plaintiffs have adequately alleged reliance in accordance with the fraud on the market doctrine (*See, Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)), and Defendants' so-called "truth on the market" defense is premature and inapplicable; Plaintiffs may properly rely on the group pleading doctrine although here actionable statements are

---

[1] Plaintiffs also respectfully incorporate herein the definitions used in the Co. Opp. submitted simultaneously with this brief.

1

attributable directly to each and every one of the Individual Defendants and Plaintiffs need not depend on the group pleading doctrine; finally, Plaintiffs address herein the adequacy of the Section 20(a) claim against the Individual Defendants.  All remaining arguments and issues addressed by defendants Nordlicht, Cassidy, and Helmig – including the adequacy of allegations regarding materially false and misleading statements and omissions during the Class Period and loss causation are addressed in the other opposition briefs that are fully incorporated herein.

## ARGUMENT

### I.    Plaintiffs Have Adequately Alleged a Section 10(b) Claim

#### A.    Plaintiffs Have Adequately Alleged Scienter as to the Company and Individual Defendants Nordlicht, Cassidy, and Helmig

##### 1.    The Legal Standard for Scienter

The PSLRA requires that a plaintiff asserting a violation of Section 10(b) "shall… state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). The Second Circuit has held that the state of mind requirement (scienter) is met where plaintiffs have shown either that defendants had "motive and opportunity to commit fraud" *or* facts that constitute strong circumstantial evidence of conscious misconduct or recklessness. *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 556 (S.D.N.Y. 2004); *see also In re Glenayre Techs., Inc. Sec. Litig.*, 982 F. Supp. 294, 297 (S.D.N.Y. 1997), citing *In Re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993).

The Supreme Court recently set forth a new construction of the "strong inference" standard set forth in the PSLRA: a complaint will survive a motion to dismiss "if a reasonable person would deem the inference cogent and ***at least as compelling*** as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*., 127 S. Ct. at 2510 (emphasis added). Thus, if the inferences properly drawn from the facts are in "equipoise," (*Id*. at 2514), the

scienter allegations will survive a 12(b)(6) motion.[2] In *Tellabs,* the High Court reiterated the established principle that when "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Id*. at 2510.

In *Tellabs*, the Court went on to say that "courts must consider the complaint in its entirety" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 2509. Even "vague or ambiguous" allegations must be considered, as "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id*. at 2511.

This changes the approach, previously taken by some courts, that examined factual allegations relating to scienter one-by-one to determine whether, standing alone, each scienter allegation was sufficient to meet the pleading requirement. If any of those allegations were not sufficient, these courts would disregard them entirely. Under the new approach, to determine whether allegations are sufficient to plead scienter, courts must now weigh all allegations supporting scienter together—disregarding none—and determine whether, collectively, the facts alleged support a strong inference that defendants acted intentionally or recklessly in making the alleged misrepresentations and omissions. *Id*. at 2507. This "holistic" approach, as Justice Ginsburg characterized it, *id.* at 2511, no longer permits courts to ignore any factual allegations that could support scienter simply because, standing alone, the fact itself would not suffice to meet the requisite strong inference of scienter; rather each such fact must be given some weight,

---

[2] The Supreme Court noted that a "court's comparative assessment of plausible inferences, while constantly assuming the plaintiff's allegations to be true…does not impinge upon the Seventh Amendment right to jury trial." *Tellabs*, 127 S. Ct. at 2511-12. At trial, plaintiff must meet a somewhat higher standard to "demonstrate that it is more likely than not that the defendant acted with scienter." *Id*. at 2513.

and all facts are then weighed together to determine whether the totality of the facts alleged give rise to a strong inference of scienter.

### 2.  Plaintiffs Have Adequately Alleged Scienter as To All Defendants

Defendants attempt, through a series of piecemeal arguments strung across six separate briefs, to argue that Plaintiffs have not alleged facts sufficient to support an inference of scienter against them. However, when taken as a whole as demanded by *Tellabs*, the allegations in the Complaint create a striking and compelling picture of scienter which none of Defendants' fragmentary defenses can defeat.

As discussed in the Complaint, the Company's largest client, BMO, accounted for about 86% of revenues in 2006, rather than the claimed 24% (¶36), of Optionable's revenues when the necessary counterparty trades and NYMEX incentives were included. In short, without BMO, upon whom the Company was dependent for the vast majority of its revenues, the Company could not be sustained in its current form.  Indeed, when BMO dropped Optionable, not only did Optionable's stock tank but its revenues simultaneously dropped to a mere pittance – from $9.1 million to less than $64,000. ¶31.

If Defendants did not know how much of the Company's revenue was attributable to its largest client, it was at minimum reckless disregard for them not to. BMO was not a mere afterthought, nor even just one of several heavy hitters that carried Optionable's bottom line: BMO was the heart and soul of the Company's business and revenues.[3] It was important for

---

[3] As a former NYMEX vice-chairman and member of Optionable's Board, Defendant Helmig was in a particularly informed position to know just how reliant the Company was upon BMO, including the counterparty transactions and NYMEX incentives. Defendant Helmig's feigned ignorance expressed in the Company's May 1, 2007 conference call about the Company's dependence on BMO, its largest customer, is at best reckless disregard. The statements he made concerning the small percentage of the Company's revenue attributable to BMO and the replaceability of BMO should it cut ties with Optionable were materially false and misleading. In that conference call, Defendant Helmig stated that it was inappropriate to speak of Optionable's exposure on BMO transactions as higher than 30%; Helmig brushed aside the analyst's concerns about counterparty transactions and implied that any

Defendants to downplay the importance of BMO to Optionable's financials because they knew they were likely to lose BMO as a client. In the May 2007 conference call, Defendant Boisseau actually said "forget about BMO." *Id.*

At least one court has acknowledged, "there are inherent problems with having one very large customer which the reasonable investor can be expected to understand." *In re Boston Technology, Inc. Sec. Litig.*, 8 F.Supp 2d 43, 60 n.20 (D. Mass 1998) (finding that the company reported the actual percentage of sales gleaned from a customer, unlike the instant case where Defendants sought to keep investors in the dark). In short, allegations of problems with that single client (here, the shocking six hundred eighty million dollar loss that resulted in BMO severing ties to Optionable, ridding itself of the BMO traders at the center of the scandal, and the related fallout) would have a "huge net effect in error as to the company's overall figures and is the type of information peculiarly within the defendants' control." *In re Computer Associates Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999).

Furthermore, the undisclosed and highly-suspect relationships and secret dealings between a high-output trader at BMO (David Lee), BMO's Executive Managing Director of Commodity Products (Robert Moore), and Defendant Cassidy, speak volumes regarding Defendants' scienter in this Action. According to a May 10, 2007 report in *The Financial Post*, Cassidy had a "close personal relationship," (¶43), with BMO trader David Lee, on whom BMO was "dependent… for as much as 30% of it revenue." *Id*. Cassidy also had a close personal relationship with Lee's direct supervisor, Robert Moore. ¶7. Contrary to Cassidy's characterization in the May 1, 2007 conference call of David Lee as having "no relationship, besides a broker/client relationship" with the Company (¶27), Confidential Witness #1 reports that both Lee and his **sister** received

---

percentage lost if BMO were to pull the plug on Optionable could be replaced by revenues from a different client. ¶27.

payments directly from Optionable. (¶7). Defendants argue that Plaintiffs do not allege the amounts or timing of these kickbacks, but the very existence of these kickbacks is strongly indicative of scienter. Furthermore, Moore's son worked in the summers as an intern at Optionable, and as a floor clerk for Capital Energy, a company owned by Defendants Cassidy and O'Connor. ¶¶7, 49. These close personal ties and favors support a strong inference that Defendants either knew or recklessly disregarded that statements made during the Class Period were materially false and misleading.

In addition to having undisclosed and highly-suspect relationships and dealings with traders at BMO whose mismarking of the options trades enabled the fraud to continue unabated until the end of the Class Period, Defendants Nordlicht, Cassidy, and O'Connor personally profited to the tune of $29 million through the sale of personally-held Company shares to NYMEX.

On January 22, 2007, Optionable announced that defendants Nordlicht, Cassidy, and O'Connor agreed to sell over 10.2 million shares of Optionable common stock to NYMEX Holdings, Inc. Defendant Cassidy sold 1,950,000 shares for a total value of $5,124,450. ¶47. Defendant O'Connor sold 1,853,886 shares for a total value of $4,986,953. *Id.* Defendant Nordlicht sold 7,000,000 shares for a total value of $18,830,000. *Id.* The timing of the insider sales in the case at bar is unusual and suspicious, occurring "just days prior to Optionable's mispriced trades becoming public." ¶47. At *no time* before or since did those Defendants make such substantial sales: these Defendants literally dumped their stock in a rigged private sale to NYMEX that lined their pockets with nearly $29M while NYMEX itself was shortly forced to write off a whopping $26M of the $29M.  It is clear who the winners were in this securities fraud.

As a result of the defendants' sales to NYMEX, NYMEX owned 19% of Optionable, with

warrants to increase that percentage to 40%. ¶¶8, 28. The transaction also gave NYMEX the right to appoint a member of the Board of Directors of Optionable, and they did: that appointee was Ben Chesir, NYMEX's Vice President of New Product Development. ¶29, 46. At the time, Optionable was touting and developing OPEX, its newly released electronic trading platform. Therefore, Optionable was taking its first steps to develop and market its new platform while a potential key competitor's VP of product development was sitting on its Board, an odd conflict to be sure.  But rather than trouble themselves about such legal pitfalls as conflicts of interest, defendants Nordlicht, Cassidy, and O'Connor were instead counting their astonishing profits.

Shortly after defendants made their profits, NYMEX announced on May 10, 2007, that it would compete with Optionable in the commodities trading business. Two days later, on May 12, 2007, NYMEX removed its representative, Ben Chesir, from Optionable's board pending review of Optionable after discovering that Cassidy had been sentenced to 30 months for a felony conviction of credit card fraud in 1997 and six months for income tax evasion in 1993. ¶16. On May 14, 2007, Optionable announced Cassidy had resigned effective two days earlier in the wake of the non-disclosure of the fraud convictions. ¶46. Tellingly, on August 14, 2007, NYMEX announced it would write down $26 million of its $28.9 million investment in OPEX that quarter, (¶51), effectively conceding that the entire investment in Optionable was worthless, and after Nordlicht, Cassidy, and O'Connor had literally walked off with the cash.

How did this bogus transaction happen? According to Confidential Witness #1, a key reason the unusual NYMEX transaction went forward was the influence of Jules Nordlicht, a NYMEX shareholder with significant holdings and – lo and behold – also an ex-con and the father of Defendant Nordlicht. ¶6(a) fn. 1. Nordlicht Senior, who had liquidated 2.19 million shares—100% of his holdings—in Optionable's IPO and therefore had no vested interest in the future of

his son's Company, (except to see that his son made as much in illegal profits as possible), also pleaded guilty to price rigging the crude oil market in 1978 and creating over $27 million in fraudulent tax losses through prearranged trading of commodity futures and price manipulation. *Id.*[4]

On May 10, 2007, it was revealed in a report by *The Financial Post* that BMO's auditor Deloitte & Touche ("D&T") reported "a serious mismarking of the book of natural-gas options," the mismarking of which caused BMO to lose $680 million Canadian. ¶¶7, 48. D&T indicated it "had never seen such a wide discrepancy in terms of pricing" between the values marked in BMO's portfolio of natural-gas options and their market value. ¶¶7, 43. Many of those prices were provided by Optionable. ¶¶7, 50. Shortly thereafter, BMO suspended all trading with Optionable.

Optionable contends (Co. Br. at 14) that the allegations concerning the D&T report should be disregarded, despite the fact that this is contrary to *Tellabs*' requirements and the article is significantly bolstered by a myriad of corroborative factual allegations.

The May 10, 2007 article is from a credible source, *The Financial Post* of Toronto. Further, the contention that a newspaper reporter who in the course of a diligent investigation for a story relies on a confidential source must reveal information about that source with some particularity in order for it to have any resonance in the scienter analysis in this case is unfounded. The authority cited for this proposition, *Miller v. Lazard*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007), does not state that newspapers must reveal their confidential sources to be relied upon, but instead that they "must indicate particularized facts about Defendants' conduct in order to support the Plaintiffs' claims." The Court in *Miller* found that allegations, for example, that

---

[4] Jules Nordlicht also liquidated 100,000 shares of his common stock in connection with NYMEX Holdings, Inc.'s 2007 IPO, for proceeds of over $13.3 million. *Id.*

purchases were "far from typical" or IPO prices were "probably a bit too high" were not particular.

In the Second Circuit, it is *not* required "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs." *Novak v. Kasaks*, 216 F.3d 300, 313-314 (2d Cir. 2000). Accordingly, where plaintiffs rely not only on confidential sources but also on other corroborating facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." In addition, under *Tellabs*, these allegations, which are corroborated by other facts alleged in detail in the Complaint, must be considered. Such corroborating facts include: the tremendous size of the BMO loss; the fact that the D&T audit indeed occurred and Defendants do not contest the fact that BMO engaged D&T in early February to perform a forensic audit; that Lee and Moore were immediately placed on a leave of absence; that BMO was dependent on Lee for as much as 30% of its revenue; and that Lee received payments from and had a close personal relationship with senior management of Optionable (including Cassidy). Indeed, BMO CEO Bill Downe, certainly a credible source for information concerning the mispricing of options trades at his own Company, announced that BMO would cut ties with Optionable as a direct result of this mispricing. ¶¶34, 39.

The article, which appeared in a credible newspaper responsible for vetting its sources, was picked up by news sources across Canada and the United States, regarding a D&T report which BMO certainly would have an interest in promptly correcting if the source's characterization of the D&T report were in fact false. Rather than making any correction, instead, the words of BMO's CEO strongly corroborate the story.

Shortly after the announcement of BMO's substantial losses as a result of mismarked trades, Optionable announced the resignation of its Chairman, Defendant Nordlicht. BMO subsequently announced it would suspend all trading with Optionable. Defendant Cassidy resigned only two days before NYMEX removed its representative from Optionable's Board after learning of Cassidy's previously undisclosed criminal record. These resignations were suspiciously timed. ¶¶6(b), 46 (Cassidy's resignation in May 2007 immediately prior to the Company's revelation that he had been convicted of multiple federal fraud offenses and spent time in prison.); ¶¶27, 43, 50 (Defendant Nordlicht's resignation after news of BMO's catastrophic losses and Optionable's failure to disclose the extent of its dependence on BMO began to be revealed). Courts in this Circuit have held that resignations of directors can add to overall inference of scienter. *See*, *e.g.*, *In re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) (unusual and suspicious facts such as resignations add to the overall pleading of circumstantial evidence of fraud.)

Long before the Company's troubled dealings with BMO and NYMEX came to a head, Defendant Cassidy was convicted—not once, but twice—on felony fraud charges for which he spent time in prison. In 1993 he was convicted and sentenced to six months for income tax evasion, and again in 1997 he was convicted and sentenced to 30 months for felony credit card fraud. ¶16. As discussed above, this information regarding fraud committed by a director would necessarily be considered material and relevant to any investor—indeed, Defendants recognize it as material in their "Code of Business Conduct and Ethics" contained in the Company's 2007 Form 10-K, which requires the reporting of any illegal or unethical behavior. That Cassidy knew of these undisclosed convictions is obvious, and it strains credulity that the other Defendants were unaware of it, particularly in light of the fact that Cassidy served as CEO and Vice-Chairman of the Board of Optionable between March 2001 and March 2004 *and again* starting

October 2005 until his resignation in May 2007 immediately prior to the Company's public revelation of his convictions. ¶6(b). In the intervening period, Cassidy conveniently served instead as a "consultant" to the Company, allowing Defendants to avoid reporting Cassidy's highly relevant felonious background in the Company's 2005 IPO Registration Statement. *Id.* Furthermore, if other Defendants did not know about Cassidy's convictions, their ignorance was reckless disregard.

As a result of the enormous loss by BMO and the disclosure of Cassidy's criminal background, Optionable was subpoenaed by a Grand Jury and by the district attorney for New York County. It received "requests for information" from the US Commodity Futures Trading Commission, the US Securities and Exchange Commission, and the US Department of Justice. These investigations provide further support for Plaintiffs' scienter allegations. *See, e.g., In re Syncor Int'l Corp. Secs. Litig.,* 327 F. Supp. 2d 1149, 1162 (C.D.Cal 2004)(*citing No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 942 (9th Cir. 2003); *In re Nash Finch Co. Sec. Litig.*, 2007 U.S. Dist. LEXIS 31987 (D. Minn. May 1, 2007)(SEC investigation accompanied by the other allegations of scienter cumulatively creates a strong inference of scienter).

In addition to all the other indicia of fraud which the Complaint alleges, Defendants are alleged to have failed to maintain meaningful internal controls during the class period and their financial reports suffered from numerous GAAP and SEC violations. The three founding stockholders of Optionable, Inc. controlled 50% of the Company's common stock and held three of the Company's four Board seats. ¶20. There was no audit committee and no compensation committee, and therefore decisions were exclusively in control of these Defendants. *Id.* Furthermore, the single "independent" Director, Defendant Helmig, was not truly independent

because he, along with Nordlicht, was a board member of another entity, Platinum Energy. *Id*. This meant that there was a total lack of meaningful independent board oversight. ¶24. Furthermore, "Defendants used improper accounting practices in violation of GAAP and SEC reporting to artificially inflate the price of Optionable's stock." ¶53. Defendants materially understated the volume of business they conducted with BMO. ¶¶56-59. Defendants violated SEC Rules by failing to disclose that revenue was not sustainable, as a result of its mispricing of deals with BMO. Defendants also failed to disclose that OPEX's contribution to the Company's revenue "mix" would be diluted because BMO's contribution to Optionable's revenue was greater than the 30% reported - and was actually closer to 80% once incentives and counterparty transactions are taken into account. ¶60.

    The Company suffered from a serious lack of internal controls and procedures, as evidenced by the Company's failure to disclose Defendant Cassidy's criminal history, BMO's actual contribution to the Company's revenue, and Optionable's dramatic mispricing of options with BMO, among others. ¶66. Contrary to Defendants' "certifications" and SEC requirements, Defendants failed to implement and maintain adequate internal controls, thereby causing GAAP and SEC violations. ¶68. Violations of GAAP and SEC violations, when coupled with other allegations of scienter, support an inference of scienter. *See, e.g., Novak*, 216 F.3d at 308; *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) ("failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter"); *In re Rent-Way Secs. Litig.*, 209 F. Supp. 2d 493, 509 (W.D. Pa. 2002) (internal control deficiencies indicative of scienter); *In re Health Mgmt. Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997) (denying motion to dismiss when plaintiff pleaded violations of GAAP and existence of "red flags" which defendant should have recognized as evidence of fraudulent scheme); *In re Triton Energy Ltd.*

*Secs. Litig.*, 2001 U.S. Dist. LEXIS 5920, *33-34 (E.D. Tex. 2001) (GAAP violations may be significant to "scienter calculus").

The Complaint further alleges that each of the Individual Defendants held high-level positions in the Company during the Class Period. Defendant Nordlicht was a founder of the Company and Chairman of the Board until his above-mentioned suspiciously-timed departure from the Company. ¶6(a). Defendant Cassidy was CEO and Vice-Chairman of the Board of Optionable between March 2001 and March 2004 and again between October 2005 until his resignation in May 2007. He also served as a "consultant" rather than CEO between April 2004 and September 2005. ¶6(b). Defendant O'Connor has been President of the Company and a member of the Board of Optionable since March 2001. 6(c). Defendant Helmig was a member of the Board of Optionable from September 2004 until his termination in November 2007. ¶6(d). Defendant Boisseau has been CFO of the Company since December 2004. ¶6(e). These allegations further support a strong inference of scienter.

Defendants argue that Plaintiffs have not pleaded facts to support a finding of conscious misbehavior or recklessness: that stock sales by Defendants Cassidy, Nordlicht, and O'Connor cannot support a strong inference of scienter because "[o]nly insider trading that is 'unusual' in timing and amount can support a strong inference of scienter." Co. Br. at 32, citing *Acito v. Imcera Group*, 47 F.3d 47, 54 (2d Cir. 1995); that Defendant Helmig actually acquired shares during the Class period, negating any inference of scienter (Helmig Br. at 22); and that Defendant Helmig benefited in no concrete and personal way from the fraud (Helmig Br. at 23).

Defendants' argument that allegations of insider trading "lack merit," Co. Br. at 33, is unavailing and their piecemeal analysis is improper after *Tellabs*. Defendant's assertion that the stock sales in question are unassailable because they were sold below market price and for the

benefit of the Company is unconvincing in light of the fact that these sales simply could not have been accomplished in such high volumes on the open market and the sales were made literally days before Optionable's mispriced trades became public. ¶47. By May 14, 2007, the stock was trading at just $0.425. The Complaint alleges that Defendant Cassidy sold 1,950,000 shares a total value of $5,124,450. ¶47. Defendant O'Connor sold 1,853,886 shares for a total value of $4,986,953. *Id.* Defendant Nordlicht sold 7,000,000 shares for a total value of $18,830,000. *Id.* That financial gain was personal and significant to those Individual Defendants.

Defendants cite *Novak v. Kasaks*, *supra*, and *Feasby v. Industri-Matematik Int'l Corp.*, 2000 U.S. Dist. LEXIS 9792 (S.D.N.Y. July 17, 2000), for the proposition that motive to benefit the Company does not suffice to plead scienter. However, neither of the sections cited in those cases dealt with insider trading. They dealt with the question of motive to defraud, not profit to individuals. *Novak* specifically states that to plead a strong inference of scienter, "plaintiffs had to allege that defendants benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-308. In *Feasby* the court used the same generalized language as *Novak* about motive to benefit the company, and added that personal profit supported a strong inference of scienter when insider sales were "unusual" in timing or amount. *Feasby,* 2000 U.S. Dist. LEXIS 9792 at *11, n.5, citing *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995). The timing of the insider sales in the case at bar is unusual and suspicious both: "just days prior to Optionable's mispriced trades becoming public." ¶47. Furthermore, at *no time* before or since did those Defendants make such substantial sales. These circumstances readily satisfy the *Acito* and *Feasby* standards for unusual timing or amount of share sales required to support a strong inference of scienter.[5]

---

[5] Defendants cite *Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir. 2001), for the proposition that there can be no inference of scienter where defendants' stock sales were at prices below where they could have maximized profits.

Defendant Nordlicht argues that no facts are alleged which create an inference of scienter as to him (Nordlicht Br. at 15); when analyzed under *Tellabs*, the allegations together do create that inference. The Complaint specifically alleges that Nordlicht personally profited by insider sales In connection with the NYMEX transaction. Nevertheless, Nordlicht argues (*Id.* at 16) that his insider sales do not create a strong inference of scienter. Defendant Nordlicht sold 7,000,000 shares for a total value of $18,830,000. ¶47. The timing of the insider sales in the case at bar is unusual and suspicious both: "just days prior to Optionable's mispriced trades becoming public." *Id.* That financial gain was personal to Defendant Nordlicht, as required by *Novak*, 216 F.3d at 307-308. Furthermore, at *no time* before or since did those Defendants make such substantial sales. These circumstances readily satisfy the *Acito* and *Feasby* standards for unusual timing or amount of share sales required to support a strong inference of scienter.

Defendants Cassidy and Helmig argue that there are no facts alleged in the Complaint which rationally support an inference that they had either motive or opportunity to defraud BMO. (Cassidy Br. at 19, Helmig Br. at 6-7). As an initial matter, motive is not a required element for the pleading of scienter, as established in the new *Tellabs* standard discussed above. Furthermore, this argument is a red herring: Plaintiffs are not alleging that Cassidy and the other Individual Defendants defrauded BMO, but that they defrauded shareholders and investors. And Plaintiffs have pleaded motive to defraud shareholders and investors, including maintaining the very existence of the Company. This also negates Cassidy's argument that he had no fraudulent intent. By definition in the Second Circuit, scienter **includes recklessness**. *See, e.g., Novak*, 216

---

Co. Br. at 33. In *Ronconi*, the price of shares in question rose dramatically shortly after the sales had been made, abrogating any inference that defendants had "talked up" the shares in order to maximize profit in their sales. Here, however, Defendants were not selling their shares on the open market, but directly to NYMEX. Defendants could not have sold their shares for nearly $30 million in profits on the open market and knew it – such trading volume could not be accomplished. Instead, with the help of Nordlicht's father, Defendants duped NYMEX into paying Nordlicht, Cassidy, and O'Connor $28,944,403 for shares of Optionable that were almost immediately deemed worthless as the writedown by NYMEX of nearly that entire purchase price confirms. ¶51.

F.3d at 311 (pleading standard for scienter met by pleading recklessness.) The standard under the PSLRA does not require fraudulent intent, and any argument as to fraudulent intent misses the mark. The totality of the scienter allegations in the Complaint combine to create a strong inference that Cassidy and Helmig acted with scienter. The allegations of scienter as to Helmig are further bolstered by the fact that he had been an insider at NYMEX before he became a board member of Optionable, where he would have come to understand NYMEX incentive awards. Nothing more is required, and Cassidy's attempt to raise the standard here is misguided.

In light of the many detailed scienter allegations in the Complaint, which taken together create a cogent and compelling inference of knowledge or reckless disregard, Plaintiffs have adequately pleaded scienter here.

**B.        Plaintiffs Have Adequately Alleged Reliance**

**1.  The Fraud on the Market Doctrine Applies**

In *Basic, Inc. v. Levinson*, the Supreme Court established that reliance for a Section 10(b) claim may be shown through the fraud-on-the-market doctrine, whereby "reliance of individual plaintiffs on the integrity of the market price may be presumed" when the defendants' misrepresentations or omissions have been "disseminated into an impersonal, well-developed market for securities."[6]  Plaintiffs have adequately alleged reliance here. *See*, *e.g.*, ¶84 ("In ignorance of the fact that market prices of Optionable's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by

---

[6] The Supreme Court has further held that for claims for failure to disclose, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-154 (U.S. 1972). As discussed in Co. Opp., Plaintiffs have alleged that the omissions are material.

defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Optionable's securities during the Class Period at artificially high prices and were damaged thereby."); *see also* ¶74(a-d) (alleging Optionable common stock traded in efficient market). Under the fraud-on-the-market doctrine, reliance is presumed in an efficient market. *See, e.g., Basic*, 485 U.S. at 241. Defendants do not contest Plaintiffs' market efficiency allegations, and Plaintiffs have alleged reliance on that efficient market. For purposes of a motion to dismiss, nothing further is required.

Recognizing it would be a fruitless endeavor to argue the fraud on the market doctrine is inapplicable, Defendant Cassidy instead makes premature and fact-based adequacy and typicality arguments that have no relevance to this motion and provide no basis for dismissal. (Cassidy Br. at 22-24). Defendant Cassidy cites no authority, nor can he, for the proposition that Plaintiffs' ability to be certified as class representatives at the class certification phase of the litigation under Fed. R. Civ. P Rule 23 impacts in any way the well-pleaded allegations of reliance at the pleading stage.

In any event, despite Cassidy's arguments, as discovery at class certification will demonstrate, Plaintiffs in this action are appropriate class representatives. Cassidy argues that Plaintiff Boyer bought and sold some shares of Optionable after the announcement of this Action, and that this trading somehow makes Boyer a "day trader." Even if this unusual argument were true, courts have repeatedly held—at the appropriate class certification stage— that day traders rely on market information just as other investors do. *See, e.g., Basic,* 485 U.S. at 246-47 (At class certification, stated that "It has been noted that 'it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?'") (quoting *Schlanger v. Four-Phase Sys. Inc.*, 555 F. Supp. 535,

538 (S.D.N.Y. 1982)); *In re Initial Public Offering Sec. Litig.*, 227 F.R.D. 65, 108 (S.D.N.Y. 2004) (noting at class certification that "[d]ay and momentum traders have the same incentives to prove defendants' liability as all other class members, and their presence in a securities class does not create intra-class conflicts."); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Labranche & Co, Inc.*, 229 F.R.D. 395, 415 (S.D.N.Y. 2004) (at lead plaintiff stage, noting that day trading plaintiff not subject to unique defense). Cassidy's cites to cases indicating the non-reliance of day traders **both** come from outside this Circuit, ignoring all controlling law to the contrary. Furthermore, one of those cases, *In re Safeguard Scientifics*, 216 F.R.D. 577 (E.D. Pa. 2003) was on a motion for class certification. The other, *In Re MicroStrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 437 (E.D. Va. 2000), was on motion for appointment of lead plaintiff. Cassidy does not cite, because he cannot, any law indicating that this issue should be decided at the motion to dismiss stage of litigation. Cassidy's argument as to Boyer's post-Class Period trading misses the mark as well: that an investor purchased shares at a low price after the truth was revealed and the efficient market absorbed the true adverse facts, is irrelevant on a motion to dismiss.

Cassidy further attempts to quibble over KLD's Class Period trading dates, in another foray into an irrelevant issue that provides no basis for dismissal. (Cassidy Br. at 22). Lead Plaintiff KLD alleges that it "purchased shares of Optionable securities at artificially-inflated prices during the Class Period and was damaged thereby." ¶3. The class is defined to include purchasers of Optionable securities between January 22, 2007 and May 14, 2007. ¶1. Cassidy's pontifications about the timing of KLD's trades have no place in this motion.[7]

---

[7] Defendant Cassidy has also strangely shoehorned a puffery argument into his arguments regarding fraud on the market. His arguments are substantially similar to those of the Company and Defendants Helmig and O'Connor, and are therefore addressed in the Co. Opp. along with their arguments. Cassidy's puffery arguments fail for the same reasons enumerated there.

### 2.   The So-Called Truth on the Market Defense Is Both Premature and Inapplicable

Defendants prematurely contend (Co. at 17-19, Cassidy at 12-14, Helmig at 15, Boisseau at 13-15, Nordlicht at 8) that the percentage of revenue attributable to BMO and the degree of counterparty risk were sufficiently disclosed in other SEC filings and in news articles and, thus, the market was aware of it. It is premature to consider such an affirmative defense at the motion to dismiss stage unless the face of the pleadings alone gives rise to the affirmative defense. *See, e.g.*, *Houbigant, Inc. v. Dev. Specialists, Inc.*, 229 F. Supp. 2d 208, 220 (S.D.N.Y. 2002). Even at the appropriate later time in the litigation, Defendants will bear a heavy burden of demonstrating this truth-on-the-market affirmative defense. *See Lapin v. Goldman Sachs Group, Inc.*, 506 F.2d 221, 237-38 (S.D.N.Y. 2006).

The "truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) claim for failure to plead particularity." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Indeed, "defendants' burden [of establishing the truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet [even] at the summary judgment stage." *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482-83 (S.D.N.Y. 1994).

Defendants' argument should be disregarded at this stage. Even to the extent the Court were to consider this argument on the merits however, it falls flat. If the market had fully absorbed from other sources the information allegedly omitted here, it would have been reflected in Optionable's stock price, *see Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1996), and the market would not have reacted the way that it did when the truth was revealed. *See* ¶¶71-72. Further, "[t]o neutralize a misstatement or omission, the information already in the public domain 'must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements[].'"

*In re Yukos Oil co. Sec. Litig.*, 2006 U.S. Dist. LEXIS 78067, *70 (S.D.N.Y. Oct. 25, 2006) (citing *Ganino,* 228 F.3d at 167)(quotations omitted). As clearly evidenced by the 90% decline in Optionable's stock value throughout the two and a half week period during which it was disclosed that BMO lost between $680 million Canadian stemming from mispriced natural gas options trades made through Optionable, that BMO actually accounted for far more of Optionable's brokerage fees than the Company claimed, that BMO would suspend its trading with Optionable, that NYMEX would release a competing platform to Optionable's OPEX, and that Defendant Cassidy has personal relationships with the BMO traders linked to the mispriced Optionable trades, the market had not previously absorbed any, let alone all, of this information. ¶¶34-46.

In arguing that the truth was already disclosed in its public filings, Optionable cites this portion of the Company's 10-KSB:

> One of our clients accounted for 24% of our revenue during 2006 [BMO]. ***On OTC transactions, we bill our services to both counterparties. Accordingly, if this client would not have entered into a portion of all of the OTC transactions in which they were involved, our 2006 revenues could have been lower if we wouldn't have been able to find a suitable counterparty to replace them in such transactions.***

(emphasis added in Co. Br. at 17).[8] This is exactly the type of statement that misled investors. Although the 10-KSB disclosed the existence of counterparties, it did so immediately after stating that BMO accounted for 24% of revenue. The combination of these statements has a clear implication that *even with* these counterparty transactions taken into consideration, "BMO accounted for [only] 24% of revenue," when in fact, this percentage completely ignores the revenue from the counterparty side of the transaction with BMO or the incentive payments from

---

[8] Defendant Helmig joins this argument at p. 16 of his brief; Defendant Boisseau joins in a similar argument regarding his statements that BMO accounted for 30% of Optionable's revenue when he "also explained the significance of counterparty transactions. (Boisseau Br. at 15).

NYMEX. A reasonable investor would assume that "if [BMO] would not have entered into entered into a portion or all of the OTC transaction in which they were involved, [Optionable's] 2006 revenues could have been lower" but *only* for the 24% of revenue which BMO contributes. In fact, transactions with BMO account for upwards of 80% of the revenue that could be affected should BMO cut ties with Optionable. ¶36.

Cassidy argues that if a senior writer at a financial media company could analyze transactions and data and come to the conclusion that BMO accounted for greater than 80% of Optionable's revenue, reasonable investors should have been able to perform his own analysis to reach a similar conclusion. Cassidy Br. at 11-12. Cassidy cites no authority to support his contention that reasonable investors should doubt "facts" stated by Company in public filings and releases when purchasing stock on the open market. Indeed, it defies both the purpose of the securities laws and common sense to suggest that a reasonable investor should be required to perform his own financial analysis of the Company's "counterparty transactions" – a complex accounting concept that many investors could not even define much less analyze – to determine whether the Company's representations in public filings concerning such transactions were lies. In short, investors are not required to double check the percentages put forth by Defendants in their public filings to see if fuzzy math was applied and whether the Company was trying to hoodwink them. *See Basic*, 485 U.S. at 230 (The purpose of the 1934 Act is to *protect investors*. "There cannot be honest markets without honest publicity" and there is a "fundamental purpose" to implement a policy of full disclosure.); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 198 (1976) (The 1934 act was designed "to protect investors against false and deceptive practices that might injure them." This clearly does not imply a burden on investors to develop advanced financial

conclusions contrary to defendants' clear assertions in public filings).[9]

### C.    The Individual Defendants Are Responsible for False and Misleading Statements Under the Group Pleading Doctrine

The Individual Defendants argue that no false and misleading statements are attributable to any of them. (Helmig Br. at 13-18, Nordlicht Br. at 6-14, Cassidy Br. at 10, 14-17). As discussed in the Opp. Co., and as alleged in detail in the Complaint, materially false and misleading statements are specifically attributable to each and every Individual Defendant.[10]

Such detailed allegations against each Individual Defendant were not required.  In the Second Circuit, the group pleading doctrine allows plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *Polar Int'l Brokerage Corp. v. Reeve,* 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000).

To invoke the group pleading doctrine, Plaintiffs must merely allege facts that identify the defendant as a corporate insider, with direct involvement in day-to-day affairs, at the entity

---

[9] Cassidy's cited cases do not apply. Cassidy Br. at 13. In the first, *Sable v. Southmark / Envicon Capital Corp.*, 819 F. Supp. 324, 334-335 (E.D.N.Y 1993), plaintiffs were "sophisticated investors seeking tax deductions" and the Court noted that the omitted information was not of material interest to these plaintiff's who had specific goals (to maximize tax losses). In the second, *Wollins v. Antman*, 638 F. Supp. 989, 994-95 (E.D.N.Y. 1986), the omitted information was *not* material and plaintiff *knew* the omitted information, which the Court found fatal to its Section12(2) claim. The company in *Wollins* disclosed that it lost a major account without elaborating on the exact percentage of total sales represented by the account. The Court noted, however, that none of the Company's statements were false, and concluded that the Company did not omit any information because the Company advised plaintiff that it had lost a "large" or "major" account, identified it by name, and disclosed the monthly sales figures since the departure of account, permitted plaintiff's accountant to review the general ledger and the cash book, provided verification of the monthly gross sales figures, revealed the extent of the decline in monthly sales after the loss of the account, provided an up-to-the-minute account of the firm's operations, and provided plaintiff with the information necessary to calculate the percentage of sales attributable to any one customer. Here, however, Optioanble did not provide investors with such details. Further, the issue in *Wollins* that the company did not elaborate on what "large" meant, is unlike the issue here where the Company specifically stated BMO's contribution to its revenue (24%, for example) but gave a grossly understated number.

[10] For example, each Individual Defendant signed the false and misleading 10-K; Boisseau and Cassidy signed the false and misleading Sarbanes-Oxley certifications;  Cassidy, Bouisseau, and Helmig made false and misleading statements in the May 2007conference call; Helmig made false and misleading statements in an Optionable press release ¶32; Cassidy made false and misleading statements in a press release ¶11.

issuing the statement, and at the time the statement was made. *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 448-50 (S.D.N.Y. 2005).

Plaintiffs allege that at all times relevant herein each of the Individual Defendants were Optionable's highest ranking and heavily involved in the day-to-day operations of the Company. (Nordlicht was founder and Chairman of the Board, Cassidy was CEO and Vice-Chairman, O'Connor was President and a Board member, Helmig was a Board member, and Boisseau was CFO; and each defendant signed the materially false and misleading 10-K) *See* ¶6. The group pleading doctrine has applied to corporate executives who occupied similar or even less-high ranking positions than those held by the Individual Defendants. *See, e.g., In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) (holding that group pleading doctrine applied to an executive vice president-general counsel, and an executive vice president of human resources during the relevant class period, because "[b]y virtue of their high level positions at the Company throughout the Class Period, the Court is bound to infer at this stage that all three had direct involvement in BISYS' daily affairs.").

As such, even without Plaintiffs' well plead allegations that each Individual Defendant made false and misleading statements, the Individual Defendants are all liable for those statements made in the Company's SEC filings and press releases.

## II.    Plaintiffs Have Adequately Pleaded Violations of 20(a) against the Individual Defendants

Plaintiffs have adequately alleged that the Individual are liable as controlling persons under Section 20(a) of the 1934 Act.  Section 20(a) provides:

> every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extents as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

23

15 U.S.C. §78(t). To establish a prima facie case of 20(a) liability, Plaintiffs must show a primary violation by the controlled person—here, a 10(b) violation by the Company, which has been adequately alleged—and show the controlling person was "in some meaningful sense [a] culpable participant[] in the fraud…." *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). Control may be established by showing defendant had "the power to direct or cause the direction of the management and policies of a person." *Id*. at 1473, citing 17 C.F.R. §240.12b-2. Plaintiffs have adequately alleged that each of the Defendants, through their positions and actions, had the power to direct management and policies of the Company, and were culpable participants in the fraud. *See*, *e.g.*, ¶¶6, 6(a-e), ¶79, 89-91.

In relation to Section 20(a) claims, the Complaint alleges that each Individual Defendant is liable "as controlling persons by reason of their status as senior executive officers and/or directors with access to non-public information about the Company." *Id*. Each Individual's position and involvement with the Company is detailed in the Complaint (¶6(a-e)) and their direct participation in false and misleading statements is also adequately alleged. (*See* above.) Nothing further is required to state a claim. *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) ("Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss.")

Once the plaintiff makes out a prima facie showing of 20(a) liability, "the burden shifts to the defendant to show that he acted in good faith, *see Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980)…and that he 'did not directly or indirectly induce the act or acts constituting the violation,'" 15 U.S.C. §78(t). To meet the burden of establishing good faith, the controlling person must prove that he exercised due care in his supervision of the violator's activities in that he "'maintained and enforced a reasonable and proper system of supervision and

internal controls.'" *First Jersey Sec., Inc.*, 101 F.3d at 1472-3, quoting *Marbury Management*, 629 F.2d at 716. This Defendants have not and cannot show. Plaintiffs' allegations of control person liability are therefore more than adequate.

Defendant Helmig argues that he "undertook a management position at Optionable and became involved in the daily activities of the company on Friday, May 11, 2007," Helmig Br. at 25, and that as the Class Period expired on the next business day. The implication is that Helmig didn't have time to partake in the fraud alleged against the Individual Defendants. However, the Complaint alleges misstatements and omissions made by Defendant Helmig, which Helmig asserts were "either true or mere corporate optimism." *Id.* For the reasons discussed herein above, and as incorporated from the other opposition briefs, these statements properly attributed to Defendant Helmig were incorrect or incomplete. By virtue of his position, his influence, his access to information, and his control over statements he himself made, caused to be made, or signed, Helmig is liable as a control person under section 20(a).[11]

## CONCLUSION

For the foregoing reasons, the motions of Defendants Nordlicht, Cassidy, and Helmig to dismiss the Complaint should be denied in their entirety.[12]

Dated:  April 1, 2008                                    Respectfully Submitted,

                                                         KAHN GAUTHIER SWICK, LLC

                                                         /s/ Kim E. Miller_____

                                                         Kim E. Miller (KM-9669)

---

[11] Plaintiffs have also adequately pleaded violations of Section 20(A) against Defendants Nordlicht, and Cassidy; the 20(A) arguments of Nordlicht, Cassidy, O'Connor, and Boisseau are addressed in Lead Plaintiffs' Opposition to Motions of Defendants O'Connor and Boisseau to Dismiss the Consolidated Amended Class Action Complaint.

[12] In the event that the Court determines that all or any portion of Defendants' Motions to Dismiss should be granted, Plaintiffs respectfully request leave to amend in accordance with Fed. R. Civ. P. Rule 15 and as noted in Opp. Co. at 30.

Michael A. Swick (MS-9970)
12 East 41st Street, 12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

-and-

KAHN GAUTHIER SWICK, LLC
Lewis S. Kahn
650 Poydras St., Suite 2150
New Orleans, Louisiana 70130
Telephone (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Memorandum was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on April 1, 2008.

<u>/s/ Kim E. Miller</u>