**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE OPTIONABLE SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**CIVIL ACTION NO. 07-3753 (LAK)**


**LEAD PLAINTIFFS' OPPOSITION TO MOTIONS OF DEFENDANTS O'CONNOR AND BOISSEAU TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

ARGUMENT .......................................................................................................................... 1

   I.   Plaintiffs Have Adequately Pleaded Loss Causation ............................................ 1

   II.  Plaintiffs Have Adequately Pleaded Violations of Section 20(A) against Defendants O'Connnor, Nordlicht, Cassidy and Boisseau .................................................... 8

   III.  Plaintiffs Have Adequately Alleged False and Misleading Statements and Omissions by Defendants O'Connor and Boisseau .............................................................. 16

   IV.  Plaintiffs Have Adequately Alleged Scienter of O'Connor and Boisseau ........................ 18

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Bechtel v. Competitive Techs., Inc.*, 448 F.3d 469 (2d Cir. 2006) ...................................................24

*Bristol-Meyers Squibb Sec. Litig.*, 2005 U.S. Dist. LEXIS 18448 (D.N.J. Aug. 17, 2006) ...........8

*Buban v. O'Brien*, 1994 U.S. Dist. Lexis 8643 (N.D. Cal. June 23, 1994) ...................................13

*Clay v. Riverwood Int'l. Corp.*, 157 F.3d 1259 (Carnes, J., concurring), *aff'd on rehearing, vacating portions of prior opinion*, 176 F.3d 1381 (11th Cir. 1999)....................................15, 16

*ClearOne Communications, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 494 F.3d 1238 (10th Cir. 2007)..............................................................................................................................23

*Combs v. Case*, 2007 U.S. Dist. LEXIS 95604 (D. Haw. Sep. 20, 2007) .....................................12

*Copland v. Grumet*, 88 F.Supp. 2d 326 (D.N.J. 1999) ....................................................................12

*DeMarco v. Robertson Stephens, Inc.*, 318 F.Supp. 2d 110 (S.D.N.Y. 2004)................................3

*Demaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) ...............................................................17

*Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336 (2005) ......................................................1, 2

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) .........8

*Epstein v. Itron, Inc.*, 993 F. Supp. 1314 (E.D. Wash. 1998) ..................................................21, 22

*Fujisawa Pharmaceuticals Co., Ltd. v. Kapoor*, 115 F.3d 1332 (7th Cir. 1997) .....................12, 14

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ...................................................17

*In re Aetna Inc. Sec. Litig.*, 34 F.Supp. 2d 935 (E.D. Pa. 1999)...................................................21

*In re Ancor Communs.*, 22 F.Supp. 2d 999 (D. Minn.1998) ...........................................................21

*In re Boston Technology, Inc. Sec. Litig.*, 8 F.Supp 2d 43 (D. Mass 1998) ..................................21

*In re Bradley Pharms., Inc. Secs. Litig.*, 421 F. Supp. 2d 822 (D.N.J. 2006) ................................8

*In re Cendant Corp. Litig.*, 60 F.Supp. 2d 354 (D.N.J. 1999) .........................................................9

*In re Cendant Corp. Sec. Litig.*, 76 F.Supp. 2d 539 (D.N.J. 1999)................................................19

*In re Computer Associates Class Action Sec. Litig.*, 75 F. Supp. 2d 68 (E.D.N.Y. 1999) ...........22

*In re Criimi Sec. Litig.*, 94 F.Supp. 2d 652 (D.Md. 2000)..............................................................19

*In re Federal National Mortgage Ass'n Sec.Litig.*, 503 F.Supp. 2d 25 (D.D.C. 2007)................13

*In re JP Morgan Chase Sec. Litig.*, 363 F.Supp. 2d 595 (S.D.N.Y. 2005)....................................21

*In re Microstrategy, Inc. Sec. Litig.*, 115 F.Supp. 2d 620 (E.D. Va. 2000)......................12, 13, 16

*In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281 (S.D.N.Y. 2005) ....................................2

*In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133 (S.D.N.Y. 1999) ...........................11

*In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728 (E.D. Mich. 2007) ..........................................24

*In re Tel-Save Sec. Litig.*, 1999 U.S. Dist. LEXIS 16800 (E.D. Pa. Oct. 19, 1999) ...................20

*In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327 (S.D.N.Y. 2007) .............................................2

*In re Worldcom,* 294 F.Supp 2d 392 (S.D.N.Y. 2003) ...................................................................19

*In re Xethanol Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 65935 (S.D.N.Y. September 7, 2007) ......................................................................................................................................2

*Jefferson Ins. Co. v. Rouhana (In re Winstar Comm.)*, 2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 27, 2006) ......................................................................................................3

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)....................................................2, 7

*Middlesex Retirement Sys. v. Quest Software, Inc.*, 527 F.Supp. 2d 1164 (C.D. Cal. 2007).........13

*Montoya v. Mamma.com*, 2006 U.S. Dist. LEXIS 13207 (S.D.N.Y. March 28, 2006)...............2, 7

*Moskowitz v. Lopp*, 128 F.R.D. 624 (E.D. Pa. 1989),...............................................................14, 16

*Nanopierce Techs., Inc. v. Southridge Capital Mgt., LLC*, 2003 U.S. Dist. LEXIS 11108, *11-*13 (SD.N.Y. June 30, 2003) ........................................................................................17

*Neubronner v. Milken*, 6 F.3d 666 (9th Cir. 1993) ........................................................................14

*Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) ..................................................................23

*Schlagal v. Learning Tree Int'l.*, 1998 U.S. Dist. LEXIS 20306 (C.D. Cal. Dec. 23, 1998).........22

*SEC v. Technical Resources,* 1977 U.S. Dist. LEXIS 12229 (December, 22 1977) ....................17

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ....................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499 (2007) ...........................................25

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) .................................................10, 11, 17

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991).....................................................19

*Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88 (2d Cir. 1981)......................................9, 12, 13

**STATUTES**

15 U.S.C. §7241........................................................................................................................18, 23

15 U.S.C. §78j(b)...............................................................................................................................2

15 U.S.C. §78t-1 ................................................................................................................................9

15 U.S.C. §78t-1(b)..........................................................................................................................15

**OTHER AUTHORITIES**

http://magtigemoer5.blogspot.com/2007_05_14_archive.html .......................................................5

http://www.bloomberg.com/apps/news?pid=20601087&sid=a10FN1t.vJyE&refer=home ...........6

Veronica M. Dougherty, *A Dissemblance of Privity: Criticizing the Contemporaneous Trader Requirement in Insider Trading*, 24 Del. J. Corp. L. 83 (1999) ................................................12

Plaintiffs respectfully submit their Opposition to the Motions to Dismiss of Defendants O'Connor and Boisseau ("Opp. to OB"). As noted in the earlier two opposition briefs previously filed with the Court, this brief will be limited to the following issues:

- Plaintiffs have adequately pleaded loss causation. This issue is addressed by Plaintiffs solely in this opposition brief. It has not been briefed previously by Plaintiffs.

- Plaintiff Boyers' Section 20(A) Exchange Act claims against Defendants Cassidy, Nordlicht, and O'Connor are adequately pleaded. Like loss causation, this issue is addressed by Plaintiffs exclusively in this opposition brief. It has not been briefed previously by Plaintiffs.

- Plaintiffs have alleged materially false and misleading statements and omissions by Defendants O'Connor and Boisseau. This argument addresses only issues raised by these Defendants to the extent not previously covered in the earlier briefing. Both the Opposition to the Company's motion and the Opposition to the Motions of Nordlicht, Cassidy, and Helmig are incorporated by reference as if fully set forth herein.

- Plaintiffs have alleged scienter with respect to Defendants O'Connor and Boisseau. Again, this argument is limited only to issues raised by these Defendants to the extent not previously addressed in the earlier briefing.

**ARGUMENT**

**I.    Plaintiffs Have Adequately Pleaded Loss Causation**

In *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336 (2005), the Supreme Court held that to plead loss causation under Section 10(b) of the Exchange Act, plaintiff must allege "the traditional elements of causation and loss." *Id.* at 347. The complaint need only provide defendants "with notice of what the relevant economic loss might be or of what the causal

connection might be between that loss and the misrepresentation[.]" *Id*. Fed. R. Civ. P. Rule 8

pleading requirements apply to loss causation, rather than the particularity requirements of Rule

9(b). *See, e.g., id*. at 346 (assuming *arguendo* that Rule 8 pleading applies to loss causation.); *In

re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) (applying Rule 8 to

pleading of loss causation); *In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 315

(S.D.N.Y. 2005) ("Rule 8… controls the specifics of the required pleading of loss causation").

As Judge Baer has noted, "to plead loss causation, the Complaint must allege that defendants'

misrepresentation or omission concealed something from the market that, when disclosed,

negatively affected the value of the security." *Montoya v. Mamma.com*, 2006 U.S. Dist. LEXIS

13207, *21-*22 (S.D.N.Y. March 28, 2006) (citation omitted). Plaintiffs have adequately alleged

loss causation for their Section 10(b) claim against Defendants. ¶¶34-46; 69-73. *See also* 15

U.S.C. §78j(b).

Moreover, "loss causation is a 'fact-based inquiry…[and] is a matter of proof at trial and

not to be decided on a…motion to dismiss." *Mamma.com*, 2006 U.S. Dist. LEXIS at *22-*23

(citation omitted). *See also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005)

("loss causation is a fact-based inquiry"); *In re Xethanol Corp. Sec. Litig.*, 2007 U.S. Dist.

LEXIS 65935 (S.D.N.Y. September 7, 2007) ("Since loss causation is a fact-based inquiry

generally… it is not an appropriate issue to be decided on a motion to dismiss.").

The Complaint readily meets these pleading requirements. The Complaint is replete with

allegations detailing the causal connection between Defendants' misrepresentations and the

economic loss suffered by Plaintiffs. *See, e.g.,* ¶¶34-46, 69-76. Plaintiffs allege that Defendants

engaged in a fraudulent scheme by making materially false and misleading statements and

omissions designed to mislead the investing public, thereby causing the Company's stock to

trade at artificially inflated levels. ¶¶69-70. The Complaint alleges that the Company's stock declined during the Class Period—from a high of $8.63 per share to as low as $0.425 per share— after a series of disclosures through media articles and Company, NYMEX, and BMO press releases. ¶71. The drops in price of the stock are alleged to have removed the inflation from the stock and caused real economic loss to investors who purchased the Company's securities during the Class Period. *Id.*[1]

The first partial disclosure is alleged to have occurred on April 27, 2007. On that date, BMO announced that it had sustained between C$350 million and C$450 million in trading losses stemming from natural gas options trades effected through Optionable. ¶34. Shares of Optionable plummeted 20.6% that day on unusually heavy trading volume to close at $5.56 per share. ¶35. The immediate drop in share prices, by as much as 20.6% in a single trading day, adequately pleads a causal connection between the falsity of Defendants' Class Period statements and omissions concerning its dependence on BMO and revenues generated through this client. "One of the ways a plaintiff can plead loss causation is to allege that the market reacted negatively to a corrective disclosure regarding the falsity of the defendants' representations. It requires a 'showing that plaintiff suffered an economic loss fairly attributable to the public airing of the alleged fraud, *i.e.,* a significant stock price decline immediately following the announcement that reveals the fraud to the public.'" *Jefferson Ins. Co. v. Rouhana (In re Winstar Comm.)*, 2006 U.S. Dist. LEXIS 7618, *44 (S.D.N.Y. Feb. 27, 2006) (citations omitted).

The next partial disclosure is alleged to have occurred on April 30, 2007, when *TheStreet.com* published an article explaining that Optionable grossly understated revenues

---

[1] Allegations of a gradual price decline are consistent with the theory that the price of the stock was artificially inflated; misrepresentations may well have buoyed stock price at a much higher level than it otherwise would have been. *DeMarco v. Robertson Stephens, Inc.*, 318 F.Supp. 2d 110, 124 (S.D.N.Y. 2004); *see also Mamma.com*, 2006 U.S. Dist. LEXIS 13207 at *25 ("[T]o satisfy the first prong of the causation analysis, plaintiffs need only allege that defendants' material omissions caused some artificial inflation in the stock.").

generated through the BMO trades "by more than $300 million" in failing to factor the profits generated through counterparty sales and incentive fees. ¶36. The article further explained that "trading deals involving BMO appear to account for 86% of the firm's brokerage fees, even if half of those fees aren't actually from BMO itself." *Id*. Even more tellingly, the article cites to an external "spokesman" for Optionable who "agrees that BMO's impact is likely more than the 24% when factoring in counterparties." *Id*. On this news, shares fell 5.49% from the opening price on April 30, to close at $5.34 per share.

In a telephone conference held on May 1, 2007 with financial analysts and investors, despite knowing or recklessly disregarding that Optionable was almost entirely dependent upon BMO, Defendants sought to assuage worried investors by falsely claiming that it could recoup the 25-30% lost revenue in crude oil options. ¶¶27, 28. Nevertheless, the following day, May 2, 2007, more devastating announcements were made by the Company, including the abrupt departure of Chairman Nordlicht. The price of common stock declined precipitously on this news, a single day decline of almost 20%, from $6.00 per share to close at $4.81 per share on huge volume. ¶38.

The Complaint next alleges a further partial disclosure on May 8, 2007. On that date, BMO issued a press release announcing that it was suspending trading with Optionable immediately and that two of its trading professionals were on leave pending the results of an external review. ¶39. This release was followed immediately by a May 9, 2007, *TheStreet.com* report on the BMO announcement, noting it could be "a big hit to Valhalla, N.Y.-based Optionable's business, which stated during a first-quarter earnings call that BMO represented 30% of its revenues." That same day, Optionable filed an 8-K indicating that NYMEX's CME Globex electronic trading platform would severely undercut OPEX by also offering options

trading for crude oil, natural gas, gold, and silver, beginning in June 2007. ¶41. The Complaint alleges that, following publication of these reports, Optionable traded on high volume of over 11 million shares and the price of the Company's stock declined almost 40%. ¶42.

The next partial disclosure is alleged to have occurred on May 10, 2007. On that day, *The Financial Post* of Toronto reported that Optionable, in collaboration with David Lee—BMO's biggest natural gas trader, who had close personal ties to Cassidy— had grossly mismarked options prices it provided to BMO. The article noted that Deloitte & Touche auditors had "never seen such a wide discrepancy in terms of pricing" between the values marked in BMO's portfolio of natural gas options and their market value. ¶43. That same day, *TheStreet.com* published an article entitled "Nymex Nails Optionable," which described NYMEX's competing platform and reiterated that the Company was "hemmorrhag[ing]" its stock value. On May 10, 2007, Optionable common stock closed at a mere $0.85 per share. ¶45.

The Complaint alleges that the full truth was finally revealed on May 14, 2007. ¶46. On that day, the Company was forced to disclose that Vice Chairman, CEO and Director Cassidy had resigned effective two days earlier. In addition, NYMEX announced it had removed its representative from Optionable's board after discovering that Cassidy had been sentenced to 30 months for a felony conviction for credit card fraud in 1997 and six months for income tax evasion in 1993. *Id.*[2] On these announcements, Optionable's shares closed at a negligible $0.425 per share on May 14, 2007.

The Complaint alleges that Plaintiffs' losses were not caused by other factors, as during the period in which Optionable's stock price fell approximately 90%, the Standard & Poor's 500 securities index was relatively unchanged. ¶¶69, 72-73. Defendant Helmig attempts to put forth a

---

[2] *See also* http://magtigemoer5.blogspot.com/2007_05_14_archive.html (May 14, 2007: "The New York Mercantile Exchange, the biggest investor in Optionable Inc., removed its representative from the energy broker's board of directors after learning the former chief executive officer served time in prison…").

premature affirmative defense, without supporting evidence, of other "intervening factor[s]" (Helmig Br. at 22, n.13), but the Complaint's allegations far exceed the pleading requirements. Nothing further is required at this stage to meet the loss causation element of the Section 10(b) claim.[3]

Defendants Cassidy and O'Connor make a fact-based contention that loss causation cannot be pleaded as to Cassidy because news of his criminal history did not come to light until after the Class Period. O'Connor Br. at 22-23, Cassidy Br. at 25-26. This argument is not only premature and contradicted by the well-pleaded allegations of the Complaint, but also fails because it ignores the fact that Cassidy (and other Defendants) are alleged to be liable for losses caused not only by the omission of the convictions but also by the myriad other materially false and misleading statements and omissions during the Class Period which artificially inflated the stock price and harmed Plaintiffs and the Class when the truth was revealed.[4]

Furthermore, even where plaintiffs do not allege, as is alleged here, a disclosure to the market of a CEO's previously-concealed conviction, courts in this District have found loss causation exists with respect to such claims given that such failure to disclose concealed the risk of a significant devaluation of the Company's stock. As noted by Judge Baer, "[i]f, as plaintiffs allege, Mamma.com was admittedly owned and controlled by a convicted scam artist it may, at

---

[3] Defendant Helmig argues that Plaintiffs do not allege that any disclosure of Helmig's association with Platinum Energy had an impact on the price of Optionable stock and have therefore failed to plead loss causation as to Helmig. (Helmig Br. at 21). The Complaint, however, alleges that Helmig made false and misleading statements or omissions as to: the percentage of Optionable's revenue attributable to BMO (¶¶13-14); Cassidy's convictions (¶¶15-16); the viability and value of OPEX (¶¶17-18); Company internal controls and business code (¶¶19-22); counter-party transactions with BMO (¶27); replaceability of BMO's trading revenues (¶¶30-31) and; the propriety and correctness of Optionable's brokerage services rendered to BMO (¶¶32-33). As discussed in this Section, loss causation is adequately pleaded with respect to these issues.

[4] Defendants themselves cannot even agree when the long-concealed Cassidy convictions were ultimately revealed to the market, further demonstrating that this is a premature, fact-intensive inquiry. Cassidy posits the convictions were revealed on May 15, 2007 (Cassidy Br. at 16, n.14) (citing no source, but a Bloomberg article on that date notes that NYMEX "removed its representative from [Optionable's board of directors] after learning the former chief executive officer served time in prison" (http://www.bloomberg.com/apps/news?pid=20601087&sid=a10FN1t.vJyE&refer=home)); O'Connor, on the other hand, cites a May 24, 2007 *Post* article as the date of revelation. O'Connor Br. at 22.

this stage of the litigation, be presumed that the stock never would have risen so dramatically, regardless of any positive earnings reports." *Mamma.com, Inc.*, 2006 U.S. Dist. LEXIS 13207 at *26. This reasoning applies with equal force here. "Loss causation can be established either where (1) the market reacted negatively to a corrective disclosure or (2) the materialization of the risks that were concealed by the alleged misrepresentations or omissions proximately caused plaintiffs' loss." *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d at 175.

The Second Circuit's decision in *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), also strongly supports Plaintiffs' loss causation allegations. In *Suez Equity*, defendants allegedly induced plaintiffs to invest in a healthcare financing venture. Defendants omitted negative information regarding the venture's principal and his past business difficulties. The venture eventually had severe liquidity problems that the plaintiffs contended were attributable to the principal's mismanagement. The district court dismissed the complaint for the failure to sufficiently plead loss causation. The Second Circuit reversed, finding that "[a] liberal reading of the complaint reveals allegations that the misrepresentations [regarding the principal's background] led plaintiffs to appraise the value of [the venture's] securities incorrectly by assuming the competency of [the principal]." *Id.* at 96. The Second Circuit reasoned that these allegations were sufficient to plead loss causation, since the failure to disclose the principal's financial and business problems could have directly affected the plaintiffs' evaluation of their investment (*i.e.*, this was a material omission), and since the principal's history could have made foreseeable his failure to manage the venture effectively. *Id.* at 98. Thus, in light of *Suez*, averring the omission of a material fact—one which a shareholder would view as significant in altering a decision whether to invest or not in a risk—is sufficient to plead loss causation. The need for a disclosure is not a *sine qua non* for sustaining a sufficiency

of the allegation challenge.[5]

In addition, Courts have repeatedly rejected the contention implied here by Defendants that to establish loss causation, plaintiff must show a stock drop following a confession that a fraud *in all its permutations* has occurred. *See*, *e.g.*, *Bristol-Meyers Squibb Sec. Litig.*, 2005 U.S. Dist. LEXIS 18448, *56 (D.N.J. Aug. 17, 2006) (rejecting defendants' contention "that a plaintiff must show that the loss was caused by a corrective disclosure that mirrors, with precision, the alleged fraud" and noting that "this theory of loss causation is flawed…it does not follow from the precedent cited, or any precedent of which the Court is aware"); *In re Bradley Pharms., Inc. Secs. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (rejecting defendants' argument that disclosure of informal SEC inquiry could not be "corrective" of prior misrepresentation because it did not specifically mention the subject of the misrepresentation").

In sum, the Complaint alleges that the stock was artificially inflated during the Class Period as a result of Defendants' materially false and misleading statements and omissions. Plaintiffs and the Class were damaged when, through a series of disclosures beginning April 27, 2007 and continuing through May 14, 2007, the last day of the Class Period, the true, adverse facts were revealed to the market and the artificial inflation in the stock price was removed, causing Plaintiffs' and the Class' damages. ¶¶69-73.

## II.     Plaintiffs Have Adequately Pleaded Violations of Section 20(A) against Defendants O'Connnor, Nordlicht, Cassidy and Boisseau

Plaintiffs have stated a claim for violations of Section 20A of the Exchange Act against

---

[5] "Thus, the *Suez Equity* plaintiffs did not merely allege a disparity between the price they had paid for the company's securities and the securities' "true" value at the time of the purchase. Rather, they specifically asserted a causal connection between the concealed information--*i.e.*, the executive's history--and the ultimate failure of the venture." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir. 2003) (quoting *Suez Equity*, 250 F.3d at 98).

defendants Cassidy, Nordlicht, and O'Connor.[6] Section 20A seeks to cure the informational imbalance between innocent stock purchasers and corporate insiders by providing:

> Any person who violates **[1]** any provision of this chapter or the rules or regulations thereunder by **[2]** purchasing or selling a security **[3]** while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction **[4]** to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) **[5]** securities of the same class.

15 U.S.C. §78t-1; *see also In re Cendant Corp. Litig.*, 60 F.Supp. 2d 354, 378 (D.N.J. 1999) (noting that to state a Section 20A claim, a plaintiff needs to plead a predicate violation of the Exchange Act, trading by a corporate insider, a plaintiff who traded contemporaneously with the insider, and the insider traded while in possession of material, nonpublic information); *Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88, 94 (2d Cir. 1981) (citing *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (*en banc*), *cert. denied*, 394 U.S. 976 (1969)) (noting that corporate insiders have a duty to disclose material, nonpublic information or abstain from trading in the securities during the time period that the material information remains undisclosed, *i.e.*, the "disclose or abstain" rule).

A plain reading of the statute and the Complaint reveals that Plaintiff Boyers' Section 20A claims against Defendants Cassidy, Nordlicht, and O'Connor are adequately pleaded. First, Plaintiffs have adequately alleged that each of these Defendants is liable for violations of predicate violations of the securities laws – specifically, Section 10(b) of the Exchange Act. *See, inter alia*, ¶¶77-87, 88-91; *see also,* ¶¶92-95, Co. Opp. at 11-26; Opp. to NCH at 2-16.

Second, Cassidy, Nordlicht, and O'Connor sold approximately 11 million shares of their own stock to profit an aggregate of approximately $29 million on April 10, 2007, days before

---

[6] The Section 20(a) arguments of O'Connor and Boisseau are addressed in the Opp. to NCH at 23-25.

BMO announced catastrophic losses from natural gas options trades with Optionable. ¶¶34, 47.

This is more than sufficient to satisfy the second element above, "purchasing or selling a

security." More bad news emerged over the one month period after Defendants sold their stock

to NYMEX, causing a precipitous fall of the share price to a mere $0.425 per share. ¶46.[7]

Third, the Complaint alleges that Defendants, including Cassidy, Nordlicht, and

O'Connor, possessed "material, nonpublic information," including: that the Company provided

false trading information to BMO that resulted in massive mispricing of options by two BMO

traders who received payments and/or favors from Defendants and had a special relationship

with them; BMO accounted for over 80% of Optionable's revenues, despite the Company's

repeated assertions that BMO only accounted for approximately 18% or 24% of the Company's

overall revenues; Cassidy had an undisclosed criminal history involving multiple fraud

convictions; OPEX was not a viable trading platform; and that a Deloitte & Touche forensic

audit of BMO was underway in early February, and that Defendants' fraud and wrongdoing

would soon be exposed . ¶¶13, 34-46, 50, 92-95.

O'Connor's argument that the information was not material because what took place was

a "manifestly legitimate business decision," O'Connor Br. at 28, ignores not only the materiality

standard applicable to securities fraud cases, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438

(1976), but also the well-pleaded allegations of the Complaint regarding the true adverse facts

that Defendants are alleged to have concealed until they could squeeze out their nearly $29

million in profits. In fact, the stock price dropped to $0.425 on May 14, 2007, the last day of the

---

[7] Any suggestion by Defendants that they could have simply sold their shares on the open market at prevailing market values, and not at the putative $2.69 per share in the NYMEX deal is disingenuous. *See, for example,* O'Connor Br. at 26-27 (claiming to have avoided a "financial windfall" or "greater profits"). Defendants could not sell such a tremendous volume of shares -- close to 11,000,000 shares -- at the prevailing market value because any attempt to do so could not have been absorbed by the market and would have radically diluted, if not decimated, the per share value then-trading on the market, rendering the shares completely worthless. The average daily trading volume of the stock during the Class Period was approximately 2,049,733 shares. *See* Declaration of Kim E. Miller ("Miller Decl."), submitted herewith, at Exhibit A.

Class Period and only a month after the announcement of the NYMEX transaction. Defendants made massive profits from their insider trading and the timing of these trades was not consistent with prior trading patterns.

In *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133 (S.D.N.Y. 1999), plaintiffs alleged a Section 20A violation including that defendants knew or were reckless in not knowing that the company's problems (deficiency of the computer system, causing financial data to be inaccurately reported) were about to be exposed and so defendants traded shares to avoid the precipitous drop in stock value that would result. Moreover, the defendants' trades were not in keeping with their past trading histories. The court denied the motion to dismiss, finding that the timing of defendants' trades before disclosure of the company's problems, as well as defendants' trading histories were sufficient indicia to ascribe to defendants that they knew or knowingly possessed material information. *Id.* at 143-44.

Here, Defendants Cassidy, Nordlicht, and O'Connor are alleged to have made off with nearly $29 million in the NYMEX sale, and shortly thereafter, news of the BMO fraud was disclosed, Optionable's share price plummeted, and NYMEX eventually wrote off over 90% of their payment as a loss. ¶¶47, 51. Thus, O'Connor's premature and baseless plea that this was a "manifestly legitimate business decision" should be rejected. Defendants are alleged to have possessed material information, traded without disclosing, and made substantial profits. They violated the basic tenet embodied within the "disclose or abstain" rule and they cannot now make retroactive excuses to deflect liability.

Fourth, the Complaint alleges that Defendants sold their shares of common stock "contemporaneously" with Plaintiff Boyer's purchases of common stock on or about April 10, 2007. ¶93. This is sufficient under the pleading rules to state a claim for purposes of Section

20A. *In re Microstrategy, Inc. Sec. Litig.*, 115 F.Supp. 2d 620, 663-64 (E.D. Va. 2000) (finding an allegation that plaintiff traded "contemporaneously" on the same day as defendant was sufficient for a Section 20A claim); *Copland v. Grumet*, 88 F.Supp. 2d 326, 338 (D.N.J. 1999).

Defendants contend that there is no standing for Plaintiffs to sue because of a lack of contemporaneous trading. Nordlicht Br. at 23-25; Cassidy Br. at 28; O'Connor Br. at 27-28. As an initial matter, the contemporaneousness requirement was developed to recognize the fact that in an open market, it is virtually impossible to identify those with whom a party is in direct privity. *In re Microstrategy*, 115 F.Supp. 2d at 662; *see also, Fujisawa Pharmaceuticals Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1337 (7th Cir. 1997) (declining to extend Section 20A liability to a party in privity with the insider); *Combs v. Case*, 2007 U.S. Dist. LEXIS 95604, *32-*33 (D. Haw. Sep. 20, 2007) (same). Section 20A thus ensures that "where contractual privity would otherwise be impractical if not impossible to show, there nonetheless was a sufficiently close temporal relationship between the trades that the investor's interests were implicated by trades made by the insider while in possession of material, nonpublic information." *Id; see generally,* Veronica M. Dougherty, *A Dissemblance of Privity: Criticizing the Contemporaneous Trader Requirement in Insider Trading*, 24 Del. J. Corp. L. 83 (1999). The *temporal limitation* limits the potential pool of plaintiffs and prevents the proliferation of lawsuits against an insider, who could otherwise be made "liable to all the world." *Wilson*, 648 F.2d at 94 (holding that plaintiff's purchase of sales one month after the insider's sales was not contemporaneous).

In other words, the contemporaneousness requirement serves as a guarantee that only plaintiffs who are actually harmed can recover. This implicitly recognizes that the further out in time from a disclosure, the better the opportunity for the market to absorb the insider sales, and thereby render impotent the effect of a harm upon a plaintiff as time goes by. *In re*

*Microstrategy*, 115 F.Supp. 2d at 663 n.86 (citing cases); *Buban v. O'Brien*, 1994 U.S. Dist. Lexis 8643, *11 (N.D. Cal. June 23, 1994). Once the market has fully absorbed the insider trades, presumably, the innocent stock purchaser no longer suffers the disadvantage of trading with one who had "superior access to information." *Wilson*, 648 F.2d at 94-95.

Defendants argue that the timing between their stock sale and the purchase of shares by Plaintiffs is dispositive. For example, Nordlicht contends, Br. at 24, that the sales at issue were not contemporaneous because the binding agreement between Defendants and NYMEX was inked on January 22, 2007. Nordlicht further contends that the actual transfer of shares took place on April 10, 2007. *See also* Cassidy Br. at 28; O'Connor Br. at 28. To the contrary, although the NYMEX deal was announced in January 2007, it was not until April 2007 that the deal was consummated and the sale, for purposes of Section 20A liability, occurred. Title, right, or interest to the shares could not be said to have passed until they were formally transferred. As a result, Defendants' sale occurred on April 10, 2007, one of the very days that Plaintiff Boyer bought Optionable shares. ¶93; Exh. A to Complaint; *see also Middlesex Retirement Sys. v. Quest Software, Inc.*, 527 F.Supp. 2d 1164, 1196 (C.D. Cal. 2007) (following Second Circuit precedent regarding the time requirement and noting that the "more persuasive rule" is that standing can be maintained on behalf of those who purchased stock on an exchange during the period when defendants sold their stock on the basis of inside information); *In re Federal National Mortgage Ass'n Sec.Litig.*, 503 F.Supp. 2d 25, 46-48 (D.D.C. 2007) (analyzing cases).

Contrary to Defendants' view, in addition, there is no authority to support the notion of zero liability because their sale of stock took place in a private contractual setting. Nordlicht Br. at 23-24; Cassidy Br. at 28; O'Connor Br. at 27-28. In *Fujisawa*, Fujisawa purchased shares of Lymphomed, Inc. directly from that company's largest shareholder, which then merged with

Lymphomed. After the merger, Fujisawa sued the seller, claiming that material inside information was withheld, causing Fujisawa to pay more than the actual value of the shares. After affirming summary judgment on statute of limitations grounds, the Seventh Circuit noted that Section 20A did not extend to face-to-face transactions. "[T]he purpose of Section 20A was to extend the protections of the existing insider trader prohibition to persons not in privity with the insider[.]" 115 F.3d at 1337. In other words, by imposing a contemporaneous trading requirement, Congress meant to protect those who purchased stock anonymously on the stock market –*e.g.*, Plaintiff Boyer and the Class members who made contemporaneous purchases. The reasoning in *Fujisawa* applies to the situation here. Plaintiff Boyer purchased his shares on the open market, anonymously, not knowing the identity of the parties from whom he purchased.

There is no question of lack of privity in this case for purposes of alleging a Section 20A claim. A plain reading of the statute supports the view that the contemporaneous trading requirement is strictly temporal in scope and not spatial (*i.e.*, there is no requirement as to specific mode or location of trade). Congress certainly could have included both a spatial and temporal limitation, but it chose only to include the latter. *See Neubronner v. Milken*, 6 F.3d 666, 670 n.5 (9th Cir. 1993) (noting that Congress never defined the term "contemporaneous", but it intended to adopt the definition as developed in case law, *i.e.*, of a temporal limitation; also recognizing that contemporaneity deals with "how far apart *in time* trades may be") (emphasis added).

Whether the affect is generated by a private sale or public transfer is immaterial. In *Moskowitz v. Lopp*, 128 F.R.D. 624, 633-35 (E.D. Pa. 1989), for example, the court held that there was standing for traders of common stock against insiders who traded in stock options because the two markets were sufficiently related. The court concluded that trading in options

affected the price of the underlying stock as well. Much like in this case, withholding information that could have affected the open market price was of paramount concern to Defendants. "[A] trader with inside information is able to exert an unfair advantage over other traders in the same market; even if other traders do not purchase directly from him, they are nonetheless adversely affected by the insider's trading." *See generally, Clay v. Riverwood Int'l. Corp.*, 157 F.3d 1259, 1271 (Carnes, J., concurring), *aff'd on rehearing, vacating portions of prior opinion*, 176 F.3d 1381 (11th Cir. 1999) (per curiam). Defendants' suggestion that they should be able to hide their misdeeds through the cloak of a private transaction strains credulity.

Cassidy also contends that the Complaint fails to make an allegation of a sale of a single share into the open market by him. Cassidy Br. at 28. As noted *supra*, the shares sold by Defendants and the shares purchased by Plaintiffs were all of the same class – common stock. Cassidy exercised options to increase his position and purchase 55,000 more shares of Optionable on May 7, 2007. Cassidy Br. at 28-29 (conceding May 7, 2007 purchase of 50,000 shares; *see also,* Miller Decl., Exhibit B (Optionable's Form 4 filed with the SEC on May 9, 2007).

On May 7, 2007, Boyer bought 500 shares, paying the same price as Cassidy. Based on the purchases by Cassidy and Plaintiff Boyer on May 7, 2007 alone, a valid Section 20A claim is stated. ¶¶4, 92-95. Boyer and Cassidy clearly traded on the same market, at a time when Cassidy was privy to material, inside information. These allegations themselves, without the shares Cassidy sold to NYMEX, state a classic Section 20A claim.

In a concessionary turn, Cassidy also makes a premature fact-based argument that, in the event that the Section 20A claim is valid, the damages authorized by Section 20A(b)(1), 15 U.S.C. §78t-1(b), cannot exceed profit gained or loss avoided. Cassidy Br. at 29. The amount of

Section 20A damages recoverable is not ripe for review at this stage of the proceedings. *In re Microstrategy*, 115 F.Supp. 2d at 665-66 (noting that because the damages calculation necessarily considers a "reasonable time" after the dissemination of the insider information, this transforms the inquiry into a fact-intensive inquiry "typically unsuitable for threshold disposition.").

Lastly, there is also no serious challenge as to the fifth requirement because the shares sold by Defendants and purchased by Boyer were all Optionable common stock, *i.e.*, the same class. *See generally, Clay v. Riverwood Int'l. Corp.*, 157 F.3d at 1270; *Moskowitz v. Lopp*, 128 F.R.D. at 633-35 (holding that stock options and common stock were sufficiently related as to be a similar class). The putative manner of trade (private versus public), as contended by Nordlicht, Br. at 23-24, is irrelevant as the stock traded was all of the same class. This makes sense because insider trades would affect the prices of only the types of stock traded contemporaneously.

Defendants effectively obtained an insurance policy for themselves based on withholding material information and continuing to make materially false and misleading statements throughout the Class Period and omitting to disclose the true adverse facts. Defendants profited by nearly $29 million by withholding material information from the market long enough to lock in these profits, and as the write down of over 90% of the purchase by NYMEX on August 14, 2007 confirms, ¶51, Defendants avoided staggering losses to themselves through this scheme while Plaintiff Boyer suffered damages. Boyer's Section 20A claims are adequately pleaded.

III.    **Plaintiffs Have Adequately Alleged False and Misleading Statements and Omissions by Defendants O'Connor and Boisseau**

Defendant Boisseau questions the materiality of Defendant Cassidy's undisclosed felony fraud convictions, wrongly arguing that the Defendants were not required to reveal the convictions under the Sarbanes-Oxley Act ("SOX") or SEC Regulations, and questioning how

the convictions were related to Optionable's business or Cassidy's role with the Company. Br. at 17-18. Under Section 10(b) and SEC Regulation 12b, Cassidy's fraud convictions were required to be disclosed if they were material in light of the information already disclosed to investors. *Demaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).

To determine materiality, the inquiry is whether reasonable investors would have viewed the omitted information as significantly altering the "'total mix' of information made available.'" *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976). In the Second Circuit, a complaint may not be properly dismissed on a 12(b)(6) motion "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co*., 228 F.3d 154, 162 (2d Cir. 2000) (citations omitted). It seems hardly debatable whether an investor would find the Chief Executive's prior fraud convictions significant to his role with the Company and to their investment decisions. *See, e.g., SEC v. Technical Resources,* 1977 U.S. Dist. LEXIS 12229, *12-*13 (December, 22 1977) (finding that the conviction of the secretary and counsel to the company of a federal offense in connection with misappropriation funds held in a trust for disabled veterans would be material to an investment decision); *Nanopierce Techs., Inc. v. Southridge Capital Mgt., LLC*, 2003 U.S. Dist. LEXIS 11108, *11-*13 (SD.N.Y. June 30, 2003) (collecting cases).

Importantly, the issue of materiality is not relevant to the disclosures that Defendants were required to make under SOX. Boisseau argues, with no legal support or reasoning, that because the Company met the SEC's disclosure requirements under Item 401 (which, even if true, is irrelevant, as the Company failed to meet the SEC's disclosure requirements under Regulation 12B), "it also met its obligations under Section 302 of Sarbanes-Oxley." Boisseau Br.

at 18. These two provisions are unrelated, and satisfying one SEC regulation, or even all, does not mean that the Company has met the obligations under SOX. Section 302(a)(5)(A) of SOX requires a certification that signing officers of the Company have disclosed to the company's auditors and audit committee "**any fraud, whether or not material**, that involves management…." 15 U.S.C. §7241. (Defendant Boisseau conveniently omits the "whether or not material" portion of the law; Br. at 17). Therefore, Boisseau's argument fails.

## IV.    Plaintiffs Have Adequately Alleged Scienter of O'Connor and Boisseau

Plaintiffs have addressed the scienter arguments raised by the Company and the other individuals (and the appropriate legal standards) at Co. Opp. at 11-26 and Opp. to NCH at 2-16, which Plaintiffs incorporate herein, as if repeated *in extenso*. The arguments contained therein apply with equal force to Defendant O'Connor and Defendant Boisseau.

With respect to O'Connor, the Complaint alleges that O'Connor was President and a board member of the Company during the Class Period ¶6(c). O'Connor personally profited to the tune of $4,986,953 through the sale of over 1.8 million of his shares to NYMEX on April 10, 2007. Two weeks later, BMO announced hundreds of millions of dollars in losses tied to mismarked trades, and the scheme unraveled, rendering the shares near worthless by the end of the Class Period. ¶¶34, 46, 47. The timing of the insider sales is highly unusual and suspect, occurring just before Optionable's mispriced trades became public. ¶¶34, 47. As alleged in the Complaint, the fact that NYMEX was forced to write off $26 million of the nearly $29 million that it paid to Defendants O'Connor, Cassidy, and Nordlicht for Optionable shares, just four months after the purchase, strongly supports Defendants' scienter, particularly that of O'Connor, Cassidy, and Nordlicht.[8] ¶51.

---

[8] Defendants' lockstep assertion that the stock sales in question are unassailable because they were sold below market price and for the benefit of the Company is unconvincing in light of the fact that these sales simply could not

In addition, O'Connor is alleged to have had additional close ties to convicted felon O'Connor and to Bob Moore, one of the two BMO traders suspended in the wake of the mispricing scandal. O'Connor owned Capital Energy – where BMO trader Bob Moore's son was a summer intern – with Defendant Cassidy, who had an undisclosed background of felony fraud convictions. ¶7. O'Connor also owned, with Defendant Cassidy, Sleepy Hollow Coffee Roasters which is currently under investigation by the SEC for its questionable relationship with Optionable. ¶50.

Of course, both Boisseau and O'Connor had duties, as officers of the Company, to do due diligence and be aware of what was happening at their own companies. The Supreme Court has recognized that "directors usually have knowledge and expertness far exceeding the normal investor's resources[.]" *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091 (1991). Certainly, this pronouncement applies with even greater force to corporate officers, particularly Presidents and CFO's like O'Connor and Boisseau.[9]

The Complaint alleges that on April 27, 2007, BMO announced that it had sustained between C$350 million and C$450 million in trading losses (which would later be increased to C$680 million) stemming from natural gas options trades effected through Optionable. ¶¶34, 48. There had been a wide discrepancy in terms of pricing between the values marked in BMO's portfolio of natural gas options and their actual market value. ¶¶7, 43. It was learned that the Company mismarked options prices provided to BMO, making the BMO book of trades grossly

---

have been accomplished in such high volumes on the open market and the sales were made literally days before Optionable's mispriced trades became public. ¶47. By May 14, 2007, the stock was trading at just $0.425. Defendants Cassidy, O'Connor, and Nordlicht handily made nearly $30 million dollars just before their shares would have been decimated had they continued to hold.

[9] Cases cited by Boisseau for the proposition that he should not be deemed to have scienter as a result of a signature on a 10-K, *e.g.*, *In re Worldcom*, 294 F.Supp 2d 392 (S.D.N.Y. 2003), *In re Criimi Sec. Litig.*, 94 F.Supp. 2d 652 (D.Md. 2000), and *In re Cendant Corp. Sec. Litig.*, 76 F.Supp. 2d 539 (D.N.J. 1999), do not protect him in light of the allegations at bar and, in any event, are no longer persuasive on this issue in light of the enactment of the Sarbanes Oxley Act of 2002, designed to address the very loophole that Boisseau seeks to slip into. As discussed below, Boisseau signed the SOX certification for the Company's 10-K during the Class Period.

inaccurate. ¶43. BMO announced, on May 8, 2007, that it would terminate its relationship with Optionable. ¶39. These allegations render Defendants' lagniappe argument that BMO's losses were a result of "market changes" a baseless and uncompelling counter-inference. *See, for example,* O'Connor Br. at 20. It was BMO that pointed a finger at Optionable, severing ties with Optionable on May 8, 2007. ¶39. BMO stated that it would change the operating structure to provide more oversight and placed the two traders who had close ties with Optionable on leave. ¶39. When BMO terminated its relationship with the Company, Optionable lost up to 86% of its revenue. ¶36.

Optionable's largest client and main source of revenue had to take a loss of C$680 million because of Optionable's alleged fraudulent accounting practices and intentional misreporting. ¶48. Plaintiffs further allege payments were made by the Company to BMO trader David Lee and his sister. ¶7. Defendants consistently failed to disclose in public filings, press releases, and conference calls, that the Company drastically understated the total percentage of revenue generated from its dealings with its largest client, BMO. Defendants thereby discounted Optionable's near-total dependence on BMO, which accounted for more than 80% of the Company's overall revenue.

Boisseau, as a Chief Financial Officer, knew or should have known about the effect that BMO had on the Company's revenue. It strains credulity to argue that the impact the Company's largest client had on Optionable's bottom line was not known to Boisseau, the CFO, and that the financial shenanigans, including the massive mispricing of options for the Company's largest client to conceal losses, alleged in the Complaint were not known to him. At minimum, the Complaint alleges reckless disregard as to Boisseau. *See*, *e.g.*, *In re Tel-Save Sec. Litig.,* 1999 U.S. Dist. LEXIS 16800, *14 (E.D. Pa. Oct. 19, 1999) (attributing to CEO/director-defendant

knowledge of misstatements made in connection with major transactions); *In re Aetna Inc. Sec. Litig.,* 34 F.Supp. 2d 935, 953 (E.D. Pa. 1999) (attributing knowledge of misstatements concerning merger valued at $8.9 million to defendants occupying the "top corporate positions" based on the size of the transaction combined with the positions held by the defendants and the degree of the operational problems alleged); *In re Ancor Communs.,* 22 F.Supp. 2d 999, 1004 (D. Minn.1998) (charging individual defendants-President/CEO/Director, VP/CFO, and co-founder/Chairman of the Board of Directors-with knowledge of fundamental problems regarding "undeniably the most significant contract in [the company's] history").

On May 1, 2007, Boisseau participated in a conference call with financial analysts and investors. ¶27. Boisseau stated that BMO – Optionable's largest customer -- accounted for just 30% of revenues. ¶27. He also falsely represented that there were enough market participants to enter the trade. ¶27. There were not. In fact, after the Company lost BMO as a client, quarterly net revenues dropped to $64,000 in 3Q:07, a drop of 99% from the $9.1 million in revenue reported during 1Q:07. ¶31. "[T]he fact that a particular matter constitutes a significant source of income to a company can establish a strong inference that the company and its relevant officers knew of easily discoverable additional facts that directly affected that source of income." *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998); *see also, In re JP Morgan Chase Sec. Litig.*, 363 F.Supp. 2d 595, 628 (S.D.N.Y. 2005) (citing *Epstein*).

In addition, at least one court has acknowledged, "there are inherent problems with having one very large customer which the reasonable investor can be expected to understand." *In re Boston Technology, Inc. Sec. Litig.*, 8 F.Supp 2d 43, 60 n.20 (D. Mass 1998) (finding that the company reported the actual percentage of sales gleaned from a customer, unlike the instant case where Defendants sought to keep investors in the dark). In short, allegations of problems with

that single client, the company contributing virtually all of the revenue to Optionable, would have a "huge net effect in error as to the company's overall figures and is the type of information peculiarly within the defendants' control." *In re Computer Associates Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999).

In addition to other indicia of fraud which the Complaint alleges, Defendants failed to maintain meaningful internal controls during the class period and their financial reports suffered from numerous GAAP and SEC violations. "[A]lleged accounting violations are relevant in assessing scienter." *Schlagal v. Learning Tree Int'l.*, 1998 U.S. Dist. LEXIS 20306, *51 n.13 (C.D. Cal. Dec. 23, 1998). ¶53; ¶¶56-59.[10]

Defendant Boisseau argues that his title as CFO is insufficient to impose liability for signing a false and misleading SOX certification and that he cannot be held accountable for this violation, despite his obligations to the investing public. The argument that Defendant Boisseau makes is the key impetus for SOX. SOX was designed to create greater accountability for CEOs and CFOs who in the past, could at times evade fraud by simply claiming they did not know what was happening in their own companies. Such is not the case anymore. When signing the SOX certification, Boisseau either 1) knew that the 10-K was false and misleading or 2) was reckless in signing the certification without performing adequate due diligence.

As required by SOX, Defendant Boisseau (along with Defendant Cassidy, who also signed the materially false and misleading Sarbanes-Oxley certifications), certified that he

---

[10] Defendants also failed to disclose that OPEX's contribution to the Company's revenue "mix" would be diluted because BMO's contribution to Optionable's revenue was greater than the revenue publicly reported. ¶60. The Complaint further alleges that OPEX was neither viable nor transparent, as it masked the true stream of revenue that was generated by a sale. "[F]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers". *Epstein v. Itron, Inc.*, 993 F. Supp. at 1326 (noting also that "[i]f it is true, as Plaintiff alleges that Itron's core product is technologically incapable of meeting requirements that are central to Itron's continued survival as a business entity, it can be strongly inferred that key officers…had knowledge of this fact."). *Epstein* held that knowledge alone of a technological incompatibility supported a strong inference of scienter. *Id.*

"reviewed the report [the 2006 10-K]" and that "based on [his] knowledge," "the report does not contain any untrue statement of a material fact or omit to state a material fact" and "the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer." 15 U.S.C. §7241; ¶¶23-24. A key component of this certification is that Defendants Cassidy and Boisseau certified the veracity of the 10-K "based on their knowledge" and *after a review.*

Accordingly, Defendant Boisseau's claim that he did not know of the omitted and false and misleading material information included in the 10-K is unavailing, as he had an obligation to be informed about the Company of which he was CFO. 15 U.S.C. §7241; *see also Rombach v. Chang,* 355 F.3d 164, 176 (2d Cir. 2004)(scienter shown by either conscious misbehavior **or** recklessness). Knowledge is imputed to an officer if he should have known such information in the performance of his duties as an executive. *ClearOne Communications, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 494 F.3d 1238, 1249 (10th Cir. 2007) ("The corporate officer is chargeable with the knowledge he or she should have had in the discharge of his or her duties. Furthermore, under the Sarbanes-Oxley Act, the signing officer of a corporate 10-K is required to certify the accuracy of the corporation's financial statements and requires the officer to design internal controls to ensure that material information relating to the corporation is made known to such officer by others within the corporation.") (internal quotations omitted) (citing 2 Fletcher Cyc. Corp. §465; 15 U.S.C. §7241(a)(1)-(4)). At the very least, Defendant Boisseau, as the Company's CFO, was under an obligation to exercise due diligence and be aware of the financial condition of the Company, including the Company's unreported reliance on BMO as its primary – if not sole – supporting customer, and the vast percentage of revenues contributed by BMO – all of which was unreported or grossly misrepresented to investors.

Arguments similar to Boisseau's, that allegations against him related to his position as CFO and signature on the false and misleading Sarbanes-Oxley certifications are "boilerplate," Boisseau Br. at 18, have been rejected by federal courts:

> "[The Sarbanes-Oxley Act] was adopted in response to the unprecedented accounting frauds … that had been perpetrated in the wake of the adoption of the PSLRA." Plaintiffs argue that the Sarbanes-Oxley certification requirements were expressly intended to prevent top executives from using a "head in the sand" defense to actions for securities fraud committed on their watch, citing to a statement by the SEC, warning corporate officers that a "false certification potentially could be subject to … both Commission and private actions for violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5." Sec. Act Release No. 8124, Pt. II.B.6 (August 29, 2002), 2002 WL 31720215.

*In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 742-743 (E.D. Mich. 2007)(quoting and adopting the language in *In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 262, 2006 WL 538756, *17-18 (D. Or. Jan. 3, 2006) because the court agreed with *Lattice* that SOX certifications give rise to an inference of scienter because they provide evidence either of knowledge of the falsity of the filing or, alternatively, knowledge the controls attested to in the certification were inadequate); *see also*, *Bechtel v. Competitive Techs., Inc.*, 448 F.3d 469, 484 (2d Cir. 2006) (Staub, J., dissenting) ("Congress enacted the Sarbanes-Oxley Act of 2002 ("Act") in response to an acute crisis: Revelations of mass corporate fraud, most vividly in connection with the Enron Corporation, threatened to destroy investors' faith in the American financial markets and, in so doing, to jeopardize those markets and the American economy. **Congress recognized that the problem was an intractable one, and that a number of strong enforcement tools would be necessary-from new regulations and reporting requirements, to expanded oversight, to new criminal provisions."**) (emphasis added).

Defendant Boisseau's contention that he can avoid liability because he was not aware of Cassidy's prior convictions not only ignores the applicable scienter standard of recklessness in

this Circuit, but also ignores the undeniable fact that he certified that he and the other Individual Defendants "are responsible for establishing and maintaining internal controls" and that they "have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities…" and have evaluated the effectiveness of these controls within 90 days prior to the report. 15 U.S.C. §7241.

If such internal controls existed, as Defendant Boisseau certified in the Company's 2006 10-K, he would have certainly been aware of Defendant Cassidy's criminal background – as it was required to be disclosed the auditors. If Defendant Boisseau was truly unaware of Cassidy's convictions, in which case such controls did not exist or were ineffective, this too makes the certification materially false and misleading. (Moreover, as discussed in detail in the prior Oppositions, Defendants' SOX Certifications and 10-K statements regarding internal controls were also false and misleading because, if such internal controls were truly in place, the Individual Defendants and the Company would not have been able to complete their scheme to defraud investors by paying kickbacks to BMO traders and mispricing BMO's book of trades and drastically understating its dependence on and revenue from BMO). Defendant Boisseau's ignorance defense fails.

In accordance with *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499 (2007), Plaintiffs have adequately alleged scienter as to Defendants O'Connor and Boisseau.

## CONCLUSION

For the foregoing reasons, and the reasons addressed in the earlier opposition briefs filed by Plaintiffs, Defendants' motions to dismiss should be denied in full.

Dated: April 4, 2008                                     Respectfully Submitted,

KAHN GAUTHIER SWICK, LLC

/s/ Kim E. Miller

Michael A. Swick (MS-9970)
Kim E. Miller (KM-9669)
12 East 41st Street, 12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

-and-

KAHN GAUTHIER SWICK, LLC
Lewis S. Kahn
650 Poydras St., Suite 2150
New Orleans, Louisiana 70130
Telephone (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiffs and the Class*

<u>**CERTIFICATE OF SERVICE**</u>

 I hereby certify that this Memorandum was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on April 4, 2008.


<u>/s/ Kim E. Miller</u>