## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re**<br><br>**OPTIONABLE, INC. SECURITIES LITIGATION** | **No. 07-cv-3753 (LAK)** |

---

### JOINT REPLY MEMORANDUM OF LAW OF DEFENDANTS MARK NORDLICHT, KEVIN CASSIDY, EDWARD J. O'CONNOR, ALBERT HELMIG AND MARC-ANDRE BOISSEAU IN FURTHER SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

---

CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
Eliot Lauer
Daniel R. Marcus
101 Park Avenue
New York, New York 10178-0061
T:  (212) 696-6192

*Attorneys for Defendant Mark Nordlicht*

MCCORMICK & O'BRIEN, LLP
Liam O'Brien
42 West 38th Street, Suite 701
New York, New York 10018
T:  (212) 286-4471

*Attorneys for Defendant Edward O'Connor*

EDWARDS ANGELL PALMER & DODGE LLP
Paul E. Dans
750 Lexington Avenue
New York, NY 10022-1200
T: (212) 912-2736

John L. Reed
Michael J. Maimone
919 North Market Street, 15th Floor
Wilmington, DE 19801
T: (302) 425-7114

*Attorneys for Defendant Marc-Andre Boisseau*

LAWRENCE R. GELBER
34 Plaza Street East
Suite 1107
Brooklyn, New York 11238
T:  (718) 638-2383

*Attorneys for Defendant Kevin Cassidy*

CONNELL FOLEY LLP
Peter J. Pizzi
Christine I. Gannon
888 7th Avenue
New York, NY  10106
T:  (973) 533-4221

*Attorneys for Defendant Albert Helmig*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................. 1

LEGAL ARGUMENT ............................................................................................................ 2

   I.   The NYMEX Transaction Does Not Raise a Strong Inference
       of Scienter Against Nordlicht, Cassidy or O'Connor. ..................................................... 2

   II.  Plaintiff's Cannot Rely on the Group Pleading Doctrine .................................................. 4

   III. The Complaint Fails to Allege Scienter as to All Individual Defendants......................... 6

        a.   The CAC Lacks Colorable Scienter Allegations As To Nordlicht. .......................... 6

        b.   Allegations Supporting Scienter on the Part of Helmig Are Lacking ...................... 7

        c.   Scienter Allegations Against Cassidy Are Inadequate............................................. 7

        d.   Allegations Supporting Scienter On The Part of O'Connor Are Absent .................. 8

        e.   The CAC fails as to Boisseau..................................................................................... 9

   IV. The CAC Fails To Allege Misrepresentations In The May 1, 2007
        Conference Call Or The May 9, 2007 Press Release......................................................... 10

   V.  There Is No Colorable Section 20A Insider Trading Claim. ........................................... 12

   VI. Plaintiffs' Section 20(a) Claim Is Inadequately Pleaded................................................. 13

   VII. Facts Supporting Loss Causation Are Absent................................................................. 14

CONCLUSION...................................................................................................................... 15

## TABLE OF AUTHORITIES

**Page**

Cases

*ATSI Communications, Inc. v. Shaar Fund, LTD.*, 493 F.3d 87 (2d Cir. 2007) ........................................ 13

*Barios v. Paco Pharm. Serv., Inc.*, 816 F. Supp. 243 (S.D.N.Y. 1993) ........................................ 11

*Buban v. O'Brien*, No. C 940331, 1994 WL 324093 (N.D. Cal. June 22, 1994) ........................................ 12, 13

*Clay v. Riverwood Int'l Corp.*, 157 F.3d 1259 (1999), *aff'd* 157 F.3d 1381 ........................................ 13

*Dresner v. Utility.com*, 371 F. Supp. 2d 476 (S.D.N.Y 2005) ........................................ 5

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) ........................................ 14

*Harrison v. Rubenstein*, No. 02-Civ-9356, 2007 WL 582955 (S.D.N.Y Feb. 26, 2007) ........................................ 9

*Hirsch v. du Pont*, 553 F.2d 750 (2d Cir. 1977) ........................................ 2

*In re Alstom*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................ 5

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ........................................ 5

*In re Blech Sec. Litig.*, 928 F. Supp. 1279 (S.D.N.Y. 1996) ........................................ 1

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ........................................ 4

*In re Geopharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432 (S.D.N.Y. 2005) ........................................ 5

*In re Hunter Envtl. Servs., Inc. Sec. Litig.*, 921 F. Supp. 914 (D. Conn. 1996) ........................................ 11

*In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333 (S.D.N.Y. 2005) ........................................ 12

**TABLE OF AUTHORITIES** (Continued)

**Page**

*In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d
194 (S.D.N.Y. 1999) ................................................................. 14

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) .................................... 4

*In re Mobil Telecomm. Techs. Corp. Sec. Litig.*,
915 F. Supp. 828 (S.D. Miss. 1995) ...................................... 8

*In re NTL*, 347 F. Supp. 2d 15 (S.D.N.Y. 2007) ........................... 12

*In re Openwave Sys. Sec. Litig.*, 528 F.
Supp. 2d 236 (S.D.N.Y. 2007) ............................................... 12

*In re Oxford Health Plans, Inc.*, 187 F.R.D.
133 (S.D.N.Y. 1999) ........................................................... 12, 13

*In re Sierra Wireless, Inc. Sec. Litig.*, 482 F.
Supp. 2d 365 (S.D.N.Y. 2007) ............................................ 3, 12

*Lentell v. Merrill Lynch & Co.*, 396 F.3d
161 (2d Cir. 2005) .................................................................. 14

*Moskowitz v. Lopp*, 128 F.R.D. 624 (E.D. Pa. 1989) ................... 12

*New York Mercantile Exch., Inc. v. Intercontinental
Exch., Inc.*, 497 F.3d 109 (2d Cir. 2007), *aff'g* 389 F.
Supp. 2d 527 (S.D.N.Y. 2005) ............................................ 9, 11

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ......................... 7

*Scone Investments, L.P. v. American Third Market
Corp.*, No. 97-Civ-3802, 1998 WL 205338
(S.D.N.Y. Apr. 28, 1998) ........................................................ 1

*SEC v. First Jersey Secs. Inc.*, 101 F.3d
1450 (2d Cir. 1996) ......................................................... 7, 13, 14

*Silva Run Worldwide Ltd. v. Gaming Lottery
Corp.*, No. 96-Civ-3231, 1998 WL
167330 (S.D.N.Y. Apr. 8, 1998) ........................................... 14

*Southwick Clothing, LLC v. GFT (USA) Corp.*, No.
99-Civ-10452, 2004 WL 2914093 (S.D.N.Y.
Dec. 15, 2004) ...................................................................... 4, 9

**TABLE OF AUTHORITIES** (Continued)

**Page**

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ........................................................................................................... 15

*Sulzer v. Associated Madison Cos., Inc.*, No. 84-576-Civ-342, 1985 WL 5856 (M.D. Fla. May 10, 1985) ........................................................................................... 8

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 127 S. Ct. 2499 (2007) ..................................................................................... 1, 8

*Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88 (2d Cir. 1981) ................................................................................ 12, 13

Statutes

*Private Securities Litigation Reform Act of 1995*, 15 U.S.C. § 78u-4(b)(2) ................................. 12

Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(b) ......................................................................................................... 12, 13

Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) ............................................................................................................ 13, 14

Securities Exchange Act of 1934, 15 U.S.C. § 78t-1 ............................................................................................................. 12, 13

17 CFR § 240.10b-5 ..................................................................................... 12, 13

17 CFR § 229.401(a)(f) ................................................................................. 7, 10

17 CFR § 228.401(a)(d) ................................................................................ 7, 10

Other Authorities

*Securities Law Handbook*, 2 Sec. Law Handbook § 29:55.20 ............................................................................................ 4

Rules

Fed.R.Civ.P. 12(b)(6) ........................................................................................ 14

Fed.R.Civ.P. 9(b) ........................................................................................... 1, 4

NASDAQ Marketplace Rule 4200 ......................................................................... 7

Defendants Mark Nordlicht ("Nordlicht"), Kevin Cassidy ("Cassidy"), Edward J. O'Connor ("O'Connor"), Albert Helmig ("Helmig"), and Marc-Andre Boisseau ("Boisseau") (collectively "defendants"), jointly submit this reply memorandum in further support of their respective motions to dismiss.

## PRELIMINARY STATEMENT

Plaintiffs' opposition briefs[1] fail to adequately address defendants' arguments requiring dismissal. Rule 9(b) is not satisfied by a complaint "in which defendants are clumped together in vague allegations."[2] *In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996).  When a fraud is alleged against multiple defendants, as here, "[c]ourts are especially vigilant in applying Rule 9(b)."  *Scone Investments, L.P. v. American Third Market Corp.*, No. 97-Civ-3802, 1998 WL 205338, *4 (S.D.N.Y. Apr. 28, 1998). The Consolidated Amended Class Action Complaint ("Complaint" or "CAC") asserts the existence of a "scheme" without alleging particularized facts and then concludes – again, without setting forth any specific actions or adverse economic effects – that defendants acted to further that scheme.  Plaintiffs' case is not derived from an independent investigation of facts, but rather from unsubstantiated press reports, emotionally charged but inadequate allegations, mischaracterizations of the sequence of events, and logically implausible inferences.  Plaintiffs have failed to plead fraud with particularity and, thus, all of the claims should be dismissed.

---

[1] Plaintiffs' opposition to Optionable's motion to dismiss is referred to as "PB1," their opposition to the motions of Nordlicht, Cassidy and Helmig is referred to as "PB2," and their opposition to O'Connor and Boisseau's motions is referred to as "PB3."

[2]  A pleading must allege particularized facts in support of its conclusions. *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 127 S. Ct. 2499, 2509-10 (2007).  Plaintiffs' suggestion that *Tellabs* should be read to allow the aggregation of conclusory allegations (PB2 at 2-4) is not defensible.  *See* Optionable Reply at 9.

**LEGAL ARGUMENT**

**I.      The NYMEX Transaction Does Not Raise a Strong Inference of Scienter Against Nordlicht, Cassidy or O'Connor.**

Despite plaintiffs' protestations, the timing of certain defendants' private stock sale to NYMEX was neither "unusual" nor "suspicious," as Optionable's Reply at 8 shows.   If Nordlicht, Cassidy and O'Connor had intended to defraud the market by inflating the price of the stock and then "dumping" it, they would not have sold at a discount from the prevailing price and would have taken advantage of the increases in the share price during the putative class period.  Thus, the circumstances of the sale negate any inference of scienter.

The structure of the NYMEX transaction also distinguishes it from cases where scienter is inferred from sales by insiders.  The typical case involves an insider selling in the open market at the prevailing price. Here, the three founding shareholders privately sold to a highly sophisticated purchaser which had full opportunity to perform due diligence (after agreeing on the price).  A person wrongfully intending to "dump" inflated stock would not give the purchaser three months to conduct due diligence particularly when that purchaser operates in the same industry and would become a joint-venture partner as a result of the transaction.  *See Hirsch v. du Pont*, 553 F.2d 750, 763 (2d Cir. 1977) ("[S]ecurities laws were not enacted to protect sophisticated businessmen from their own errors of judgment. Such investors must, if they wish to recover under federal law, investigate the information available to them with the care and prudence expected from people blessed with full access to information."). In fact, NYMEX had an opportunity to (i) perform due diligence; (ii) negotiate a price per share; and (iii) then lower that price by agreeing to assume various non-monetary obligations intended to benefit

Optionable and all its shareholders, including plaintiffs.[3] The founding shareholders relinquished personal monetary gain in exchange for increased value to the company, effectively demonstrating the antithesis of intent to defraud shareholders.

Plaintiffs' conclusory allegation that Cassidy's statements in connection with the January 22, 2007 announcement failed to disclose a scheme to misprice options to help BMO traders conceal their losses, CAC ¶ 10, is unsourced and inherently implausible. Plaintiffs allege no specific facts to support the notion that the individual defendants, or anyone outside BMO, knew in January 2007 that BMO's commodities portfolio showed an undisclosed loss.

Plaintiffs make the irrelevant allegation that Jules Nordlicht, Mark Nordlicht's father, who is not alleged to have owned any Optionable shares during the class period, was somehow "influential in convincing NYMEX" to go forward with the purchase of Optionable's shares. This assertion is based solely on the purported "confidential witness," described as "an analyst who followed Optionable during the Class Period." CAC at n.1. Plaintiffs fail to allege any facts indicating that the purported "confidential witness" was in any position to know about NYMEX's decision-making process, rendering this source wholly inadequate. *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (in securities fraud cases plaintiff must provide sufficient information for court to assess whether confidential source was in position to know what was ascribed to her).

Plaintiffs suggest impropriety by exaggerating even their own allegations regarding a

---

[3]  See Optionable Form 8-K filed January 22, 2007, page 1 of 6, attached as Exhibit 1 to the Supplemental Affirmation of Lawrence R. Gelber (stating that "closing of the transactions contemplated by the Term Sheet [was] subject to . . . [NYMEX] being satisfied, in its sole and reasonable discretion, with its legal, accounting, regulatory, business and other due diligence investigation" to be completed prior to the execution of the "Definitive Agreements" and that consideration to be exchanged also included joint marketing and cobranding activities, hosting of Optionable servers and assistance in joint technology development).

connection between Jules Nordlicht and NYMEX, ostensibly to support an unsubstantiated assertion that he somehow caused NYMEX to enter into the transaction with Optionable.  PB2 at 7-8; CAC n.1.  The CAC alleges no facts to support plaintiffs' absurd conclusion that Jules Nordlicht's "influence" (owning less than 1% of NYMEX, a company with 92 million shares outstanding) was the "key reason" the NYMEX transaction went forward, though they improperly introduce that wild accusation for the first time in their opposition brief.  *See, e.g., Southwick Clothing, LLC v. GFT (USA) Corp.*, No. 99-Civ-10452, 2004 WL 2914093 at *6-7 (S.D.N.Y. Dec. 15, 2004) ("a complaint cannot be amended merely by raising new facts and theories in plaintiff's opposition papers, and hence such new allegations and claims should not be considered").  These irrelevant allegations cannot save the Complaint from its inadequacies and should be ignored.

## II.    Plaintiffs Cannot Rely on the Group Pleading Doctrine.

Plaintiffs' opposition invokes the group pleading doctrine to overcome the lack of particularized allegations of misstatements by individual defendants.  That doctrine does not apply. The group pleading doctrine can only be invoked as to corporate publications such as registration statements, annual reports, press releases and other "group published information" which are presumed to have resulted from the collective action of individuals involved in the day-to-day affairs, typically senior executives. *Securities Law Handbook*, 2 Sec. Law Handbook § 29:55.20.  Rule 9(b), Fed.R.Civ.P., still must be satisfied.  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381-82 (S.D.N.Y. 2004) ("even under group pleading doctrine, Plaintiff must allege with particularity that a defendant was an insider or affiliate who knew the group published statements were false at the time they were issued"); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 479-80 (S.D.N.Y. 2006) (plaintiff may only invoke the

group pleading doctrine if it "has alleged facts indicating that the defendant was a corporate insider or affiliate with direct involvement in the daily affairs of the company").

Because the CAC fails to particularize the deficiencies in Optionable's "group published information," the doctrine cannot salvage the CAC.  *Id*.  Also, the CAC fails to allege that certain individual defendants, including Nordlicht (a non-executive board member who was never employed by Optionable) and Helmig, were involved in the day-to-day affairs of the corporation when the allegedly deficient publications were prepared, rendering the group pleading doctrine inapplicable as to them.  Aside from signing the 2006 10-KSB, there are no allegations that Nordlicht played a role in preparing or making any statements or that he knew that any statements made by Optionable were false.  Similarly, Helmig, for all but one business day of the class period, was a non-executive board member.[4]

Even the cases that plaintiffs cite – *BISYS* and *Alstom* – show that the doctrine cannot apply to those defendants who did not have "direct involvement in the everyday business of the company." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005); *In re Alstom*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) ("Complaint must allege that the statements were made at a time when the particular defendant held a high level position indicating that he was an insider, with direct involvement in day-to-day affairs"); *see also Dresner v. Utility.com*, 371 F. Supp. 2d 476, 494-495 & n. 9 (S.D.N.Y 2005) (co-founder and chair of company's board not insider for purpose of group pleading doctrine); *In re Geopharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 445 (S.D.N.Y. 2005) (dismissing claims because of absence of specific allegations that board chairman played role in preparing the press release at issue or in day-to-day operations).

---

[4] Helmig only took on an executive role on Friday, May 11, 2007.  *See* CAC ¶ 46.

### III.    The Complaint Fails to Allege Scienter as to All Individual Defendants.

### a.    The CAC Lacks Colorable Scienter Allegations As To Nordlicht.[5]

The CAC fails to set forth facts showing that any of the statements in the 2006 10-KSB were false and misleading.[6]    Nor do plaintiffs raise any inference – much less a strong inference – that Nordlicht or any of the other defendants acted with scienter with respect to any of those statements.    The disclosed percentage of revenue from Optionable's relationship with BMO was accurate, and the role of counterparty transactional volume and NYMEX incentive payments were fully disclosed in the 2006 10-KSB.    Optionable Reply at 4-6.    Cassidy's unrelated convictions were not a required disclosure and, even if they were, there is no loss causation as to that information, *Id*. at 6-7, nor is there any allegation that Nordlicht or others knew about Cassidy's past.

While plaintiffs conclude that OPEX was a "sham," allegedly enabling a "scheme" to misprice marks with BMO's Lee and Moore, the CAC fails to set forth how this scheme worked (e.g., how BMO's portfolio positions were marked, existing risk management controls, and the means by which such controls were supposedly evaded).    Even if facts underlying this "scheme" had been adequately alleged, there are no allegations that Nordlicht had any relationship with either Lee or Moore or played any role in Optionable's transactions with BMO, much less knew about improprieties involving BMO.    Nor are there any allegations that any defendant knew that any of the disclosures mentioned above were materially misstated.    As shown in Optionable's reply at 1-6, the allegations with respect to those items fail to state a claim.

---

[5] On certain issues, this joint reply brief contains separate passages for each individual defendant because plaintiffs' opposition briefs separately attack each defendant. To the extent applicable, however, all of the arguments in this reply support each individual defendants' motion and should be considered as such.

[6] The only public statement attributed to Nordlicht in the CAC is the 2006 10-KSB.

**b.     Allegations Supporting Scienter on the Part of Helmig Are Lacking.**

The CAC fails as to Helmig, an outside director, because it fails to allege contemporaneous knowledge by Helmig of information plaintiffs say Optionable should have disclosed, namely, that allegedly (i) an improper relationship existed with two BMO traders; (ii) improper valuations were provided by Optionable personnel to BMO; and (iii) Cassidy had past unrelated convictions.  *See* cases cited in Helmig Moving Brief at 11-12.  Plaintiffs concede Helmig may not have known about Cassidy's past problems but assert that such ignorance was reckless disregard.  PB2 at 11.  That assertion, however, is not supported by allegations in the CAC or by *any* legal authority. The charge of recklessness is illogical: the individual defendants cannot be *reckless* in not ferreting out background facts about an individual who was a consultant at the time of Optionable's Regulation S-B filing which itself (Item 401) did not require such information even for corporate officers.[7] The individual defendants cannot be held to a higher standard than called for by applicable law.

**c.     Scienter Allegations Against Cassidy Are Inadequate.**

Plaintiffs have failed to allege against Cassidy either (i) "facts to show that [Cassidy] had both motive and opportunity to commit fraud," or (ii) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004); *see also SEC v. First Jersey Secs. Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996).  Because plaintiffs are unable to allege any fact rationally supporting a "strong inference" that Cassidy had

---

[7] Plaintiffs cannot rely upon the NYMEX transaction to infer scienter on the part of Helmig because he was not a party to that transaction and instead acquired Optionable shares during the class period (on April 4, 2007).  *See* Helmig Moving Brief at 22. Plaintiffs acknowledge this point and then conveniently forget about it. PB2 at 13. Plaintiffs also make no attempt to defend their allegation that Optionable made a materially false statement in the 10-KSB when it stated that Helmig qualified as "'independent' within the meaning of Marketplace Rule 4200." The CAC does not allege, nor could plaintiffs prove, that Helmig failed to meet the NASDAQ definition, which is the only statement Optionable made.

(i) motive to defraud BMO (BMO makes no complaint here) or the over-the-counter bulletin board market on which Optionable's shares were traded, or (ii) opportunity to do so, it relies exclusively on two inferences. The first is based upon a closed chapter in Cassidy's history, and the second is a rather dramatic stretch precariously balanced upon rumored friendships and relationships which, even if they existed, are demonstrative of nothing. Under *Tellabs,* "the court must take into account plausible opposing inferences." Given that plaintiffs have failed to plead any facts to support their wild accusations, such allegations deserve no more credit than the contrary inference: that the individual defendants' conduct was intended to serve Optionable's best interests. The Complaint fails to overcome the more logical inferences of nonfraudulent intent; i.e., that Cassidy (and the other individual defendants) believed in the company's business model. Indeed, Cassidy's actions – including his May 7, 2007 purchase of 55,000 shares of OPBL, as disclosed on an SEC Form 4 – suggest this far more plausible inference.

> ### d. Allegations Supporting Scienter On The Part Of O'Connor Are Absent.

Plaintiffs' inability to meet the applicable scienter standards as to O'Connor has reduced them to seeking evil in a mundane irrelevancy – O'Connor helped Robert Moore's son get a summer job at Capital Energy, in which O'Connor was a shareholder. PB3 at 19. This triviality hardly suggests an ongoing fraudulent relationship to carry out a convoluted scheme aimed at helping BMO traders hide substantial trading losses. Personal friendships arising from business relationships are too common a circumstance to support securities fraud allegations. *See, e.g., In re Mobil Telecomm. Techs. Corp. Sec. Litig.*, 915 F. Supp. 828, 838 & n. 7 (S.D. Miss. 1995) (no duty to disclose obvious); *Sulzer v. Associated Madison Cos., Inc.*, No. 84-576-Civ-342, 1985 WL 5856, at * 3 (M.D. Fla. May 10, 1985) (no duty to disclose fact which would be obvious to ordinary investor).

Plaintiffs have failed to plead any specific facts showing that O'Connor, or any defendant, participated in or was aware of any alleged mispricing scheme.[8]  Moreover, plaintiffs have not alleged that O'Connor's involvement with Cassidy in Sleepy Hollow Coffee Roasters, Inc. or Capital Energy shows that O'Connor knew or recklessly disregarded facts concerning alleged mispricing. Additionally, plaintiffs' have improperly asserted in their opposition, but not in the CAC, that the SEC is conducting an investigation of Sleepy Hollow, when plaintiffs' source provides simply that the SEC looked at Optionable's relationship with Sleepy Hollow, which was disclosed in Optionable's 10-KSB.[9]  CAC ¶ 50; PB3 at 19. *See Southwick Clothing*, 2004 WL 2914093 at *6-7.  Plaintiffs cannot claim that the individual defendants *must* have known of the allegedly fraudulent scheme because of their status as officers and directors of Optionable.  A blanket "*must have known*" allegation based solely upon a "high level position[]" by itself is insufficient to allege fraudulent conduct on the part of an officer or director.  *See, e.g., Harrison v. Rubenstein*, No. 02-Civ-9356, 2007 WL 582955, *7 (S.D.N.Y Feb. 26, 2007).

### e.    The CAC fails as to Boisseau.

Allegations of motive and scienter are non-existent as to Boisseau, who never served as a director of Optionable or bought or sold Optionable securities.  His status as CFO is not enough to justify his presence as a party. *Id.* Plaintiffs attack Boisseau by asserting that he allegedly failed to disclose Cassidy's convictions and adequately explain the BMO effect on Optionable's revenue.

---

[8] In fact, plaintiffs' allegations of a mispricing scheme ignore the undisputed fact that BMO's transactions executed by Optionable and its portfolio position were cleared through NYMEX with each trade marked-to-market on a daily basis, providing BMO with a daily portfolio valuation.  Thus, valuations apparently provided to BMO by Optionable were only one of the many sources BMO could rely upon to mark its book to market. *See New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 497 F.3d 109, 111 (2d Cir. 2007) (discussing process of "marking-to-market"), *aff'g* 389 F. Supp. 2d 527 (S.D.N.Y. 2005).

[9]    The 10-KSB (at 35) fully discloses the relationship between Sleepy Hollow and Optionable.

As noted, Item 401 of the SEC's requirements did not require a disclosure about Cassidy's past. Even if Section 302 of SOX imposed a more rigorous requirement (it does not, nor do plaintiffs cite authority for that proposition, PB3 at 18), plaintiffs fail to allege facts demonstrating that Boisseau himself actually knew about Cassidy's history. Almost conceding that plaintiffs would not be able to establish scienter as to Boisseau under Pre-SOX cases (PB3 at 18-19), plaintiffs appear to be arguing that SOX imposes strict liability, yet plaintiffs fail to cite a single case suggesting that is so.

As to BMO, plaintiffs fail to allege facts demonstrating that any statement by Boisseau was actually false or misleading. Indeed, they charge him with knowledge not only of Optionable's financial situation but also that of BMO, arguing that it "strains credulity" that "the financial shenanigans, including the massive mispricing of options for the Company's largest client to conceal losses . . . were not known to [Boisseau]." PB3 at 20. It is plaintiffs' argument that "strains credulity." The level of knowledge plaintiffs seek to impose upon Boisseau bears no relationship to the law, which explains why plaintiffs cite none. Plaintiffs' claims against Boisseau fail as a matter of law.

## IV.    The CAC Fails To Allege Misrepresentations In The May 1, 2007 Conference Call Or The May 9, 2007 Press Release.

As Optionable's briefing makes clear (Moving at 17-19; Reply at 4-6), the 10-KSB fully disclosed customer concentration risk, the possible reduction in counterparty transaction volume if BMO ceased to be a customer, and the contribution to earnings from NYMEX's volume-based incentive payments. 10-KSB at 20-23. The 10-KSB therefore advised investors about the contingency which unfortunately came to pass: the loss of the BMO account, causing a loss of counterparty volume and a reduction in NYMEX volume-based incentive payments. Despite this disclosure, plaintiffs pointlessly pillory Helmig about one comment in the May 1, 2007

conference call -- "There is no counterparty [risk], because they're clear transactions" -- when it is clear that remark was entirely true, *New York Mercantile Exch., Inc. v. Intercontinental Exchange, Inc.*, 323 F. Supp. 2d 559, 562 (S.D.N.Y. 2004), *aff'd* 497 F.3d 109, 111 (2d Cir. 2007) (cleared transactions have no counterparty risk), and therefore not actionable. *Barios v. Paco Pharm. Serv., Inc.*, 816 F. Supp. 243, 252 (S.D.N.Y. 1993). Nor can Helmig be faulted for *not* delving into the entirely separate issue – whether the loss of BMO would cause a drop in *counterparty* transaction volume -- a risk which, again, was fully disclosed in the 10-KSB. *In re Hunter Envtl. Servs., Inc. Sec. Litig.*, 921 F. Supp. 914, 920 (D. Conn. 1996) (no material omissions where defendant gave "more than ample warning" in SEC filings).[10] The May 9, 2007 press release is also not problematic because it made a true statement about a single aspect of Optionable's business – "brokerage and execution" – and again did not stray into other operational subjects. Surely a fraud claim cannot be premised upon an outside director's failure to comment upon internal operational issues with which he is not familiar.

Finally, the comment attributed to Helmig in a May 8, 2007 article (CAC ¶ 30) was given *before* BMO's May 8, 2007 announcement; indeed it addresses the range of possible consequences if BMO were to withdraw its business from Optionable. Plaintiffs make no attempt to allege that his comment was intentionally false when made. In fact, obtaining new business to replace BMO was indeed one "extreme scenario," just as an opposite "extreme scenario" was implied – that Optionable might not be able to replace BMO's sales volume. The CAC at ¶ 31 fails to state a claim based upon this remark because it qualifies as puffery, *see*

---

[10]    Given the adequacy of Optionable's disclosures on customer concentration and its implications, plaintiffs gain nothing by pointing out that Helmig was a former vice-chair of NYMEX "where he would have come to understand NYMEX incentive awards." PB2 at 4, n.3. It took no special knowledge to understand Optionable's disclosures about the way in which NYMEX "incentive awards" worked – an increase or a decrease in transaction volume caused a corresponding increase or decrease in its NYMEX incentive payments.

Optionable Reply at 7-8, and plaintiffs' argument is premised upon "fraud by hindsight," which courts universally reject. *In re NTL*, 347 F. Supp. 2d 15, 26-27 (S.D.N.Y. 2007); *In re Sierra Wireless*, 482 F. Supp. 2d at 373.

### V.    There Is No Colorable Section 20A Insider Trading Claim.

Because plaintiffs' Section 10(b) and Rule 10b-5 claims fail, there is no liability against the founding shareholders under Section 20A. *See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255 (S.D.N.Y. 2007) (heightened pleading requirements of PSLRA and Rule 9(b) apply to claims of insider trading); *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 364 (S.D.N.Y. 2005) (no liability under 20A absent adequately pleaded insider trading claim).

Plaintiffs argue that the trades were contemporaneous with the passing of "[t]itle, right or interest to the shares . . . [when] they were formally transferred." PB3 at 13-14. Plaintiffs, however, offer no citation for this argument, which makes little sense in the context of a Section 20A claim. The purpose of the statute is to protect only those who might actually have traded with the insiders and who could have bought defendant's actual shares. *See, e.g., Buban v. O'Brien*, No. C 940331, 1994 WL 324093, at *2 (N.D. Cal. June 22, 1994) (citing *Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88, 95 (2d Cir. 1981); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999). Here, plaintiffs could not have bought the founding shareholders' shares on April 10, 2007, because the founding shareholders had entered into a binding agreement to privately sell their shares to NYMEX on January 22, 2007, three months earlier. *See* Optionable Reply at 8.

Plaintiffs argue that the private versus open market trade distinction is immaterial. *See* PB3 at 14-15, relying on *Moskowitz v. Lopp*, 128 F.R.D. 624, 635 (E.D. Pa. 1989), which found that an "option trader is injured by insider trading in the underlying shares since the price of the option is directly related to the price of the stock." In citing *Moskowitz*, plaintiffs appear to

argue that any trading by an insider that has any effect on the open market prices creates 20A liability, even if plaintiff and defendant did not trade in the same "space." But *Moskowitz* was not a Section 20A case. In *Moskowitz* the plaintiff exercised an option to purchase shares contemporaneously with the defendant's sale and therefore could have purchased the defendant's shares. Here, because plaintiff Boyer could not have purchased the founding shareholders' shares, they were not contemporaneous investors in securities of the same class. 15 U.S.C. § 78t-1(a); *see also Buban*, 1994 WL 324093, at *2 (citing *Wilson*, 648 F.2d at 95); *In re Oxford Health Plans, Inc.*, 187 F.R.D. at 143.

Plaintiffs undermine their own argument in citing *Clay v. Riverwood Int'l Corp.*, 157 F.3d 1259 (1999), *aff'd* 157 F.3d 1381, which provides that insider trading allows an unfair advantage over other traders "in the same market." Here, the founding shareholders and Boyer were *not* in the same market. Closing on the January 22, 2007 private contract at a discount to the market had no transactional nexus with Boyer's open market trade three months later (April 10, 2007). *See Clay*, 964 F. Supp. at 1570 (plaintiff had no standing to sue for insider trading where executives exercised stock appreciation rights because there was no transactional nexus). Also, the reported volume on April 10, 2007 was 861,100 shares, *not* over 10 million shares, indicating that the market treated the transaction as a discrete private deal. Bongiorno Dec., Ex. 6. Moreover, Cassidy *bought* 55,000 more shares of Optionable stock on May 7, 2007, a purchase which further undermines a scienter argument as to Cassidy. Gelber Aff. Ex. A.

VI.    **Plaintiffs' Section 20(a) Claim Is Inadequately Pleaded.**

Because plaintiffs' Section 10(b) and Rule 10b-5 claims fail, their Section 20(a) control persons claim must also fail. *ATSI Communications, Inc. v. Shaar Fund, LTD.*, 493 F.3d 87, 108 (2d Cir. 2007); *see also SEC v. First Jersey Secs., Inc.*, 101 F.3d at 1472-73 (for a 20(a) claim plaintiff must "show a primary violation by the controlled person."). A Section 20(a) violation

requires facts from which it can be inferred that the defendant exerted actual power or influence over the controlled person. *See Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96-Civ-3231, 1998 WL 167330 at *13 (S.D.N.Y. Apr. 8, 1998). Lacking such facts, plaintiffs lump the individual defendants together by broad generalizations based upon their status as executives and/or board members, but fail to allege specific events reflecting the exercise of actual control by any of the individual defendants over anyone engaged in wrongdoing. PB2 at 24. Pleading mere *status* as an officer or director is not enough. *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 21 (S.D.N.Y. 1999). Thus, plaintiffs' Section 20(a) claims against the defendants should be dismissed with prejudice.[11]

## VII.    Facts Supporting Loss Causation Are Absent

Plaintiffs argue that loss causation *cannot* be decided on a motion to dismiss, PB3 at 2, though their own cases say otherwise. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) (complaint was dismissed on a Rule 12(b)(6) motion for failing to plead loss causation); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) (same). In *Lentell*, the court noted that loss causation "is a fact-based inquiry and the degree of difficulty in pleading will be affected by circumstances, *but our precedents establish certain parameters*." 396 F.3d at 174 (emphasis added). For example, "unwarranted deductions of fact are not admitted" as true on a Rule 12(b)(6) motion. *Id.* at 174-175. Thus, a plaintiff's loss causation allegations must have a factual basis because conclusory allegations of fraud are insufficient.

As set forth in Optionable's Reply at 7, plaintiffs' reliance upon *Suez Equity Investors,*

---

[11] Further, as to Helmig, all of the allegedly false statements addressed in the CAC were before he first assumed an executive position and became involved in Optionable's day-to-day activities. For the same reason, plaintiffs have failed to allege requisite control on the part of Helmig because they cannot allege that he had the "power to direct or cause the direction of the management and policies" until he assumed an executive position on May 11, 2007, one business day before the close of the putative class period. *SEC v. First Jersey Sec. Inc.*, 101 F.3d at 1473.

*L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) misses the mark. Unlike in *Suez*, there was no omission of a material fact sufficient to plead loss causation because there was no concealment that could have foreseeably caused Optionable's business to fail.

## CONCLUSION

For all of the foregoing reasons, defendants Mark Nordlicht, Kevin Cassidy, Edward J. O'Connor, Albert Helmig and Marc-Andre Boisseau respectfully submit that the Consolidated Amended Class Action Complaint should be dismissed with prejudice and without leave to amend as to each of them.

DATED:        New York, New York
              April 22, 2008

CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP


By:____*/s/ Eliot Lauer*_____
        Eliot Lauer
101 Park Avenue
New York, New York 10178-0061
T:  (212) 696-6192
F:  (212) 697-1559

*Attorneys for Defendant Mark Nordlicht*


MCCORMICK & O'BRIEN, LLP


By:____*/s/ Liam O'Brien*_____
        Liam O'Brien (LO-3930)
Jeffrey B. Silverstein (JS-4818)
42 West 38th Street, Suite 701
New York, New York 10018
T:  212-286-4471
F:  212-504-9574
*Attorneys for Defendant Edward O'Connor*

LAWRENCE R. GELBER, ATTORNEY AT LAW


By:____*/s/ Lawrence R. Gelber*_____
        Lawrence R. Gelber
34 Plaza Street East
Suite 1107
Brooklyn, New York 11238
T:  (718) 638-2383
F:  (718) 857-9339

*Attorneys for Defendant Kevin Cassidy*

EDWARDS ANGELL PALMER & DODGE LLP    CONNELL FOLEY LLP


By:____*/s/ Laurie E. Morrison*_____    By:____*/s/ Peter J. Pizzi*_____
       Laurie E. Morrison           Peter J. Pizzi
750 Lexington Avenue    888 Seventh Avenue
New York, NY 10022-1200    New York, NY  10106
T:  (212) 912-2916    T:  (212) 262-2390
F:  (212) 308-4844    F:  (212) 262-3118

- and -    *Attorneys for Defendant Albert Helmig*

John L. Reed
Michael J. Maimone
919 North Market Street, 15th Floor
Wilmington, DE 19801
T:  (302) 425-7114
F:  (302) 777-7263

*Attorneys for Defendant Marc-Andre Boisseau*